# HAFETZ & NECHELES LLP
ATTORNEYS AT LAW

10 EAST 40TH STREET, 48TH FLOOR
NEW YORK, N.Y. 10016
TELEPHONE: (212) 997-7400
TELECOPIER. (212) 997-7646

September 7, 2018

**VIA ECF**
Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

    Re:    *United States v. Raniere, et al.*, 18-cr-204 (NGG)

Dear Judge Garaufis:

    We write on behalf of Defendant Clare Bronfman pursuant to the Court's invitation to submit additional briefing regarding her bail conditions. Tr. 23, 25, 27-28, 38.[1] The terms of her release are as follows:

- Ms. Bronfman's appearance is secured by a $100 million bond, signed by two close family members, and by $50 million in assets, including $8 million of US real estate owned by her sister. ECF No. 106 at 1-3.

- Ms. Bronfman is confined to her home 24 hours a day, with the exception of attorney visits and three 90-minute breaks per week coordinated with Pretrial Services. Tr. 10-11.

- Ms. Bronfman "may not directly or indirectly associate or have contact with, except in the presence of her attorneys, current or former employees, or independent contractors, of or for NXIVM, including any and all of the related entities; current or former members of DOS, or with any individual who [i]s currently or was formerly on the stripe path, subject to reasonable exceptions agreed upon by the parties." Tr. 37-38.[2]

    Ms. Bronfman respectfully requests that the Court rescind or modify the no-contact provision. As we have previously explained, Ms. Bronfman agrees not to contact her co-

---

[1] "Tr." refers to the transcript of the bail hearing held on August 21, 2018.

[2] The restriction on contact with current or former members of DOS applies only to those individuals whose membership is known to Ms. Bronfman. Tr. 38.

1

defendants outside the presence of counsel. Tr. 16. She has no interest in contacting any individual who expresses a desire not to be contacted by her. Tr. 15, 36. However, Ms. Bronfman has been involved with NXIVM for 16 years, and many of her closest friends are on NXIVM's "stripe path" or were NXIVM employees or contractors.[3] ECF No. 106 at 5-6; Tr. 28-29. She should be allowed to contact those individuals outside the presence of counsel. If the government has a compelling interest in restricting Ms. Bronfman's contact with particular NXIVM-affiliated individuals—which thus far it has not demonstrated—it should be required to identify those individuals and seek a more narrowly tailored no-contact order.[4]

A.  *The Court Must Carefully Scrutinize the No-Contact Provision for Compliance with the Bail Reform Act and the Constitution*

The government does not dispute that any restriction on Ms. Bronfman's ability to associate with others must be "narrowly tailored," in part to "protect [her] constitutional rights." Tr. 18; ECF No. 112 at 3-4. But because the government fundamentally misunderstands what that means, the underlying reasons for this narrow tailoring requirement require explanation.

Under the Bail Reform Act, the Court "may at any time amend [its bail] order to impose additional or different conditions of release." 18 U.S.C. § 3142(c)(3). "While the challenged condition is currently in place," Ms. Bronfman "do[es] not bear the burden of persuading the Court that the challenged condition is inappropriate." *United States v. Lillemoe*, No. 3:15-CR-00025 (JCH), 2015 WL 9694385, at *1 (D. Conn. May 28, 2015). Rather, the Bail Reform Act favors release on a personal recognizance bond to conditional release, just as it favors conditional release to pretrial detention. *See United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). The government has the burden of proving, by a preponderance of the evidence, that Ms. Bronfman presents a "serious risk" of flight or obstruction of justice. 18 U.S.C. § 3142(f)(2); *see also Sabhnani*, 493 F.3d at 75; *United States v. Friedman*, 837 F.2d 48, 49 (2d Cir. 1988); *United States v. Schlegel*, No. 06-CR-550, 2008 WL 11338900, at *2 (E.D.N.Y. June 13, 2008) (government "retains the burden of proof" on application to modify condition of release). If the government satisfies that burden, the Court must impose "the *least restrictive* . . . condition, or combination of conditions, that [it] determines will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(c)(1)(B) (emphasis added). The "least restrictive condition" requirement is of critical importance. Conditions designed to "'guarantee' community safety and the defendant's appearance" go too far, as the Court "cannot require more" than a "reasonable assurance" against flight or danger. *United States v. Orta*, 760 F.2d 887, 891-92 (8th Cir. 1985) (en banc); *accord United States v. Xulam*, 84 F.3d 441, 444 (D.C. Cir. 1996).[5]

---

[3] Ms. Bronfman is currently 39 years old; her association with NXIVM began when she was approximately 23.

[4] We understand that the Court would be open to revisiting the issue of home confinement in a month or two (Tr. 10-11) and we intend to make another application to lift that condition later this fall.

[5] Similarly, "[t]he Eighth Amendment to the Constitution states that '[e]xcessive bail shall not be required.'" *Sabhnani*, 493 F.3d at 74-75 (quoting U.S. Const. amend. VIII). This means that bail conditions cannot be "excessive . . . 'in light of the perceived evil'" they are intended to address. *United*

HAFETZ & NECHELES LLP

  The presumption against restrictive bail conditions takes on even greater importance where those conditions burden constitutional rights in addition to the defendant's general interest in liberty. No-contact provisions, in particular, "implicate[] the First Amendment right of association." *United States v. Arzberger*, 592 F. Supp. 2d 590, 603 (S.D.N.Y. 2008). The "freedom of association" encompasses "two distinct" rights: "expressive association" and "intimate association." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-18 (1984).

  The right to "expressive association" is "implicit in the right to engage in activities protected by the First Amendment," and it protects the individual's ability to "associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Id.* at 622. This right protects Ms. Bronfman's communications with other individuals affiliated with NXIVM. As the government acknowledges, NXIVM is an educational organization that offered "self-help programs" and "classes based on [Keith] Raniere's teachings." ECF No. 52 at 2. This is more than sufficient to implicate the freedom of expressive association, which protects every "form of expression, whether it be public or private." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000). The abridgment of that expression—"even if in pursuit of a compelling government objective—is justified only if there is no less restrictive means of achieving that end." *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 997 (2d Cir. 1997). Thus, any no-contact requirement must be designed with caution, since inadequate "[p]recision" is unconstitutional. *Id.*; *see also Arzberger*, 592 F. Supp. 2d at 604 (First Amendment requires "particularized determination" before imposing "no-contact condition"); *Lillemoe*, 2015 WL 9694385, at *2-3 (same).

  The no-contact requirement also burdens Ms. Bronfman's right to "intimate association," which protects her "choice to 'enter into and maintain certain intimate human relationships [without] undue intrusion by the State.'" *Matusick v. Erie Cty. Water Auth.*, 757 F.3d 31, 57 (2d Cir. 2014) (quoting *Roberts*, 468 U.S. at 617-18) (alteration in original). While the Second Circuit has not yet "decide[d] whether the right to intimate association extends to friendships," *Patel v. Searles*, 305 F.3d 130, 136 (2d Cir. 2002), other Courts of Appeals have held that "[p]ersonal friendship is protected as an intimate association." *Akers v. McGinnis*, 352 F.3d 1030, 1039-40 (6th Cir. 2003); *see also Maydak v. United States*, 363 F.3d 512, 516 (D.C. Cir. 2004) (holding that "photographs of prisoners visiting with family, friends, and associates depict the exercise of associational rights protected by the First Amendment"); *cf. Walker v. Henderson*, 239 F.3d 366 (5th Cir. 2000) (unpublished) (noting that "the Supreme Court has reasoned that friendships may also merit constitutional protection"); *Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1221 (9th Cir. 2012) (holding that "[t]he roommate relationship easily qualifies" as a protected "intimate association"); *Davis v. City of New York*, 902 F. Supp. 2d 405, 443 (S.D.N.Y. 2012) ("relationships with . . . family and close friends are entitled to substantial constitutional protection"); *Steinbach v. Branson*, No. 1:05CV101, 2007 WL 2985571, at *15 n.10 (D.N.D. Oct. 9, 2007) ("an arbitrary denial of visitation with family and close friends, arguably, infringes upon the fundamental right to intimate association"). And with good reason: it is inconceivable that the government may forbid a person from seeing her friends without compelling justification. Ms. Bronfman has been involved with NXIVM for 16 years, and as we previously explained to the Court, many of Ms.

---

*States v. Polouizzi*, 697 F. Supp. 2d 381, 395 (E.D.N.Y. 2010) (quoting *United States v. Salerno*, 481 U.S. 739, 754 (1987)); *see also id.* at 388-90.

3

HAFETZ & NECHELES LLP

Bronfman's closest friends are affiliated with NXIVM. The no-contact provision effectively bars her from communicating with these individuals during the incredibly stressful and isolating experience of criminal prosecution. The personal toll on Ms. Bronfman has constitutional weight, and it, too, underscores the importance of narrowly tailoring any no-contact provision.

Indeed, courts are required to respect defendants' freedom of association when setting conditions of supervised release. Even in that context—in which the defendant has been convicted of a crime and is no longer presumed innocent—any deprivation must be "narrowly tailored to serve a compelling government interest." *United States v. Myers*, 426 F.3d 117, 125-26 (2d Cir. 2005); *see also United States v. Jacques*, 321 F.3d 255, 266 (2d Cir. 2003) (noting the "constitutional difficulties [that] could arise if the associational condition [of supervised release] were construed to interfere with [the defendant's] relationship with her family").

### B.     *The No-Contact Provision Must Either Be Rescinded or Significantly Narrowed*

The no-contact provision is unjustified and, at a minimum, dramatically overbroad. Ms. Bronfman is unable to associate with a large swath of individuals currently or formerly affiliated with NXIVM—an organization that is not a criminal enterprise, as the government concedes (ECF No. 112 at 4), and that has been a core component of Ms. Bronfman's life for well over a decade. The provision must therefore be pared down or rescinded to comply with the law.

1.     <u>There is no compelling interest justifying the no-contact provision.</u>

The arguments presented by the government do not even remotely justify the no-contact provision. The government claims the provision is necessary to prevent Ms. Bronfman from intimidating potential witnesses that she knows through NXIVM, but the government has presented *no* evidence of any risk of witness tampering or obstruction of justice. Nor do the allegations of the indictment (of which Ms. Bronfman is presumed innocent) suggest any such risk, since Ms. Bronfman is not charged with forced labor, sex trafficking, extortion, or any crime of violence.

The government repeatedly points to Ms. Bronfman's so-called "abusive litigation" as proof of a risk of obstruction, but we have already refuted this argument, and the government evidently has no response.

- In its initial brief, the government argued that Ms. Bronfman compiled information on NXIVM adversaries (including the damage they caused and crimes they committed against NXIVM, which the government provides no reason to question) and pursued litigation against them. ECF No. 52 at 9-10.

- In response, we explained that (1) the alleged conduct predates the first arrests in this case and therefore does not show any intent to influence this proceeding, and (2) Ms. Bronfman only took action against adverse parties through lawyers and within the bounds of the law, raising colorable and even meritorious claims that several courts have adjudicated in favor of Ms. Bronfman and NXIVM. ECF No. 106 at 4; *see also* Tr. 14-15. We further demonstrated that taking legal action and collecting information about

4

witnesses is entirely proper and does not demonstrate a risk of obstruction. ECF No. 106 at 5 (citing *United States v. Persico*, 376 F. App'x 155, 157 (2d Cir. 2010); *United States v. LaLonde*, 246 F. Supp. 2d 873, 875 (S.D. Ohio 2003)).

- The government did not even *attempt* to address these arguments. All it has done is reiterate its baseless and conclusory accusation of "harassment, coercion, and abusive litigation." ECF No. 112 at 4. This is not a legitimate argument, has no legal basis, and cannot serve as a basis for bail conditions.

Imposing restrictions on Ms. Bronfman because of her entirely legitimate involvement in litigation would violate her First Amendment right to access the courts and petition for the redress of grievances. The "right to petition" protects all but "sham" litigation, which is not alleged here (let alone proved). *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 525-26 (2002). Bail conditions undoubtedly have the potential to infringe that right. *See United States v. Janis*, 820 F. Supp. 512, 513-14 (S.D. Cal. 1992) (order pursuant to § 3142 requiring MCC to facilitate pretrial detainee's access to the courts for civil litigation). Here, Ms. Bronfman has no intention of suing any potential witness and, as we have already offered (Tr. 18), is willing to agree not to sue anyone in connection with NXIVM as a condition of her release. It is utterly impermissible, however, to impose restrictions on Ms. Bronfman because of her previous involvement in litigation, which is constitutionally protected activity. *Cf. Lozman v. City of Riviera Beach, Fla.*, 138 S. Ct. 1945, 1949 (2018) ("[T]he First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech.").

The Court correctly declined to consider the August 21, 2018 letter submitted to the Court by attorney Neil Glazer purportedly on behalf of several anonymous former NXIVM members who claim to have been "terrorized" by litigation financed by Ms. Bronfman. Tr. 11. It bears repetition, however, that the letter's allegations (1) are totally conclusory, devoid of evidence, and entitled to zero weight and (2) come from self-interested unidentified parties who may obtain a litigation-related advantage from any burden imposed on Ms. Bronfman and, by their own admission, are themselves the subject of criminal charges and investigations. Moreover, if these individuals do not want Ms. Bronfman to contact them, Ms. Bronfman will readily agree not to do so, as we have already offered (Tr. 15). Plaintiff's counsel cites no instance of any unwanted direct contact from Ms. Bronfman, because there has been none—a broad no-contact order is unnecessary. The individuals whom Ms. Bronfman has supposedly targeted can easily apply to the Court or the government for specific protection if they feel it necessary. And those who wish to remain anonymous will presumably report whatever Ms. Bronfman says to their zealous counsel in the extremely unlikely event that Ms. Bronfman contacts them. (Again, if they do not want further contact, they can simply say so, and she will desist.)

While the Court did not opine on the relevance of Ms. Bronfman's past litigation, it did identify Ms. Bronfman's wealth as a reason to cut her off from her NXIVM contacts. Tr. 31-32. We respectfully submit that Ms. Bronfman's weath is an impermissible factor to even consider with regard to whether she is entitled to the same protection of her rights to association as other citizens. *United States v. Dreier*, 596 F. Supp. 2d 831, 831-32 (S.D.N.Y. 2009) ("[A]ny citizen—good, bad, indifferent, famous, infamous, or obscure—may call upon the courts to

**HAFETZ & NECHELES LLP**

vindicate his constitutional rights and expect that call to be honored."); *cf. Roberts v. LaVallee*, 389 U.S. 40, 42 (1967) (it is "repugnant to the Constitution" to deny rights "based upon the financial situation of the defendant"). Ms. Bronfman's contacts cannot be limited based on speculation that her wealth alone (irrespective of her actions) will somehow be seen as intimidating by prospective witnesses. Any testifying witness will have to face Ms. Bronfman in open court anyway, and there is no suggestion (nor could there be) that Ms. Bronfman will use her wealth to improperly influence any witness before trial.

The no-contact provision therefore serves no legitimate purpose and should be rescinded.

2.   The no-contact provision is dramatically overbroad.

Even if there were some merit to the government's concerns (which there is not), they could not possibly justify the scope of the no-contact provision.

The no-contact provision bars Ms. Bronfman from contacting a wide range of individuals currently or formerly affiliated with NXIVM. The likely number of covered individuals ranges from several hundred to over a thousand. Tr. 19. Only a miniscule fraction of these are potential witnesses. Consequently, for the vast majority of covered individuals, there is no government interest whatsoever in restricting contact with Ms. Bronfman, and the no-contact provision is clearly overbroad and unconstitutional in its current form.

If the government wants to prevent Ms. Bronfman from contacting its potential witnesses, the government should provide a list of these witnesses so that the no-contact provision can be more narrowly tailored.[6] *Cf. Schlengel*, 2008 WL 11338900, at *7 (specifying individuals on no-contact list). While the government might prefer not to give the defendants a witness list, it is the government's burden to justify the conditions of release, *see id.* at *2, and it cannot evade its statutory and constitutional obligations by shifting the burden to the defendant. The Bail Reform Act expressly requires the Court to impose "the *least restrictive* . . . combination of conditions" to "reasonably assure" against flight or danger. 18 U.S.C. § 3142(c)(1)(B). Nothing in the text of the Act allows the Court to impose more onerous conditions of release simply so the government can keep the defendants in the dark about its case against them.

It is no answer to say that Ms. Bronfman can request the government's consent to contact specific individuals. This improperly shifts the burden to Ms. Bronfman to justify her need to communicate with a given individual, even if the government has no legitimate interest in preventing those communications in the first place. It also improperly requires Ms. Bronfman to identify her close friends to the government, which can then use that information in its investigation even if it vetoes her request. Ms. Bronfman has serious concerns that identifying the individuals she wants to associate with will expose them to unwanted attention from the government and hostility from third parties. From what we understand, at least two individuals whose names have been raised in connection with bail conditions for the defendants in this case have been shortly thereafter approached by the FBI at their homes; other individuals whose

---

[6] For example, the government has identified Ms. Bronfman's bookkeeper as a potential witness. Ms. Bronfman does not at this time challenge the restriction that she not have contact with this individual outside the presence of counsel.

HAFETZ & NECHELES LLP

names have surfaced (or could be determined even if not stated on the record) in bail proceedings have been publicly identified on anti-NXIVM websites or been investigated by their employers. Ms. Bronfman should not be required to expose her friends and acquaintances to this sort of scrutiny in order to communicate with them.

It is also no answer to say that Ms. Bronfman is free to meet with these individuals in the presence of counsel. Unless the communications involve some matter relevant to her defense, which most will not, there is nothing that would justify the presence of a lawyer. Ms. Bronfman's legal counsel cannot reasonably be expected to supervise her daily life while preparing for trial, and Ms. Bronfman cannot reasonably be expected to pay for such services. The no-contact provision is therefore, as a practical matter, a complete bar on communicating with her close friends.

Accordingly, if the Court does not rescind the no-contact provision, it should require the government to identify by name the specific individuals it wants to shield from unsupervised contact with Ms. Bronfman and narrow the provision to cover only those individuals.

Respectfully submitted,

/s/

Kathleen E. Cassidy

cc:   AUSAs Moira Kim Penza, Tanya Hajjar (via ECF)
      All defense counsel of record (via ECF)