1      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF NEW YORK
2

3 ------------------------------------X
             :
4 UNITED STATES OF AMERICA,  :
             : 18-CR-00204 (NGG)
5            :
      v.     : 225 Cadman Plaza East
6            : Brooklyn, New York
             :
7 RANIERE, et al.,    : September 18, 2018
             :
8      Defendants. :
 ------------------------------------X
9

10   TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
     BEFORE THE HONORABLE VERA M. SCANLON
11      UNITED STATES MAGISTRATE JUDGE

12
 APPEARANCES:
13
 For the Government:    TANYA HAJJAR, ESQ.
14           MOIRA KIM PENZA, ESQ.
           United States Attorney's Office
15          Eastern District of New York
           271 Cadman Plaza East
16          Brooklyn, New York 11201

17 For Defendant Raniere:  MARC A. AGNIFILO, ESQ.
           TENY ROSE GERAGOS, ESQ.
18          Brafman & Associates
           767 Third Avenue
19          New York, New York 10017

20          PAUL DerOHANNESIAN, II, ESQ.
           DANIELLE RENEE SMITH, ESQ.
21          DerOhannesian & DerOhannesian
           677 Broadway, Suite 707
22          Albany, New York 12207

23

24         (Appearances continue on next page.)

25

 Proceedings recorded by electronic sound recording,
 transcript produced by transcription service

```
 1                                                                    2

 2

 3    APPEARANCES CONTINUED:

 4
      For Defendant Mack:          WILLIAM F. McGOVERN, ESQ.
 5                                 Kobre & Kim LLP
                                   800 Third Avenue, Floor 6
 6                                 New York, New York 10022

 7    For Defendant Russell:       JUSTINE A. HARRIS, ESQ.
                                   AMANDA RAVICH, ESQ.
 8                                 Sher Tremonte LLP
                                   90 Broad Street, 23rd Floor
 9                                 New York, New York 10004

10
      For Defendant Nancy
11       Salzman:                  ROBERT SOLOWAY, ESQ.
                                   Rothman, Schneider, Soloway &
12                                    Stern, P.C.
                                   100 Lafayette Street, Suite 501
13                                 New York, New York 10013

14    For Defendant Bronfman:      SUSAN R. NECHELES, ESQ.
                                   KATHLEEN ELIZABETH CASSIDY, ESQ.
15                                 Hafetz & Necheles LLP
                                   10 E 40th Street, 48th Floor
16                                 New York, New York 10016

17
      For Defendant Lauren
18       Salzman:                  HECTOR DIAZ, ESQ.
                                   Quarles & Brady, LLP
19    (Telephonically)            Two North Central Avenue
                                   Phoenix, Arizona 85004
20

21
      Court Transcriber:           SHARI RIEMER, CET-805
22                                 TypeWrite Word Processing Service
                                   211 N. Milton Road
23                                 Saratoga Springs, New York 12866

24

25
```

3

1   (Proceedings began 12:33 p.m.)

2            THE COURT:  Criminal Cause for a Status Conference,

3   Case No. 18-CR-00204, <u>United States v. Keith Raniere, Allison</u>

4   <u>Mack, Clare Bronfman, Kathy Russell, Lauren Salzman, and Nancy</u>

5   <u>Salzman</u>.

6            Counsel, can you state your name for the record

7   starting with the Government?

8            MS. HAJJAR:  Tanya Hajjar and Moira Penza for the

9   Government.  Good afternoon, Your Honor.

10           MS. PENZA:  Good afternoon, Your Honor.

11           THE COURT:  Okay.

12           MR. AGNIFILO:  Good afternoon, Marc Agnifilo, Paul

13   DerOhannesian next to me.  I have Teny Geragos, and I have

14   Danielle Smith, and we're all for Keith Raniere.  Good

15   afternoon, Judge.

16           THE COURT:  Afternoon.

17           MR. McGOVERN:  Good afternoon, Your Honor; Bill

18   McGovern for Allison Mack.

19           MS. HARRIS:  Good afternoon, Your Honor; Justine

20   Harris and Amanda Ravich for Kathy Russell.

21           MR. SOLOWAY:  Hello, Your Honor; Robert Soloway for

22   Nancy Salzman.

23           THE COURT:  And your late appearance is why?

24           MR. SOLOWAY:  I'm sorry, Your Honor?

25           THE COURT:  Your late arrival?

1          MR. SOLOWAY:  Yes, I apologize, Your Honor.  I was

2   in the Southern District for a conference before Judge

3   Schofield, and I ran over here after that.  I was also in a

4   conference at 9:30 before Sterling Johnson, so I ran to the

5   Southern District to do that and ran back here to do this.  I

6   really apologize though.

7          THE COURT:  I won't ask you which district you

8   prefer.

9          Yes.

10          MS. NECHELES:  Good afternoon, Your Honor; Susan

11   Necheles and Kate Cassidy for Ms. Bronfman.

12          THE COURT:  Okay.  And on the phone?

13          MR. DIAZ:  Your Honor, Hector Diaz for Lauren

14   Salzman appearing telephonically.  Good afternoon.

15          THE COURT:  All right.  Good afternoon.  Okay.  So

16   we had a very brief conference last week to have you all talk

17   and see if you could resolve some of your -- ideally all of

18   your e-discovery issues.

19          So, one, did you have the meeting, and, two, can I

20   get an update on where we stand with issues?

21          MS. HAJJAR:  Yes, Your Honor, we did at the Court's

22   direction meet with defense counsel after last week's

23   conference.  We listened to some of defense counsel's specific

24   requests and priorities.  It's worth noting I think that not

25   all defense counsel have the same list of priorities, but it

5

1   was significant I think for the Government to hear those

2   lists.

3            There are two large time-consuming tasks that are

4   ahead of us.  The first is the very significant number of

5   electronic devices that are seized from two properties in

6   Clifton Park, New York, and the other is a privilege review on

7   several electronic devices that we can begin because at our

8   request defense counsel provided a list of attorneys for their

9   clients.  And so we can engage our firewall team to begin that

10  review.

11           The defense counsel for Nancy Salzman also indicated

12  which devices seized from her residence she intended to assert

13  a privacy interest and which devices she intended to assert a

14  privilege which makes things considerably easier for us.  We

15  did learn that these -- we did hear from Ms. Salzman's

16  attorney last night, and so the Government will be taking

17  steps today to implement some of the searches based on what

18  defense counsel has provided.

19           We again are seeking to prioritize devices used from

20  the residence for which no defendant is asserting a privacy

21  interest.  We expect to make those electronic devices

22  available in full -- discovery copies available for early

23  access to all the defendants by the end of next week.  And --

24           THE COURT:  And how many is that?

25                   [Pause in proceedings.]

6

```
 1              MS. HAJJAR:  Your Honor, I think it's 10 devices
 2    from that residence which we expect to make available in full.
 3              THE COURT:  Okay.  And that -- you said the end of
 4    next week so we're looking at 9/28?
 5              MS. HAJJAR:  Yes, at the end of next week, Your
 6    Honor.
 7              THE COURT:  Okay.
 8              MS. HAJJAR:  And in the interim, we can also provide
 9    devices seized from Nancy Salzman's residence that -- for
10    which she's not asserting a privacy interest.  The Government
11    also --
12              THE COURT:  Just so I keep track of this.
13    There's -- that's additional devices?
14              MS. HAJJAR:  Yes.
15              THE COURT:  Okay.  How many is that?
16              MS. HAJJAR:  There were two devices, Your Honor --
17              THE COURT:  Okay.
18              MS. HAJJAR:  -- that Ms. Salzman indicated she was
19    not asserting a privacy interest in.
20              THE COURT:  Okay.
21              MS. HAJJAR:  I should note, Your Honor, although I'm
22    giving the Court an estimate of the number of devices, the
23    numbers -- the data on those devices vary widely, and so if
24    Your Honor would like we can -- we can put in a letter
25    attempting to break out the data associating the -- in terms
```

1  of, you know, gigabytes or terabytes.  That may be --

2         THE COURT:  I think we're moving in that direction.

3  But the ones that are open I guess it's not really that

4  relevant, right?

5         MS. HAJJAR:  The ones that -- I'm sorry, Your Honor?

6         THE COURT:  The ones that you've talked about that

7  are going to be produced for open discovery, the 10 and the 2.

8         MS. HAJJAR:  Yes, but just to note, Your Honor,

9  that --

10         THE COURT:  Okay.

11         MS. HAJJAR:  -- the larger the device the more time

12  it takes in terms of processing and the more -- just the more

13  voluminous the discovery.  But I'll just note that for the

14  Court.

15         THE COURT:  All right.  Do you have a number

16  associated with those?

17         MS. HAJJAR:  No, I was -- but we can provide the

18  Court and the parties with those numbers.

19         THE COURT:  Okay.

20         MS. HAJJAR:  The other request the Government made

21  at the meet and confer last week was that should the

22  defendants choose to do so one thing that would move the

23  process more quickly with respect to the privilege review is

24  for defense counsel to, if they are willing, prepare a

25  privilege log to provide to the firewall AUSA in assisting

8

1    with reviewing those materials for potentially privileged

2    items and for, you know, further discussions on the privilege

3    side.  That may make things move faster, and we've made that

4    request.  We haven't yet heard what defense counsel has chosen

5    to do, but that will -- that would be -- you know, in the

6    interests of moving expeditiously I think that would be a

7    significant way to move things forward.

8             THE COURT:  So what would that involve just to

9    educate me on that front?  Is it --

10            MS. HAJJAR:  We've provided full native copies of

11   the devices for which defense -- defendants are asserting a

12   privilege so full copies of a -- of a cellular telephone and

13   email addresses.  And so, you know, to the extent counsel are

14   willing to do this they would review the contents for

15   potentially privileged materials and make a log of what

16   those --

17            THE COURT:  Okay.

18            MS. HAJJAR:  -- precisely what that privilege is

19   with which -- with which attorney.  And whether the privilege

20   is being asserted in that individual's personal capacity or as

21   a -- or on behalf of NXIVM or pursuant to some joint defense

22   agreement.

23            THE COURT:  Okay.  I suggest I know -- and maybe

24   I'm just still catching up, everybody has a copy of their own

25   device.  Is that where you're at?

9

1          MS. HAJJAR:  Yes, with the exception of Ms. Nancy

2     Salzman's because of the volume of materials for which she has

3     asserted a potential privilege and because the Government only

4     received yesterday a amended list of devices for which she

5     said there could be privileged materials.

6          THE COURT:  Okay.

7          MS. HAJJAR:  So we're working with those materials,

8     but they're significantly more voluminous in Ms. Salzman's

9     case.

10          THE COURT:  Okay.  So it -- would you be able to

11     give me a list that tells me who has how many devices or the

12     size of the device?

13          MS. HAJJAR:  Yes.

14          THE COURT:  Okay.  All right.  Does that account for

15     all the devices?

16          MS. HAJJAR:  These are the -- these are the devices

17     for which the -- that are the largest, Your Honor.

18          THE COURT:  Okay.

19          MS. HAJJAR:  And thus in the Government's view will

20     take the most time to sort through and search.  Cognizant that

21     privilege reviews take time and can be difficult because the

22     Government team, the primary review team, cannot begin that

23     search until the privilege review has been completed.  And so

24     these are the -- in the Government's view the most

25     time-consuming and significant undertakings in the discovery

1    process.

2            THE COURT:  Okay.  Is there other information?

3            MS. HAJJAR:  Your Honor, the Government's happy to

4    answer any questions the Court or the parties have, but that's

5    where we are.  We did -- we did indicate to defense counsel --

6    the Government reached out to Mr. Agnifilo in a -- in an

7    effort to try to adjourn this conference in an -- because it's

8    been only two days since the parties met and conferred --

9            THE COURT:  That's okay.

10           MS. HAJJAR:  -- in the Government's view -- I'm

11   sorry?

12           THE COURT:  That's okay.  I wanted to see you, so

13   even if he agreed you'd still be here.  So look at it as

14   somewhat of an educational process for me.

15           All right.  I should have asked for all the

16   defendants, your clients' waive their appearance?

17           MR. AGNIFILO:  For Mr. Raniere, that's true.

18           THE COURT:  Everybody?

19           MS. HARRIS:  Yes, Your Honor.

20           MR. SOLOWAY:  Yes, for Nancy Salzman, also, yes.

21           MS. NECHELES:  Yes, on behalf of Ms. Bronfman.

22           MR. McGOVERN:  And for Ms. Mack as well.

23           THE COURT:  Okay.  All right.

24           MR. DIAZ:  And yes for Lauren Salzman, Your Honor.

25           THE COURT:  Sorry.  Yes, you have to tap every so

1    often so I remember.  Okay.  All right.

2              Defense counsel.

3              MR. AGNIFILO:  I think first of all, thank you, Your

4    Honor, and good afternoon.  We really echo the Government's

5    comments.  I thought the meet and confer that we had after the

6    conference with you was very productive.  We got a chance to

7    understand a little more from them on the volume and the

8    devices.  And I think they heard from us areas where we might

9    be able to help, frankly, and lift some of the objections

10   which has already started to happen and prioritize within what

11   sounds like a mountain of information they still have to go

12   through, kind of prioritize within that mountain.            So

13   for example, we learned that I think the bulk of the data that

14   they need to review comes out of the Clifton Park residences,

15   and I think -- and others can sort of add any detail that I

16   leave out, others on the defense team, but I think we are --

17   we're of the view that that's maybe the least relevant

18   information for us.  It includes a whole lot of videotape

19   recording that we don't think is going to be directly relevant

20   to our defense.

21             Doesn't mean we don't ultimately want it, but in

22   terms of prioritizing what I'd try to point the Court to and

23   hopefully point the Government to are search warrants that

24   were executed very early on in the case over Lauren Salzman's

25   iPod account back in December of 2017, and those search

12

1  warrants were used to get -- the search warrant results were

2  used to get a search warrant with respect to Keith Raniere's

3  accounts.  And I think those two buckets of data if you will

4  are probably the most important to us, and they've been

5  pending the longest.  And so I think if we can -- to the

6  extent we can work with you and work with the Government to

7  kind of shift the priorities so that we can really get started

8  on building our defense based on the discovery, that would be

9  helpful.

10         And last point is I think the concept of a schedule

11  I think we probably all agree would be useful just so we're

12  talking about the same things.  We've put together our own but

13  we want to make sure it matches theirs and that you have the

14  benefit of that as well.

15         THE COURT:  Okay.  So I think it would be helpful

16  for me to hear your general or particular concerns then come

17  back, hear from the Government, and talk about then the dates

18  that we're talking about.  Okay.

19         MS. NECHELES:  Susan Necheles, Your Honor.

20         THE COURT:  Yes.

21         MS. NECHELES:  Your Honor, we did think, you know,

22  about the -- had given some thought to the idea of a privilege

23  log and how to do this.  And it seems that, you know, when the

24  Government seizes electronic material and email accounts,

25  they're required to run a search on it.  They're only allowed

13

1   to seize whatever is in the warrant, what's responsive to the

2   warrant, so they copy the entire material, take everything

3   back, and then they have to run searches.  Only the stuff that

4   is responsible to -- for the searches needs to be looked at

5   for whether there is any privileged material in there.

6          So there is this massive stuff, and it seems like if

7   the Government -- you know, if we could get sort of the

8   searches and, you know, then we could address that --

9   everybody could address their own issue.  Right now the

10  Government has been calling discovery copies -- although I

11  don't really understand the term, but the discovery copies

12  they call is everything they see, the whole computer that they

13  copied.  And they give that -- they have to give that back to

14  whichever defendant they took it from.

15         But out of that there's only a small portion that

16  will be responsive to the warrant, and so it seems like they

17  could run their searches without reviewing the material, give

18  that to us, and then we could see exactly what it is that we

19  would be -- you know, I mean instead of having a whole

20  computer to try to go through and figure out is there a

21  privilege log that we could do you would have what's

22  responsive.  It's how you would do it if there were a

23  subpoena.  If I got a subpoena and was responding to it and I

24  would only do a privilege log for what was actually

25  responsive, not to everything on my client's computer I

1  wouldn't create a privilege log -- or everything in their

2  email account.

3           So that's -- it seems like it would make more sense

4  to do it since the Government is obligated and I would assume,

5  for example, for those two email accounts that they've had for

6  over a -- or since 2017 and that they've already used to

7  obtain other search warrants where they must have done the

8  searches that they were required to do by the search warrants.

9  And so we should be able to obtain those or at least whoever's

10 account it was to be able to obtain it.  Keith Raniere, who I

11 don't think had -- I don't know if he's asserted privilege --

12 should be able to obtain -- you know, we should be able to

13 obtain those already and be able to look at those for whether

14 there's anything responsive.  I just think it would be a

15 better process.

16           And then we would also ask for just the timetable

17 for when they expect the other searches to be accomplished.

18           THE COURT:  All right.  We'll come back to the

19 schedule later on.

20           Okay.  You're really going to have to deal with me,

21 explain the mechanics of how this works because -- for the

22 Government.

23           MS. HAJJAR:  Yes, Your Honor, we cannot do what Ms.

24 Necheles is suggesting.  Just to be clear, the process of

25 searching these three of four -- apart from Nancy Salzman's

15

1  devices which are voluminous -- but the other email address

2  for privilege, the -- sorry, the process of searching them

3  generally has begun.  However, once the Government is on

4  notice or receives a request for an assertion of privilege,

5  that process stops, and in order to respect the privilege

6  that's in place and not to taint the primary team, we halt the

7  search and first have a firewall AUSA review for privilege.

8  And then the responsiveness search continues.

9       But that doesn't mean that the privilege log that we

10  are asking defense counsel to complete needs to be of the

11  entirety of the device.  Counsel has identified -- counsel for

12  Mr. Raniere and counsel for Ms. Bronfman have identified

13  attorneys and attorney lists and domain names.  And so what we

14  have proposed to do is to segregate, to run those searches

15  through the raw data, segregate out potentially privileged

16  materials because they constitute communications with those

17  attorneys, and the remainder can go immediately to the primary

18  team review, that's Ms. Penza and I.  We can continue our

19  search and produce materials from that batch of

20  not-potentially privileged materials.

21       As to the potentially privileged back, that is the

22  batch that -- for which it would be extremely efficient if we

23  were to receive additional information about the nature of the

24  privilege and the privilege asserted and for which Ms. Shannon

25  Jones, another AUSA, will be reviewing to see whether those

1  materials are in fact privileged.  But we cannot search that

2  material for responsive to the warrant without having -- I

3  mean we cannot now having received an assertion of privilege

4  continue to search.

5          THE COURT:  Okay.  So can we get back to Ms.

6  Necheles?

7          MS. NECHELES:  Your Honor, so --

8          THE COURT:  My understanding is what the Government

9  says.  I don't -- I'm not sure how the mechanics of what

10 you're asking for would happen.

11         MS. NECHELES:  Well, that's fine.  So the

12 Government -- it sounds like it's two tracks.  One track is

13 they are reviewing the materials or they separated out the

14 privileged stuff.  So put the privileged stuff --

15         THE COURT:  Well, they haven't done that yet.

16         MS. NECHELES:  Well, that should take about 10

17 minutes.  I mean it's running names through a computer and

18 just saying -- and those get put into a different box by a

19 computer.  Nobody's doing this by hand.  And so -- and then

20 that gets sent over to a different group.  It's no longer

21 being searched, and --

22         THE COURT:  Okay.  So sorry.  So you've provided all

23 of your --

24         MS. NECHELES:  Yes.

25         THE COURT:  -- everybody that you're going to claim

17

1    as privileged?

2        MS. NECHELES:  Weeks ago.  Weeks ago.

3        THE COURT:  Okay.

4        MS. HAJJAR:  May I?

5        THE COURT:  Yes, go ahead.

6        MS. HAJJAR:  May I just respond to that?

7        THE COURT:  Uh-huh (affirmative.)

8        MS. HAJJAR:  Just to clarify, we have received lists

9    of attorneys from Ms. Bronfman, Mr. Raniere, but only

10   yesterday did we receive from Ms. Nancy Salzman and Ms. Lauren

11   Salzman.  And so the -- but in theory, yes, the data can be

12   segregated.  But the -- we are -- we have engaged a

13   third-party vendor in order to do this efficiently, and we

14   intend to produce the materials in a format that defense

15   counsel can upload it to whatever reviewing platform they wish

16   to use, Relativity or Concordance.  And the -- there is a bit

17   of processing time in all of that, and so it -- that's not the

18   primary issue.  But it's --

19       THE COURT:  Okay.  We're back to scheduling.  I just

20   want to understand the mechanics.  So you're not necessarily

21   on a different page if I understand for -- Ms. Necheles, your

22   client, you believe you -- the version of the privilege log

23   which would be basically identifying the communications that

24   you think would be privileged, you've already provided that

25   information?

1            MS. NECHELES:  We provided the names.

2            THE COURT:  The names of the attorneys?

3            MS. NECHELES:  Yes, so --

4            THE COURT:  And there's no other privilege, nobody

5   else that the Government should know about?

6            MS. NECHELES:  And we've said to the Government if

7   you run across anything else that looks privileged, we're not

8   waiving it, but those are the names.

9            THE COURT:  Okay.

10           MS. NECHELES:  We've given all the names that we

11  could think of, and presumably those will end up in a separate

12  bucket.  Now in that separate bucket, I don't -- you know, if

13  it's only 10 names -- or 10 items, well, then, of course we

14  could go through them if the Government told us these are the

15  ones that have come up and here is what you should look at,

16  you know.  I mean I guess it's going to depend on how

17  voluminous that is.  So -- but it doesn't really -- shouldn't

18  impact the timing of everything else because --

19           THE COURT:  Because you're saying there's not --

20  your assumption is there's not that much that's privileged.

21           MS. NECHELES:  Oh --

22           THE COURT:  That vast majority needs to be searched?

23           MS. NECHELES:  There might be a lot privileged.

24           THE COURT:  Okay.

25           MS. NECHELES:  But still, it's so much data that the

1  Government has seized that I think that even if it's a lot, if

2  it were 10 percent of what it was that would be surprising to

3  me.  You know, the Government will still have all of this

4  other data that they can be searching for what is responsive.

5  They can also -- the tag team can also just run searches on

6  what's privileged to see -- I mean there may be 1,000 emails

7  with lawyers -- I'm just making that number up.  And if you

8  ran the searches, maybe only 10 of them will be responsive to

9  the searches.

10          So you don't have to create a privilege log for

11  every attorney's -- but that's sort of a separate -- we can

12  talk about protocol with the tag team about how to review that

13  and, you know, rather than going through and trying to figure

14  out everything at first.  It's only relevant for things that

15  they have the right to search or to seize.  The Government

16  doesn't have the right to seize every email.  They only have

17  the right to seize emails that fit within the warrant, and

18  presumably they're looking by search terms for what is

19  responsive to the warrant.

20          And so then the question is when will be getting all

21  of the other material?  So put aside the privileged materials,

22  even the other materials, they have to be running search terms

23  or, you know, determining what's responsive and giving us some

24  of that stuff which we're saying is so old I would assume

25  they've already done that. Because they've already used some

1  of that material, they must have at least already started

2  doing those searches or completed the search.  So that's what

3  I think we are -- you know, once the searches are done it's

4  just mechanics of how, you know, sending it off to a discovery

5  vendor who will then make copies of that.  That can't take

6  very long.  It's really the only thing that I think that takes

7  time here is the searches, and so that's really where we need

8  a sort of time estimate when that will take place.

9         THE COURT:  All right.  Other defense counsels'

10 concerns?

11        MS. HARRIS:  Your Honor, no specific concern, I just

12 want to note that on behalf of Kathy Russell there have been

13 no email accounts.  We talk about all defendants having their

14 own emails or devices.  There have been none produced to us

15 that were seized from her so that I just didn't want the

16 record later to suggest that everyone had been in the same

17 position.  We haven't given the list of attorneys only because

18 it hasn't -- the issue hasn't become ripe and may never become

19 ripe.  But I just note that for the record.

20        THE COURT:  Okay.  Anybody else?  Any concern,

21 anybody?

22    (No audible response)

23        THE COURT:  Okay.  All right.  So we're back to the

24 Government.

25        MS. HAJJAR:  Your Honor, the -- we have produced a

1  subset of Mr. Raniere's emails.  I take the point that there

2  are some material that have been seized that are more --

3  likely to contain more relevant materials than others, and I

4  appreciate defense counsel pointing to those -- to specific

5  items that they believe contain the most potentially, you

6  know, significant material.  The two items that were mentioned

7  are Mr. Raniere's email addresses, a subset has been produced.

8  But again, the privilege review process has to take place on

9  those materials.

10        As to Ms. Salzman -- Ms. Lauren Salzman's iPod

11  account, the Government made efforts, early efforts, to just

12  expedite access to that by making it available in full to

13  defense counsel.  However, the Government received a late

14  objection by counsel for Ms. Salzman asserting privilege and

15  objecting to that full disclosure which is -- which is fine,

16  and the Government will search it and conduct a privilege

17  review.  But that process just takes time, and so we are going

18  to make best efforts do to that quickly.  But there is a

19  privilege process in place, and that needs to be completed

20  before we can continue.

21        THE COURT:  Okay.  If I -- you just have to excuse

22  me if this is a basic question but as I understand, there's a

23  culling out the privileged information both from devices and

24  email accounts, right?  That's one thing.  You have gotten for

25  those individuals who have a privilege issue or anticipate

22

1  that they do, do you have the names from everybody?

2           I understand, Ms. Harris, your client doesn't have

3  this.

4           Has everybody else provided you with the names that

5  would trigger that -- the identification of privileged

6  materials?

7           MS. HAJJAR:  As of yesterday, yes.  However, we had

8  asked for the domain names for those law firms from Ms. Nancy

9  Salzman.  We expect to get them, but we haven't yet.

10          THE COURT:  Okay.

11          MS. HAJJAR:  So that's just one -- just one caveat

12  there.

13          THE COURT:  So if I understand this process

14  correctly you would or your colleague would run the searches

15  and segregate that material from the vast -- what we

16  anticipate is the vast majority of the material; is that

17  right?

18          MS. HAJJAR:  Yes, although I'll note it's not clear

19  at all that that would be -- the vast majority would be

20  non-potentially privileged.  We just don't know.  But that --

21          THE COURT:  Okay, speculation possibly.

22          MS. HAJJAR:  Yes.

23          THE COURT:  What is that -- how much time?  What

24  does that involve?

25          MS. HAJJAR:  In terms of the -- just this process of

23

1   segregation, Your Honor, it does not -- that does not take

2   time.

3               THE COURT:  Okay.

4               MS. HAJJAR:  The -- one moment, Your Honor.

5               THE COURT:  Sure.

6                         [Pause in proceedings.]

7               MS. HAJJAR:  I was just reminded that that is true

8   for the email accounts that we are talking about.  That may

9   not be true for the number of devices that were seized from

10  Ms. Nancy Salzman's residence.  Those are far more voluminous

11  but may not contain the same -- may not contain

12  attorney-client correspondence.  And so focusing on the email

13  addresses, the segregation of data does not -- is not the

14  time-consuming process.  The next step is the time-consuming

15  process.

16              THE COURT:  Okay.  Just to get an estimate, how long

17  would it take to do the segregation part of the privilege

18  side, the privilege segregation for the emails -- email

19  accounts?

20              MS. HAJJAR:  As to Mr. Raniere and Ms. Bronfman's,

21  those can be completed by the end of the week I think.  As to

22  the remainder, that may take more time.  I'll just note, Your

23  Honor, that we've -- we have engaged a third-party vendor to

24  assist in processing these materials.  They have been giving

25  us updates on the material -- on how long it would take to

24

1    process and to run search terms, et cetera.  But I'll just

2    note that does depend on the volume that we're talking about,

3    and so we've been told that Ms. -- one of Ms. Nancy Salzman's

4    devices, a laptop, constitutes 1.3 terabytes.  So that will

5    take significantly longer, but for Ms. Bronfman's email

6    address, email account, and Mr. Raniere's email account that

7    should not take that much time.

8              THE COURT:  So the segregation you think could be

9    done by the end of this week?

10             MS. HAJJAR:  Yes.

11             THE COURT:  Okay.  Do they have any estimate on what

12   running these privilege searches would be on the devices?

13   I -- so I understand your suggestion is maybe the defense

14   counsel can help, but if you were doing -- running the names

15   that you've been given or the domain names that you've been

16   given on the device, do you have any idea what that involves?

17             MS. HAJJAR:  Your Honor, do you mean reviewing those

18   materials for privilege or do you mean just simply --

19             THE COURT:  Just step one, separating it out so that

20   we have some idea that you are -- the other team is dealing

21   with 5 percent, 10 percent, 50 percent of the data.

22             MS. HAJJAR:  That can be done by next week as well,

23   that -- those running the searches and segregating the data.

24   As to -- again, as to Ms. Bronfman and Mr. Raniere's email

25   accounts which are far -- in terms of volume far less than Ms.

1  Salzman's.  So just to be clear, with Ms. Bronfman's email

2  account and Mr. Raniere's email account, which are -- which is

3  not that voluminous in terms of amount of data, those searches

4  and the data can be segregated by the end of next week.  That

5  is not true --

6           THE COURT:  So next week, okay.  Okay.  But what

7  about the other materials that you have, the segregations

8  which I understand to be step one?

9           MS. HAJJAR:  Your Honor, we need more time to answer

10  that question.  There is a significant number of devices that

11  Ms. Nancy Salzman asserted a privilege over.  I don't have --

12  you know, we don't have those numbers right now, and we

13  don't -- and therefore we cannot give an estimate on behalf of

14  the vendor in terms of how long it will take to process all

15  that data and segregate the data.  We will have those numbers,

16  but we don't right now.

17           THE COURT:  When do you expect to get those numbers?

18  And just -- I mean really maybe explaining to me the most

19  basic, but is the difference she has email, she has text, she

20  has video, she has things that I don't even know exist?  But

21  is that -- and some things can be searched easily and some

22  things can't be?  Is that part of this or --

23           MS. HAJJAR:  That may be part of it, but I think the

24  other part of it is simply technical in terms of simply

25  getting that amount of data onto a searchable database is

1    itself an enormous undertaking.

2            THE COURT:  All right.  You have to fill me in.  Why

3    is that such an enormous undertaking?

4            MS. HAJJAR:  Because of the amount of data, Your

5    Honor.  Because of the amount of data to even get it to a --

6    on a database to permit searches and to permit the segregated

7    buckets of data.

8            THE COURT:  Now is there some way -- you know, if

9    you have -- like totally making these up, you have you said a

10   terabyte plus, it takes three days to move that from a device

11   to a server?

12           MS. HAJJAR:  That's --

13           THE COURT:  Or what are we talking about, this data

14   quantity?

15           MS. HAJJAR:  Your Honor, that's one -- that's a

16   single -- that's Ms. Nancy Salzman's laptops.  There are a

17   number of other devices that only yesterday were made clear to

18   us which ones her attorney was asserting a privilege and which

19   ones were not.

20           THE COURT:  Right.

21           MS. HAJJAR:  We will be able to get an estimate on

22   in terms of time, but part of the reason, Your Honor, that we

23   thought it -- you know, it made sense to receive additional

24   information from defense counsel as to which defenses they

25   intended to assert a privilege and which not is partly to be

1  able to --

2          THE COURT:  Prioritize this.

3          MS. HAJJAR:  -- apply the core to that.

4          THE COURT:  Right.

5          MS. HAJJAR:  We received this information at 8:00

6  p.m. last night, and so it's -- I -- we're just not in a

7  position to report that information to the Court or to inform

8  defense counsel.

9          THE COURT:  Do you have an estimate now that you

10 have the information that you -- okay.  Everybody can stay

11 seated.  It's really fine.

12         MS. HAJJAR:  In terms of how long it will take in

13 order to get an estimate of how long -- of --

14         THE COURT:  Yes, step one.  To -- because this all

15 is about scheduling, right?  You're on this incredibly tight

16 timeline given the volume that you have, but that's the

17 timeline you're on.  And trying to get a handle both for

18 defense counsel and you're planning and thinking about the

19 trial date, what is feasible here?  And --

20         MS. HAJJAR:  Your Honor, what we would suggest is to

21 submit a letter by the end of this week explaining exactly

22 what we know and what we don't know with respect to how long

23 it will take.

24         THE COURT:  Okay.  So that would be -- that

25 information would be, what, the -- what it will take to get

28

1    the information into a usable, stable state I guess on some

2    kind of server, whatever it is, and then run the searches that

3    segregate out names and domain names as best you can?  I mean

4    I -- I'm guessing, you correct me if I'm wrong, video creates

5    its own problem.  Now I don't know if there's any privilege

6    videos.  I don't really have no idea what that would be, but

7    it's theoretically there, I don't know.  So --

8            MS. HAJJAR:  The Government and counsel were

9    discussing just that at least week's conference, Your Honor.

10   They've requested that we specify what type of file type are

11   on some of these devices, we can -- we will make efforts to do

12   that, but before we can do that we need to be able to have our

13   firewall AUSA have an opportunity to review those devices for

14   which Ms. Nancy Salzman has asserted a privilege.  You know,

15   Your Honor, I wish we were able to give you a clear estimate

16   right now, but given the position we're in, given that we met

17   last week, and given we --

18           THE COURT:  All right.

19           MS. HAJJAR:  -- received attorney information last

20   night, we need a little more time to be able to give the Court

21   a -- information that will permit the Court to give a

22   realistic schedule.

23           THE COURT:  So you think you're -- when would you

24   have the information that you're talking about, the first

25   blush of what's on the devices and how you'd be going through

29

1  the segregation process?

2          MS. HAJJAR:  One moment, Your Honor.  We would

3  propose filing a letter early next week which I think will

4  allow us to give the best estimate we can -- the best estimate

5  available to us in terms of how long -- how long these

6  processes will take.

7          THE COURT:  Okay.  All right.  Let me go back to

8  defense counsel.  You're -- can you in any way -- are you

9  interested in any way in contributing to this privilege

10  segregation aspect?

11          MS. NECHELES:  So, Your Honor, these devices were

12  searched or seized, as I understand it, in November or March

13  of this year.

14          MR. AGNIFILO:  Which ones?

15          MS. NECHELES:  The ones from Nancy's --

16          MR. AGNIFILO:  March 27th --

17          MS. NECHELES:  March 27th.

18          MR. AGNIFILO:  -- 2018.

19          MS. NECHELES:  So it's -- what the Government is

20  saying is confusing to me because they seized them and then

21  they have an obligation to search them.  They can't just let

22  them sit there forever, so it would seem to me that they would

23  have already put them on a database.  I don't understand how

24  they search them if it's not in a database.

25          And then in addition, Your Honor, once there's the

1  database then as we said before segregating the stuff just

2  means running names through it and segregating.  Now obviously

3  that will not segregate the videos, but put those in a

4  different bucket, you know, because that's, as you said,

5  doubtful that they're really a privilege issue.  So --

6           THE COURT:  Speculation, but, you know.

7           MS. NECHELES:  Right, maybe but probably not.

8  Because if you're videoing a lawyer's meeting you're probably

9  not planning on [inaudible].  So, you know, put those in a

10  separate bucket.  But the -- everything else I would have

11  thought would be in a database or once you create the database

12  then it's quicker and easy to run the searches that you

13  segregate out.  Again, it's not -- we're not talking about

14  having to review that.  We're talking about producing to the

15  rest of us and to -- and all of that shouldn't have had to

16  wait for the list of the names of attorneys to create.  I --

17  that's why I -- when they --

18           THE COURT:  So I -- as I understand the question

19  there's really a question for an update from like -- or

20  information from the Government about the logistics question.

21  So from the Government we've been hearing that you -- with

22  your vendor there is some process that needs to happen because

23  you have these devices.  And maybe I incorrectly made an

24  assumption, but I thought you were still working from the

25  device and not from a database or a server stored set of

1   materials.  And defense counsel's speculating --

2            MS. NECHELES:  Just give me --

3            THE COURT:  -- asking that what happened between the

4   spring and here as to where the materials are.

5            MS. NECHELES:  Your Honor, just --

6            THE COURT:  Go ahead.  That's fine.

7            MS. NECHELES:  -- if I could -- just to be clear.

8            THE COURT:  You can have a seat.

9            MS. NECHELES:  When the Government comes to Your

10  Honor and asks for a search warrant, they tell Your Honor

11  we're going to make copies of these -- whatever we see there,

12  and then we'll take it back and we'll promptly do a search on

13  it for whatever Your Honor has authorized us to seize and we

14  will seize only that material.  Well, some of this stuff has

15  been -- Keith Raniere, they've had it since November of last

16  year.  Those searches should be done, you know, or at least

17  substantially done.  It -- and that's what we're asking.  Are

18  the searches done, and if so, why are we not being produced

19  right now?  Now if the searches are done and they need to run

20  another thing to segregate out whatever might be privileged,

21  okay, that -- that's fine.  But we should be what are the

22  dates that we should -- we'll begin using?  It's not like they

23  just seized all this material.

24            THE COURT:  Okay.  Again, I'm putting the -- we

25  don't understand yet -- I don't understand yet or know what is

1    the physical reality of what has happened and what needs to

2    happen before you can set a schedule.

3            So now back to the Government, basically a question

4    as where is the data given that you've had -- depending on

5    what we're -- which set of data we're talking about, a

6    moderate to, you know, fairly meaningful amount of time where

7    you theoretically had access to it?

8            MS. HAJJAR:  Yes, Your Honor.  So let me -- I think

9    there are -- there are different categories of data.  And I

10   also want to clear certain of the categories of data that Ms.

11   Necheles is referring to right now in terms of execution of

12   the search of that data, that is not any data that her

13   client -- her client is asserting any sort of privacy interest

14   or standing to challenge the way the Government has been

15   conducting its searches.

16           THE COURT:  Okay.  So without a chart telling me

17   exactly what we're talking about this gets -- starts to get a

18   little hard to follow as to who pocket of data we're talking

19   about.  So --

20           MS. HAJJAR:  So the -- so the only data in which the

21   Government understands Ms. Bronfman to be asserting a privacy

22   interest is on her email account.

23           THE COURT:  Okay.

24           MS. HAJJAR:  Her email account was seized in the --

25   was seized in the spring.  There was a search warrant in the

1    spring as to her email account.  There were some searches run

2    on her.  The search of her account began immediately, but her

3    account immediately did raise concerns about privilege.  Given

4    the timing of how this case has gone and given that the

5    Government understood it's an ongoing situation and that Ms.

6    Bronfman -- the Government knew Ms. Bronfman would be in the

7    case eventually at a certain point, the way that we decided to

8    deal with that set of data was to hold off on it --

9                THE COURT:  Okay.

10               MS. HAJJAR:  -- halt our search, and wait until we

11   did have a list of attorneys from Ms. Bronfman as to that

12   data.  Ms. Bronfman was only arrested on July 23rd.  We

13   received a list not long after that, and that process is well

14   in place in terms of being able to segregate the data and

15   continue our searches of her account.  So that is the only

16   account as to which Ms. Necheles and her client have any

17   standing to challenge anything about.  Now as to the bulk of

18   the data which is what we're --

19               THE COURT:  Well, what about Raniere so we get the

20   two emails?

21               MS. HAJJAR:  Sorry, that was in -- I believe that

22   was in November, the search warrant was in November.  Again,

23   search of that account began immediately and continued.  We

24   have continued that search.  The Government has produced a

25   subset of our search with the caveat that our search of that

1    email account was ongoing.  There were certain concerns in

2    producing that data in a format that would -- and this is

3    going to overlap slightly with what I talk about, the process

4    of what happens when data gets to the FBI.  There was a

5    concern regarding after we began producing materials to

6    counsel for Mr. Raniere and Ms. Mack when they were the only

7    two defendants in the case back in April, there became -- a

8    concern arose about the way the Government was producing the

9    data, that the data -- we didn't have metadata.

10            THE COURT:  Right.

11            MS. HAJJAR:  And it wasn't being produced in a Bates

12    stamp way that would be easy, that would be the way that going

13    forward would be useful for everybody at trial.  So the

14    Government -- and at that point no privilege concern was

15    raised by Mr. Agnifilo about Keith Raniere's email account.

16    That's -- we -- the Government then very much understanding we

17    also had all these other searches going on at the same time

18    and process going on, at that point in -- as -- in terms of

19    Keith Raniere's email account, the priority became finding a

20    vendor which is something that we did as to the other data as

21    well, and then at the time point of the superseding indictment

22    for the first time a privilege issue was raised.  So search of

23    the email account is halted.  We have no engaged a third-party

24    vendor.  Of course as Your Honor can imagine, we are the

25    Government and actually getting a process in place of engaging

1    a vendor is itself a time-consuming --

2              THE COURT:  Can I just make sure I understand?  So

3    you did not -- given the timing of Raniere assertion of

4    privilege you did not finish your search of his email?

5              MS. HAJJAR:  That is absolutely correct.

6              THE COURT:  Okay.  All right.

7              MS. HAJJAR:  So those are like -- those -- Your

8    Honor, those two accounts and those two accounts are the only

9    things -- so as to Mr. Raniere's email account, that is the

10   only thing as to which he is asserting privacy interest.  And

11   as to Clare Bronfman's email account, that is the only thing

12   she is asserting a privacy interest in.  So in terms of

13   concerns over how the Government is conducting its searches,

14   et cetera, those are the two accounts that they should be

15   discussing themselves.

16             MS. NECHELES:  Your Honor, can I just -- to be

17   clear, this has nothing to do with a privacy interest.  This

18   is Rule 16.  We are entitled to every other defendant's

19   materials that is responsive.  So that's why we're discussing

20   everything.  The Rule 16 issue -- or the privacy issue is

21   totally irrelevant.  We're entitled to everybody -- they've

22   all asserted they only want to produce to us what the

23   Government had the right to seize under the Fourth Amendment

24   what they were offering --

25             THE COURT:  Okay.  That's what I've heard so far is

36

1   the Government was moving along with its review, which is the

2   search that you are talking about.  But there was a privilege

3   issue raised and so it has not been completed.

4           MS. NECHELES:  But -- and what we're saying is put

5   aside the privilege.  Give us everything else that's

6   responsive to the searches.

7           THE COURT:  How do --

8           MS. NECHELES:  And we're entitled to everybody's.

9           THE COURT:  All right.  I don't know if we're

10  talking in circles.  I don't know how you do that without

11  segregating out the privilege information.

12          MS. NECHELES:  Yes, they can just run the privilege

13  searches on the databases that presumably --

14          THE COURT:  Okay.  We're having a -- we haven't

15  gotten up to that yet, but it's how they're going to do this.

16          MS. NECHELES:  Okay.  But the issue of whose --

17  whether I have a right to assert a privacy interest --

18          THE COURT:  Okay.

19          MS. NECHELES:  -- as to Keith Raniere, no, but I

20  have a right to get that stuff.  And I have a right to get it

21  promptly because it's Rule 16 material and I need it before it

22  can go to trial.

23          THE COURT:  Okay.

24          MS. HAJJAR:  Your Honor, the concern about --

25  together has -- so the Government now I think wants to turn to

1   the large bulk of material that really is the material that

2   creates a time-consuming process --

3           THE COURT:  I got it.

4           MS. HAJJAR:  -- that creates the complexity.  And

5   what the Government did -- which was in terms of beginning of

6   searches, the searches began within days of the search being

7   executed on Nancy Salzman's house and on 8 Hale Drive.  That

8   being said there -- that is a very time-consuming process.  We

9   are talking about 60-plus devices seized from those places.

10  We have -- there is a special unit within the FBI that needs

11  to process every single one of those pieces.  That is a

12  process that has been a very time-consuming process.  In the

13  interim, certain materials have been searched.  The searches

14  are ongoing.  There have been these halting issues based on

15  assertions of privilege.

16          But, Your Honor, we also -- there was also a

17  re-prioritizing based on what we were hearing from defense

18  counsel that they wanted it produced in a certain way.

19          THE COURT:  Right.

20          MS. HAJJAR:  And so the Government couldn't spend

21  time producing it one way just to reproduce it again a second

22  way.  So now we are -- now we are in a place where we have a

23  third-party vendor.  A lot of these issues are getting sorted

24  out.  And I think we will be in a better place to give time --

25  but searches do take time, Your Honor.  Searches for

38

1  responsive materials to warrants, especially when there have

2  been these kind of halting processes, those take time.  And so

3  there is still a ways to go here which is what we did stress

4  to Judge Garaufis.

5        THE COURT:  So -- just so I understand again, are

6  you physically in a position to start doing these searches, or

7  are we still talking about getting devices onto a database?

8        MS. HAJJAR:  We are still talking -- so there -- it

9  is a rolling process.  So material -- the way we have been --

10  again, part of -- part of the difficulty here is that the

11  Government did attempt to make everything available right

12  away.

13        THE COURT:  I understand, but everybody doesn't

14  agree, right.

15        MS. HAJJAR:  And so -- and that's fine, but we

16  didn't know that everyone didn't agree until weeks after we --

17  the -- weeks after we had requested hearing any objections.

18  So we thought we were operating in a way that they were going

19  to get all of this data at the end of last month.  So I do

20  want to be clear about that, Your Honor.

21        In terms of the actual process of getting the data

22  to -- it's going device by device, and so we are very much in

23  that process of getting material to our third-party vendor.

24  But it is a process, so it's a rolling basis.  And we will

25  continue both the privilege -- understand -- the privilege

39

1  segregation and our searches and production all on a rolling

2  basis now going forward.

3  　　　　　　　THE COURT:  Okay.

4  　　　　　　　MS. HAJJAR:  But there's not going to be a hard stop

5  that we can give as to when that will be complete.

6  　　　　　　　THE COURT:  Okay.  Again, think of this as an

7  educational question.  Is the point that it physically takes

8  time to run the different searches, or is it just that there's

9  just the three of you working on it?  Or you don't -- now, is

10  it one of these things where computers can only run the

11  searches so much or the human power that you have working on

12  this can only do so much of a review reasonably?  What is the

13  -- I don't yet understand what the constraints are.

14  　　　　　　　MS. HAJJAR:  Well, of course there's always the

15  human power element.  But here what we are talking about in

16  the very first instance is an actual difficulty.  Like

17  actually taking it days to move data from one place to another

18  to another.  And so we engaged in that process as to a lot of

19  devices in this effort to provide everything in fall.  Then

20  that doesn't work.  And so now we have to do the same process

21  with our vendor.  They take -- again, I do not want to be held

22  to any of these estimates, but that takes days per device to

23  get --

24  　　　　　　　THE COURT:  So just so I understand, you basically

25  had to start again by moving to a vendor?  Just so we get --

1            MS. HAJJAR:  So this is to put it on to a reviewing

2    platform in order to produce it in a way that we understand

3    the defendants and the Government --

4            THE COURT:  Can use it.

5            MS. HAJJAR:  -- thinks will be the most useable way

6    of having the data.

7            THE COURT:  Okay.  So you have the physical

8    challenge of getting it onto whatever the platform is and

9    you're somewhere in that process but it's not complete.  Then

10   you're going to have to do what we're talking about running

11   the searches.  There's the privilege piece of it.  You're

12   going to segregate out some information.  You're going to do

13   that using the data points which appear to be mostly

14   attorneys' names and the law firm or the attorney's domain

15   names and look for that.  You're going to pull that out.  Now

16   at the point where defendant's counsel is asking the search,

17   basically have the searches to decide what's responsive to the

18   search warrant been done at all or what their estimate would

19   be.  And I assume there's a difference between the email and

20   the devices.

21           MS. HAJJAR:  There is, Your Honor.  And again, the

22   Government at this point does not want to be cabined into

23   certainly how we are going to be doing our searches.  I know

24   Ms. Necheles is saying search terms but there are different --

25           THE COURT:  Are there ways -- and this again --

41

1          MS. HAJJAR:  There are.  There are other ways that

2    the Government wants to make sure it's within the bounds of

3    its search.  It's a very careful process.  Certainly, it's

4    often been done without search terms.  Search terms are

5    certainly something that the Government is considering.  But

6    we have to make sure that we are adhering to the warrant and

7    complying with other obligations that we have.  So we are --

8    that is a process that will take time because once you run

9    searches you find out X term hits on a million things.  And so

10   then you have to revise your searches.

11         THE COURT:  Right.

12         MS. HAJJAR:  And then we don't want to hear down the

13   road oh well you used this term and that term really wasn't

14   within the scope of the warrant.

15         THE COURT:  All right.  So that's like a normal e-

16   discovery problem that happens, but it's a problem.

17         MS. HAJJAR:  It's a process.  It's a long process.

18   It's not just you run the searches, dump everything --

19         THE COURT:  Hang on.  Just have a seat.  I want to -

20   - because we're going to -- go ahead.

21         MS. HAJJAR:  Run the searches.  I think what Ms.

22   Necheles is almost suggesting is we should come up with a list

23   of searches, run those searches, and then just dump all of

24   that to the defendants.  And I think down the road she would

25   be challenging that at a suppression hearing.  So we have to

42

1   do a little bit of due diligence in terms of making sure that

2   the process that we are applying is going to --

3        THE COURT:  I think the position is slightly

4   different which is this case has been -- even though there

5   have been these production bumps along the way, has been on

6   for a while and how to be sure that there's sufficient

7   physical resources, I mean like computer power, and the vendor

8   services, and either FBI and/or attorney time put into this to

9   start pushing out this data to figure out whatever's

10  responsive.  That's I think the bigger question of how does

11  this get done and does it make a difference, you know, if

12  there's only one person working on it or two persons working

13  or three, or you know, what's appropriate, right?  If you were

14  to -- if there's just one of you, we can be here until next

15  year.  It would be an enormous project.  If you have two, if

16  you have three -- but at some point adding people doesn't

17  help.  Right?  I mean so this is somewhat of a dynamic answer

18  but their fundamental point is there's a search warrant.  The

19  search warrant should be executed and you take what you're

20  allowed to take and that's it.  And then the case goes on with

21  that information or trying -- moving towards getting the

22  schedule but trying to understand what needs to be done for

23  you to get through that process.

24        MS. HAJJAR:  Your Honor, we do propose to submit

25  something to the Court and to the parties to apprise them of

43

1    the process.  But I just want to note that it matters whether

2    this is an email account for which the Government or the

3    reviewer has to go email by email or, as Mr. Raniere's counsel

4    has pointed out, it's a hard drive with videos of various

5    speeches or meetings.  Those are different things and they

6    take -- it depends -- it's very much a review process.

7    Depends on the type of file and how it's hosted.  And so we

8    also want to be clear that while searches -- this process of

9    getting it up to a searchable database is for things like

10   emails or other items that we are going to review document by

11   document.  So that's one bucket of material.  Not everything

12   needs to be hosted that way and we have had a conversation

13   with defense counsel about videos or audio files.  That

14   doesn't need put on this, on a relativity or concordant

15   database.  So part of the difficulty in estimating the time it

16   will take is, even from our perspective figuring out how best

17   to get these materials over because this is not a case where

18   there's been an image of several cell phones and that can just

19   be turned over in PDF form.  We are doing it in a form for

20   which the Government and defense counsel can review properly.

21            THE COURT:  Where we are now is there's kind of a

22   fundamental tension between the physical reality in the labor

23   intensive piece that you're talking about which both of you

24   are leading and then your colleague's doing the privilege part

25   of it and the trial dates and all of that.  And this is the

44

1  beginning of the process of trying to figure out how to sync

2  those.  So you may have these physical challenges but the

3  defendants have other rights, so I'm trying to see where this

4  goes.

5           Okay.  Anything else I need to know right from the

6  Government, then hear from defense counsel and come back to

7  you?

8           MS. HAJJAR:  I don't believe so, Your Honor.

9           THE COURT:  Okay.  Who wants to --

10          MR. McGOVERN:  Bill McGovern for Allison Mack.  I

11 don't really want to dwell on looking backwards but I think

12 the frustration you're hearing from us is all of these issues

13 were entirely foreseeable.  It's not the first big electronic

14 discovery case this office has done or presumably these --

15          THE COURT:  Well, I mean --

16          MR. McGOVERN:  So I just wanted --

17          THE COURT:  The big fork in the road of the

18 Government position which so far sounds understandable is they

19 were thinking they were working on more than open file

20 situation amongst all of you and they're not.  And that is a

21 real change in detour.

22          MR. McGOVERN:  I mean we asserted I think rights

23 that every defendant would assert in a case like this.  I

24 think it's entirely foreseeable that the defendants wouldn't

25 want to waive their attorney-client privilege or their privacy

45

1  rights.  I think it happens in every case.  We were the party

2  just on the Bates stamping that in the early part of the

3  production we realized we were getting a mass of information

4  that wasn't really on a format that we thought would be

5  useful.  We raise that issue because again, we've always

6  received documents in that format.  We never anticipated it

7  would be kind of -- we'd hear six months later as a reason

8  that there's been a slowdown in production.

9          But let me, instead of looking backwards, let's try

10  to look forward.  And a couple of suggestions coming out of

11  this.  One is if the Government would entertain or Your Honor

12  would entertain a rolling production so we're not waiting

13  until they get through an entire review but we could work out

14  a staged production which we do on the defense side all the

15  time when we produce to the Government, work out some portion

16  each week so that we can get started.

17          Additionally, the prioritization point I think is

18  important to us so that we're not waiting for stuff that we

19  know is not going to be relevant.

20          THE COURT:  And then just so I -- your priorities

21  were those email accounts first?

22          MR. McGOVERN:  Yeah.  I mean I think we probably

23  want to confirm once we see the full list but that was an

24  example of priority.

25          THE COURT:  All right.

46

1          MR. McGOVERN:  And then just the last point and then

2    I'll sit down is I think the outcome of this conference, they

3    referenced a letter explaining the technology which I think

4    would be good.  It may be helpful for everybody.  I think what

5    we'd like is a table that has columns like device, size of

6    device, status of search, and date expected to be complete.

7    And that way when we come together again we can point to

8    different items on the list and talk about them I think in a

9    little more organized way.

10          THE COURT:  Okay.  Ms. Necheles?

11          MS. NECHELES:  Thank you, Your Honor.  So Your

12    Honor, I'm just a little concerned when I hear the Government

13    say that they want to go through things email by email.  And

14    of course they have the right to review materials for what is

15    responsive.  But if there is a January or February trial date

16    and there are 10 million emails, that's just not logistically

17    possible.

18          THE COURT:  We're working towards trying to figure

19    out the answer to that question.

20          MS. NECHELES:  And so, Your Honor, what we -- the

21    tension comes in when the Government says we've asserted

22    certain rights, no, no, we just had followed the law.  You

23    seized materials.  You told the Court that you would search

24    them.  Do the searches that you're required.  And don't give

25    other people my personal information that you had no right to

1  seize.  So it's sort of basic.  It's no surprise that a

2  defendant would assert that.  Every single case you assert

3  that.  It's fundamental.  I've never been in a case where a

4  defendant has waived their fourth amendment right and said go

5  ahead and seize everything in my house, go ahead and seize

6  everything in my computer.  That would be absurd and

7  malpractice.  So it's not a surprise.  The question is when

8  are they going to finish -- when you have a multi-defendant

9  case like this, they have to produce -- finish the searches in

10 time so that the other defendants can get everything that was

11 seized and then prepare for trial.  And so that's what we're

12 looking at.  What date would you be given?  I don't care how

13 you are doing it.  You want to look at every email --

14         THE COURT:  You do care how.  Right?  I mean there's

15 --

16         MS. NECHELES:  Put all your lawyers on it.  I don't

17 care.  But what date will you be getting me all the Rule 16

18 material, which means the stuff that you seized from other

19 people so that I can start preparing for trial.  And that's

20 what we're sort of asking for those kind of deadlines to be

21 set so that we can work back.  And I agree we need to know

22 from technically and that it would be helpful to get those

23 technical information about when things will be processed so

24 that they can start or finish doing the searches.  I guess the

25 Government had said they'd start them.

48

1          THE COURT:  Other defense counsel?

2          MS. HARRIS:  Your Honor, I would just note that one

3    thing we're not talking about today but we did discuss at the

4    meet and confer is the notion that they do have, I believe the

5    Government has in its possession other items and other

6    accounts for which it does anticipate that there is Rule 16

7    material and I think in the context of our meet and confer

8    they were unwilling, and I think that was reflected in the

9    conference before Your Honor, maybe a little bit before Judge

10   Garaufis as well, they are unwilling to sort of identify with

11   any kind of detail what those materials are.  We understand

12   the investigation is ongoing.  They've indicated they intend

13   to supersede, but nonetheless we have --

14         THE COURT:  Yes.  I agree.

15         MS. HARRIS:  -- right now a trial date and if there

16   is at least a description of what is -- oh, we have five other

17   email accounts and the volume is X, Y, Z and we are performing

18   searches of those, we would ask that whatever submission is

19   sent to the Court gives at least a preview of what we don't

20   have itemized yet and sort of the discovery letters.  That's

21   number one.

22         And then number two, I think I flag this now in a

23   very preliminary form but again, because these issues may come

24   up later, you know, I understand there is a sort of a

25   practical advantage to sort of what they call a full discovery

49

1    copy for items like if we're not -- there's no privacy

2    interest, we can't make a motion to suppress.  I want to flag

3    for Your Honor I have some concerns for like that happening

4    wholesale and I'm not taking a position but obviously they've

5    made representations and warrant applications to the Court to

6    get that material that said they're going to only seize

7    limited material.  That may be no harm no foul because there

8    is no privacy interest, there's nothing for us as defense

9    counsel to raise.  But again, they are in conducting further

10   investigation and they're going to bring additional charges

11   and I don't know if I -- we may have issues.  And again, it's

12   very [indiscernible] several hypothetical layers later, if

13   they bring charges later that they seized outside the scope of

14   a warrant and in contravention to a warrant application that

15   was made to Your Honor.  If we're dealing only with the

16   charges here and there's like extra stuff, like whatever,

17   we're not going to make silly motions just to make silly

18   motions.  But if they're going to bring new charges based on

19   items seized outside the scope of a warrant, even if we don't

20   have a privacy interest, I'm just putting a placeholder there

21   that we may have issues.

22           THE COURT:  Okay.  Government, you heard that.  Yes,

23   your client, your concerns?

24           MR. SOLOWAY:  Your Honor, thank you.  I represent

25   Nancy Salzman and I think that we, number one just factually,

50

1    turned over a list of seven lawyers to the Government

2    yesterday.  Ms. Penza references something like six devices

3    that are in the mix here.  And we have notified the Government

4    as to between 45 and 48, I don't remember the exact number,

5    over which we assert no privilege interest.  45 --

6              THE COURT:  45?  Okay.

7              MR. SOLOWAY:  45 or 48.  And that leaves roughly 15

8    devices that we suspect contain attorney-client privilege

9    materials.  And there are, with respect to those 15 or so, you

10   know, we're talking about phones, we're talking about hard

11   drives, we're talking about laptops which we suspect there

12   will be communications between attorneys and Ms. Salzman.  And

13   we think that the way that things should occur is that when

14   the Government has the domain names that they need -- now they

15   just have the seven names of the attorneys and they want a

16   little bit of additional information which we'll readily be

17   able to supply today, that once the materials are segregated

18   out that are a hit on the attorneys, or the attorneys' firms,

19   or the domain names, then there would be the ability to

20   disseminate the balance of that material promptly as Rule 16

21   material if in fact it's responsive to the warrant.

22             THE COURT:  That's my question.  For those devices

23   and your 45 though you're still saying the warrant applies and

24   --

25             MR. SOLOWAY:  Yes, of course.

1          THE COURT:  All right.  And so there needs to be a

2    search.

3          MR. SOLOWAY:  Right.  And that's the search that I

4    think everybody is saying like what's been going on?

5          THE COURT:  What's the holdup.

6          MR. SOLOWAY:  Right.  And what's been going on.  And

7    there is going to be this subset of materials that Your Honor

8    identified before and the Government was talking about whether

9    there's going to be a privilege log.  Well gee, you know, we

10   want -- you know there's often litigation with that subset of

11   what the Government segregates out.  Is there really privilege

12   here?  You know, or is there an exception?  For example, a

13   crime fraud exception to what would be attorney-client.  You

14   know, there's a litigation at that point.  But I think what

15   we're trying to understand and not really seem like we are

16   necessarily there, and the Government is indicating it's a

17   large volume of material, and it is, but now the Government

18   knows that with respect to 45 to 48 of those electronic

19   devices they don't have any issues with respect to taint teams

20   and things like that in providing to us.  What we want is for

21   the Government to supply us that subset of materials that's

22   filtered out as responding to those or a hit on those attorney

23   names.  And then we can do that work.  Right?  We would have

24   designated lawyers that are going to function to deal with the

25   issues relating to privilege with the tainting lawyers from

52

1    the Government.  Right?  Those things are going to be going on

2    at least at my firm at the same time as we are reviewing the

3    other Rule 16 discovery that Ms. Necheles was talking about

4    that like where is it of the other defendants so we can

5    prepare for trial.  I mean that's what we're working toward,

6    right?  For the Government to give us -- and I think you're

7    working toward some sense of when those things can happen.

8    Like when will we come back and maybe have our next meeting

9    and have answers to that sort of concrete.

10                THE COURT:  All right.  I think we're back to the

11    Government and --

12                MS. HAJJAR:  So Your Honor, I think from what Mr.

13    Soloway just said speaks a little to what the difficulty is

14    here in terms of prioritization.  So the Government

15    understands its obligations.  But other defendants have said

16    they don't very much care what's in Nancy Salzman's house.

17    Now, that's what they're saying now in terms of like what

18    their priorities are.  But Nancy Salzman wants the stuff

19    that's in Nancy Salzman's house which of course makes sense.

20    And so that's why this is -- Judge Garaufis has now designated

21    the case complex.  It is a complex case.  There are a lot of

22    factors at play here.  And I want to be clear in terms of the

23    devices, that was only last night that we --

24                THE COURT:  I got it.  I know.  8 o'clock.

25                MS. HAJJAR:  -- were given the 45 devices that are

53

1    not privileged.  So of course the Government will do rolling

2    productions.  We've been doing rolling productions.  That's

3    exactly what we intend to do.  We will certainly move forward

4    with our best efforts and in good faith.

5              THE COURT:  Okay.

6              MR. DIAZ:  Your Honor, this is counsel for Lauren

7    Salzman.  I was hoping maybe I could just for a minute go back

8    to Ms. Salzman's iCloud account.

9              THE COURT:  Yes.

10             MR. DIAZ:  Last night we did disclose a list of six

11   lawyers in terms of potentially privileged material.  At the

12   meet and confer it was our understanding that the size of Ms.

13   Salzman's iCloud account wasn't massive data in terms of a

14   terabyte or anything of that sort.  And I just was hoping

15   maybe we can clarify with the Government.  And this, again,

16   this is something that I think goes back to December of 2017

17   in terms of the warrant.

18             MS. HAJJAR:  I'm happy to address it, Your Honor.

19             THE COURT:  Sure.

20             MS. HAJJAR:  So as to Lauren Salzman's iCloud

21   account, yes, the Government has largely searched Ms.

22   Salzman's iCloud account and we're happy to prioritize that

23   production.  Again, this was not an account that we -- when

24   the Government was conducting its search of Lauren Salzman's

25   iCloud account, the Government did not identify a clear

54

privilege issue and so we've only now heard this privilege

issue.  We are going to prioritize because we are hearing that

Lauren Salzman's iCloud account is something everyone is

interested in.  So that is an item that is relatively discrete

that we are going to prioritize making sure it's with our

vendor, segregated out in terms of any attorney-client

communications and then producing responsive materials from

that account to defense counsel, Bates stamped with metadata

in a way that everybody can use.  So that is not a problem.

And again, Your Honor, that was an item where as of -- we

actually did --

THE COURT:  I got it.  Move on.

MS. HAJJAR:  -- produce that one to everyone and had

to halt that production because we thought everyone was

getting that, so --

THE COURT:  Okay.  Does everybody know -- I mean I

was just looking at it.  There is an entry on the docket at

138 that the case is designated as complex?  Did everybody see

that before you got here?

FEMALE SPEAKER:  Yes.

THE COURT:  Okay.  So just to make sure everybody

knows.  Okay.  Look, I'm just going to read the relevant part

of this and then come back to how we're going to go ahead.

So no attorney who has appeared or will enter an

appearance on behalf of any party in this case may commit to

55

1   participating in any other trial between January 1, 2019 and

2   June 30, 2019 without first requesting in writing and

3   receiving specific permission from this Court.  The January 7,

4   2019 trial date remains in place pending further discussion of

5   the October 4, 2018 status conference after Magistrate Judge

6   Scanlon establishes a discovery schedule for the parties.

7   They are directed to confer with any pretrial scheduling and

8   to propose a schedule for all pretrial matters built around

9   the January 7, 2019 trial date or a proposed alternate date

10  before the October 4 status conference.

11          So I hear the Government saying something, you want

12  to put in a letter first later this week, early next week.

13  And then some materials will be available the end of next

14  week.  But I'm going to reiterate the point as things stand

15  now, and obviously it's a dynamic conversation between the

16  Government and defense counsel and everybody and Judge

17  Garaufis but you are currently on a fairly tight schedule.

18  And I hear it's hard and I hear there are some restraints but

19  this has got to move ahead.  So I think it would be helpful to

20  hear from the Government what you're saying as to what it will

21  take as to every device or at least you can talk about it in

22  terms of categories of device for you to -- both to the

23  privilege segregation and privilege review and the application

24  of the search warrant to the materials.  And I hear what

25  you're saying about trying and I appreciate that you want to

56

1  work with defense counsel to follow their priorities even

2  though their priorities may not all be the same.  But this

3  material needs to start coming over to the defendants.  And

4  try to figure out how that can happen and whether the

5  restraints in which you seem to be operating, which I have a

6  basic grip on, you know, are going to be acceptable.  Maybe

7  you need more people on this.  Maybe you need more resources.

8  Maybe you don't.  Maybe so much of this is going to turn out

9  to be video that really is not going to be as big a project as

10 it sounds like it is right now.  But you know, the current

11 very immediate project is to get a very detailed workable

12 schedule dealing with the physical constraints and then

13 lawyers, last agent constraints because that's the prelude to

14 your conversation amongst yourselves which needs to go into

15 the Court and Judge Garaufis before the 4th.  So start working

16 backwards from the 4th.  Now the Government hearing all this,

17 what's your position.  And if you want to answer along with

18 that your thoughts of the best way -- you know, can there be a

19 rolling production?  The prioritization, you know, which

20 counsel had given the example but said that could be more

21 developed and also the suggestion of the table.  I need the

22 table.  It's just too hard to follow.  I get the broad swath

23 categories.  But as to any particular person's device as we

24 get more specific, we need a checklist just to know what we're

25 talking about here.  So in any order that you'd like to

57

1   respond.

2           MS. HAJJAR:  May we make a suggestion, Your Honor.

3   We are sensitive to the Court's concern.  We understand that

4   the Court would like to enter a discovery schedule.  But we

5   just want that schedule to be workable and we don't want the

6   schedule to be set on -- to sort of be set in the absence of

7   true real information about what is in our position, how long

8   technically it will take to do the processes we've discussed.

9           What we propose is to submit a letter to Your Honor

10  early next week providing as much information as we can.  We

11  are open to communicating with defense counsel about setting

12  the briefing schedule or other types of deadlines in

13  conjunction with doing that, in conjunction with our reporting

14  to the Court about what we can do and what time frame because

15  it does occur to us that there are challenges defense --

16  motions the defense can make in the absence, facial challenges

17  or other types of challenges that don't require a full set of

18  discovery.  And so we can discuss those things and we can

19  provide an update to the Court by early next week is what we

20  propose.  But the Government, in the Government's view it

21  makes sense to base this discovery schedule on data and not

22  giving the fact that it's been just two days since we met and

23  conferred with defense counsel.  We're not in possession of

24  all those facts right now.

25          Also, we agree that we are happy with providing

58

1    discovery on a rolling basis but we agree that there are

2    different priorities.  So to the extent defense counsel can

3    come to some agreement about whether it is the iCloud or other

4    devices for which -- that they would like to review first,

5    obviously that is helpful, but we don't get a clear sense of

6    that here listening carefully to defense counsel just now.

7                THE COURT:  All right.  So that does seem like it

8    would be helpful if everybody talked.

9                So going back to Judge Garaufis' scheduling point.

10   If the Government were to get me the letter by Monday at noon,

11   counsel, then your thoughts could then -- we'd want your

12   thoughts.  Now, I don't have a sense of the greater case.  The

13   Government's suggesting the motion practice to which the

14   district judge is responding or anticipating -- is potentially

15   some of it separate from this discovery?  That's right?  I

16   mean I don't need to get into -- I'm not trying to do anything

17   that -- has anything really to do with what Judge Garaufis is

18   doing.  I just want to get a sense of how that affects this

19   pretrial scheduling point.

20               MS. NECHELES:  There will be some but there's basic

21   motions such as severance or also some of it -- basic motions

22   that are dependent, all of the suppression motions dependent

23   on what is being produced here.

24               THE COURT:  Okay.  So is it realistic to say that

25   the Government's letter Monday noon -- defense, you want to

1  put anything in writing Wednesday at 5 and then now the

2  question is how -- you know, we need to set the schedule and

3  then you need to plow into having your conversation about your

4  pretrial motions and you have to put that in a letter by --

5  ahead of that conference the next Thursday.  My suggestion if

6  it's doable would be to do have a conference which would have

7  to be late in the day like Thursday, the 27th.  So we have the

8  Government's letter Monday, defense counsel Wednesday, and

9  leave it come here Thursday.  We set the schedule as best we

10 can.  And then you have your conversation about whatever it is

11 you want to do with Judge Garaufis.

12         The time constraint on my side is I have a bench

13 trial next week.  Right now it's scheduled for all week.  I

14 don't know if it's actually going to take that long which is

15 why I'm suggesting late in the day that if the trial changes,

16 we could change the time of the conference.  I think you need

17 that amount of time in order to get your pretrial schedule

18 together.  They are kind of going hand -- not kind of, they

19 are going hand in hand here.  Does somebody, anybody disagree?

20 Does that sound right?

21         MR. AGNIFILO:  That seems workable for us, Judge.  I

22 think that's fine.

23         THE COURT:  Anybody else?  That works?  All right.

24 So the Government?  Okay.  So right now we'll say 5 o'clock on

25 the 27th.  I know it's late.  It's just because of the trial.

60

1  If the trial changes, we'll let you know and move it up. It's

2  very possible it would be done beforehand but you never know.

3           Can we address the point though -- so that was about

4  everything we've talked about here that counsel raised with

5  regard to the unidentified sources of information. What's the

6  Government's position? I know it was alluded to in Judge

7  Garaufis' conference. It was alluded to here last week. How

8  are we going to handle the undisclosed information as it fits

9  into both the schedule for the discovery and your conversation

10 about the bigger planning for the trial?

11          MS. HAJJAR: So Your Honor, the Government continues

12 to receive sources of information and so that's where we are.

13 And we don't believe it's appropriate at this point to have to

14 delineate to defense counsel certain materials that we expect

15 to receive or not receive. That being said, there is also a

16 lot of information that the Government has been getting on a

17 rolling basis that we know the defense counsel wants that we

18 are actively moving to produce. So we have been receiving

19 bank records. Bank records were something that --

20          THE COURT: That's totally apart from the e-

21 discovery.

22          MS. HAJJAR: Totally apart from the e-discovery.

23          THE COURT: Okay.

24          MS. HAJJAR: And so that's why this kind of like

25 estimate as to like when this will all be complete is very

61

1  difficult.  So as to bank records, we anticipate -- right now

2  our legal assistant who has been working on the bank records

3  portion, just what we have, we are still awaiting certain

4  results.  But the portion that we actually have right now,

5  just the part that she was able to process is 10,000 pages of

6  records.  I expect that there's going to be a lot more as

7  well.  So that is the -- we are talking about an enormous

8  amount of material.  And so we are going to -- like for

9  example, those bank records, we want to do it efficiently.

10 But as soon as those can be Bates stamped, those are going to

11 go out to all the defendants.  But there are categories like

12 that and information that the Government is going through its

13 files and making sure that defense counsel has it.  As I think

14 Ms. Necheles said when we met and conferred she was like if

15 the Government has it and you thought it was interesting, we

16 want it.  And look, there are obviously different concerns and

17 we don't accept that everything might necessarily be Rule 16,

18 but in general we want to produce as much as we can but that

19 is a lot of stuff.  And so we are moving forward as quickly as

20 we can.  We only got those subpoenas.  Some of those subpoena

21 returns we just got.  And we expect more.  And so this kind of

22 finality which defense counsel seems to want given this

23 January date that is currently standing, that is what, Your

24 Honor, the Government does not feel like we are going to be

25 able to propose to you as to exactly when this final date is

62

1   going to be.

2        THE COURT:  Right.  So in that way we're in the same

3   position we were in last week.  And until that trial date

4   changes, you have to deal with that.  If you all agree that

5   there's some other date and it fits with Judge Garaufis or it

6   fits in his January to June window and this is a, I have no

7   idea, three or four month trial, that's just a hypothetical,

8   right, and so then you can finish by January, be reasonable,

9   that's not where we are now and that's really what the point

10  of that letter is.  So to lay out where you are.  It would be

11  helpful if you add to your letter just your estimates as to

12  the non e-discovery.  Okay.  But --

13       MS. HAJJAR:  You know, we certainly suggest that we

14  speak to defense counsel on Monday about whether the trial

15  date is something that is actually feasible even as to what's

16  being produced on a rolling basis and what's expected and

17  whether all the defendants actually agree that they can be

18  prepared for trial on that date given the protected discovery.

19       THE COURT:  But I need your outline and estimate of

20  your production.  And that's still just going to go back to

21  the point that was raised.  You know, I'm not going to put you

22  on the spot and say you need to say now what the unidentified

23  discovery is, but there needs to be some way, if not

24  immediately, down the line if you know you're getting or have

25  material that -- I get it.  You might want to keep it

63

1  confidential because some other part of this situation -- you

2  know, that would be the prudent thing to do.  But if they have

3  -- but if it's material they're entitled to and material that

4  relates to the schedule, then you're going to have to pick

5  which way and that's a strategic decision for your office,

6  etc., etc.  It's just been flagged.  You don't necessarily

7  need to, you know, resolve it today or even on Monday.  But it

8  can't be that there's a discovery schedule and then there's a

9  dump of materials three months from now that nobody even knew

10  about and, except you all, and that affects the trial

11  schedule, affects everything else.  Everybody can understand

12  there are different tracks potentially going on but at some

13  point there's a Venn diagram and they're going to -- if it

14  goes in their favor and to the extent they're preparing for

15  trial and it's material you have to turn over.  So --

16        MS. HAJJAR:  And we of course understand that, Your

17  Honor.

18        THE COURT:  Okay.

19        MS. NECHELES:  Your Honor, I --

20        THE COURT:  Yes, ma'am.

21        MS. NECHELES:  I do not believe there is -- I don't

22  believe it's a strategic decision for the Government.  I don't

23  believe that there is a provision under Rule 16 that allows

24  them to withhold information because they're worried about

25  future cases.  They must turn it over to us if it's material.

64

1              THE COURT:  If it's material.  Some of it is

2    apparently material they have and some it's material they

3    don't have.  So --

4              MS. NECHELES:  They don't have to turn over to us

5    stuff they don't have.  But they have in their possession a

6    lot of stuff they're not turning over.  And if it's documents

7    that they received pursuant to subpoena and they just need to

8    be copied, we should be getting those this week or next week.

9    There's no reason for there to be a delay.  I'm just --

10             THE COURT:  I don't think you're getting anything of

11   that sort in the next week but there's --

12             MS. NECHELES:  But this is not like some electronic

13   discovery.  It just needs to be sent to a copy vendor and they

14   can produce it.  The Government has always done that.  And

15   there are protective orders in place in this case that they

16   asked for and they got.  They're extremely burdensome.  We

17   should be getting this material so that we can be preparing

18   for trial.  I don't actually understand what provision under

19   the law they're depending on to say that they can withhold it.

20             THE COURT:  All right.  Look, we're working on a

21   schedule.  The issue has been flagged.  It was mentioned last

22   week to the district  judge.  It was mentioned last with me.

23   I'm telling the Government you're going to have to make a

24   choice.  I'm not going to ask them to make a choice right now

25   as to what their position is with regard to this material.

1  And but we do need some kind of information as to when this is

2  going to be produced.  I'm going to say this material needs to

3  be at the top of the pile compared to the bottom of the pile.

4  It's all going to have -- whatever is appropriately produced

5  under the applicable rules are going to need to be produced.

6  But we've got a vast amount of data they're working on.  I'm

7  not forcing the Government to say that this needs to be at the

8  top of the pile right now, but you're going to have to make

9  that choice and provide that information fairly soon.

10             Okay.  Other issues?  Okay.  So we'll hear from the

11 Government Monday.  If you all, if you want to put anything in

12 writing on Wednesday and Thursday at 5, you know, your clients

13 are welcome if you want.  If the client is in custody to come

14 and we should know about it, you should let everybody know.  I

15 understand there was a waiver before.  So okay.  We're good?

16 Thanks.

17             MR. DIAZ:  Your --

18             ALL:  Thank you, Your Honor.

19             THE COURT:  Hold on.  Did you want something?

20             MR. AGNIFILO:  No.

21             MS. HAJJAR:  No.

22             THE COURT:  Okay.

23             MR. DIAZ:  Your Honor --

24             THE COURT:  Sorry.  The voice from the --

25             MR. AGNIFILO:  Where is that?

66

1          THE COURT:  Yes, I'm sorry.  Go ahead.

2          MR. DIAZ:  Yeah, Your Honor.  I was just going to

3    ask if the Court would permit Arizona counsel to appear

4    telephonically for the appearance on the 27th.

5          THE COURT:  That's fine.  All right.  Thank you.

6    (Proceedings concluded at 2:00 p.m.)

7                          * * * * * *

67

1        I certify that the foregoing is a court transcript from

2    an electronic sound recording of the proceedings in the above-

3    entitled matter.

4

5    _____

6                              Shari Riemer, CET-805

7

8    Dated:   September 19, 2018