```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF NEW YORK

----------------------------X
                            :
UNITED STATES OF AMERICA,    :
                            :    18-CR-204 (NGG)(VMS)
        v.                   :
                            :    September 27, 2018
KEITH RANIERE, et al.,       :
                            :    Brooklyn, New York
            Defendant.       :
                            :
----------------------------X


    TRANSCRIPT OF CRIMINAL CAUSE FOR STATUS CONFERENCE
        BEFORE THE HONORABLE VERA M. SCANLON
            UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For the Government:          BRIDGET M. ROHDE, ESQ.
                             UNITED STATES ATTORNEY
                             BY: MOIRA KIM PENZA, ESQ.
                                 TANYA HAJJAR, ESQ.
                             ASSISTANT U.S. ATTORNEYS
                             271 Cadman Plaza East
                             Brooklyn, New York  11201


For the Defendant:           MARK AGNIFILO, ESQ.
                             WILLIAM McGOVERN, ESQ.
                             ROBERT SOLOWAY, ESQ.
                             AMANDA RAVICH, ESQ.
                             SUSAN NECHELES, ESQ.
                             HECTOR DIAZ, ESQ.



Court Transcriber:           ARIA SERVICES, INC.
                             c/o Elizabeth Barron
                             102 Sparrow Ridge Road
                             Carmel, NY 10512
                             (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

```
 1              THE CLERK:  Criminal cause for status
 2   conference, case number 18-CR-204, U.S. v. Keith
 3   Raniere, Allison Mack, Clare Bronfman, Kathy Russell,
 4   Lauren Salzman, and Nancy Salzman.
 5              Counsel, please state your appearances,
 6   starting with the government.
 7              MS. PENZA:  Moira Kim Penza and Tanya Hajjar
 8   for the United States.  Good afternoon, your Honor.
 9              THE COURT:  Hello.
10              Other counsel in the room?
11              MR. AGNIFILO:  Mark Agnifilo, Paul
12   DerOhannesian, and Teny Geragos for Mr. Raniere, who is
13   incarcerated, and we waive his appearance.
14              THE COURT:  Okay.
15              MR. McGOVERN:  Bill McGovern and Sean
16   Buckley for Allison Mack, who also has waived her
17   appearance today.
18              THE COURT:  Okay.
19              MR. SOLOWAY:  Hello, your Honor.  Robert
20   Soloway appearing for Nancy Salzman, together with
21   David Stern, who is on the phone.  I'm joined at
22   counsel table by our paralegal, Myrawin (ph) Ulerio, U-
23   l-e-r-i-o.
24              THE COURT:  And your client is here or
25   waives her appearance?  Your client is here or she
```

```
1    waives her appearance?
2              MR. SOLOWAY:  My client waives her
3    appearance, your Honor.
4              THE COURT:  Okay.
5              MS. RAVICH:  Amanda Ravich for Kathy
6    Russell.  My client waives her appearance.
7              THE COURT:  Okay.
8              MS. NECHELES:  Good afternoon, your Honor.
9    Susan Necheles and Kate Cassidy for Ms. Bronfman, and
10   she waives her appearance as well, your Honor.
11             THE COURT:  Okay.  So we have the
12   government's letter from the 24th, the 25th with
13   supplemental information, and the Necheles/Cassidy
14   letter.  Have you all had any additional opportunity to
15   talk about -- did I skip the folks on the phone after
16   all that effort?
17             THE CLERK:  Yes.
18             THE COURT:  On the phone, I think you were
19   acknowledged but if you could state your appearance
20   please?
21             MR. DIAZ:  Yes, your Honor.  Hector Diaz for
22   Lauren Salzman, and we waive Ms. Salzman's appearance.
23             THE COURT:  Sorry.  Have you had any
24   additional opportunity to talk about any of these
25   issues?  Then there was deafening silence.  We have the
```

1    government's letter of the 24th with the most relevant,

2    the proposed schedule, and the 25th with additional

3    technical information as well as the updated schedule.

4    This may be an obvious question but let me just make

5    sure.

6              On the third page of your second letter, you

7    say the government has endeavored to make available

8    full discovery copies of all the electronic data in its

9    possession to defendants and has done so with respect

10   to a significant number of devices.

11             Does everybody have a copy of their own

12   information at this point?

13             MS. PENZA:  Yes, your Honor, that's right,

14   almost.  There are a few outstanding items from the

15   search of Nancy Salzman's house, which have all been

16   indicated on our spreadsheet.  To the extent we have --

17   to the extent there have been imaged copies, we expect

18   those to be made available by next Friday, which we

19   indicated in the spreadsheet.

20             THE COURT:  Okay.

21             MS. PENZA:  So those are in the process of

22   getting from the FBI, where we will provide them to

23   Doopcoop (ph) in full, and Nancy Salzman's attorneys

24   will be able to get those.

25             THE COURT:  So those are the couple of I

```
1    think Oregon Trail devices that are noted.

2              MS. PENZA:  Yes.  For example, 1B79.

3              THE COURT:  Right, okay.  Let me also ask

4    you -- TBD.  So it's there for 1B87, 86, 85, 81 --

5              MS. PENZA:  So most -- I'm sorry.

6              THE COURT:  Just so the record is complete

7    -- 1B74, 1B71.  I think those are the TBD's.  What's up

8    with those?

9              MS. PENZA:  The vast majority of those I

10   believe are the ones that have been sent to FBI

11   headquarters.  Those were sent in response to one of

12   the questions that defense counsel asked regarding when

13   those were sent to FBI headquarters.  It's been on a

14   rolling basis, understanding that there is this queue

15   that we explained in our letter as to priorities and

16   what they will attempt to unlock or otherwise access.

17   Some of those items were sent all the way back in

18   March.  So that is what accounts for most of the TBD's.

19   I believe there is --

20             THE COURT:  The iPod?

21             MS. PENZA:  -- one TBD that was an accident,

22   which was --

23             THE COURT:  So the iPod?

24             MS. PENZA:  -- the iPod.  That one, as I

25   said, searches -- that one is I believe currently
```

1    password protected and we can make it available and

2    consider further whether -- we can have further

3    discussions with Mr. Soloway about the password.

4              THE COURT:  Okay.  My takeaway -- you can

5    correct me if I'm wrong -- is that -- this is from, Ms.

6    Necheles, your letter.  Your primary concerns are the

7    timing for the motion, particularly severance, and then

8    later on, the December motions.  This is not a great

9    schedule for you.  You can elaborate.

10             MS. NECHELES:  Our primary concern is that

11   this is not enough time for us to prepare for trial

12   once we get the discovery.  Also, the motion schedule

13   is not just workable.

14             THE COURT:  There's the big question, which

15   is, are you going ahead in early January or is that

16   going to change?  Let's talk about -- for the

17   government, you're talking about -- you can make this

18   production by December 7th?

19             MS. PENZA:  Your Honor, I want to be clear

20   that the December 7th date that we proposed was not

21   proposed as a discovery cutoff.

22             THE COURT:  So what is it?

23             MS. PENZA:  We proposed that date as a date

24   by which we would endeavor to make substantial

25   productions on an ongoing basis.  Your Honor, we're in

a case that has been designated complex.  We understand

that the defendants are saying that they want a trial

soon.  There has to be a balance of those two things.

The government recognizes that this is a labor-

intensive process on both sides and that the schedule

that we proposed was very complex -- I mean was very

compressed.

But a discovery cutoff is really not

something that is customary in criminal cases.  The

government isn't aware of a criminal case in which an

arbitrary discovery cutoff was made, absent there being

a fixed trial date.  If your Honor would permit me, in

the FIFA racketeering case, which in many ways I think

is one of the most similar cases that has recently been

before this Court, Judge Chen addressed this very

issue.

What she said was that she was not going to

set an arbitrary cutoff date.  She said that -- if I

may quote from her, she said, "I'm not going to set a

discovery cutoff.  I think, as is true in all or most

criminal cases, I should say, it's a rule of reason.

The government will certainly have to explain any

belated disclosure that the defense claims is

prejudicial to them and then the defense will have to

explain why they're prejudiced by this."

1          Your Honor, what the government doesn't want

2     is an arbitrary cutoff date based on a trial date that

3     appears not to be set right now.

4          THE COURT:  Maybe I'm not -- why is it not

5     set?  You're expecting or hoping that it will change

6     based on the designation next week?

7          MS. PENZA:  Your Honor, defense counsel has

8     said, based on the date that we have proposed, that

9     they don't believe that they can -- they don't like the

10    schedule we proposed.  This was the best schedule we

11    could come up with based on the January 7th date.  The

12    government is saying, look, we understand, January 7th

13    is the date that the judge imposed, it's the date that

14    defendants were saying they wanted, and this is what

15    will have to happen if that's what they want.  I think

16    that balances the complexity of the case.

17         But we get it, it's very, very compressed

18    for both sides.  It's going to be very labor-intensive.

19    But if defense counsel wants to move the date, then we

20    need to have discussions about what a substantial

21    production date will be, and we will be making rolling-

22    basis productions.  Again, defendants have a lot of the

23    material already in full, so this concern about a

24    cutoff whereby we won't be able to use the evidence

25    doesn't really matter as to things that we've already

1    produced in full.  But the government shouldn't be

2    saddled with a cutoff date at a time when we don't know

3    exactly when the trial is going to be, so it is a rule

4    of reason.

5             THE COURT:  A couple of things so far you've

6    said that I can pretty much anticipate the defendants

7    do not agree with.  There's no balance in favor of the

8    government from their perspective.  You want to go to

9    trial, you have moved ahead with this case.  They do

10   not think that they should have to deal with your

11   technical problems on the schedule.  The balance is

12   really to protect the defendants, from the defendants'

13   perspective.

14             There arbitrary cutoff date, I think the

15   question is, are we talking about information -- you've

16   alluded to that there may be more going on in this

17   case.  Are we talking about these documents, these

18   devices, or something else?  There's certainly the

19   possibility -- you mentioned in your letter that it

20   takes particular effort -- this is my language but this

21   is the gist of it -- a particular effort to find data

22   that may not be evidently on a device.  Maybe it was

23   deleted, maybe it was hidden.  There's the technical

24   pieces where it's harder to find it.

25             To the Judge Chen about reason, yes, that's

1    in play, but we're talking about what defendants have

2    now said several times, information, some of which

3    you've known about for a while.  That seems to be

4    moving forward, much of which you have had for a while.

5    These two communications with me were about explaining

6    the technical challenges.  You don't want a cutoff date

7    but the practical question is, how can the defendants

8    prepare for this January trial?  And you're suggesting

9    that they should be the ones asking for the extension

10   when, so far, it's not evident to me that it's their

11   problem.  It seems to be your problem.

12            MS. PENZA:  Well, they said that it was.

13   December 7th is the date when the government said, we

14   can endeavor to make -- and we will stick to that in

15   terms of, we will try to endeavor to get substantial

16   discovery out there by then.

17            THE COURT:  Try and endeavor, this is the

18   problem.

19            MS. PENZA:  But, your Honor, searches don't

20   end because of a trial date.  That's what I think is

21   one of the pieces that's missing here.  We have

22   unindicted coconspirators, we have --

23            THE COURT:  For this conversation, let's

24   focus on what we have here.

25            MS. PENZA:  Sure but, your Honor, we have

1  obligations to continue to produce discovery to them,

2  absent any date that is set.  And to the extent that

3  the trial is not looking like it's going to be until

4  spring or some later date --

5          THE COURT:  I can't read those tea leaves.

6  If that is what happens, then we could certainly come

7  back and readjust these.  But that's not where we are

8  and that's not the circumstance under which we're

9  having this conversation.  We may go through this, you

10  have a conversation next week with the trial judge and

11  the world shifts.  We get it.

12          MS. PENZA:  Your Honor, I do believe that it

13  isn't inappropriate for us to refer to this type of

14  balance.  We have done our best.  That is the best we

15  can do is the December date.  That's what we said is

16  the best we can do.  And with an aggressive motion

17  schedule, the government believes that that would -- it

18  would be tough but we could do it.  Defendants are

19  saying no.  They're saying that's not enough time to

20  review discovery.

21          THE COURT:  Right, which does not mean

22  extend our trial date.  It means the government should

23  be more resources, more lawyers, more everything into

24  this so that you can get it done.

25          MS. PENZA:  Your Honor, respectfully, that's

1    not -- that is the impossibility here because there are

2    technical things that can't be anticipated as we go

3    through this.  Additionally, the trial team, the

4    agents, the prosecutors who've been working on this,

5    they're the ones who need to be conducting this search.

6    We can't just have-- it may seen fungible but it really

7    is not.  This is a very complex case.

8              THE COURT:  Your trial team is -- how many

9    lawyers are on the trial team?  Obviously, you two.

10   How many others are there?  What are the resources that

11   are dedicated to this?

12             MS. PENZA:  Our agents in the first instance

13   do the searching in consultation with AUSA's where

14   appropriate.  From an agency perspective, we have three

15   FBI agents assigned to the case as well as a task force

16   officer.  We also have agents from the Department of

17   Homeland Security.

18             THE COURT:  And that does not include

19   whoever works on it at headquarters, right?  That's

20   separate.

21             MS. PENZA:  The headquarters issue is out of

22   our hands, your Honor.

23             THE COURT:  Okay.

24             MS. PENZA:  So that's a separate -- that's

25   totally separate and apart.

1          THE COURT:  And then the lawyer?  You two

2    and you're obviously the person who's doing the

3    teamwork kind of on the side.  Are you the only two?

4          MS. PENZA:  We are the trial time.

5          THE COURT:  You're it, okay.  Let me ask a

6    different kind of question.  Your proposed schedule --

7    this is page 3 of your letter from the 24th.  For the

8    Raniere and Bronfman assertion of privilege, you're

9    proposing October 19th.  They have all the materials,

10   they're going to have all the materials?

11         MS. PENZA:  They do.

12         THE COURT:  They have that.

13         MS. PENZA:  And we've provided it segregated

14   so they have both the privileged set and the non-

15   privileged set.

16         THE COURT:  And then the --

17         MS. PENZA:  I'm sorry, the potentially

18   privileged set, your Honor.

19         THE COURT:  Ms. Salzman -- is this by the

20   October 5th date?  Is this what you're talking about?

21         MS. PENZA:  Yes.

22         THE COURT:  One particular concern in

23   defendants' letter, the one at 149 on the docket, is

24   the severance motion.  The choice to make the motion

25   seems tied -- potentially tied to the discovery.

1    You're suggesting it happen October 12th?

2              MS. PENZA:  There are other types of

3    motions, your Honor, that are encompassed within those

4    facial challenges.  There are facial challenges to the

5    indictment, certain other motions that are

6    contemplated.

7              THE COURT:  Right.

8              MS. PENZA:  I will note, your Honor, that

9    this is modeled after a similar schedule that Judge

10   Chen did set in FIFA.  She had staggered briefing

11   schedules where motions addressed to the allegations

12   themselves, the facial allegations of the indictment,

13   were due first, and then motions which involved a

14   deeper dive into discovery were next.  We think that

15   makes sense here, your Honor.

16             THE COURT:  I'm just highlighting and trying

17   to get your response to the point that was made on page

18   2 of the letter at 149 that the severance motion is --

19   to read it, "that is simply not possible by October

20   12th."  I assume -- we can hear from counsel but the

21   reason would be you're talking about the discovery

22   coming in almost two months -- whatever word you want

23   to use, a very significant part of the discovery, if

24   not all of it, having been produced by December 7th, two

25   months later, and deciding whether they're interested

1    in severance motions may depend on what the discovery

2    shows.  So I'm wondering why you think that's -- I

3    understand the facial piece but why that particular

4    motion could be made in an informed way so early

5    relative to the production of the discovery.

6            MS. PENZA:  Your Honor, I'm not sure what

7    the anticipated basis for the motion for severance is.

8    There are many such bases.  Should we hear from defense

9    counsel that they anticipate to make one that's

10   specific to certain discovery, that makes sense.  That

11   objection makes sense.  But should it just be a blanket

12   objection to filing these types of motions early, we

13   think these are addressed by the face of the

14   indictment.  There are motions to sever that could be

15   filed that don't involve a wholesale review of

16   discovery.

17           THE COURT:  But are you suggesting they

18   should be allowed to make two motions to sever if

19   appropriate, one up front based on information known

20   now or in or around the dates that you're proposing,

21   and another made later?

22           MS. PENZA:  If it makes sense, your Honor.

23   I think if their motion to sever is addressed to the

24   face of the indictment, it makes sense for them to do

25   it now.  If, for example, based on a particular piece

1   of discovery or otherwise, they decide then this motion

2   to sever is grounded on a particular client based on

3   this -- it's a reasonable question, your Honor.  We are

4   endeavoring to make a schedule that is reasonable.  So

5   should defense counsel say, we can't file this

6   particular type of motion, we couldn't have filed it

7   earlier, we'd like to make it now, I think that makes

8   sense.

9          THE COURT:  I should have said the

10  preliminary statement, which I assume we all know,

11  right, from the trial judge's previous order.  These

12  particular scheduling issues will be decided by him but

13  the discovery-related ones -- this is all running in

14  tandem, right?  I'm dealing with the discovery, which

15  may or may not affect these other dates.

16         Defense, your concern is for the government

17  to make as thorough a production as possible by the

18  December 7th date.

19         MS. NECHELES:  Your Honor, I would note that

20  one of the things -- I think the government said two

21  things that I just want to add a little comment on.

22  One is that judges in other cases -- the government

23  said that judges in other cases don't set discovery

24  cutoffs.  I totally disagree with that.  In every case,

25  judges set discovery cutoffs for Rule 16 material

1    that's already in the government's possession, that

2    they should produce it six months, nine months before

3    trial.  That's what we're talking about, not things

4    that maybe they discover later.  Obviously, that's a

5    different issue and the government -- we can deal with

6    that at the time should there be other things.  But

7    what we're talking about here and what these charts

8    talk about are things that are in the possession and

9    that have been in the government's possession for a

10   long time.

11          The other thing the government said is that,

12   obviously, there will be continuing searches.  That's

13   not okay.  The government has to do their searches and

14   then turn over to all of the codefendants everything,

15   and they can't keep using that body of material to keep

16   doing searches because that would mean that the

17   government had material in their possession that the

18   defendants don't have, that is potentially material to

19   the charges at trial.  That would violate Rule 16

20   because the defendants are entitled to everything that

21   is material to the trial.  So the government has to

22   compete its searches pursuant to the warrants, turn

23   over everything to us, and they can't keep using that

24   database to keep searching because that would be a

25   total violation.

1          THE COURT:  They can't keep using --

2          MS. NECHELES:  They computers that they --

3          THE COURT:  -- the non-responsive material.

4          MS. NECHELES:  Yes, to do new searches

5     because that would be a total violation of Rule 16 and

6     the warrant.

7          THE COURT:  I think -- let me just clarify.

8     I'm not sure -- for the government, was your point a

9     technical point that because you're doing this on a

10    rolling basis and there's some material that you,

11    relatively speaking, can access for the search reliably

12    and fairly promptly, but there are other parts of the

13    searches that are, as you described briefly in your

14    letter, more technical.  You just are not going to know

15    whether you have accessed and reviewed everything for a

16    while.

17         MS. PENZA:  Are you referring to the letter

18    we filed, your Honor?  I believe Ms. Necheles is

19    referring to something -- is making a general point

20    about the propriety of searching --

21         THE COURT:  I am but I think --

22         As I understand it, Ms. Necheles, you're

23    responding to the government's point that -- the

24    suggestion that there could be ongoing searches.

25    You're saying no, you have to basically finish your

1    warrant-permitted search and that's it.

2              MS. NECHELES:  Yes.

3              THE COURT:  I'm going back to the government

4    to clarify because I thought the way this was coming up

5    was because you're doing something on a rolling basis

6    to comply with the warrant but some parts of it you can

7    search fairly simply and other things are going to be

8    harder to search, so you're not going to know until you

9    do the harder searches that you've finished the search

10   for the warrant.  Maybe I'm wrong.  It's not that

11   you're planning to go through everything, produce what

12   you think should be produced, and then do it again

13   expecting to find more.

14             MS. NECHELES:  Or run different search terms

15   because now they think something else relevant or in

16   the middle of the trial say, I'm curious about this.

17   Somebody just testified, let me go back.

18             THE COURT:  Right.

19             MS. NECHELES:  That is what's impermissible

20   also under U.S. v. Wei (ph) and Rule 16.

21             THE COURT:  Let's go back to the technical

22   point.  Go ahead.

23             MS. PENZA:  Your Honor, we're aware of

24   United States v. Wei.  We think at this juncture, the

25   point that Ms. Necheles is raising is academic.  First,

1    we're talking about how we're going to get responsive

2    results from our search to defendants, and the Court

3    and the parties are all engaged in that discussion.

4    Whether or not we're complying with the searches under

5    -- we're executing the search warrants properly is a

6    separate question that can be raised in some kind of

7    motion practice that's not before this Court right now.

8              THE COURT:  My understanding of the

9    defendants' point is that this goes in tandem.  You

10   need to have a deadline and at that deadline, if the

11   government -- you haven't done your search, basically

12   the defendants' perspective is, that's it.  You don't

13   get to go back and search.  I was making the

14   observation that maybe, because of the way you've

15   described the rolling production based on the

16   technological challenges, there may be a period between

17   here and whatever that deadline turns out to be, even

18   though I know you don't want a deadline, so that you're

19   not holding on to information that you know you have.

20   You just will not have gotten to it based on the

21   technical issues.

22              So your perspective is what?

23              MS. PENZA:  Your Honor, there's a difference

24   between completion of a search and a deadline by which

25   we have to produce materials so that the defendants

1  have an opportunity to review it adequately and prepare

2  for trial.  We're focused on the latter right now.

3  When will that point be that the defendants -- that a

4  court could say, this is the deadline by which you have

5  to provide material responsive to the warrants that you

6  intend to use at trial.  Whether or not our search of

7  the material as to the warrant is ongoing is a separate

8  question, your Honor.

9           THE COURT:  The distinction is lost on me,

10 sorry.

11          MS. HAJJAR:  Sorry, your Honor.  The

12 government accepts that there has to be a certain point

13 at which the government -- to prevent unfair surprise

14 or prejudice to the defendants, that there should be an

15 effort to have provided everything it expects to use at

16 trial.  But of course, there can always be other

17 things, and then we would make arguments and say,

18 defendants aren't prejudiced because this is

19 substantially similar to other things we produced,

20 those kinds of things.

21          But their remedy, if the Court should

22 choose, is to say okay, government, you provided it too

23 late.  You can't use that evidence, it's unfairly

24 prejudicial.  But the issue of whether, under the

25 Fourth Amendment, we are properly complying with a

1   search where we have unindicted coconspirators, where

2   there is an ongoing investigation in this case, you

3   can't -- there shouldn't be a you have to end your

4   search tied to a discovery deadline, and there's on

5   precedent for that.

6            THE COURT:  To the back table.

7            MS. NECHELES:  Your Honor, I think the

8   government is confusing two things.  What was just

9   mentioned was the government turning over to us what

10  they intend to use at trial.  But I'm talking about

11  Rule 16 discovery that covers a much broader area,

12  what's material, what might be material to the defense.

13  Whatever database gets returned from the search

14  warrants -- whatever is the return on these warrants is

15  material to the defense.

16           MS. HAJJAR:  Your Honor --

17           THE COURT:  Hold on, don't interrupt.

18           MS. NECHELES:  Therefore, by its nature,

19  there are things that go to the charges here and

20  clearly, when they got those search warrants executed,

21  they thought that there were things that were material

22  -- are material to the charges here.  That's why they

23  got those search warrants.  So if they are material to

24  the charges or they touch upon a witness or they refer

25  to Nexium, it's material to the defense.  So if it's

1    return on a search warrant, I'm entitled to the whole

2    thing.  They can't have a database that they are using

3    to keep looking at things for this trial that I don't

4    have.  The entire database is material to the defense

5    and I'm entitled to have it with enough time to prepare

6    for trial.

7              So that's why they have to finish the search

8    warrant, finishing executing the search warrant, and

9    turn over to me everything that they got responsive to

10   the search warrant, unless they can really say it has

11   no materiality to the defense, and I don't think that

12   it is possible under any of these search warrants to be

13   saying that they are not material to the defense.  It's

14   a very broad standard, very broad standard.

15             THE COURT:  And your thought about the time

16   line of December 7th is what?

17             MS. NECHELES:  With this massive amount of

18   material, I cannot prepare for a January trial with

19   this material being returned by December.  Basically,

20   the vast majority of it, the government is saying,

21   we're going to endeavor to prepare and produce by

22   December.  I guess the government could choose and say

23   that they don't need all this stuff and they're just

24   not going to be using any of it and they're not going

25   to execute the searches, so produce to us stuff that

1    they have determined is material and do it now.  They

2    arrested everybody months and months and months ago.

3              THE COURT:  So everybody is making an

4    estimate somewhat in the dark.  But if you were going

5    to estimate, based on what you have heard is going to

6    be produced on a rolling basis, how much time would you

7    need to review it?

8              MS. NECHELES:  Judge --

9              THE COURT:  You're saying a month is not

10   enough so --

11             MS. NECHELES:  It's hard to say.  I don't

12   know what's on there.  I would think that I would need,

13   at a minimum, three months to be preparing for trial

14   with this stuff, at a minimum.  I don't know what's on

15   there.  I need to upload, I need to make sure it's been

16   produced in a form I can use.

17             THE COURT:  Hopefully -- that's part of this

18   conversation that as things are -- that was from last

19   week's conversation, isn't it.  Everybody has gotten

20   some material.  I'm going to put an asterisk next to it

21   but if there are technical issues that anyone is having

22   with the production, you should be identifying it

23   immediately so that we're not looking and assuming that

24   things that have been produced are unusable.

25             MS. NECHELES:  I agree, your Honor, and we

```
1    take that as our responsibility.  We have been doing

2    that and we've been contacting the government with any

3    problems, and they've been working to work them out.

4    We do understand our responsibility.

5              THE COURT:  And it's been going okay?

6              MS. NECHELES:  I beg your pardon?

7              THE COURT:  You made the caveat that the

8    three-month minimum is without technological problems

9    on your side.

10             MS. NECHELES:  Just because I know -- I know

11   that as it goes along, things get -- there are often

12   problems, even when everybody is acting in good faith.

13             MR. AGNIFILO:  Your Honor, if I could just

14   complete the thought.

15             THE COURT:  Okay, yes, other views.

16             MR. AGNIFILO:  Thank you, Judge, only

17   because Mr. Raniere is in prison.  And the government

18   -- while I understand the government's difficulty in

19   the task at hand, they've been adamant that they're not

20   going to agree on any bail package.  So I'm in quite

21   the pickle because in answer to this problem -- I know

22   this is not the issue before your Honor.

23             THE COURT:  We might as well put it on the

24   record here so you all know what's happening next week.

25             MR. AGNIFILO:  Right.  The discovery is more
```

1    voluminous than we thought and it's taking longer to

2    put together than we thought.  Maybe there's a bail

3    package that would make sense that we can live with.

4    They're never going to say that.  They couldn't have

5    been clearer.  They're never agreeing to let him out.

6    As a result, I don't think I'm going to get him out.

7              So I don't have the luxury of taking three

8    months to look at the discovery.  I just don't.  So

9    whether I can do it in a month, whether I can do it in

10   six weeks, eight weeks, I have an obligation to Mr.

11   Raniere in the position that he's in, to do it faster

12   than three months.  So I just wanted to complete the

13   thought.  And I'm not trying to add ambiguity or

14   dissension to the record.  I just had to put that on

15   the record.

16              THE COURT:  Meaning that you're never going

17   to be the person asking for an extension here, as

18   things stand now.

19              MR. AGNIFILO:  I want to try the case

20   January 7th.  Sometimes my colleagues don't always agree

21   with that and I'm trying to harmonize all the views.

22   And I'm not even finding fault with the government in

23   what I'm saying.  I'm just stuck in a situation that

24   I'm in and it's really incumbent upon me, I think, to

25   move as quickly as possible.  So my position is that we

1  start the trial on January 7th.  I'm looking to be

2  accommodating to different views but I'm not in a

3  position to say that it's going to take me three months

4  starting in the second week of December to look at this

5  discovery, which puts us into mid-March, I guess, which

6  I think is too long.  That's it, just to the complete

7  the thought.

8           THE COURT:  Right.

9           MR. AGNIFILO:  Thank you, Judge.

10          THE COURT:  Others, your view?  Any other

11 views?

12          MR. McGOVERN:  I don't think we have

13 anything to add to that.  We're going to work to the

14 schedule that gets set.  We are concerned about getting

15 firm deadlines on discovery but we have nothing else to

16 add.

17          THE COURT:  Okay.  We're working from

18 December 7th.  This is a tandem effort with the trial

19 judge but it's his trial, so he can decide that this is

20 going to be something different.  Let's go back to the

21 chart which is part of the 25th and get some idea of

22 when you will know what the productions are going to be

23 or the best way for the government to update everyone.

24 A December 7th data dump does not help anybody.

25          I agree with the government that there would

1    be a reasonableness analysis but what is reasonable is

2    shaped by all of the facts that have come forward so

3    far, and this is an effort to really, really do this

4    expeditiously.  The problems, by the time you get to

5    December 7th, would need a lot of technical and resource

6    explanation.

7                You have some definite dates.  Looking at

8    your chart, when do you think you might get an update?

9    I think one thing you've said that's a little bit

10   concerning, maybe a lot concerning, is this idea of

11   there's a queue.  I have no idea what's going on in the

12   rest of the country.  If you're at the front of the

13   queue, great.  If you're at the back of the queue and

14   there's -- I don't have any sense of the centralized

15   resources on that front.  If they're just going to say,

16   we'll get to it when we get to it, that's not great.

17               MS. PENZA:  Your Honor, may I address some

18   of those questions.

19               THE COURT:  Sure, yes.

20               MS. PENZA:  Just one thing I just want to

21   correct.  It is not at all the government's proposal to

22   do a data dump on December 7th.  We are sensitive to the

23   defense's desire to access discovery.  That is why we

24   are -- we would love to make full discovery copies of

25   all electronic devices as early as possible.

1          THE COURT:  Right.  So far, they haven't
2    gone for that.
3          MS. PENZA:  That hasn't happened yet.
4          THE COURT:  Right.
5          MS. PENZA:  Your Honor, one thing we did
6    invite in our letter is, should Nancy Salzman's
7    attorney determine that, based on their review of a
8    particular device, there isn't much of an objection to
9    having it made in full to all defendants.  We would
10   just ask that that be noted to the government.  We will
11   make that particular device available in full to all
12   defendants promptly.
13         THE COURT:  I think you already know that.
14   If that turns out to be the case, it would be great if
15   you could let everybody know to move this along.
16         MS. PENZA:  With respect to the items that
17   have been sent to Quantico, your Honor, there is -- we
18   have absolutely no control over how those devices and
19   how those -- if those devices will be accessed and how
20   the information will be gathered from those devices.
21   At present, they're not accessible.  The information on
22   them is not accessible to the government.
23         THE COURT:  Let me just understand what
24   you're saying.
25         MS. PENZA:  Yes.

1          THE COURT:  That means technologically --

2          MS. PENZA:  Technologically.

3          THE COURT:  -- nobody in the government can

4  do it, or you're not at the top of the list so they're

5  not even trying to figure things out for you.  What

6  does it mean that it can't be done?

7          MS. PENZA:  It currently cannot be accessed.

8  It is possible that attempts can be made to access

9  those, to brute force those devices, for example.  But

10  there is a queue.  It's a very specialized laboratory.

11  These devices may not be at the head of the queue and

12  we cannot give an estimate as to at what time they will

13  be.  That said, your Honor --

14          THE COURT:  Just so I'm clear, those are

15  just the ones that are at the FBI headquarters?

16          MS. PENZA:  Correct.

17          THE COURT:  So it's a modest, relatively

18  speaking, part of this list.

19          MS. PENZA:  Yes, your Honor, and I'll just

20  note, to the extent that trial comes and goes and the

21  devices haven't been accessed -- I just merely point

22  out that this is a premature issue.  Should the

23  government come into possession, be able to access the

24  information on these devices, that would be a proper

25  time to determine when and if that information could be

1  used, what we should do about that.

2           THE COURT:  There's no decision.  The

3  purpose of my questions right now is, you have

4  helpfully added some dates to the chart, the second

5  version of the chart.  I was starting with what seemed

6  then to be potentially the most difficult other dates.

7  Those are the TBD's.  So you're saying technically, you

8  just don't know.  So then there's a whole other set of

9  dates on here that search commenced and ongoing.  When

10 would you have an estimate or even a prediction?

11          MS. PENZA:  Your Honor, some of those

12 devices are subject to claims of privilege, so it does

13 make sense to have a set schedule to determine claims

14 of privilege because, for obvious reasons, we can't --

15 unless those potentially privileged materials are

16 sorted through and there's a determination about them,

17 we can't provide that information, that bucket of

18 potentially privileged materials.

19          THE COURT:  I understood, correct me if I'm

20 wrong, from our conversation previously, the way that

21 works is essentially, you've gotten the lawyers'

22 contact and identifying information.  Your colleague is

23 basically handling that.  You're going to segregate out

24 the privileged material, we'll deal with it on the

25 motion.  You don't know or at least you didn't know

1    sitting here whether that was 1%, 2%, we don't know

2    what that is.  But everything else is subject to your

3    search and production.  So putting the privilege aside,

4    what about the rest of it?

5            MS. PENZA:  Just to clarify, your Honor,

6    you're asking with respect to non-potentially-

7    privileged materials on the items that have been

8    highlighted potentially -- that may have potentially

9    privileged materials, you're asking how long it will

10   take the government to produce responsive results to

11   those?

12           THE COURT:  I guess it may be exactly the

13   same question.  The ones I was focused on were the ones

14   that are identified as searched, commenced, and

15   ongoing, focusing on the non-privileged material.

16           MS. PENZA:  It depends, your Honor.  Some of

17   these, for example the 8 Hale Drive devices have been

18   produced in full to the defendants or will be by a

19   particular date.

20           THE COURT:  I'm sorry, which ones are we

21   looking at now?

22           MS. HAJJAR:  1B50, your Honor, and then

23   down.  So all the 8 Hale Drive materials have either

24   been provided to all the defendants now or will be

25   provided by October 5th.  Even though it says search

```
1   commenced and ongoing --

2              THE COURT:  This is an update?  Okay.

3              MS. HAJJAR:  No, it's in there.  But what

4   I'm saying in terms of the search being -- the fact of

5   the search having commenced and being ongoing is really

6   irrelevant to the conversation we're having because the

7   defendants have that, have the full ability to search,

8   just as Ms. Necheles was describing.  They have their

9   vendors.  They will have full access the same way the

10  government has by October 5ᵗʰ --

11             THE COURT:  Okay.

12             MS. HAJJAR:  -- to everything at 8 Hale.

13             THE COURT:  So you're saying the ones that

14  are marked as (ui), not so important because everybody

15  has it, right?

16             MS. HAJJAR:  Yes, your Honor.

17             THE COURT:  But the ones that are not all --

18             MS. HAJJAR:  We've laid out aggressive

19  deadlines for ourselves for the stuff that was not at

20  Nancy Salzman's house.  Your Honor, what we're really

21  talking about here is just Nancy Salzman -- the devices

22  from Nancy Salzman's house.

23             THE COURT:  Okay.

24             MS. HAJJAR:  That is where there is

25  difficulty.  For example, two laptops recovered from
```

1    Nancy Salzman's house, Mac computers.  Just the time to

2    get them on to our vendor system, converted from Mac,

3    to be in the proper format, which will then be in the

4    proper format for the defendants and usable for them,

5    that has taken over two weeks just for us to get it on

6    to the system so that the search terms could be run to

7    segregate them out.  So that's just two devices, your

8    Honor.  That's an example of the technicalities here

9    and why it's very difficult for us to be able to give

10   you more definitive estimates of when.

11           THE COURT:  Let me ask what may be

12   completely naïve question, but why seriatim instead of

13   parallel?  Why isn't it all the devices all hooked up?

14           MS. HAJJAR:  Because they can't do that.  It

15   takes time to go through.  We have a platform and they

16   upload them as we get them.  So they have a queue of

17   additional items that we've provided them, that we're

18   waiting to get on to the platform.  This is one of the

19   most reputable vendors in the business.  They've been

20   doing this for a very long time.  I don't believe it's

21   an issue of resources on their part.  We have committed

22   in the same way I'm sure defendants have committed to

23   their vendor and have put a lot of resources towards

24   that.  So it's happening and then the searches have to

25   happen, and it's an ongoing process.  Searching is an

1    ongoing process, as was described in our letter.  There

2    are hidden files, there are things like that.

3              There are parallel processes going on, your

4    Honor.  Not everything has to be uploaded to our

5    vendor.  There are other items, for example, where we

6    have just produced the results of the search.  I think

7    one of those was like an 8 Hale camera, for example.

8    We just pulled out the pictures out and gave them

9    everything.  That search is done.  But there aren't --

10   it's difficult because the things that are really going

11   to be the most time intensive that really are going to

12   result in what Ms. Necheles is afraid of, getting a

13   large data dump and then having to sift through it,

14   those are the things that are difficult for us to give

15   an estimate to, and that's the problem.  There's really

16   no way around that, your Honor.  That's why ultimately,

17   the --

18             THE COURT:  That's the problem.  There is a

19   way around it by expanding the resources.  The question

20   is, is that possible or practical or reasonable to

21   demand?  You two can only do so much work and whoever

22   is working with you.  So at some point, even if you

23   were to enhance the technical ability, you might hit a

24   bottleneck.  Maybe you could be assisted, but I

25   understand your point that the people with more

1  thorough knowledge of the case are the best to go

2  through the material.

3              What's your suggestion?  We need a plan here

4  and I understand your motions -- it will be decided by

5  the district judge against the backdrop of this

6  discovery.  The ones that will come to me are probably

7  these privilege motions.  You think I a week you're

8  going to know more?

9              MS. PENZA:  Sorry, your Honor.  Our

10 suggestion is laid out in our letter.  Currently, the

11 trial is set for January.  We can proceed with that in

12 mind and go forward.  I think defense counsel's letter,

13 as I read it, does not have a problem with that.  I'll

14 just note --

15             THE COURT:  I'm sorry.  Your letter

16 suggests --

17             MS. PENZA:  It sets forth a schedule, your

18 Honor, by which -- for those devices for which we have

19 dates, we will abide by those deadlines and then --

20             THE COURT:  I'm sorry.  Are you talking

21 about your chart?  Am I missing something?

22             MS. PENZA:  Partly our chart, your Honor,

23 and partly the general deadline involving privilege

24 logs, scheduling of any --

25             THE COURT:  Which one, this one?

1          MS. PENZA:  Yes, your Honor.

2          THE COURT:  Right, and this one, okay.  You

3    have this.  Except for the privilege point, this will

4    generally be dealt with by the district judge.  I am

5    still asking the same question about -- I get the focus

6    on Ms. Salzman's devices -- when you will have a better

7    handle on the production schedule because it's not fair

8    or realistic to think that defense counsel can plan how

9    they're going to defend if they don't have any idea

10   what is coming in when.  You're telling me here you

11   don't know.  This is putting aside the ones that have

12   the very technical problems, the ones that are marked

13   as TBD.

14          MS. PENZA:  Your Honor, we've given

15   ourselves deadlines going through the next -- October.

16   We are going to do our best efforts to get as much out

17   for the other devices on a rolling basis.  I do want to

18   note that what I think is a sensible approach is to be

19   sensitive to what defendants want.  For example, we've

20   received requests -- we received comments or requests

21   in the vein of, what we really want are these

22   communications.  What we don't want are hours and hours

23   of lectures.  We don't want that so please don't -- we

24   want you to prioritize what would be --

25          THE COURT:  Just put that on hold for one

1    second because I think that's a helpful point and it

2    would be good to be discussed here.  But still, in

3    general, when will you know -- let's focus on the

4    Salzman devices -- what the likely technical schedule

5    could be?  Obviously, if they tell you, we are most

6    interested in 1B93, you'll move that to the front of

7    the list.  Any idea?

8                MS. PENZA:  Your Honor, we could submit a

9    letter -- you could direct the government to provide a

10   letter in three weeks updating your Honor about what

11   efforts have been made to get discovery out and what

12   remains, and we've have a better idea then.

13               THE COURT:  So you think three weeks is when

14   you would be able to report on progress and

15   predictions?

16               MS. HAJJAR:  I think that's fine, your

17   Honor, bearing in mind -- we just want the Court to

18   acknowledge we have set very aggressive deadlines for

19   the certain -- for items not Nancy Salzman's phone, so

20   we certainly were attempting to prioritize those.

21               THE COURT:  There's no criticism that you're

22   not -- I'm not suggesting, nor do I think defendants

23   are suggesting that you're not working hard.  The point

24   is that this is an enormous task on a short deadline.

25   So it's how to deal with that problem, not that you're

1    not trying.

2                MS. HAJJAR:  No, and I wasn't taking it that

3    way, your Honor.  What I just want to emphasize is that

4    we have prioritized the emails and electronic items

5    that defendants have also expressed an interest in

6    having sooner rather than later.

7                THE COURT:  Okay.

8                MS. HAJJAR:  So we will have to be working

9    on parallel schedules.

10                THE COURT:  Okay.

11                MS. HAJJAR:  But I think what your Honor is

12    really asking -- in three weeks, will we have a better

13    idea technically?

14                THE COURT:  Yes, that's step one.

15                MS. HAJJAR:  Yes, I think we will have a

16    better idea technically.

17                THE COURT:  Okay.  Back to your colleague's

18    point, you have heard some requests from some

19    defendants about a priority, the materials they are

20    interested in.

21                MS. PENZA:  Yes, your Honor, but we will

22    continue to be sensitive to that.  My point is simply

23    that, if in a week or two, as we prepare to make our

24    report to the Court, should we hear from defense

25    counsel about a priority, we would like to incorporate

1  that and focus on those devices that are likely to

2  yield fruitful results.

3         THE COURT:  Okay, two things that obviously

4  would feed into some reasonableness analysis if it

5  becomes necessary to make that, but I thought you were

6  not all on the same page about your priorities from our

7  conversation two sessions ago.

8         MR. AGNIFILO:  I think we are, Judge.

9         THE COURT:  Is that any better, any worse,

10  any closer, any overlap?  Has the diagram gotten any

11  better.

12         MR. AGNIFILO:  I think that the government

13  knows our priorities and I think they've been trying to

14  produce according to our priorities.

15         THE COURT:  Not to interrupt but who is

16  "our," because I thought there was a disagreement about

17  -- from this side of the room.  I'm not sure I can

18  remember --

19         MR. AGNIFILO:  There are a couple of general

20  principles and if any of my colleagues disagree, they

21  will let me know.  I think my colleagues with the

22  government alluded to the fact that there's so much

23  data space taken up by videos, videos of people talking

24  and lectures.  That is really -- someone might disagree

25  with me.  That's the lowest priority.  The highest

```
 1   priority are email accounts.
 2              THE COURT:  Which do seem to be moving
 3   forward, right?
 4              MR. AGNIFILO:  Yes, I think we are.
 5              THE COURT:  Okay.
 6              MR. AGNIFILO:  And the government I think is
 7   trying to work with us, and I appreciate it.
 8              THE COURT:  Okay.  What's your second-
 9   highest priority?
10              MR. AGNIFILO:  You stumped me with that one.
11   I only know my highest priority.
12              THE COURT:  Interesting world view but okay.
13   That's for your client.  Everybody else?
14              MR. AGNIFILO:  Yeah.  Secondarily, I guess
15   there are things like phone records, bank records,
16   things like that.  What's clearly in the basement of
17   our priority list, the lowest priority, really are the
18   videos.  The reason that we're trying to focus on that
19   is, I think in terms of just the terabyte space, so
20   much of it is taken up by videos.  Really what's
21   helpful in making just the raw mass of information
22   almost more manageable is almost to cut that stuff out
23   for the time being and say, give us the emails, give us
24   the records.
25              THE COURT:  So now maybe I have to ask a
```

1    followup from a question I asked before.  I thought

2    from previous conversation, the government was not yet

3    in a position to say what was video and what was not.

4    Has that changed?

5            MS. PENZA:  Your Honor, we are able to -- it

6    has been inventoried in a sense.  We can figure out how

7    many video files are on what device.

8            THE COURT:  That's moving forward.  That's

9    good.

10            MS. PENZA:  I think the point is whether --

11    notwithstanding what Mr. Agnifilo just said, the

12    probative value of those videos obviously requires

13    listening to them and sort of delving deep into what

14    the file is.

15            THE COURT:  In our previous conversation,

16    you weren't even up to that stage.  Now you know video

17    versus whatever the other options are at this point.

18            MS. PENZA:  May I just explain how this --

19            THE COURT:  Sure.

20            MS. PENZA:  If you are viewing a device in

21    FBI's review database, you can see each file.

22    Sometimes the file type is designated, making it

23    obvious to the person what it is, an MP3 or a video

24    file.  Sometimes it's not entirely obvious for reasons

25    that I probably can't explain to your Honor because I

1    don't know, but there are files where the file name

2    isn't immediately obvious.  But certainly yes, there

3    are ways to determine this device appears to have a lot

4    of audio or video.

5              THE COURT:  And you have those kind of

6    indexes now for the devices that you can access.

7              MS. PENZA:  We have noted where we -- we've

8    noted two devices, your Honor, in our letter where we

9    just noted to the Court and the parties where we

10   thought there were substantial numbers of audio or

11   video files.  So as we continue to look through each of

12   these devices and see where we -- see the video files,

13   we can make note of that and pass it along to defense

14   counsel.

15             THE COURT:  So for two devices, you know

16   that, is that right?

17             MS. PENZA:  I'm sorry, your Honor?

18             THE COURT:  Is it for two devices, you know

19   that?

20             MS. PENZA:  Two devices where there was a

21   particular large number of audio and video files.

22             THE COURT:  But you could do that quick view

23   indexing effort on the other devices and get a

24   handle --

25             MS. PENZA:  Yes, your Honor.  It does take

1    time because it's not user friendly.  This system is

2    unfortunately not user friendly or particularly

3    intuitive but yes, it can be done.  But I'll just note

4    that one of these devices is particularly large.  There

5    are video and audio files but there are also email

6    correspondence and other items which may be of interest

7    to defense counsel.

8         THE COURT:  Which one was that?

9         MS. PENZA:  That is -- I believe it's 1B89,

10   your Honor.

11        THE COURT:  The 333 gigabytes?  Okay.

12   You're putting video at the bottom and email at the

13   top.

14        Other defense counsel, your preferences,

15   your priorities, your thoughts about any of this?

16        MR. SOLOWAY:  Judge, I have one observation,

17   I think I would call it, on --

18        THE COURT:  Do you mind -- can you use a

19   mic?

20        MR. SOLOWAY:  On behalf of Nancy Salzman.

21        THE CLERK:  Speak into the mic.

22        THE COURT:  It's hard to hear.

23        MR. SOLOWAY:  Thank you, Judge.  I think

24   following up on something Ms. Necheles was talking

25   about and trying to figure out how the case can be

1    moved to trial, where the discovery schedule, at least

2    the government keeps saying it's inappropriate, unfair,

3    not really consistent with the law to set a discovery

4    cutoff.  Ms. Bronfman's lawyer was kind of responding,

5    that doesn't really apply in the case of materials that

6    the government has in their possession.  Yes, there's

7    obviously continuing investigation but --

8            For example, in our situation with Nancy

9    Salzman, it has to be remembered, I think, that with

10   respect to search warrants that were attributable to

11   Nancy Salzman, that consisted of the 8 High Drive and 3

12   Oregon Trail premises.  We asserted absolutely no

13   attorney/client privilege issues with respect to 8 Hale

14   Drive in its entirety.  We gave the government a list

15   of 42 to 45 devices from the 3 Oregon Trail that we

16   also asserted no attorney/client privilege.

17           THE COURT:  And just so I'm clear, no

18   privacy either, right?

19           MR. SOLOWAY:  We didn't say anything about

20   privacy.  They were recovered in Nancy Salzman's home

21   but we didn't assert privilege.

22           THE COURT:  Okay.

23           MR. SOLOWAY:  Attorney/client privilege with

24   respect to those devices.

25           MS. PENZA:  We're on a fundamental

1    misunderstanding then of how we've been proceeding,

2    your Honor, based on that.

3              THE COURT:  Okay.

4              MR. SOLOWAY:  Let me just ask one particular

5    question, and that relates to the discovery cutoff

6    issue at this moment.

7              THE COURT:  Okay.

8              MR. SOLOWAY:  Because with respect for

9    example to an item that we made no assertion --

10   specifically, what we did was we said that no

11   attorney/client privilege issues are asserted with

12   respect to these particular 42 devices, and I have the

13   email in front of me.  One of them happens to have been

14   this Kiosara (ph) phone --

15             THE COURT:  The one they can't get into?

16             MR. SOLOWAY:  -- that is identified in the

17   government's chart as something that had to go out to

18   -- it's on page -- it's IB74.

19             THE COURT:  74, right.

20             MR. SOLOWAY:  So in order to get some kind

21   of order, is there a principle that can operate that

22   would say that there's going to be a trial on a certain

23   date.  This particular phone is sent to the FBI

24   headquarters.  There's been no -- there should be a

25   point at which the government can't just continue to

1    say, we might one day break into this phone or force

2    this phone open.  These are things that they've had

3    since March 27th, 2018, and we're still now, at the end

4    of September, learning that we don't know when if ever

5    we're going to see the contents of this phone.

6            I don't know whether the phone is important.

7    We haven't asserted anything with respect to

8    attorney/client privilege as to it, but there are --

9    there can't be, with respect to things that the

10   government has, just a continuum that goes on forever

11   and be consistent with an actual firm trial date.

12           THE COURT:  I think it's reasonable, for the

13   things the government has described all summer as

14   technologically challenging, which seems to be the ones

15   that are TBD, to get an update in some period of time.

16   But you're saying -- is there a point you want to make

17   about the 42 minus the TBD's?  There was some sense of

18   a misunderstanding here so --

19           MS. NECHELES:  Your Honor, could defendants

20   take one minute?

21           THE COURT:  Counsel, why don't you speak for

22   one second because I'm not sure where this is.

23           (Tape off, tape on.)

24           THE COURT:  We're back on the record.  Yes,

25   sir.

1          MR. SOLOWAY:  -- what particular interests

2     were asserted with respect to 8 Hale Drive right now.

3     My only answer to that is that I have to go back and

4     look at the communications that were made between my

5     firm and the government and also discuss it with the

6     government.

7          THE COURT:  Okay.

8          MR. SOLOWAY:  I'm not going to say anything

9     further about it right now because I don't have the

10    records in front of me of what communications we made.

11         THE COURT:  Can you have that in the next

12    couple of days?

13         MR. SOLOWAY:  Yes, of course.

14         THE COURT:  Okay.

15         MR. SOLOWAY:  Yes, I can have it, yes.

16         THE COURT:  Friday, Monday?

17         MS. PENZA:  Your Honor, every discussion in

18    this case has been with the understanding that the

19    government was providing everything pursuant to 8 Hale

20    because the defendant was asserting -- because Nancy

21    Salzman asserted no privacy interest in it.  We've had

22    that open discussion multiple times before your Honor.

23    This should be something that we need to resolve

24    tonight because otherwise --

25         THE COURT:  We're not going to do it.

1              MS. PENZA:  Your Honor, otherwise, we need

2    to claw back things from the other defendants.  There's

3    a real problem here because we've been operating

4    under --

5              MR. SOLOWAY:  We'll resolve it tonight,

6    Judge.  That's no problem.  We'll go back and look and

7    we'll resolve it.

8              THE COURT:  And you'll let me know tomorrow

9    if you haven't worked this out?

10             MR. SOLOWAY:  Yes.

11             MS. PENZA:  And that will change the

12   government's position on the deadline for substantial

13   production because this was on the understanding that a

14   whole home full of devices was provided to all

15   defendants.

16             THE COURT:  So you're meeting the district

17   judge on the 4th?  Are there other issues, other

18   priorities?

19             MR. SOLOWAY:  I think the only thing we'd

20   want to suggest on the priorities is that -- I open

21   this up for other comment -- that we hold to the

22   December 7th deadline that the government volunteered in

23   their letter for discovery.  If things are later

24   produced, there can be a discussion with the Court

25   about whether they're admissible or not, if they

1    weren't produced for good cause, and have that

2    discussion then.  I think having everybody walking out

3    of this room with a firm deadline of the substantial

4    discovery date I think would be helpful.

5              THE COURT:  All right.

6              MR. AGNIFILO:  Let me just add one thing

7    because I said emails but I didn't say text messages

8    that are also in the government's possession at this

9    point.  That's a priority as well, Judge.

10             THE COURT:  Okay.

11             MS. NECHELES:  Your Honor, just in terms of

12   priorities, there are a lot of business records that

13   we're still surprised not to have seen.  We would

14   expect to have all -- those touch directly on issues in

15   the case, telephone records, bank records, accounting

16   records.

17             THE COURT:  Non-device discovery.

18             MS. NECHELES:  Right, subpoenas.  All of

19   that stuff should be -- I see that in the government --

20   they have declined to sort of identify this stuff and

21   say that they will turn it over by December 7th.  That's

22   a priority.  That stuff is critical to our defense,

23   much more critical for Ms. Bronfman than many other

24   things.  It should be easy for them to just copy it all

25   and produce it.

1            THE COURT:  Okay.

2            MS. PENZA:  Your Honor, just on that point,

3    we understand that.  We have been doing that on a

4    rolling basis.  For example, Ms. Necheles I think

5    emphasized that bank records were a priority.  We've

6    produced over 10,000 pages of bank records this week.

7    We intend to produce more, so we understand that.

8            THE COURT:  When are you going to finish

9    that?

10            MS. PENZA:  We're still receiving some.

11            THE COURT:  I get that.  Let's talk about

12    what you have.  I'm not expecting you to pull it all --

13            MS. PENZA:  A couple weeks, your Honor, a

14    few weeks.

15            THE COURT:  I'm not sure that's reasonable.

16    You have to tell me more.  This is what we're going to

17    do.

18            MS. PENZA:  I will explain to you that there

19    is a technical problem because certain banks have

20    produced records in a way that are double-encrypted.

21    In order to actually produce them to defense counsel,

22    we have to go through a conversion process, so that's

23    why I'm saying a couple weeks.  It is a technical

24    issue.  Otherwise, we would have produced every single

25    bank record in our possession as of last week, when we

1    produced these.

2            MS. NECHELES:  It's not just bank records.

3            MS. PENZA:  I understand.  I was just giving

4    an example.

5            THE COURT:  All right, time out on this.

6    You have issues.  You need to talk about them.  Number

7    one, the Salzman devices, and two, your schedule.  If

8    you want to try to explain in more detail why this

9    double encryption can't be worked out, have a

10   conversation with the banks to produce it or what is

11   going on, you can do that.

12           If you work these issues -- this is where

13   we're leaving today:  For now, the discovery is -- it's

14   not a cutoff but the expectation is that the government

15   will have produced as much as possible.  If you don't

16   have enough resources dedicated to this, then the

17   office needs to have that conversation.  This is not

18   prejudging it.  It is accepting that you can make these

19   arguments but if you are not putting this into it and

20   that's why this doesn't get done, then the government

21   will have a problem.

22           If you have not figured out these issues

23   with Salzman and a schedule for the production of the

24   business records and similar materials, then come back

25   here on Tuesday at 5:00.  I'm on criminal duty so I

1     can't promise you that I will start at 5:00.

2     Hopefully, it will and we will hash the rest of this

3     out.   It may be that there are issues you would like to

4     talk about with each other ahead of your October 4th

5     conference but you can do that.

6              Does anybody have a problem coming in?

7     Calling in is not ideal.   Hopefully, we can sort out --

8     we'll try to figure that out or we'll do a version of

9     what we did today.

10             MS. PENZA:   Your Honor, may I just clarify

11    something?   Are we to come in on Tuesday if these

12    issues are not resolved?   In other words, are we

13    setting -- are we planning to come in or are we --

14             THE COURT:   You'll resolve your outstanding

15    issues and that would mean that you are all working

16    towards the December 7the deadline and the privilege

17    schedule is acceptable, the privilege briefing schedule

18    is acceptable.   The other issues you can raise with the

19    district judge.   And you've worked out a schedule on

20    these issues that were flagged today, which is the

21    Salzman production and the -- I'm just going to group

22    together those business records but the non-device

23    discovery, then you can let me know by noon on Tuesday

24    and I will expect you.   If everyone is not on the same

25    page about that, then there's a 5:00 conference.

1          MS. NECHELES:  Your Honor, with respect to

2     one thing.

3          THE COURT:  Yes.

4          MS. NECHELES:  I've never created a

5     privilege log when the government has done a seizure.

6     It's kind of an unusual process they're sort of setting

7     up.  They have a (ui) --

8          THE COURT:  I'm going to interrupt you and

9     say, why don't you all talk about it?  If you don't

10    work it out, we'll talk about it on Tuesday.  Not to

11    agree or disagree with you, but it seems like it would

12    be a better idea, especially for Ms. Salzman, to have

13    an idea of where you are with the production and then

14    talk about what the process -- the point I think you're

15    going with, which is what is your experience.  And the

16    second point being, however you resolve this issue, is

17    it practical to do what's talked about here or should

18    something else happen.

19         For now, 5:00 on Tuesday.  If you need to

20    call in, just let -- I guess the best thing would be if

21    you could just have a joint letter about who we should

22    call.  We should try to get everybody on the line and

23    not have this problem.  Normally, I would suggest that

24    you call in but that wasted twenty minutes here, so try

25    to avoid that.  If you have resolved everything, let me

1    know by noon.  If somebody doesn't mind giving us a

2    call, I don't see all the bounces right away,

3    especially when I'm on criminal duty.  We'll talk next

4    week if needs be.  Thank you.

5                    *  *  *  *  *  *  *

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18         I certify that the foregoing is a correct

19    transcript from the electronic sound recording of the

20    proceedings in the above-entitled matter.

21

22

23

24

25    ELIZABETH BARRON                    October 1, 2018
```