UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br><br>   -   v.   -<br><br><br>KEITH RANIERE, CLARE BRONFMAN,<br>ALLISON MACK, KATHY RUSSELL,<br>LAUREN SALZMAN, and NANCY SALZMAN,<br><br>Defendants. | Case No. 1:18 Cr. 00204-NGG<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**Date of service: November 16, 2018**<br><br>**As corrected: December 3, 2018** |

**CORRECTED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT ALLISON
MACK'S MOTIONS TO DISMISS THE INDICTMENT**

William F. McGovern
Sean S. Buckley
800 Third Avenue
New York, New York 10022
Tel: 212 488 1210 / 1253
William.McGovern@kobrekim.com
Sean.Buckley@kobrekim.com

*Attorneys for Defendant Allison Mack*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ...................................................................................iv

**PRELIMINARY STATEMENT** ...........................................................................1

**BACKGROUND** ....................................................................................................2

   A. Factual Background ..........................................................................................2

   B. Summary of the Indictment ..............................................................................5

**ARGUMENT** ...........................................................................................................6

  I.   The Indictment Fails to Plead the Forced Labor and the Trafficking Counts with Sufficient Specificity and Should Be Dismissed Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(iii)...............................................................................6

    A.  Applicable Law...........................................................................................6

    B.  Discussion..................................................................................................8

      1.   The Forced Labor Count Lacks Specificity and Should Be Dismissed..............8

      2.   The Trafficking Counts Lack Specificity and Should Be Dismissed. ...............10

  II.  The Forced Labor Count Should Be Dismissed Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for Failure to State a Claim. ...........................................11

    A.  Applicable Law.........................................................................................11

    B.  Discussion................................................................................................12

      1.   The Forced Labor Count Cannot State that Ms. Mack Knowingly Provided or Obtained Labor or Services from Any Person....................................................12

      2.   The Forced Labor Count Cannot State that the Means as Defined Under the Statute Were Used by Ms. Mack. ......................................................................14

  III.  The Trafficking Counts Should Be Dismissed Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for Failure to State a Claim. ...........................................17

    A.  The Trafficking Counts Cannot State that Ms. Mack Participated in a Commercial Sex-Trafficking Venture. .......................................................................17

      1.   The Trafficking Counts Cannot Establish that Anyone Received Anything of Value. ...............................................................................................................18

      2.   The Trafficking Counts Cannot State the Receipt of Anything of Value "On Account Of" Any Sex Act. ...............................................................................20

    B.  The Trafficking Counts Cannot State that Ms. Mack Knew Force, Fraud, or Coercion Would be Used to Cause Someone to Engage in a Commercial Sex Act. 22

      1.   The Trafficking Counts Fail to State Force and Coercion as a Matter of Law..23

      2.   The Trafficking Counts Cannot State that Ms. Mack Knew Coercion Would Be Used to Cause a Commercial Sex Act. ..............................................................25

  IV.  The TVPA Is Unconstitutionally Vague as Applied to Ms. Mack's Alleged Conduct. ..................................................................................................................26

A.   Applicable Law............................................................................................27

B.   Discussion..................................................................................................28

**CONCLUSION** ...........................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Adia v. Grandeur Mgmt. Inc.*,
   No. 17-CV-9349, 2018 WL 4300528 (S.D.N.Y. Sept. 10, 2018).........................................15

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)........................................................................11

*Ashton v. Kentucky*, 384 U.S. 195 (1966) ...............................................................................27

*Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*,
   502 F.3d 545 (6th Cir. 2007)..................................................................................................27

*Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805 (M.D. Tenn. 2013) .............................28

*Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262 (W.D. Wa. 2012) ..........................28

*Cochran v. United* States, 157 U.S. 286 (1895).................................................................7, 11

*Cruz v. Maypa*, 773 F.3d 138 (4th Cir. 2014).................................................................15, 17

*DeSilva v. N. Shore-Long Island Jewish Health Syst., Inc.*,
   No. 10-CV-1341, 2012 WL 748760 (E.D.N.Y. Mar. 7, 2012) ...........................................15

*Grayned v. City of Rockford*, 408 U.S. 104 (1972)................................................................27

*Headley v. Church of Scientology Int'l.*, 687 F.3d 1173 (9th Cir. 2012)...........................16, 24

*Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*,
   2013 WL 6816174 (W.D. Ark. Dec. 24, 2013).................................................20, 21, 28, 29

*Kolender v. Lawson*, 461 U.S. 352 (1983)..............................................................................27

*Muchira v. Al-Rawaf*, 850 F.3d 605 (4th Cir. 2017)...................................................15, 16, 17

*N.A.A.C.P v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).................................................21

*Nobel v. Weinstein*, No. 17-CV-9260, 2018 WL 3863452 (S.D.N.Y. Aug. 14, 2018)......20, 26

*Petersen v. Boeing Company*,
   No. 10-CV-0999, 2015 WL 12090213 (D. Ariz. Feb. 18, 2015)........................................14

*Russell v. United States*, 369 U.S. 749 (1962) ..................................................................passim

*Sira v. Morton*, 380 F.3d 57 (2d Cir. 2004) ....................................................................7, 8, 9

*Todd v. United States*, No. C-11-0470, 2012 WL 2952084 (W.D. Wash. June 26, 2012)......18

*United States v. Afyare*, 632 F. App'x 272 (6th Cir. 2016) .........................................10, 21, 29

*United States v. Aleynikov*, 676 F.3d 71 (2d Cir. 2012).........................................................12

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998) .............................................................8

*United States v. Awan*, 459 F. Supp. 2d 167 (E.D.N.Y. 2006) ...................................................7

*United States v. Bailes*, 10 F. Supp. 2d 607 (S.D. W. Va. 1998)..............................................12

*United States v. Biancofiori*,
    No. 16-CR-306-1, 2018 WL 372172 (N.D. Ill. Jan. 11, 2018) .....................................25, 26

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1984) .....................................................30

*United States v. Bradley*, 390 F.3d 145 (1st Cir. 2004) ..........................................................15

*United States v. Brozyna*, 571 F.2d 742 (2d Cir. 1978) ..........................................................11

*United States v. Callahan*, 801 F.3d 606 (6th Cir. 2015) ........................................................15

*United States v. Campbell*, 111 F. Supp. 3d 340 (W.D.N.Y. 2015) ..........................................18

*United States v. Coia*, 719 F.2d 1120 (11th Cir. 1983) ...........................................................12

*United States v. Covington*, 395 U.S. 57 (1969)...............................................................12, 17

*United States v. Dann*, 652 F.3d 1160 (9th Cir. 2011) ...........................................................14

*United States v. Estrada-Tepal*, 57 F. Supp. 3d 164 (E.D.N.Y. 2014) ...........................passim

*United States v. Giovanelli*, 464 F. 3d 346 (2d Cir. 2006) ........................................................7

*United States v. Granderson*, 511 U.S. 39 (1994) ..................................................................28

*United States v. Hall*, 20 F.3d 1084 (10th Cir. 1994) ..................................................12, 14, 17

*United States v. Lanier*, 520 U.S. 259 (1997)..................................................................27, 28

*United States v. Marcus,* 487 F. Supp. 2d 289 (E.D.N.Y. 2007).....................................passim

*United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010) .............................................................13

*United States v. Peterson*, 544 F. Supp. 2d 1363 (M.D. Ga. 2008)............................................9

*United States v. Pirro*, 212 F.3d 86 (2d Cir. 2000)............................................................passim

*United States v. Risk*, 843 F.2d 1059 (7th Cir. 1988) ......................................................passim

*United States v. Rivera*, 799 F.3d 180 (2d Cir. 2015)..............................................................23

*United States v. Roy*, 630 F. App'x 169 (4th Cir. 2015)....................................................25, 26

*United States v. Serrano*, 191 F. Supp. 3d 287 (S.D.N.Y. 2016) .................................................7

*United States v. Solovey*, No. 4-CR-244S,  2005 WL 1279228..................................................9

*United States v. Thompson*, 896 F.3d 155 (2d Cir. 2018).........................................................27

*United States v. Todd*, 627 F.3d 329 (9th Cir. 2010) ........................................................25, 28

*United States v. Tomasetta*, 429 F.2d 978 (1st Cir. 1970) ........................................................7

*United States v. Toviave*, 761 F.3d 623 (6th Cir. 2014)......................................................13, 14

*United States v. Urso,* 369 F. Supp. 2d 254 (E.D.N.Y. 2005) ................................................7, 9

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ..........................................................6, 30

*Vang v. Prataya*, No. 12-CV-1847, 2017 WL 401942 (D. Minn. Jan. 30, 2017)....................21

*Wood v. General Motors Corp.*, No. 8-CV-5224, 2015 WL 1396437 (E.D.N.Y. 2015) ..........7

**Statutes**

18 U.S.C. § 1589....................................................................................................................23

18 U.S.C. § 1591.........................................................................................................18, 22, 23

22 U.S.C. § 7101.............................................................................................................18, 28

**Rules**

Fed. R. Crim. P. 7(c)(1) ...........................................................................................................7

Fed. R. Crim. P. 12(b)(1) ........................................................................................................12

Fed. R. Crim. P. 12(b)(3)(B)(v) ........................................................................................passim

Fed. R. Crim. P. 12(d)..............................................................................................................12

## PRELIMINARY STATEMENT

When one strips away the sensationalist media reports of a case involving an alleged "cult," celebrities, and sex, what is left before the Court is a threadbare Indictment that does not come close to satisfying the constitutional requirements of fair notice and due process, let alone of the charges the government has brought against Allison Mack.  At bottom, the Indictment is vague and deficient because Ms. Mack's conduct simply does not fit the crimes with which she is charged.

Around 2015, Ms. Mack joined an organization, referred to as DOS, which endeavored to help women with self-improvement and upholding commitments.  To show commitment to the organization and ensure its confidentiality, members voluntarily gave up "collateral" in the form of a personal secret to be kept within DOS.  No one's collateral has ever been released by anyone associated with DOS.  Indeed, numerous former DOS members left the organization with the understanding that their collateral would not be released.  Nonetheless, Ms. Mack is now facing serious charges of forced labor conspiracy and sex trafficking on the theory that she coerced DOS members to perform labor and engage in commercial sex acts against their will by threatening to release their collateral.

Because of the tenuous grounds of the government's case, the Indictment merely parrots the language of the applicable statutes and utterly lacks any of the particularity required by the Constitution in order to provide Ms. Mack adequate notice to mount a defense, and to ensure that the government, at trial, would be held to the facts presented to the grand jury.  For this reason alone, these counts should be dismissed.

Notwithstanding these constitutional deficiencies, these counts should also be dismissed because, even assuming the allegations in the Complaint are true, they fail to state a crime within the terms of the statutes.  The forced labor charge fails to state a claim because the Complaint

shows that "acts of care" and other tasks DOS members engaged in do not constitute "labor or service," and that, even if they did, members were not coerced into providing them. The sex-trafficking charges likewise fail to state a claim because Ms. Mack never received anything of value on account of a sex act. On the contrary, the allegations in the Complaint show that Ms. Mack never received any money from her participation in DOS at all, let alone on account of a sex act as required under the statutes. The allegations also show that Ms. Mack never instructed anyone to partake in a sex act, and did not even know that the alleged sex acts were occurring.

Even if the Court finds that the Indictment has sufficiently stated the sex-trafficking charges, interpreting the sex-trafficking statutes to apply to Ms. Mack's conduct would render them unconstitutionally vague. No reasonable person in Ms. Mack's position would have understood that her participation in DOS would have subjected her to criminal liability under statutes designed to curb human trafficking and the prostitution of children. Accordingly, the Court should dismiss Counts Two, Four, Five and Six of the Indictment.[1]

## BACKGROUND

### A. Factual Background[2]

In 2015, a "women's mentorship group," was founded with the goal of helping women improve themselves. (Compl. ¶¶ 11, 15, 17, 42.) This organization, referred to by the government as "DOS," recruited women who wanted to overcome personal weakness. (*Id.*) To that end, if a prospective member wanted to learn about the organization, she first had to provide "collateral,"

---

[1] As set forth in more detail in the Notice of Motion accompanying this memorandum, Ms. Mack also joins in, to the extent applicable, the motion to dismiss filed by co-defendants Clare Bronfman, Kathy Russell, and Nancy Salzman as well as the motions to dismiss filed by co-defendants Lauren Salzman and Keith Raniere.

[2] For the purpose of this motion only, Ms. Mack accepts as true the allegations of the Indictment and Complaint. Ms. Mack expressly reserves her right to dispute the accuracy of these allegations at later stages of these proceedings, including at trial where she will vigorously dispute the charges.

typically sensitive information "meant to ensure that the prospective [member] would keep what she was about to learn a secret." (*Id.* ¶ 15.) After the prospective member volunteered this information, she was told about DOS's mission and structure and given the choice to join. (*Id.* ¶¶ 17, 18.)

Prospective members were informed that DOS's internal structure was a women-only organization with the mission to help members overcome personal weakness. (*Id.* ¶ 17.) In order to achieve this, the prospective member would be a "slave" to a "master" (*i.e.*, the individual who recruited them). (*Id.*) Using the word "slave" was symbolic of women being slaves to various things in life, such as men or vanity. (*Id.*) Prospective members were also told that they would be required to perform "acts of care" for the person who recruited them, such as bringing her coffee and buying her groceries. (*See id.* ¶ 20.) Certain members would be given various other assignments, including acts of self-denial such as being celibate. (*See id.* ¶ 22.) Members of DOS understood that providing "collateral" and performing "acts of care" enabled them to better uphold their commitments. (*Id.* ¶ 52.)

After being informed of DOS's framework, the prospective member was told that, if she chose to join, she would have to provide additional collateral to ensure that she would maintain the organization's confidences and to demonstrate her commitment to DOS. (*See id.* ¶¶ 18, 37.) So long as they did not speak about DOS, members understood that their collateral would not be released (*See id.* ¶ 51.)[3]

Ms. Mack was a young actress who provided collateral and joined DOS soon after its inception. (*Id.* ¶ 37.) She subsequently invited Jane Doe 5,[4] another actress in her early thirties,

---

[3] In reality, no collateral has ever been released by DOS or any of the defendants, including that given by members who have left DOS and failed to uphold their commitment to the organization.

[4] Jane Doe 5 is referred to as Jane Doe 1 in the Complaint.

to join DOS around February 2016.  (*Id.* ¶ 42.)  As was required of all new members, Ms. Mack asked Jane Doe 5 first to provide "collateral," which Jane Doe 5 did in the form of "false and highly damaging accusations against her family members."  (*Id.*)  After Ms. Mack informed Jane Doe 5 of the structure and mission of DOS, Jane Doe 5 agreed to join DOS and to provide more collateral.  (*Id.* ¶¶ 42-43.)  When Jane Doe 5 eventually left DOS, she felt assured, in part after speaking to Ms. Mack, that her collateral would not be released so long as she did not speak publicly about DOS.  (*Id.* ¶ 51.)  Tellingly, there is no allegation that Jane Doe 5's collateral ever was released.[5]

Ms. Mack told Jane Doe 5, upon her joining, that she had to be celibate for six months. (*Id.* ¶ 44.)  At some unknown point in time, Ms. Mack told Jane Doe 5 to make a series of contacts with Mr. Raniere, none of which directed sex.  (*Id.*; *see also* ¶ 45.)  After Jane Doe 5's initial contact with Mr. Raniere, Jane Doe 5 and Mr. Raniere allegedly had repeated sexual contact over the "following months."[6]  (*Id.* ¶ 47.)

Ms. Mack also interacted briefly with another DOS member, Jane Doe 8, who had been invited to the organization by CC-2.[7]  CC-2 described DOS to Jane Doe 8—a model, former actress and friend of CC-2—as a secret society that transformed her life.  (Compl. ¶ 52.)  Jane Doe 8

---

[5] In reality, Jane Doe 5's collateral was never released, even though she left DOS and apparently has agreed to testify against Mr. Raniere and Ms. Mack on behalf of the government.  Indeed, despite the many damaging public statements by former DOS members, the only individual whose collateral has ever been released is Ms. Mack's.  Her collateral was not released by anyone affiliated with DOS, but by the government in its Complaint.

[6] Again, what is most telling about the government's theory of the case is what the Complaint does not allege. There is no allegation that Ms. Mack at any time ordered Jane Doe 5 to engage in sex acts with Mr. Raniere. Similarly, even assuming the truth of the allegation that Jane Doe 5 had repeated sexual contact with Raniere (Compl. ¶ 47), there is no allegation that Ms. Mack even knew about those alleged encounters.

[7]  Jane Doe 8 is referred to as Jane Doe 2 in the Complaint. CC-2 was invited to DOS by Ms. Mack. (*Id.* ¶ 53.)

agreed to provide a video of a "damaging secret" to learn more about DOS, and afterwards, agreed to join DOS. (*Id.* ¶ 52.) Like Jane Doe 5, two of Jane Doe 8's first acts of self-denial were to refrain from sexual intercourse and masturbation. (*Id.* ¶ 54.) The Complaint alleges, at some unspecified point in time, that "[Ms. Mack] and CC-2 . . . contacted Jane Doe [8] and told her [about an] assignment…to 'seduce Keith [Raniere]' and have him take a picture of Jane Doe [8] to prove that she had done it." (*Id.*) Ms. Mack told Jane Doe 8 that the assignment was a "privilege" and that "I give you permission to enjoy it," which Jane Doe 8 interpreted as "I give you permission to enjoy sex with Raniere." (*Id.*) The Complaint does not allege that Ms. Mack knew of or intended Jane Doe 8 to have sex with Mr. Raniere as part of the assignment. After the call, Jane Doe 8 ultimately left DOS in May 2016 because she did not want to have sex with Mr. Raniere.[8] (*Id.* ¶ 57.)

Finally, the Complaint alleges, in a general fashion, that "DOS masters," but not Ms. Mack specifically, received a financial benefit in the form of continued status and participation in DOS, *i.e.*, "the masters *continued* to receive acts of care and the work of the equivalent of a full time employee." (*Id.* ¶ 24 (emphasis added).)

### B. Summary of the Indictment

On July 23, 2018, a Grand Jury returned Superseding Indictment S1 18 Cr. 244 (NGG) (the "Indictment") against Allison Mack, Keith Raniere, and four additional defendants.[9] Relevant here, the Indictment charges Ms. Mack, among other crimes, with conspiracy to commit forced labor in violation of 18 U.S.C. § 1589 (Count Two) (the "Forced Labor Count"), conspiracy to

---

[8] Despite this alleged refusal, there is no allegation that Jane Doe 8's collateral ever was released. And this is so because in reality, it never was released.

[9] The underlying Indictment was returned on April 19, 2018, and charged Ms. Mack with these same crimes, but with the same lack of any factual detail.

commit sex trafficking in violation of 18 U.S.C. § 1591 (Count Four), sex trafficking in violation of 18 U.S.C. § 1591 (Count Five) and attempted sex trafficking in violation of 18 U.S.C. § 1591 (Count Six) (Counts Four through Six, collectively, the "Trafficking Counts"). (Ind. ¶¶ 35, 37-39.) Each count is alleged in a conclusory paragraph tracking the language of the statutes, without additional specificity. (*See id.*)

## ARGUMENT

I.     **The Indictment Fails to Plead the Forced Labor and the Trafficking Counts with Sufficient Specificity and Should Be Dismissed Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(iii).**

The Indictment, being wholly conclusory, fails to afford Ms. Mack notice of the charges against her and to ensure that the government will be held at trial to those facts presented before the grand jury. Given the nature of the crimes alleged—involving threats and generic statutory terms—the Indictment is required to plead facts to describe a particular criminal act, rather than a type of crime. Instead, the Indictment is no more than a bare recitation of statutory language, and thus should be dismissed as facially invalid.

### A. Applicable Law

An Indictment must contain enough information to "[1] fulfill[] the Sixth Amendment right 'to be informed of the nature and cause of the accusation;' [2] prevent[] a person from being subject to double jeopardy as required by the Fifth Amendment; and [3] serve[] the Fifth Amendment protection against prosecution for crimes based on evidence not presented to the grand jury." *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (citation omitted). To accomplish this, the indictment must "contain some amount of factual particularity," *id.* at 45, and also "serve[] [the] important corollary purpose" of "inform[ing] the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had." *Russell v. United States*, 369 U.S. 749, 768 (1962) (internal quotation marks and citations omitted); *see also* Fed. R.

Crim. P. 7(c)(1).  Courts have recognized that there are "limitations" to the oft-cited proposition that an indictment that merely tracks statutory language is sufficient.  *United States v. Pirro*, 212 F.3d 86, 93 (2d Cir. 2000).  An indictment must not only allege the essential elements of the offense, but it must also contain sufficient factual detail that "apprises the defendant of what he must be prepared to meet."  *Cochran v. United* States, 157 U.S. 286, 290 (1895); *see also United States v. Giovanelli*, 464 F. 3d 346, 352 (2d Cir. 2006) (defendant raised specificity challenge in terms of "due process and vagueness").  Where the statutory terms are "generic," descending into particulars is required to inform the accused of the specific offense.  *Id.*; *Russell*, 369 U.S. at 763; *see also United States v. Urso,* 369 F. Supp. 2d 254, 267 (E.D.N.Y. 2005) (each allegation, read in context of the whole indictment, must be "pled with sufficient factual particularity").

"The quantum and type of factual specificity required in an indictment varies according to the charges alleged against the defendant."  *Urso*, 369 F. Supp. 2d at 266.  The Second Circuit, with respect to crimes involving threats, has dismissed indictments that "merely track statutory language . . . when more specific pleading was necessary to permit the accused to prepare his defense and defend against double jeopardy."  *Sira v. Morton*, 380 F.3d 57, 73 (2d Cir. 2004); *see, e.g.*, *Wood v. General Motors Corp.*, No. 8-CV-5224, 2015 WL 1396437 (E.D.N.Y. 2015) (dismissing insufficient extortion indictment).[10]  At a minimum, for an indictment to satisfy constitutional requirements, it "must state some fact specific enough to describe *a particular criminal act*, rather than a type of crime."  *Pirro*, 212 F.3d at 93 (emphasis added).  Where a

---

[10] *See also United States v. Serrano*, 191 F. Supp. 3d 287, 290 (S.D.N.Y. 2016) (finding indictment that tracked statute insufficient because it failed to allege an element "implicit" in the statute); *United States v. Tomasetta*, 429 F.2d 978, 980 (1st Cir. 1970) (loan-sharking indictment defective as it failed to allege the "precise time and date" of the offense or to identify the place within Worcester [Massachusetts] where the alleged criminal act had occurred); *United States v. Awan*, 459 F. Supp. 2d 167, 175-76 (E.D.N.Y. 2006) (dismissing charge of illicit conspiracy for failing to specify the kind of "material support" provided), *aff'd* 384 F. App'x 9 (2d Cir. 2010).

defendant "objects to the indictment before trial," she is "entitled to a more exacting review of the indictment than one who waits until after trial to object." *Id.* at 92.

### B.  Discussion

Although the Forced Labor and Trafficking Counts concern threats and generic statutory terms, the Indictment does nothing more than parrot the statutory language, and thus should be dismissed for lack of specificity.  While some additional allegations are set forth in the Complaint, they are not properly considered in determining whether the Indictment is constitutionally sufficient, and they nonetheless fail to state a claim as explained in Part II *infra*.  *See United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998).  The Constitution demands that the Indictment itself must "fulfill the functions of notifying the defendant of the charges against him and of assuring that he is tried on the matters considered by the grand jury."  *Pirro*, 212 F.3d at 92.  The Indictment has not done so here.

### 1.  The Forced Labor Count Lacks Specificity and Should Be Dismissed.

The Forced Labor Count alleges that Ms. Mack and others "between September 2015 and July 2017 . . . within the Eastern District of New York and elsewhere" conspired to obtain the "labor and services" of unspecified and unnamed "lower-ranking DOS members" by one of the means, or combination of the means, prohibited by Section 1589(a).  (*See* Ind. ¶ 35.)  This single-paragraph allegation is constitutionally deficient for several reasons.

Most obviously, the Indictment fails to specifically identify the "lower-ranking DOS members."  This deficiency is fatal in light of the fact that a forced labor charge requires threats of serious harm or physical restraint against alleged victims, and such crimes require the identification of specific victims.  *See Sira*, 380 F. 3d at 56 (requiring, for statutes prohibiting threats, that victims be named).

8

Further, the tracking of "generic" statutory terms is insufficient to give Ms. Mack notice of her alleged crimes, especially given that this case involves an entirely voluntary organization distinct from a typical forced labor situation. *See Pirro*, 212 F.3d at 92; *Russell*, 369 U.S. at 768. For instance, although Section 1589(a) provides that there are at least three means (or a combination thereof) of illegally obtaining forced labor, the Indictment does not specify which prohibited means were allegedly used in this case, and instead simply recites all three. *See United States v. Peterson*, 544 F. Supp. 2d 1363, 1375 (M.D. Ga. 2008) (dismissing indictment that merely recited one of the prohibited means under Section 1589(3), a generic term which "does not sufficiently apprise the defendant of what he must be prepared to meet").

Apart from being insufficient to satisfy the particularity required of threat crimes generally, the lack of specificity in the Indictment is especially problematic from a constitutional notice and due process perspective because the government's case is illusive.  Its theory of coercion is premised upon an unspecified threat of "serious harm" (Ind. ¶ 35.).  Without more specificity, Ms. Mack is left to guess at what the government finds criminal about her conduct in an entirely voluntarily organization from which she derived no financial benefit.  Likewise, the term "labor and services" provides insufficient notice because it requires Ms. Mack and the Court to guess at what labor and services specifically were obtained through the aforementioned unspecified threats. As such, the Indictment's barebones recitations deprive Ms. Mack of fair notice regarding her charges and rob her and the Court of the confidence that "the government's case at trial will reflect the evidence presented to the grand jury." *See Urso*, 369 F. Supp. 2d at 267.  Finally, the broad time span alleged here of 21 months is also problematic. *See United States v. Solovey*, No. 4-CR-244S, 2005 WL 1279228, at *2 (time period alleged in indictment of approximately 16 months is a "substantially broad one"); *Sira*, 380 F. 3d at 56.

Accordingly, because the Indictment has failed to state facts "specific enough to describe a particular criminal act, rather than a type of crime," the Forced Labor Count must be dismissed. *Pirro*, 212 F.3d at 93.

### 2. The Trafficking Counts Lack Specificity and Should Be Dismissed.

The Indictment fails entirely to allege any factual particulars, let alone those demanded by the Constitution, with respect to the Trafficking Counts.  To state a claim under the Trafficking Counts, the Indictment must adequately allege that Ms. Mack (i) knowingly benefitted (financially or by receiving anything of value), (ii) from participation in a commercial sex-trafficking venture, (iii) while knowing (or recklessly disregarding) that means of force, fraud, or coercion would be used to cause the trafficked person to engage in a commercial sex act.  *United States v. Afyare*, 632 F. App'x 272, 283 (6th Cir. 2016).

The Indictment fails to allege any of these elements.  As with the Forced Labor Count, because the Trafficking Counts rely upon unspecified threats of force, fraud and coercion, the law requires the Indictment to allege additional facts to satisfy the notice requirements of the Fifth and Sixth Amendments.  The Trafficking Counts fail to provide any particulars that would provide Ms. Mack with constitutionally adequate notice.  For example:

- Like the Forced Labor Count, Count Four identifies no alleged victims and relies on the non-specific phrase "lower-ranking DOS members";

- None of the Trafficking Counts provides any specificity as to the nature of the threats, how and when they were communicated, or by whom;

- Trafficking Counts identify no details regarding where the commercial sex acts allegedly occurred, other than to allege "within the Eastern District of New York and elsewhere";

- The Trafficking Counts provide no specifics regarding the nature of alleged commercial sex acts, who performed them when and where, or what value was given to whom on account of them.

These allegations therefore provide neither notice to Ms. Mack of the charges, nor assurance to the Court and Ms. Mack that the government's case at trial will reflect evidence presented to the grand jury. *Pirro*, 212 F.3d at 92; *Russell*, 369 U.S. at 768.

The flaws in the Trafficking Counts are further compounded by the decision to allege that this unspecified conduct violated both prongs of the Trafficking Counts (*see* Ind. ¶ 37 (alleging that conspiracy was contrary to 18 U.S.C. § 1591(a)(1) and 1591(a)(2)); *see also* Ind. ¶ 38 (same)). This inclusion of both prongs, each of which exposes a defendant to liability under different types of conduct, exacerbates the lack of specificity contained in the other portions of the Indictment, making it impossible for Ms. Mack to prepare her defense. *See, e.g.*, *Cochran*, 157 U.S. at 290 (indictment must contain sufficient factual detail that "apprises the defendant of what he must be prepared to meet"); *United States v. Brozyna*, 571 F.2d 742, 746 (2d Cir. 1978) (indictment should be sufficiently clear so that defendant "will not be misled while preparing his defense").

As the Indictment lacks the specificity demanded by the Constitution for due process and notice, the Court should dismiss Counts Four, Five, and Six of the Indictment pursuant to Fed. R. Crim. P. 12(b)(3)(B)(iii). *Pirro*, 212 F.3d at 92; *Russell*, 369 U.S. at 768.

## II. The Forced Labor Count Should Be Dismissed Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for Failure to State a Claim.

Assuming *arguendo* that the Forced Labor Count was constitutionally sufficient on its face, it should still be dismissed for failure to state a claim. The allegations in the Complaint, if assumed true for this motion, cannot constitute a violation of any statute, let alone the Forced Labor Count.

### A. Applicable Law

"[T]he indictment must contain an allegation of every fact which is legally essential [for] the punishment to be inflicted." *Apprendi v. New Jersey*, 530 U.S. 466, 512 (2000) (internal quotation marks omitted). A defect in the indictment, including "failure to state an offense," can

11

be raised and determined without a trial on the merits if the basis for the motion is reasonably available.  *See* Fed. R. Crim. P. 12(b)(3)(B)(v).  In fact, Rule 12(b) ensures that trials will be efficient and that defendants raise defenses "that the court can determine without a trial on the merits" before trial.  Fed. R. Crim. P. 12(b)(1).  To that end, Rule 12(d) requires the court to make a pretrial determination on the motions raised by a defendant unless "it finds good cause to defer a ruling."  Fed. R. Crim. P. 12(d).  Rule 12(d) also allows the court to consider factual issues in its disposition of 12(b) motions.  *Id.*; *see also United States v. Coia*, 719 F.2d 1120, 1123 (11th Cir. 1983) (district court may make findings of fact as well as law in pretrial proceedings).

A defense is "capable of determination" if a trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense.  *United States v. Covington*, 395 U.S. 57, 59 (1969); *see also United States v. Hall*, 20 F.3d 1084, 1087 (10th Cir. 1994) (where facts are undisputed, the court may dismiss charges because the government is incapable of proving its case); *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988) (dismissing indictment where "the government's own facts proffered to the defendant and the district court simply did not conform to the allegations in the indictment"); *United States v. Bailes*, 10 F. Supp. 2d 607, 610 (S.D. W. Va. 1998) (using operative facts from protective orders to dismiss indictment).  An indictment thus can be challenged for failure to allege a crime within the terms of the applicable statute.  *United States v. Aleynikov*, 676 F.3d 71, 75 (2d Cir. 2012).

## B.  Discussion

### 1.  The Forced Labor Count Cannot State that Ms. Mack Knowingly Provided or Obtained Labor or Services from Any Person.

The allegations of the Forced Labor Count are insufficient to state a claim under Section 1589.  Even taking the allegations of the Complaint as true, they show that the Forced Labor Count cannot state that the "labor or services" of the kind recognized by the statute and intended by

Congress were obtained here.  Accordingly, the Court should dismiss the Count pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v) for failure to state a claim.  *See Risk*, 843 F.2d at 1061.

Section 1589, the federal forced labor statute, was "passed to implement the Thirteenth Amendment's [prohibition] against slavery or involuntary servitude."  *United States v. Toviave*, 761 F.3d 623, 629 (6th Cir. 2014).  Without "a clear expression of Congressional intent," the Court should not transform the statute to cover the circumstances alleged here, which bears little resemblance to those of paradigmatic forced labor cases and their victims.  *See id.* at 626 (describing prostitution, forced sweatshop work, and forced domestic service as "paradigmatic forced labor").  The term "labor or services," left undefined by the statute, is accorded its ordinary meaning.  *United States v. Marcus*, 628 F.3d 36, 44 (2d Cir. 2010).  Moreover, "[p]art of a fair reading of statutory text is recognizing that Congress legislates against the backdrop of certain unexpressed presumptions."  *Toviave*, 761 F.3d at 628.

Webster's Dictionary defines "labor" as the "expenditure of physical or mental effort especially when fatiguing, difficult, or compulsory" and "service" is defined as "the performance of work commanded or paid for by another."  *Id.* at 44 n.10.  In determining the application of the forced labor statute, courts have been careful not to expand the concept of forced "labor or services" beyond its logical reach or what Congress intended.  In *Toviave*, for instance, the Sixth Circuit held that a parental figure's requirement that children do household chores does not constitute forced "labor or service," even though "the chores were enforced by reprehensible, abusive force" and the defendant kept proceeds resulting from them.  761 F.3d at 626.  In so holding, the court observed that the impetus behind the statute was codifying the Thirteenth Amendment's prohibition of slavery and involuntary servitude, which means it "could not have been intended to overturn . . . longstanding parental right[s]."  *Id.*  Thus, even though the defendant

13

in *Toviave* ordered the children to perform tasks such as babysitting or cleaning, which fall within a technical interpretation of "labor or service," the situation fell too far outside "paradigmatic forced labor" to constitute a federal crime. *See id*.; *see also Petersen v. Boeing Company*, No. 10-CV-0999, 2015 WL 12090213 (D. Ariz. Feb. 18, 2015) (being confined to an office for eight hours a day did not constitute labor or work because there was no "exertion conveying effort").

Here, the government's own facts proffered in the Complaint fail to state a claim. *See Hall*, 20 F.3d at 1087; *Risk*, 843 F.2d at 1061. Rather, the Complaint makes clear that the "labor or service" in question refers to "acts of care" and "tribute" largely in the form of various personal favors and errands. (*See* Compl. ¶ 20.) Although the nomenclature allegedly chosen by DOS is sensationalist (*i.e.*, "master" and "slave"), those words must be understood within the context of an organization structured for self-improvement and accountability. The Complaint shows that the DOS members were not employed or expected to be paid like employees, and that the purpose of such acts, as understood by DOS members, was self-improvement, dependability, and selflessness. Although an unconventional arrangement, the "labor" and "services" allegedly rendered here are more akin to personal favors and volunteer work, and do not fall under conduct prohibited by the forced labor statute.

### 2. The Forced Labor Count Cannot State that the Means as Defined Under the Statute Were Used by Ms. Mack.

Even if the "acts of care" and related tasks alleged in the Complaint (but not in the Indictment) qualify as "labor or services" under the statute, the Complaint's allegations show that they were not obtained by one of the prohibited means. Section 1589 is "intended to address *serious* trafficking, or cases where traffickers threaten harm to third persons, restrain their victims without physical violence or injury, or threaten dire consequences by means other than overt violence." *United States v. Dann*, 652 F.3d 1160, 1169 (9th Cir. 2011) (internal quotation marks

14

omitted and emphasis added).  As such, "not all bad employer-employee relationships . . . will constitute forced labor." *Id.* at 1170.

Serious harm or threats of serious harm, "considered from the vantage point of a reasonable person in the place of the victim, must be 'sufficiently serious' to *compel* that person to *remain* in her condition of servitude when she otherwise would have left."  *Muchira v. Al-Rawaf*, 850 F.3d 605, 618 (4th Cir. 2017).  The alleged victims continued acquiescence to servitude must be objectively reasonable under the circumstances; a "subjective feeling" of negative consequences is insufficient.  *See Adia v. Grandeur Mgmt. Inc.*, No. 17-CV-9349, 2018 WL 4300528, at *3 (S.D.N.Y. Sept. 10, 2018).  In addition, the nature of the "serious harm" threatened must be more than "adverse, but legitimate consequences."  *See DeSilva v. N. Shore-Long Island Jewish Health Syst., Inc.*, No. 10-CV-1341, 2012 WL 748760, at *7 (E.D.N.Y. Mar. 7, 2012) (threats from employer to fire or publicly berate plaintiff insufficient for forced labor); *see also United States v. Bradley*, 390 F.3d 145, 155 (1st Cir. 2004), *rev'd on other grounds*, 545 U.S. 1101 (noting distinction between "merely abusive employers" and employers who "deliberately sought to compel forced labor," with only the latter covered under the statute).

That is why cases involving forced labor share a similar set of characteristics, including squalid living conditions, extreme isolation, actual threats of physical harm, and exploitation of the victim's lack of education or familiarity with the English language.  *See Muchira*, 850 F.3d at 618 (describing typical forced labor situations).  These conditions are used to prevent vulnerable victims from leaving their captors.  *Id.*; *see, e.g.*, *United States v. Callahan*, 801 F.3d 606, 619 (6th Cir. 2015) (finding forced labor where alleged victim was cognitively impaired and kept with her daughter in the basement); *Cruz v. Maypa*, 773 F.3d 138, 146 (4th Cir. 2014) (plaintiff spoke limited English and had passport confiscated).

15

On the other hand, courts have found no serious harm threatened where the alleged victims, based on their personal circumstances and resources, were not reasonably compelled to stay in their condition.  In *Headley v. Church of Scientology Int'l.*, for example, former members of the "Sea Org" within the Church of Scientology brought a forced labor claim against the church.  687 F.3d 1173 (9th Cir. 2012).  Plaintiffs had to "make a symbolic commitment to serve [Sea Org] for a billion years," and were assigned manual labor, such as yard work or hand-cleaning dried human excrement.  *Id.* at 1176.  If a member tried to leave, other members of Sea Org discouraged them by banding together to dissuade them and threatening to declare the dissenter a "suppressive person," which is akin to being excommunicated, resulting in the loss of contact with friends and family.  *Id.* at 1175, 1179.  The Ninth Circuit rejected the plaintiffs' claim of coercion and held that such consequences did not qualify as "serious harm" or a cognizable "threat."  *Id.*  The court emphasized that the plaintiffs joined and voluntarily worked for Sea Org because they believed it was the right thing to do, and that they had numerous opportunities to leave.  *Id.* at 1180-81.  *See also Muchira*, 850 F.3d at 620 (forced labor did not occur where the alleged victim was not especially vulnerable—*i.e.*, she was not young, inexperienced, or brought to the country illegally).

The government's apparent theory here is that the alleged victims were coerced to perform tasks because Ms. Mack threatened to release their "collateral."  The Complaint itself, however, demonstrates that, "considered from the vantage point of a reasonable person in the place of the victim," there was no "sufficiently serious" harm that compelled any of the alleged victims to stay in DOS.  First, like the members of Sea Org, women voluntarily joined DOS and provided collateral voluntarily to learn about the organization.  (Compl. ¶¶ 15, 17.)  Put differently, the consequence of having collateral released was legitimate because collateral was given voluntarily with the knowledge that it could be released under certain, agreed upon events.  Significantly, none

16

of the typical hallmarks of forced labor are present here.  *See Muchira*, 850 F.3d at 618.  The alleged victims were not young or particularly vulnerable in terms of education, social status, or finances.  They also were not physically restrained or confined.

The release of embarrassing material voluntarily given, thus, cannot amount to "serious harm" commensurate with other forced labor cases, where victims involuntarily surrendered their personal security or items of legal value, such as being kept in extreme physical isolation or having passports confiscated.  *See, e.g.*, *Cruz*, 773 F.3d at 146.  Even if the release of voluntary "collateral" can amount to "serious harm" under the statute, the Complaint shows that no one's collateral was ever threatened to be released publicly such that a person would have felt "compelled" to stay. Jane Doe 5 was assured, after speaking with Ms. Mack, that her collateral would not be released if she did not speak out about DOS.  (Compl. ¶ 51.)  Indeed, when people left DOS, their collateral was not released.  (Compl. ¶ 33.)  Consequently, the Forced Labor Count cannot state that a reasonable person under the circumstances would have felt compelled to stay within DOS.

### III.    The Trafficking Counts Should Be Dismissed Pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v) for Failure to State a Claim.

The Trafficking Counts too should be dismissed because they fail to state a claim under Section 1591.  Specifically, taking the allegations in the Complaint as true, the Trafficking Counts still cannot show that Ms. Mack knew that a prohibited means would be used to cause someone to engage in a commercial sex act.  Accordingly, the Trafficking Counts should be dismissed pursuant to Fed. R. Crim. P. 12(b)(3)(B)(v).  *See Covington*, 395 U.S. at 59; *Hall*, 20 F.3d at 1087.

### A. The Trafficking Counts Cannot State that Ms. Mack Participated in a Commercial Sex-Trafficking Venture.

The Complaint's allegations establish that there is no case to prove under the Trafficking Counts.  *Risk*, 843 F.2d at 1061.  In particular, they show that nothing "of value" was given or received by anyone, especially not by Ms. Mack, as required of a commercial sex act.  The

17

allegations demonstrate that, to the extent the alleged non-monetary items may qualify as "things of value," they were not given "on account of" any sex act.

### 1. The Trafficking Counts Cannot Establish that Anyone Received Anything of Value.

The sex-trafficking statute defines a "commercial sex act" as "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. §1591(e)(3). The meaning of "anything of value" must be understood in the context of the history and purpose of the statute. Section 1591 was promulgated as part of the Trafficking Victims Protection Act of 2000 (the "TVPA") and in response to Congress' recognition that "[t]he sex industry has rapidly expanded over the past several decades. It involves sexual exploitation of persons, predominantly women and girls, involving activities related to prostitution, pornography, sex tourism, and other commercial sexual services." 22 U.S.C. § 7101(2).

Courts have observed that the purpose of the TVPA was to regulate a class of activities that are economic in nature, more specifically, sexual exploitation for a profit. *See Todd v. United States*, No. C11-0470, 2012 WL 2952084, at *6 (W.D. Wash. June 26, 2012) ("commercial sex acts are necessarily economic in nature . . . and distinguishable from laws governing gender-motivated crimes of violence and not involving such economic activity"); *United States v. Campbell*, 111 F. Supp. 3d 340, 344-46 (W.D.N.Y. 2015) (TVPA was intended to regulate an "economic 'class of activities'") (citation omitted). In *United States v. Marcus*, for instance, the government contended that it is more consistent with the statute's purpose to focus inquiry of what is a "commercial sex act" on "whether a given individual has been sexually exploited *for profit*, rather than on whether traffickers profited directly or indirectly from the exploitation." 487 F. Supp. 2d 289, 307 (E.D.N.Y. 2007), *aff'd in part*, *vacated in part*, 628 F.3d 36 (2d Cir. 2010) (emphasis added).

Here, the government's characterization of the facts in the Complaint cannot constitute a violation of Section 1591. Specifically, they fail to state any of the "commercial sexual services"—*i.e.*, prostitution, pornography, sex tourism—contemplated by Congress are present in this case. The Complaint shows that Ms. Mack never received money as a result of a sex act. Instead of money, the only possible things of value involved are "increased status," "financial opportunities," and "acts of care"—none of which comes close to this Court's understanding of "things of value" in exchange for commercial sexual services. *See United States v. Estrada-Tepal*, 57 F. Supp. 3d 164, 172 n.7 (E.D.N.Y. 2014) (listing cases under Section 1591, all of which have clear connections to sexual exploitation for profit).

The *Marcus* case aptly illustrates how courts have required that the sex act be connected to profit generation in order to satisfy the "commercial sex act" requirement. The victim there initially entered into a consensual BDSM[11] relationship with the defendant, but subsequently was physically forced to engage in extreme sexual conduct. *Marcus*, 487 F. Supp. 2d at 294. The defendant photographed her engaging in such BDSM activities, and posted the photos on a website, from which the defendant derived profit. *Id.* The defendant argued that the government failed to establish a "commercial sex act" within the meaning of the sex-trafficking statute because "the commercial gain resulted from the depiction of sex acts rather than the acts themselves." *Id.* at 306. In rejecting that contention, the Court held that "a commercial sex act may include sexual acts that are photographed for commercial gain" and observed that "the defendant has not contested that he derived financial benefit from photographs of [the plaintiff] engaging in sex acts as defined

---

[11] "BDSM" refers to an alternative sexual lifestyle, involving bondage, dominance/discipline, submission/sadism, and masochism. *See Marcus*, 487 F. Supp. 2d at 292.

in the jury charge." *Id.* at 307 (emphasis added).[12]  Here, by contrast, there are no allegations that Ms. Mack received any "commercial gain" or "financial benefit"—because she did not.  Indeed, there are no allegations that anyone profited at all from the alleged sex acts.

### 2. The Trafficking Counts Cannot State the Receipt of Anything of Value "On Account Of" Any Sex Act.

To the extent the alleged non-monetary items qualify as "things of value," they were not given "on account of" any sex act.  Once again, the government's own allegations establish that the government cannot prove its case, simply because there is no case to prove.  *See Risk*, 843 F.2d at 1061. The Complaint's allegations show that Ms. Mack did not receive anything of value *because* anyone had sex with Mr. Raniere.  It states, with respect to "sex trafficking within DOS," that "DOS masters received a financial benefit in the form of continued status and participation in DOS, *i.e.* the masters *continued* to receive acts of care and work of the equivalent of a full time employee."  (Compl. ¶ 24 (emphasis added).)  Even assuming Ms. Mack was a "DOS master," she would have already been receiving status and "acts of care" before any alleged sex trafficking occurred, and thus necessarily did not receive those things "on account of" any sex act.

"On account of" means that there needs to be "a causal relationship between the sex act and an exchange of an item of value."  *See Marcus*, 487 F. Supp. 2d at 306.  For instance, in *Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*, the court held that Section 1591 cannot be violated where there is no causal relationship between the sex acts and money received by

---

[12]  The decision in *Nobel v. Weinstein*, No. 17-CV-9260, 2018 WL 3863452 (S.D.N.Y. Aug. 14, 2018) does not require a different result.  There, the court held that the requirement of "anything of value" was satisfied because "for an aspiring actress, meeting a renowned producer carries value, in and of itself."  Putting aside the extreme broadening of the statute through that definition, *Weinstein* is nonetheless distinguishable from Ms. Mack's conduct because she herself derived no benefit "on account of" the alleged sex acts.  Ms. Mack, as described, was already fully receiving the benefits alleged, irrespective of the occurrence of the alleged commercial sex act, even if said benefits can be found to constitute "anything of value" under the statute.

defendants. No. 10-CV-4124, 2013 WL 6816174, at *16 (W.D. Ark. Dec. 24, 2013). In that case, defendants were members of Tony Alamo Christian Ministries ("TACM"), a "communal" organization whereby members' earnings are deposited into a joint account and members' expenses were paid from the joint account. *Id.*, at *1. The head of the church, Tony Alamo, forced the plaintiffs to become his "spiritual wives" and subjected them to sexual and physical abuse as minors. *Id.* Plaintiffs sued church members and other "sister wives" of Alamo who "shared a home with [plaintiffs] during the time they were being abused" and "who encouraged and facilitated the abuse or, at the very least, did nothing to prevent the abuse when they had the duty and ability to do so." *Id.* at *2. The court dismissed the sex-trafficking count because there was no evidence that defendants were compensated "on account of" the sex acts, or that plaintiffs' living expenses were paid "as some sort of quid pro quo for the sex acts that occurred with Alamo." *Id.* at *16; *see also Vang v. Prataya*, No. 12-CV-1847, 2017 WL 401942, at *6 (D. Minn. Jan. 30, 2017) (rejecting that a "commercial sex act" occurred because the meals, lodging, transportation and clothing that defendant had provided to minor plaintiff were not "on account of" the sex acts he engaged in with her).

Similar to the "sister wife" defendants in *Kolbek*, the Indictment fails to allege that Ms. Mack received any benefits as "some sort of quid pro quo for the sex acts that occurred." Rather, as in *Kolbek*, Ms. Mack belonged to the same organization as the person who allegedly committed the sex acts and as a result of that membership, had always enjoyed certain benefits unrelated to any sex acts. *See Afyare*, 632 F. App'x at 284 ("The defendant's mere membership in the venture is insufficient if he is ignorant of the venture's sex trafficking activities (and the means and method thereof)"). In other words, there can be no guilt simply by association. *Cf. N.A.A.C.P v. Claiborne*

21

*Hardware Co.*, 458 U.S. 886, 919 (1982) (it is unconstitutional for the government to punish one's mere association with a group that has both legal and illegal aims).

The requisite nexus is a critical piece of the sex-trafficking crimes alleged in the Trafficking Counts.  Put simply, there is no commercial sex act if there are no allegations connecting the exchange of something of value on account of the alleged sex act.  This must necessarily be the case to avoid an extreme broadening of the statute, and to realize Congressional intent, in enacting the statute, of targeting sexual exploitation for profit.  *See also supra* at Point III(A)(1).

For these same reasons, the Trafficking Count cannot state that Ms. Mack "benefit[ed], financially or by receiving anything of value, from participation" in the alleged sex-trafficking venture.  18 U.S.C. §1591(a)(2).  Section 1591(a)(2) requires both that the defendant "benefitted" from participation in the venture *and* that such venture involves "a commercial sex act" in which a person receives something of value in exchange for the sex act.  In the classic example of sex trafficking, this construction makes sense.  A pimp benefits financially from his prostitute having sex with a customer, *and* the sex act is exchanged for money paid by the customer to the prostitute and/or pimp.  Here, Ms. Mack did not benefit financially, or otherwise, from the alleged victims having sex with Mr. Raniere, nor were the sex acts between them of a commercial nature (*i.e.*, there is no allegation that Mr. Raniere—or anyone else—paid the alleged victims to have sex).

Because the Trafficking Counts fail to state that anyone engaged in a commercial sex act or that Ms. Mack benefitted financially from the alleged venture (even assuming the Complaint's allegations to be true), the Court should dismiss these counts.

### B. The Trafficking Counts Cannot State that Ms. Mack Knew Force, Fraud, or Coercion Would be Used to Cause Someone to Engage in a Commercial Sex Act.

The Trafficking Counts should be dismissed for the additional reason that the Complaint shows that no one was coerced as a matter of law to engage in a sex act, let alone that Ms. Mack

knew that would occur. The "collateral"—the only fact alleged anywhere that arguably could support a claim of force or coercion—was given voluntarily by the women for the purpose of self-improvement and is unrelated to the unspecified commercial sex acts alleged in the Indictment.

### 1. The Trafficking Counts Fail to State Force and Coercion as a Matter of Law.

Courts have recognized that terms like "force and coercion" are generic and therefore should be construed narrowly "to avoid criminalizing consensual conduct" that occurs during the ordinary course of a legal—even if unconventional—sexual relationship. *See Marcus*, 487 F. Supp. 2d at 305 (emphasizing that physical restraint as part of consensual BDSM conduct would not constitute grounds for conviction under the statute). Coercion is defined as "threats of serious harm to or physical restraint against any person." *Id.*

For purposes of the Trafficking Counts, the definition of "serious" harm is identical to that of the Forced Labor Count. *Compare* 18 U.S.C. § 1589(c)(2) (defining "serious harm" in context of forced labor) *with* 18 U.S.C. § 1591(e)(4) (defining "serious harm" in the context of the Trafficking Counts). Thus, determination of whether coercion occurred requires consideration of "the particular vulnerabilities of a person in the victim's position but also requires that her acquiescence be objectively reasonable under the circumstances." *See United States v. Rivera*, 799 F.3d 180, 186-87 (2d Cir. 2015).

Here, the Complaint's allegations show that no fraud, coercion, or force was used to cause anyone to engage in a commercial sex act. The only possible theory alleged is of coercion—*i.e.*, the Jane Does "felt" having sex with Raniere was part of their DOS commitment and if they broke

their commitment, their collateral could be released. (Compl. ¶ 37; *see also id.* ¶¶ 18, 57.) Even assuming the truth of that allegation, however, the Trafficking Counts still fail as a matter of law.[13]

As in *Headley*, *see* supra at Point II(B)(2), the allegations make clear that the Jane Does joined DOS voluntarily because they believed it would further their goals of self-improvement, voluntarily gave up "collateral" to learn about and commit to DOS, and had ample opportunity to leave DOS of their own volition. *See Headley*, 687 F.3d at 1180-81. For example, Jane Doe 5 "felt assured enough that as long as she did not speak out about DOS (as opposed to just breaking her lifetime commitment), her collateral would not be released." (Compl. ¶ 51). This understanding was based in part on her knowledge that other DOS members had left and their collateral had not been released. *Id.*[14]

Although the public release of the "collateral" may have been embarrassing, there is no authority suggesting that embarrassment alone amounts to "serious harm" as required for coercion by the statute. Assuming *arguendo* release of such material constitutes "serious harm"—and it does not—there can be no coercion because Jane Doe 5, in her own words, did not herself believe that such collateral would be released, underscoring that no reasonable person would have objectively felt "compelled" to perform any sex acts. (*See id.*). This is buttressed by the fact that Jane Doe 5's collateral was a "false" accusation against her family and she engaged in a voluntary

---

[13] As to fraud, there are no allegations from which to infer that there were any misrepresentations that caused the alleged victims to engage in a sex act. As explained, *supra* at Point II(B)(2), the alleged victims gave up their "collateral" voluntarily and did not engage in any sex acts in reliance on any misrepresentations. Indeed, each alleged victim had a choice whether to do so or not, and one chose not to. *See infra* at Point III(B)(2).

[14] To the extent that there is any alleged coercion, it would have been to stay silent about DOS, not to engage in sex.

sexual relationship with Mr. Raniere.  As between disclosure of a false accusation and having sex against your will, a reasonable person would not have felt "compelled" to choose the latter.

### 2. The Trafficking Counts Cannot State that Ms. Mack Knew Coercion Would Be Used to Cause a Commercial Sex Act.

Similarly, the Complaint's allegations show that Ms. Mack did not know that means of force, fraud, or coercion would be used to cause any person to engage in a commercial sex act. The Trafficking Counts require that the defendant must "know" that coercion "*would be* used to cause the trafficked person to engage in a commercial sex act." Courts have stated that "the defendant [must] know in the sense of being aware of an established modus operandi that will in the future cause a person to engage in [a commercial sex act]." *United States v. Roy*, 630 F. App'x 169, 170 (4th Cir. 2015) (citing *United States v. Todd*, 627 F.3d 329, 334 (9th Cir. 2010)); *accord Estrada-Tepal*, 57 F. Supp. 3d at 169-70; *see also United States v. Biancofiori*, No. 16-CR-306-1, 2018 WL 372172, at *3 (N.D. Ill. Jan. 11, 2018) (noting that the prospective language "would be used" requires that the defendant have a plan for the victim at the time he recruits her).

A fair reading of the Complaint's allegations underscores that Ms. Mack barely even had any involvement, or even knowledge, of the alleged sex acts.  Indeed, it is startling, given the serious charges in the Indictment, just how little Ms. Mack interacted with the alleged victims and how little she even knew about any sex acts.  Not only did Ms. Mack tell Jane Doe 5 that she had to be celibate for six months (a fact indisputably inconsistent with sex trafficking) but the government's own allegations show Ms. Mack never told Jane Doe 5 to engage in a sex act—let alone a commercial sex act—with Mr. Raniere.  (Compl. ¶ 44).  The series of contacts that Ms. Mack told Jane Doe 5 to make with Mr. Raniere did not involve anything sexual, and included innocuous means like email.  Significantly, the Complaint shows that Ms. Mack barely had any involvement in or even knowledge of the sexual encounters between Jane Doe 5 and Mr. Raniere

over the several months after the initial contact directed by Ms. Mack, let alone that Ms. Mack ever threatened Jane Doe 5 to engage in those unspecified sexual encounters.  *See id.*

As compared to Jane Doe 5, Jane Doe 8 is alleged to have had even less contact with Ms. Mack.  Putting aside the conclusory allegations in the only count involving Jane Doe 8 of "attempted sex trafficking" (Count Six), *see* Point I *supra*, the Complaint alleges that the conduct underlying Count Six springs from a single conversation between Ms. Mack and Jane Doe 8.  The only thing Ms. Mack is specifically alleged to have said directly to Jane Doe 8 herself is "I give you permission to enjoy it."  (Compl. ¶ 56.)  Jane Doe 8 ultimately left DOS without any sexual contact with Raniere, and suffered no adverse consequences as a result.  (*Id.* ¶ 57.)

Tellingly, the Complaint only alleges that the DOS members felt that their collateral "could" or "might" be released, not that it "would" be released.  (Compl. ¶¶ 18, 45, 47, 50.)  Thus, the Trafficking Counts must be dismissed because they cannot state that Ms. Mack knew of "an established *modus operandi* that will in the future cause a person to engage in [a commercial sex act]," *Roy*, 630 F. App'x at 170, or that she had a "plan" to sex traffic the victims at the time the Jane Does were recruited into DOS. *Biancofiori*, 2018 WL 372172, at *3; *see also Weinstein*, 2018 WL 3863452 at *8 (Section 1591(a) requires the pleader to allege awareness, at the initial recruitment stage, that certain prohibited means will be used achieve a commercial sex act).  Because the Indictment has not remotely stated the requisite elements of the sex-trafficking charges, even assuming the Complaint's allegations to be true, the Court should dismiss the Trafficking Counts.

## IV.    The TVPA Is Unconstitutionally Vague as Applied to Ms. Mack's Alleged Conduct.

Moreover, interpreting the Trafficking Counts as applied to Ms. Mack's conduct would render the statute unconstitutionally vague.  Put simply, no reasonable person in Ms. Mack's

position would understand that the allegations underlying the Trafficking Counts would subject her to criminal liability.

### A.  Applicable Law

Due process requires laws to be sufficiently clear to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and to "provide explicit standards for those who apply them."  *Grayned v. City of Rockford*, 408 U.S. 104, 108-109 (1972); *see also Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 551 (6th Cir. 2007) (the primary purposes of the vagueness doctrine are "to ensure fair notice to the citizenry" of proscribed criminal conduct and to provide explicit "standards for enforcement").  A statute that authorizes enforcement by "sweeping in a great variety of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application," is also constitutionally impermissible.  *Ashton v. Kentucky*, 384 U.S. 195, 199 (1966) (citation omitted).  To avoid unconstitutional vagueness, there must be minimal guidelines to govern the discretion of those who enforce the law in question.  *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).  Due process, thus, "bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."  *United States v. Lanier*, 520 U.S. 259, 266 (1997).

Numerous courts already have acknowledged the breadth of the sex-trafficking statute and its potential to capture innocent conduct. *United States v. Thompson*, 896 F.3d 155, 167 (2d Cir. 2018) (recognizing that the statutory language of Section 1591 is "decidedly broad"); *Estrada-Tepal*, 57 F. Supp. 3d at 171-72 (recognizing the statute would criminalize conduct such as parents, shelters and soup kitchens helping children who are sex workers).

27

### B.  Discussion

A person of ordinary intelligence, given the legislative purpose and prior enforcement of the statute, would not have reasonably known a "commercial sex act" would encompass the alleged conduct here.  *See United States v. Granderson*,  511 U.S. 39, 54 (1994) (holding that, when interpreting the scope and application of a criminal statute, the court should consider the text, structure, purpose, and legislative history underlying it and, resolve ambiguities in favor of the defendant per the rule of lenity); *Lanier*, 520 U.S. at 266.  The purpose of the sex-trafficking statute is to target "prostitution, pornography, sex tourism, and other commercial sexual services."  22 U.S.C. § 7101(b)(2); *Todd*, 627 F.3d 329 at 330-31 ("[t]he statute focuses on those (usually men) who make money out of selling the sexual services of human beings (usually women) they control and treat as their profit-producing property.").  *See supra* Point III(A).

As explained above, Ms. Mack did not receive any money in exchange for the alleged sex acts that occurred in this case and her receipt of non-monetary items such as "acts of care" should not be construed as satisfying the "anything of value" requirement under the definition of "commercial sex act."  *Cf. Backpage.com, LLC v. Cooper*, 939 F. Supp. 2d 805, 834 (M.D. Tenn. 2013) (state sex-trafficking statute was unconstitutionally vague and overbroad because "commercial sex act," defined as "any sexual act for which something of value is given or received," includes substantial activity unrelated to sex trafficking); *Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1281 (W.D. Wa. 2012) (statute's definition of "commercial sex act" is overbroad as it includes "vast swaths of legal, consensual, non-commercial sexual activity").

More significantly, a person of ordinary intelligence would not have reasonably known that receiving benefits, which lack a "quid pro quo" to any sex act, could be interpreted as a violation of the statute.  *See Kolbek*, 2013 WL 6816174, at *16 (holding that such benefits, without

a "quid pro quo" do not trigger Section 1591 liability). Neither the Complaint nor the Indictment alleges such quid pro quo with respect to Ms. Mack and the alleged commercial sex acts. To the contrary, the Complaint makes it clear that Ms. Mack had already been receiving the alleged benefits of elevated status, "acts of care," and the like as a result of her membership in DOS prior to any sex acts occurring. (*See* Compl. ¶ 24.) As such, logically, those benefits could not have been conferred "on account of" the alleged sex acts. This causal nexus is an essential component of the statute to avoid criminalizing an individual's membership in an organization alone, without that individual actually partaking in sex trafficking. *See, e.g.*, *Marcus*, 487 F. Supp. 2d at 306; *Kolbek*, 2013 WL 6816174, at *16. As the Sixth Circuit aptly illustrated, a soccer player who belongs to a team with sex traffickers and who knows sex-trafficking proceeds benefit the team is not guilty of sex trafficking himself. *See Afyare*, 632 F. App'x at 286; *see also Kolbek*, 2013 WL 6816174, at *6 (mere membership benefits received while sex acts were occurring in the organization insufficient for causal nexus required for "commercial sex act").

Prior applications of the sex-trafficking statute likewise fail to provide notice that Ms. Mack's alleged conduct would be covered, precisely because her conduct is so far afield from what the statute is intended to target. As commensurate with the legislative history, purpose, and language of the statute, prior prosecutions under the sex-trafficking law focused on individuals selling sex for a profit. A recent survey of applications of Section 1591 by this Court concluded that it has not been applied "to anyone other than an individual directly and substantially involved in an underlying sex trafficking scheme." *Estrada-Tepal*, 57 F. Supp. 3d at 172 n.7. Thus, the Court in *Estrada-Tepal*, while acknowledging that the broad language of the statute could criminalize a hypothetical mother who drives around her daughter involved in a sex-trafficking scheme, designated such an application as on the "periphery of 18 U.S.C. §1591's applicability"

29

and, thus, not problematic from a constitutional perspective. *See id.* at 172. The application of Section 1591 to Ms. Mack is not hypothetical, but no less peripheral and unforeseen. Indeed, all of the cases examined in *Estrada-Tepal* involved a pimp, brothel operator, or someone who directly engaged in having or soliciting sex. *See id.* at 172 n.7. These cases far surpass the alleged facts of Ms. Mack's conduct. Applying the sex-trafficking statute to Ms. Mack's conduct here is unconstitutional because she lacked fair notice that her conduct would be considered criminal. [15]

## CONCLUSION

For the foregoing reasons, the Court should dismiss Counts Two, Four, Five and Six of the Indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B). Additionally, Count One in its entirety, as well as Racketeering Acts Seven and Eight specifically, of the Indictment should be dismissed against Ms. Mack for the reasons set forth in the motions of her co-defendants, in which she joins.

Dated: New York, NY
      November 16, 2018

As corrected: New York, NY
      December 3, 2018

Respectfully submitted,

KOBRE & KIM LLP

  /s/                              

William F. McGovern
Sean S. Buckley
800 Third Avenue
New York, New York 10022
Tel: 212 488 1210 / 1253

*Attorneys for Defendant Allison Mack*

---

[15] In the alternative, the Court should order the government to provide the defendants with a bill of particulars, as the defendants had previously demanded on August 14, 2018 (Exhibit A). It is well-settled that a bill of particulars cannot save an indictment, *Russell*, 369 U.S. at 769-70. However, if the Court determines the Indictment is not legally insufficient, the government should be ordered to provide additional particulars to allow Ms. Mack to prepare an adequate defense. *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1984) (bill of particulars can be sought to enable defendant to "prepare for trial, to prevent surprise, and to interpose a plea of double jeopardy"); *Walsh*, 194 F.3d at 47 (bill of particulars warranted when allegations "are so general they do not advise the defendant of the specific acts of which he is accused").