```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2

3    ------------------------------------X
                                        :
4    UNITED STATES OF AMERICA,          :
                                        :   18-CR-00204 (NGG)
5                                       :
                  v.                    :
6                                       :   225 Cadman Plaza East
     KEITH RANIERE, also known as       :   Brooklyn, New York
7    Vanguard,                          :
                                        :
8                       Defendant.      :   February 11, 2019
     ------------------------------------X
9
             TRANSCRIPT OF CRIMINAL CAUSE FOR ORAL ARGUMENT
10             BEFORE THE HONORABLE VERA M. SCANLON
                  UNITED STATES MAGISTRATE JUDGE
11
     APPEARANCES:
12
     For the Government:        TANYA HAJJAR, ESQ.
13                              MOIRA PENZA, ESQ.
                                SHANNON JONES, ESQ.
14                              MARK LESKO, ESQ.
                                United States Attorneys Office
15                              Eastern District of New York
                                271 Cadman Plaza East
16                              Brooklyn, New York 11201

17   For Keith Raniere:         TENY ROSE GERAGOS, ESQ.
                                MARC AGNIFILO, ESQ.
18                              Brafman & Associates
                                767 Third Avenue
19                              New York, New York 10017

20   For Allison Mack:          SEAN STEPHEN BUCKLEY, ESQ.
                                Kore & Kim, LLP
21                              800 Third Avenue
                                New York, New York 10022
22
     For Kathy Russell:         JUSTINE A. HARRIS, ESQ.
23                              Sher Tremonte, LLP
                                90 Broad Street
24                              23rd Floor
                                New York, New York 10004
25
                    (Appearances continue on next page.)


     Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
```

```
 1                                                                    2

 2

 3    APPEARANCES (Continued):

 4    For Nancy Salzman:          ROBERT SOLOWAY, ESQ.
                                  Rothman Schneider Soloway &
 5                                  Stern, P.C.
                                  100 Lafayette Street
 6                                Suite #501
                                  New York, New York 10013
 7
      For Clare Bronfman:         KATHLEEN ELIZABETH CASSIDY, ESQ
 8                                SUSAN NECHELES, ESQ.
                                  Hafetz & Necheles, LLP
 9                                10 East 40th Street, 48th Floor
                                  New York, New York 10016
10
      Court Transcriber:          RUTH ANN HAGER, C.E.T.**D-641
11                                TypeWrite Word Processing Service
                                  211 N. Milton Road
12                                Saratoga Springs, New York 12866

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1    (Proceedings began at 12:39 p.m.)

2            THE CLERK:  Is everyone on the line?

3    (Mr. Sullivan is barely audible on the telephone.)

4            MR. SULLIVAN:  Yes, Michael Sullivan [indiscernible]

5    on behalf of [indiscernible].

6            THE CLERK:  Criminal cause for oral argument, case

7    number 18-CR-204, United States v. Keith Raniere, Allison

8    Mack, Clare Bronfman, Kathy Russell, Lauren Salzman and Nancy

9    Salzman.

10            Counsel, can you state your name for the record

11    starting with the Government?

12            MS. HAJJAR:  Good afternoon, Your Honor.  Tanya

13    Hajjar, Moira Penza, Shannon Jones, Mark Lesko for the

14    Government.

15            THE COURT:  All right.  Good afternoon.

16            MS. PENZA:  Good afternoon, Your Honor.

17            MS. CASSIDY:  Good afternoon, Your Honor.  Kathleen

18    Cassidy and Susan Necheles on behalf of Clare Bronfman who

19    waives her appearance today.

20            THE COURT:  Good afternoon.

21            MS. GERAGOS:  Good afternoon.  Teny Geragos and Marc

22    Agnifilo who is present with me on behalf of Keith Raniere,

23    who waives his appearance.

24            THE COURT:  Okay.

25            MS. HARRIS:  Good afternoon, Your Honor.  Justine

4

1    Harris for Kathy Russell.

2              MR. BUCKLEY:  Good afternoon, Your Honor.  Sean

3    Buckley for Allison Mack, who waives her appearance today.

4              THE COURT:  Ms. Harris, is your client here?

5              MS. HARRIS:  No, she waives her appearances --

6              THE COURT:  Waives her appearance.  Okay.

7              MS. HARRIS:  Thank you.

8              MR. SOLOWAY:  Hello, Your Honor.  Robert Soloway.

9    Excuse my voice.  I have a little cold.  For Nancy Salzman who

10   waives her appearance today.

11             THE COURT:  Okay.  All right.  So we're here for two

12   reasons:  one was to check in on discovery which is why all

13   counsel are here; and then two, to pick up the discussion

14   about the Government's privilege motion.  So if you are not

15   particularly interested in the privilege motion, after we

16   discuss the discovery issues, if there are any, you don't have

17   to stay.  It's up to you if you're interested.  Feel free, but

18   if you don't want to, you don't need to.

19             So discovery and its status aside from privilege.

20             MS. PENZA:  Would you like us to remain seated, Your

21   Honor?

22             THE COURT:  Yeah.  It's -- I mean, I know with trial

23   lawyers it's hard to fight your instincts.  If you're more

24   comfortable standing, I prefer you seated because you're

25   closer to the microphone.  I can you hear you better, but --

5

1          MS. PENZA:  I'm happy to do what you prefer, Your

2    Honor.

3          THE COURT:  Okay.

4          MS. PENZA:  Your Honor, discovery has been

5    proceeding.  I don't remember whether we have been before Your

6    Honor since December 6th, but around that date we provided the

7    bulk of material that had been in our possession.  We have

8    continued to produce discovery on a rolling basis as we

9    receive documents and we believe we've been diligent in our

10   obligations in that regard.

11         THE COURT:  So you have a lot more to go.  You

12   have --

13         MS. PENZA:  Your Honor, we continue to receive

14   materials.  So, for example --

15         THE COURT:  Okay.

16         MS. PENZA:  -- next counsel is on the line.  We just

17   recently have received a large quantity of material from them.

18   We have been producing that on a rolling basis.  We know

19   defendants are in close communications with NXIVM's counsel,

20   but yet we've only recently received certain documents so

21   things like that they take time.  So on -- on a rolling basis

22   we continue.

23         So we produce, for example, the vast majority of

24   what we believe to be responsive documents pursuant to the

25   October search warrants that we received, which have not been

6

1   the subject of the first deadline.  While there are still some

2   additional documents, we obviously are receiving documents

3   from our team and we will produce those expeditiously as we do

4   a responsiveness review, but the vast bulk of material has

5   been produced.

6            THE COURT:  What about the bank records that you

7   were having trouble accessing?

8            MS. PENZA:  Those have been produced on our -- we

9   have -- I believe we have recently received some additional

10  bank records.  We intend to produce those in the same course

11  that we have been.  We've been doing them expeditiously, in

12  honor of a rolling basis, all of the bank records that were

13  being discussed previously have all been produced.

14           THE COURT:  And any update on the various devices

15  that you can access that you had to send to, I think, Quantico

16  or --

17           MS. PENZA:  No update, Your Honor.

18           THE COURT:  Because they're just sitting there and

19  the Government shutdown didn't help?

20           MS. PENZA:  Yeah.  I'm sure it did not help, but we

21  have no update on that.

22           THE COURT:  No update.  All right.  Any defendant's

23  particular concerns, discovery?

24           MS. NECHELES:  Susan Necheles.  I'll try to outline

25  a few things.  Your Honor, I think one thing that we have one

7

concern is that there were a number of devices that were

seized from -- devices that were owned by or seized by a place

belonging to Nancy Salzman.  We were given the entirety of

these devices, but my understanding is that the Government was

supposed to be searching them and then producing to us the

Rule 16, what they have -- what is responsive to the search

warrant because without that we can't know what the

Government -- what is potentially exhibit at trial.  There's

so much volume here that it's just -- no way for us to go

through it all and to figure out anything in it.

        So we still don't have the Rule 16 material or the

identified material and I don't know what the time line is on

that when the Government intends to produce that.

        Do you want me to go on or --

        THE COURT:  Yes, go through it all.

        MS. NECHELES:  Okay.  A second issue, Your Honor, I

think is just a timing issue.  I don't know whether this is an

issue that's to bring up before Your Honor or it's an issue of

when there will be expert discovery disclose -- or expert

disclosure.  We've had discussions with this with the

Government.  We have been unable to reach an agreement.  It's

our position that the Government should disclose their expert

witnesses and that we potentially have expert witnesses.  I

believe I may have an expert witness that it is an expert

witness that is totally responsive to the Government's case.

8

1          And I can't even begin to formulate an expert

2    statement because I don't have the bill of particulars from

3    the Government.  I really don't know actually -- frankly, the

4    theory of their case on the charges and, you know,

5    particularly the trust and estates [ph.] I don't understand.

6    So until I do, I can't really have an expert statement.

7          And so we would ask that defense expert statements

8    be delayed till a later date.  And we -- I believe that they

9    cannot -- if we don't have a bill of particulars sending for

10   us the Government's theory of the case, we cannot produce an

11   expert statement until the middle of the Government's case or

12   sometimes perhaps two weeks or three weeks before the defense

13   case is expected to begin because I will be able to formulate

14   what an expert would be testifying about.  So that was the

15   second issue.

16         The third issue, Your Honor, is -- and I'm a

17   little -- I'm not totally clear on this, but there was some

18   materials which Your Honor allowed the Government to withhold

19   from producing until six weeks before and this is based on an

20   *ex parte* affidavit by the Government and we are very, very

21   concerned about this.  I'm concerned about the volume of it.

22   I believe that those materials, I believe, relate to Kristin

23   Keeffe, who is going to be the Government's -- one of the main

24   witnesses against Ms. Bronfman.  And she may have voluminous

25   materials.  I have not seen any materials from her.  I haven't

9

1  seen her computer.  I believe that, you know, she -- there may

2  be voluminous materials that I need to have access to, to

3  examine, to prepare the defendant theory and cross-

4  examination.  I can't even begin to sort of say what it -- you

5  know, what the defense theory is until I understand what is in

6  her materials.

7          So we would ask that we have access to the *ex parte*

8  affidavit so that we could respond to it and perhaps be able

9  to discuss this further with Your Honor.  We raise that issue

10  because we think it's a critical issue and it's really

11  impairing the defendant's ability to prepare for trial and it

12  will make it very difficult for us to have a fair trial.

13          THE COURT:  Okay.  Any other issues?  All right.

14  Did you talk about any of these with Judge Garaufis,

15  especially that way they were -- if they relate to scheduling,

16  for example, expert discovery point?

17          MS. NECHELES:  No, Your Honor.  I think that we had

18  meeting with the Government.  There's been some discussion,

19  but I'm a little confused actually where we left that with

20  Judge, you know, Garaufis.  I think we said we would talk

21  further on it, but given how quickly the trial is approaching

22  and how we need to get their expert, the Government has said

23  to us -- I think what they said was they expect to have four

24  or five expert witnesses.  I don't have a clue.  We -- I gave

25  them sort of an outline of the type of expert I may be

10

1   calling.  They declined to do the same for us.  I don't have a

2   clue what type of expert they might be having.  I think it is

3   possible that they are thinking of calling experts in the area

4   where it's real contested scientific issues, like issues on

5   cult -- or issues on -- and if so there would be serious

6   Daubert hearings and so we really need to build in time for

7   that.  So I think it's important that at this point we'd be

8   setting dates on it.

9               MS. PENZA:  Your Honor, if I may --

10              THE COURT:  Yeah.

11              MS. PENZA:  -- to speak to the expert issue first.

12              THE COURT:  Um-hum.

13              MS. PENZA:  I do think that there is a general

14  concern that the trial team have about issues that are

15  properly before Judge Garaufis and they have not been referred

16  being brought to Your Honor in the first instance and

17  unexpectedly.

18              So, for example, Your Honor, last -- the Government

19  met with defense counsel two Mondays -- two weeks ago now and

20  conferred on various additional dates.  We were before -- we

21  were before Judge Garaufis last Wednesday.  Prior to going

22  before Judge Garaufis we sent an email to defense counsel with

23  proposed dates which included --

24              THE COURT:  Those dates for --

25              MS. PENZA:  including expert disclosure.

11

1          THE COURT:  Um-hum.

2          MS. PENZA:  At Wednesday's conference Mr. Agnifilo

3    stated to Judge Garaufis that we had put proposed dates before

4    the Court and that he suggested that he try to come back to us

5    and talk about those dates.  We had no follow-up conversation

6    with defense counsel and now it's being brought before Your

7    Honor.

8          So this is a -- the exact type of matter that we

9    believe at this moment is before Judge Garaufis.  The

10   Government proposed reasonable -- in our view reasonable dates

11   that were earlier than what defense counsel had initially

12   requested at the meet and confer.  And so we believe that this

13   is a problem being brought to Your Honor when it really isn't

14   ripe yet and certainly could have been handled before Judge

15   Garaufis last Wednesday if there was a serious concern about

16   the way thing were proceeding.  And so that is something that

17   the Government is very concerned about because it feels like

18   that is happening with various issues, that they are being

19   brought to Your Honor when Judge Garaufis is to be --

20          THE COURT:  My --

21          MS. PENZA:  Like the --

22          THE COURT:  You don't like the BOP issue.  Is that

23   what --

24          MS. PENZA:  We don't like the BOP issue, Your Honor.

25          THE COURT:  Well --

12

 1          MS. PENZA:  We believe that we should have been

 2   copied on that email.

 3          MS. GERAGOS:  That's -- Teny Geragos for

 4   Mr. Raniere.  I've spoken with Ms. Penza about that.  My only

 5   thing I was trying to get done in that email was to be able to

 6   see my client who I hadn't been able to see in over a week.  I

 7   was not trying to bring the issue to Your Honor.  I know where

 8   bail stands.  It stands in front of Judge Garaufis.  I just

 9   want to make that clear.

10          THE COURT:  The Government was aware of what was

11   going on, so it doesn't -- like it's not as if I don't talk to

12   Judge Garaufis.  This is not as if this is happening in a

13   vacuum about issues that are appropriately shared.

14          So I mean, I --

15          MS. PENZA:  You understand that it's just that our

16   privilege team is not there -- there -- that -- they have a

17   very specific role here.  And so when they're getting a bail

18   letter on -- late at night and there have been specific

19   concerns about them sharing information with us, et cetera, it

20   is of concern to us.  And we just going forward the trial team

21   wants to make sure that we are being apprised and that it's

22   not on our colleagues who are on the privilege team to be

23   allowing that to happen.  Defense counsel needs to be

24   including us on those.

25          THE COURT:  On those kinds of issues there's nothing

13

1    stopping you from sharing that kind of information, but let's

2    just so go back to the expert points.  So your belief is --

3    the Government's belief is that you left it with defense

4    counsel for a follow-up who is no standing up, if you don't

5    mind having a microphone in it. If this is for Judge Garaufis

6    then all I want to know is, is it moving forward.

7              UNIDENTIFIED VOICE:  So it's --

8              THE COURT:  And if not does it need to go to his

9    attention?

10             UNIDENTIFIED VOICE:  It's truly that -- my proposal

11   is -- still my proposal is that in regard to a broad array of

12   dates, 3500 material marked exhibits, exhibit list, witness

13   list, stuff like that.  Rather than fighting it out in court,

14   we'll see if we can achieve consensus.

15             I think the expert issue is a discrete issue and

16   it's a particular concern to Ms. Necheles and her client --

17             THE COURT:  Can you come closer to the microphone?

18             UNIDENTIFIED VOICE:  Yes, I'm sorry.  Yes.

19             THE COURT:  Make sure it's on.

20             THE COURT:  Um-hum.  Go ahead.

21             UNIDENTIFIED VOICE:  No, I'm fine.  I'm -- feel like

22   I'm accepting the Academy Award.

23             So I think that their general dates that I think

24   that we should work out very -- if we can, 3500 experts -- not

25   experts, marked exhibits, exhibit lists, things like that.

14

1          I think Ms. Necheles raised an issue that's of

2    particular concern to her and her client because what the

3    Government has said in the past is that they intend to call

4    multiple experts, three, four, five, more, less, I don't know.

5    And I think that Ms. Necheles has raised a possibility that

6    they might have an expert that's in the nature of rebuttal

7    evidence to the Government's experts so that we don't kick

8    that particular can down the lane because at the end of the

9    day there's no litigation that's going to flow from when they

10   turn over marked exhibits for 3500.  It's going to be when

11   it's going to be.

12          There could be significant litigation, though, that

13   relates to the experts and --

14          THE COURT:  [Indiscernible] point.

15          UNIDENTIFIED VOICE:  So I think Ms. Necheles is

16   raising that as a discrete stand-alone issue.

17          THE COURT:  Okay.  So still, does that mean that

18   your conversation does touch on the expert date on planning or

19   does defense counsel need to have a conversation with

20   Government --

21          MS. NECHELES:  Your Honor, we already had the

22   conversation.

23          THE COURT:  -- need to have another follow-up?

24          MS. NECHELES:  I don't know what else we would have

25   a conver -- we said we want their expert witness information

1    first and we could not give more details than I already have

2    about ours.  They came back proposing the same date and

3    they're not open to that.  So I could have another

4    conversation, but it's going to be the same conversation.

5    They want things turned over at the same time.  They feel

6    that's fair.  We feel like we can't do that and we need a date

7    set.  And so I just think that there needs to be a decision

8    made by someone else other than us.  It's not -- it's almost

9    not a question of the exact date because if we had the

10   framework worked out I think we could work out a date.  You

11   know, it's the issue of we believe we need to get this

12   information from them of their expert witnesses and then have

13   a later date on -- I -- I am not planning on calling an expert

14   who will opine on anything.

15           So I don't think that I really need to give expert

16   testimony.  It's not the classic type of expert.  I may call a

17   witness who would explain something if the Government's case

18   is murky but I don't know what their theory is, so I can't

19   sort of exchange expert statements because I can't even write

20   an expert statement at this point.  And so that's where --

21   what the problem is.  I really, you know, the -- if I call an

22   expert it will be rebuttal evidence, not rebutting their

23   experts necessarily but maybe rebutting our arguments that

24   they are made in their case, depending what those arguments

25   are on the wills and -- or as their expert will be part of

1    their -- what they are putting in right now as their case in

2    chief that they really are going to have four or five experts.

3    We think we just need a date set for that so we can have the

4    litigation that follows and really --

5            THE COURT:  When you say the date set, for what?

6    When the Government will provide you with the information and

7    if there's going to be a Daubert hearing that that be

8    scheduled.

9            MS. NECHELES:  Yes.

10            MS. PENZA:  Your Honor, we proposed -- this is

11    why -- this is very frustrating because we proposed a date for

12    expert disclosures by the Government and for defense case in

13    chief and we proposed a different date for expert disclosures

14    that would be rebuttal.  So I'm really not understanding what

15    the complaint is here.

16            THE COURT:  So do you not agree to those dates and

17    you think --

18            MS. NECHELES:  The Government's date is fine.  The

19    problem is what does rebuttal mean.  I -- the expert that I am

20    thinking of calling may rebut an expert of theirs or it may

21    just rebut their case and what the Government is saying is

22    rebuttal experts rebutting their experts.

23            THE COURT:  Um-hum.

24            MS. NECHELES:  And I'm saying I don't know whether I

25    recall this -- I can't really give expert disclosure at this

17

1    point because I don't know the Government's case.  And so

2    that's the only -- I don't have a problem with their dates.

3                    THE COURT:  Okay.

4                    MS. NECHELES:  It is a question of our date for when

5    we would give experts and I just don't want to be precluded at

6    a later date because of the issue of whether this person would

7    be -- if I called them would be part of my case in chief could

8    be murky.

9                    MS. HARRIS:  Your Honor?

10                   THE COURT:  Yes.

11                   MS. HARRIS:  Chime in a little bit?

12                   THE COURT:  Yeah.

13                   MS. HARRIS:  I mean, I think just to sort of --

14   since we are now discussing experts to close the loop on a few

15   issues.  When we met with the Government I understood the

16   Government to represent that by mid-February it would give us

17   at least a heads up of the type of experts that we'd be

18   calling so at least we had some visibility into the pipeline.

19   And I haven't heard them either in their email to us about

20   scheduling or today or any other day saying they're not able

21   to do that.  So mid-February is this week, so hopefully we

22   will get that cleared.  That's number one.

23                   Number two, I just want to note that in their email

24   proposing the dates that was just referenced their proposal

25   for expert disclosures is April 25th.  But I think the

18

1    rebuttal -- I do personally actually have a problem with the

2    rebuttal, the sort of expert disclosures, Government and

3    defense rebuttal dated March 4th.  That's a mere eight -- you

4    know, with the short month of February that's barely eight or

5    nine days after receiving the disclosure of the principal

6    experts.

7            And so, look, I don't know whether on behalf of

8    Ms. Russell we have -- you know, I'm going to have a

9    particular issue that's of particular importance to her to

10   rebut but, you know, I think the dates as Ms. Necheles

11   indicated, the February 25th date with the idea that it would

12   get some heads up about the type of experts that are going to

13   be called before February 25th is all workable.  I think what

14   we're both concerned with is the idea of when if we have

15   something to rebut either the specific expert or something

16   about the Government's case which may not ripen until the

17   actual representation of evidence when the deadline would be

18   imposed on the defense side.

19           THE COURT:  Okay.  So you're concerned with two

20   possible kinds of --

21           MS. HARRIS:  Correct.

22           THE COURT:  -- [indiscernible], one directly

23   rebutting the Government -- an expert the Government has and,

24   two, sort of rebuttal in quotes on the case in chief.  As to

25   the first -- have you talked to the Government about the

19

1   schedule.

2           MS. HARRIS:  We received this shortly before -- the

3   night before the Wednesday in court conference, so I did not

4   come here today to --

5           THE COURT:  Okay.

6           MS. HARRIS:  Discuss that particular issue, but

7   because we're nor discussing it I --

8           THE COURT:  Okay.

9           MS. HARRIS:  -- [indiscernible] it, so we haven't

10  responded.  We've not as a group responded to this email from

11  last week.

12          MS. PENZA:  But, Your Honor, we discussed all the

13  dates before.

14          THE COURT:  Okay.

15          MS. PENZA:  We were at a meeting where we were to

16  sit down and we discussed with the Government our problems

17  with this.

18          THE COURT:  Okay.  I think as this stands now --

19          MS. PENZA:  That we don't think --

20          THE COURT:  -- at least a second kind of expert

21  which I'm going to say is the one that is the rebuttal to the

22  case in chief and not to -- necessarily to a specific expert.

23  It's only for Judge Garaufis, but I think you need a time line

24  for raising this.  So when can you all talk and then let him

25  know if there is this unresolved issue, you know, which you

20

1  may then decide I should deal with, but --

2          MS. PENZA:  The Government is happy to put in a

3  letter by the end of this week.

4          THE COURT:  Okay.  All right.  All right.  The other

5  issue was the rule -- the other one of the other issues was

6  the Rule 16 for the Salzman devices.

7          MS. PENZA:  Yes.  So, Your Honor, I believe that

8  defendants are conflating Rule 16 discovery with trial

9  exhibits.  That's not what Rule 16 is meant to do.  So we have

10  provided defense counsel with everything.  They cannot

11  complain about not having received everything.  That has

12  already been done.  We have been also providing Bates stamped

13  responsive materials as we've been going through it.  It's an

14  enormous amount of material, as defense counsel has

15  acknowledged, but they have the same access that we do.  And

16  we are continuing to provide it, but that is -- all of the

17  case law is crystal clear that Rule 16 is not meant for them

18  to have an outline of how we are proving every element at

19  trial.

20          MS. NECHELES:  No, Your Honor, I think that the

21  Government is wrong here.  That's not what we're arguing.

22  We're not asking for the exhibits at this point.  We're asking

23  for something that we're clearly entitled to.  Rule 16 allows

24  the defense to know what evidence the Government has in its

25  possession and the Government should only have in its

1   possession what is responsive to the search warrant and so

2   that's what we're asking.  Give us what's responsive to the

3   search warrant and there should be a date by which that

4   happens, by which they have searched the materials and given

5   us what is responsive so that we can prepare for trial based

6   on what is the evidence -- the bulk of evidence and that is

7   all that we are asking for.  It's what we get in every case.

8   What is unusual in this case is that we have the entirety of

9   the computers from someone else.

10          But even if when they search Ms. Bronfman's

11  computers they have to produce the Rule 16 materials by some

12  date certain so that we can prepare for trial knowing what the

13  Government -- what the Government has in its possession and

14  that's what we're asking for here.

15          MR. SOLOWAY:  Your Honor?

16          THE COURT:  Yes.

17          MR. SOLOWAY:  I'm going to try to communicate I

18  think some context here that Your Honor might be -- I'm not

19  sure.  But we entered into an agreement with Government, a

20  stipulation that was drafted by the parties and so ordered by

21  the Court in October of 2018.  We're now in February of 2019.

22  At that time there was and still is a mass -- a very large

23  number of electronic devices that had been seized by the

24  Government months earlier before Nancy Salzman's arrest at her

25  home at 3 Oregon Trail.

22

1    The Government proposed to produce full forensic

2  copies of those materials prior to conducting a full search

3  for materials that were technically or legally within the four

4  corners of the warrant, what was -- what they had probable

5  cause to seize.  They proposed to turn over full forensic

6  copies of everything and Nancy Salzman agreed to that so that

7  we could move the case ahead and everybody would have the

8  materials and we could try the case on an expedited -- what

9  was a relatively expedited schedule.

10    All the defendants have standing to assert the

11  right, I believe, to this Rule 16 material, not just Nancy

12  Salzman because it's seized as part of the case and is going

13  to be used by the Government as case evidence.  But Nancy

14  Salzman entered into the agreement.  And the agreement

15  provided specifically that while we agreed that full forensic

16  copies of the Nancy Salzman devices would be turned over to

17  all defendants that -- and specifically the stipulation reads

18  the Government has identified and will continue to identify

19  material on the Oregon Trail devices that is responsive to the

20  search warrants authorizing the seizure of the Oregon Trail

21  devices and will produce the materials so identified to

22  counsel for the defendants.

23    The material so identified is that material that's

24  within the confines of Rule 68 within the confines

25  specifically of probable cause.  I think we believe, but I

23

1    think that's what Ms. Necheles is asserting here.  And so

2    since we're the party that signed the stipulation, I just

3    wanted to give you that information.

4              THE COURT:  Okay.  This -- I understand the

5    [indiscernible].  We could correctly [indiscernible].  The

6    Government, you're taking the position -- they have the

7    universe of documents so we've done what we have to do.  The

8    fact that we're trying to work with a subset of that is not

9    really -- it doesn't matter.  They have everything.

10             And defendant's position is it's nice that we have

11   everything, but we care about the subset that would have

12   been -- or that, you know, is permitted by the search warrant.

13   So it's sort of a difference between the universe and the

14   galaxy.  And you're taking -- so is this the mismatch or is

15   there something --

16             MS. PENZA:  Yeah, I believe it is -- our position is

17   that we have complied with our Rule 16 --

18             THE COURT:  Because you've given them everything,

19   even --

20             MS. PENZA:  -- obligations.

21             THE COURT:  -- though you haven't identified the

22   subset that you would have been allowed to get based on the

23   search warrant.  So if the stipulation hadn't been entered

24   into and all the materials couldn't have been shared, you

25   would have had to keep going for --

24

1          MS. PENZA:  Well, we had -- I want to be very clear,

2    Your Honor.

3          THE COURT:  Um-hum.

4          MS. PENZA:  We have been producing thousands and

5    thousands and thousands of Bates numbered documents as well.

6          THE COURT:  Okay.  But we're still trying to get to

7    the outer limit of what you are allowed to use based on the

8    search warrant.  That's --

9          MS. PENZA:  Well, allowed to use is a different

10   question, Your Honor.

11         THE COURT:  What's the difference?

12         MS. PENZA:  That's why we keep running into the same

13   problem.  So the defense counsel wants to have a cutoff date

14   for stopping our search and that is just not supported by any

15   case law.  But down the road --

16         THE COURT:  All right.

17         MS. PENZA:  -- if they want to move to suppress at

18   trial, that is their remedy.  It's not that they get to come

19   in and say the search stops.  That's just not the way it

20   works, Your Honor.  Our search is we're operating in good

21   faith.  Our search is continuing and there is no -- there is

22   no basis for that search to be cut off.

23         THE COURT:  Okay.  So this is basically the same

24   argument we've had three times before, right?  This may be the

25   third time we've had it.  And so it's this question of does

1   the deadline mean anything, where is the balancing test go and

2   how is that going to be made.  Is this any different than what

3   we've been talking about before?

4          MS. PENZA:  Your Honor, I think the main -- I mean,

5   here part of the difference is they have everything.  They

6   have everything.  They have the same access.  They have the

7   same -- they have vendors.  They can run the same searches.

8   They've now received our enterprise motion.

9          So in terms of the balancing test that would happen,

10  I do believe we're at a very different place because they do

11  have access --

12         THE COURT:  Well, I wasn't making statement about

13  what the outcome of the balancing test would be, just that

14  it -- you know, we've always talked about approaching that

15  time when the balancing test would come in, but I guess the

16  argument, if I understand defense counsel, you're saying, you

17  know, just because we were cooperative we shouldn't be on the

18  short end of the stick because we allowed the Government to

19  share all the information.  That was an accommodation and the

20  Government -- had Nancy Salzman not agreed to share the

21  contents of all her devices with everybody, you would have had

22  to do your search, so the information was produced or not.

23         MS. PENZA:  Well, so, first of all, that's a -- it's

24  a misstatement because Nancy Salzman agreed and then we

25  withdrew our motion.  So whatever is a motion before the

26

1  Court, which Your Honor actually ended up mooting based on the

2  agreement.

3          So the idea that Nancy Salzman agreed and we would

4  have otherwise been in this other world, there's -- we're now

5  in a hypothetical because it -- it is possible that Judge

6  Garaufis or Your Honor could have ordered that turning -- that

7  everything should be turned over and then we would have been

8  in the boat when everybody had access to everything.

9          THE COURT:  What does the text in the stipulation

10 mean?  I mean, the one that counsel -- you have a copy, right,

11 on you?

12         MS. PENZA:  That we would continue our searches,

13 that's just a statement of our obligation.  Of course we're

14 going to -- we certainly in no way intended to change that we

15 had put forth in the motion and I believe everybody understood

16 that.  Our obligations are always the same.  We have an

17 obligation to conduct our searches when we receive materials

18 pursuant to a search warrant in good faith and to comply with

19 the law and that is what we are doing.

20         THE COURT:  And is your thought that you can conduct

21 these searches all the way up and through trial?

22         MS. PENZA:  Potentially, Your Honor.

23         THE COURT:  And not -- know --

24         MS. PENZA:  Absolutely.  And the question would be,

25 could we use certain evidence if defendants are prejudiced by

27

1   it.

2            MS. NECHELES:  Your Honor, could I address it?  I

3   don't think Ms. Penza -- I don't think she's correct on the

4   law.  I think that there's plenty of law out there that says

5   you must do the searches in time and material.  I just

6   finished a trial where the judge set a cutoff date for when

7   the searches would be done and that is commonly done.  It is

8   true that the Government can always -- there's generally -- if

9   there's newly discovered evidence they can use that, but this

10  is not --

11           THE COURT:  That's not what we're talking about.

12           MS. NECHELES:  -- newly discovered.  They had

13  this -- these computers since March of 2018.  They just are

14  not putting as a priority the search which are critical to the

15  defense.  That's not their priority so they don't want to do

16  that with the time we need to be able to know what the

17  universe is.  They want to shift the burden --

18           THE COURT:  Okay.

19           MS. NECHELES:  -- to the defense and to get our job

20  to figure out, out of this massive material, what might the

21  Government use, but that's not how Rule 16 is set up and

22  that's not what the case law is on searches.  The searches are

23  supposed to be done promptly.  This is -- they have the -- and

24  they promised to do that.

25           THE COURT:  Okay.

28

1          MS. PENZA:  Your Honor, we've got a new search

2    warrant --

3          MS. NECHELES:  I don't interrupt Ms. Penza.  I don't

4    appreciate her interrupting me.

5          THE COURT:  All right.  So that goes --

6          MS. NECHELES:  I understand they got a new search

7    warrant, but they still have had that search.  They've had the

8    computers all this time.  They got a new search warrant

9    because they know the law requires them to do this promptly.

10   We have a quick upcoming trial date and we ask that they be

11   given a date by which the Government will have completed its

12   searches and produce the materials to.

13         THE COURT:  All right.  So it seems that the

14   Government's position is they don't have to do that, so this

15   seems like it needs to be teed up for a motion.

16         So you think this is for me or you think -- what is

17   your respective positions as to whether this goes to the trial

18   judge or is tied to discovery and should it be part of, for

19   example, issues you raise in a letter on discovery on Friday

20   or something else?

21         MS. NECHELES:  Your Honor, I think that all of this

22   discovery materials at the heart of what the Court sent to you

23   and that if the Government is unhappy or we're unhappy with

24   what you decide we can always appeal it.  But I think that

25   what Judge Garaufis wanted was for Your Honor to look at both

29

1   the expert, all of these things first, so I would say

2   certainly I think that this is at the heart of what Judge

3   Garaufis has asked you to look at.

4           THE COURT:  And the Government.

5           MS. PENZA:  We don't have a position on this

6   particular motion.  We certainly think things, you know -- you

7   and Judge Garaufis can work it out.

8           THE COURT:  Okay.  So then the second expert piece

9   because you're talking about potentially raising it during

10  trial seems to me that Judge Garaufis should be part of that,

11  but this issue -- so I think it's defendant's -- it's your

12  motion.  So do you want to talk to each other and just let me

13  know what you propose a schedule?  That's fine.  If you can't

14  agree, I'll decide.

15          All right.  Then the other issue -- so let me know

16  by the end of the week what you're proposing -- and then the

17  last issue is the materials that are being withheld.  Is it

18  till six weeks before?

19          MS. PENZA:  Yes, Your Honor.  So in the first

20  instance we would ask that the Court issue an order that

21  defense counsel should not state the name of people they

22  believe to be cooperating witnesses on the record.  We have

23  obviously been -- we've been operating under that and so we

24  would ask that they do that going forward.

25          MS. NECHELES:  Your Honor, I actually do not think

1  that there is any more that covers that and I think that

2  there's been -- that would be kind of an amazing thing.  There

3  is an enormous amount of press in this case.  Everybody's name

4  is in the press every day, including our names.  It's an

5  enormous amount of press.  I think that to -- it's a little

6  bit of gamesmanship here.  I don't think that there is any

7  basis to have --

8        THE COURT:  All right.  I'm not ordering that.  But

9  in terms of the material you're concern is you -- you think

10  it's -- it's six weeks, right?  I haven't gone back to it,

11  but --

12        MS. PENZA:  I think it's six weeks, Your Honor.

13        MS. NECHELES:  I think there might be computers here

14  that need to be searched.  I don't know.  But given what was

15  in the enterprise letter, which is a massive amount of things

16  that we have to look at and resolve and it appears that what

17  is being withheld are email accounts and computers.  And we

18  will not be able to prepare effectively for trial in that last

19  six weeks when there's going to be a lot of other stuff coming

20  to us, all of the witness prior statements, all of the

21  exhibits that are being marked by the Government to then start

22  searching computers or whole email accounts for what I believe

23  will be possibly the most critical witness and case.  I just

24  don't understand this at this point which is why I'm asking

25  for us to be able to respond, to view the *ex parte* affidavit

31

1   and respond to it because it is hard for me to understand

2   given the volume of very sensitive material that we've been

3   given in this case and the likelihood that we know who the

4   witnesses are here.  I do not understand why we would not be

5   given access to this.

6            There may be -- I understand that there are issues

7   about where this woman was located and whether she was trying

8   to hide from other people in the -- or in the group.

9            THE COURT:  Okay.  I don't -- I'm not going to

10  acknowledge or deny, you know, what the content was nor is the

11  Government.  I guess the practical question and this I don't

12  know is the volume of discovery related to the issues that are

13  the subject of that order.

14           MS. PENZA:  But, Your Honor, all I mean to say with

15  respect to that was if there are sen -- particularly sensitive

16  issues about for location or anything like that, that I don't

17  really have a -- that may be a reason to keep that portion or

18  that small portion of items in the Government's position or to

19  make it for attorney's eyes only or extra confidential, I

20  don't know.  But in general, the bulk of what this person

21  would have does not seem to me to be -- or seems to me to be

22  critical to the defense.

23           THE COURT:  Okay.  Again, I'm neither confirming or

24  denying the content of the application, so there is an order

25  and you know what the order is.  I think that the practical

32

1  questions for the Government which you could let me know *ex*

2  *parte* is the volume of material, I guess.

3          MS. PENZA:  Well, we will let you know *ex parte* by

4  the end of the week --

5          THE COURT:  To like whatever happens --

6          MS. PENZA:  -- Your Honor.

7          THE COURT:  -- they could manage it.  All right.

8  All right.  Those are the three discovery-related issues.

9          Was there any other discovery-related issue?

10          MS. PENZA:  Your Honor, the Government has one.

11          THE COURT:  Um-hum.

12          MS. PENZA:  So there were a lot of -- there were a

13  number of devices used from 8 Hale.  No defendant has asserted

14  a privacy interest over 8 Hale.  And so the Government's

15  position is that there cannot be any privilege associated with

16  8 Hale.  Nobody wants to take any sort of ownership over 8

17  Hale and so the Government proposes not doing a privilege

18  review of the material from 8 Hale unless anyone can assert

19  some reason why we should be doing so.

20          THE COURT:  I don't have your handy charts with me.

21  Can you fill in just what that is -- what that means?

22          MS. PENZA:  It is a lot -- so 8 Hale is the --

23  the -- I'll call it a residence that has been described in a

24  number of the papers as the library and so there were a number

25  of devices used from there.  No defendant is asserting a

33

1  privacy interest over anything within the library.  My

2  understanding is that NXIVM is not either, so given that we do

3  not understand how there could possibly be a claim that any

4  sort of privilege would be preserved as to the items in that

5  residence.

6          MS. NECHELES:  I don't understand the Government's

7  argument, frankly.  If things are stored in a certain place

8  and nobody is looking at them or -- they're still privileged.

9  Just because you put boxes in someone's basement and

10 they're -- you know, with the understanding they're not --

11 they're just being held there because it's a convenient

12 storage place and those boxes have emails with you and your

13 attorney or correspondence, that doesn't mean you're waiving

14 privilege on it.

15         THE COURT:  I guess this depends how far you've --

16 and I don't know enough about this, so you may have to fill me

17 in how far you push that, right?  So if you put it in a locked

18 storage cabinet at a, you know, used store, then yeah, what

19 you're saying would be right.  If you stick it in the public

20 library where anybody can come in and look at it or some other

21 similarly readily accessible place then --

22         MS. PENZA:  Yeah, I think it is all --

23         THE COURT:  -- it would seem like you waived it, so

24 I don't know how one can consider -- you know, was it given to

25 someone to be the -- you know, like whatever, a safe deposit

34

1  box at a bank.  You don't expect the bank to look at it

2  without a warrant or some other, you know, granted permission

3  or is this a more public place because --

4          MS. NECHELES:  So, Your Honor, I don't know

5  what's -- whether there's -- I don't know whether we're

6  arguing about something that makes any difference.  You know,

7  I would suggest --

8          THE COURT:  I don't know either.

9          MS. NECHELES:  -- that maybe the Government could

10 identify what is there that they -- that is arguably

11 privileged.  I mean, that's --

12         THE COURT:  Well, they're saying they haven't done

13 any segregation.  Is that what you're saying?

14         MS. PENZA:  Well, they have everything from 8 Hale

15 and so our --

16         THE COURT:  Who's the "they" here?  Sorry.

17         MS. PENZA:  All defendants.

18         THE COURT:  Okay.

19         MS. PENZA:  Have everything from 8 Hale.

20         THE COURT:  Um-hum.

21         MS. PENZA:  And so our position would be

22 privilege -- there is a burden on defendants on privilege.

23 Maybe we're bleeding into what our next discussion is going to

24 be --

25         THE COURT:  So great.  We'll move on.

35

1          MS. PENZA:  -- but this is a residence that no one

2    here is willing to assert any privacy interests over, where

3    there were numerous people going in and out all the time,

4    where it was -- where we say it was the scene of a number of

5    crimes that were committed.  And so to say that you are

6    protecting the confidentiality of items that are in this type

7    of location, we just don't think that that burden can be

8    shown.  And if somebody wants to show it, they -- we would ask

9    that the Court order them to do so and that it shouldn't be

10   the Government affirmatively trying to prove that there is no

11   privilege.  We -- it's essentially an abandoned house in the

12   way the defendants have been acting in regards to 8 Hale thus

13   far.

14          THE COURT:  Is anybody asserting privilege over

15   these materials or have a different description?  I really --

16          MS. HARRIS:  Your Honor --

17          MS. NECHELES:  I need to -- sorry, go ahead.

18          MS. HARRIS:  With respect to 8 Hale I agree with

19   what Ms. Penza is saying.  That's fine.  Let me just confer

20   with my client and if there are certain devices that I know

21   will have privilege -- I didn't realize that they were not

22   going to segregate privilege materials from that.  If there

23   are certain devices that I think will definitely have

24   privileged materials for Mr. Raniere, I will let them know by

25   the end of the week.

1          MS. PENZA:  I think we're misstate -- like this is

2    kind of conflating the issues.  Like there may be things that

3    would hit upon privileged terms.  The question is whether

4    there can be an assertion of privilege over anything in this.

5    And so the question of whether it's been segregated on the

6    Government's end, that's a different question.  The question

7    is whether they are going to assert privilege and can assert

8    privilege over devices in what I'm comparing to an abandoned

9    house at the point -- at this point given that none of the

10   defendants and NXIVM are not asserting any privacy interests

11   over the material.

12          THE COURT:  Okay.

13          MS. HARRIS:  I think we have to like take a look at

14   it.  I don't know off the top of my head --

15          THE COURT:  Okay.

16          MS. HARRIS:  -- what's on the 8 Hale devices, but it

17   would be helpful to know if the segregation process was done

18   with respect to the 8 Hale devices.  I just don't know.

19          THE COURT:  Yeah, but the Government's position is

20   it doesn't matter because if it's an abandoned -- it's like

21   leaving it out on the sidewalk.  Anybody can look at it.  This

22   is; -- I mean, you may have a -- I do not know the facts about

23   this and you can -- if we don't need to spend much more time

24   on this.  If you have a reason to describe it differently than

25   we can -- a motion I guess look at this more carefully.  And I

37

1  don't know what this place, you know, is.

2          MS. NECHELES:  Your Honor, I think that the

3  Government is conflating two things.  I think that it is

4  while -- what the Government is saying is that if nobody has

5  standing to object to a seizure then they're entitled to take

6  the whole thing.  But that's not true.  They had a search

7  warrant and they're limited to what they can take by the

8  search warrant, whether or not that was all they had the

9  constitutional right to take, whether or not someone is

10 willing to stand up in court now and say they have standing,

11 it's sort of like if they went into my home --

12          THE COURT:  Well --

13          MS. NECHELES:  -- and searched and seized stuff.

14          THE COURT:  No, no.  So let me -- as I understand

15 this argument just so we have the argument teed up I think

16 there's a different point which is they would only need the

17 warrant is anyone cared and actually had a privacy interest.

18 If you left your files in the middle of the park outside,

19 that's -- anybody can take your files, anyone can read your

20 files --

21          MS. NECHELES:  But that's not what --

22          THE COURT:  -- anyone can do whatever and --

23          MS. NECHELES:  -- happened here.

24          THE COURT:  Okay.  So what happened?

25          MS. NECHELES:  It was a private home.  It's like if

38

1    they went into my house and searched and seized my stuff.

2              THE COURT:  But your house is not abandoned, so

3    let's just get on the same page about --

4              MS. NECHELES:  Wait -- no, I'm --

5              THE COURT:  Okay.

6              MS. NECHELES:  And then they wanted to introduce

7    stuff from my house in this case.  I wouldn't have standing

8    here.  Nobody in this case would have standing to challenge

9    what was seized, but it wasn't because it was abandoned stuff.

10   They're only using the words "abandoned" because no one here

11   is saying they have standing to challenge it.  There still was

12   somebody -- it was private property they went into.  It wasn't

13   a park.  That's why they needed a search warrant.  There's

14   somebody into privacy interest that was being invaded and they

15   got the right to take certain things.  Just because that

16   person doesn't have standing here doesn't mean they can't play

17   this game that they just go -- they say, "Well, nobody has

18   standing so, therefore, we can ignore the seizure" because

19   you're still violating someone's rights.  If they took stuff

20   from my house and were now trying to introduce in this case

21   things that they had no right to take, I wouldn't have

22   standing to come into this court and object to it, but it

23   would still violate my private interest.  There is a reason

24   that they had to get a search warrant.

25             Now, we may not be able to challenge that search

1  warrant because we don't have standing, but they still are

2  required to follow the rules in that search warrant or follow

3  the limits in it.  That doesn't mean they can just take

4  everything and put it into evidence.  That would be

5  violating -- that would just be a wholesale cynical disregard

6  of the Constitutional limits that they would be playing a game

7  that oh, nobody has standing so I don't have to follow the

8  Constitution, the Fourth Amendment requirements.  I can

9  violate these people who are not here in court.  I can totally

10  disregard their Constitutional rights and violate it because

11  they don't have standing here.

12         THE COURT:  All right.  I understand the difference.

13  The arguments are going to be slightly different and I

14  don't --

15         MS. NECHELES:  It's not stuff they found in a public

16  park.

17         THE COURT:  -- know what the facts are, but the

18  argument is -- it's not your home, it's not someone else's

19  home.

20         MS. NECHELES:  No, it is someone's home.

21         MS. PENZA:  Your Honor --

22         THE COURT:  All right.

23         MS. HARRIS:  May I ask if by Friday if we're going

24  to make this showing that, you know, we could --

25         THE COURT:  All right.  Let's just with -- the

40

1  Government, yes, on the schedule.

2          MS. NECHELES:  Okay.

3          THE COURT:  But just so the Government has clearly

4  described --

5          MS. PENZA:  Your Honor, I just want to make --

6          THE COURT:  -- its position -- um-hum.

7          MS. PENZA:  I mean, we're operating in like a

8  fantasy world here.  If anyone had standing it would be

9  somebody in this room or NXIVM.  Nancy Salzman put in a claim

10 for 8 Hale in a separate civil proceeding but now doesn't want

11 anything to do with it.  They -- if anyone had a privacy

12 interest it would be somebody here but nobody is asserting it.

13 And so we're not talking about Ms. Necheles's home in some big

14 Constitu -- you know, some huge Constitutional issue, that's

15 just not where we are.  And so that's kind of number one in

16 terms of this idea about -- about standing.  It's not like

17 it's Ms. Necheles's home that we're talking about.

18          And secondly, none of this has anything to do with

19 privilege.  That's a totally separate issue.  So in terms of

20 like there's the one issue of like the abandoned house and,

21 therefore, everything.  But then on top of that if somebody

22 doesn't protect the confidentiality of privileged materials

23 that in itself is a separate waiver on privilege.  And that's

24 what we're getting at right now is, if nobody is going to come

25 in and say what this house was, how it was protected, whether

41

1   there were locks on the doors, whether there was any sort of

2   steps taken to figure out who was going in or not because

3   they're frankly, we proffered evidence that there wasn't and

4   we're not -- and so what we're saying is that defendants,

5   whomever should have to do that by a date certain or else

6   there should be a ruling that there can't be a privilege here.

7          THE COURT:  All right.  So it's a spectrum.  Maybe

8   one is abandoned, two is unlocked, you know, three is unlocked

9   but easy to get into, four is -- you know, is don't anybody

10  touch my stuff, right, with the colloquially description of

11  the Fourth Amendment.

12         So --

13         MS. HARRIS:  Your Honor --

14         THE COURT:  Yes.

15         MS. HARRIS:  Could I just ask for clarification

16  before we --

17         THE COURT:  Sure.

18         MS. HARRIS:  -- tee up the motion practice?  I

19  understood that there are a number of devices, like electronic

20  devices, computers, other communication devices that were

21  seized from 8 Hale.  With respect to privilege issues

22  obviously they're individuals who are not defendants in this

23  case who were perhaps communicating with lawyers with or

24  without individuals who are defendants in this case privy on

25  those communications.

42

1          As I understand the Government to be saying that

2   simply because none of the defendants here have standing to

3   challenge the Fourth Amendment issues that communications

4   contained on devices, presumably password-protected devices

5   that are with lawyers that have been identified to the

6   Government that that privilege is now hereby waived, that they

7   don't have to do the segregation because I think that's where

8   the bulk of these issues -- the communications that we claim

9   would be privileged are going to be.  They're going to be

10  communications that are perhaps very similar to the ones that

11  are before Your Honor or not or being part of the taint review

12  and I just don't see how the fact that they're in a physical

13  property that no one here is claiming standing for makes a

14  difference, but --

15          THE COURT:  So is it just your response to the

16  question which I think is a good helpful question.

17          MS. PENZA:  So, Your Honor, I think the answer would

18  be that it depends, but certainly to the extent that if the

19  privileges that are -- my understanding is that if the

20  privilege -- I don't believe that, for example, Ms. Harris has

21  asserted any privileges that belonged to Ms. Russell.  So if

22  we're talking, for example, about NXIVM privileges I think

23  that the -- that NXIVM would have to make a showing that if

24  Keith Raniere's executive library holds these documents and he

25  is the head of all of this and he allows access to all of

43

1  those documents on a free-for-all basis whether that privilege

2  is intact I believe that NXIVM or whomever else would have to

3  assert that that privilege still stands in that situation.

4              THE COURT:  Yep.

5              UNIDENTIFIED VOICE:  Your Honor?

6              THE COURT:  Yep.

7  (Mr. Sullivan on the phone extremely difficult to hear and

8  understand.)

9              MR. SULLIVAN:  This is [indiscernible] on behalf of

10 [indiscernible].  I actually [indiscernible] I just want to

11 [indiscernible] Court clear with regard to NXIVM

12 [indiscernible].  We never [indiscernible] abandon the way the

13 Government [indiscernible] abandoned [indiscernible] search

14 warrant [inaudible] initial claim of the property itself.  If

15 NXIVM is unaware [indiscernible] property [indiscernible] made

16 on behalf of [inaudible] the Government to the extent

17 [indiscernible] appear to be privileged based on search terms

18 [indiscernible] for the Government.  NXIVM is not waiving

19 [indiscernible] hypothetical may be [inaudible] NXIVM to

20 [inaudible] claim [indiscernible] seized [inaudible] as well.

21 So [indiscernible] NXIVM today [inaudible] not knowing huge

22 documents seized [indiscernible].

23             THE COURT:  For the Government?

24             MS. PENZA:  Your Honor, I don't think that's

25 actually accurate.  I think what we're asking here is

44

1   presuming there are hicks [ph.] in terms that NXIVM has

2   provided can NXIVM sustain their burden of showing that a

3   privilege still exists as to those devices.  And so I don't

4   really -- like we can purport that there are certain

5   documents.  We also don't necessarily have a problem with

6   NXIVM getting those documents as long as they are bound by the

7   protective order and as long as the other defendants are

8   comfortable with that to the extent their own privileged

9   materials are somehow commingled with those.

10          So we don't have a problem as long as NXIVM's

11  counsel is going to sign onto the protective order; however, I

12  think what we don't want is for this to be a prolonged process

13  because we don't think that this requires a document-by-

14  document review.  Assume there are a number of hits as to the

15  same NXIVM counsel that we've -- that have been provided prove

16  as is your burden by a preponderance that this is your

17  privilege.  And that's where I'm not -- like that's -- that --

18  these materials should still be privileged when they are kept

19  in a house where nobody is willing to say, this is mine.

20          THE COURT:  All right.  So it seems like you need to

21  talk.  It seems like it's going to be a motion and it seems

22  like there are a couple of issues.  One, Ms. Necheles' point

23  that the Fourth Amendment is the key point here and the

24  Government can't just have what it wants, then another would

25  be related to that.  But the facts are related to this

45

1   circumstance about whether the -- anyone was actually

2   protecting sort of this standard attorney/client thing.

3   Anybody lock the cabinet?  Was the cabinet in a room that was

4   locked?  Was -- you know, all those kinds of questions.  And

5   then the segregation point I think.  I think that's the order,

6   but we just might as well get this ready.

7             And to -- you know, to your point you don't want to

8   be extended.  I don't want to be extended, but, you know, your

9   briefing needs to be tight and fast in order to get these

10  things resolved quickly enough.  All right.  Can we -- so can

11  we talk -- so you're going to talk this week and let me know

12  what your proposed schedules are for these various issues to

13  be briefed.  And can we talk about any other reason, like can

14  we move on to the motion that we're here for?

15            MS. NECHELES:  Your Honor, just one last sort of

16  administrative point because we're here talking about

17  discovery, like the Government's enterprise letter of motion

18  filed last week and --

19            THE COURT:  I didn't read it.  Sorry.

20            MS. NECHELES:  No, that's okay.  Nothing specific

21  that comes of it.  And Ms. Russell's pending motion we are

22  submitting to the Government later today a sort of follow-up

23  discovery letter on very discrete points, Brady issues in

24  particular relating to Ms. Russell.

25            I don't think there's anything Your Honor has to do

46

1   now but since we're here talking about discovery I don't want

2   it to be said that I didn't raise these issues.  I think there

3   are things that were dealt with in the first instance with the

4   Government.  If there's anything that has to be elevated

5   to the Court's attention, we'll do so.

6                THE COURT:  Okay.

7                MS. NECHELES:  Thank you.

8                THE COURT:  All right.  So I don't know if anybody

9   wants to stay for the next conversation which is about the

10  Government's motion trying to get some resolution -- I guess

11  thematic or over-arching thesis.

12               All right.  So this is really the second part of

13  this discussion and I tried to do this last week because my

14  concern, which is still a concern, is that these issues that

15  are raised so I would -- I would break into two.  There's the

16  globally immigration-type arguments and privileges asserted --

17  being asserted by defendants and the crime fraud exception.

18               So there seems to me from having read your papers

19  this has a lot to do with the individual documents, but the

20  privilege review tainting thought that since the trial team

21  had drafted the motion you might have more context for this

22  motion.

23               So I am still at the -- sort of trying to figure out

24  on the one hand presumably you have a bit more of a big

25  picture.  On the other hand, you haven't seen the documents.

47

1   Kind of balance this.  But if there's information, argument

2   that would be helpful and I'd also like to know procedurally,

3   particularly on the crime fraud if you think an information

4   you've provided is enough to make that determination, if there

5   should be other information, if there needs to be a hearing.

6   You know, I'm not sure what you're thinking.  So since it's

7   your motion, your floor.

8          MS. PENZA:  Thank you, Your Honor.  When Your Honor

9   initially set the motion schedule and we thought it was a

10  sensible way of approaching it because we tried to distill for

11  purposes of this motion legal issues we thought could be

12  briefed and approached and evaluated and decided before -- and

13  apart from looking at any documents.  And so with respect to

14  the immigration-related arguments, what we've said is I think

15  separate and apart from any emails or communications.  It's

16  the simple legal -- it's a legal proposition that

17  privileges -- such a privilege cannot be asserted as defendant

18  Clare Bronfman and NXIVM have tried to do, which is to say

19  that a privilege can be shared in some way between a company

20  representative and a visa applicant or Clare Bronfman and a

21  visa applicant, that there is no basis for such an asserted

22  privilege.  And the only case that we found to address the

23  issue has rejected it.

24          And so in our view, Your Honor, this is a legal

25  claim that can be evaluated in the absence of looking at any

48

1    particular documents because the documents themselves don't

2    shed light on whether or not such a privilege can be asserted.

3    It's a legal matter whether under this doctrine of

4    attorney/client privilege narrowly construed whether

5    defendants have met their burden to show that such a privilege

6    in fact existed.

7         And the filings that have been submitted on behalf

8    of Ms. Bronfman and NXIVM contain almost no facts.  There's no

9    factual support or even proffer that -- that individuals were,

10   in fact, represented and by whom.  It is their burden, Your

11   Honor, and there is no legal authority or factual support for

12   these privileges in the Government's view.

13        MS. CASSIDY:  Your Honor, this is, you know, what we

14   covered last time when the trial team was not here, but our

15   position is that this cannot be decided apart from the

16   documents.  There are a myriad of different arrangements:  who

17   is the attorney, who is the company that is applying with a

18   visa, what type of visa is it, is the person a current

19   employee or a potential employee who's the beneficiary.  And

20   so there are, you know, many, many different variations on the

21   immigration issues and it's going to come down to an analysis

22   of each of those specifically.

23        So I can't really respond to their arguments in --

24   you know, in the abstract without reference to particular

25   documents and I think the procedure that we discussed last

49

1    time with Your Honor is that the taint team [ph.] would

2    identify to us a series of immigration documents --

3              THE COURT:  An example -- um-hum.

4              MS. CASSIDY:  -- as examples, that we would be able

5    to respond to to tee up for an *ex parte* review.

6              THE COURT:  So this is the -- like the example

7    that -- it seems to me that immigration law is on a spectrum.

8    And I don't know if you're just saying, well, at one end there

9    can't be privilege at all, which would be a corporate entity

10   sponsoring someone for, just say H1B visa where you need the

11   Department of Labor to sign off.

12             The company really is not in the same position as

13   the visa applicant because the company has the obligation to

14   determine that there is no one in the United States who could

15   take -- is qualified to take the job and then that the person

16   who's the applicant is the best applicant and it's really not

17   something where you're particularly vested in, you know, that

18   it's person A.  It's somebody with that resume who is

19   available who will take the job at the -- you know, the salary

20   point.

21             So there you would say, okay, you're probably right.

22   The visa applicants and the company and probably can't be

23   represented -- shouldn't be represented by the same

24   individuals because all of the applicants' qualifications

25   would need to be vetted and the company just shouldn't be

50

1    involved in that.

2          The other side of the spectrum seems to be family

3    relationships where the application is as a unit.  Right?

4    It's husband and wife or parent -- a mother and child -- you

5    know, very tight units where they're making basically joint

6    representations about the relationship that exists.

7          So it seems like it would be possible for someone

8    unless something, you know, disastrous happens, that there's a

9    conflict to have a joint representation and privilege

10   communications on that end of the immigration spectrum.  And

11   just -- maybe just from the briefing I'm not -- you know, I

12   don't know where this falls.  There are other kinds of

13   immigration arrangements that happened.

14         Now, you might say, well, a company is always going

15   to be in a particular position which means that you can't have

16   the shared or joint representation.  I'm not sure what you're

17   saying.

18         MS. PENZA:  Right, Your Honor.  We -- the Government

19   agrees with the first -- that first point about the company

20   and the visa applicant being in fundamentally different places

21   and no privilege attached to communications which copy both.

22         With respect to the second scenario Your Honor

23   described, I'm not aware of that arrangement in any of the

24   particular disputed issues that come up.  There is no familial

25   relationship, for example, where a husband and wife have said,

51

1  we are seeking a visa, you know, based on our marriage or

2  based on some familial situation.  I'm not aware of one --

3            THE COURT:  I'm just using that as a point of --

4            MS. PENZA:  -- being asserted.

5            THE COURT:  -- like the spectrum of relationships.

6  So one of the -- I'm just looking -- sorry -- through the

7  brief.  I mean, one of the examples that you used -- this is

8  really more on crime fraud I guess is the email with the sort

9  of -- we're thinking about.  What are the different

10  possibilities of how one could immigrate legally to the United

11  States and you sort of challenged the underlying factual

12  assumptions that are being made.

13            MS. PENZA:  Well, that took the crime fraud

14  argument, Your Honor, which is the second --

15            THE COURT:  Right, right.  But I'm just using it as

16  an example that individuals who are involved in discussion

17  about immigration possibilities could cover the gamut of

18  possibilities.  Now, I understand you're offering facts that

19  say that that really wasn't their -- there were inappropriate

20  conversations happening in that particular context.  I'm

21  looking at the doc -- this is just for the record, right?

22  256, your brief with the October 6, 2016 email.  It was just

23  an example.

24            So your position is what, that all -- because it's a

25  corporation, it just -- there's not ever going to be a

52

1    personal relationship and so any communications about the

2    immigration just by their nature can't have a joint

3    representation?

4            MS. CASSIDY:  So simply that basic legal point that

5    attorney/client communications are protected because they're

6    confidential communications with a client and the attorney

7    where you have a third party involved in that communication

8    and the third party -- the relationship between the third

9    party and the two -- the protected relationship is, one, a

10   visa applicant for a company representative and a corporate --

11   and a corporate lawyer or Clare Bronfman and -- who is a third

12   party in term of a relationship between a visa applicant and

13   her attorney.  That necessarily breaks the privilege and

14   there's no legal support for such a joint dual representation

15   in this context.  The Government has said there is -- the

16   defense has failed to say a single case supporting a finding

17   of attorney/client privilege.

18           THE COURT:  Well, I think -- okay, so let's just

19   take a different example and then I'll come back to the point

20   that you just made.  So page 8.  You know, there's the

21   immigrant investor program example.  Let's move on in the

22   corporate world, a closer relationship.

23           MS. PENZA:  Your Honor, the -- I think this -- the

24   portions of the brief you are referring to are related to

25   crime fraud.

53

1          THE COURT:  But I just want to understand what you

2    think the context is for immigration-related applications

3    because that's what these communications seem -- are about.

4    So you're -- you know, if you just say a corporation can never

5    have a joint representation with the applicant is that just --

6    and there's no --

7          MS. PENZA:  Precisely.  Yes.

8          THE COURT:  No matter what the --

9          MS. PENZA:  Yes.

10          THE COURT:  -- the application is.

11          MS. CASSIDY:  No.

12          THE COURT:  Okay.

13          MS. CASSIDY:  And I just don't believe that the law

14    supports that.  I mean, there are, as you've noted, Your

15    Honor, just a variety of circumstances with these issues

16    arising and I think a lot of immigration lawyers and a lot of

17    companies would be very surprised to understand that they

18    can't consult an attorney about what are our options with

19    respect to Employee A or prospective Employee A for

20    immigration, what types of visas can we consider.  And that is

21    one of the categories --

22          THE COURT:  Right.

23          MS. CASSIDY:  -- that the Government is saying there

24    is no privilege there and Ms. Bronfman cannot have a privilege

25    with immigration lawyers when she is talking about someone

54

1  else's immigration status and --

2          THE COURT:  Is it --

3          MS. CASSIDY:  -- then to take it another step, they

4  say that if the visa applicant is ever copied on any email

5  that that destroys the privilege.

6          THE COURT:  Yeah, and I think that is what you're

7  saying but I'm trying to understand the Government's position.

8  And one reason I think that there's not a lot of case law is

9  because immigration questions don't rise to the level of the

10 district court.  I mean, the BIA appeals go to the circuit and

11 most of this work is done before the executive administrative

12 agencies.  So --

13         MS. PENZA:  I just want to clarify one thing

14 Ms. Cassidy said.

15         THE COURT:  Yeah.

16         MS. PENZA:  She said in the Government's view a

17 person could not consult with an attorney about the visa

18 application of another individual.  That's not the

19 Government's view.  The Government's view is the inclusion of

20 that other person whose interests are at odds with the

21 other -- which -- for whom there is no like identical legal,

22 you know, reason to be --

23         THE COURT:  But it's a point about --

24         MS. PENZA:  -- consulting attorney.

25         THE COURT:  -- odd -- at odds.  So I gave you the

55

example where it's just -- it's a common one.  H1B.  Because
of the way the DOL and immigration authorities have set things
up I don't think that the interests align because of sometimes
legal fiction that's engaged in that, you know, we're looking.
We describe our perfect person in the marketplace and we say,
we can't find the person in the marketplace and we say, oh my
gosh, look, the current employee happens to be the perfect
person and we're going to take that person.  Okay.  Fine.  But
just hypothetically an immigrant investor type, something
where there's a closer relationship between the creation of
the opportunity.  So, you know, on one end family visas, but
we're looking for that middle ground where it's corporate, but
more cooperative, I guess.  I don't know if there's a better
word.  Is that -- you just think that doesn't exist.

          MS. PENZA:  Your Honor, the -- I -- there are a few
pieces that address this issue, but the one that did, did
address it and it's squarely on point.  The In Re: DeMeollo
[ph.] case.  The same arguments were made by the defendant
there.  This is a common practice in immigration matters.  Why
can't this be a joint or dual representation and the court
considered that claim and said it is at odds with all
assertions of attorney/client privilege, all of the basic
tenants and basic doctrine.  It is this idea that you can --
that communications can be shielded with the inclusion of
someone else whose legal interests aren't aligned.  The court

56

1  rejects that.

2        THE COURT:  It's the caveat that I'm just trying to

3  get my head around and how we figure it out here without

4  looking at the documents where you see their interests are not

5  aligned.  And so I've given you the spectrum.  We assume that

6  the married couple, you know, I mean, ideally we're perfectly

7  aligned and then the H1B example, the structure of the visa is

8  that they are not identical, right, because they're supposed

9  to be acting together in concert to say, let me set this job

10  up for you and, wow, you're the perfect person.

11        MS. PENZA:  And I think it's worth, Your Honor,

12  thinking about other cases where courts have found

13  attorney/client communications are not to be waived.

14        So in typically that happens where someone is acting

15  as a translator, for example.  The court says, okay, you're

16  operating as a translator between attorney, you're an agent of

17  the person, you are indispensable for [indiscernible] legal

18  advice and, therefore, you don't waive what would otherwise be

19  privileged.

20        Given how narrowly construed those exemptions the

21  third-party waiver doctrine are, it's -- it strains

22  imagination to think that in this case where there's such a

23  divergence between the interests of the two people aside --

24  the one person is not acting as an agent, not acting as a

25  translator, not acting as an indispensable accountant that

57

1   that would preserve the privilege.  And if it is, we're asking

2   for the defense to make the preliminary showing of what -- of

3   how that's so that the attorney/client relationship in fact

4   existed and we don't have --

5              THE COURT:  So --

6              MS. PENZA:  -- even that.

7              THE COURT:  And we're not -- there's no decision

8   yet, but this goes to that point about whether you can do that

9   without looking at the documents.  Look, this idea that there

10  could have been some over-arching determinations, you know, I

11  fostered it.  It may be my -- you know, maybe having this

12  motion in this context because of a thought I had back in the

13  fall about trying to cut to the chase on this so, you know,

14  sorry if it's my complication here, but the defendant's point

15  is you've got to look at the documents to tell.

16             MS. PENZA:  But respectfully, Your Honor, the -- we

17  don't think that's -- we don't think that's the case.  We

18  think there can be some showing an existence of an

19  attorney/client relationship without looking at the

20  purportedly privilege communications.

21             So what -- you know, what they -- and we're getting

22  these as an example again, but what Judge Levy did there was

23  having a hearing about whether or not a common interest

24  agreement existed in the first place as a threshold matter

25  which didn't involve the communications that were purportedly

58

1    subject to that --

2            THE COURT:  Yeah, but it did involve the hearing --

3    like it did involve an evidentiary presentation about the

4    relationship.

5            MS. PENZA:  It did, Your Honor, which didn't involve

6    privileged -- potentially privileged material.  It just had --

7    it was a hearing with respect to whether a common interest

8    agreement existed.

9            MS. CASSIDY:  And part of the issue, Your Honor, is

10   that this is not one relationship that we're talking about.

11           THE COURT:  Right.

12           MS. CASSIDY:  And so there is -- you know, there's a

13   divergence of interest and as you've said there is a spectrum

14   of where the interests are very closely aligned and where they

15   may diverge more.  And there are -- I mean, the Government has

16   not seen the communications and I'm not divulging anything

17   privileged in this context, but there are plenty of emails

18   where there is no visa applicant copied on the email and it

19   sounds as of they're saying that still in those instances they

20   don't believe there could be a privilege.  And that -- I

21   just -- that's not correct under the law.

22           THE COURT:  You are saying --

23           MS. PENZA:  That's not what we're saying.  I mean,

24   that's not what we're saying with respect certainly with

25   respect to NXIVM privileges.  We're not saying as an abstract

1    matter there can be no -- there can be no communications

2    between the company representative and attorney about the

3    third part visa application.

4          With respect to Ms. Bronfman's asserted privilege,

5    specifically with regard to the visa applicant that's in the

6    papers, the Government has also asserted a crime fraud

7    exemption, so yes.

8          THE COURT:  Okay.  But putting that side for a

9    minute --

10         MS. PENZA:  Putting that aside.

11         THE COURT:  Okay.  So they're not saying what you

12   think they're saying, but your point -- defendant's point, as

13   I understand it is -- and this is my concern -- there are --

14   it seems like -- you know, I haven't seen these documents.

15   There are multiple combinations of communications.  So

16   different corporate players, different lawyers, potentially

17   different -- and I don't know if they want to they third

18   parties because maybe they're low-level employees.  I don't

19   know who they are.  They're whoever that person is.  And don't

20   you need to know what each one of those persons is doing on a

21   communication?  Now, maybe you could group together.  There's

22   a combination -- there's communications, but don't you need to

23   know that?

24         MS. PENZA:  The Government's first point in response

25   to that is no.  The third-party waiver doctrine is dispositive

60

1    here.

2          The second point is the defendants haven't met their

3    burden to establish that such a relationship existed.

4          THE COURT:  Well, what's your -- your view is

5    this -- a common interest or shared -- I think it's described

6    as a shared legal interest.  You think that can exist in this

7    situation or just that they haven't shown it.  And "situation"

8    is sort of a sloppy term because, again, there's different --

9          MS. PENZA:  Yeah, what --

10         THE COURT:  -- kinds of communication.

11         MS. PENZA:  The Government's position is it cannot

12   be established that such -- the types of privileges that NXIVM

13   has asserted could exist.  They can't.

14         But secondly, if they are going to assert the

15   existence -- truly the existence of a common interest

16   agreement or something like that, there has to be some showing

17   that such an agreement, in fact, existed and whether it was

18   oral, whether it was written.  The Government has noted that

19   even the article that the defendants cite in support of their

20   motion noted that significant ethical considerations and they

21   recommended that such an agreement be put in writing.

22         The Government has not received any such retainer

23   agreement between the visa applicant and the attorney and it's

24   doubtful that one exists.  And so if it was an oral agreement,

25   what's the evidence that such an agreement existed?  We have

1    received nothing to support the existence of these privileges.

2            With respect to -- I recognize that there are

3    multiple visa applicants at issue.  I will note, however, that

4    the attorneys are in almost one and the same.  They're the

5    same one or two attorneys that are -- have been involved in

6    each of the disputed privileges at issue.  And so it's a

7    matter of putting in -- or a hearing where that attorney

8    testified that such an agreement existed, that's one way of

9    establishing that the common interest agreement existed, which

10   is what happened before Magistrate Levy.

11           MS. CASSIDY:  Your Honor, there is also the issue of

12   work product and I don't think the Government has addressed

13   that, but work product, you know, protects communications.

14   Some of these are hypothetically, you know, speaking.  Could

15   be a memo that an attorney writes about the different options

16   for immigration for a particular person.  I don't believe

17   sharing that with the potential visa beneficiary would destroy

18   work product protection.  It's these types of considerations

19   that are really just going to be made on a case-by-case basis

20   and necessitate the Government giving at least some examples

21   to us of what they believe are not privileged.  And then we

22   can come to Your Honor with -- to resolve these specific legal

23   disputes.

24           But in their initial motion, and we're either taking

25   a different position now.  They basically took the view that

62

1    NXIVM and its attorneys if Ms. Bronfman was copied on it and

2    other NXIVM employees were copied on it that there would not

3    be any privilege.

4                So I think that, you know, and now they're saying

5    that they're not taking the position -- that they're only

6    talking about third parties.

7                THE COURT:  That's not your position, is it?

8                MS. CASSIDY:  But the third party --

9                MS. PENZA:  It's not.  I'm not sure what Ms. Cassidy

10   is referring to --

11               THE COURT:  NXIVM is its own unit, right?  You're

12   talking about non-NXIVM.

13               MS. PENZA:  Yes.

14               THE COURT:  Or I don't know.

15               MS. PENZA:  Potentially Ms. Cassidy is referring to

16   ESF, the other -- the other Bronfman-owned entity.  That's

17   possibly what they're referring to and yes, the Government's

18   view there would be a NXIVM representative that's included on

19   a communication with -- that's an ESF -- for which the

20   privilege belongs to ESF, would waive the privilege.  But I'm

21   not sure -- Ms. Bronfman is indisputably a representative of

22   NXIVM, so she would not include her inclusion to waive such a

23   privilege if it was validly asserted by NXIVM.

24               THE COURT:  So this is the argument you're making.

25   It's on page 10, I guess, the other claim privilege is the

63

1    indication is Jonathan Ware.  Is that the ESF issue?

2              MS. PENZA:  Page 10, Your Honor, of the original

3    brief.

4              THE COURT:  The one that's on the docket as 256,

5    yeah.  Your February -- your -- sorry, December 28th letter.

6    I guess on ECF it shows up one page longer because you

7    don't -- right, you don't number your cover page, so --

8              MS. CASSIDY:  Oh, page 10 at the top.

9              THE COURT:  Yeah.  All right.  Any -- so just to sum

10   up, the defendants, your view is you need to look at the

11   communications but you're still working with the Government to

12   have -- to get to see some of the immigration communications

13   that they're particularly concerned with, right?

14             MS. CASSIDY:  Yes, I --

15             THE COURT:  Your interaction with the taint team.

16             MS. CASSIDY:  Yes.  I'm waiting for the taint team

17   to identify to us a set of immigration documents that they do

18   not believe are privileged.

19             THE COURT:  Um-hum.

20             UNIDENTIFIED VOICE:  Your Honor, we have already

21   identified some within our first two traunches and we were

22   going to put together about, you know, a dozen or so

23   additional examples, which they should all get by the end of

24   today.

25             THE COURT:  Oh, all right.  Well, that will be fast.

64

1        UNIDENTIFIED VOICE:  It won't be all in --

2        THE COURT:  Just a sample.

3        UNIDENTIFIED VOICE:  -- [indiscernible] documents.

4   Just a sample.

5        THE COURT:  That's all I think.  Okay.  All right.

6   Let's talk about the crime fraud exception.  What -- and

7   this -- go ahead.

8        MS. CASSIDY:  May I just make one --

9        THE COURT:  Sure.

10       MS. CASSIDY:  -- as a -- sort of take-away point,

11  Your Honor, is that we are -- we do seek the legal ruling as

12  to the threshold legal matters that govern this case separate

13  and apart from reviewing the individualized communications --

14       THE COURT:  Right.

15       MS. CASSIDY:  And we don't think that's practical.

16       THE COURT:  Okay.  All right.  Crime fraud.

17       MS. CASSIDY:  So we've made -- we have proffered to

18  Your Honor segments of communications that are non-privileged

19  that we think support the crime fraud exception here.  We have

20  additional information, so if the -- the Government has made

21  its arguments in succession, whether the privilege existed we

22  dispute, whether such a privilege could exist we dispute.

23       If the Court were to find such a privilege existed,

24  the Government's point is then it's -- it's subject to crime

25  fraud and we've proffered some information about that.  If the

65

1    Court would want more to establish, for example, that

2    Ms. Bronfman's communications with Frontier Solutions were in

3    furtherance of crime fraud, the Government could provide

4    additional information to meet its burden.

5              Again, the Government made a threshold point about

6    the existence of the privilege in the first instance which is

7    the defendant's burden but he's prepared to proceed with

8    respect to crime fraud.

9              THE COURT:  So maybe you have to walk me through

10   this a little.  You have -- the communications that you're

11   showing in your brief are ones that you have access to.  And

12   so you're suggesting, what, that if I look at -- this is

13   mostly the letters that went through the Mexican attorneys,

14   right, or --

15             MS. CASSIDY:  I thought Your Honor was referring to

16   the initial but, yes, there's also a NXIVM privilege that

17   Mr. Sullivan is asserting with respect to --

18             THE COURT:  Okay.  Well, I -- whichever you want

19   to --

20             MS. CASSIDY:  There are two crime fraud exception --

21             THE COURT:  Whichever -- sorry, that was just the

22   one that was on the next page, so I went to that one.  But

23   you're suggesting that the submissions that you provided in

24   and of themselves suggest criminal activity such that other

25   communications between, what, the same people must also --

66

1    which might on their face be privileged because one could deem

2    them, I don't know, associated or similar to the

3    communications that you have -- that you've included in your

4    brief that that shows the crime fraud exception?

5              MS. PENZA:  No, Your Honor.  The Government's --

6              THE COURT:  Okay.  What's your argument?

7              MS. PENZA:  The Government's position is that NXIVM

8    has not in the initial matter established that this

9    attorney/client relationship existed.  But beyond that,

10   that -- and it's not on the face of the documents we're

11   proffering to -- because we haven't seen the documents, we've

12   proffering to Your Honor that what happened here was that

13   these attorneys sent threatening letters to --

14             THE COURT:  Sorry.  When I said documents, I didn't

15   mean the ones that are with the tainting.  I mean, the ones

16   that you're quoting in your brief.

17             MS. PENZA:  Yes.

18             THE COURT:  Go ahead.

19             MS. PENZA:  That these letters were sent to -- to

20   victims in this case.  And Mr. Sullivan, the -- originally

21   NXIVM's response was not provided to the Government.

22   Belatedly it was, so we did receive that and review it.  But

23   makes no attempt to explain the basis for these letters, that

24   there's some legitimate business purpose or why these letters

25   were sent to people who have absolutely no connection NXIVM

1    Mexico.  There's no reason for these communications between

2    NXIVM representatives and these attorneys Mexico to be

3    privileged given the fact that Raniere and Bronfman drafted

4    letters, were sent to these victims.  And it would be against

5    public policy to have these -- this attorney/client

6    relationship preserved and intact.

7              There was no explanation given about this

8    relationship and why these attorneys were representing NXIVM,

9    whether they were representing -- in fact representing NXIVM,

10   NXIVM Mexico, who -- there's just no factual explanation

11   whatsoever for this and the Government has real concerns about

12   communications that are purported privileged between Raniere,

13   Bronfman and these attorneys in Mexico.

14             THE COURT:  Okay.  So I am confused as to these

15   letters in and of themselves, but what I don't understand is

16   what you think I'm supposed to extrapolate from this.  Does

17   this mean because if these letters were drafted and sent in

18   the way you described by these attorneys that any

19   communication between or among these individuals would not

20   be -- wouldn't be privileged because of the crime fraud

21   exception or is it -- is it -- you know, there may be other

22   drafts iterations, communications about sending these letters?

23   I'm not -- I don't understand how far you think it goes that

24   you have documents that you think are problematic.  And I'm

25   not even sure -- I don't even really understand -- this may

68

1  just be my ignorance about this.  What you think the crime is

2  with this except that this person is not -- I'm just looking

3  at one of them, the chief attorney of a criminal investigation

4  so there's a fraudulent statement in the letter and --

5          MS. PENZA:  The other trouble --

6          THE COURT:  Go ahead.

7          MS. PENZA:  I'm sorry.  The other troubling matter,

8  which Your Honor may be alluding to, is why it was that a

9  letter on attorney letterhead that was drafted by Raniere or

10 Bronfman made its way purportedly from this attorney and made

11 its way in the hands of U.S. based victims.  There's no

12 legitimate business explanation for any of this.

13         And so other communications between NXIVM

14 representatives and these attorneys in Mexico that relate to

15 the same subject matter, yes.  The Government's view is that

16 this is in furtherance of crime fraud.

17         MS. CASSIDY:  What crime?  I don't know what crime

18 they're saying is --

19         THE COURT:  All right.  What crime are you --

20         MS. CASSIDY:  -- being further --

21         MS. PENZA:  The --

22         MS. CASSIDY:  And again, I don't know what

23 communications.  All communications between anyone from NXIVM

24 and these attorneys I don't think the Government has made a

25 showing that there is no possible -- no legitimate legal

69

1    matter that these attorneys were being consulted on.

2            THE COURT:  Okay.  So the first question is really,

3    really we're both asking, what is it that the Government

4    thinks is wrong just using these letters are an example.  And

5    maybe it's just having more context.  And two, I think we're

6    both asking the same question, which is even if one were to

7    say on its face this could be a showing of a crime being

8    committed with the existence of these attorneys in Mexico,

9    what is the effect of that on whatever other communi -- the

10   potentially -- say it differently -- the communications that

11   the taint team may have access to that involve these.  Is it

12   like one of these things like in -- there's a view if you blow

13   a privilege you've blown it for everything.  And are you

14   saying, okay, well, there's a letter that one could say makes

15   a showing of some kind of crime and so that means that every

16   communication from one of these individuals or NXIVM to these

17   Mexican lawyer is a -- you know, is no longer privileged or is

18   it ones that center around, you know, hypothetically there

19   could be more drafts of these letters and there could be

20   emails about who you're going to send the letters to and there

21   could be whatever.

22           Some sort of legal analysis as to why these are the

23   appropriate topics to address in the letter.  I mean, I

24   don't -- so I'm unclear as to (a) what exactly you think is

25   wrong with these letters what they show; and (b) what the

1  outcome should be if one were to agree that this was a showing

2  of a crime fraud exception.

3           MS. PENZA:  The attorney -- well, I'll go in order,

4  Your Honor.  For the first --  he attorney/client privilege is

5  meant to protect communications with an attorney that -- you

6  know, to solicit the attorney's advice, to receive legal

7  advice.  What it's not intended to protect is sending a draft

8  letter to a victim and having the attorney be an instrument to

9  harass or intimidate witnesses or victims on your behalf,

10 which is what these letters demonstrate because the letters

11 was drafted in its entirety by Raniere or Bronfman and

12 received verbatim by the recipient of the letter.  The

13 attorney was not -- was not providing any legal function

14 there.  They were simply an instrument to harass or intimidate

15 and the attorney/client -- the cases the Government cited say

16 that that is against public policy, that we don't use the

17 attorney/client privilege to protect communications like that.

18 That's not what it's meant for and we don't -- it's narrowly

19 construed and it's not appropriate.

20           THE COURT:  So your view is that this is unlawful --

21 this -- sending this letter is, what, unlawfully harassing,

22 intimidating --

23           MS. PENZA:  It's subject to crime --

24           THE COURT:  -- what crime is -- just so we're clear.

25 Well, what's the crime, just so we're clear?

71

1          MS. PENZA:  Harassing or intimidation of a witness.

2          THE COURT:  Okay.

3          UNIDENTIFIED VOICE:  Witness and what so --

4          MS. CASSIDY:  There was no proceeding at that point.

5          MS. PENZA:  Your Honor, it's --

6          MS. CASSIDY:  And we don't think that -- the

7    Government is just speculating.  They don't know what is in

8    these communications and what legal advice --

9          THE COURT:  Well, wait a minute  Hang on, hang on.

10   So first of all, you think it's something between Raniere,

11   Bronfman and the attorney wouldn't be privileged, right,

12   because they are not operating together.  They don't have --

13         MS. PENZA:  Yeah, no privilege for this --

14         THE COURT:  -- sort of the same -- okay, so --

15         MS. PENZA:  -- material.

16         THE COURT:  But even i -- if one would agree they

17   had some collective endeavor that they could communicate with

18   an attorney about collectively then you're saying that this

19   letter -- the letter is the commission of a crime.  It's

20   memorializing a threat --

21         MS. PENZA:  It's certainly cause to believe --

22         THE COURT:  -- and it's being sent.

23         MS. PENZA:  Yes, the standard is probable cause,

24   Your Honor, where the Government can show probable cause in

25   furtherance of a crime.

72

1          THE COURT:  And the crime, you're saying is

2    committing, is what?  Intimidating --

3          MS. PENZA:  And harassment, but I just want to note,

4    Your Honor --

5          THE COURT:  -- a witness.

6          MS. PENZA:  -- that the -- the law here is a little

7    bit broader than simply -- it -- the legal standard for the

8    crime fraud exception is in the -- it is considered in the

9    broader context that asserting the privilege in the first

10   instance is -- it's a privilege that you're asserting.  It's a

11   communication that is legit -- it should be legitimate.  And

12   so it should not protect communications like these which are

13   in furtherance of no legitimate seeking of legal advice and we

14   know that because the witnesses -- the victims, in fact,

15   received letters written verbatim by Raniere and Bronfman.

16          And I just want to note this is NXIVM's privilege

17   that they are asserting and so Mr. Sullivan hasn't provided

18   any -- any information about who these attorneys are, what the

19   nature of the relationship is and any communications that

20   relate to the subject matter.  So for example, I'm just

21   speculating.  I don't know if such a communication exists, but

22   a communication that says, I'd like you to send this letter to

23   victim A or victim B.  That would be the same -- that would be

24   subject to crime -- that would be subject to the crime fraud

25   exception just the way -- that -- but some other communication

1  may not be.  And so we're saying whether it relates to the

2  issue that the Government has raised to the Court's attention.

3        THE COURT:  So the difficulty -- all right.  Let me

4  just say what I don't understand.  So I disagree with the

5  point that if a client drafts a letter and the lawyer sends it

6  that that in and of itself is problematic.  I would imagine

7  that happens every day in copyright and trademark violations.

8  It is not an unusual situation on behalf of a corporation that

9  happens.

10       So the question here, there's -- your original

11  point, which is, is there a privilege.  And so if this is

12  NXIVM's privilege then how is Mr. Raniere on this.  Okay.  So

13  that's one thing.

14       And two is, what is the crime because what is --

15  this letter if one took out what seems to be a false statement

16  and an intimidating statement, I am the chief attorney of a

17  criminal investigation in Mexico, et cetera, et cetera, I'm

18  not -- I don't know what you say about this letter.  Is it

19  actually threatening, is it -- you know, people don't like

20  getting letters that cease and desist, but that doesn't mean

21  it's criminal.  You may say in the context of this case where

22  other actions took place one could see this as intimidating or

23  threatening.  We still have defendant's counsel's point which

24  is about because they're -- we don't think there's a -- at

25  least I -- I don't know.  There doesn't seem to be a

74

1    proceeding at this point.

2          And then my other question which is, okay, even if

3    one were to say this letter, which obviously you have so it's

4    not privileged here, if -- what is the effect?  Does this mean

5    everything about this letter, so if hypothetically there are

6    emails that -- I guess I gave examples earlier, right, that

7    are drafts, that are consulting about, well, can we mention

8    this, but not this, that we want to achieve this goal,

9    whatever it is.  Is it limited to that or is it every

10   communication involving these attorneys that then are exposed

11   because of the crime fraud exception.  All right.  But those

12   are my questions.

13         Mr. Sullivan, you wanted to say something?

14         MR. SULLIVAN:  Well, very briefly, Your Honor.  Your

15   Honor, [inaudible] obligation [inaudible] mean that they

16   believe first on some of these communications [indiscernible]

17   declined.  And then as a result of that, every sort of

18   communications with the attorneys will be [indiscernible].  I

19   don't [indiscernible] conclusions on either of those

20   [indiscernible] on a regular basis where somebody

21   [indiscernible] action that there's not some type of

22   [indiscernible] and I don't see any more [indiscernible].  I

23   didn't think [indiscernible] to the extent that somebody

24   [inaudible] privileged very specific in terms of

25   [indiscernible].  We believe [indiscernible] should not be

1  [indiscernible] claim that every communication [indiscernible]

2  on behalf of NXIVM and these lawyers and now [indiscernible]

3  protected [inaudible] if there's a particular document

4  [indiscernible] believes [indiscernible].  I think

5  [indiscernible] NXIVM give us an opportunity to share

6  [indiscernible] to give us an opportunity to respond.

7           THE COURT:  Let me just ask you, what's your take on

8  the first sentence of the letter?  I'm looking at the one

9  that's quoted on Government page 11 on the Court's system,

10  page 12 of the brief, but this opening statement, "I'm the

11  chief attorney of a criminal investigation in Mexico with more

12  than 20 individuals tied together in a cooperative destructive

13  network"?  One could view that as a pretty aggressive

14  threatening statement.

15           UNIDENTIFIED VOICE:  Your Honor, if I could just add

16  a little, too.

17           THE COURT:  Okay.

18           UNIDENTIFIED VOICE:  If it's a crime in Mexico to

19  defame a corporation, it's different and they don't have the

20  same [indiscernible] privileges.  It's a crime there.  And

21  I -- they don't have the same First Amendment protections.  I

22  believe that what this letter was saying is what you are doing

23  even though it's protected in the U.S., it's a crime in Mexico

24  and there are a number of people that we believe are

25  committing this crime in Mex -- you know, even though you're

76

1  doing whatever you're doing in the U.S., this is a crime in

2  Mexico, what you are doing and I'm investigating this.  I

3  think that the Government's --

4       THE COURT:  This person is not a Government

5  attorney, right?

6       UNIDENTIFIED VOICE:  No, but you could bring it as a

7  civil lawyer there.  You can bring this --

8       THE COURT:  You can initiate a criminal

9  investigation?

10      UNIDENTIFIED VOICE:  You -- yes.

11      THE COURT:  Okay.

12      UNIDENTIFIED VOICE:  So I think that this is

13  obnoxious and, you know, just like demand letters that are

14  cease and desist letters often are and demand letters that I

15  see often telling people that unless you pay money we're going

16  to bring the following -- there's a lot of things that are

17  not -- they're not crimes.  I don't think this is a crime and

18  I don't think the Government has been able to articulate.  I

19  think that the reason the Government is floundering on this is

20  because it isn't a crime.  You know, when they say there were

21  threats there's no proceeding that was going on.  It's not

22  threats against a witness that were being made.  Yeah, it's a

23  threat but it's a threat within the legal system in Mexico

24  that I think that they were entitled to make.  So I don't

25  think that the Government has made at all the showing that

77

1  this is a -- that this fits within [indiscernible].

2       THE COURT:  All right.  Let em just go back to the

3  Government.  Your view is that based on the submissions that

4  are here that I could decide that there is a crime fraud

5  exception or you want to make a supp -- you want to provide

6  some other information.

7       MS. PENZA:  We can make a supplemental showing on

8  this, Your Honor, but I just want to clarify.  This isn't a

9  matter of a cease and desist -- a normal cease-and-desist

10 letter in the context of like a trademark dispute or some kind

11 of defamation of NXIVM in Mexico.  These are DOS victims.

12 These are victims of the sex trafficking allegations in the

13 indictment.  And so the idea --

14      THE COURT:  Just so we're clear you say Jane Doe is

15 not referenced in the superseding indictment?

16      MS. PENZA:  She --

17      THE COURT:  Jane Doe 9.  Yeah.  Um-hum.

18      MS. PENZA:  9.  8 is in reference to the indictment,

19 but these were -- these were DOS slaves that -- they have

20 no -- they have no possible connection of nexus to NXIVM

21 Mexico nor were they making defamatory -- this whole idea that

22 this is what -- it has no basis in fact at all.

23      UNIDENTIFIED VOICE:  I don't believe that the

24 Government has the full picture of the facts, you know, and

25 I'm not prepared to make any representations at this point,

78

1   but I -- getting into privileged materials but I think there

2   were connections between NXIVM Mexico and these individuals.

3          THE COURT:  I'm looking at you all like you could

4   tell me.

5          MS. PENZA:  We're asking for an factual proffer from

6   the NXIVM representatives.

7          UNIDENTIFIED VOICE:  They have -- I mean, they have

8   the burden on crime fraud and I don't think they've close to

9   meeting it.  They have some additional facts that they can

10  submit and the taint team can submit any documents that they

11  believe establish crime fraud then so be it and we'll answer

12  any of those submissions.

13         THE COURT:  All right.

14         UNIDENTIFIED VOICE:  But I don't think on this

15  record that you could make a finding of crime fraud --

16         THE COURT:  All right.  The --

17         UNIDENTIFIED VOICE:  -- initiates [ph.] privilege.

18         THE COURT:  The Government -- I'm sorry.  The

19  Government's preliminary position is that NXIVM hasn't shown

20  that these -- that communications of this type are privileged,

21  right?

22         MS. PENZA:  Yes.  And that the -- I don't know

23  even -- is it NXIVM Mexico that's represented by Miss -- by

24  these attorneys?  Is it NXIVM?  Is it another individual

25  associated with NXIVM Mexico?  We haven't received any

79

1  information as far as I can tell establishing the privilege in

2  the first instance like who is -- who actually is exercising

3  such a privilege.

4          THE COURT:  That's you, Mr. Sullivan.  What's the --

5          MR. SULLIVAN:  [Inaudible] documents [indiscernible]

6  the documents email [indiscernible] brief obviously

7  [inaudible] documents referring to.  I don't think

8  [indiscernible] and I think we're kind of processing

9  [indiscernible] timely fashion [indiscernible].

10          THE COURT:  Okay.

11          MS. PENZA:  Your Honor, what we're simply asking of

12  Mister --

13          MR. SULLIVAN:  [Inaudible] I'm sorry [indiscernible]

14  counsel [inaudible] work on behalf of [indiscernible]?

15          THE COURT:  I think, Government, are you asking --

16          MS. PENZA:  I was just going to say what was -- what

17  is being asked of Mr. Sullivan is simply who is the client

18  with respect to the relationship asserted here.  When were the

19  dates of representation.  Was there, in fact, a representation

20  of NXIVM or was it some individual associated with NXIVM

21  Mexico?  We just don't have the facts, Your Honor, and they're

22  very basic but we haven't received any sort of initial factual

23  basis for asserting a privilege in the first instance.

24          THE COURT:  So I guess now I'm confused.  I thought

25  NXIVM you had provided some information or no, you're saying

80

1   it's not specific enough.  Is that the concern?

2           MS. PENZA:  Yes.

3           MR. SULLIVAN:  That's news to me, Your Honor.  I'm

4   happy obviously to supplement [indiscernible] provide

5   [inaudible] the attorney [inaudible] search terms [inaudible].

6   So [inaudible] --

7           MS. NECHELES:  Your Honor --

8           THE COURT:  Ms. Necheles.

9           MS. NECHELES:  I'm a little surprised by that

10  because it seems to me that on their face these documents show

11  that there was communications with people -- high-ranking

12  people from NXIVM consulting with and discussion with an

13  attorney in Mexico bringing legal claims that could be made.

14  I mean, that's what this is about.  They're communicating with

15  each other and then communicating with NXIVM Mexico.  In fact,

16  I believe that this email between Keith Raniere and Clare

17  Bronfman discussing what they're going to be telling the

18  NXIVM -- the lawyer in Mexico is something that should be

19  presumably privileged.  I -- they're talking about a legal

20  matter.  This is a legal matter in Mexico and it's that --

21  it's in anticipation of litigation and, you know, bringing

22  claims.  And that's the kind of thing that's normally

23  privileged.

24          THE COURT:  Can I just -- I'm sorry.  Maybe I've

25  lost on something.  Is there -- is there -- I thought there

81

1  was some issue that when Mr. Raniere was on these emails that

2  you were not asserting the privilege or did I lose -- did I

3  lose that along the way?

4          MS. NECHELES:  I think that was with respect to

5  immigration matters.

6          THE COURT:  So not -- okay.

7          MS. NECHELES:  We had agreed that if Ms. Bronfman

8  had consulted an attorney, an immigration attorney --

9          THE COURT:  Right.

10          MS. NECHELES:  -- about someone's immigration styles

11  and then had shared that with Mr. Raniere.  We were not taking

12  the position that that was privileged.

13          THE COURT:  But that does not extend to other kinds

14  of communications?

15          MS. NECHELES:  That's correct.  I mean, they were

16  both representatives of NXIVM.

17          THE COURT:  Okay.  So that was my misunderstanding.

18  I thought that that point you had made about the immigra --

19  I'm sorry, the immigration extended to the other issues raised

20  in the brief.  All right.

21          MS. NECHELES:  Right, not when it's are NXIVM legal

22  matter.

23          THE COURT:  Okay.  All right.

24          MS. NECHELES:  And the Government --

25          THE COURT:  All right.  And I think -- and for the

82

1  Government you can fill in if I'm wrong about this, but I

2  thought, now, the Government, you're raising a point.  You

3  think that there would be a difference between different NXIVM

4  corporate entities.  Is that the point you're trying to make?

5          MS. PENZA:  Yes.  We have -- we don't understand

6  who -- is it NXIVM Mexico?  Is it an individual, a high-

7  ranking person from NXIVM Mexico who's retained these

8  attorneys?  We haven't received any information from NXIVM

9  about the nature of this privilege.

10          THE COURT:  Okay.  Well, hang on.  Mr. Sullivan,

11  your belief was that you had provided information, so the gap

12  is now -- rather than thinking what NXIVM on block this should

13  be NXIVM in its different corporate capacity -- or

14  corporate -- I don't know, corporate forms, I guess.  Is

15  that -- that's the point you're raising now?

16          MS. PENZA:  Well, certainly yes.

17          THE COURT:  Have you raised this issue before with

18  them?

19          MS. PENZA:  Yes.

20          THE COURT:  All right.  Mr. Sullivan, where is that

21  from your perspective?

22          MR. SULLIVAN:  Again, Your Honor, I apologize.  I

23  think the Government raised it and I overlooked it, but I

24  understood they represented to the Government [indiscernible]

25  attorney [indiscernible] on behalf of the [indiscernible]

83

1    nature [inaudible] communications [indiscernible].

2           MS. NECHELES:  And in addition, Your Honor, I mean,

3    we had provided in our dealings with the taint team, which is

4    how we thought this was proceeding that Ms. Bronfman was

5    communicating with these attorneys on behalf of NXIVM.  We

6    provided the nature of the legal matter that NXIVM was being

7    represented on and we provided the dates of representation.

8           THE COURT:  And she has the status in both NXIVM

9    based in the U.S. and in Mexico?

10          MS. NECHELES:  I'll have to check on Mexico.

11          THE COURT:  Okay.

12          MR. SOLOWAY:  Your Honor, just first --

13          MS. NECHELES:  I don't think we've ever spoken about

14   NXIVM Mexico.

15          MR. SOLOWAY:  This is the first time we ever started

16   subdividing NXIVM.

17          THE COURT:  Okay.

18          MR. SOLOWAY:  Until ten minute ago it was just NXIVM

19   and now we have NXIVM Mexico is -- seems it just dropped out

20   of the sky.

21          THE COURT:  Well, I feel better that

22   [indiscernible], I don't know what's -- all right.

23          The Government.

24          MS. PENZA:  Your Honor, there -- we have at times

25   and made very clear in the filings that we were doing so used

1  NXIVM as an umbrella term for a variety of legal entities, all

2  of which have different corporate structures.  They are

3  admittedly confusing, including --

4              THE COURT:  But now you're suggesting that the

5  umbrella term is not helpful in regard to certain kinds of

6  communications and that --

7              MS. PENZA:  This is the first time we've heard that

8  these attorneys were retained to defend against a defamation

9  suit by NXIVM Mexico, as I understood -- if that's -- or --

10 sorry, to bring a defamation suit on behalf of NXIVM Mexico

11 [indiscernible] --

12             THE COURT:  It's a -- it's a cease-and-desist letter

13 rather than -- but that there is a Mexican cause of action

14 that is touched on in that letter.

15             UNIDENTIFIED VOICE:  Your Honor, I don't think this

16 is --

17             THE COURT:  Just kidding.  Okay.

18             UNIDENTIFIED VOICE:  I mean, on its face that's

19 what -- it's on its face saying this is a crime in Mexico.

20 And -- so --

21             THE COURT:  But I'm still going to repeat myself.

22 I'm sorry.  Because this is -- I don't understand that first

23 sentence while an individual lawyer is saying or that I am --

24 sorry, I lost the page here.  Let me find it.  "I am chief

25 attorney of a criminal investigation in Mexico."  Now, there

85

1  may be Mexican procedures like whatever the equivalent of a

2  private attorney general or something here that that's

3  supposed to be a -- or maybe there's something lost in the

4  translation here but, you know, because that to me is the most

5  disturbing line in that sentence -- in that -- I'm sorry, most

6  disturbing sentence in this letter.

7          UNIDENTIFIED VOICE:  I understand what Your Honor is

8  saying.  I think that -- and I'm not an expert on Mexican law,

9  but my understanding is that you can bring these kind of

10 lawsuits in Mexico and that are criminal based on civil and a

11 civil attorney bringing them and --

12         THE COURT:  May well be.

13         UNIDENTIFIED VOICE:  -- that there were a number of

14 people in --

15         THE COURT:  It's a different system.

16         UNIDENTIFIED VOICE:  And I think it was just a way

17 of trying to get people to stop doing something.

18         THE COURT:  Okay.  So is there anymore informa -- it

19 seems to me a couple of pieces.  One, if there's any other

20 information that NXIVM should provide if relevant and if it's

21 relevant to your making the claim of privilege to the

22 Government with regard to the different NXIVM entities.  And

23 then the Government, if you want -- I'm still not sure you can

24 make these decisions without looking at the particular

25 documents.  But if you think that some kind of proffer would

86

1  be helpful are you suggesting to do it on paper or something

2  else?

3          MS. PENZA:  One moment, Your Honor.  Yes, we can do

4  it paper.

5          THE COURT:  Okay.  So what would you time line be

6  with regard to that?

7          MS. PENZA:  If we can just get clarity from

8  Mr. Sullivan --

9          THE COURT:  Um-hum.

10          MS. PENZA:  -- at his earliest convenience about who

11  retains these attorneys, we'll be prepared to put a note -- a

12  brief letter outlining any additional factual proffer within

13  ten days or so.

14          THE COURT:  Shorter, shorter.

15          MS. PENZA:  End of the week.

16          THE COURT:  All right.  So Mr. Sullivan, on your

17  side?

18          MR. SULLIVAN:  Just responding to the Government in

19  terms of [indiscernible] attorneys, Your Honor?

20          THE COURT:  Yes.

21          MR. SULLIVAN:  Yeah, I think [indiscernible] should

22  be able [inaudible].

23          THE COURT:  Okay.  All right.  So that will by the

24  close of business on the 13th and the Government by the 20th.

25  Obviously, if you want to object you can object.  All right.

87

1   But you should not halt your process of exchange -- you know,

2   for the taint team identifying documents.  You said you'll be

3   producing some soon and having the conversation with counsel

4   for the defendants about some of the documents because I'm

5   still not sure these can be -- these questions can be resolved

6   without looking at the documents.

7           All right.  Other issues, other thoughts or

8   theories?  Are there anything on this?  Okay.

9           UNIDENTIFIED VOICE:  Your Honor, I have one -- one

10  thing, but it should get the thing -- the last thing for this.

11  It's something that was touched on early but it's not related

12  to any of the things we've been talking about for the last two

13  hours.  Now that I have everyone in suspense.

14          THE COURT:  All right.  I'm going to make one

15  observation before you make your final, which is this is

16  difficult espec -- I recognize this is difficult especially

17  for the Government because you are honoring this split.  So,

18  you know, I'm sorry you've had to do this twice and, you know,

19  looking for information from both sides but I think

20  defendant's counsel is like, well, the other day I observed

21  that you have, you know, half the knowledge on one side, half

22  the knowledge on the other.  I'm trying to figure out how to

23  bring it together without causing a problem for the privilege.

24          So this is a work in progress but hopefully it can

25  get resolved sooner rather than later.  All right.  You're up.

88

1          MR. SOLOWAY:  Your Honor -- Your Honor, oh my God.

2  A drink.

3          UNIDENTIFIED VOICE:  He's drinking water, just so

4  the record is clear.

5          MR. SOLOWAY:  It's not working.

6          THE COURT:  Do you want to write it and he can -- or

7  whisper.

8          MR. SOLOWAY:  Okay.  Let me see if I can go to a

9  different place in my voice, but the Government has turned

10  over two separate groups or productions of emails that they

11  have taken the position or are not subject to the

12  attorney/client privilege.  And in the first one there was a

13  group of those emails that related to Nancy Salzman and in the

14  second group all of the emails related to only Keith Raniere

15  and Clare Bronfman.  I'm just wondering if February 11th

16  today, Your Honor, was the date for the third production by

17  the taint team of a group of emails that they -- or

18  communications that they take the position are not subject to

19  any attorney/client privilege and will include emails from

20  Nancy Salzman.  Are there any other emails that involve Nancy

21  Salzman that the Government takes the position are not subject

22  to attorney/client privilege?  Was that understandable or no,

23  Judge?

24          MS. PENZA:  Your Honor --

25          THE COURT:  Yes, except for the date.  I'm trying --

89

1          MS. PENZA:  Yeah, I don't think we had a discussion

2   about when we were doing the third set.  What we had discussed

3   as being --

4          THE COURT:  It's a sampling.

5          MS. PENZA:  It was a sampling, plus we were going to

6   get back to last -- the last time we were here we had had

7   about 300 or so documents from Ms. Bronfman's counsel and 130

8   so from Mr. Raniere's counsel.  We've gone back and forth and

9   back and forth.  And now we're at the position where we can

10  say these are the documents for the Government and the

11  defendants are not in agreement.

12          And so for Mr. Raniere I think we're down to three

13  or four -- three or four email chains, maybe less, maybe two

14  or three.

15          THE COURT:  And the other day you also three -- it

16  looks like three to four email chains were going to be on

17  something you didn't agree about.

18          MS. PENZA:  Right, right.  So that's been confirmed

19  and then -- and we've gone back and forth about that.  And

20  then with Ms. Bronfman we are -- we're going to have a much

21  larger number and we're going to get them that list today of

22  where we think that, you know, we disagree with their

23  privilege assertion or we're not going to take issue with it

24  or -- there are a couple of cate -- there are a couple of

25  documents.  We're like, we're going to need to set these aside

90

1   and we need to have further review because we need additional

2   information before we can make that determination, but that's

3   just a handful.

4           THE COURT:  And then there's a third group.

5           MS. PENZA:  And a sampling --

6           THE COURT:  But then we're going --

7           MS. PENZA:  -- of immigration documents.

8           THE COURT:  -- to sample and you were going to bring

9   immigration into that, right?

10          MS. PENZA:  Yes.

11          THE COURT:  So I'm not sure where the -- today's

12  date came from and what [indiscernible] --

13          MR. SOLOWAY:  I thought there was a communication

14  that I saw somewhere and I may be wrong on the date --

15          THE COURT:  And I could have been wrong on the date.

16          MR. SOLOWAY:  -- that indicated when the next, you

17  know, universal group of documents that the taint team

18  believes are not subject to privilege would be distributed.  I

19  thought I saw that somewhere.

20          THE COURT:  I didn't think anything was that quick,

21  but maybe time flies.

22          Does anybody else have a recollection about that

23  date?

24          MS. PENZA:  I don't recall there being a date that

25  was mentioned.  All I can say is that, you know, we are trying

91

1    to -- the taint team is trying to move through these issues as

2    soon as we can and as soon as we have a next substantial set

3    of new documents to distribute to the defendants, we will.

4          MR. SOLOWAY:  Okay.  So as soon as indicating that

5    the Government doesn't know yet when that will be, when the

6    taint team --

7          MS. PENZA:  That is correct.

8          MR. SOLOWAY:  Okay.

9          MS. PENZA:  You know, we're hoping that we can just

10   start figuring out how to mass tag documents, but we're still

11   working on that.

12         THE COURT:  So I think what you're -- so this is

13   from the order in 335 that you were going to provide the

14   additional list of docs, which is what you're doing today.

15   That's where I think the 11th comes from.  Then defendants

16   were going to let the Government know any disagreements by the

17   19th and if you -- or let me -- it's a dynamic process.  But

18   if you can't agree then give me the documents with your

19   argument and then if the Government wanted they could

20   oppose -- they could respond.

21         So the sort of uncertainty here, and this was --

22   really depends how this shakes up is defendants wanted to --

23   you're going to make your submission *ex parte* and you -- I

24   felt there might be some issues that you couldn't even tell

25   the taint team, I think.  I don't know what this -- I don't

92

1  know what it is.  So you're going to -- I think that what was

2  scheduled for the 11th is what you're getting today.

3          Okay.  Now --

4          MR. AGNIFILO:  Very briefly, Judge.  The trial team

5  has complained that the last two court conferences that -- an

6  email that we sent out on Friday, February 1st was somehow

7  trying to, I don't know, get the issue of bail in front of

8  Your Honor instead of in front of Judge Garaufis.  And I'd

9  just point out what we're trying to do and it's very clear.

10  On Friday, February 1st, the full magnitude of what was going

11  on in the MDC was not really known to us.  It was starting to

12  become known slowly.  We were starting getting panicked phone

13  calls from federal public defenders on Tuesday, two days --

14  three days earlier, that there was -- had been a fire that at

15  the time was not being reported.  We didn't know if there were

16  injuries.  We didn't know what the situation was.  And in

17  doing this for 28 years I've never gotten phone calls of the

18  nature that I got that week from federal public defenders

19  repeating things that prisoners were saying along the lines of

20  "There's a fire.  We can't breathe the air in certain units.

21  The guards are wearing gas masks but the prisoners are not."

22  And then reports about temperatures and prisoners being locked

23  down in cells for days on end in total darkness.

24          So on Friday, February 1st, what we wanted is we

25  wanted to have Mr. Raniere produced here for the Tuesday court

93

1    conference that was going to be four days later so we could

2    speak to him before the Wednesday conference in front of Judge

3    Garaufis because we weren't -- we hadn't seen him.  We didn't

4    see Mr. Raniere for I think a total of nine days.  I can't

5    think of a time when we've gone three days without seeing him,

6    so it's an unprecedented delay and I want to point out just

7    because things aren't getting better.

8            I went there this morning to see him.  I got there

9    at 9:00 o'clock.  I was told the prisoners were on lockdown.

10   I wait until 11:30 sitting with some lovely lawyers who made

11   nice conversation but I wasn't there to see them.  None of our

12   clients came down and I had to leave and come to court.  So I

13   didn't see Mr. Raniere in advance of this court appearance,

14   which was my plan.

15           It's -- and I know this is not Your Honor's

16   situation alone.  It's getting spread out among all the judges

17   in the Southern and Eastern District, but this is not -- this

18   situation is not better.  It's not getting better.  I don't

19   know what the problems are.  There's been a number of hearings

20   and I think some things have come to light and I think a lot

21   of things haven't come to light.  So I just want to sort of

22   nip the one issue in the bud.

23           This is a crisis and for us to be kept from our

24   client for eight consecutive days and then for me not to be

25   able to see him before an important court conference like

94

1    today is really a problem and it's not passing.  It's not

2    over.  It's not discrete.  It hasn't been addressed.  It's

3    going on and it's going on now.

4            So we come here today.  To a certain extent it would

5    have been nice to have his thoughts on certain things.  Your

6    Honor is working very, very hard and the Government I think on

7    their end is working hard too as we are to do things quickly.

8    The problem is, we're forced to do things without consultation

9    with our client because we don't get to see him when we want

10   to.  So I just want to make the record clear to that effect

11   and I thank the Court for the time.

12           THE COURT:  Just two things.  One, you -- this

13   conversation happened before -- at least as to the bail -- as

14   to the confinement conditions with Judge Garaufis, didn't it,

15   last week?

16           MR. AGNIFILO:  It did.  We had a --

17           THE COURT:  And you did --

18           MR. AGNIFILO:  We had something that was -- it

19   wasn't a hearing with sworn testimony.  It was a hearing where

20   Judge Garaufis asked the MDC if there was heat, then [ph.] the

21   date of the hearing.  We know there's heat then because there

22   was sort of heat then.  We -- it wasn't a very probing factual

23   hearing, as has been done in many other courtrooms, but that's

24   what Judge Garaufis felt he needed to know and he satisfied

25   himself as to the --

95

1          THE COURT:  Okay.  That was on the bail application,

2    though, right?

3          MR. AGNIFILO:  -- due process arguments.  Yeah.  So

4    the due process though --

5          THE COURT:  All right.

6          MR. AGNIFILO:  -- there was a bail application that

7    was due process bail application which has been denied.

8          THE COURT:  And there was no -- there's no request

9    that he come here, be brought here today, right?

10          MR. AGNIFILO:  We didn't request that he come here

11    today.  That's correct.  Because my plan was to see him in the

12    morning.  And part of the problem -- and this is -- it's

13    gotten a little bit worse.  I mean, the MDC -- there was no

14    legal visiting I think in total of eight or nine entire days,

15    full days before the fire in January.  I mean, so this is a

16    major problem and it's still a major problem.  And I don't

17    know when it's going to get better.  I don't know what it's

18    going to take to get better.  The feeling down there is very

19    different than it was before the fire.  I -- you know, maybe

20    because there's been a lot of attention.  I don't know that

21    the results are necessarily positive but, you know, this is

22    still a problem we deal with and continue to deal with.

23          And there's no remedy.  I'm not asking for anything.

24    I know Judge Garaufis I think at the end of the hearing last

25    week said if we continue to have problems to bring them, you

96

1   know, to his attention and we're going to write the Judge a

2   letter, so -- but I figured I'd put it on the record with Your

3   Honor.  That's it.

4        THE COURT:  For the Government?

5        MS. PENZA:  Your Honor, we -- of course -- as we

6   expressed last week in front of Judge Garaufis, the Government

7   took everything that was -- all the allegations regarding MDC

8   very seriously.  We believe Judge Garaufis took the matter

9   very seriously.  Obviously we also at the end of the hearing

10  off the record I went up to Mr. Agnifilo and Ms. Geragos and I

11  specifically asked them to let me know whether they have any

12  problems and that I would immediately address those with MDC

13  because that's often -- as Your Honor is aware and that's

14  often the way these things work, we have had situation where

15  USAs are able to speak to counsel for MDC and figure out

16  what's going on.

17        This is the -- again, the very first I'm hearing of

18  any concerns about any disruption in legal visits.  I don't

19  know if Your Honor would like to inquire as to whether they

20  were able to see their client over the past week since our

21  last appearance if this is the first time that they've been

22  denied over that time period.  I think that would be relevant

23  to figuring out whether this was an anomaly or whether this is

24  a consistent problem that's been happening.  But I will say

25  that the Government, of course, takes the defendant's right to

97

1  meet with their attorney very seriously.  And that's why I

2  certainly did ask for it to be brought to our attention.

3           Of course, you know, here we are discussing -- and

4  it has nothing to do with bringing the matter before Your

5  Honor.  I want that to be clear.  Our concern primarily is,

6  yes, that Judge Garaufis hears the issues that he has said he

7  wanted to -- wants to hear.  That is, of course, a concern,

8  but also that the trial team be included.  That was the

9  Government's concern.

10          But in terms of right now, this is the very first

11 we're hearing of an issue --

12          THE COURT:  Well, we just got to court.  So what's

13 the answer to --

14          MR. AGNIFILO:  So --

15          THE COURT:  -- having you see your client?

16          MR. AGNIFILO:  We -- Ms. Geragos and I saw him on

17 Thursday and there was no problem and we saw him for exactly

18 as long as we wanted to see him.  And then I was going to -- I

19 planned on seeing him again today and today was -- was the --

20 I believe it was the first day since the fire when there was a

21 stretch, I think eight or nine days, when we couldn't see him.

22 So this is the first day today.

23          And I -- again, I don't know that it will -- maybe

24 there will be no recurrence.  But just so -- so I think what

25 Judge Garaufis invited us to do is if there are ongoing

1  problems with attorney access to write a letter to Judge

2  Garaufis, but I figured -- I literally just came from the jail

3  here, so I'd just share it with Your Honor.

4          THE COURT:  All right.  So there's a record.

5          The Government, did you want to say something else?

6          MS. PENZA:  Nothing else, Your Honor.

7          THE COURT:  All right.  So there's a couple issues.

8  There's this thing about the email.  I understood it to be

9  about Mr. Raniere being produced because there were these

10 circumstances at the MDC which, as counsel said, interfered

11 with attorney visits and as the press has made clear

12 interfered with public visits and there are lots of questions

13 about the -- the living conditions there.  There are various

14 litigations going on.  I think that the U.S. Attorney -- the

15 Inspector General is looking into it.  So there are -- there

16 is a lot of attention to the -- to the various issues there.

17         But in the moment when that email -- my

18 understanding of that email is that it was about the hearing

19 and the potential problems with the production given what was

20 going on.  So I don't -- you know, given the timing and the

21 distress at the MDC it did not seem to me to be, you know,

22 problematic, that it was sent to those who were interested in

23 the hearing.

24         That being said, it wasn't about anything

25 privileged.  There was no limitation on the taint team sharing

1    that information with the rest of the Government.  So, you

2    know, one can clearly hope that there continues to be

3    improvement at the MDC and nothing of this magnitude is going

4    to come up along the way.  You know, have to see obviously

5    what happens with the visits.  And there is some -- there are

6    several suits, I believe, Judge DeArcy Hall's case is the one

7    that the order related to the Sixth Amendment claim about the

8    visits, so there is litigation on point.

9         There is -- but I think now duly -- not delayed but

10   rescheduled hearings with a case that's with Judge Brody which

11   I think touches on the same issue and that's the one looking

12   for the preliminary injunction and then other issues have been

13   raised on a case-by-case basis.  And like this is a tough case

14   because you're trying to move things along quickly.  Everybody

15   is working hard and if you can't talk to your client that

16   could be a problem in getting this done.

17        So things got better, things are on hold.  I think

18   you're making the record and, you know, like Judge Garaufis is

19   a person who can issue a head order that would address the

20   concern if it ends up continuing to be a problem.  So there we

21   are.  It doesn't seem to me from counsel's point of view

22   anyone here has done anything wrong with the emails that were

23   sent and particularly given the circumstances.  But it seems

24   like the communications other than on the privilege issue, you

25   know, can go to everybody.  So I don't anticipate that this

1  will happen again.  Who knows?  We're going to find out

2  what -- I mean, we'll see.

3           This is not a political comment.  Who knows what's

4  going to happen after Friday, right?  So there may be another

5  hiccup in all of this, more than a hiccup, but we'll see.  So

6  the point in raising that is this is involving and if things

7  come up you can let me know or Judge Garaufis know depending

8  on how they develop with particular regard to any -- to your

9  client.  So --

10          MR. AGNIFILO:  Thank you, Judge.

11          THE COURT:  All right.  All right.  So we have

12 working timelines for everything, I think.  Anything else?

13 No?  All right.  Thank you.

14          MR. AGNIFILO:  Not from us.

15          MS. PENZA:  Not for the Government.

16          ATTORNEYS:  Thank you.

17          THE COURT:  Okay.

18 (Proceedings concluded at 2:49 p.m.)

19                          * * * * *

20

21

22

23

24

25

101

1          I certify that the foregoing is a court transcript

2     from an electronic sound recording of the proceedings in the

3     above-entitled matter.

4                          _____

5                          _____

6                          Ruth Ann Hager, C.E.T.**D-641

7     Dated:  February 12, 2019