**ASHCROFT LAW FIRM**™

February 26, 2019

Magistrate Judge Vera M. Scanlon
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

      Re:      <u>USA v. Raniere et al | 1:18-cr-00204-NGG-VMS</u>

Dear Judge Scanlon:

Please accept this letter in response to and correction of several points raised in the Government's letter dated and filed with the Court on February 20, 2019. Further, I write to address and reiterate the basis for NXIVM's privilege assertions.

1. *NXIVM Complied With This Court's Instructions From The February 11, 2019 Hearing And Provided The Government With The Requested Information On Time Which Further Supports A Finding Of An Attorney-Client Relationship*

On February 11, 2019, this Honorable Court held a hearing in the above-referenced criminal matter to discuss privilege issues, which I was invited to and attended with this Court's permission via telephone. Specifically, the Government was interested in the identity or individuals that retained Mr. Ricardo M. Olmedo Gaxiola ("Mr. Olmedo" and Mr. Diego Ruiz Durán ("Mr. Ruiz").[1] At said conference, this Honorable Court asked me to provide this information to the Government by close of business on February 13, 2019. *See* Tr. at 88:24. On February 13th at 1:20pm, the Government also inquired via email as to the ownership status of NXIVM Mexico. On February 13th at 4:16pm, I emailed the Government and informed them that "I am told that Ricardo Olmedo was hired for NXIVM (US) and Diego Ruiz was hired for NXIVM Mexico." *See* Ex. A. I also informed the Government, per their email of February 13th at 1:20PM that I was told that "NXIVM (US) owns 99% of NXIVM Mexico" per their request. *Id.* Further, the Government has been aware of these attorney-client relationships given their inclusion on NXIVM's list of prior counsel which was transmitted to the Government on December 8, 2018.

The Government called my office Thursday, February 14th. During the phone call, the Government expressed concerns that I had relied on the information from charged defendants as to which entity or individuals had hired each of the two mentioned attorneys/firms. I explained to the Government the process I undertook to obtain this information and that I was relying on information from an attorney since I had been unable to locate engagement letters. I did share with the Government, however, that I had seen at least one email that corroborated the representation.

---

[1] The Government reiterated this request in its email at 1:20pm on February 13th, requesting NXIVM counsel to "provide [the] information as to identity of the entity or individuals that retained Ricardo Olmedo of Olmedo Gaxiola & Abogados and Diego Ruiz Durán of Bufete Ruiz Durán S.C. and formerly of CLG Abogados." *See* Ex.1.

February 26, 2019
Page 2 of 4

The Government, still appearing dissatisfied with my explanation, commented that it was "convenient" that NXVIM (US) and NXIVM Mexico had separate counsel – a comment that I did not understand, and did not respond to. From there, the Government inquired if I had spoken with Mr. Olmedo or Mr. Ruiz and I confirmed I had not. The Government asked if it "made sense" for me to speak with them, and I confirmed to them that it did, and I would try.

Following my conversation with the Government, I asked for and was provided contact information for Mr. Olmedo. I placed a call on Friday, February 15th to Mr. Olmedo at his office. Unfortunately, he was not at his office. On February 21st and 22nd, I heard from and spoke with one of the English-speaking attorneys in Mr. Olmedo's office and he confirmed that the Firm was hired and did work on behalf of NXIVM US related to the theft and misuse of client lists and potential interference of NXIVM's operations. This conduct was reported to Mexico authorities. Further, Mr. Olmedo's office forwarded a copy of an engagement letter between his firm and Clare Bronfman dated August 3, 2015. This letter referenced an exhibit to the engagement letter – which we have not seen – indicating the work was being done on behalf of "corporations, brands, licenses, [and] industrial or intellectual property instruments as detailed in exhibit 1".

As for Mr. Ruiz, I learned that Mr. Ruiz was on his honeymoon in Dubai, UAE, and indicated I would hear back upon his return next week. After receiving and reading the Government's February 20th letter to the Court, I reached out and connected with Mr. Ruiz on February 21st. He confirmed that he was retained by NXIVM Mexico, that he had a written agreement with NXIVM Mexico, that the information he sent to several people that had attempted to extort money from NXIVM Mexico or commit other crimes against NXIVM Mexico was accurate, that similar information was also sent by Mexico City Prosecutor General's office (Ex. B), and that private attorneys can and do become special prosecutors in Mexico in matters like this.

Contrary to the Government's claim, I did confirm representation of both attorneys, one retained by NXIVM (US), the other retained by NXIVM Mexico, that NXIVM (US) owned (at that time) 99% of NXIVM Mexico, and that I understood further that NXIVM Mexico would likely be retaining me to represent the Company in this matter. I also advised the Government that neither NXIVM US nor NXIVM Mexico was waiving any privileges in any communications in the possession of the Government.

2. *NXIVM Has Established The Existence Of The Attorney-Client Relationship As A Legal Matter*

The Government appears to have a misunderstanding of the requirements to establish an attorney-client relationship. NXIVM is not required to account for and provide to it a signed retainer agreement or proof of payment of legal fees by a certain party. The existence of the attorney-client relationship can be inferred, and the conduct of the parties confirms that Mr. Olmedo and Mr. Ruiz were hired for the purposes of providing legal advice and confidential work product.

a. <u>NXIVM US Retained Mr. Olmedo and NXIVM Mexico Retained Mr. Duran.</u>

Although at the time of my call with the Government I had not yet located any executed retainer agreements between NXIVM (US) and Mr. Olmedo nor between NXIVM Mexico and Mr. Ruiz, I have since confirmed with Mr. Ruiz that his firm was retained by NXIVM Mexico and that there is a written service agreement (in Spanish) that reflects this arrangement. Mr. Olmedo's Firm has also provided me with a copy of a written agreement between the Firm and Ms. Bronfman (in English) that Mr. Olmedo explained covered work on behalf of NXIVM US.

Of course, a written agreement is not required to establish an attorney-client relationship. An attorney-client relationship does not depend on the existence of a formal retainer agreement nor upon payment of a fee. *See Hansen v. Caffry*, 280 A.D.2d 704, 705, 720 N.Y.S.2d 258 (2001). A court can look to the words and actions of the parties to ascertain the existence of such a relationship. *See Tropp v. Lumer*, 23 A.D.3d 550, 806 N.Y.S.2d 599 (2005).

Here, the work of the attorneys makes it clear that they were performing work on behalf of NXIVM US and NXIVM Mexico. The cease and desist letters issued by both Mr. Olmedo and Mr. Ruiz explicitly reference NXIVM as the injured party and were clearly designed to stop the harassment of NXIVM's business operations in Mexico. Because the existence of an attorney-client relationship ultimately turns on the "words and actions of the parties," *Kubin*, 801 F.Supp. at 1115, this Court can and should find that Mr. Olmedo and NXIVM (US) and Mr. Ruiz and NXIVM Mexico established such a relationship.

b. Payment of Legal Services

While the Government seeks to make much out of Ms. Bronfman's alleged payment to Mr. Olmedo's firm, whether a fee was paid or not, and by whom, is not determinative of the client in an attorney-client relationship. *See* Government's Letter at p. 2; *see e.g., Priest v. Hennessy*, 51 N.Y.2d 62, 69 (1980). Well-established rules and law establish that a third-party can pay for legal services and it does not affect or negate the existence of an attorney-client relationship. *See Priest v. Hennessy*, 51 N.Y.2d 62, 70 (1980); *see also Grace v. Center for Auto Safety*, 72 F. 3d 1236, 1242 (6th Cir. 1996); *Hillerich & Bradsby Co. v. MacKay*, 26 F. Supp. 2d 124 (DDC 1998) ["The question of whether an attorney-client relationship exists does not necessarily depend upon who pays the fees"]; *Moran v. Hurst*, 32 A.D.2d 909, 911, 822 N.Y.S.2d 564, 566 (2d Dep't 2006) (attorney-client relationship does not depend upon payment of a fee).

Ms. Bronfman's alleged payment to Mr. Olmedo's firm simply has no bearing on whether or not an attorney-client relationship exists between Mr. Olmedo and NXIVM (US) and Mr. Ruiz and NXIVM Mexico and an attorney-client relationship can and should be found by this Court given the information provided by NXIVM to the Government and this Court.

c. Crime Fraud[2]

As explained at length in our response to the Government's motion, the crime-fraud exception is inapplicable as the Government has failed to adequately identify a crime and failed to

---

[2] NXIVM incorporates by reference its arguments made in its January 11, 2019 response to the Government's motion.

meet its burden in establishing particularized evidence for *each* communication. *See In re 650 Fifth Ave.*, No. 08-cv-10934 (KBF), 2013 WL 3863866 (S.D.N.Y. July 25, 2013). Even if the Government correctly identified misstatements in these letters, which it clearly has not, the Government has also failed to identify and analyze *each* and *every* email, failed to provide sufficient detail surrounding *each* communication, and failed to identify for *each* communication which potential law was violated to trigger the crime-fraud exception. *See Aiossa v. Bank of Am., N.A.,* No. CV 10-01275 (JS) (ETB), 2011 U.S. Dist. LEXIS 102207, at *17 (E.D.N.Y. Sep. 12, 2011). It is not enough that the communications are related to the crime or fraud, nor is it enough that the purpose and intent of the communication at issue be simply about the subject matter of a criminal investigation or charge. *See In re Grand Jury Subpoenas Duces Tecum,* 798 F.2d 32, 34, 21 Fed. R. Evid. Serv. 616 (2d Cir. 1986); *see also United States v. Bob*, 106 F.2d 37, 40 (2d Cir. 1939) ("[t]he mere assertion of an intended crime or fraud is not enough....").

The Government in its letter argues that "Raniere and Bronfman used Mr. Olmedo Gaxiola and Mr. Durán to make false, fraudulent, and threatening statements to DOS victims." *See* Government's letter at p. 3. The Government, however, is wrong, as there were no false statements in these letters.

As Mr. Ruiz explained after his retention as counsel, Mr. Ruiz reported misconduct to the Mexico City Prosecutor General's office. Per Mr. Ruiz, after conducting a preliminary investigation into the claims, the Mexico City Prosecutor General's office opened a criminal investigation and issued letters to the individuals directing them to cease their activities. On October 11, 2017, Mr. Ruiz sent cease and desist letters to the same individuals. In these letters, Mr. Ruiz notified the recipient of the criminal investigation, provided them with English translations of the Mexico City Prosecutor General letters, and directed them to cease and desist their efforts to harm NXIVM Mexico[3]. Several weeks later, Mr. Olmedo sent similar cease and desist letters to these individuals, also notifying them of the existence of the criminal investigation and his role as "special prosecutor" in the matter. As was explained by Mr. Ruiz, Mexican lawyers play a unique role when investigating criminal misconduct.

The letters from the Mexico City Prosecutor General verify the accuracy of Mr. Ruiz's account and demonstrate that both his and Mr. Olmedo's letters contained no false statements. Mexican authorities had opened an investigation into extortion and warned the individuals that they faced the risk of prosecution should they continue to unlawfully harm the interests of NXIVM Mexico.

Based on the foregoing, the Government's letter request and motion should be denied in its entirety.

Sincerely,

/s/ Michael J. Sullivan
Michael J. Sullivan

---

[3] Importantly, these letters were sent before there was any public indication of a potential criminal investigation into NXIVM related activities. It was not until October 17, 2017, that the New York Times reported that the Eastern District of New York was reviewing NXIVM related activities.