MKM:MKP/TH/MJL/KMT
F. #2017R01840

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

                              Docket No. 18-204 (S-1) (NGG) (VNS)

    - against -

KEITH RANIERE,
CLARE BRONFMAN,
ALLISON MACK,
KATHY RUSSELL,
LAUREN SALZMAN and
NANCY SALZMAN,

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT'S REPLY MEMORANDUM IN FURTHER SUPPORT OF
ITS MOTION TO ADMIT CERTAIN RACKETEERING EVIDENCE

                                    RICHARD P. DONOGHUE
                                    UNITED STATES ATTORNEY
                                    Eastern District of New York
                                    271 Cadman Plaza East
                                    Brooklyn, New York 11201

Moira Kim Penza
Tanya Hajjar
Mark J. Lesko
Kevin Trowel
Assistant U.S. Attorneys
    (Of Counsel)

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this reply memorandum in further support of its motion to admit certain racketeering evidence ("Reply").[1]  The government has moved for a pre-trial ruling that certain categories of evidence relating to the racketeering conduct of the defendants and their co-conspirators are admissible at trial to prove, among other things, (i) the specific charged predicate offenses underlying the racketeering conspiracy; (ii) the existence and nature of the charged racketeering enterprise (the "Enterprise"); (iii) the background of the charged racketeering conspiracy; (iv) the membership of the defendants and others in the Enterprise; (v) the involvement of the defendants and others in the affairs of the Enterprise; (vi) the relationships between the defendants and their co-conspirators; (vii) the continuity of the Enterprise's illegal activities; and (v) the methods and means employed by members and associates of the Enterprise. There is no legitimate basis to exclude any of the evidence the defendants seek to preclude.

---

[1]    The government's sealed motion was filed on February 4, 2019 and is not yet docketed (hereafter "Motion" or "Mot.").  Defendants Keith Raniere, Clare Bronfman, Allison Mack, Kathy Russell, Lauren Salzman and Nancy Salzman filed sealed oppositions on February 22, 2019, which respectively appear at ECF Docket Numbers 373 ("Raniere Opp."), 368 ("Bronfman Opp."), 372 ("Mack Opp."), 371 ("Russell Opp."), and 370 ("Lauren Salzman Opp.").  It does not appear that Nancy's Salzman's letter opposition ("Nancy Salzman Opp.") has been docketed.  Raniere, Nancy Salzman and Russell joined in the Bronfman Opp., and Mack and Lauren Salzman joined in the Bronfman Opp. and the Raniere Opp.

For the reasons set forth in the government's motion and those that follow, the Court should grant the government's motion in its entirety.

ARGUMENT

In its initial motion, the government has articulated, for each category of evidence proffered, specific reasons why the evidence is connected to the Enterprise. As such, this evidence is admissible both as direct proof of the Enterprise and as critical background evidence under Rule 404(b).

I.      Admissibility of Racketeering Evidence

In their oppositions to the government's motion, each defendant except Raniere advances the baseless argument that evidence of a co-conspirator's conduct, offered to prove the existence of the racketeering conspiracy, is inadmissible as against her. See, e.g., Bronfman Opp. at 1 (arguing that "even if some of the evidence is admissible against certain Defendants, it is not admissible against Clare Bronfman, who undisputedly was unaware of much of the alleged conduct related to the charged conspiracy"); Mack Opp. at 6; Russell Op. at 1; Nancy Salzman Opp. at 1. This argument should be rejected.

In proving the RICO conspiracy charge, the government must prove both the existence of the Enterprise and a pattern of racketeering activity, and "[p]roof of these elements may well entail evidence of numerous criminal acts by a variety of persons, and each defendant in a RICO case may reasonably claim no direct participation in some of those acts. Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant . . . ." United States v. DiNome, 954 F.2d 839, 843 (2d Cir. 1992). In accordance with this well-established principle, the Second Circuit has repeatedly held that evidence of

2

"other" crimes is admissible as direct evidence of an enterprise and a pattern of racketeering activity regardless of whether they are alleged in the indictment and without reference to Rule 404(b).  See, e.g., United States v. Ashburn, No. 11-CR-0303 NGG, 2015 WL 588704, at *8 (E.D.N.Y. Feb. 11, 2015)  (collecting cases and explaining that "[n]ot only are the acts of others relevant to the RICO charges against each defendant, but these acts need not be charged in the indictment to be admissible").

As the Second Circuit has made clear, when a defendant joins a racketeering conspiracy and participates in serious crimes, "'there is a likelihood that evidence proving the existence of the enterprise through its acts will involve a considerable degree of prejudice.  Nonetheless, the evidence may be of important probative value in proving the enterprise.'"  United States v. Mejia, 545 F.3d 179, 206-07 (2d Cir. 2008) (upholding the admission of evidence of a prior uncharged shooting because it demonstrated the existence of the racketeering enterprise and the existence of the conspiracy with which the defendants were charged).  In any event, any such risk can be mitigated effectively by a cautionary instruction limiting the jury's consideration of the evidence to the purposes for which it is offered.  See  United States v. Mickens, 926 F.2d 1323, 1329 (2d Cir. 1991); United States v. Clemente, 22 F.3d 477, 483 (2d Cir. 1994) (approving the district court's instruction that the defendants were "not on trial for any crimes except for those that were charged in the indictment.").

II.     Adequacy of the Disclosure of the Racketeering Evidence

The defendants complain that they have not been given a detailed account of the racketeering evidence at issue in the government's motion.  The defendants are wrong.

3

They can look to the superseding indictment, other filings by the government, as well as  the

voluminous discovery and other submissions in this case.  As but one example, the

government has described in its motion regarding defendants' assertions of attorney-client

privileges the evidence underlying the defendants' recruitment of non-citizens to work in one

or more Nxivm-affiliated organizations and/or as sexual partners of Raniere.  (See, e.g., Mot.

at 26-27.)  The government has also produced hundreds of emails in discovery to the

defendants reflecting these efforts.

At this stage, the government's disclosures must simply be sufficient for the

Court to determine if the evidence is relevant and rule on any categorical objections under

Rule 403 or otherwise.  Indeed, Courts routinely resolve Rule 403 objections to categories of

conduct in advance of trial.  For instance, in Ashburn, 2015 WL 588704 at *3-24, this Court

ruled on a government motion in limine seeking the admission of several categories of

"crimes and bad acts" as racketeering evidence, including prior gang affiliation, assaults,

shootings, murders, murder conspiracies, firearms possession and trafficking, thefts,

robberies, and narcotics possession and sales.  See id. at *3-5.  Although some specific

instances of conduct were identified in the government's motion, such as particular murders,

other types of conduct were described solely in categorical terms.  For example, the Court

considered the government's request to offer evidence that gang members "robbed jewelry

stores and stole credit card numbers" and "would steal cell phones from people walking

down the street," without reference to any specific instances or acts.  See id. at *5, 19.  This

Court conducted a detailed Rule 403 analysis and granted the government's motion as to five

of the six categories of conduct on which the government moved.[2] Id. at *23, 36 ("While the number of other acts the Government has proffered is indeed significant, the court does not agree that the dangers that [the defendant] has identified substantially outweigh the probative value, particularly where, as here, each of these acts is relevant and admissible as proof of the enterprise or is inextricably intertwined with other direct evidence.  See Fed. R. Evid. 403.") (emphasis in original).

Here, the defendants are well aware of the conduct at issue, as evidenced by their detailed and comprehensive oppositions to each of the proffered categories of evidence. The defendants are in a position to raise categorical objections under Rule 403, and they have done so in their oppositions.[3]

III.   CBI Evidence

Bronfman's argument that evidence concerning CBI is unfairly prejudicial (Bronfman Opp. at 4) and offered to prove Raniere's propensity to commit fraud (id. at 5) mischaracterizes and misunderstands the reason the government seeks to admit the evidence. Indeed, Bronfman fails to address the stated, permissible purposes for this evidence—

---

[2]     Although this Court initially denied the government's motion to admit evidence of prior gang membership, it later granted a motion for reconsideration after finding that this too was direct evidence of the racketeering crimes charged.  Id. at ECF Dkt. Entry dated February 24, 2015.

[3]      The defendants remain free to object at trial to the admission of racketeering evidence if, in the context of other evidence introduced at trial, it becomes, for example, "needlessly cumulative."  Id. at *24.

namely, providing background to the Enterprise—and instead focuses on CBI's settlement with the New York Attorney General to suggest that the government seeks to introduce CBI evidence to "portray Raniere as a serial fraudster."  (Id. at 5).  Although discussion of CBI's settlement and its purportedly prejudicial effect takes up several pages of Bronfman's brief (id. at 4-6), it warranted only a single sentence in the government's motion (Mot. at 15). Bronfman, in other words, uses the settlement as a strawman to distract from the plainly permissible purposes for which the CBI evidence is offered.

Bronfman all but concedes the relevance of this evidence when she asserts that its evidentiary value would be lessened "if" it were established that "NXIVM and DOS were pyramids."  (Bronfman Opp. at 7 (emphasis added)).  In light of the defendants' motions to dismiss, however, the government does not anticipate that Raniere, Bronfman and their codefendants will concede at trial that NXIVM, DOS and the charged Enterprise were structured as pyramids, with benefits flowing up through the Pyramid Organizations, including NXIVM and DOS, to Enterprise members and associates, and ultimately to Raniere.  The structure of NXIVM, DOS and the Enterprise – and the benefits that accrued to Raniere and his codefendants as a result of that structure – will, in other words, be central issues at trial.

Accordingly, evidence of the structure of CBI and Raniere's role in organizing and benefitting from that structure are relevant to and probative of the structure he and his codefendants employed in establishing NXIVM, DOS, other Pyramid Organizations and, ultimately, the Enterprise, after CBI collapsed.  Indeed, aside from Bronfman's specious propensity argument, she makes no attempt to counter the government's argument that the

CBI evidence is relevant to this question or that it is inextricably intertwined with the formation of the charged Enterprise.  (Mot. at 16).  For the reasons stated in the government's motion, this evidence should be admitted.

IV.    Nxivm's Teachings and Practices

The defendants' argument that the "government has no real reason for introducing" evidence of Nxivm's teachings and practices is similarly meritless.  (Bronfman Opp. at 8.)  This evidence is inextricably intertwined with the racketeering enterprise and is "highly relevant to the jury's understanding of the existence, motives, and objectives of the RICO conspiracy and the means by which it was conducted."  See United States v. Beasley, 72 F.3d 1518, 1527-28 (11th Cir. 1996) (holding that evidence in racketeering conspiracy against a "religious cult" was "relevant, because . . . teachings were used to justify, rationalize, and promote crime").[4]

Nxivm's teachings and practices are direct evidence of the existence and nature of the Enterprise and provide crucial context for nearly every one of the means and methods and predicate acts alleged in the superseding indictment, an argument with which the defendants do not even attempt to grapple.  For example, Nxivm's teachings about "suppressives" (defined by Nxivm as people who when they "see[] something good, they

---

[4]    Notably, Nxivm's "Rules and Rituals" state "[u]nder no circumstance should any rule, ritual or method be construed to have any religious or mystical content . . . we fashion all aspects of [NXIVM] in a non-religious, non-mystical and practical manner," so defendants' reliance on cases analyzing Federal Rule of Evidence 610, which prohibits using religion to impeach a witness's credibility, is misplaced.

want to suppress it and destroy it") are crucial to understanding the motivation and

willingness of the defendants and their co-conspirators to participate in Racketeering Acts

Two and Three, because the victims of those acts were people the defendants had labeled as

enemies and "suppressives" (RA-2 and 3).  And Nxivm's teachings about women's allegedly

prideful natures and willingness to "play the victim," and the emphasis in Nxivm's teachings

on penances and "ethical breaches," are interwoven into Jane Doe 4 and the DOS victims'

experiences.  These concepts also appear throughout the documents that will be trial exhibits,

including emails between the victims and the defendants.  For example, Jane Doe 4 and

Raniere exchanged at least 300 emails discussing her supposed "breach" and approximately

400 emails discussing her acting like a "victim."  An understanding of what these words

meant within Nxivm is crucial to the jury understanding these documents and Jane Doe 4's

testimony.

Evidence regarding Nxivm's teachings is also directly relevant to the predicate

acts and substantive charges related to forced labor and sex trafficking, because the victims'

exposure to Nxivm's teachings is relevant to assessing whether they were coerced into labor

and sex.  For example, the definition of "serious harm" under the forced labor and sex

trafficking statutes includes "any harm . . . that is sufficiently serious, <u>under all the</u>

<u>surrounding circumstances</u>, to compel a reasonable person <u>of the same background and in the</u>

<u>same circumstances</u> to perform or to continue performing" labor or services or commercial

sexual activity, respectively.  18 U.S.C. §§ 1589(c)(2), 1591(e)(4) (emphasis added).

Victims' exposure to Nxivm's curriculum — with its emphasis on punishment and

consequences, among other things — is plainly a relevant "surrounding circumstance" in

8

assessing whether the victims would have been compelled to engage in the objects of those charged crimes.

The defendants are also wrong in arguing that Nxivm's "aggressive recruiting practices" have "nothing to do with the racketeering acts that purportedly form the RICO pattern" and "whether the DOS acts and non-DOS acts" are associated with similarly structured organizations has "nothing to do with whether they form a RICO pattern." (Bronfman Opp. at 9.)  Recruiting is identified in the superseding indictment as a means of achieving the principal purpose of the Enterprise, i.e., "obtain[ing] financial and personal benefits for the members of the Enterprise" (Indictment ¶ 4.), and without a continuous stream of new recruits, the Enterprise could not achieve its alleged purpose.  Accordingly, this evidence is direct evidence of an element the government must prove at trial.   Boyle v. United States, 556 U.S. 938, 946 (2009) ("purpose" as one of the three features that a racketeering enterprise must have).  Moreover, recruiting practices are interwoven into the facts of Racketeering Acts One and Five and all the DOS-related predicate acts and substantive charges insofar as they involve efforts to keep members of Nxivm within the community and as one of the core tenants of DOS was the recruitment of new "slaves."

Evidence of Nxivm's teachings and practices are not "unfairly prejudicial." See Beasley, 72 F.3d at 1528.  Nxivm's teachings and practices are no more inflammatory than the allegations surrounding the predicate acts and charged offenses themselves, which include keeping a woman in a room for nearly two years, nonconsensual sex, extreme diets and sleep deprivation, sexually explicit photographs and branding of Raniere's initials on women's bodies without their knowledge.  See United States v. Bourne, 08-CR-888 (NGG),

2011 WL 4458846, at *14 (E.D.N.Y. Sept. 23, 2011).  Moreover, the Court has already

stated its intention to have prospective jurors fill out a questionnaire before oral voir dire,

allowing the parties and the Court to identify and strike any jurors who will be unable to set

aside personal feelings or to follow any limiting instructions given by the Court.

   Finally, the defendants' argument that evidence of Nxivm's teachings and

practices would be "affront to the First Amendment," (Bronfman Br. at 9) is meritless.  The

issue before the Court "is not the prosecution or regulation of the speech itself" and the

Supreme Court has recognized that "the First Amendment . . . does not prohibit the

evidentiary use of speech to establish the elements of a crime or to prove motive or intent."

Wisconsin v. Mitchell, 508 U.S. 476, 489 (1992); United States v. Herron, --- Fed. Appx. ---,

2019 WL 626150, at *3 (2d Cir. Feb. 14, 2019) (summary order) (affirming conviction and

district court's determination that defendant's "rap videos were 'used to establish the

existence of, and [his] participation in, the alleged RICO enterprise," and thus the First

Amendment is not implicated") (quoting United States v. Pierce, 785 F.3d 832, 841 (2d Cir.

2015)).

 V. Cash Smuggling, Structuring, and Tax Evasion

   Bronfman incorrectly characterizes the government's proffered evidence of

cash smuggling, structuring and tax evasion (Mot. at 22) as evidence of "other crimes"

(Bronfman Opp. at 12).  It is not.  The proffered evidence falls within the period charged in

the Superseding Indictment, involves the charged defendants and unindicted coconspirators,

and is offered as direct evidence to prove the existence of the Enterprise in which the

defendants participated.  See Mejia, 545 F.3d at 206 ("Where, as here, the existence of a

racketeering enterprise is at issue, evidence of uncharged crimes committed by members of that enterprise, including evidence of uncharged crimes committed by the defendants themselves, is admissible to prove an essential element of the RICO crimes charged—the existence of a criminal enterprise in which the defendants participated" (internal quotation marks omitted)).  Rather than address this argument, however, Bronfman asserts, contrary to allegations on the face of the Superseding Indictment and the many government filings in the response to defendants' pretrial motions, that the government's "'enterprise' theory is that all Defendants were involved in NXIVM."  (Bronfman Opp. at 12).  This assertion misreads the Superseding Indictment and fails to acknowledge the permissible purposes of the proffered evidence in this racketeering prosecution.

Bronfman also fails to acknowledge that the proffered evidence of these crimes is a means by which the defendants sought to achieve "[t]he principal purpose of the Enterprise," that is, "to obtain financial and personal benefits for the members of the Enterprise."  (Indictment ¶¶ 4, 6).  See United States v. Diaz, 176 F.3d 52, 79 (2d Cir. 1999) ("[Rule] 404(b) bars the admission of '[e]vidence of other crimes, wrongs, or acts' to prove the defendant's propensity to commit the crime charged.  However, this rule is not controlling here, for an act that is alleged to have been done in furtherance of the alleged conspiracy is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." (internal alterations and quotation marks omitted)).  Because Rule 404(b) simply does not apply in this context, it is again a non-sequitur to suggest, as Bronfman does, that the government is offering the proffered evidence to prove "propensity."  (Bronfman Opp. at 13).  To the contrary, the evidence is offered as direct evidence that the defendants

"knowingly and intentionally conspire[d]" to participate in the charged Enterprise. Bronfman's arguments are irrelevant to the admissibility of this evidence in a racketeering prosecution and they should be rejected.

VI.    Campaign Contribution Evidence

The defendants' response regarding the admissibility of evidence of the "conduit contribution scheme" distills into nothing more than a meritless argument that the government should not be able to prove its case the way it sees fit.  See Old Chief v. United States, 519 U.S. at 172, 187-88 (1997).  The defendants essentially concede that the evidence of campaign contributions is relevant to Racketeering Acts Two and Five and to the DOS-related acts and crimes, but assert that the government has "no need of evidence concerning [d]efendants' motives."  (Bronfman Br. at 15.)   This is simply not their call to make and their arguments should be rejected.

As to the evidence regarding the "use of other political lobbyists in attempts to gain influence," the defendants' cases regarding First Amendment protection of lobbying efforts are inapposite.  The government intends to introduce evidence that the defendants relied on political strategists and lobbyists to illegally gain political influence (such as through bundled campaign contributions) and in connection with their attempt to have perceived enemies of the Enterprise and/or the Pyramid Organizations indicted for crimes they did not commit or on the basis of false or misleading information.  The First Amendment does not protect such conduct.  See United States v. Rahman, 189 F.3d 88, 117 (2d Cir. 1999) ("Notwithstanding that political speech and religious exercise are among the activities most jealously guarded by the First Amendment, one is not immunized from

prosecution for such speech-based offenses merely because one commits them through the medium of political speech or religious preaching.").

VII.    Evidence Relating to the Recruitment and Grooming of Sexual Partners for Raniere

At trial, the government expects to admit evidence that the members of the charged enterprise (the "Enterprise") recruited and groomed sexual partners for Raniere, both within and outside of DOS, and were themselves in sexual relationships with him that involved pledges of loyalty, "penances" for "ethical breaches," and "collateral."  Although this evidence is self-evidently admissible against all defendants as direct evidence of the charged racketeering conspiracy involving the "recruit[ment] and grooming" of "sexual partners for RANIERE" (Indictment ¶ 6(c)), the defendants seek to preclude the introduction of such evidence.  See, e.g., Mack Opp. at 2 n.1; Bronfman Opp. at 18-19.  Acknowledging the admissibility of evidence demonstrating a relationship of trust between co-conspirators, Bronfman proposes, instead, that evidence of her "business and friendships with Raniere and each other could serve the same purpose with less unfair prejudice."  Bronfman Opp. at 18.  The defense cannot and should not be permitted to sanitize the government's evidence in this way.  Nor is such evidence inflammatory in the context of this case, which involves sex trafficking and forced labor.

Moreover, and in the alternative, such evidence is admissible as "other crimes, wrongs or acts" under Rule 404(b).  The evidence of the defendants' relationships with Raniere and facilitation of other sexual relationships with Raniere tends to establish their motive, knowledge and intent with respect to the alleged racketeering acts.  For example, the

defendant Clare Bronfman's longstanding intimate relationship with Raniere tends to establish her motive, knowledge and intent with respect to her participation in the identity theft racketeering acts.  The evidence also provides important background of the conspiracy, explains the relationship of trust among coconspirators and enables the jury to understand the complete story of the charged crimes.

The government also intends to offer evidence that members of the Enterprise, including the defendants, were aware of and facilitated Raniere's sexual relationships with two underage victims:  (1) a fifteen-year-old girl who was employed by Nancy Salzman and who—ten years later—became Raniere's first-line "slave" in DOS; and (2) a child whose sexual relationship with Raniere was known to, and facilitated by, members of the Enterprise.  Raniere's sole argument in opposition to the admission of evidence relating to his relationship with the first victim is that the government has relied on "inadmissible, unreliable, rank hearsay."  (Raniere Opp. at 6.)  To the contrary, the government expects to introduce, among other sources of evidence, (1) dated images of the victim, constituting child pornography, that were created and possessed by Raniere[5] and (2) electronic communications between the victim and Raniere reflecting their sexual relationship and indicating that it began when she was fifteen years old.

---

[5]    The government previously alerted the defendants to the existence of this evidence.

As to Raniere's relationship with the second victim, the evidence demonstrates how members and associates of the Enterprise were directed and expected to recruit and groom sexual partners for him. Although the defendants question the reliability of this evidence, dismissively claiming that it consists of "discredited internet allegations and press reports," (Raniere Opp. at 4), the government intends to introduce direct evidence, including witness testimony. This evidence does not lack any indicia of reliability that would justify preclusion under Rule 403 of the Federal Rules of Evidence.

VIII.   Recruitment of Non-Citizens and Immigration Fraud

At trial, the government will offer evidence that the defendants and their co-conspirators sought to secure visas and immigration status for certain non-citizens so that they could work in one or more Nxivm-affiliated organizations or as sexual partners for Raniere. The evidence relating to this conduct will consist, in large part, of testimony from the same witnesses who will testify regarding the charged offenses. Where uncharged crimes are no more serious than the charged offenses and are based on the same proof, there is no serious danger that any prejudice will flow from the admission of evidence of the uncharged offenses. See United States v. Mejia-Velez, 855 F. Supp. 607, 611 (E.D.N.Y. 1994).

Bronfman argues that by admitting such evidence, the government "intends to blame Bronfman because the noncitizens she allegedly brought in and encouraged to stay were later recruited into DOS." Bronfman Opp. at 17. This misstates the purpose of offering such evidence. The evidence is admissible as direct evidence of the charged racketeering Enterprise, the primary purpose of which was to "recruit[] new members" into Nxivm and

DOS (Indictment ¶ 4), as well as the defendants' involvement in the affairs of the Enterprise and the methods and means employed by members of the Enterprise.

Efforts by the defendants and others to assist Raniere's sexual partners to enter or remain in the United States is also significant proof of their involvement in the Enterprise. For instance, Mack's "sham" marriage to a co-conspirator and first-line DOS "slave" flows directly out of her participation in DOS. As a first-line DOS "slave," Mack's wife herself recruited DOS "slaves" who pledged loyalty and obedience both to her and to Raniere, their "Grandmaster." Evidence as to the relationship between and among Raniere and the first-line DOS "slaves" are not only inextricably intertwined with the evidence relating to the charged crimes as to DOS, but it also provides proof concerning the operation of the Enterprise and Mack's place within it.

Similarly, Russell's involvement in leasing a property under an assumed name to house a DOS "slave" who was not legally in the United States demonstrates her loyalty to Raniere and willingness to act at his direction. Russell leased the property for over seven years and, each year, paid the rent in cash and in full. Although Russell claims that she was "intentionally kept in the dark regarding the property's residents," Russell Opp. at 2, the evidence is admissible to demonstrate that Russell was entrusted and expected to carry out Raniere's directives in furtherance of the goals of the Enterprise.

IX.   <u>Surveillance and Harassment of Nxivm Enemies</u>

Defendants make no serious attempt to refute the government's arguments regarding the relevance of the surveillance and harassment evidence set forth in the government's opening brief. (Mot. at 33-34). For example, defendants' argument that use of

16

"coded language and secret email accounts" would only be consciousness-of-guilt evidence for "uncharged crimes that are not admissible in the first place" (Bronfman Opp. at 20), is meritless.  Because the charged conduct involves a scheme to surveil email accounts illegally, evidence that at the same time the defendants were engaged in a scheme to surveil bank accounts illegally belonging to the same victims (and people they believed to be connected to those victims, as well as others) is admissible as direct evidence of the Enterprise and its means and methods (Indictment ¶ 6) and under 404(b) to demonstrate motive, intent and absence of mistake as to the charged conduct.

Moreover, defendants' reliance on United States v. Hatfield, 685 F. Supp. 2d 320 (E.D.N.Y. 2010), for the proposition that "the Indictment itself refutes the Government's 'inextricably intertwined' claims since it tells the government's story 'without mentioning' these uncharged acts of surveillance," demonstrates the weakness of their response as to admissibility of this evidence.  First, Hatfield did not involve racketeering charges. Moreover, the indictment in Hatfield was 71 pages long, including a 50 page factual recitation describing the alleged schemes.  United States v. Brooks, et al., 06-CR-550 (S-1) (JS).  The court's analysis in Hatfield is irrelevant to this Court's analysis of the government's proffered evidence.

The defendants' argument that the surveillance and harassment evidence is unfairly prejudicial is also baseless.  Bronfman cites United States v. Basciano, No. 03-CR-929 (NGG), 2006 WL 385325, *8 (E.D.N.Y. Feb. 17, 2006), in support of her argument, but it is inapposite.  In Basciano, this Court precluded evidence that the defendant solicited the murder of a prosecutor working on the case, i.e., "a man the[ jury] will see each day of trial."

At trial in this matter, by contrast, the government does not intend to offer evidence that the defendants surveilled or threatened any member of the prosecution team or other government official involved in the case.  Basicano does not support the defendants' argument, and it should be rejected.

> X.      Abusive Litigation and Obstruction

Bronfman provides no legal support for her assertion that the Court should preclude evidence that the Enterprise "[u]s[ed] harassment, coercion and abusive litigation to intimidate and attack perceived enemies and critics of RANIERE."  (Indictment ¶ 6(f)).  This category of evidence proves an expressly alleged "mean[] and method[]" of the Enterprise, and is therefore admissible as evidence of the charged Enterprise.  See e.g., United States v. Johnson, No. S5 16 CR. 281 (PGG), 2019 WL 690338, at *5 & n.4 (S.D.N.Y. Feb. 16, 2019) (holding that evidence of uncharged robbery is admissible to prove enterprise in light of stated purposes, means and methods of the enterprise); see also United States v. Canner, No. 12-CR-00102, 2013 WL 4052463, at *3 (S.D. Ind. Aug. 12, 2013) ("The structure of an enterprise is proven by 'explaining who participated in it, what they did and its purpose, means and methods' (quoting United States v. Torres, 191 F.3d 799, 806 (7th Cir. 1999)).

Bronfman's argument that the Enterprise's use of abusive litigation to silence and intimidate critics is protected by the First Amendment is frivolous.  To support her argument, she relies exclusively on Singh v. NYCTL 2009-A TRUST, 683 F. App'x 76, 77 (2d Cir. 2017), in which the Second Circuit applied the "Noerr–Pennington doctrine."  As the Second Circuit has explained elsewhere, "under the Noerr–Pennington doctrine, citizen petitions are immune from antitrust liability in light of the First Amendment."  See In re

18

DDAVP Direct Purchaser Antitrust Litig., 585 F.3d 677, 685–86 (2d Cir. 2009).  This

doctrine has no relevance to the abusive litigation employed by the Enterprise.

Bronfman's separate argument that her use of abusive litigation to intimidate

"DOS defectors" is unduly prejudicial to her is equally frivolous.  It defies logic to assert, as

Bronfman does, that she took steps to pursue "legal options against DOS defectors" even

though she did not "know about or agree to" the DOS acts she was attempting cover up to

protect the Enterprise and promote Raniere.  (Bronfman Opp. at 21; Indictment ¶¶ 4, 6).  In

any event, this argument is a question of proof, not of evidentiary relevance, and it must

await the close of the government's case at trial.

Contrary to Bronfman's assertion, the government is entitled to present proof

of victims' and witnesses' fear of leaving or speaking out against the Enterprise or Pyramid

Organizations for fear of being subjected to harassment.  This evidence is directly related to

several of the stated means and methods of the Enterprise and is direct evidence of the

existence of the Enterprise.  (Indictment ¶¶ 4, 6).  Indeed, attempts to intimidate perceived

enemies is quintessential enterprise evidence; that this Enterprise used abusive litigation and

other methods rather than violence is of no consequence.  See, e.g., United States v. Coppola,

671 F.3d 220, 242 (2d Cir. 2012) ("[W]here an organized crime enterprise cultivates a

reputation for violence and intimidation in achieving its conspiratorial goal . . . , a jury may

reasonably consider that reputation in assessing" reasons for victim's actions).

Finally, Raniere's statements in Raniere v. Microsoft, et al., 15-CV-540 (N.D.

Tex. 2017) regarding his personal wealth were made under oath and are admissible as

statement of a party opponent.  These statements are plainly relevant to showing the lengths

to which Raniere was willing to go to avoid admitting to his control of the assets he in fact controlled. His pursuit of the frivolous and abusive litigation in the Microsoft case, and the support he received from his codefendants in the course of that litigation, is proof of the relationship of trust among the defendant and evidence of the existence of the Enterprise.

XI.    Conduct After DOS Was Exposed

The government expects to introduce evidence at trial that after the existence of DOS was publicly disclosed, the defendants and their co-conspirators protected Raniere and the Enterprise by, among other things, attempting to silence and intimidate DOS slaves and issuing public statements falsely denying Raniere's involvement in DOS. As one example, on or about July 7, 2017, and on or about September 29, 2017, Bronfman received letters from separate DOS victims requesting the return or destruction of collateral, which included descriptions of the collateral, including nude photographs and videos. Months later, in December 2017, Bronfman released a public statement characterizing DOS as a "sorority," stating that it had "truly benefited the lives of its members, and does so freely. I find no fault in a group of women (or men for that matter) freely taking a vow of loyalty and friendship with one another to feel safe while pushing back against the fears that have stifled their personal and professional growth." Bronfman was also significantly involved in efforts to silence and intimidate DOS "slaves." For example, Bronfman and Raniere drafted letters addressed to DOS "slaves" that Bronfman and Raniere feared would publicly disclose the existence of DOS. These letters were later sent to several DOS "slaves" by attorneys in Mexico. The defendants' participation in these efforts are direct evidence of the charged conspiracy and Enterprise.

Bronfman mischaracterizes this evidence as the "perfectly understandable" and routine activities of a "company embroiled in a public relations emergency." (Bronfman Opp. at 22-23.) Although Bronfman offers various factual rebuttals to the government's evidence, none of her arguments are legal challenges to the admissibility of such evidence as proof of the Enterprise and her place within it. Bronfman claims that she "knew nothing about DOS at the time of the charged offenses," Bronfman Opp. at 24, but she is wrong; the "offense" with which she is charged is a racketeering conspiracy that extended through March 2018.

Bronfman's reliance on United States v. Cassese, 290 F. Supp. 2d 443, 454 (S.D.N.Y. 2003) and United States v. Lobo, 516 F.2d 883 (2d Cir. 1975) is misplaced. The district court in Cassesse merely observed that consciousness-of-guilt evidence, standing alone, is insufficient to sustain a conviction. 290 F. Supp. 2d at 454. In Lobo, the Second Circuit affirmed a defendant's conviction when his co-defendant fled during trial and was convicted in absentia at the defendant's trial, finding that the district court properly instructed the jury that the co-defendant's flight could be considered only against the fleeing co-defendant. Lobo in no way supports Bronfman's argument that efforts on the part of members of the Enterprise to hide Raniere from law enforcement are inadmissible as racketeering evidence.

Bronfman also objects to the admission of evidence that she paid for the legal representation for her co-defendants and co-conspirators. (Bronfman Opp. at 23-24.) Her arguments miss the mark. The government is not seeking to disqualify a "house counsel," as it did in United States v. Gotti, 771 F. Supp. 552, 553 (E.D.N.Y. 1991). It is instead seeking

to introduce evidence that Bronfman, as a "benefactor," paid for legal representations for her co-defendants and others who were subpoenaed to prove the existence and membership of the Enterprise.  See United States v. Simmons, 923 F.2d 934, 949 (2d Cir. 1991) ("We have previously indicated that payment of attorneys' fees by one individual on behalf of other suspected members of a criminal enterprise 'may imply facts about a prior or present relationship' between the benefactor and his beneficiaries.") (citation omitted); see also United States v. Orgad, 132 F. Supp. 2d 107, 125 (E.D.N.Y. Mar. 9, 2001) ("The Second Circuit had held that the payment of legal fees for others—'benefactor payments'—or otherwise arranging for their representation is highly probative evidence of the existence and membership of criminal enterprises") (citing Simmons).  The evidence is also admissible to establish Bronfman's position within the Enterprise.  See Simmons, 923 F.2d at 949 ("Certainly, evidence of such payments is highly relevant to whether the benefactor is head of a criminal enterprise as defined by the RICO statute.").  Evidence as to Bronfman's payment of her co-defendants' and co-conspirators legal fees is direct, relevant and probative evidence of the Enterprise.

## CONCLUSION

For the reasons set forth in the Motion, and in the absence of any showing of unfair prejudice, the government respectfully submits that the Court should find that the co-conspirator conduct alleged in the superseding indictment and listed in the Motion is highly probative of the charged racketeering conspiracy and that this probative value is not substantially outweighed by a danger of unfair prejudice.

Dated:     Brooklyn, New York
           March 11, 2019

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Moira Kim Penza
Tanya Hajjar
Mark J. Lesko
Kevin M. Trowel
Assistant United States Attorneys
        (Of Counsel)