MKM:TH/MKP/KMT
F. #2017R01840

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

     - against -

KEITH RANIERE,
CLARE BRONFMAN,
ALLISON MACK,
KATHY RUSSELL,
LAUREN SALZMAN and
NANCY SALZMAN,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No. 18-204 (S-1) (NGG) (VNS)


THE GOVERNMENT'S MEMORANDUM OF LAW IN
RESPONSE TO DEFENDANTS' MOTIONS TO SUPPRESS


RICHARD P. DONOGHUE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Moira Kim Penza
Tanya Hajjar
Kevin Trowel
Assistant U.S. Attorneys
      (Of Counsel)

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ...................................................................................................... 3

I.     Applicable Law ................................................................................ 3

      A.     Probable Cause ........................................................................ 3

      B.     Particularity / Overbreadth ....................................................... 4

      C.     Good Faith Exception .............................................................. 5

      D.     *Franks* Doctrine .................................................................... 7

           1.     Intentionality or Recklessness .......................................... 8

           2.     Materiality ...................................................................... 9

II.     Application ...................................................................................... 10

      A.     Raniere's *Franks* Motion ....................................................... 10

           1.     Raniere's Motion Is Facially Deficient ............................. 10

           2.     Agnifilo's Affirmation Provides No Evidence of Misconduct ..... 11

           3.     Raniere Misquotes and Misconstrues the Warrant Affidavits, Which Are Neither False nor Misleading .................................. 13

      B.     Bronfman's Motion to Suppress ............................................... 25

           1.     The March and October Warrants Are not Overbroad ............. 26

                a.     The Warrants Establish Probable Cause for the Identified Offenses .............................................................. 26

                b.     The Warrants Establish a Fair Probability to Believe Evidence of the Crimes Would Be Found in the Places to Be Searched .......................................................... 30

           2.     The Warrants Are Particular ............................................. 36

           3.     The Government Did Not Exceed the Scope of the March Warrant .................................................................................. 42

           4.     The Government Relied on the Warrants in Good Faith ......... 45

           5.     Bronfman's Argument about Third Parties is Meritless ......... 46

CONCLUSION ....................................................................................................... 47

PRELIMINARY STATEMENT

The government respectfully submits this memorandum of law in opposition to

defendants Keith Raniere and Clare Bronfman's motions to dismiss evidence seized by the

government in connection with five search warrants.  Specifically, Raniere seeks a <u>Franks</u>

hearing and suppression of evidence seized pursuant to the following warrants:

- IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE APPLE IDS ASSOCIATED WITH KEITH RANIERE, LAUREN SALZMAN AND ALLISON MACK, THAT IS STORED AT PREMISES CONTROLLED BY APPLE, INC., 17-M-1026 (Dec. 5, 2017) (Go, M.J.) (the "December Warrant")

- IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE YAHOO! IDENTIFIER KEITHRANIERE@YAHOO.COM, 18-M-45 (Jan. 18, 2018) (Pollak, M.J.) (the "January Warrant")

- IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE YAHOO! IDENTIFIER KEITHRANIERE@YAHOO.COM, 18-M-981 (Oct. 15, 2018) (Pollak, M.J.) (the "Raniere October Warrant")

Bronfman seeks suppression of evidence seized pursuant to the following warrants:

- IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THREE GOOGLE IDENTIFIERS, 18-M-210 (Mar. 8, 2018) (Levy, M.J.) (the "March Warrant")

- IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE GOOGLE IDENTIFIER "CLAREWBRONFMAN@GMAIL.COM," 18-M-982 (Oct. 15, 2018) (Pollak, M.J.) (the "Bronfman October Warrant")

The defendants' arguments are without merit.  Raniere's motion is deficient on its

face, and is supported only by an affidavit from his counsel, Mark Agnifilo, who is not a witness,

has no personal knowledge of the relevant facts, and cannot offer relevant proof, as required by

<u>Franks v. Delaware</u>, 438 U.S. 154, 171 (1978).  Agnifilo's affirmation instead contains

additional legal arguments, including arguments that are directly refuted by the documents upon

which Raniere's motion and Agnifilo's affirmation rely.  Moreover, as set forth in detail below,

the challenged affidavits are accurate and Raniere does not identify any evidence of law enforcement misconduct to warrant a <u>Franks</u> hearing.  Raniere's motion should be denied.

   Bronfman's arguments that certain warrants are overbroad and insufficiently particular are equally meritless.  As an initial matter, Bronfman misunderstands the showing the government must make to obtain a search warrant, and she incorrectly asserts throughout her brief that the government was required to show probable cause that she personally committed each crime for which the government sought evidence in her Google account.  She is wrong as a matter of law, <u>see, e.g.</u>, <u>Steagald v. United States</u>, 451 U.S. 204, 212–13 (1981) (discussing difference between search warrant and arrest warrant), and this faulty premise cannot support the remainder of her argument.  Both Warrants establish probable cause that the identified crimes were committed and that "evidence, contraband, instrumentalities and/or fruits" of those crimes would be found in the specific data identified in the Warrants.  In addition, the government did not exceed the scope of the March Warrant.

   Bronfman also misunderstands the relevant case law on particularity and offers no legal authority for the relief she requests.  She relies on cases in which courts have found warrants overbroad where they purport to allow law enforcement to search an entire premises for "evidence" of "crimes," without identifying either the kinds of "evidence" sought (e.g., certain documents, firearms, drug paraphernalia, items of clothing, etc.) or, in some cases, the crimes under investigation.  As set forth below, these cases concerning "general warrants" are plainly inapposite here, where, in Attachment B-2 to both the March Warrant and the October Warrant, the government has identified with particularly the things to be searched – i.e., specific categories of information maintained by Google – and listed the crimes for which probable cause

was established in the affidavits.  Bronfman cites no case in any court that has found such a warrant unconstitutionally overbroad and the government is not aware of any.

In any event, there is no evidence of law enforcement misconduct, and the government was entitled to rely in good faith on the magistrate judges' findings of probable cause.  Even if Bronfman were correct in some part of her argument, which she is not, she offers no serious argument that the "last resort" of suppression would be warranted here.   Her motion should also be denied.

BACKGROUND

The government notes the Court's familiarity with the facts of this case and incorporates here by reference its description of the charges underlying the Superseding Indictment set forth in its Memorandum of Law in Response to Defendants' Pretrial Motions, dated December 17, 2018.  (DE 248 at 3-7.)

ARGUMENT

For the reasons set forth below, Raniere's and Bronfman's motions to suppress should be denied.

I.    Applicable Law

    A.    Probable Cause

The Fourth Amendment to the U.S. Constitution provides:

    The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  Whether the "probable cause" clause of the Fourth Amendment is satisfied depends on the "totality of the circumstances."  United States v. Wagner, 989 F.2d 69, 71-72 (2d

Cir. 1993). As to each request to search, "[t]he issuing judicial officer must 'make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" Id. at 72 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)); accord Walczyk v. Rio, 496 F.3d 139, 156 (2d Cir. 2007).

Probable cause "does not demand any showing that a good-faith belief be 'correct or more likely true than false.'" Walczyk, 496 F.3d at 157 (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)). Rather, probable cause "requires only such facts as make wrongdoing or the discovery of evidence thereof probable." Id. "A showing of nexus [between the criminal activity and the thing to be searched] does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." United States v. Singh, 390 F.3d 168, 182 (2d Cir. 2004) (internal quotation marks omitted).

B.     Particularity / Overbreadth

The Fourth Amendment's particularity requirement "makes general searches . . . impossible and prevents the seizure of one thing under a warrant describing another," Marron v. United States, 275 U.S. 192, 196 (1927), by foreclosing a "general, exploratory rummaging in a person's belongings," Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). To satisfy the particularity requirement, warrants must specify (1) the offenses for which probable cause has been established; (2) the place or thing to be searched; and (3) the items to be seized relating to the specified offenses. United States v. Galpin, 720 F.3d 436, 445-46 (2d Cir. 2013).

Accordingly, "broadly worded categories of items available for seizure" do not necessarily render a warrant deficient. United States v. Riley, 906 F.2d 841, 844 (2d Cir. 1990).

"Once a category of seizable papers has been adequately described, with the description delineated in part by an illustrative list of seizable items, the Fourth Amendment is not violated because the officers executing the warrant must exercise some minimal judgment as to whether a particular document falls within the described category." Riley, 906 F.2d at 843-45 (upholding warrant that authorized a search for "records and other items that constitute evidence of the offenses of conspiracy to distribute controlled substances and distribution of the same"). "It is true that a warrant authorizing seizure of records of criminal activity permits officers to examine many papers in a suspect's possession to determine if they are within the described category. But allowing some latitude in this regard simply recognizes the reality that few people keep documents of their criminal transactions in a folder marked 'drug records.'" Id. at 845; see also Andresen v. Maryland, 427 U.S. 463, 480-82 & n.10 (1976) (upholding warrant that authorized the seizure of "other fruits, instrumentalities, and evidence of crime at this [time] unknown," when limited to a real estate fraud relating to a particular parcel of land); United States v. Young, 745 F.2d 733, 759-60 (2d Cir. 1984) ("[U]se of the term 'other evidence' following the term 'money' was sufficient to permit the agents to seize such manifestations of wealth as furs, jewelry, and expensive automobiles."); United States v. George, 975 F.2d 72, 76 (2d Cir. 1992) (collecting similar cases).

C.  Good Faith Exception

The Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation" of its terms. United States v. Leon, 468 U.S. 897, 906 (1984). The exclusionary rule developed as "a 'prudential' remedy, crafted by the Supreme Court," United States v. Raymonda, 780 F.3d 105, 117 (2d Cir. 2015), and it is neither a "personal constitutional right" nor a means "to 'redress the injury' occasioned by an unconstitutional search," Davis v. United States, 564 U.S. 229, 237 (2009). Rather, "[t]he rule's sole purpose . . . is to deter future

Fourth Amendment violations." Id. Accordingly, "the exclusionary rule is designed to deter police misconduct," not mistakes by judges and magistrates. Leon, 468 U.S. at 916.

Thus, even where probable cause is lacking or a warrant is overbroad, suppression will rarely be the appropriate remedy. As the Supreme Court has explained, suppression is the Court's "last resort, not [its] first impulse." Hudson v. Michigan, 547 U.S. 586, 591 (2006). Suppression is an appropriate remedy only where it deters "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." Herring v. United States, 555 U.S. 135, 144 (2009). The Supreme Court has explained that where law enforcement has obtained a warrant, suppression will be "an appropriate remedy" only where (1) "the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) "the issuing magistrate wholly abandoned his judicial role," such that "no reasonably well trained officer should rely on the warrant;" (3) the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is "facially deficient" in that it "fail[s] to particularize the place to be searched or the things to be seized . . . that the executing officers cannot reasonably presume it to be valid." Leon, 468 U.S. at 923; United States v. Clark, 638 F.3d 89, 99 (2d Cir. 2011) (holding that warrant lacked probable cause to believe evidence of criminal conduct would be found throughout the premises searched, but citing Leon, applying good faith exception and reversing district court's grant of suppression motion).

As the Second Circuit has explained, "[a]pplication of the exclusionary rule depends on the 'efficacy of the rule in deterring Fourth Amendment violations in the future' as well as a determination that 'the benefits of deterrence . . . outweigh the costs.'" United States v. Rosa, 626 F.3d 56, 64 (2d Cir. 2010) (quoting Herring, 555 U.S. at 141). Accordingly, "'[t]he

extent to which the exclusionary rule is justified by these deterrence principles varies with the culpability of the law enforcement conduct.'" Rosa, 626 F.3d at 64 (quoting Herring, 555 U.S. at 143). A reviewing court will therefore "look to whether 'police conduct [is] sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system.'" Rosa, 626 F.3d at 64 (quoting Herring, 555 U.S. at 143); see also Leon, 468 U.S. at 911 ("[A]n assessment of the flagrancy of the police misconduct constitutes an important step in the calculus."). "'The pertinent analysis of deterrence and culpability is objective,' and '[this Court's] good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal' in light of 'all of the circumstances.'" Rosa, 626 F.3d at 64 (quoting Herring, 555 U.S. at 145).

D.    *Franks* Doctrine

"Ordinarily, a search or seizure pursuant to a warrant is presumed valid." United States v. Awadallah, 349 F.3d 42, 64 (2d Cir. 2003). Where, however, a defendant alleges that an affidavit in support of a search warrant contains deliberately misleading or recklessly false information, a district court should determine whether circumstances warrant a hearing to test the accuracy of those claims in accordance with Franks v. Delaware, 438 U.S. 154, 155-56 (1978).

To warrant a hearing, "a defendant must make a substantial preliminary showing that: (1) the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998) (internal quotation marks omitted); see also Awadallah, 349 F.3d at 64 (noting that "in order to invoke Franks doctrine, a defendant must show that there were intentional and material

misrepresentations or omissions in the warrant affidavit.").  As the Supreme Court explained in

Franks:

> to mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.  Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained.  Allegations of negligence or innocent mistake are insufficient,

Franks, 438 U.S. at 171.

### 1.    Intentionality or Recklessness

A defendant seeking to make the first required showing of an intentional or reckless

misstatement or omission must show more than inadvertent error.  "[E]very statement in a written

affidavit does not have to be true."  United States v. Martin, 426 F.3d 68, 73 (2d Cir. 2005).  With

respect to omissions, "the mere intent to exclude information is insufficient . . . [because] every

decision not to include certain information in the affidavit is intentional insofar as it is made

knowingly . . . . An affiant cannot be expected to include in an affidavit every piece of information

gathered in the course of an investigation."  Awadallah, 349 F.3d at 67-68 (internal quotation

marks omitted).

"A misrepresentation or omission is intentional when 'the claimed inaccuracies or

omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth.'"

Awadallah, 349 F.3d at 64 (quoting United States v. Canfield, 212 F.3d 713, 717–18 (2d Cir.

2000)).  "'To prove reckless disregard for the truth,'" a defendant must "'prove that the affiant in

fact entertained serious doubts as to the truth of his allegations.'"  United States v. Rajaratnam,

719 F.3d 139, 154 (2d Cir. 2013) (quoting United States v. Whitley, 249 F.3d 614, 621 (7th Cir. 2001)).  Reckless disregard "can sometimes be inferred from the omission of critical information in a[n] . . . application."  Id. at 154 (emphasis original).  "But such an inference is not to be automatically drawn simply because a reasonable person would have included the omitted information . . . [T]he inference is particularly inappropriate where the government comes forward with evidence indicating that the omission resulted from nothing more than negligence, or that the omission was the result of a considered and reasonable judgment that the information was not necessary to the . . . application."  Id. at 154-55.

        2.    Materiality

The moving defendant must also prove that any misstatements or omissions alleged were material.  To determine if the false information was material, i.e., "necessary to the issuing judge's probable cause determination . . . a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant."  United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000) (citing Salameh, 152 F.3d at 113).  "If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate.  As with the inclusion of false information, 'omissions from an affidavit that are claimed to be material are governed by the same rules.'"  Id. (quoting United States v. Ferguson, 758 F.2d 843, 848 (2d Cir. 1985)); see also Rajaratnam, 719 F.3d at 146 (stating that, to determine whether omissions are material, a court should consider whether, "if the omitted material had been included in the affidavit, the affidavit would still establish probable cause" (internal quotation marks omitted)).

II.     Application

A.     Raniere's *Franks* Motion

Raniere moves for a Franks hearing regarding the January Warrant and the Raniere October Warrant.  As set forth below, his motion is deficient on its face, he identifies no law enforcement wrongdoing and he fails to identify any material misstatement or omission.  His motion should be denied.

1.     Raniere's Motion Is Facially Deficient

As an initial matter, Raniere's motion is deficient on its face.  It is supported only by an affirmation from Raniere's counsel, Mark Agnifilo ("Aff."), made "upon information and belief" (Aff. ¶ 2), not by "[a]ffidavits or sworn or otherwise reliable statements of witnesses" as required by Franks, 438 U.S. at 171.  Moreover, Agnifilo's affirmation contains arguments that would have been more appropriately included in the brief, not relevant facts of which Agnifilo has personal knowledge.  This is insufficient to raise a dispute warranting a Franks hearing.  See United States v. Gotti, 771 F. Supp. 535, 539 (E.D.N.Y. 1991) ("The 'belief' of counsel is not enough. To entertain it as though it were would require a hearing in every case in which counsel affirmed his 'belief' that a supporting affidavit was false; would, without more, render virtually meaningless the presumption that the supporting affidavit is valid; and would fulfill the desire of defense counsel to cross-examine the affiant."); see also United States v. Mathews, No. 18-CR-124, 2018 WL 2277839, at *1 (S.D.N.Y. May 17, 2018) (denying request for Franks hearing based on counsel's affidavit, because he lacked personal knowledge of the relevant facts); United States v. Mitchell, No. 05 CR. 1218 (RCC), 2006 WL 2290998, at *3 (S.D.N.Y. Aug. 9, 2006) ("[Defendant] – having stated generally (by his counsel) that all of the allegations in the affidavit are mistaken and having submitted no proof of deliberate falsehood or of reckless disregard for

the truth – has not met his burden to justify a <u>Franks</u> Hearing."); <u>United States v. Caruso</u>, 684 F. Supp. 84, 87 (S.D.N.Y. 1988) (denying <u>Franks</u> hearing where motion was based on affidavit of defense counsel, who did not have personal knowledge of the underlying facts).

In any event, the nature of Agnifilo's "belief" does not meet the <u>Franks</u> standard. He asserts that "the affidavits in support of these warrants suffer from deficiencies, misrepresentations and omissions and are materially misleading as to significant facts." (Aff. ¶ 4). But <u>Franks</u> is concerned with the conduct of law enforcement affiants, not with the truth of the underlying facts in an affidavit. <u>See</u> <u>Rajaratnam</u>, 719 F.3d at 153 ("The Supreme Court in <u>Franks</u> held that misstatements or omissions caused by 'negligence or innocent mistake[s]' do not warrant suppression."). To warrant a hearing, a defendant must make a "substantial showing" that the "inaccuracies or omissions are the result of the affiant's <u>deliberate falsehood</u> or <u>reckless disregard for the truth</u>" and that they were "necessary to the judge's probable cause finding." <u>Salameh</u>, 152 F.3d 113 (emphasis added). In the absence of credible allegations of government misconduct, a misleading affidavit alone does not entitle a defendant to a <u>Franks</u> hearing. <u>See</u> <u>Martin</u>, 426 F.3d at 73 ("[E]very statement in a written affidavit does not have to be true."). Accordingly, even if a counsel's unsworn affirmation "upon information and belief" might theoretically suffice to warrant a <u>Franks</u> hearing, the assertions made in Agnifilo's affirmation make clear that his would not.

### 2.    <u>Agnifilo's Affirmation Provides No Evidence of Misconduct</u>

Raniere's motion and Agnifilo's affirmation fail to allege government misconduct that would entitle Raniere to a <u>Franks</u> hearing. Both are premised on alleged omissions by the law enforcement affiant. (Br. 3 ("Here, the affidavits contain reckless and material omissions")). But Raniere fails to acknowledge that in all three affidavits the affiant expressly stated that the

11

"affidavit is intended to show simply that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter."  (Ex. 1 ¶ 3; Ex. 2 ¶ 3; Ex. 3 ¶ 4).  As the Second Circuit has explained in the course of rejecting a defendant's argument that he was entitled to a <u>Franks</u> hearing based on alleged omissions,

> [a]n affiant cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation.  However, every decision not to include certain information in the affidavit is 'intentional' insofar as it is made knowingly.  If . . . this type of 'intentional' omission is all that <u>Franks</u> requires, the <u>Franks</u> intent prerequisite would be satisfied in almost every case. . . .  [Rather,] Franks protects against omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate.

<u>Awadallah</u>, 349 F.3d at 67–68 (quoting <u>United States v. Colkley</u>, 899 F.2d 297, 300–01 (4th Cir. 1990)).

Raniere offers only conclusory assertions about the affiants' intent that are insufficient under this Circuit's case law.  <u>See</u> <u>United States v. Rajaratnam</u>, 719 F.3d 139, 154 (2d Cir. 2013) ("A[n] . . . applicant does not <u>necessarily</u> act with 'reckless disregard for the truth' simply because he or she omits certain evidence that a reviewing court, in its judgment, considers to be 'clearly critical.'" (emphasis in original)).  Many of their assertions are not supported even by Agnifilo's independently deficient affirmation.  In the absence of any evidence that the affiants acted intentionally or with reckless disregard, Raniere's motion should be denied.

3.    <u>Raniere Misquotes and Misconstrues the Warrant Affidavits, Which Are Neither False nor Misleading</u>

Raniere fails to identify a single material omission, much less one that was intentional or reckless.  He identifies six categories of omissions by the affiant, none of which is a basis for a <u>Franks</u> hearing.

<u>First</u>, Raniere frivolously takes issue with certain references to Nxivm in the affidavits, including the use of the words "cult" and "scheme."  (Br. 3).  Across the three warrants, the word "cult" is used once in the December Warrant and once in the January Warrant, both times in the following sentence: "Additionally, articles in Forbes, the Albany Times Union and Vanity Fair asked whether Nxivm was a cult."  (Ex. 1 ¶ 6; Ex. 2 ¶ 6).  The word "scheme" is used in reference to Nxivm in the same two warrants, in the following sentence: "Since at least 2003, various news outlets have described Nxivm as a multilevel marketing scheme, commonly known as a pyramid scheme, in which members are recruited via a promise of payments or services for enrolling others into the scheme."  (Ex. 1. ¶ 6; Ex. 2 ¶ 6).

Raniere does not – and cannot – assert that these statements are factually incorrect.  Rather, there is a suggestion in Agnifilo's affidavit, but not in Raniere's brief, that the government should have alerted the court to the purported method by which certain reporters acquired information about Nxivm.  (Aff. ¶ 10-13).

Raniere is wrong.  He fails to identify the legal basis for this purported government obligation to provide what amounts to impeachment information about a reporter whose article is cited as background and no such obligation exists.  In <u>Illinois v. Gates</u>, the Supreme Court addressed the circumstances under which testimony of an <u>informant</u> – i.e., a person who claims to have first-hand knowledge of the commission of crimes – could establish

13

probable cause.  See 462 U.S. at 230-40.  The Court reaffirmed that probable cause is a "fluid concept" and concluded that a magistrate judge should assess an informant's information as part of the broader "totality of the circumstances."  Id. at 233-34.  "In performing this examination of the 'totality of the circumstances' . . . the court may consider . . . 'an informant's veracity, reliability and basis of knowledge.'"  United States v. Gagnon, 373 F.3d 230, 235 (2d Cir. 2004).  Raniere identifies no such rule that would apply to the author of a press article, identified in the warrant as such, and offered only as background.  Because the warrant affiant had no legal obligation to provide this information, his purported failure to do so cannot have been intentionally or recklessly misleading.

Moreover, even if Raniere were correct, he fails to explain (1) how the affiants' factually correct description of the press articles was misleading in light of the impeachment-type information he has identified, (2) how the purported omission could possibly have been "necessary to the issuing judge's probable cause determination," Canfield, 212 F.3d at 718, or (3) the connection between the journalists' purportedly improper sources and their use of the words "cult" and "scheme."  Accordingly, even if the information is true, there can be no serious argument that the omission of this information, related to a press article offered for background, would, if included, have undermined the probable cause established in the affidavit.  See Rajaratnam, 719 F.3d at 146.  This argument is meritless and provides no basis for a Franks hearing.

The information in Agnifilo's affirmation also is not true.  The articles referenced by the government in paragraph six of the December and January Warrants were authored by

14

Suzanna Andrews of Vanity Fair,[1] Michael Freedman of Forbes,[2] and James Odato and Jennifer Gish of the Times Albany Union.[3]  Although the government is aware of evidence that Raniere and others sought to have charges brought against Odato and Andrews, none were ever brought. There has been no allegation of wrongdoing against Freedman or Gish.  Raniere offers no support for his assertion that reporters from the Albany Times Union and Vanity Fair "hacked" into Nxivm servers (Aff. ¶ 10), and Agnifilo's reference to a criminal plea by John Tighe and the three individuals Tighe named in the course of his allocution is irrelevant to the point for which he offers it as support.  (Id.).  Tighe was a blogger, Jim O'Hara was a former Nxivm lawyer who had a falling out with the organization, and Toni Foley/Natalie is a former girlfriend of Raniere.  None of the three were journalists for the publications underlying the affiant's challenged statement and none, to the government's knowledge, were involved in writing the relevant articles.  As noted above, Odato wrote for the Times Albany Union, but the double hearsay in Tighe's plea allocution as to a journalist who was one of two authors of one of several articles referenced on background is irrelevant to the probable cause established in the affidavit.

Raniere also takes issue with the affiant's description of Nxivm's lawsuits against critics.  (Br. 3).  Raniere does not direct the Court to the purportedly inaccurate statement, cf.

_____

[1]    Suzanna Andrews, The Heiress and the Cult, Vanity Fair (Oct. 13, 2010), https://www.vanityfair.com/culture/2010/11/bronfman-201011.

[2]    Michael Freedman, Cult of Personality, Forbes (Oct. 13, 2003), https://www.forbes.com/forbes/2003/1013/088.html

[3]    James Odato and Jennifer Gish, Secrets of NXIVM, Times Albany Union (Feb. 11, 2012), available at https://www.timesunion.com/local/article/Secrets-of-NXIVM-2880885.php.

Franks, 438 U.S. at 171 ("They should point out specifically the portion of the warrant affidavit that is claimed to be false."), but he appears to be referencing the following sentence, which appears in the December Warrant and the January Warrant: "Nxivm and Raniere have filed numerous lawsuits against critics, including journalists."[4]  (Ex. 1 ¶ 6; Ex. 2 ¶ 6).  Here again, Raniere does not take issue with the veracity of this statement, which does not characterize the litigation or assert the purpose of the lawsuits.  Rather, he suggests that it is somehow relevant that three purported Nxivm critics were referenced in the course of Tighe's state court plea allocution (Aff. ¶ 10), and that the aforementioned journalist at the Albany Times Union was put on leave by the paper (id. ¶ 11).  Raniere does not (and could not) assert that this group of individuals represents the universe of "critics" against whom Raniere and Nxivm have filed suit and he again fails to identify the source of the government's obligation to disclose this information, how it misled the court, or how it was "necessary" to the probable cause determination.  This argument is equally baseless.

Finally, on this point, Raniere takes issue with the affiant's statement that "[s]ince defecting, several DOS victims have received 'cease and desist' letters from a Mexican attorney, and Clare Bronfman has filed a criminal complaint against one victim in Canada."  (Aff. ¶ 14-15; Ex. 1 ¶ 24).  Raniere acknowledges the truth of this statement, but suggests that the government should have provided details about Bronfman's allegations in Canada against a DOS victim.  (Aff. ¶¶ 15-16).  Raniere fails to explain how this information about Bronfman's attempt to bring

---

[4]     Raniere incorrectly asserts that the affidavits "stat[e] that Nxivm brings frivolous, vexatious litigation against 'critics'…."  (Aff. ¶ 10).  None of the three affidavits use the words "vexatious" or "frivolous."

charges would have materially affected the probable cause assessment, particularly in light of the affiant's disclosure that Bronfman had filed the criminal complaint. In any event, Raniere fails to note that the Vancouver Police Department investigated Bronfman's claims and declined to bring charges against the DOS victim. (DE 202).

Second, Raniere asserts that "the Government" – not the affiant, as would be relevant to a Franks hearing – "mischaracterized Raniere's departure from the United States to Mexico." (Br. 4). Raniere's attribution of this statement to the "Government" is not a mistake; this argument does not actually concern the affidavit, but rather seeks to relitigate a bail argument made by the prosecution team in this case. This is clear from Raniere's citation to paragraph 18 of the Agnifilo affirmation, which asserts that "[t]he affidavit also falsely stated that Raniere evaded law enforcement, specifically that he fled to Mexico in response to a New York Times article." (Aff. ¶ 18). Although the government made this assertion in sum and substance at Raniere's bail hearing, the affidavits say no such thing. Rather, paragraph 23 in the December and January Warrants says:

> In or around November 2016, several weeks after the New York Times broke a story on DOS, and days after the FBI began interviewing witnesses, Raniere flew to Mexico with Clare Bronfman.

(Ex. 1 ¶ 23; Ex. 2 ¶ 23; Aff ¶ 18). Raniere does not – and cannot – challenge the veracity of this statement. The affiant stated an undisputed fact and the magistrate judge properly considered it in the context of the entire warrant.

It is baseless to suggest, as Raniere does, that it is relevant – much less material to the probable cause assessment – that he had previously been in Mexico. (Aff. ¶¶ 19-21). The fact that Raniere was apparently familiar with, and comfortable in, Mexico, and had resources and

17

connections there, only strengthens the government's bail argument that he is a flight risk. It is completely irrelevant to the affidavits, which did not assert that Raniere "evaded" law enforcement or "fled" to Mexico (Aff. ¶ 18), but rather stated the uncontested fact that Raniere left the country shortly after the FBI investigation began. Raniere cannot show that this statement was intentionally or recklessly false or, even if they could make such a showing, that the statement was material to the probable cause assessment. This argument should be rejected.

Third, Raniere asserts that the "affidavit misrepresents to the Court the reasons that many women joined [DOS]." (Br. 4). The support he offers for this assertion is Agnifilo's recitation of purported facts of which Agnifilo has no first-hand knowledge and for which he offers no support. (Aff. ¶¶ 24-25). These unsupported assertions are not an "offer of proof" and are legally irrelevant to Raniere's request for a <u>Franks</u> hearing. <u>See</u> <u>Franks</u>, 438 U.S. at 171.

Equally irrelevant is Raniere's assertion that statements in the affidavit attributed to Jane Doe 3 and Jane Doe 4 are "obviously false." (Aff. ¶ 24). It does not matter whether by this statement he intends to suggest that the affiant mischaracterized the statements made by Jane Does 3 and 4, or that Jane Does 3 and 4 misled the affiant. Agnifilo has no personal knowledge of facts relevant to the former argument and the latter would be irrelevant to a showing of law enforcement – not witness – misconduct necessary to entitle him to a <u>Franks</u> hearing. <u>See</u> <u>Salameh</u>, 152 F.3d at 113 (explaining that movant must show intentional or reckless disregard for the truth). This baseless and unsupported argument should be rejected.

Fourth, Raniere directs the court to a purported inconsistency between the warrant affidavits and notes taken by two bloggers, and they assert that the inconsistency "goes to the heart of the allegations of fraud, coercion and deception." (Br. 4; Aff. ¶¶ 25-27). The premises of Raniere's argument are that (1) there is an inconsistency between the affidavit and the blogger's

18

notes; (2) the blogger's notes accurately reflect Jane Doe 4's statement and the affidavit does not; and (3) the statement reflected in the blogger's notes undermines the government's theory of fraud. None of these three premises withstand scrutiny.

To begin with, the central premise of Raniere's argument is incorrect: the statements in the affidavit are not inconsistent with the blogger's notes and provide no evidence of the affiant's intentional or reckless disregard for the truth. The affidavit asserts that

> [a]t one point, while Jane Doe 4 was filming, she noticed a text come in from "KAR" asking, in sum and substance, how the branding was going. At the time, Jane Doe 4 assumed "KAR" stood for Karen Unterriner, a high-ranking woman in Nxivm, who she assumed was Lauren Salzman's slave. Jane Doe 4 now believes the message was from Raniere, whose middle name is "Alan."

(Ex. 1 ¶ 48; Ex. 2 ¶ 45). The blogger's notes say "[a]t one point, [Jane Doe 4] was asked to hold Lauren Salzman's cell phone. She saw a text come in from Keith [Raniere] asking how the girls were doing. She was previously unaware that he was involved with/guiding/or monitoring the activities of DOS." (Aff. Ex. 7 at 3).

Raniere is incorrect that these statements are inconsistent with respect to the point at which Jane Doe 4 realized "KAR" was Raniere, rather than Karen Unterriner. Indeed, the blogger's notes say nothing about <u>when</u> Jane Doe 4 realized that the text was from Raniere and suggest only that Jane Doe 4 was aware the text was from Raniere by the time she spoke to the blogger. The affidavit, by contrast, provides a careful chronology of these events. Contrary to Raniere's assertions, the notes do not contradict the affidavit, much less evince intentional or reckless disregard for the truth, and they provide no basis for a <u>Franks</u> hearing.

Moreover, even if Raniere were correct that the blogger's notes say that Jane Doe 4 realized <u>during</u> the branding ceremony that Raniere was involved in DOS, that hardly "goes to

19

the heart" of the government's theory of fraud.  Indeed, even on that understanding, Jane Doe 4 would not have known of Raniere's involvement in DOS until <u>after</u> she was recruited to DOS, <u>after</u> she provided initial collateral, <u>after</u> she provided additional collateral, and <u>after</u> she provided still more collateral because the previous collateral was not "damaging enough."[5]  (Ex. 1 ¶¶ 43-48).  If, as Raniere asserts, Jane Doe 4 learned of Raniere's involvement while the smell of burning flesh from the branding ceremony was still in the air, it would do nothing to undermine the government's theory of fraud.  For this reason, even if Raniere were correct about the alleged inconsistency, the misstatement would not have undermined the point made in the challenged paragraph that Raniere's involvement in the organization was not disclosed to DOS members and prospective members.  Consequently, it is not "material" for purposes of the <u>Franks</u> analysis.  <u>See</u> <u>Canfield</u>, 212 F.3d at 718 ("If the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate.").

<u>Fifth</u>, Raniere asserts that the affiant misled the court in the emphasized sentence below:

> On or about January 14 and 15, 2018, a "Coaches Summit" was held in Albany, New York for Nixvm coaches.  <u>According to a blog that covers Nxivm, people present at the meeting reported that Mack, Salzman and another woman, Nikki Clyne, claimed to be the founders of DOS and further stated that Raniere was not involved in DOS.</u>  The blog also posted a photograph of Mack leaving the facility where the Coaches Summit was taking place.

---

[5]     The affidavit mistakenly asserts that the branding ceremony took place in March 2016.  In fact, it took place in March 2017, a short time after Jane Does 3 and 4 were inducted into DOS in "early 2017."  (Ex. 1 ¶ 43; Ex. 2 ¶ 41).

(Ex. 2 ¶ 25 (emphasis added); Br. 5).  Again, Raniere does not and cannot challenge the veracity of the statement.  The warrant affiant correctly identified the source of the information as a "blog" and accurately described the content of the post.  Rather, Raniere suggests that the government has an obligation to provide what amounts to impeachment information about reporters and bloggers on matters collateral to the content of their reporting.  (Aff. ¶¶ 31-34).

This argument is baseless for the reasons stated above.  Raniere provides no legal authority to support his assertion that the government is required to provide impeachment-type material under these circumstances.  See Gates, 462 U.S. at 230-40 (discussing probable cause assessment of "veracity" and "basis of knowledge" of informants).  Nor does Raniere attempt to explain how the affiant's factually correct statement was misleading in light of the impeachment-type information he has identified, or how the purported omission could possibly have been "necessary to the issuing judge's probable cause determination."  Canfield, 212 F.3d at 718.  To the contrary, the reviewing magistrate was properly informed that the source of the information was a "blog," and the judge would have taken that into consideration in assessing the significance of the information.  Moreover, the inclusion of the information identified by Raniere would have had no effect on the probable cause determination.  The challenged sentence is one of three in the paragraph, which is one of 12 paragraphs under the heading "DOS Overview" in the December Warrant.  (Ex. 1 ¶¶ 14-25).  In the 10 paragraphs preceding the above-quoted paragraph, the affiant conveyed information "based upon conversations with "DOS victims and several other former Nxians."  (Ex. 1 ¶ 14).  Raniere does not challenge any of the information contained in those paragraphs.  This single sentence was immaterial to the probable cause determination and provides no basis for a Franks hearing, even assuming the affiant should have included the impeachment-type information.  See Rajaratnam, 719 F.3d at 146.

21

Sixth, and finally, Raniere challenges the affiant's description of a nearly two-year period during which Jane Doe 4 – a previous sexual partner of Raniere's – was confined to a bedroom "after she developed romantic feelings for a man who was not Raniere, in part to extract work from her." (Ex. 3 ¶ 16e). Raniere's assertions are internally inconsistent; they claim without support that Jane Doe 4's "stay" was "voluntary," and in the next sentence assert that she was "control[ed]" by her family, not Raniere and Salzman. (Br. 5). Given this contradiction, it is not clear what "portion of the warrant affidavit . . . is claimed to be false." Franks, 438 U.S. at 171.

It is abundantly clear, however, that Agnifilo has no first-hand knowledge of the relevant facts and no basis upon which to offer an affirmation on the subject. Notably absent from Raniere's motion on this (or any other) point, is an affidavit or offer of proof from him or his co-defendant Lauren Salzman. (Aff. ¶¶ 41-44). See Franks, 438 U.S. at 171 ("those allegations must be accompanied by an offer of proof. . . . Affidavits or sworn or otherwise reliable statements of witnesses should be furnished"). Raniere's failure in this regard is alone sufficient grounds to reject this argument.

That the argument is directly contradicted by the document Raniere cites is another reason to reject this argument. (Aff. ¶ 42 (citing Ex. 9)). Raniere relies primarily on Exhibit 9, an email chain on November 8 and 9, 2010, between Raniere and Lauren Salzman, which in fact confirms their role in confining Jane Doe 4 to her room. At the time, Jane Doe 4 had been in the room for approximately 8 of the 23 months she would eventually spend there. Salzman's November 8 email to Raniere states in full:

> Doomp,
> I'm going to sleep but apparently [Jane Doe 4][6] wrote a letter that said "let me out I'm coming undone". ░░░░░░ intercepted it and didn't show the parents bc they are so reactionary.  She instead texted me asking for permission to speak to [Jane Doe 4].  I told her "no" and explained why I thought it was bad on a postulate level.  I am not going there tonight b/c of the letter, but I will stop by in the morning.  Probably around 8am.  I plan to explain to [Jane Doe 4] that I think she's had a huge setback and this focus of "let me out of the room" is totally in the opposite direction of healing a breach.  If there's anything that you think I should add or do differently please let me know.  If not, and if you're ok with what I'm planning I'll just report in afterwards.  I will call you before I go over there in the morning, but I've not been able to reach you mornings this week.  If possible I'd like to sleep through the night tonight, but if there's anything urgent you need to tell me about this you can wake me.  If not, I'll be up around 6:30am.
> Love you.
> xx

(Ex. 9).

This email confirms the truth of the affiant's statement and directly contradicts Raniere's baseless assertions.  First, the email confirms that Jane Doe 4 was, in fact, confined to a room for an ethical "breach."  Second, the email confirms that Jane Doe 4 was held there against her will; she attempted to write to her parents with a request to be "let out" because she was "coming undone."  Third, the email confirms that Salzman prevented Jane Doe 4's plea from reaching her parents, for fear that her parents would let her out ("[Jane Doe 4's sister] . . . didn't show the parents bc they are so reactionary").  Fourth, the email confirms that Salzman and Raniere were among those responsible for Jane Doe 4's confinement, and that Salzman

---

[6]    The redacted word is a nickname used by Raniere, Salzman and others to refer to Jane Doe 4 in the Raniere October Warrant.

viewed Raniere as the ultimate decision-maker on the subject ("If there's anything that you think I should add or do differently please let me know.  If not, and if you're ok with what I'm planning I'll just report in afterwards.").  Fifth, the email confirms that Jane Doe 4's sister viewed Salzman as the decision-maker on Jane Doe 4's confinement insofar as she believed she had to ask Salzman "for permission" to speak to Jane Doe 4.  Salzman denied the request on this occasion.  Sixth, the email indicates that Salzman cancelled a visit to Jane Doe 4 – who was already "coming undone" – as punishment for Jane Doe 4's letter to her parents, corroborating Salzman's role as a decision-maker in Jane Doe 4's confinement.  Seventh, the email confirms that Salzman planned to speak to Jane Doe 4 the next day and that Jane Doe 4 would not be let out of the room ("this focus of 'let me out of the room' is totally in the opposite direction of healing a breach").

      Raniere's response to Salzman's email does not support his argument and instead confirms that he had the final word on Jane Doe 4's confinement.  As an initial matter, his response makes clear that he was aware of Jane Doe 4's long-term confinement ("for as long as she has"), supported it, and served as an advisor to Salzman about how to continue it.  He advised Salzman not to be swayed by Jane Doe 4's petition for release or her plea that she was "coming undone" ("You do not want to buy into [Jane Doe 4's] tantrum or externalizations.").  He further advised Salzman on how to handle her discussion with Jane Doe 4 the next day ("You might try asking…") and dismissed her suffering as a product of her "entitlement."

      Nor do the emails attached to Raniere's motion as exhibits 10 and 11 contradict the warrant affiant's statement.  As the affiant was aware at the time of the affidavit, and as the government will prove at trial through documentary and witness testimony, Raniere and other members of the Enterprise directed Jane Doe 4's family to send Jane Doe 4 to Mexico with little

money and no identity or immigration documents as punishment for Jane Doe 4 having left the room in which she was confined for two years.

The documentary evidence and witness testimony confirms that Jane Doe 4 suffered a horrific trauma at the direction of Raniere and other members of the Enterprise. The affiant provided a factual, accurate and non-sensational description of the event. There is no basis for a <u>Franks</u> hearing.

      B.     <u>Bronfman's Motion to Suppress</u>

Bronfman moves to suppress the March and Bronfman October Warrants as overbroad and insufficiently particular. As set forth below, Bronfman misreads the relevant case law and her arguments are without merit. Even if her arguments were meritorious, however, Bronfman's motion would fail because the agents relied in good faith on the magistrate judges' probable cause determinations. She offers no evidence of deliberate, reckless or grossly negligent law enforcement conduct, and her unsupported incantations to the contrary provide no basis for the Court to exercise the "last resort" of suppression. Bronfman also asserts that the government exceeded the scope of the March Warrant, and this argument, too, is meritless.

1.    The March and October Warrants Are not Overbroad

a.    The Warrants Establish Probable Cause for the Identified Offenses

As an initial matter, Bronfman misunderstands the probable cause showing the government must make in order to secure a search warrant. When a magistrate judge assesses probable cause for a search warrant, the reviewing magistrate must first determine "the offenses for which probable cause has been established." Galpin, 720 F.3d at 445-46. Contrary to Bronfman's suggestion, however, the question before a magistrate at this stage is not whether there is probable cause to believe the identified crimes were committed by the person who owns or controls the thing to be searched. (Br. 9, 17 (suggesting that the search warrants were overbroad because they did not establish probable cause as to Bronfman's participation in the identified crimes[7])). Rather, a search warrant is addressed to the link between alleged crimes and the place or thing to be searched not, as she suggests, to the link between alleged crimes and a particular person; evidence of the latter would support an arrest warrant or indictment. As the Supreme Court explained in Steagald v. United States,

> [W]hile an arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review, the interests protected by the two warrants differ. An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore

---

[7]    See, e.g., Br. 17 (suggesting that probable cause to search for certain alleged crimes did not exist because "Bronfman was charged in only a handful of counts and predicate acts [and] the grand jury plainly did not find probable cause to believe that Bronfman was involved in the other offenses").

> safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.

451 U.S. 204, 212–13 (1981).  Indeed, as the Court is aware, information obtained by the government in the course of a court-authorized search of a place often subsequently establishes probable cause that the person who owns or controls the searched location committed the identified crimes.

Bronfman does not contest that the March and Bronfman October Warrants established probable cause to believe that the identified offenses had been committed.  (Ex. A ¶ 4; Ex. C ¶ 5).[8]  Rather, she argues that it is relevant to the search warrant applications that the affidavits do not allege that she personally committed each of the identified crimes.  That standard must, of course, be met with respect to an arrest warrant or indictment, but there is neither legal

---

[8]    The March Warrant asserts that "[b]ased on the facts set forth in this affidavit, there is probable cause to believe that users of the Subject Accounts . . . and others have committed violations of 18 U.S.C. § 875 (interstate threats to injury property or reputation), 18 U.S.C. § 1028A (aggravated identity theft), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1546 (visa fraud), 18 U.S.C. § 1591 (sex trafficking by force, fraud or coercion and interference in an investigation into sex trafficking by force, fraud or coercion), 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1952 (using an interstate facility to commit unlawful activity, i.e., extortion), and 18 U.S.C. § 1962 (engaging in a pattern of racketeering activity)."  (Ex. A ¶ 4).

    The Bronfman October Warrant asserts that "[b]ased on the facts as set forth in this affidavit, there is probable cause to believe that the information described in Attachments A-1 and A-2 contains evidence, contraband, instrumentalities and/or fruits of violations of 18 U.S.C. § 1028 (identity theft), 18 U.S.C. § 1324 (encouraging and inducing illegal entry and harboring of aliens), 18 U.S.C. § 1349 (conspiracy to commit wire fraud), 18 U.S.C. § 1512 (obstruction of justice), 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1591 (sex trafficking), 18 U.S.C. § 1592 (document servitude), 18 U.S.C. § 1952 (using an interstate facility to commit unlawful activity, i.e., extortion), 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 1962 (engaging in a pattern of racketeering activity), ▮▮▮▮▮▮▮▮▮▮▮▮

nor logical support for her assertion that it applies to search warrants. See United States v. Canfield, 212 F.3d 713, 718 (2d Cir. 2000) ("Probable cause is a practical, commonsense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." (emphasis added; internal quotation marks and alterations omitted)).

The March Warrant explains that a magistrate judge had already found probable cause to believe that Raniere had committed crimes related to sex trafficking and forced labor and the criminal complaint was attached to the search warrant affidavit as Exhibit 1. (Ex. A ¶ 5, Ex. 1). As Bronfman concedes, the facts set forth in the affidavit established probable cause to believe that Bronfman herself had participated in visa fraud, in violation of 18 U.S.C. § 1546. (Br. 9; Ex. A ¶ 44-45). In addition, the affidavit included allegations establishing probable cause to believe that members and associates of DOS, including Raniere, engaged in (1) wire fraud, in violation of 18 U.S.C. § 1343, by making material misrepresentations about DOS to members and prospective members, including stating that it was a women-only organization, concealing Raniere's involvement and concealing the sexual aspects of DOS, and thereby obtained collateral from members and prospective members through a scheme to defraud (Ex. A   ¶¶ 13-25, 31 (incorporating facts set forth in complaint against Raniere), Ex. 1 (complaint against Raniere));[9] (2) use of an interstate facility to commit state law extortion, in violation of 18 U.S.C. § 1952, in connection with demands that members and prospective members of DOS (a) provide "collateral"

_____

[9]    These allegations also formed the basis of Count Three of the superseding indictment returned by the grand jury in this matter on July 23, 2018. (DE 50).

that DOS "masters" threatened – at Raniere's direction – to release if the member or prospective member did not provide additional collateral (id. ¶ 18); (b) perform sufficient acts of care (id. ¶ 21); or (c) refuse to have sex with Raniere when assigned to do so by their "master" (id. ¶ 23) (see generally id. ¶¶ 13-25; Ex. 1 (complaint)); (3) interstate threats to injure property or reputation, in violation of 18 U.S.C. § 875, in connection with Raniere and Bronfman sending "cease and desist" letters from a Mexican attorney and pursing criminal charges against women who defected from DOS (id. ¶ 31, Ex. 1 ¶ 35); and (4) aggravated identity theft, in violation of 18 U.S.C. § 1028A, in connection with Raniere's use of the email account of Pam Cafritz, "one of Raniere's lovers and close confidants for several decades," and who "died in November 2016" (id. ¶¶ 35-43).  Further, these violations of 18 U.S.C. §§ 1343, 1546, 1591, 1589, and 1952 all serve as racketeering predicates and, together with March Affidavit's assertion of facts that support the existence of an enterprise the affairs of which were conducted through these crimes, give rise to probable cause that a violation of section § 1962 had been committed.

The Bronfman October Warrant also established probable cause to believe that the crimes listed in paragraph five of the affidavit had been committed.  (Ex. C ¶ 5).  Indeed, on July 22, 2018, nearly three months before the October Warrant was authorized, a grand jury sitting in the Eastern District of New York returned the operative superseding indictment against Bronfman and her five co-defendants, charging the defendants variously with crimes and/or racketeering acts in violation of 18 U.S.C. §§ 1028, 1324, 1349, 1512, 1589, 1591, 1592, 1956 and 1962.  (Ex. C. ¶¶ 11-14; DE 50).  See, e.g., United States v. Feng Ling Liu, No. 12 CR. 934, 2014 WL 101672, at *5 (S.D.N.Y. Jan. 10, 2014) (collecting cases in which reviewing court relied on indictment in part to establish probable cause).  The superseding indictment did not charge a violation of "using an interstate facility to commit unlawful activity, i.e., extortion," because it instead alleged New

29

York state law extortion as racketeering acts seven and eight in Count One.  Bronfman was personally charged with racketeering conspiracy, in violation of 18 U.S.C. § 1962 (Count One), premised on alleged racketeering acts of identity theft conspiracy, 18 U.S.C. § 1028 (Racketeering Acts ("RA") 2, 10 and Count 7); and encouraging and inducing illegal entry, 18 U.S.C. § 1324 (RA 5).  These crimes are described in part in the October Warrant in paragraphs 16b (RA 2), 16d (RA 5) and 16f (RA 10, Count 7).

b.      The Warrants Establish a Fair Probability to Believe Evidence of the Crimes Would Be Found in the Places to Be Searched

In addition, the March and October Warrants both established a "fair probability" to believe that evidence, contraband, instrumentalities and/or fruits of these crimes would be found in the places to be searched.  See Wagner, 989 F.2d at 71-72.  As the Second Circuit has explained, "[a] showing of nexus [between the criminal activity and the thing to be searched] does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience."   Singh, 390 F.3d at 182 (internal quotation marks omitted).  Moreover, the government need not establish that the place to be searched will contain "smoking gun," or direct, evidence of the identified crimes.  See United States v. Abu-Jihaad, 630 F.3d 102, 132 (2d Cir. 2010) (explaining, in context of more exacting standard for admission of evidence under Rule 401, that to be relevant "evidence need not be sufficient by itself to prove a fact in issue, much less to prove it beyond a reasonable doubt"); see also Old Chief v. United States, 519 U.S. 172, 179 (1997) ("The fact to which the evidence is directed need not be in dispute.").  The facts alleged in the Warrants easily met this standard.

i.    The March Warrant

With respect to the March Warrant, Bronfman first incorrectly asserts that the government had "no justification" for searching the Bronfman Account for "DOS-related evidence."[10]  But the warrant describes (1) the structure and practices of DOS (Ex. A ¶¶ 13-25); (2) the high-profile defection of a DOS "slave," which led to "some defection of Nxians, including a member of the Executive Board and additional DOS members" (id. ¶ 26); and (3) revelations about DOS in the press, the subsequent FBI investigation, Raniere's departure from the United States and statements by Raniere and Nxivm disclaiming that Raniere had any 'involvement in or knowledge of the practices of DOS" (id. ¶¶ 26-29).  In light of the further allegation that "high-ranking Nxians" (id. ¶ 29), including Bronfman (id. ¶ 45), were in "communicat[ion] . . . regarding how Nxivm should respond to the media reports regarding DOS" (id. ¶ 29, 45), there was a "fair probability" to believe that these categories of information would be found in the Bronfman Account.  Indeed, it is more than a "fair probability" that any discussion about how to deal with the damaging reports about, and investigation into, the DOS practices discussed in paragraphs 13-

---

[10]    Presumably, Bronfman is referring to the categories of "information to be seized by the government" listed on Attachment B-2, Part II, items a-h, j-k: "[c]ommunications between and among KEITH RANIERE and any DOS members," "[e]vidence of enticement or recruitment of women to have sex with KEITH RANIERE," "[e]vidence of grooming of women to be sexual partners for KEITH RANIERE," "[e]vidence of KEITH RANIERE'S involvement with DOS and efforts to keep his involvement hidden from DOS members," "[e]vidence of branding of DOS members and attempts to conceal the same," "[e]vidence of extortion of DOS members, including requests for collateral," "[e]vidence related to the organization structure and hierarchy of Nxivm and DOS," "[e]vidence of miscellaneous jobs members of DOS were ordered to undertake without pay," "[e]vidence of attempts to contact DOS/Nxivm defectors," and "[e]vidence of attempts to impede law enforcement's investigation into crimes committed by DOS/Nxivm."

31

25 of the March Warrant would include discussions relevant to establishing the facts of those practices, other participants and victims, as well as knowledge and consciousness of guilt.  The likelihood of finding these discussions in the Bronfman account is heightened by the fact that Bronfman was Raniere's "financial backer" (id. ¶ 46), and the negative press and investigation would have had a negative impact on her interest and investment in Raniere and Nxivm.  It was plainly appropriate for the magistrate judge to approve the government's request to search for this information in the Bronfman Account.

Next, Bronfman misreads the March Warrant when she asserts that Attachment B-2, Part II, item n – "[a]ny records pertaining to the means and source of payment for services" – would allow the government to "scour" the Bronfman account for "any and all records of transactions," even if unrelated to this case.  (Br. 10).  Item n refers to payment for services related to the Bronfman Account.  This is clear from the plain language of the item, which does not refer to bank records or credit card statements, and from its context among requests for information relevant to attribution (item l) and access (item m).

Finally, Bronfman incorrectly asserts that Attachment B-2, Part II, item g – "[e]vidence related to the organization structure and hierarchy of Nxivm" – "could conceivably have allowed" the government to seize "any emails that discussed NXIVM business."  (Br. 10). The argument is not supported by the language in the attachment and there is no evidence the government viewed the provision as Bronfman asserts.  Indeed, if that had been the understanding of the government at the time of the March Warrant, and if the government had in fact conducted the search alleged by Bronfman following the March Warrant, the government would not have sought the October Warrant.  The October Warrant confirms that the government had not yet undertaken the broader search of Nxivm related documents alleged by Bronfman; such a search

was, after all, a central purpose of the October Warrant.  (Ex. C ¶ 15, n. 1).

██████████████████████████████████████████████████████████████

████████████████████████████████  as a result of which the magistrate judge permitted

the government to seize several categories of documents related to Nxivm's business and the

Enterprise's Nxivm-related criminal activity.  (See, e.g., Ex. C Att. B-2 items m-p).[11]  The October

Warrant is evidence of the government's good faith and of Bronfman's willful misreading of both

warrants.

ii.    The October Warrant

With respect to the Bronfman October Warrant, Bronfman incorrectly asserts that

the government failed to establish probable cause that evidence of wire fraud, obstruction of

justice, forced labor, sex trafficking, document servitude, and extortion would be found in her

email account.  (Br. 17).  As an initial matter, at the time of the October Warrant, the government

had established probable cause to the satisfaction of a grand jury that Bronfman and others had

agreed to form the charged Enterprise, of which Bronfman would be a member or associate, and

that she and her codefendants had agreed to conduct the Enterprise through a pattern of

racketeering activity, including all of the crimes she lists on page 17 of her brief ████████████

---

[11]    Even if Bronfman were correct about item g in the March Warrant, the discovery of those materials pursuant to the October Warrant was inevitable and independent of the March Warrant and suppression is not warranted.  See United States v. Mulholland, 702 F. App'x 7, 10 (2d Cir. 2017) ("When . . . evidence is obtained pursuant to a warrant issued after an illegal search, the independent source doctrine applies if, "(1) the warrant [was] supported by probable cause derived from sources independent of the illegal [search]; and (2) the decision to seek the warrant [was] not . . . prompted by information gleaned from the illegal conduct." (quoting United States v. Johnson, 994 F.2d 980, 987 (2d Cir. 1993)).

See United States v. Pirk, 292 F. Supp. 3d 584, 589 (W.D.N.Y. 2017) (assessing search warrant and finding that, "while the affidavit did not simply rely on the charging by indictment of [the defendants] with various crimes, including firearm offenses, the existence of the Indictment supports a finding of probable cause to believe a crime was committed"); United States v. Mouzon, No. 16 CR 284 (CM), 2016 WL 7188150, at *4 (S.D.N.Y. Dec. 2, 2016) (assessing search warrant and finding that the magistrate judge "would have been all but justified in concluding, based solely on the facts alleged in the Indictment, that there was probable cause existed to believe that [defendant] had engaged in criminal activity.").

Moreover, the affidavit in support of the March Warrant was attached to the affidavit in support of the October Warrant and the government explained that it was seeking the October Warrant to supplement the March Warrant in an abundance of caution. (Ex. C ¶ 15). As set forth above, the March Warrant describes (1) the structure and practices of DOS (Ex. C, Ex. 3 ¶¶ 13-25); (2) the high-profile defection of a DOS "slave," which led to "some defection of Nxians, including a member of the Executive Board and additional DOS members" (id. ¶ 26); (3) revelations about DOS in the press, the subsequent FBI investigation, Raniere's departure from the United States and statements by Raniere and Nxivm disclaiming that Raniere had any 'involvement in or knowledge of the practices of DOS" (id. ¶¶ 26-29); (4) Bronfman role as Raniere's "financial backer" (id. ¶ 46); and (5) her role in addressing "how Nxivm should respond to the media reports regarding DOS" (id. ¶ 29, 45). This establishes more than a "fair probability" that that categories of information she challenges – which relate to DOS (id. ¶ 13-25) – would be found in the Bronfman Account.

34



Finally, Bronfman asserts that the warrant was overbroad because it authorized the seizure of "innocent materials," including materials relating to Raniere's "teachings." (Br. 18). Bronfman cites no legal support for this argument and the government is aware of none. See United States v. Fama, 758 F.2d 834, 838 (2d Cir. 1985) ("[t]he fact that an innocent explanation may be consistent with the facts as alleged . . . does not negate probable cause"). The government is plainly entitled to seize otherwise "innocent" materials that are evidence of criminal activity in light of the facts and circumstances of the particular search and seizure. See United States v. Gaskin, 364 F.3d 438, 457 (2d Cir. 2004) ("[C]ourts recognize that experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a

35

layman might not."). Nxivm and Raniere's "teachings" are discussed in the arrest warrant for Raniere (Ex. C Ex. 1 ¶ 3-10), are relevant to the charged Enterprise (Superseding Indictment ¶¶ 1, 2, 6g, 7-12, 22), and will be part of the government's case at trial as evidence related to certain charges and racketeering acts and as background to explain the codefendants' relationships and the formation of DOS, among other things. It was appropriate for the government to seize documents responsive to this item in connection with the October Warrant.

2.    The Warrants Are Particular

Bronfman incorrectly asserts that both Warrants are effectively "general warrants" that permitted the government to search for evidence of any criminal activity. (Br. 11, 19). That assertion is belied by Attachment B-2 to each of the Warrants, which specifies the "Information to be disclosed by Google" (Ex. A Att. B-2, Part I; Ex. C Att. B-2, Part I) – i.e., the types of data the government sought – and the "Information to be seized by the Government" (Ex. A Att. B-2, Part II; Ex. C Att. B-2, Part II) – i.e., the criminal activity for which the warrant established probable cause to seize documents. Attachment B-2 to each Warrant specifies with particularity (1) the offenses for which probable cause has been established; (2) the place to be searched; and (3) the items to be seized relating to the specified offenses. See Galpin, 720 F.3d at 445-46.

Bronfman offers no legal support for her primary argument that the list of crimes identified in Attachment B-2, Part II in both Warrants is insufficiently particular to satisfy the Fourth Amendment. In asserting otherwise, she misreads United States v. George, 975 F.2d 72, 76 (2d Cir. 1992), United States v. Buck, 813 F.2d 588 (2d Cir. 1987), and United States v. Gigante, 979 F. Supp. 959 (S.D.N.Y. 1997), none of which speak to the issue that she raises. (Br. 12, 19-21). It is true that in George, for example, the Court explained that "[m]ere reference to 'evidence' of a violation of a broad criminal statute or general criminal activity provides no readily

ascertainable guidelines for the executing officers as to what items to seize." George, 975 F.2d at 76.

But the court's concern in George was that the warrant's "mere reference to 'evidence'" did not specify what kinds of things it permitted the government to search for, i.e., particular documents, computers, phones, photographs, firearms, drugs, items of clothing, or some other kind of "evidence." Indeed, the paragraph from which Bronfman's quote is drawn begins by noting that "[a] failure to describe the items to be seized with as much particularity as the circumstances reasonably allow offends the Fourth Amendment." Id. at 76. Buck, cited in Galpin, addressed the same issue and found the warrant lacking where it permitted the government to seize "any papers, things or property of any kind relating to" the crime under investigation found anywhere within the house to be searched. Buck, 813 F.2d at 591 (discussed in George, 975 F.2d at 77). The warrant in Buck, in other words, identified only the "location to be searched and the crime or crimes to be investigated," and did not provide any guidance at all about the items to be seized. Id. The same was true in Gigante, in which the warrant also "mere[ly] refer[red] to 'evidence'" of certain crimes, without specifying the type of evidence or where it might be located. See Gigante, 979 F. Supp. at 966.[12]

_____

[12]    Nor does Gigante support Bronfman's assertion that the October Warrant is insufficiently particular insofar as it refers to "communications between and among" the defendants charged in the Superseding Indictment "and any unindicted coconspirators or victims." (Br. 20; Ex. C Att. B-2, Part II, c). This is an example of the kinds of documents that the government is entitled to seize as "contraband, fruits, evidence and/or instrumentalities" of the crimes identified in the first paragraph of Part II. It is therefore the criminal nature of the communication (i.e., it relates to the crimes listed in the preamble to Part II of the attachment), plus the presence of one or more of the named defendants – not the identity of the unindicted coconspirators or victims – that is relevant to the agents executing the warrant. This is easily

George, Buck and Gigante are inapposite to the March and Bronfman October Warrants. The government identified in great detail the information to be disclosed to the government by Google, and Bronfman does not challenge any part of those descriptions. (Ex. A Att. B-2, Part I; Ex. C Att. B-2, Part I). The warrant did not seek to rummage through Bronfman's house, or through her computer hard drive, for that matter. Cf. Buck, 813 F.2d at 591 (contrasting a search of a home with that of a safe deposit box and noting that in connection with a search of the latter "the mere identification of the location to be searched and the crime or crimes to be investigated are tolerable" under the Fourth Amendment). The affidavit established probable cause to believe that Bronfman's Google account would contain contraband, fruits, evidence and/or instrumentalities of the identified crimes, and it sought to search that particular, narrowly defined place for the particularly defined kinds of things specified in Part I of the attachments, as related to the specified offenses identified in Part II. See Galpin, 720 F.3d at 445-46.

The cases Bronfman cites that address the requirement that the government identify the offenses for which probable cause has been established make clear that her argument is meritless. The Court addressed this point in George, for example, in which the warrant failed to specify the criminal offense that was under investigation. The Court held that the Fourth Amendment is offended by "a general warrant authorizing the seizure of 'evidence' without mentioning a particular crime or criminal activity to which the evidence must relate." George, 975

---

distinguishable from the warrant at issue in Gigante, which purported to permit the government to seize, for example, financial records of unnamed individuals. See 979 F. Supp. at 966. In Gigante, unlike here, the fact that permitted the government to seize a particular document was the identity of the unidentified "criminal associates," a fact which would not have been immediately apparent to an agent executing the warrant. Id.

F.2d 77-78 ("In other words, the 'evidence' for which the officers were to search under the catch-all clause is not limited either to a generic classification, e.g., records or documents, or, even more egregiously, to a particular crime." (internal citation omitted)).  In United States v. Vilar, the court concluded that the warrant was insufficiently particular where it failed "to indicate what specific acts of wrongdoing are being investigated." No. 05-CR-621, 2007 WL 1075041, at *22 (S.D.N.Y. Apr. 4, 2007).  The warrant in Galpin suffered from a similar defect, and "the government d[id] not dispute" that the warrant was insufficient particular where it "generally authorized officers to search [defendant's] physical property and electronic equipment for evidence of violations of 'NYS Penal Law and or Federal Statutes."  720 F.3d 436 (2d Cir. 2013).  (Br. 12-13, 19).

These cases are inapposite where, as here, the warrant identifies the crimes to which the seized evidence must relate.  Unlike the warrants in George, Vila and Galpin, Part II of Attachment B-2 in both Warrants plainly "mentions a particular crime or criminal activity" to which the materials must relate in order to be seized by the government.  George, 975 F.2d 77-78. In addition, Attachment B-2, Part II to both Warrants provides further guidance to the agents executing the warrant in the form of a list of illustrative subjects to which the seized evidence may relate.  The March Warrant lists 16 subjects derived from the probable cause established in the warrant (Ex. A Attachment B-2, Part II, items a-p) and the October Warrant lists 21 subjects derived from the probable cause established in the warrant (Ex. C Attachment B-2, Part II, items a-u).  Bronfman cites no case in which a court has held that this level of detail is insufficiently particular under the Fourth Amendment.

Bronfman's specific challenges to the Bronfman October Warrant are equally meritless. (Br. 19-20). Attachment B-2, Part II, item b[13] provides an illustration of the kind of information that can be seized in light of the citation to 18 U.S.C. § 1962 in the first paragraph of Part II. It permits the government to search for "evidence pertaining to . . . [t]he structure of the Enterprise and means and methods of the Enterprise described in the" Superseding Indictment, "including conspiring to commit and committing crimes." But this is hardly tantamount to a "general warrant" that permitted the government to search for evidence of "any crime whatsoever." (Br. 19). The affidavit (and the Superseding Indictment itself) demonstrated probable cause to believe that Bronfman and her codefendants agreed to conduct the affairs of the charged Enterprise through a pattern of racketeering activities. The seizure of evidence of the structure and means and methods of the Enterprise as charged in the Superseding Indictment is plainly supported by the probable cause established in the warrant and by the probable cause found by the grand jury in returning the Superseding Indictment. To conclude otherwise would have the bizarre and illogical effect of limiting the government's search in inverse proportion to the breadth of the defendants' crimes.

---

[13]    Item b provides as follows: "The structure of the Enterprise and means and methods of the Enterprise described in the Superseding Indic[tment] captioned United States v. Raniere, et al., 18-[CR-]204 (S-1) (NGG), including conspiring to commit and committing crimes, demanding absolute commitment to RANIERE, including by exalting RANIERE's teachings and ideology, and not tolerating dissent; inducing shame and guilty in order to influence and control members and associates of the Enterprise; obtaining sensitive information about members and associates of the Enterprise in order to maintain control over them; recruiting and grooming sexual partners for RANIERE; using harassment coercion and abusive litigation to intimidate and attack perceived enemies and critics of RANIERE and encouraging associates and others to take expensive Nxivm courses, and incur debt to do so, as a means of exerting control over them and to obtain financial benefits for the members of the Enterprise."

It is nonsensical to assert, as Bronfman does, that the provision permitting the government to search for documents related to crimes charged in the Superseding Indictment would be "confusing" to an agent executing the search.  (Br. 20).  An agent executing this warrant would have no difficulty understanding that, in addition to the crimes alleged in the Superseding Indictment, the government had also established probable cause to believe <u>additional</u> crimes had been committed.  Unlike in <u>United States v. Zemlyansky</u>, 945 F. Supp. 2d 438, 460 (S.D.N.Y. 2013) (Br. 20), the various provisions describing the information to be seized are not in conflict, and do not require the executing agent to reconcile irreconcilable instructions.  <u>Cf. id.</u> (noting a "potential – albeit bizarre – reconciliation" of certain provisions that would have permitted "unlimited search and seizure" as to certain kinds of electronic devices, but not others).[14]

---

[14]    Bronfman correctly notes that the warrant did not list New York state law extortion among the preamble of crimes listed in Attachment B-2, Part II.  Instead, the preamble lists the Travel Act, 18 U.S.C. § 1952 (using an interstate facility to commit unlawful activity, i.e., extortion), a provision of federal law that – like 18 U.S.C. § 1962 – incorporates certain state crimes, in this case New York state extortion.  <u>See</u> 18 U.S.C. §§ 1952 (prohibiting interstate and international travel with intent to "promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of any unlawful activity," including extortion "in violation of the laws of the States in which committed"), 1961(1)(A) (defining "racketeering activity" to include "act[s] or threat[s] involving . . . [inter alia] extortion . . . which is chargeable under State law and punishable by imprisonment for more than one year").

The omission of § 1590 from the preamble was unintentional, but immaterial. (Br. 20).  Section 1590 prohibits trafficking "for labor and services in violation of this chapter." 18 U.S.C. § 1590.  The Superseding Indictment refers to § 1590 in Racketeering Acts 6A and B, both of which allege trafficking for, <u>inter alia</u>, labor and services in violation of § 1589.  There is therefore no evidence that could be seized in connection with the alleged violations of § 1590 that could not also be seized in connection with the alleged violations of § 1589, which is listed in the preamble.

41

Both the March and Bronfman October Warrants are sufficiently particular under the Fourth Amendment and Bronfman's motion on this ground should be denied.

3.    <u>The Government Did Not Exceed the Scope of the March Warrant</u>





### 4.    The Government Relied on the Warrants in Good Faith

Even if the Court were to find that the Warrants were lacking in probable cause, there is no basis to suppress the fruits of either Warrant.  In arguing to the contrary, Bronfman asserts that the warrants were "so deficient" that the government's reliance on them was not objectively reasonable.  But she relies primarily on George and Vilar for this proposition (Br. 16, 21) and, as described above, those cases are inapplicable where, as here, the government has identified the particular items to be seized, relating to the specified offenses.  See Galpin, 720 F.3d at 445-46.  Her remaining arguments are equally meritless.  As set forth in detail above, the government was not required to prove that Bronfman herself participated in the listed offenses to search her email account for documents related to those offenses (Br. 16) and the government did not exceed the scope of the March Warrant (Br. 16).  Bronfman has offered no evidence of law enforcement misconduct and suppression is therefore unwarranted.  See Rosa, 626 F.3d at 64; see also Leon, 468 U.S. at 911 ("[A]n assessment of the flagrancy of the police misconduct constitutes an important step in the calculus.").

### 5.    Bronfman's Argument about Third Parties is Meritless

Bronfman complains that the government produced the complete contents of two third-party email accounts to the defendants.  (Br. 22).  The government's review of those documents is ongoing, but in light of the extraordinarily compressed trial schedule in place at the time of the production and the need for the government to prioritize the review and production of search warrant results for the named defendants, the government did not believe it was prudent to withhold production until such time as the government's review was complete.  The government's production was a good faith effort to provide the defendants with potentially relevant documents in a timely fashion.  If the government had taken the opposite approach, Bronfman likely would have complained that the government had failed to timely provide the results of the relevant warrants.  In any event, Bronfman acknowledges that she lacks standing to raise this argument and it is not a basis to suppress the results of the two searches she identifies.  See United States v. Payner, 447 U.S. 727, 735 (1980) ("[T]he supervisory power does not authorize a federal court to suppress otherwise admissible evidence on the ground that it was seized unlawfully from a third party not before the court."); United States v. Anderson, 772 F.3d 969, 976 (2d Cir. 2014).

CONCLUSION

For the reasons set forth above, the government respectfully submits that the

defendants' motions are without merit and should be denied.

Dated:      Brooklyn, New York
            January 23, 2019

                                        Respectfully submitted,

                                        RICHARD P. DONOGHUE
                                        UNITED STATES ATTORNEY
                                        Eastern District of New York
                                        271 Cadman Plaza East
                                        Brooklyn, New York 11201

Moira Kim Penza
Tanya Hajjar
Kevin Trowel
Assistant United States Attorneys
        (Of Counsel)

47