UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

   -  v.  -

KEITH RANIERE, CLARE BRONFMAN,
ALLISON MACK, KATHY RUSSELL,
LAUREN SALZMAN, and NANCY SALZMAN,

                      Defendants.

No. 18-cr-204 (NGG)

**ORAL ARGUMENT REQUESTED**

**Date of service:  January 9, 2019**

**SEALED MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
CLARE BRONFMAN'S MOTION TO SUPPRESS**

Alexandra A.E. Shapiro
Fabien M. Thayamballi
Shapiro Arato LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 257-4880

Susan Necheles
Kathleen E. Cassidy
Hafetz & Necheles LLP
10 East 40th Street, 48th Floor
New York, New York 10016
(212) 997-7400

*Attorneys for Defendant Clare Bronfman*

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ........................................................................................................... 1

    A.    The March Affidavit And March Warrant............................................... 1

    B.    The October Affidavit And October Warrants ........................................ 3

ARGUMENT ................................................................................................................. 8

I.    The Evidence Obtained From The March Warrant Should Be Suppressed ...................... 8

    A.    The March Warrant Was Overbroad........................................................ 8

    B.    The March Warrant Was Insufficiently Particular................................. 11

    C.    The Government Exceeded The Scope Of The March Warrant.......................... 14

    D.    The Good-Faith Exception Does Not Apply ......................................... 15

    E.    Bronfman Is Entitled To Suppression Or At Least An Evidentiary Hearing ....... 17

II.    The Evidence Obtained From The October Warrants Should Be Suppressed ................. 17

    A.    The October Warrants Were Overbroad ................................................ 17

    B.    The October Warrants Were Insufficiently Particular ........................... 19

    C.    The Good-Faith Exception Does Not Apply, And Bronfman Is Entitled To Suppression Or, At A Minimum, A Hearing ........................................ 21

III.    The Government's Conduct With Respect To Third-Party Searches Raises Questions About Its Good Faith And Justifies Further Suppression ................................. 22

CONCLUSION.............................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Caldarola v. Cty. of Westchester*,
   343 F.3d 570 (2d Cir. 2003) .................................................................. 23

*Carpenter v. United States*,
   138 S. Ct. 2206 (2018)................................................................... 8, 11

*Coolidge v. New Hampshire*,
   403 U.S. 443 (1971).......................................................................... 8

*Kentucky v. King*,
   563 U.S. 452 (2011) ......................................................................... 11

*Lauro v. Charles*,
   219 F.3d 202 (2d Cir. 2000) .................................................................. 23

*Roberts v. United States*,
   656 F. Supp. 929 (S.D.N.Y. 1987) .......................................................... 14

*Steagald v. United States*,
   451 U.S. 204 (1981)......................................................................... 11

*United States v. Anderson*,
   772 F.3d 969 (2d Cir. 2014) .................................................................. 24

*United States v. Bershchansky*,
   788 F.3d 102 (2d Cir. 2015) ........................................................... 15, 16, 17

*United States v. Cohan*,
   628 F. Supp. 2d 355 (E.D.N.Y. 2009) ....................................................... 11

*United States v. Comprehensive Drug Testing, Inc.*,
   621 F.3d 1162 (9th Cir. 2010) ................................................................ 24

*United States v. Galpin*,
   720 F.3d 436 (2d Cir. 2013) ........................................................... passim

*United States v. George*,
   975 F.2d 72 (2d Cir. 1992) ............................................................. passim

*United States v. Gigante*,
   979 F. Supp. 959 (S.D.N.Y. 1997) ........................................................ 12, 21

*United States v. Hasting*,
  461 U.S. 499 (1983) ............................................................................ 24

*United States v. Johnson*,
  221 F.3d 83 (2d Cir. 2000) ................................................................. 24

*United States v. Leary,*
  846 F.2d 592 (10th Cir.1988) ............................................................ 13

*United States v. Leon*,
  468 U.S. 897 (1984) ..................................................................... 16, 21

*United States v. Metter*,
  860 F. Supp. 2d 205 (E.D.N.Y. 2012) .............................................. 23

*United States v. Ming He*,
  94 F.3d 782 (2d Cir. 1996) ................................................................. 24

*United States v. Payner*,
  447 U.S. 727 (1980) ............................................................................ 24

*United States v. Pena*,
  961 F.2d 333 (2d Cir. 1992) ............................................................... 17

*United States v. Percoco*,
  No. 16-CR-776 (VEC), 2017 WL 6314146 (S.D.N.Y. Dec. 11, 2017) ................................... 13

*United States v. Raymonda*,
  780 F.3d 105 (2d Cir. 2015) ............................................................ 8, 9

*United States v. Roche,*
  614 F.2d 6 (1st Cir. 1980) .................................................................. 13

*United States v. Silver*,
  184 F. Supp. 3d 33 (S.D.N.Y. 2016) ................................................. 13

*United States v. Spilotro*,
  800 F.2d 959 (9th Cir. 1986) ............................................................. 16

*United States v. Ulbricht*,
  858 F.3d 71 (2d Cir. 2017) ............................................................. 1, 11

*United States v. Vilar*,
  No. S3-05-CR-621-KMK, 2007 WL 1075041 (S.D.N.Y. Apr. 4, 2007) ........................ passim

*United States v. Voustianiouk*,
  685 F.3d 206 (2d Cir. 2012) ......................................................... 15, 16

*United States v. Wey,*
    256 F. Supp. 3d 355 (S.D.N.Y. 2017) .............................................................. passim

*United States v. Zemlyansky,*
    945 F. Supp. 2d 438 (S.D.N.Y. 2013) .............................................................. passim

*Voss v. Bergsgaard,*
    774 F.2d 402 (10th Cir. 1985) ............................................................................ 13

**Constitutional Provisions and Statutes**

U.S. Const., amend. IV ................................................................................................. 8

18 U.S.C. § 1961 ......................................................................................................... 13

## PRELIMINARY STATEMENT

The government obtained several search warrants for Clare Bronfman's personal email account, all of which violated the Fourth Amendment and were so facially invalid that no reasonable officer could rely on them in good faith. These warrants purported to authorize the government to rummage through Ms. Bronfman's communications for evidence of virtually any crime whatsoever. They also purported to authorize the seizure of broad swaths of information untethered to the allegations against Ms. Bronfman or, indeed, any criminal activity. And despite the warrants' expansive terms, the government went so far as to seize evidence outside the scope of one of the warrants, in effect conducting a warrantless search.

The Fourth Amendment's requirements for search warrants are imbued with special importance when applied to searches of electronic data, as "hard drives and e-mail accounts may be 'akin to a residence in terms of the scope and quantity of private information [they] may contain.'" *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) (quoting *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013)). In order to enforce respect for these requirements and deter the government's repeated violation of Ms. Bronfman's constitutional rights, the evidence obtained from the searches at issue should be suppressed.[1]

## BACKGROUND

### A.    The March Affidavit And March Warrant

On March 8, 2018, FBI Special Agent Michael Lever swore to an affidavit in support of warrants to search three email accounts allegedly associated with ▮▮▮▮▮▮▮▮, Clare Bronfman, and ▮▮▮▮▮▮▮▮, respectively. (Declaration of Alexandra A.E. Shapiro

---

[1] Ms. Bronfman files her motion under seal, as the search warrants it describes and attaches are covered by protective orders. (Dkts. 85, 236).

("Shapiro Decl.") Ex. A (the "March Affidavit") ¶¶ 1-2).  The March Affidavit includes as an exhibit the Complaint filed against Keith Raniere and describes NXIVM and DOS in largely the same terms as the Complaint.  (March Affidavit ¶¶ 5-25, 30-31, 34, Ex. 1).  The central scheme alleged in the March Affidavit is also the same as in the Complaint:  Raniere and other DOS "masters" allegedly obtained collateral from new members of DOS and used that collateral to extort labor and sex.  (*Id.* ¶¶ 16-24).  Agent Lever further alleged that after the New York Times published an article revealing the existence of DOS, Raniere fled to Mexico with Bronfman's help and disclaimed any knowledge of or involvement in DOS.  (*Id.* ¶¶ 26-29).

The March Affidavit says relatively little about Bronfman.  Agent Lever alleged that Bronfman was a member of NXIVM's Executive Board who was a "known financial backer" of Raniere and NXIVM and was "close" to Raniere.  (*Id.* ¶ 10, 27).  He further alleged that, according to emails between Raniere and Bronfman, the two Defendants discussed "fraudulently obtain[ing] visas for Mexican workers" for NXIVM and, after the revelation of DOS, discussed a "public relations campaign to dissociate Raniere from DOS and to smear DOS victims."  (*Id.* ¶¶ 44-45).  Agent Lever claimed that he expected that Bronfman's email account would contain Raniere's travel bookings and other information allowing the government to locate Raniere in Mexico and collect evidence of his purported double life and attempt to evade prosecution.  (*Id.* ¶¶ 5, 46-49).  He also alleged that Bronfman's credit card had been used to make purchases for Raniere or his lover ███████, presumably while in Mexico.  (*Id.* ¶ 51).

Based on the March Affidavit, Magistrate Judge Robert M. Levy issued a search and seizure warrant for Bronfman's email account the same day.  (Shapiro Decl. Ex. B (the "March Warrant")).  The March Warrant did not incorporate the March Affidavit by reference.  It required Google to disclose to the government the contents of all emails associated with

Bronfman's account, as well as subscriber and location information and a host of other logs,

communications, passwords, and records.  (March Warrant, Attachments A-2, B-2.I).  The

March Warrant authorized the government to seize "[a]ll information" disclosed by Google

> that constitutes contraband, fruits, evidence and/or instrumentalities of violations
> of 18 U.S.C. § 875 (interstate threats to injure property or reputation), 18 U.S.C.
> § 1028A (aggravated identity theft), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C.
> § 1546 (visa fraud), 18 U.S.C. § 1591 (sex trafficking by force, fraud or coercion
> and interference in an investigation into [such crimes]), 18 U.S.C. § 1589 (forced
> labor), 18 U.S.C. § 1952 (using an interstate facility to commit unlawful activity,
> i.e. extortion), and 18 U.S.C. § 1962 (engaging in a pattern of racketeering
> activity), involving KEITH RANIERE, CLARE BRONFMAN and/or
> ██████████████ since January 1, 2015 . . . .

(March Warrant, Attachment B-2.II).  The information the government was authorized to seize

"includ[ed]," but was not limited to, "information pertaining to" DOS's practices and

concealment, "[e]vidence of enticement or recruitment of women to have sex with" Raniere,

"[e]vidence of grooming of women to be sexual partners for" Raniere, "[e]vidence related to the

organizational structure and hierarchy of Nxivm and DOS," and "[a]ny records pertaining to the

means and source of payment for services (including any credit card or bank account number or

digital money transfer account information)."  (Id.).  None of this information was specific to

Bronfman's email account.  Indeed, Agent Lever requested that Judge Levy authorize the seizure

of virtually identical categories of information from the ██████████████ email accounts.

(March Affidavit, Attachments B-1.II, B-3.II).  And despite the breadth of these categories, the

government managed to seize documents that fell far outside their scope, as explained below.

    **B.**    **The October Affidavit And October Warrants**

       On October 15, 2018, Agent Lever swore to another affidavit in support of two warrants

(1) authorizing further searches and seizures of the information already obtained from Google

pursuant to the March Warrant and (2) requiring Google to disclose further information

regarding Bronfman's email account "beyond the time period set forth in the [March] Warrant": specifically, "for the time period of September 8, 2011, when the [account] was created, through July 23, 2018, when Bronfman was arrested." (Shapiro Decl. Ex. C (the "October Affidavit") ¶¶ 1-2, 15, 28, 33).

Agent Lever observed that Bronfman, Raniere, and the other Defendants had been arrested and indicted, and he explained the charges in the Superseding Indictment.[2] (*Id.* ¶¶ 9-11). He began with the DOS-related offenses, and again provided no reason to believe that Bronfman was involved in DOS or any of those offenses. (*Id.* ¶ 14). He then described "the criminal schemes, *apart from the DOS related schemes*, charged in the Superseding Indictment." (*Id.* ¶ 16 (emphasis added)). Agent Lever alleged that Bronfman was involved in three such predicate acts: (1) a scheme to install keyloggers on the computers of NXIVM's perceived enemies, (2) a scheme to induce a foreign national to enter the United States illegally, and (3) a scheme to pay Raniere's bills using the credit card of his dead ex-lover, ████ (*Id.* ¶¶ 16b, d, f). He did not allege her involvement in any other charged acts, including the acts of alleged obstruction, trafficking, and document servitude that he described. (*Id.* ¶¶ 16c, e).

Agent Lever also identified several other, unindicted crimes then under investigation, ████████████████████████:

- ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

---

[2] The Superseding Indictment was the first and only indictment against Bronfman. It was returned in July 2018, several months after the March Warrant was issued. (October Affidavit ¶ 11; Dkt. 50).



Agent Lever opined that the March Warrant could provide the "necessary authority" to search the information already obtained from Google for "evidence of [these] additional crimes," since the "[March] Warrant contemplates seizure of, among other things, 'contraband, fruits, evidence and/or instrumentalities' of '18 U.S.C. § 1962 (engaging in a pattern of racketeering activity),' '[e]vidence related to the organizational structure and hierarchy of Nxivm,' and attribution evidence." (*Id.* ¶ 15 & n.1). However, Agent Lever sought an additional warrant pertaining to that prior Google response allegedly "out of an abundance of caution." (*Id.* ¶ 15).

Significantly, in an effort to show probable cause for further searches and seizures of Bronfman's email account, Agent Lever referred to information obtained via the March Warrant:

29.  . . . A keyword search of the Google Response for the word "collateral," resulted in emails where Bronfman discussed requests for returns of collateral from DOS victims.



(*Id.* ¶¶ 29-31).

Agent Lever also made other allegations regarding Bronfman, supposedly derived from "emails obtained from other sources," that did nothing to tie her to the "additional" crimes purportedly under investigation.  (*Id.* ¶ 32).

4

████████████████████████████████ (4) regularly used her email address to communicate with other Defendants and discuss matters related to NXIVM.  (*Id.* ¶¶ 32-33).

Based on the October Affidavit, Magistrate Judge Cheryl L. Pollak issued the two requested search and seizure warrants.  (Shapiro Decl. Ex. D (the "October Warrants")).  The October Warrants, which did not incorporate the October Affidavit by reference, authorized the government to seize "[a]ll information" disclosed by Google

> that constitutes contraband, fruits, evidence and/or instrumentalities of violations of 18 U.S.C. § 1028 (identity theft), 18 U.S.C. § 1324 (encouraging and inducing illegal entry and harboring of aliens), 18 U.S.C. § 1349 (conspiracy to commit wire fraud), 18 U.S.C. § 1512 (obstruction of justice), 18 U.S.C. § 1589 (forced labor), 18 U.S.C. § 1591 (sex trafficking), 18 U.S.C. § 1592 (document servitude), 18 U.S.C. § 1952 (using an interstate facility to commit unlawful activity, *i.e.* extortion), 18 U.S.C. § 1956 (money laundering), 18 U.S.C. § 1962 (engaging in a pattern of racketeering activity), ████████████ ████████████████████████, involving [any of the indicted Defendants] since September 8, 2011 . . . .

(October Warrants, Attachments B-1, B-2.II).  The information the government was authorized to seize "includ[ed]," but was not limited to, "information pertaining to" (1) the "crimes charged in the Superseding Indic[tment]"; (2) the "means and methods" of the enterprise, "including conspiring to commit and committing crimes," exalting Raniere's "teaching and ideology," "recruiting and grooming sexual partners for" Raniere, and "encouraging associates and others to take expensive Nxivm courses"; (3) "[c]ommunications between and among" the Defendants and/or "any unindic[ted] co-conspirators or victims"; (4) "[e]vidence of R[aniere's] sex with underage women"; (5) "[e]vidence of attempts by members of the Enterprise to obstruct justice through false testimony, falsifying documents, intimidating witnesses and/or other means"; (6) "[f]inancial and tax-related information of the defendants, co-conspirators, Nxivm and affiliated entities"; (7) "[e]vidence of cash payments within Nxivm or related entities"; and (8) several other categories of information, including those listed in the March Warrant.  (*Id.*).

7

The government produced the over 3 terabytes of data seized pursuant to these Warrants only yesterday.  We reserve the right to supplement our motion after reviewing it.

## ARGUMENT

### I.    The Evidence Obtained From The March Warrant Should Be Suppressed

#### A.    The March Warrant Was Overbroad

The Fourth Amendment provides that "no Warrants shall issue[] but upon probable cause."  U.S. Const., amend. IV.   "[A]ny intrusion in the way of search or seizure is an evil," so "no intrusion at all is justified without a careful prior determination of necessity," and "those searches deemed necessary should be as limited as possible."  *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971); *accord United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013) (warrant requirement is designed to provide "assurance that the permitted invasion of a suspect's privacy and property are no more than absolutely necessary") (quotation marks omitted).

"[A] warrant is overbroad if its description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based."  *United States v. Wey*, 256 F. Supp. 3d 355, 382 (S.D.N.Y. 2017) (quotation marks omitted); *accord Galpin*, 720 F.3d at 446.  The Court must determine whether the magistrate judge "had a substantial basis" for determining that "given all the circumstances set forth in the affidavit," there was a "fair probability that contraband or evidence of a crime w[ould] be found in a particular place." *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015) (quotation marks omitted).  A mere showing of "reasonable grounds for believing that the records [a]re relevant and material to an ongoing investigation" is insufficient and "falls well short of the probable cause required for a warrant."  *Carpenter v. United States*, 138 S. Ct. 2206, 2221 (2018) (quotation marks omitted). The Court "may conclude that a warrant is invalid where the magistrate's probable-cause

determination reflect[s] an improper analysis of the totality of circumstances." *Raymonda*, 780 F.3d at 113 (quotation marks omitted).

The March Warrant was dramatically overbroad, authorizing the government to search for and seize evidence far outside the scope of probable cause furnished by the March Affidavit. At best, the March Affidavit provided probable cause to believe that Bronfman engaged in visa fraud, discussed "damage control" with Raniere after DOS was revealed, paid for Raniere's travel, and helped him travel to Mexico. This showing could not possibly justify the search for or seizure of "[a]ll information" pertaining to "interstate threats," "aggravated identity theft," "wire fraud," "sex trafficking," "forced labor," "extortion," or "racketeering." (March Warrant, Attachment B-2.II). Furthermore, as the March Affidavit provided no basis for believing that Bronfman was involved in the operation of DOS, it did not justify searching for evidence concerning DOS's operation, let alone the "enticement or recruitment of women to have sex with" Raniere or the "grooming of women to be sexual partners for" Raniere. (*Id.*).

Indeed, the scope of the March Warrant was arbitrary. It plainly was not tailored to the government's showing of probable cause as to Bronfman's email account, since the government sought essentially identical categories of information from the ███████ and ███████ email accounts. (*Compare* March Affidavit, Attachments B-1.II *and* B-3.II, *with* Attachment B-2.II). This was entirely improper. The government asserted that Raniere controlled the ███████ email account, and that ███████ was a DOS "slave." While the government might have had reason to look for DOS-related evidence in those accounts, there was no justification for performing the same searches on Bronfman's account.

The March Warrant also authorized the government to search for and seize broad categories of materials with little to no bearing on any of the crimes under investigation. For

example, the government was allowed to seize "[a]ny records pertaining to the means and source

of payment for services (including any credit card or bank account number or digital money

transfer account information)." (March Warrant, Attachment B-2.II). Under this provision, the

government could scour Bronfman's personal email account and seize any and all records of

transactions, even if the purchased "services" were entirely irrelevant to this case. Similarly, the

government was allowed to seize "[e]vidence related to the organizational structure and

hierarchy of Nxivm." (*Id.*). This provision was not limited to organizational charts or similar

documents, and could conceivably have allowed the government to seize all emails providing

any information about the roles and responsibilities of NXIVM members—in other words, any

emails that discussed NXIVM business. This apparently was Agent Lever's understanding, since

in the October Affidavit, he opined that this "organizational structure" provision was broad

enough to render the October Warrants superfluous. (October Affidavit ¶ 15 n.1).

But the March Affidavit did not even come close to justifying the seizure of *all* emails in

the account of a NXIVM executive concerning any transactions or any NXIVM business,

without limitation. NXIVM is indisputably a legitimate business. (*See, e.g.*, Dkt. 194 at 4-7,

Dkt. 257 at 12-13). The March Affidavit tacitly acknowledges this (¶¶ 7-9), despite its brief and

false insinuation, unrelated to the investigation, that NXIVM could be a pyramid scheme (¶ 10).

By authorizing an indiscriminate search of innocent documents, "the Warrant[] [is], in essence,

[an] all-records warrant[] unsupported by probable cause to seize all records," which violates the

Fourth Amendment. *Wey*, 256 F. Supp. 3d at 394; *see also United States v. Vilar*, No. S3-05-

CR-621-KMK, 2007 WL 1075041, at *20 (S.D.N.Y. Apr. 4, 2007) (affidavit describing scheme

to defraud investors did not justify seizure of "*all* client files, *all* investment advisory

agreements, and *all* documents concerning [client] communications").

10

B.      **The March Warrant Was Insufficiently Particular**

In addition to being overbroad, the March Warrant failed the test of particularity. "The Founding generation crafted the Fourth Amendment as a response to the reviled 'general warrants' and 'writs of assistance' of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity." *Carpenter*, 138 S. Ct. at 2213 (quotation marks omitted). "Those general warrants 'specified only an offense,' leaving 'to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched.'" *United States v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017) (quoting *Steagald v. United States*, 451 U.S. 204, 220 (1981)). Accordingly, the Fourth Amendment "require[es] the warrant to 'set out with particularity' the 'scope of the authorized search.'" *Id.* (quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011)). While a warrant suffers from overbreadth if it "seek[s] specific material as to which no probable cause exists," it lacks particularity if it "giv[es] so vague a description of the material sought as to impose no meaningful boundaries." *United States v. Cohan*, 628 F. Supp. 2d 355, 359 (E.D.N.Y. 2009); *accord United States v. Zemlyansky*, 945 F. Supp. 2d 438, 450 (S.D.N.Y. 2013). "To be sufficiently particular under the Fourth Amendment," a warrant must (1) "identify the specific offense for which the police have established probable cause," (2) "describe the place to be searched," and (3) "specify the items to be seized by their relation to designated crimes." *Ulbricht*, 858 F.3d at 99 (quoting *United States v. Galpin*, 720 F.3d 436, 445-46 (2d Cir. 2013)). "[T]he particularity requirement assumes even greater importance" when dealing with a "search of electronic data," as "e-mail accounts may be akin to a residence in terms of the scope and quantity of private information [they] may contain." *Id.* (quotation marks omitted).

11

The March Warrant lacked particularity in several respects.[5]  *First*, the March Warrant improperly authorized the government to search for and seize "[a]ll information . . . that constitutes contraband, fruits, evidence and/or instrumentalities of violations" of any of eight criminal statutes, including "18 U.S.C. § 1343 (wire fraud)" and "18 U.S.C. § 1962 (engaging in a pattern of racketeering activity)."  (March Warrant, Attachment B-2.II).  However, the "[m]ere reference to 'evidence' of a violation of a broad criminal statute . . . provides no readily ascertainable guidelines for the executing officers as to what items to seize."  *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992); *see also id.* at 77 ("'limits' to a search consisting only of a broad criminal statute [a]re invalid").  Indeed, the Second Circuit has "struck down a warrant authorizing the seizure of 'any papers, things or property of any kind relating to' the crime under investigation."  *Id.* at 76-77 (citing *United States v. Buck*, 813 F.2d 588 (2d Cir. 1987)).

The RICO and wire fraud statutes are extraordinarily expansive, and a warrant authorizing the government to search for evidence of any violation of those statutes does not comport with the Fourth Amendment.  In *United States v. Gigante*, 979 F. Supp. 959 (S.D.N.Y. 1997), the court suppressed evidence and noted that, "by authorizing searches and seizures of evidence relating to violations of such an immensely broad statute as 18 U.S.C. § 1962 ('RICO')," the warrant "seemingly provide[d] no limits at all."  *Id.* at 966-67.  In *United States v. Wey*, where the court also suppressed evidence, the court observed that the warrants' "reference to seizing 'property purchased with the proceeds of fraud'" was not a "substitute for the requisite identification of the crime under investigation."  256 F. Supp. 3d at 385 n.6.  And in *United*

---

[5] In evaluating particularity, the Court must consider the warrants alone, unaided by the affidavits.  There is no indication that any of the affidavits were attached to any of the warrants, and the warrants do not "contain 'deliberate and unequivocal language of incorporation.'"  *In re 650 Fifth Ave. & Related Properties*, 830 F.3d 66, 100-01 (2d Cir. 2016) (quoting *United States v. Walker*, 534 F.3d 168, 172-73 & n.2 (2d Cir. 2008)).

*States v. Vilar*, the court found that the warrant's reference to "fraud schemes" was inadequate and "unhelpful to the Inspectors executing the search, as the [w]arrant d[id] not . . . explain the referenced fraud schemes, nor d[id] it identify the particular transactions and illicit activities upon which the [w]arrant was founded." 2007 WL 1075041, at *22. Similarly, "other Circuits have held that even warrants that identify catchall statutory provisions, like the mail fraud or conspiracy statutes, may fail to comply with . . . the particularization requirement." *Galpin*, 720 F.3d at 446 n.5 (citing, as examples, *United States v. Leary,* 846 F.2d 592, 594 (10th Cir.1988); *Voss v. Bergsgaard,* 774 F.2d 402 (10th Cir. 1985); and *United States v. Roche,* 614 F.2d 6, 8 (1st Cir. 1980)).

An officer searching Bronfman's email account for RICO violations could refer to a massive list of federal and state felonies, even though there is no conceivable probable cause to believe that Bronfman committed any of them. *See* 18 U.S.C. § 1961(1).[6] And rather than limiting the search to the evidence of the wire fraud alleged in the March Affidavit, an officer searching for "wire fraud" in general could look for evidence of entirely unrelated frauds, such as bid-rigging or the bribery of public officials.[7] Nothing in the March Warrant required the government to limit its search to the "specific acts of wrongdoing" that there was probable cause to investigate, which is fatal to the Warrant. *Vilar*, 2007 WL 1075041, at *22; *see also Roberts v. United States,* 656 F. Supp. 929, 935 (S.D.N.Y. 1987) (warrant containing "no restriction to

---

[6] For instance, the warrant authorized the government to search Bronfman's email account for evidence concerning, *inter alia*, murder, arson, robbery, illegal gambling, narcotics trafficking, bribery of public officials, sports bribery, embezzlement (including from unions, pensions, and welfare funds), economic espionage, copyright infringement, counterfeit goods, contraband cigarettes, biological and chemical weapons, nuclear materials, and securities fraud. *See id.*

[7] *Cf. United States v. Percoco*, No. 16-CR-776 (VEC), 2017 WL 6314146, at *7 (S.D.N.Y. Dec. 11, 2017); *United States v. Silver*, 184 F. Supp. 3d 33, 37 (S.D.N.Y. 2016).

any specific wrongful transaction to which documents were related" lacked particularity), *rev'd on other grounds,* 852 F.2d 671 (2d Cir. 1988).

*Second*, as explained above, the March Warrant improperly authorized the government to search for and seize all records of payments and all emails concerning NXIVM business.  (*See* Point I.A *supra*).  A "catch-all paragraph or provision . . . authorizing the seizure of 'any or all records' of a particular type" generally does not satisfy the Fourth Amendment.  *Vilar*, 2007 WL 1075041, at *22.  As records of financial transactions and corporate business are "hardly, by [their] particular character, contraband," a warrant authorizing their indiscriminate seizure is "insufficiently particularized."  *Wey*, 256 F. Supp. 3d at 385 (quotation marks omitted); *see also id.* at 386-87 & n.7 (collecting cases); *Zemlyansky*, 945 F. Supp. 2d at 457-58 (same).

### C.    The Government Exceeded The Scope Of The March Warrant

The government also violated the terms of the March Warrant, searching for and seizing documents that fell outside its scope, and using those documents to justify the October Warrants.

According to the October Affidavit, the government's search of Google's response to the March Warrant revealed "evidence of racketeering activity, including evidence of conduct [later] charged in the Superseding Indictment, as well as evidence of other criminal activity."  (October Affidavit ¶ 15). ███████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████ The government's review also

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

██ ██  The government cited this evidence in the October Affidavit when seeking the October Warrants.

To the extent any of this evidence falls within the scope of the March Warrant, as Agent Lever suggested (*id.* ¶ 15 & n.1), this simply confirms the March Warrant's overbreadth and lack of particularity.  As explained below, however, the March Warrant did not authorize the government to search for or seize several of these categories of evidence.

"We look directly to the text of the search warrant to determine the permissible scope of an authorized search."  *United States v. Bershchansky*, 788 F.3d 102, 111 (2d Cir. 2015).  The March Warrant permitted an overbroad search for evidence pertaining to DOS and a wide variety of crimes.  ███████████████████████████████████████████████

███████████████████████████████████████  so far afield that it is unclear what, if anything, they have to do with those topics.  "[A] warrant to search a computer for evidence of [certain crimes] cannot be used as a blank check to scour the computer for evidence of [other] crimes."  *Vilar*, 2007 WL 1075041, at *37.  The government's collection and use of information beyond the scope of the March Warrant was, in effect, a "warrantless search in violation of the Fourth Amendment."  *Bershchansky*, 788 F.3d at 111; *accord United States v. Voustianiouk*, 685 F.3d 206, 212, 214 (2d Cir. 2012).

### D.    The Good-Faith Exception Does Not Apply

The March Warrant and its execution by the government were not merely inadequate by Fourth Amendment standards.  They were so deficient that the government cannot satisfy its burden of proving that its conduct was objectively reasonable, as required to establish the "good

faith" exception to the exclusionary rule. *George*, 975 F.2d at 77; *accord Zemlyansky*, 945 F. Supp. 2d at 474 (government bears burden of proof).

Where, as here, the "only limit on [the] scope of search is that items to be seized be evidence of [a] violation of any one of [several] federal statutes, some of exceptional scope, [the] warrant [is] so facially deficient that [the good-faith exception is] not applicable." *George*, 975 F.2d 77 (citing *United States v. Spilotro*, 800 F.2d 959, 968 (9th Cir. 1986)); *accord id.* (observing that "it was quite clear when this warrant was executed that 'limits' to a search consisting only of a broad criminal statute were invalid"). Nor could the government reasonably believe that it was entitled to search for and seize any and all records of Bronfman's financial transactions or work with NXIVM. *See Vilar*, 2007 WL 1075041, at *22-24 (collecting cases).

It was also "entirely unreasonable" to believe that the full scope of the March Warrant was justified. *United States v. Leon*, 468 U.S. 897, 923 (1984) (quotation marks omitted). The March Affidavit did not even purport to link Bronfman's email account to most of the crimes under investigation and was therefore totally "lacking in indicia of probable cause" as to much of the information sought by the March Warrant. *Id.* (quotation marks omitted).

Moreover, the government cannot claim that it was "objectively reasonable" to seize evidence outside the scope of the March Warrant. *Bershchansky*, 788 F.3d at 113. "Nothing in the warrant . . . provided any reason for the[] officers to conclude that the magistrate judge had authorized them to search" for information concerning, for example, ███████████████████ ████████████████████████████████████████████████ ████████████████████ *Voustianiouk*, 685 F.3d at 215.

16

### E.    Bronfman Is Entitled To Suppression Or At Least An Evidentiary Hearing

"Because the Government's agents violated the Fourth Amendment and do not fall within

the shield of the good faith exception, suppression of evidence from the [March Warrant]

search[es] is warranted." *Zemlyansky*, 945 F. Supp. 2d at 476.  And because the October

Warrants were based in part on the fruits of the March Warrant, the evidence seized pursuant to

those warrants should be suppressed as well.  *See Bershchansky*, 788 F.3d at 112 ("[e]xclusion

extends to . . . indirect products of unlawful searches").

At a minimum, if the government raises factual issues concerning its good faith or the

proper scope of the suppression remedy, the Court should schedule an evidentiary hearing.  *See

United States v. Pena*, 961 F.2d 333, 339 (2d Cir. 1992) ("evidentiary hearing" is "ordinarily

required" where motion papers raise "contested issues of fact"); *Wey*, 256 F. Supp. 3d at 366-67

(after suppression motion was filed, "the Court made a preliminary determination that a hearing

was warranted to address whether the Government acted in good faith"); *Zemlyansky*, 945 F.

Supp. 2d at 473 n.13 (same); *id.* at 476 (ordering further hearing to determine scope of remedy).

## II.    The Evidence Obtained From The October Warrants Should Be Suppressed

### A.    The October Warrants Were Overbroad

The October Warrants were patently unconstitutional.  They were even broader than the

March Warrant, and the October Affidavit did not even come close to establishing probable

cause for their full scope.  Nothing in that Affidavit suggested that Bronfman was involved in,

for example, "conspiracy to commit wire fraud," "obstruction of justice," "forced labor," "sex

trafficking," "document servitude," "extortion," or ████████████ (October Warrants,

Attachments B-1, B-2.II).  Nor did it suggest that her email account would contain "[e]vidence of

enticement or recruitment of women and/or girls to have sex" with Raniere, "evidence of

R[aniere's] sex with underage women," "[e]vidence of attempts by members of the Enterprise to

17

obstruct justice through false testimony, falsifying documents, intimidating witnesses and/or other means," or "[e]vidence of cash payments within Nxivm or related entities," whether innocent or otherwise. (*Id.*). Agent Lever simply made no effort to link Bronfman to these offenses or subjects under investigation. Yet, inexplicably, the October Warrants authorized the government to rummage through Bronfman's email account in the hope of finding it.

Even more inexplicably, the October Warrants permitted the government to search through Bronfman's account for evidence of *any* of the "crimes charged in the Superseding Indic[tment]." (*Id.*). As Bronfman was charged in only a handful of counts and predicate acts, the grand jury plainly did not find probable cause to believe that Bronfman was involved in the other offenses. And since the October Affidavit did not even purport to suggest her involvement in those offenses, either, there was no justification for such a broad search of her emails.

Essentially, the October Warrants treated Bronfman's email address as a likely repository of evidence for *every* crime under investigation, even though the October Affidavit only purported to implicate Bronfman in a small subset of those alleged crimes. This is the very definition of overbreadth. *See Galpin*, 720 F.3d at 448 (warrant authorizing search for evidence of child pornography when there was only probable cause to believe defendant had committed a registration offense "was facially overbroad and thus violated the Fourth Amendment").

The October Warrants also authorized the seizure of broad swaths of clearly innocent materials, such as materials exalting Raniere's "teaching and ideology" or showing that the Defendants "encourag[ed] associates and others to take expensive Nxivm courses." (October Warrants, Attachments B-1, B-2.II). As explained above, NXIVM is indisputably a legitimate business, and its teachings and course offerings are not evidence of a crime. Moreover, like the March Warrants, the October Warrants impermissibly authorized the seizure of any and all

18

payment records and emails concerning NXIVM business, regardless of their bearing on the

crimes under investigation.  (*Id.*).  The October Warrants went even further in permitting the

seizure of any and all financial and tax information pertaining to the Defendants (including

Bronfman), their co-conspirators (who were not identified in the Warrants), NXIVM, and

NXIVM's affiliated entities (which, again, are not identified).  (*Id.*).  Again, "the Warrants are, in

essence, all-records warrants unsupported by probable cause to seize all records.  That

constitutes a violation of the Fourth Amendment."  *Wey*, 256 F. Supp. 3d at 394.

### B.    The October Warrants Were Insufficiently Particular

1.    The October Warrants also violated the Fourth Amendment's particularity

requirement.  Most significantly, they did not adequately specify the criminal conduct under

investigation.  Like the March Warrant, the October Warrants authorized the government to

search for and seize any evidence relating to any violation of the RICO or wire fraud statutes

(among others), which are far too broad to impose any meaningful limits on the search.  (*See*

Point I.B *supra*).  However, the October Warrants were even worse in several respects:

2.    The October Warrants authorized the government to search for and seize all

"information pertaining to" the "means and methods" of the enterprise, which "includ[ed]"

conspiring to commit and committing crimes."  (October Warrants, Attachments B-1, B-2.II).

The October Warrants did not specify these crimes, effectively allowing the government to look

for any evidence of any crime whatsoever.  This clearly violated the constitutional prohibition on

general warrants.  *See George*, 975 F.2d at 75-77 (a "warrant's broad authorization to search for

'any other evidence relating to the commission of a crime' plainly is not sufficiently particular");

*Galpin*, 720 F.3d at 447 (government conceded that warrant authorizing search for "evidence of

violations of 'NYS Penal Law and or Federal Statutes'" was insufficiently particular).  Indeed, "a

19

warrant not limited in scope to *any crime at all* is so unconstitutionally broad that no reasonably well-trained police officer could believe otherwise." *George*, 975 F.2d at 77.

3.      The October Warrants also authorized the government to search for and seize all "information pertaining to . . . [t]he crimes charged in the Superseding Indic[tment]." (October Warrants, Attachments B-1, B-2.II). There is no indication that the Superseding Indictment was attached to the Warrants, but it could only have undermined their particularity. The crimes charged in the Superseding Indictment largely overlap with the crimes listed in the preamble to the Warrants, but there are exceptions on both sides. The Warrants referred to additional crimes under investigation but not yet charged. And the Superseding Indictment refers to certain crimes—namely, labor trafficking in violation of 18 U.S.C. § 1590 and extortion in violation of the New York Penal Law—that were, for some reason, omitted from the Warrants. The "part[ial overlap" between the Warrants and the Indictment, with unexplained omissions from the Warrants, "could well create confusion on the part of an officer committed to properly executing the warrant." *Zemlyansky*, 945 F. Supp. 2d at 460. Separately, as explained in Bronfman's motion to dismiss, the Superseding Indictment fails to provide guidance concerning which of several unspecified crimes were charged by the grand jury, forcing the executing officers to guess or to pick the ones they believed would be most promising. (Dkt. 194 at 26-31; Dkt. 257 at 2-7). As a result, the October Warrants' reference to the Superseding Indictment was a "confusing warrant provision[]" that "fail[ed] to coherently guide discretion in the search of electronics." *Id.* As the purpose of the particularity requirement is to guide and cabin this discretion, the October Warrants' failure to do so "violate[d] the Fourth Amendment." *Id.*

4.      The October Warrants' vagueness was amplified by the provision permitting the government to search for and seize "[c]ommunications between and among" the Defendants

and/or "any unindic[ted] co-conspirators or victims." (October Warrants, Attachments B-1, B-2.II). The October Warrants did not identify these "unindic[ted] co-conspirators or victims," allowing the executing officers, again, to substitute their own judgment for that of the magistrate. They resemble the deficient warrant in *United States v. Gigante*, which referred generally to "criminal associates of the named subjects" and "entities owned, controlled or otherwise utilized for illegal purposes by or on behalf of the named subjects" without identifying them. 979 F. Supp. at 966. These terms were "bereft of meaningful limitation curtailing the officers' discretion when executing the warrant," *id.* (quotation marks omitted), and the same is true here.

5.  As explained above, the October Warrants authorized searches and seizures of large, generic categories of records, such as payment records, financial records, tax records, and emails concerning NXIVM business, without any meaningful limitation. (*See* Point II.A *supra*). "Catch-all" provisions of this sort are not only overbroad, they are inadequately particularized, and therefore violate the Fourth Amendment on that ground as well. *See Wey*, 256 F. Supp. 3d at 385-87; *Vilar*, 2007 WL 1075041, at *22-23.

### C.    The Good-Faith Exception Does Not Apply, And Bronfman Is Entitled To Suppression Or, At A Minimum, A Hearing

The good-faith exception does not apply. Given the multitude of defects catalogued above, the October Warrants were "so facially deficient . . . that the executing officers [could] not reasonably presume [them] to be valid." *Leon*, 468 U.S. at 923. The overbreadth is blatant when one compares the October Affidavit to the October Warrants, and the lack of particularity is obvious from the case law rejecting similarly expansive warrants. *See, e.g.*, *George*, 975 F.2d at 76-77 ("no reasonably well-trained police officer could believe" that an "authorization to search for 'evidence of *a* crime,' that is to say, any crime," satisfies the Fourth Amendment).

The fruits of the October Warrants should therefore be suppressed.  *See, e.g.*, *Zemlyansky*, 945 F. Supp. 2d at 476.  To the extent the government contends that portions of its searches are salvageable, we will address that contention in reply or, if necessary, at an evidentiary hearing.  (*See* Point I.E *supra*).  In addition, once Defendants are able to review the documents seized pursuant to the October Warrants, there may be further bases for suppression.

## III.    The Government's Conduct With Respect To Third-Party Searches Raises Questions About Its Good Faith And Justifies Further Suppression

The government also appears to have disregarded the terms of other search warrants in this case, violating the constitutional rights of third parties and ignoring the limits imposed on its conduct by judicial officers.  This conduct provides a further reason that, if the Court does not suppress the fruits of the March and October Warrants outright, it should hold an evidentiary hearing to determine whether the government executed those Warrants in compliance with their terms.

As explained above, in the March Affidavit, the government sought a search warrant for the email account of ██████████    The government represented that, out of the mass of information obtained from Google, the government would search for and seize a subset of that information.  (March Affidavit, Attachment B-3).  Thus, the warrant for ████████ account almost certainly purported to impose some limits on the government's ability to search for and seize ████████ emails.  Nevertheless, the government produced the *entire* account to Defendants in discovery.  (Declaration of Kathleen E. Cassidy ¶¶ 4-8, Exs. B ,D).  The government also produced the *entire* email account of one of ████████████, which the government also obtained through a search warrant.  (*Id.* ¶¶ 2-3, 6-8).

By all appearances, the government's dissemination of the entirety of these email accounts, rather than the portions identified by the warrants, contravened the terms of the

warrants and violated the Constitution.  It certainly violated the Fourth Amendment privacy interests of the account holders.  *Cf. Caldarola v. Cty. of Westchester*, 343 F.3d 570, 575 (2d Cir. 2003) ("dissemination of [a] videotape [of a perp walk] implicate[d] privacy interests that are protected by the Fourth Amendment"); *Lauro v. Charles*, 219 F.3d 202, 209-10 (2d Cir. 2000) (the "improper exacerbation of an otherwise lawful seizure" violates the Fourth Amendment). Moreover, the dissemination of the full accounts contradicted the government's representations to the magistrate concerning the scope of the information to be seized and searched.

This is not an isolated instance.  In another case in this District, "the government repeatedly asserted its intent to release indiscriminately [several hard drives it had seized and imaged] to *every* defendant, prior to conducting any review to determine if it contained evidence outside the scope of the warrants."  *United States v. Metter*, 860 F. Supp. 2d 205, 215 (E.D.N.Y. 2012).  The court found that the contemplated "release to the co-defendants of any and all seized electronic data without a predetermination of its privilege, nature or relevance to the charged criminal conduct" constituted an "assault on [the defendant's] privacy" and "underscore[d] the government's utter disregard for and relinquishment of its duty to insure that its warrants [we]re executed properly."  *Id.*

If the government believes that it can violate the rights of third parties because Defendants lack standing to complain, then it is possible that the government believes it can make evidentiary use of this material with impunity, as well.  This also suggests that the government's execution of the March Warrant and October Warrants deserve special scrutiny, and that if the government asserts that it relied on those Warrants in good faith, the Court should hold an evidentiary hearing in order to test that assertion and examine the procedures used to search through and seize Bronfman's emails.

23

In addition, the Court should suppress the evidence seized from the third-party email accounts at issue.  Federal courts may exercise their "supervisory powers" to "implement a remedy for violation of recognized rights," to "preserve judicial integrity," and "as a remedy designed to deter illegal conduct."  *United States v. Hasting*, 461 U.S. 499, 505 (1983); *see, e.g.*, *United States v. Johnson*, 221 F.3d 83, 85, 96-97 (2d Cir. 2000) (exercising supervisory power to decline to entertain government's cross-appeal due to improper prosecutorial conduct); *United States v. Ming He*, 94 F.3d 782, 792 (2d Cir. 1996) (exercising supervisory power over federal prosecutors to hold that "cooperating witnesses are entitled to have counsel present at debriefings").  To deter the government's improper dissemination (and possible misuse) of third-party emails, the Court should suppress the entirety of the searches of these accounts.

We acknowledge that binding precedent prevents criminal defendants from invoking the court's supervisory powers to suppress third-party evidence in which the defendants have no privacy or property interest.  *See United States v. Payner*, 447 U.S. 727, 730-36 (1980); *United States v. Anderson*, 772 F.3d 969, 976 (2d Cir. 2014).  Nevertheless, we preserve for further review the contention that the government's conduct should not be permitted.  It is especially crucial that if "the government comes into possession of evidence by circumventing or willfully disregarding limitations in a search warrant, it must not be allowed to benefit from its own wrongdoing by retaining the wrongfully obtained evidence or any fruits thereof."  *United States v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1174 (9th Cir. 2010).

24

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should suppress the fruits of the March Warrant, the

October Warrants, and the third-party warrants described above.


Dated:          January 9, 2019
                New York, New York

                                        Respectfully submitted,


                                        /s/ Alexandra A.E. Shapiro
Susan Necheles                          Alexandra A.E. Shapiro
Kathleen E. Cassidy                     Fabien M. Thayamballi
Hafetz & Necheles LLP                   Shapiro Arato LLP
10 East 40th Street, 48th Floor         500 Fifth Avenue, 40th Floor
New York, New York 10016                New York, New York 10110
(212) 997-7400                          (212) 257-4880

                                        *Attorneys for Defendant Clare Bronfman*