1

```
 1   UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF NEW YORK
 2   ------------------------------x
                                      18-CR-204(NGG)
 3   UNITED STATES OF AMERICA,
                                      United States Courthouse
 4            Plaintiff,             Brooklyn, New York

 5            -against-             August 21, 2018
                                      2:00 p.m.
 6   CLARE BRONFMAN,

 7            Defendant.

 8   ------------------------------x

 9        TRANSCRIPT OF CRIMINAL CAUSE FOR BAIL APPLICATION
            BEFORE THE HONORABLE NICHOLAS G. GARAUFIS
10             UNITED STATES SENIOR DISTRICT JUDGE

11   APPEARANCES

12   For the Government:      UNITED STATES ATTORNEY'S OFFICE
                              Eastern District of New York
13                            271 Cadman Plaza East
                              Brooklyn, New York 11201
14                            BY:  MOIRA KIM PENZA
                                   TANYA HAJJAR
15                                 KATHLEEN ELIZABETH CASSIDY
                              Assistant United States Attorneys
16

17   For the Defendant:      HAFETZ & NECHELES LLP
                              10 East 40th Street
18                            48th Floor
                              New York, New York 10016
19                            BY:  SUSAN R. NECHELES, ESQ.
                                   KATE E. CASSIDY, ESQ.
20

21   Court Reporter:         LINDA D. DANELCZYK, RPR, CSR, CCR
                              Phone:  718-613-2330
22                            Fax:    718-804-2712
                              Email:  LindaDan226@gmail.com
23


24

25   Proceedings recorded by mechanical stenography.  Transcript
     produced by computer-aided transcription.
```

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    2

1              (In open court.)

2              THE COURTROOM DEPUTY:  All rise.  Criminal cause for

3    bail application hearing.  Case Number 18-CR-204, U.S.A. v

4    Clare Bronfman.

5              Counsel, please state your appearances for the

6    record.

7              THE COURT:  You may be seated in the back.

8              Appearances.

9              MS. PENZA:  Thank you, Your Honor.  Moira Kim Penza,

10   Tanya Hajjar and Karin Orenstein for the United States.  Good

11   afternoon, Your Honor.

12             MS. NECHELES:  Susan Necheles and Kate Cassidy for

13   Ms. Bronfman, who is here as well, Your Honor.  Good

14   afternoon, Your Honor.

15             THE COURT:  Good afternoon.

16             All right.  I understand that the financial package

17   of $50 million in assets has been completed; is that correct?

18             MS. PENZA:  It is, Your Honor.

19             THE COURT:  And in defense counsel's letter of

20   August 20th, there's a chart which sets forth the figures; is

21   that correct?

22             MS. PENZA:  That's correct, Your Honor.  I'm just

23   going to confirm.

24             THE COURT:  I can't hear you.

25             MS. PENZA:  I'm sorry, Your Honor.  I was going to

PROCEEDINGS                           3

1   have Ms. Orenstein confirm that.  I've looked at it and I

2   believe that is correct.

3           THE COURT:  Ms. Orenstein?

4           MS. ORENSTEIN:  Yes, that's correct.  I've been

5   working with defense counsel to make sure that all the

6   documents that were necessary were coming in.  They did come

7   in.  Everything's been filed and is in order, as far as the

8   government's concerned.

9           THE COURT:  All right.  And you agree?

10          MS. NECHELES:  Yes, Your Honor.

11          THE COURT:  Okay, so that issue has been resolved.

12          And what other issues did we have from the last

13  meeting that we had weeks ago?

14          MS. NECHELES:  Your Honor, if I could.

15          I believe that at the last meeting Your Honor left

16  open two issues.  You said that in the interim, until we

17  fulfilled the conditions, that you were going to place

18  Ms. Bronfman under house arrest and with GPS monitoring and,

19  in addition, you would restrict the people that she could

20  associate with.

21          But you told Your Honor -- you told us that we could

22  raise that again today after we fulfilled all the conditions.

23          We worked with the government, Ms. Orenstein was

24  very good to work with.  We were able to get everything done,

25  it was complicated but we appreciate her help in that we were

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    4

1    able to get all of those conditions satisfied at this point.

2              So I would like to address --

3              THE COURT:  Let's me just hear from the government

4    on that particular issue because it seems to be a bone of

5    contention.

6              I've just read the government's latest submission

7    which arrived a few minutes ago.

8              Have you seen it?

9              MS. NECHELES:  Yes.

10             THE COURT:  Oh, good.

11             MS. PENZA:  Your Honor, would you like the

12   government to approach?

13             THE COURT:  Come on up, let's have everybody up

14   here.

15             MS. PENZA:  Okay, Your Honor.

16             Yes, I apologize for the late filing, we were

17   responding to the filing we received yesterday afternoon.  We

18   have --

19             THE COURT:  I'm not being critical of anybody.  I'm

20   just saying when I received it.  Not that it was late or --

21   everyone seems to be filing at last minute, so why should you

22   be any different.

23             Go ahead.

24             MS. PENZA:  Understood, Your Honor.  I'm sorry, Your

25   Honor, what exactly are you...

PROCEEDINGS                              5

1                THE COURT:  Well, the question of whether the terms

2        of Ms. Bronfman's release were temporary in nature and not --

3        and would be rereviewed and reconsidered at this meeting.

4                MS. PENZA:  Your Honor, specifically as to the home

5        detention, Ms. Necheles certainly did reserve her right at the

6        time once the security had been met to raise that.

7                As to the association issue, that I recall there

8        being a discussion about limiting the provision and hopefully

9        the parties agreeing to it.  But, again, it was relatively up

10       in the air.  So the government would not say that either of

11       those were solidified, even in the government's view.

12               So I think both of those are open issues, although

13       we certainly never intended there to be an understanding that

14       there would be a provision such that Ms. Necheles is now

15       suggesting.  It always seemed that the parties were to be

16       contemplating some way of narrowing the original association

17       provision, which stated that the defendant would have no

18       contact with any current or former members of NXIVM.

19               There was an objection regarding what constitutes a

20       member of NXIVM.  We then worked to propose something

21       different, and I believe Ms. Necheles is now seeking a

22       provision that only limits Ms. Bronfman's communication with

23       codefendants except in the presence of counsel.

24               MS. NECHELES:  Your Honor, maybe it would be helpful

25       for me just to address first one and the government can

PROCEEDINGS                                6

1    respond and then...

2          So I think, if I could address the home detention

3    first, and we can deal with the association second.  Because I

4    think the association might be a little more complicated.

5          Your Honor, what we are proposing at this point is

6    essentially that Ms. Bronfman be allowed out of the house

7    during the daytime with the restriction of where she could go.

8    She would be restricted to the terms of what Your Honor has

9    said of where she is able to travel to.

10          And my understanding with having spoken to pretrial

11   services, including today, is that what we are proposing is

12   totally technologically feasible, and there's one of the three

13   ways that this is commonly done by pretrial services.

14          So we'd have a curfew, and there would be a

15   restriction on the area she could travel.  And if she traveled

16   outside that area, she would continue to have her GPS bracelet

17   monitor on her ankle.  If she traveled outside of that area or

18   anywhere near the ports or an airport, there would be an alarm

19   that went off immediately at services.

20          They would not be monitoring her moment by moment

21   where she is, but they would have a curfew that she will be

22   in.

23          One of the pretrial officers is in court here today

24   and I spoke to her.  I saw that in the government's letter

25   they said that this was not feasible.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                          7

1          I asked pretrial, maybe the government didn't

2    understand what I was suggesting because I am told that this

3    is feasible, technologically feasible.

4          We believe that this would be a sufficient

5    restriction to prevent her from fleeing; to be home every

6    night, if she left Manhattan, if she left the area, they would

7    have an immediate alarm.

8          The only difference really would be that the area

9    she's allowed to be in is a little bit bigger.  Right now

10   she's allowed to be in her home.  Then it would be Manhattan

11   and Brooklyn, Queens essentially.  But if she stepped out of

12   those area or stepped into an airport or stepped into one of

13   the ports, the alarm would immediately sound for pretrial.

14          MS. PENZA:  Your Honor, I also spoke to Ms. Quijije,

15   I believe it is, who is in the courtroom today.

16          THE COURT:  Why doesn't she come up.

17          Good afternoon, ma'am.  Please state your

18   appearance.

19          PRETRIAL SERVICES OFFICER:  Good afternoon, Your

20   Honor.  Jeannine Quijiji, pretrial services.

21          THE COURT:  Welcome.

22          PRETRIAL SERVICES OFFICER:  Thank you.

23          MS. PENZA:  And, Your Honor, obviously, Ms. Quijije

24   is now here, but the government did speak to her today, and

25   our position was not that it was technologically not feasible.

PROCEEDINGS                                    8

1   My understanding, from my conversation just so the Court

2   understands the record that the government was making, was

3   that practically it's not feasible.

4           In order to effectively monitor the defendant, this

5   is not something that is routinely, if ever, done where there

6   would be a certain location where they would be monitoring

7   her.  Usually there is curfew, or there is home detention.

8           Home detention enables pretrial services to expect

9   to know where she is most times, and then the government in --

10  again, trying to fashion the least restrictive conditions that

11  we believe would mitigate the risk of flight, proposed that

12  there be a certain period of time each day or not -- excuse

13  me, Your Honor, a certain period of time where Ms. Bronfman

14  would have more freedom beyond her home.

15          When I spoke to Ms. Quijije about that, she informed

16  me that three days a week of 90 minutes would be a reasonable

17  period that pretrial could effectively monitor and make sure

18  that Ms. Bronfman did stay within the designated area.

19          THE COURT:  Is that right?

20          PRETRIAL SERVICES OFFICER:  That's correct, Your

21  Honor, under home detention.

22          THE COURT:  Under home detention.

23          PRETRIAL SERVICES OFFICER:  Correct.

24          THE COURT:  I see.

25          MS. NECHELES:  Your Honor, what we're proposing is a

PROCEEDINGS                              9

1   curfew, which I understand is a common form that pretrial does

2   when there is no realistic harm to others.  There is no reason

3   here that home detention is required as opposed to GPS

4   monitoring.

5        What we are saying is we believe that the least

6   restrictive way of ensuring that Ms. Bronfman appear is a

7   curfew, which is technologically available, it's something

8   that is it commonly done, as I understand it; and would

9   immediately notify pretrial if she left the designated area.

10  It just gives her a little bit of a larger designated area.

11       As you can imagine being in a one -- in someone's

12  one-bedroom apartment for months, it's difficult, it's very

13  restrictive, and so we're asking for a less restrictive.  This

14  is a woman who is used running, jogging, exercising and would

15  like to be able to do that within Manhattan.

16       MS. PENZA:  Your Honor, the government, in light of

17  the case, in light of the extraordinary flight risk of the

18  defendants, we don't believe that's appropriate in order to

19  effectively monitor her.

20       We are, as the government stated, we believe that

21  there are positions that we could take, as we have, that would

22  allow Ms. Bronfman the time outside of her one-bedroom

23  apartment.  The government obviously understands that point.

24  But to have unfettered access to all of Manhattan all day long

25  does not comport with the flight risk in this case.

PROCEEDINGS                                    10

1          THE COURT:  I see.  Well, as I stated previously,

2    the Court is concerned that Ms. Bronfman is not the type of

3    defendant in terms of the availability of means to depart the

4    jurisdiction that most other people have.  And assuming her

5    good faith and all, at this time, a month down the road, two

6    months down the road that all may change, depending on what's

7    in discovery and what the circumstances are.  I have no idea,

8    not having seen any of that.  But I think she has the

9    capability, the financial capability, notwithstanding the very

10   large sum money that's been placed by her as security that she

11   could leave the jurisdiction.

12          But I am concerned that she's certainly entitled,

13   while she's on bail, to be able to have physical exercise, see

14   her friends who are not associated with the case in some way.

15   And if it becomes apparent that she needs to get a health club

16   membership be go to a health club for an hour and half a day,

17   we'll talk about that later on.

18          But for the time being, I'm going to require that

19   she be on home confinement subject to those three

20   90-minute-a-week breaks that will be coordinated with pretrial

21   services.

22          And I think that what's quite clear about New York

23   City is it's a big place; Queens, Brooklyn and Manhattan,

24   south of 96th Street, might as well be offering someone the

25   opportunity to see the world, because you can certainly see

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                    11

1    the world in Brooklyn, Queens and Manhattan, at least in terms

2    of the city of people and the different communities, different

3    types of eateries.

4           And I understand why she would want this, but I have

5    a concern about her potential for flight.  I also have a

6    letter here, which I read, from a firm, a law firm in

7    Philadelphia.  I'm putting that aside and not considering that

8    because I think it's not fair to Ms. Bronfman for me to start

9    considering third-party submissions in connection with her

10   bail.

11          MS. NECHELES:  I appreciate that.

12          THE COURT:  All right.  And if -- let me put it this

13   way:  If after a month or two there is good reason to

14   reconsider, I will reconsider.  But for the time being, and

15   subject to the three-day-a-week, 90-minutes-a-day exception

16   and exception that pretrial might make for trips to a health

17   club, for instance, for her physical health and mental health,

18   I'm requiring that she remain at home for now.

19          And I would add that I also have a concern that all

20   of these sureties were really not made aware of the suggestion

21   that Ms. Bronfman be able to travel around the city during the

22   day every day.  And if I am going to reconsider at some point,

23   I would want to bring back all the sureties, including

24   Ms. Bronfman's mother, to hear from them about whether they

25   want to continue the sureties in person in court.  All right?

PROCEEDINGS                                    12

1          But I certainly will keep an open mind.  All right?

2          MS. NECHELES:  I appreciate that, Your Honor.

3          I would just mention that Ms. Bronfman does come

4   regularly to our office, and has done so and has permission

5   from pretrial, and there really has been no problem.  She

6   comes to our office.  She is not being monitored in that time.

7          THE COURT:  Why should she, she's with you?  I

8   assume that she comes to your office, you have your

9   discussions and maybe you're ordering lunch from a nice

10  restaurant.

11         MS. NECHELES:  She eats much more carefully than I

12  do, Your Honor.

13         THE COURT:  But still, you could order carefully.

14  And if she orders carefully, good for her.

15         Yes, ma'am.

16         PRETRIAL SERVICES OFFICER:  Just to clarify, she is

17  still being monitored, her location is being monitored, so we

18  know --

19         THE COURT:  Where she is.  She's not being -- no

20  one's watching her --

21         PRETRIAL SERVICES OFFICER:  Correct.

22         THE COURT:  -- at the conference table.

23         PRETRIAL SERVICES OFFICER:  Correct.

24         THE COURT:  No, I understand what it means.  Okay.

25         All right, so there we are.

*LINDA D. DANELCZYK, RPR, CSR, CCR*
*Official Court Reporter*

PROCEEDINGS                                      13

1          Next subject.

2          MS. NECHELES:  So if I could address then the issue

3   of her association.

4          THE COURT:  Let's do that.

5          MS. NECHELES:  So, Your Honor, the government, the

6   cases, and I've read the cases, and I tried to quickly read

7   the case cited by the government here.  The cases are very

8   clear that with respect to association, that putting a

9   limitation on somebody's association, even in a criminal case

10  before somebody has been convicted -- there's different case

11  law that governs after conviction, but prior to any

12  conviction, that's a serious infringement on someone's

13  constitutional right, and it has to be justified on an

14  individual basis; you know, with respect to each individual,

15  with a compelling government reason.

16          What the government has cited here is -- and the

17  cases what they say -- you know, the one case talks about, you

18  know, I'm not associating with other -- with felons.  And they

19  know that could be a compelling reason.

20          But what the government is saying here is that

21  Ms. Bronfman should not be able to associate even with people

22  who want to associate with her:  People who are her friends.

23  People who are her employees.  They're saying that employees

24  should have to lose their job, even though they want to work

25  for Ms. Bronfman, that her accountant should lose her job

PROCEEDINGS                                            14

1    because the government says they may call this person as a

2    witness.

3              Not because Ms. Bronfman is alleged to be

4    interfering with those people, but because they say that in

5    the past, she has been involved in aggressive litigation.

6              Now, all of that litigation, every single aspect of

7    it, was run by lawyers and was totally managed by lawyers.  We

8    are not talking about any letter or any action or any phone

9    call ever done by Ms. Bronfman.  We're talking about letters

10   and litigation by lawyers, including a lawyer in Mexico, who I

11   believe has said, I have read the letter, and what he has said

12   to people is you are interfering with business relationships,

13   and if you continue to do so, we will the -- this may be a

14   criminal charge.

15             It's not -- I do not believe that there is a

16   criminal charge against anybody in Mexico, but he has -- there

17   have been ten years of fighting between people at NXIVM and

18   people on the outside, with the criminal cases brought by law

19   enforcement authorities against people who hacked into NXIVM,

20   who stole material, who altered information on a computer.

21             Prosecutors have found this to be valid information.

22   I know Your Honor doesn't have enough in front of you to make

23   this decision, but I am telling you, there are cases and there

24   is no question about that.  Now -- that this has happened.

25             Courts have found, in civil litigation, that people

PROCEEDINGS                                              15

1   have committed serious wrongdoing against NXIVM.   The

2   mitigations may have been or may not have been, however, all

3   of that will be litigated in this case, I doubt it, because

4   the government wants to bring it all in this case, and we

5   welcome it, because we believe there was serious wrongdoing,

6   and we will be able to explain it.

7            But none of this has involved any threats or any

8   misbehavior by Ms. Bronfman.  No court has ever said she did

9   anything inappropriate with any of these people.  The only

10  person who is saying that is a class action lawyer who is

11  writing to Your Honor.  We welcome him to tell us who he

12  doesn't want her to associate and we will not -- she will not

13  contact any of those people.

14           If there is an individual who is saying they don't

15  want contact from Ms. Bronfman, we don't want to go there.  We

16  will stay away from that person.  But what we are saying is

17  that if somebody wants to be friends with Ms. Bronfman and

18  asks to be friends with her and is seeking to have a

19  relationship with her, there is just no legitimate reason for

20  the Court or the government here to be saying she should not

21  be associating with those people.  They are -- I respectfully

22  submit that the government here is attempting to use court

23  process to isolate her and to push people into cooperating

24  against her.

25           Depriving people of their livelihood --

PROCEEDINGS                                             16

1          THE COURT:  That's a jump.

2          MS. NECHELES:  Your Honor, depriving people of their

3     livelihood and saying we want you to be a witness for us is

4     wrong.  That's a person who wants to work for her, who has

5     said to us, her lawyer has said to us she wants -- the

6     bookkeeper wants this job.  If she can't talk to Ms. Bronfman,

7     she can't have the job.

8          So we don't understand what the purpose of this

9     would be, and we object to all of these restrictions.  We do

10    not object at all to a restriction of saying that if a person

11    says they don't want to talk to Ms. Bronfman, that she not

12    contact them.

13         And we don't have an objection to a restriction

14    which says that she not contact people who are codefendants

15    outside the presence.

16         But, Your Honor, I want to point out this:  She's

17    not charged in any of the DOS.  She's not charged with even

18    knowing about DOS.  I think the government would agree she

19    didn't even know about DOS until the newspaper articles

20    started coming out.  She's not charged with -- when government

21    proposes that she can't associate with DOS members, they're

22    secret.  We don't know who the DOS members are.  There is no

23    list of DOS members.  It was a secret organization.

24         She's not charged with any violence against them.

25    She's not charged with being involved in any master/slave

PROCEEDINGS                                         17

1   relationship or anything like this.  So we don't think that

2   there is any valid government purpose for these broad

3   restrictions.

4           THE COURT:  Okay.

5           MS. PENZA:  Your Honor, the government does believe

6   that these are tailored to concerns that the government has in

7   its specific case.

8           Your Honor, we charged a racketeering case.  This is

9   a criminal enterprise.  There are unindicted coconspirators.

10  There are also numerous witnesses.

11          Now the government is not in a position to identify

12  who our witnesses are and what our conversations with various

13  witnesses are, but Ms. Necheles, the person with whom

14  Ms. Necheles is talking about is not here to speak for

15  herself.

16          And for there to be the -- for the onus to be on

17  potential witnesses to say to Ms. Bronfman, who has wielded an

18  enormous amount of power in this organization that operates in

19  specific ways that the government has alleged as part of its

20  indictment, that relies on harassment, that relies on

21  intimidation, for it to be the onus of the potential witnesses

22  to say Ms. Bronfman I don't want to speak to you, that's

23  inappropriate, Your Honor.  And this is not an unusual

24  condition.

25          But essentially here because of -- because the case

PROCEEDINGS                                        18

1    is unique, the government was fashioned -- was attempting to

2    fashion a way that would be a proxy for potential witnesses.

3    And, in fact, here there are many ways in which Ms. Bronfman's

4    constitutional rights are -- that it is now, we tailored it,

5    to protect Miss Bronfman's constitutional rights.

6            So, for example, there were four individuals who

7    Ms. Necheles has offered, since Ms. Bronfman was indicted,

8    that she wanted to speak to.  Three of those the government

9    agreed to.  And so in light of that, Your Honor, we believe

10   that this is a provision that should stand and is necessary in

11   order to protect the integrity of the trial process.

12           MS. NECHELES:  Your Honor, can I add a few things?

13           First off, NXIVM is no longer in business.  So to

14   extent that they say NXIVM was harassing, it's no in business,

15   it's not operating at this point.

16           We agree we will not -- Ms. Bronfman will not sue

17   anybody.  If they're concerned about aggressive litigation,

18   she will not sue anybody with respect to NXIVM while this case

19   is pending.  So that any --

20           THE COURT:  If it doesn't exist, why would she sue

21   anybody?

22           MS. NECHELES:  That's the only thing she

23   supposedly -- the only way she supposedly harassed anybody.

24           And I am saying that one of these people, who they

25   have identified came forward and said she wants to be a

PROCEEDINGS                                    19

1     associating with Ms. Bronfman, other people have told me that.

2               This is a lot of people they are talking about.  And

3     when they talk about the stripe path and that the she should

4     have nothing to do with people on the stripe path, there were

5     5 to 700 people who have gone through that, and 300 people

6     currently.  There's a lot of people they are talking about.

7     These are not all potential witnesses.

8               THE COURT:  But if they are potential witnesses,

9     they would be meeting -- if possible, they would be your

10    witnessed and they would be meeting with you.  They don't need

11    to meet with Ms. Bronfman in order to be available to her to

12    assist you with your case.

13              MS. NECHELES:  Right.  We are talking about two

14    different things.  And I don't think she will be contacting

15    all these people.

16              I'm talking about whether she can be in contact with

17    the people who are her friends, and employees, and people she

18    has associated with for many years and who are not alleged to

19    have done anything criminal, have not been indicted, and who

20    are her friends.

21              What is the valid restriction, the compelling

22    government interest in preventing her from associating with

23    friends as opposed to an employee and people who want to

24    associate with her, people not alleged to have been involved

25    in the criminal activity?  It's a separate question of us

PROCEEDINGS                        20

1    contacting.

2              THE COURT:  If she may friends she went to college

3    with.  I don't think we're talking about her college friends.

4              MS. NECHELES:  We're talking about her NXIVM

5    friends.  She's been involved --

6              THE COURT:  We're only talking the NXIVM people, and

7    I'm sure that a person who has, over the course of her life,

8    had many, many friends and acquaintances has many friends and

9    acquaintances who have absolutely no connection with any of

10   these entities; with stripe path, with NXIVM, with DOS.

11             And really, I wanted to go over what is proposed on

12   page 3 in the government's letter to see exactly what the

13   problem is.

14             Is what you're proposing, counsel, what's, in

15   effect, the second paragraph under Roman numeral II?

16             MS. PENZA:  Yes, Your Honor.

17             THE COURT:  All right, so let's just go over it.

18   All right?

19             The first item is the defendant may not directly or

20   indirectly associate or have contact with, except in presence

21   of her attorneys, current or former employees or independent

22   contractors of or for NXIVM, including any and all affiliated

23   entities current -- current entities.

24             That's the first.  That's the first limitation.

25   What's the problem with that?

PROCEEDINGS                                      21

1              MS. NECHELES:  So many of those people are her

2     friends, close friends, and her accountant is one of those

3     people.  Her current accountant is one of those people.  A

4     former -- a current -- a former employee of NXIVM and, in

5     fact, a current employee, someone who is in charge of trying

6     to get tax returns and things filed for NXIVM.

7              This is a person who has said to us, whose attorney

8     has said she wants to continue to have this job.

9              THE COURT:  All right, stop for a minute.

10             What about the accountant?  I mean because that

11    seems to be the claim being made as to that issue.

12             MS. PENZA:  So, Your Honor, the government's

13    position as to the accountant is that it is inappropriate for

14    her to continue being the accountant.

15             This is an accountant who has the wherewithal to get

16    a new job.  That is not going to be a concern for the

17    accountant.  I understand the accountant may want to have the

18    immediate job that's available, but that job has not been able

19    available for the past several weeks since, and that has been

20    fine.

21             And then in addition, here, that accountant, in

22    particular, is intimately involved.  And we're talk about

23    potential witnesses.  This one charged conduct in our

24    indictment where the accountant was the accountant during the

25    time period where there's alleged to have been improper

PROCEEDINGS                           22

1    financial transactions.

2              So the government has a very specific concern

3    regarding this accountant continuing to communicate with

4    Ms. Bronfman.

5              Now, that being said, Your Honor, the government has

6    stated that it has no objection to -- my understanding is

7    right now there are two accountants for Ms. Bronfman.  And

8    that indeed over the past -- since Ms. Bronfman's arrest,

9    there actually has been -- the accountant at issue has been

10   doing some work for Ms. Bronfman, with the other accountant as

11   an intermediary.  And so it is not an infeasible thing for

12   this accountant to continue doing work, if it is so important

13   that she continue doing that work --

14             THE COURT:  Without direct contact.

15             MS. PENZA:  Without direct contact.

16             MS. NECHELES:  It's not the same work.  She can't

17   have an employee she can't talk to.  Especially an accountant.

18   It's basically her bookkeeper.

19             THE COURT:  She should find somebody else.  Let her

20   find somebody else.

21             MS. NECHELES:  We do not believe the government has

22   stated a reason --

23             THE COURT:  That's not a reason?

24             MS. NECHELES:  No.  There's many, many cases where

25   the government -- there's many cases involving corporations

PROCEEDINGS                                    23

1    where the government can't just come in and say somebody is

2    charged here so you have to fire these other people.  You

3    can't hire -- you can't -- you have to fire your secretary

4    because she may be a witness.

5           This happens all the time.  The government doesn't

6    get to come in and say we've brought a criminal case, so you

7    have to fire that person.  They don't have the right to do

8    that.  There is no allegation of witness tampering here or

9    anything improper ever by Ms. Bronfman.  I don't think that

10   they have the right to do this, to come in and say fire your

11   employee.  This woman who was never charged with anything, she

12   gets to lose her job because we, the government, say so.  I

13   don't think they have the right to do that.

14          THE COURT:  And?

15          MS. PENZA:  Your Honor, the defendant has not cited

16   any law as to what she is currently stating.

17          THE COURT:  She can cite some law and send it to me.

18   Send me some law.

19          MS. NECHELES:  Your Honor, I will.

20          THE COURT:  I mean, you know --

21          MS. NECHELES:  I'll send you --

22          THE COURT:  -- in this room I've heard everything so

23   you can add that to the list.

24          MS. NECHELES:  Yes, but I believe that the cases

25   that we cited, which talk about how there has to be a

PROCEEDINGS                                    24

1    compelling government reason.

2            I mean I think that if the government is asking Your

3    Honor to cause a woman to lose her job --

4            THE COURT:  No, that's not what they said at all.

5    No.  No.  No.

6            MS. NECHELES:  That is what they are saying.

7            THE COURT:  Oh, no, no, no.  Oh, no.

8            What they said was there would be no direct contact,

9    but there could be contact through another person so that all

10   of the information necessary to fulfill the defendant's

11   obligations to file tax returns and review financial documents

12   can be met with the intermediary, and since she already has

13   another accountant, it can be done that way.

14           MS. NECHELES:  What I heard the government say --

15           THE COURT:  They're saying that she's a friend.  The

16   friend part is the part that's the problem.  It's not that the

17   accountant part that's the problem here.  It's the friend

18   part.  If she wants to hang out, the answer is "no".

19           MS. NECHELES:  No, let me be clear.  The problem is

20   we cannot have an employee who Ms. Bronfman cannot talk to.

21   She cannot spend her life trying to go around finding someone

22   else.  It just won't work.  The government's first comment was

23   she with find another job, not a big problem.  Then they said,

24   well, she can set up this other.  This can't happen, Your

25   Honor, it's not feasible.

PROCEEDINGS                                    25

1              THE COURT:  All right, send me a memo about why I --

2              MS. NECHELES:  I will, Your Honor.  With respect to

3     friends who are also in this group.

4              THE COURT:  On that, did you have something to add?

5              MS. PENZA:  Yes, Your Honor, I just wanted to be

6     very clear.  There is another bookkeeper in place.  So this

7     isn't a matter of Ms. Bronfman going out to find one.  There

8     is another one in place currently who could act, and has been

9     acted over the past six weeks as the intermediary.  So this is

10    not some pie-in-the-sky proposal by the government, and it is

11    specifically in order to narrowly tailor this to protect

12    Ms. Bronfman's rights.

13             MS. NECHELES:  The only reason we've been doing that

14    way in this is unbelievably difficult way is because of this

15    provision in the bail.  We can't continue this forever.  You

16    have to double pay to get one person's job done.  You need two

17    people now to do one person's job.  It's just not feasible.

18             So this person will lose her job because of the

19    government.  And I don't think the government has the right to

20    do that, to come in and say that we should put this kind of

21    restriction on a woman who's just trying to earn a living

22    because the government thinks maybe they might be interested

23    in her as a witness in this case.

24             THE COURT:  Well, what they're doing, essentially,

25    is conflating a friendship with a business obligation.

PROCEEDINGS                          26

1          MS. NECHELES:  No, Your Honor, this is not a friend.

2    I'm talking about two separate things.

3          I'm talking about a business that an employee, who

4    now the government is saying you need a second employee to

5    interact with the first employee because you can't speak to

6    them.  That, she's not going to pay twice for the same work.

7    She has been doing it for the last six weeks so that we can

8    raise this with Your Honor, but it just makes no sense.

9          But this is not a friendship.  This is an employee

10   situation.  There is a separate issue I want to raise with

11   respect to friends, who fall within this category.

12          THE COURT:  Well, we're dealing with the bookkeeper.

13   This is a bookkeeper we're talking about?

14          MS. PENZA:  Yes, Your Honor.

15          THE COURT:  This is a CPA or just a bookkeeper?

16          MS. NECHELES:  I don't know if she is also a CPA.

17          But she is a person who handles -- her bookkeeper.

18   She is a person who handles her financial affairs, someone who

19   normally she will be talking to 10, 15, 20 times a day.  And

20   instead now she has to call somebody else to call the

21   bookkeeper to find out, you know, it just doesn't work.

22          MS. PENZA:  Your Honor, I just want to be clear.

23          THE COURT:  It's the -- the issue really is the

24   status of the bookkeeper in the overall enterprise

25   potentially, all right?  And that's whatever it is.  That's

PROCEEDINGS                                                    27

1      the problem.  That's the situation.

2              I don't know that there's very much I can do to help

3      you with that.  If she loses her job because Ms. Bronfman was

4      using her to do things that were not appropriate, allegedly,

5      if that's the case, is that what's being alleged?

6              MS. PENZA:  Yes, Your Honor.

7              I'm alleging it, Your Honor.

8              MS. NECHELES:  I would ask for specifics because

9      this is --

10             THE COURT:  We're not trying the case on a bail

11     application.

12             MS. NECHELES:  Yes, but the government needs to give

13     a compelling reason, they should say what --

14             THE COURT:  You send me a memo --

15             MS. NECHELES:  Okay.

16             THE COURT:  -- about why I have to do this the way

17     you want me to do it.

18             MS. NECHELES:  I just think it's required --

19             THE COURT:  There are solutions.  If this can't be

20     worked out, Ms. Bronfman can have telephone conversations with

21     you from the MDC.

22             Don't get me going.  I'm not here to provide a

23     solution that's unworkable.  I'm trying to provide a solution

24     that's fair, equitable, and has the minimal problem for your

25     client.  But we're going into such detail here, you want --

PROCEEDINGS                                          28

1    you want a lot.

2              MS. NECHELES:  Your Honor, so are we.  I mean,

3    respectfully, I hear what you're saying and I understand how

4    frustrating and difficult this can be.

5              THE COURT:  It's not frustrating, I'm just telling

6    you it's going to be my way or she goes to the MDC.

7              MS. NECHELES:  Your Honor, it's always your way.

8              THE COURT:  It's going to be my way in the end.

9              MS. NECHELES:  Yes, it is.

10             THE COURT:  So, you know, anything else on this

11   point?

12             MS. PENZA:  Not on that point, Your Honor.

13             THE COURT:  Send me a memo.  I'll consider anything

14   you send me, all right?  Case law.  I'm happy to consider

15   anything you have to say, believe me.

16             MS. NECHELES:  I'll send you a memo on this whole

17   issue, on her friends --

18             THE COURT:  We haven't gotten to the friends.  Now

19   you're ahead of us.  You're getting ahead of us.

20             Let's talk about the friends.

21             MS. NECHELES:  Your Honor, Ms. Bronfman has good

22   friends, very close friends for a number of years who were

23   what are called "independent contractors".  NXIVM was a

24   business.  It was a business that had about $7 million annual

25   revenue.  And in the course of it, many of the people who

1    worked -- associated were working, were independent

2    contractors.  She was -- Ms. Bronfman as involved in it, and

3    was close friends with many of the people.

4              These people are not alleged -- have not been

5    indicted, have not been charged with any crime.  They are her

6    friends.  We do not understand why she should be restricted

7    from speaking with them.

8              MS. PENZA:  Your Honor.

9              THE COURT:  This is the second application.

10             MS. PENZA:  Yes.

11             MS. NECHELES:  No, we're still on the first.

12             THE COURT:  No, wait a minute.  I haven't read about

13   friends.

14             MS. NECHELES:  Current or former employees or

15   independent contractors of or for NXIVM.

16             THE COURT:  I see.

17             So you're saying that this category, these are her

18   friends, some of them.

19             MS. NECHELES:  Some of the people are friends.

20             MS. PENZA:  Your Honor, the government is attempting

21   to try and delineate which people in this organization and,

22   yes, we understand it was a large organization and that's why

23   we have not said -- our initial position was members of NXIVM,

24   which the defendant, which I believe was a semantic argument,

25   said that there were no actual members of NXIVM.

PROCEEDINGS                                    30

1          That being said, the government has made attempts to

2    narrow, narrow this provision.  We have had no meaningful back

3    and forth with defense counsel about how they think this could

4    be effectively narrowed.

5          Knowing that, we believe that this -- these

6    categories of people represent a proxy of people who we

7    believe could either be unindicted coconspirators, or

8    potential witnesses, because of how long they've been with the

9    organization, because of their commitment to the organization,

10   because of their participation through other members; either

11   being members of the enterprise, or being directed by other

12   members of the enterprise to do certain things on behalf of

13   the enterprise.  So that's what the government's position is

14   as to these conditions.

15         That's how we've tried to structure it.  We are open

16   to other ways of structuring it, but we have had no meaningful

17   feedback as to how it can be differently narrowed to take into

18   account those considerations.

19         MS. NECHELES:  Your Honor, what we --

20         MS. PENZA:  And so what we've suggested, for

21   example, we have a reasonable exception point.  And we have

22   made reasonable exceptions already.

23         But what I am afraid, Your Honor, is that the people

24   who Ms. Bronfman actually wants to speak to are the people at

25   the highest reaches of the organization who are unindicted

PROCEEDINGS                           31

1   coconspirators, and that is honestly, Your Honor, what is

2   sounds like to me, or people who are very much witnesses to

3   these crimes.

4            MS. NECHELES:  Your Honor, can I just address this

5   whole witness issue.  I mean, I would think the government

6   would be happy for her to speak to witnesses because then they

7   can find out what she has to say.

8            I don't really understand this.  We are not out

9   there, she is not out there seeking to find out information or

10  interfere, and there is no claim that she is seeking to

11  interfere with anybody, any witness, or has done anything to

12  interfere with any witness.

13           You know, if the government -- we have proposed what

14  we believe would be restricted, you know, a fair way to

15  restrict.  Anybody who says they don't want to speak to her,

16  we don't want to speak to.

17           THE COURT:  Unfortunately, unfortunately, that --

18  the problem is that Ms. Bronfman has, because of her wealth

19  and her status, a great deal more leverage over other people

20  than a garden variety defendant in a case in the Eastern

21  District.

22           It's just a fact that she is who she is.  And so if

23  she's going to talk to somebody, she's talking to somebody

24  with the benefit of her large wealth behind her, and some

25  people, potentially, could be intimidated by this, including

PROCEEDINGS                                          32

1    some of the people who have been involved in these

2    organizations.  So, I mean, that's your problem.

3            The problem is that she isn't your ordinary garden

4    variety defendant.  She's a person of substantial wealth and

5    high social standing, and so that's -- that's the difficulty

6    that we're grappling with here.

7            It's not that -- the Court doesn't want to limit her

8    from being with friends, but these are people with whom she

9    was in business, if you will, some of them, and if there's

10   someone in this category that you think is really more a

11   friend than anything else and really isn't of concern to the

12   government, then all you have to do is call the government and

13   say she wants to talk to her old friend from -- you know, that

14   she knows from Dalton, or wherever she went to high school,

15   and it'll be pretty clear whether this is someone that the

16   government is -- that, you know, has down as a potential

17   witness.

18           I just don't -- how many people does she need to

19   talk to in a given day?  I mean, we're talking about -- I

20   don't understand this.

21           MS. NECHELES:  Right now --

22           THE COURT:  Why are we even having this discussion?

23           MS. NECHELES:  Because the government has proposed

24   this restriction.  Right now -- I don't think that it's right

25   to require the defendant to come forward and say to the

PROCEEDINGS                                                33

1    government, These are the people I'm the closest with, when

2    they are saying you committed crimes with people so now we're

3    giving them leads in terms of discovery.  I don't think it's

4    right.

5            THE COURT:  Maybe she won't be able to have -- to

6    spend time with her closest friends from these organizations

7    for the next few months until we square this away.  You know,

8    that does happen.

9            MS. NECHELES:  Although, I don't know of cases

10   really where that happens, Your Honor.  I mean these kind of

11   restrictions, I have not seen a single case where this kind of

12   restriction was upheld or --

13           THE COURT:  Upheld?

14           MS. NECHELES:  Yeah, I think --

15           THE COURT:  Imposed.  Try imposed.  Try organized

16   crime cases.

17           MS. NECHELES:  Right, where people are involved in a

18   criminal enterprise, where NXIVM has not been named as a

19   criminal enterprise.

20           THE COURT:  Well, maybe not.  But I have a letter

21   here, that I'm not using today, from a lawyer in Philadelphia

22   that says a lot of stuff that is very disturbing and if we

23   credit it, which I'm trying to avoid doing --

24           MS. NECHELES:  A class action lawyer who wants to

25   sue --

PROCEEDINGS                                    34

```
 1              THE COURT:  I don't care what kind of lawyer he is.

 2              MS. NECHELES:  I don't think the Court can be

 3    used --

 4              THE COURT:  I'm not using it, but I'm saying that

 5    we're going to have an investigation when doing -- when

 6    handling a bail application and having a trial or bail

 7    application.  That's pretty far afield from what we do in this

 8    courthouse.

 9              MS. NECHELES:  And, Judge, I'm trying to be

10    reasonable.  I'm saying to the government, anybody, you tell

11    us who you don't want, specific names, who you think may be a

12    witness, may be an unindicted coconspirator, whatever, and if

13    we have an objection to those people, we'll take it up with

14    you.  But right now it's just like everybody.

15              The next category, current or former members of DOS.

16    DOS is secret organization.  We don't know who those people

17    are.  So these categories are so broad, Your Honor, that it's

18    really oppressive, and so that's what we're objecting to.

19              THE COURT:  Well, if you don't know whether someone

20    is part of an organization, you wouldn't be violating the

21    terms of the bail.

22              If Ms. Bronfman talked to someone that she knew just

23    socially, with whom she never had any business in this, with

24    NXIVM or any of these activities, she's just a friend who she

25    met through some social organization which she was a part, or
```

PROCEEDINGS                                35

1     she met at college, or that she met some other way.

2              MS. NECHELES:  Correct.

3              THE COURT:  I don't think there are -- I don't think

4     that's really the problem.

5              The problem is that she has, apparently, allegedly,

6     many contacts who were -- her prime contacts are people who

7     were part of this organization.  That's what this is about.

8              MS. NECHELES:  Yes.

9              THE COURT:  It's not about her college friends.

10    It's not about her high school friends.  It's not about, you

11    know, the people she saw when she spent her summers on the

12    Vineyard, or wherever she went.

13             MS. NECHELES:  You're right, it's about her friends,

14    Your Honor, for example.

15             THE COURT:  Right.

16             MS. NECHELES:  And that's the final category, people

17    who are on the stripe path.

18             These are people who were -- hundreds of people who

19    were involved with NXIVM who I don't think the government is

20    going to have hundreds of witnesses here, you know.

21             THE COURT:  I hope not.

22             MS. NECHELES:  And so I think that's what the issue

23    is, you know, is that the government should have the burden of

24    saying these are the people you should not associate with,

25    name the specific people.  And it could be everybody

PROCEEDINGS                                    36

1   represented by that letter.  I don't care.  If somebody

2   doesn't want her to contact them, we don't want her to have

3   anything to do with them.  We're not looking for problems.

4   We're looking for her to be able to talk to friends under this

5   unbelievably stressful period in her life.  That's all we're

6   really asking for, Your Honor.

7           MS. PENZA:  Just briefly, Your Honor.

8           So I just want to make clear a few points.  So,

9   number one, the stripe path again, the government was

10  attempting to come up with a reasonable proxy with no

11  reasonable feedback from defense counsel.  The government does

12  not believe it is reasonable to have to proffer who we believe

13  in our continuing investigation may be an unindicted

14  coconspirator or a potential witness.

15          We would be willing to talk about certain levels of

16  the stripe path, which I certainly didn't want to burden Your

17  Honor with, but we were not able to have that conversation

18  with the defendant's attorneys.

19          I do want to state, Your Honor, that I believe that

20  Ms. Necheles is understating Ms. Bronfman's knowledge of

21  members of DOS.

22          While the government has not alleged that

23  Ms. Bronfman herself was a member of DOS, there was a

24  significant effort in the aftermath of DOS being revealed, not

25  just publicly in the newspaper articles and The New York

PROCEEDINGS                                    37

1   Times, but within the NXIVM community, once DOS was revealed;

2   efforts by Ms. Bronfman to gather information about

3   prospective victims, speaking disparagingly about certain DOS

4   victims.

5          And so the idea that Ms. Bronfman has no

6   understanding, given her status within this organization,

7   given her closeness to Mr. Raniere, giving her putting a

8   letter up stating her support of NXIVM in the aftermath of the

9   original New York Times article.  To say she that has no

10  concept of who may be members of DOS is certainly understated.

11  So the government also wanted to put that on the record.

12          MS. NECHELES:  Just to be clear, that's really not I

13  said.  I said that it was a secret society.  We don't who were

14  members.  She was not a member, as the government has said

15  now, and, yes, some people were publically identified as

16  members or identified within NXIVM, and she knows who those

17  people are.  I didn't say she knows any members, but I don't

18  know who are the members.

19          THE COURT:  Anything else on any of this?

20          MS. PENZA:  No, Your Honor.  No, we stand by our --

21          THE COURT:  All right, I'm going to -- until further

22  notice, and subject to appeal, I'm imposing the following

23  restriction, as set forth in the government's letter:

24          The defendant may not directly or indirectly

25  associate or have contact with, except in the presence of her

1    attorneys, current or former employees, or independent

2    contractors, of or for NXIVM, including any and all of the

3    related entities; current or former members of DOS, or with

4    any individual who's currently or was formerly on the stripe

5    path, subject to reasonable exceptions agreed upon by the

6    parties.

7              I will add that with respect to members, current and

8    former members of DOS, this will include those current and

9    former members of DOS about whom whose status she is aware of.

10             So if there's somebody out there and she has no idea

11   this person is a member of DOS, she wouldn't be in violation

12   of her bail requirements if she had a conversation or was

13   friendly with such a person.

14             So I mean I'm not going to set up rules that she

15   couldn't possibly follow because she didn't know about it.

16             Do you understand that, Ms. Bronfman?  Do you

17   understand that description, set of descriptions?

18             THE DEFENDANT:  Yes, Your Honor.

19             THE COURT:  Thank you.

20             All right, what else do we have for today?

21             So when can you have -- how about you provide the

22   Court with a legal memorandum in the next two weeks.

23             MS. NECHELES:  That's fine, Your Honor.

24             THE COURT:  All right, and then a week later any

25   reply.

PROCEEDINGS                                    39

1              MS. PENZA:  Thank you, Your Honor.

2              MS. NECHELES:  We wrote Your Honor a letter about

3    discovery.

4              THE COURT:  Discovery, oh, one of my favorite

5    subjects.

6              You read the discovery letter?

7              MS. PENZA:  I did read the letter, Your Honor.

8              THE COURT:  So what's the story about discovery?

9              MS. PENZA:  Your Honor, we believe that the

10   defendant's letter is premature.  The government has been

11   actively complying with our obligation.  We requested a

12   5 terabyte drive from the defendant last week.  We have not

13   received that drive yet.  In the interim, we have been

14   providing substantial discovery.

15             This is a case where we estimate -- we now have an

16   estimate that is approximately 12 terabytes worth of data.

17   We -- it is a -- we intend file a case update letter with the

18   Court prior to our next appearance before Your Honor with the

19   other defendants.

20             THE COURT:  When is that?

21             MS. PENZA:  I believe it's September 13th, Your

22   Honor.

23             THE COURT:  Right.

24             MS. PENZA:  But I don't have my phone in front of

25   me.

PROCEEDINGS                                    40

1          So we will file something in advance of that.  But

2     the government can assure Your Honor that we are proceeding as

3     expeditiously as possible.

4          We are in the process of seeking to retain vendors

5     to enable us to proceed more quickly, but as it stands, we are

6     certainly doing the best we can and have been in communication

7     with defense counsel about things that we need in order to

8     allow us to provide discovery.

9          So we don't believe that there are any issues that

10    are ripe for Your Honor to rule on at this stage.

11         THE COURT:  I'm just thinking in terms of the

12    January 7th trial date, and so whatever needs to be done to

13    expedite the providing of discovery to the defense is very,

14    very important.

15         MS. PENZA:  And we do understand that, Your Honor.

16    There are actual technological limitations in terms of -- we

17    would love to provide it as quickly as possible, but it takes

18    days and days simply to transfer data from one place to

19    another and then to the defendants.  And there's nothing

20    really the government can do about that.

21         In addition, there is a firewall process set up

22    regarding certain materials, and so we will certainly -- we

23    are certainly moving forward as quickly as possible.  We took

24    Your Honor's point and raised it at our last conference as

25    well and we understand that.  We do believe that we may raise

PROCEEDINGS                                                    41

1   the complexity of the case in our case update letter.

2              MS. NECHELES:  Your Honor.

3              THE COURT:  What does that mean?

4              MS. PENZA:  We may be seeking to have the case

5   designated as a complex case officially, given how much data

6   that there is in this case.

7              MS. NECHELES:  Your Honor, I think the case update

8   letter may actually solve the issue.  I mean, our concern is

9   we have not gotten the 5 terabyte drive because the government

10  requested that we have some sort of encryption device also

11  that we then had to order, that I think we just got yesterday

12  from Amazon and we were sending the drive down today.

13             But I do believe that the production -- the searches

14  that will have to be done and the production may just take a

15  long time.  And that is why we want an outline of what is

16  there and what is coming because Your Honor has set a firm

17  trial date, and we're concerned that we will not have the time

18  to review the material.

19             And I am not faulting the government, I'm just

20  saying that I hear what they're saying in terms of technology,

21  and even if they're working as quickly as they can work, there

22  are steps that have to be gone through.

23             They asked us if we were willing to waive some of

24  our rights to make things quicker.  We are not willing to

25  waive our rights to make things quicker.  We want the search

1  warrants to be executed in the way they should be and not

2  given to other people if they don't have the right to them,

3  and I know the government will respect that.  And so it might

4  take longer.  But we just want to be able to all know

5  realistically what the time frame is, you know, so that we can

6  talk realistically about a date, which Your Honor set a date,

7  a firm trial date, which we are concerned that we will not

8  have the materials with enough time to be able to review them

9  for that trial date.

10        THE COURT:  Well, and that will bring us back to the

11  question of whether this case should be designated as a

12  complex case and whether the trial date would have to be

13  changed, which the Court is very much opposed to, unless a

14  good cause is shown for it.

15        MS. NECHELES:  And that's why I asked that, and

16  maybe the discovery update will tell us.  That's why I asked

17  that we get an index of what needs to be produced in a

18  realistic timetable, because I believe a realistic timetable

19  is going to take us well into December for when things will be

20  produced.

21        Because I do not believe that search warrants have

22  even been executed yet, given the volume of -- I mean while

23  the initial material may be seized, I don't think the

24  government has had the time to go through the computers.  You

25  said there were 60 devices.  That's a lot of work.  So I don't

PROCEEDINGS                                          43

1   know that they have had the time to go through all of that and

2   then start producing things; you know, finish their search,

3   which they have to do to be able to produce things to us, the

4   entirety.

5            And I know that there are issues -- you know, they

6   have a firewall with attorney/client things being reviewed

7   that that is, undoubtedly, another factor that is going to

8   slow things down a little bit.  So I believe that we are -- it

9   is optimistic to think that discovery will be finished

10  producing by December.

11           And then there's always issues of uploading the

12  materials on our side, getting it in a form that is

13  searchable, and then actually searching and reviewing 60

14  devices' worth of materials.  And so I feel like if this

15  were -- if an index were sent out and a realistic timetable

16  were set before Your Honor, we could all set something that --

17  you know, we could see whether this January trial date was at

18  all possible and set a realistic trial date so that we can all

19  block that time off our schedules, as Your Honor wishes.

20           THE COURT:  I think you all should talk about that

21  and come back to me on September 13th, and that way we can be

22  in a better position, if we need to address it.  Okay?

23           MS. PENZA:  Thank you, Your Honor.

24           MS. HAJJAR:  Thank you, Your Honor.

25           MS. NECHELES:  Anything else from the government?

LINDA D. DANELCZYK, RPR, CSR, CCR
Official Court Reporter

PROCEEDINGS                                          44

1          MS. PENZA:  Not from the government, Your Honor.

2          THE COURT:  Anything else from the defense?

3          MS. NECHELES:  No.

4          THE COURT:  All right, we will see you in September.

5          MS. PENZA:  Thank you, Judge.

6

7          (Whereupon, the matter was concluded.)

8

9                    *     *     *     *     *

10

11

12   I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
13

14   s/ Linda D. Danelczyk                  August 22, 2018

15

16     LINDA D. DANELCZYK                         DATE

17

18

19

20

21

22

23

24

25