UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

  -  v.  -

CLARE BRONFMAN,

                Defendant.

No. 18-cr-204 (NGG) (VMS)

## <u>SENTENCING MEMORANDUM OF CLARE BRONFMAN</u>

Ronald S. Sullivan, Jr., Esq.
Ronald Sullivan Law, PLLC
1300 I Street, N.W.
Suite 400 E
Washington, D.C. 20005
(202) 935-4347

Duncan Levin, Esq.
Tucker Levin, PLLC
230 Park Avenue, Suite 440
New York, New York 10169
(212) 330-7626

*Attorneys for Defendant Clare Bronfman*

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ...................................................................................1

**INTRODUCTION** .........................................................................................................2

**BACKGROUND** .........................................................................................................12

**THE COURT SHOULD EXERCISE ITS DISCRETION AND IMPOSE A BELOW GUIDELINES SENTENCE IN THIS CASE** ...................................................22

A. The Court Has the Discretion to Impose a Non-Guidelines Sentence ...................................23

B. Guidelines Analysis .........................................................................................................23

    1. Clare Bronfman did not smuggle, transport or harbor at least 6 unlawful aliens ........25

    2. Clare Bronfman was not an organizer, leader, manager, or supervisor in criminal activity.................................................................................................................34

C. The Court Should Sentence Clare Bronfman to a Below Guidelines Sentence Because a Guidelines or Above Guidelines Sentence Would Be "Greater than Necessary" to Achieve Section 3553(a) Objectives .................................................37

    1. Offense and offender characteristics.................................................................37

        a. Offense Conduct .................................................................................38

        b. Offender characteristics ...................................................................43

    2. The need for the sentence imposed.................................................................43

        a. Specific Deterrence...............................................................................44

        b. General Deterrence .............................................................................46

    3. The kinds of sentences available.................................................................47

    4. The Sentencing Guidelines .............................................................................48

    5. Policy statements .........................................................................................48

    6. Avoiding unwarranted sentencing disparities...........................................49

        a. The Sentencing Commission's most recently published sentencing statistics demonstrate that a Guidelines or above Guidelines sentence for Clare

Bronfman would create an unwarranted disparity ......................................50

      b.    Individual sentences imposed by federals courts in New York demonstrate that a Guidelines or above Guidelines sentence for Clare Bronfman would create an unwarranted disparity ................................................................54

   7.  The need for restitution ..............................................................................62

D.  An Upward Departure or Variance Is Not Warranted ..............................................64

E.  The Totality of the Factors Support a Below Guidelines Sentence ........................69

   1.  The collateral consequences are severe ......................................................69

   2.  Clare Bronfman's conduct was aberrant ....................................................72

F.  A Non-Custodial Sentence Is Particularly Appropriate in the Face of a Global Health Crisis in Which the Government Is Seeking to Reduce the Number of Prisoners in Government Custody ...........................................................................................................................74

**CONCLUSION** .........................................................................................................81

# TABLE OF AUTHORITIES

**Cases**

*In re Local # 46 Metallic Lathers Union*,

    568 F.3d 81, 85 (2d Cir.2009) .................................................................62, 63

*Hughey v. United States*,

    495 U.S. 411 110 S. Ct. 1979, 109 L. Ed. 2d 408 (1990) ................................63

*Kimbrough v. United States*,

    552 U.S. 85 (2007) ...............................................................................23

*United States v. Al-Rikabi*,

    606 F.3d 11 (1st Cir. 2010) ...................................................................34

*United States v. Anderson*,

    533 F.3d 623 (8th Cir. 2008) .................................................................70

*United States v. Archer*,

    671 F.3d 149 (2d Cir. 2011) .................................................25, 26, 34, 63

*United States v. Baig, et al*,

    CR-13-351(SJF) (E.D.N.Y.) ...................................................................54

*United States v. Baird*,

    580 F.Supp.2d 889 (D.Neb. 2008) ..........................................................43

*United States v. Booker*,

    543 U.S. 220 (2005) .............................................................................23

*United States v. Brockman*,

    183 F.3d 891 (8th Cir. 1999) .................................................................35

*United States v. Caraballo*,

    595 F.3d 1214  (11th Cir. 2010) .............................................................37

*United States*. *v*. *Carty*,

    264 F.3d 191, 196 (2d Cir. 2001).......................................................................71

*United States v*. *Chandler*

    220 F. Supp. 2d 165 (E.D.N.Y 2002) .............................................................61

*United States v*. *Ebbers*,

    458 F.3d 110 (2d Cir. 2006)............................................................................56

*United States v*. *George*,

    13-2762-cr (2d Cir. 2015) .........................................................................56, 59

*United States*. *v*. *Giardina*,

    2011 WL 5082177 (E.D.N.Y. Oct. 4, 2011)................................................59, 60

*United States v*. *Hadash*,

    408 F.3d 1080, 1084 (8th Cir. 2005) ..............................................................73

*United States v*. *Howe*,

    543 F.3d 128 (3rd Cir. 2008) ..........................................................................73

*United States v*. *K*.,

    160 F.Supp.2d 421, 442 (E.D.N.Y.2001) ......................................................71

*United States v*. *Kim*,

    193 F.3d 567, 570 (2d Cir. 1999) .............................................................57, 58

*United States v*. *Lara*,

    905 F.2d 599 (2d Cir. 1990) ...........................................................................49

*United States v*. *Lewis*,

    09-3002 (2d Cir. 2010) ...................................................................................62

*United States v*. *Lora-Andres*,

    844 F.3d 781 (8th Cir. 2016) ..........................................................................34

*United States. v. Maier,*

    1975 F.2d 944, 948 (2d Cir.1992)...................................................................72

*United States v. Mehta,*

    16-2585 (2d Cir. March 21, 2019) ......................................................57, 59

*U.S. v. Munoz-Nava,*

    524 F.3d 1137, 1149 (10th Cir. 2008) ...........................................................71

*United States v. Nesbeth,*

    188 F.Supp.3d 179, 180 (E.D.N.Y. 2016) ..............................................69 ,70

*United States v. Parmelee,*

    42 F.3d 387 (7th Cir. 1994) ...........................................................................36

*United States. v. Patel*

    (2:16-cr-00584-DRH-AYS)............................................................................58

*United States v. Patterson,*

    281 F.Supp.2d 626 (E.D.N.Y. 2003) ............................................................73

*United States v. Porbeni,*

    08-cr-00477-GBD (S.D.N.Y.) ......................................................................60

*United States v. Ruff,*

    535 F.3d 999, 1006-07 (9th Cir. 2008) ........................................................54

*United States. v. Ruiz,*

    04 Cr. 1146 (RWS), 2006 WL 1311982 (S.D.N.Y. May 10, 2006) ................44

*United States v. Sash,*

    396 F.3d 515 (2d Cir. 2005) ...................................................................61, 62

*United States v. Shonubi,*

    103 F.3d 1085 (2d Cir.1997) ........................................................................26

*United States v. Spitsyn*,

403 Fed. App'x 572 (2d Cir. 2010) ................................................................26

*United States v. Stewart*,

590 F.3d 93, 141 (2d Cir. 2009) ....................................................................70

*United States v. Tai*,

750 F.3d 309 (3d Cir. 2014) ..........................................................................35

*United States. v. Thavaraja*,

200 F.3d 627 (9th Cir. 2000) ........................................................................70

*United States v. Uppal*,

No. 18-3483, 2019 U.S. App. LEXIS 36856, at *2 (2d Cir. Dec. 13, 2019)....................58

*United States v. Vieke*,

348 F.3d 811 (9th Cir. 2003) ........................................................................73

*United States v. Vigil*,

476 F. Supp. 2d 1231, 1235 (D.N.M. 2007) ....................................................70

*United States v. Walsh*,

700 F.2d 846 (2d Cir. 1983), *cert. denied*, 464 U.S. 825 (1983)...............47

*United States v. Whitney*,

673 F.3d 965 (9th Cir. 2012) ........................................................................35

*United States v. Zhyltsou*,

13-803-cr (2d Cir. Oct. 3, 2014) ..................................................................60

*U.S. v. Barrie*,

267 F.3d 220 (3d Cir. 2001) ..........................................................................36

*U.S. v. Jarrett*,

956 F.2d 864 (8th Cir. 1992) ........................................................................37

*U.S. v. Jones,*

    531 F.3d 163 (2d Cir. 2008) ........................................................26

*U.S. v. Lewis,*

    68 F.3d 987 (6th Cir. 1995) ........................................................36

*U.S. v. Mejia-Orosco,*

    867 F.2d 216 (5th Cir.) ........................................................36

*U.S. v. Paul,*

    634 F.3d 668 (2d Cir. 2011)........................................................37

*U.S. v. Ramos-Paulino,*

    488 F.3d 459 (1st Cir. 2007) ........................................................36, 37

*U.S. v. Tank,*

    132 F. App'x 883, 886 (2d Cir. 2005) ........................................................37

*U.S. v. Toohey,*

    740 F.3d 253 (2d Cir. 2014) ........................................................50

*Wisconsin v. Mitchell,*

    508 U.S. 476 (1993)........................................................42

**FEDERAL STATUTES**

8 U.S.C. § 1324........................................................55, 56

8 U.S.C. § 1324(a)(1)(A)(iii) ........................................................38, 56

8 U.S.C. § 1324(a)(1)(A)(v)(i) ........................................................58

8 U.S.C. § 1324(a)(1)(B)(i) ........................................................58

8 U.S.C. § 1324(a)(2)(b)(ii) ........................................................58

8 U.S.C. § 1325(c) ........................................................57

18 U.S.C. § 371........................................................60

18 U.S.C. § 1014........................................................60

18 U.S.C. § 1028(A) .................................................................... 62

18 U.S.C. § 1028(a)(1) ...................................................................61

18 U.S.C. § 1028(a)(2) .................................................................... 60

18 U.S.C. § 1028(a)(3) .................................................................... 61

18 U.S.C. § 1028(a)(7) ....................................................1, 38, 41, 59, 60

18 U.S.C. § 1028(b)(1)(A)(ii) ............................................................ 60

18 U.S.C. § 1028(b)(1)(B) ...............................................................61

18 U.S.C. § 1028(b)(1)(D) ....................................................1, 38, 41, 59

18 U.S.C. § 1028(c)(3) .................................................................... 60

18 U.S.C. § 1028(c)(3)(A) .......................................................1, 38, 59

18 U.S.C. § 1028(f) .................................................................... 62

18 U.S.C. § 1029(a)(3) .................................................................... 61

18 U.S.C. § 1029(b)(1) .................................................................... 61

18 U.S.C. § 1029(c)(1)(A)(i) .............................................................. 61

18 U.S.C. § 1324(a)(1)(A)(iii) ............................................................1

18 U.S.C. § 1343 ........................................................................56

18 U.S.C. § 1344 ........................................................................61

18 U.S.C. §§ 1546(a) ....................................................................57

18 U.S.C. § 1542 ....................................................................61, 62

18 U.S.C. § 3553(a) ...................................................1, 23, 37, 48, 62, 70

18 U.S.C. § 3553(a)(1) ..................................................................38

18 U.S.C. § 3553(a)(2) ...............................................................43, 44

18 U.S.C. § 3553(a)(2)(B) ...............................................................46

18 U.S.C. § 3553(a)(2)(C) ...............................................................44

18 U.S.C. § 3553(a)(3) ..................................................................47

18 U.S.C. § 3553(a)(4) ................................................................................48

18 U.S.C. § 3553(a)(5) ................................................................................48

18 U.S.C. § 3553(a)(6) ...........................................................................49, 50

18 U.S.C. § 3553(a)(7) ................................................................................62

18 U.S.C. § 3561(a). ...................................................................................48

18 U.S.C. § 3663A ......................................................................................62

18 U.S.C. § 3663A(a)(1) .............................................................................62

18 U.S.C. § 3663A(c)(1)(A)(ii), .................................................................62

18 U.S.C. § 3663A(c)(1)(B), .......................................................................62

18 U.S.C. § 3664(e) ....................................................................................63

28 U.S.C. § 994(j) .......................................................................................47

Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note) ......48

## UNITED STATES SENTENCING GUIDELINES

U.S.S.G. Ch. 1, pt. A, subpt. 4(b). ........................................................41, 42

U.S.S.G. § 1B1.3 ........................................................................................25

U.S.S.G. § 2B1.1 ...................................................................................49, 53

U.S.S.G. § 2B1.1, app. note 2 (1999) ........................................................41

U.S.S.G. § 2L1.1 ...................................................................................36, 49

U.S.S.G. § 2L1.1(b) ..............................................................................42, 43

U.S.S.G. § 2L1.1(b)(2)(A) ..........................................................................33

U.S.S.G. § 3B1.1 ...........................................................................34, 35, 37

U.S.S.G. § 3B1.1(c) .............................................................34, 35, 36, 37

U.S.S.G. § 5H1.4. .......................................................................................49

U.S.S.G. § 5K1.1 ........................................................................51, 52, 53

U.S.S.G. § 5K1.3 ........................................................................51, 52, 53

U.S.S.G. § 5K2.20 ...............................................................................................71, 72, 73

U.S.S.G. § 5K2.20, Application Note 3 ...........................................................................72

U.S.S.G. § 5K2.20(a) .......................................................................................................72

U.S.S.G. § 5K2.20(b) .......................................................................................................72

U.S.S.G. § 5K2.20(c) ..................................................................................................72, 73

## OTHER MATERIALS

Barry Meier, *The Journey of the 'Sex Cult' Heiress: From Reluctant Recruit to Criminal Defendant*, THE N.Y. TIMES (Aug. 11, 2018), *available at* https://www.nytimes.com/2018/08/11/business/clare-bronfman-nxivm.html .................46

Chelsia Rose Marcius, *Four New York prisons still see high numbers of coronavirus* New York Daily News (August 10, 2020), *available at https://www.nydailynews.com/new-york/ny-coronavirus-new-york-prisons-still-see-high-numbers-of-covid-19-20200810-dwovpwlumvhjlnwpbjcob42ohu-story.html* ....................................................................78

Christina Maxouris, *In a week, New York City became the epicenter of the US coronavirus outbreak* (CNN March 21, 2020), *available at* https://www.cnn.com/2020/03/21/health/new-york-coronavirus-cases-epicenter/index.htm..............................................................................................................75

*Coronavirus Tax Relief*, IRS.gov (updated April 3, 2020), *available at* https://www.irs.gov/coronavirus..................................................................................75

*Coronavirus Update: Inmate At Metropolitan Detention Center Tests Positive For COVID-19*, CBS News (March 21, 2020), *available at* https://newyork.cbslocal.com/2020/03/21/coronavirus-inmate-tests-positive-metropolitan-detention-center-brooklyn/ ......................................................................77

*COVID-19 Infection Tracking in NYC Jails, The Legal Aid Society (July 31, 2020), available at https://www.legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/#:~:text=%E2%80%9CCOVID%2D19%20is%20spreading%20rapidly,the%20epicenter%20of%20COVID%2D19.* ....................................................................................78

David Shortell and Kara Scannell, *New coronavirus cases in US jails heighten concerns about an unprepared system*, CNN.COM (March 20, 2020), *available at* https://www.cnn.com/%202020/03/18/politics/coronavirus-in-us-jails-heighten-concerns/index.html.........................................................................................................77

David Weisburd, *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) ..............................................................................46

Eddy Rodriguez, *NYC Prisoners Released Early Due to COVID-19 Concerns Were Re-Arrested, Police Say*, Newsweek (June 13, 2020), *available at* https://www.newsweek.com/nyc-prisoners-released-early-due-covid-19-concerns-have-been-re-arrested-police-say-1510697 ......................................................................................................80

Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011) ..................................................................46

Grace Hauck, *These states are ordering residents to stay home or shelter in place. What does that mean?*, USA TODAY (March 21, 2020) *available at* https://www.usatoday.com/story/news/nation/2020/03/21/coronavirus-lockdown-orders-shelter-place-stay-home-state-list/2891193001/................................................75

Jason Hanna, *Federal and most state prisons are banning visits to protect inmates from coronavirus*, CNN (March 14, 2020), *available at* https://www.cnn.com/2020/03/14/health/prisons-coronavirus-visitations-banned/index.html..........................................................................................76, 77

JOINT STATEMENT FROM ELECTED PROSECUTORS ON COVID-19 AND ADDRESSING THE RIGHTS AND NEEDS OF THOSE IN CUSTODY (March 25, 2020), available at https://fairandjustprosecution.org/wp-content/uploads/2020/03/Coronavirus-Sign-On-Letter.pdf. ......................................79, 80

Kathryn G. Menu, *Sweeping Immigration & Wire Fraud Investigation Results in Arrest of Sag Harbor 7-Eleven Owners*, SAG HARBOR EXPRESS (June 19, 2013), *available at* https://sagharborexpress.com/23954....................................................................54

Knvul Sheikh, *No More Than 10 People in One Place, Trump Said. But Why?*, THE N.Y. TIMES (Mar. 16, 2020), *available at* https://www.nytimes.com/2020/03/16/health/coronavirus-social-distancing-crowd-size.html ..........................................................75, 76

*Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons,* LOS ANGELES TIMES (March 20, 2020), *available at* https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-corona%20virus-and-incarceration73 ..............................................................76

Molly Crane-Newman and Larry McShane, *Seagram's liquor heiress Clare Bronfman pleads guilty in NXIVM cult prosecution, to pay $6 million forfeiture*, N.Y. DAILY NEWS (Apr. 19, 2019), *available at* https://www.nydailynews.com/news/crime/ny-nxivm-guilty-pleas-20190419-bx5shvbnvvcuxoge67g45wtbd4-story.html ............................................46, 47

Natasha Haverty, *Why New York is releasing so few inmates during the pandemic*, Northcountrypublicradio.org (July 24, 2020) *available at* https://www.northcountrypublicradio.org/news/story/41971/20200724/why-new-york-is-releasing-so-few-inmates-during-the-pandemic/. ............................................80

Rebecca Rosenberg, *More than 1,500 NYC inmates have been released during coronavirus crisis*, New York Post (April 10, 2020), *available at* https://nypost.com/2020/04/10/more-than-1500-nyc-inmates-have-been-released-amid-coronavirus-crisis/ .......................80, 81

Reuven Fenton and Emily Saul, *Seagram's Heiress Clare Bronfman pays feds $6M over role in Nxivm*, N.Y. POST (Aug. 14, 2019), available at https://nypost.com/2019/08/14/seagrams-heiress-clare-bronfman-pays-feds-6m-over-role-in-nxivm/ ...........................................47

Robin McDowell, *38 positive for coronavirus in NYC jails, including Rikers,* ABC NEWS (March  21, 2020), *available at* https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911 ...........................................77

Rosa Goldensohn, *Coronavirus Testing Ramps Up in New York — But Not in State Prisons*, The City (June 15, 2020), *available at* https://www.thecity.nyc/justice/2020/6/15/21292352/coronavirus-testing-ramps-up-in-new-york-but-not-in-state-prisons.  ...................................................77

Sarah Jarvis, *Coronavirus: The Latest Court Closures And Restrictions,* LAW 360 (updated April 3, 2020), *available at* https://www.law360.com/articles/1252836/coronavirus-the-latest-court-closures-and-restrictions?nl_pk=33156e8a-4880-48b4-ac3fc0946694fc14&utm_%20source=%20newsletter&utm_medium=email%20&utm_campaign=%20special73 ................................................................................76

S. REP. 105-274 (1998) .................................................................................41

Soo Kim, *U.S. Coronavirus Update as Death Toll Surpasses 150 Trump Admin Prepares for Pandemic to Last 18 Months or Longer*, NEWSWEEK (March 19, 2020), *available at* https://www.newsweek.com/us-coronavirus-update-death-toll-surpasses-150-trump-admin-prepares-pandemic-last-18-months-1493249 .........................................74

Will Yakowicz, *From Heiress To Felon: How Clare Bronfman Wound Up In 'Cult-Like' Group Nxivm*, FORBES (May 31, 2019), *available at* https://www.forbes.com/sites/willyakowicz/2019/05/31/from-heiress-to-felon-how-clare-bronfman-wound-up-in-cult-like-group-nxivm/#5311f83a3ecf.......................................46

World Health Organization, COVID-19 Updates (updated April 3, 2020), *available at* https://www.who.int/emergencies/diseases/novel-coronavirus-2019..............................75

U.S Citizen and Immigration Services, *Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States available at* https://www.uscis.gov/humanitarian/humanitarian-or-significant-public-benefit-parole-for-individuals-outside-the-united-states ("What is Parole?") ..........................................28

USMS, *Facts and Figures*, Feb. 25, 2020, *available at* https://www.usmarshals.gov/duties/factsheets/facts.pdf ..................................................80

U.S.S.C. *Annual Report and Sourcebook of Federal Sentencing Statistics (2018) available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2018/2018-Annual-Report-and-Sourcebook.pdf ...................51, 52, 53

U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12 (May 2004), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf .........................................44

U.S.S.C. *4th Quarter Release of Preliminary Fiscal Year 2019 Data* ...................................52, 53

Zusha Elinson and Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, The Wall Street Journal (March 22, 2020), *available at* https://www.wsj.com/articles/jails-release-prisoners-fearing-coronavirus-outbreak-11584885600 .........................................80

## PRELIMINARY STATEMENT

On September 30, 2020, Clare Bronfman will appear before this Court for sentencing, pursuant to her guilty plea to one count of conspiracy to conceal and harbor an alien for financial gain in violation of 18 U.S.C. § 1324(a)(1)(A)(iii) and one count of fraudulent use of identification in violation of 18 U.S.C. §§ 1028(a)(7), 1028(b)(1)(D) and 1028(c)(3)(A).  At the time of sentencing, Clare will be 41 years old with no prior criminal history (criminal history category I). Clare Bronfman submits this memorandum to assist the Court in determining a sentence that will be sufficient but not greater than necessary to satisfy the purposes of sentencing pursuant to 18 U.S.C. § 3553(a).

The Presentence Investigation Report (hereafter "PSR") assesses Clare Bronfman's adjusted offense level as a 17, which yields an advisory Guidelines range of 24 to 30 months. However, we respectfully submit that an adjusted offense level of 16, as estimated by the government in Clare's plea agreement and which yields an advisory Guidelines range of 21 to 27 months, should be the Court's starting point in determining the appropriate sentence for Clare.  We further submit that a below Guidelines sentence is appropriate in this case.

In light of Clare's history and characteristics, her role in the offense, the more than two years she has already spent in home confinement, the collateral consequences of her guilty plea, the goals of federal sentencing, as well as a recent legislative mandate to reduce the number of prisoners in government custody in the face of a global health crisis, we respectfully request the Court impose a below Guidelines non-custodial sentence of three years probation.  We believe this recommendation is firmly rooted in the letter and spirit of the Guidelines and is a proper and appropriate sentence for an otherwise law-abiding individual and first-time offender.

**INTRODUCTION**

Before judging the severity of Clare's actions and the punishment for the two counts to which she has pleaded guilty — rather than the many unproven and false accusation and statements surrounding the case — it is important to consider the motivations that have guided Clare's life. It is also important to recognize the source of her regard for the NXIVM community and the teachings she and thousands of other students of NXIVM classes received over more than two decades — which have nothing to do with DOS, <u>a secret society that Clare neither participated in nor knew anything about</u>.

Serious though these charges are against Clare Bronfman's co-defendants, they are distinctly separate from those that brought Clare before this Court.  At the outset, with regard to the charges that Clare actually pleaded guilty to, she has been contrite in her guilt, recognizing the mistakes of her actions.  That is true to this day.  This not only says a lot about the kind of person that Clare is — serious and responsible, especially in the face of life-altering developments — it is the kind of person that Clare has always been.  In rendering a sentence, we earnestly and very respectfully ask Your Honor to consider Clare's role carefully:

- What has she has been accused of, and what has she *not* been accused of?

  a. She pleaded guilty to two crimes: fraudulent use of identification and harboring an alien for financial gain.  <u>She has never been accused of participating in the core criminal conduct that is known as the "NXIVM case":  sex trafficking, human trafficking, abuse of minors, branding</u>. *Nothing* in the indictment, her pleas, or in evidence at any trial alleges that she knowingly funded – or even knew about – any of these core crimes.

b.   She has never had the opportunity to be heard on any of these far more serious allegations, and they are simply false.

c.   Clare's culpability, with respect to the criminal conduct alleged against her co-defendants, is no different than the dozens of other sophisticated professionals who believed that Keith Raniere and NXIVM were doing good in the world.

- What has she has pleaded guilty to, and *why* did she do what she did?

a.   Fully recognizing Clare's non-involvement in DOS and any of the core criminal conduct alleged against her co-defendants, the government allowed Clare and one other co-defendant to plead guilty to non-RICO crimes because the government recognized that her crimes were wholly unrelated to any human or sex trafficking activity.

b.   The nature of the RICO conspiracy at the heart of the co-defendants' case is of an entirely different nature than the two charges that Clare pleaded guilty to. She did not plead guilty to and she was never charged with any involvement in sex or human trafficking.

c.   She wrote a lot of checks to NXIVM; that is true. But what she was funding was something that she believed in deeply. <u>Those checks were never written with the knowing intent of harming another living soul</u>. And those checks have nothing to do with the conduct for which Clare Bronfman pleaded guilty.

d.   None of the money Clare loaned to NXIVM or invested in any of the associated companies were used to support DOS or anyone's personal

3

lifestyle. They were for the purpose of investment, or loans for litigation, and a few business expenses.

- What are simply *unproven* and *untrue innuendo* "around the edges" of this case? For example:

    a. That NXIVM is DOS and DOS is NXIVM (absolutely not; NXIVM was an important part of Clare's life and social development, as was true for thousands of other people who took NXIVM's executive success programs; DOS was a secret society with a number of members, some whom had no experience with NXIVM, and, unlike NXIVM, DOS was not a company but a secret society.)

    b. That she "had to have known" about criminal activity happening at the DOS secret society (simply not true, not at all in Clare's character, unsupported by *any* evidence, and the evidence is clear that Keith Raniere and others continued to hide things from Clare *even after DOS became public*. *In fact, it was not until during Mr. Raniere's trial that Clare found out about many of the details relating to DOS*);

    c. That she somehow made a false public statement relating to Keith Raniere after the DOS secret society came to light (even when the first accounts of DOS were published in the press, senior NXIVM leaders were instructed to lie and did lie about the full scope of DOS activities. Clare received only a partial picture of DOS during pre-trial discovery and the full picture during Mr. Raniere's trial.)

d. That, but for her money, NXIVM wouldn't have existed (not true, since NXIVM was profitable and able to sustain itself fully. Clare's financial assistance did help to fund various endeavors, however none of those are related to the core allegations in this case.)

e. That Clare funded a sex cult (not true; NXIVM was not a sex cult. Clare never funded or engaged in human trafficking or sexual abuse, nor is there any evidence that she did.)

**What is most important, we submit to the Court, is that Clare Bronfman be held responsible for what she did to break the law but not for the government to ask her unfairly to take the fall for facts beyond her involvement.** We remain very concerned that the government's presentation to the Court be based on *fact*, not *innuendo*. To that point, we renew our application for a <u>Fatico</u> hearing, as set forth in more detail herein, and hope that the following memorandum is helpful to the Court in understanding Clare Bronfman's role and motivations.

Unfortunately, the U.S. Probation Department has got it wrong. The PSR alleges that Clare Bronfman "used her wealth to support" her co-defendant's crimes. That is false. It is also clear that the U.S. Probation Department believes that Clare "participated in efforts to secure and recruit immigration status for non-citizens so they could . . . become sexual partners for Raniere." That is also false.[1] If the Court is going to consider Clare's role in NXIVM and the far more serious

---

[1] We would respectfully like to take this opportunity to address an unrelated, but important, misunderstanding raised by the Court during the August 18 status conference that Clare was somehow responsible for lengthy delays in getting information to the U.S. Probation Department. As the government knows full well, in June 2019, Clare Bronfman's attorney, Kate Cassidy, called Probation to ask when it planned to meet with Clare because no pre-sentence investigation interview had yet been scheduled. Ms. Cassidy was informed that no officer had been assigned to Clare yet. In July 2019, Ms. Deniz was assigned to Clare and interviewed her in late July. After the Presentence Interview, Clare's counsel asked whether the financial information could be provided in a format other than on Probation's normal forms because it

crimes to which her co-defendants pleaded guilty, what has come to light has left the very unfortunate misimpression that she knew about and funded a sex cult. That is exactly what the Probation report implies and exactly what we hope to be able to show this Court, in this filing and through testimony if permitted, is not true. Much of the conduct described in the PSR is not conduct that Clare pleaded guilty to, nor is it related to any specific additional crimes that she has ever been alleged to have committed.

Turning to her actual offense conduct, it is important at the outset to clearly establish what kind of person Clare Bronfman is. Not what the Government, some witnesses, and the media orchestrates Clare to be seen as, but who she really is. Not simply according to her or the statements of her counsel, but by the accounts of people who have known Clare for the entirety of her life. To read how others continuously describe Clare's principles in action is to see that many of the accusations levied against her character around this case, whether as a frivolous heiress or as an intimidator of witnesses, is completely contrary to her personal integrity.

It is also important to understand what kind of life Clare has led, and it is crucial to recognize why Clare got involved in NXIVM — and why she stayed involved. When Clare arrived for her first NXIVM classes, she felt devoid of purpose but had personally experienced how the organization had helped members of her own family through personal crisis. Clare's deep

---

was proving difficult to reduce her financial picture to the Probation forms. Collecting all of Ms. Bronfman's financial information was complicated and time consuming, as it entailed dealing with a number of different financial professionals, trustees, and accountants, and Clare and her counsel wanted to ensure it was being consistently reported and accurate. As of July 2019, Clare's accounting services were handled by two different accounting firms. It required coordination between these firms as well as trustees and lawyers to provide complete and accurate financial information as of a uniform reporting date. Each accounting firm provided the financial information under their purview. Once received, the information then needed to be reviewed, consolidated and reconciled. The process of collecting and reporting all of this financial information to Probation was completed by November 7, 2019 – only about three months after the interview. Thus, as the government knows, there was no undue delay by Clare Bronfman in getting very voluminous and complex financial information to Probation.

involvement with NXIVM was driven by her desire to help an organization whose mission she believed in, whose actions she saw first-hand as dovetailing with her own ethical principles, and which she saw up-close as successful in assisting people.

These are the reasons, facts and circumstances of Clare Bronfman's life and decision-making which should inform her sentencing. Since Clare is being sentenced prior to any of her co-defendants, her potential sentence cannot be compared to theirs; however, we respectfully submit that Clare certainly should not be sentenced harsher than co-defendants Nancy Salzman, Lauren Salzman, or Allison Mack, since, unlike them, she was not convicted of participating in the racketeering enterprise alleged in the Indictment. Clare stands before this Court as a human being who has taken responsibility for her actions.

We respectfully ask that the Court deeply examine (1) *why* she did what she did and what motivated her actions, and, perhaps even more importantly, (2) what she *actually* did, not what is unproven, unfair, and truly false innuendo.

**On Clare Bronfman's Character And the Testimonies to It**

The numerous declarations praising Clare's person have been overwhelmingly **consistent**. In the approximately 60 letters that have poured in on her behalf, Clare is described as a kind and compassionate person, intensely driven and disciplined, humble and generous, possessing good moral character, a charitable nature and purest intentions, who lives her life guided by a strict set of principles. These principles require that she dedicate herself and her wealth to making a positive impact on the world, that she live an ethical and honest life, and not harm any person or animal.

It has been also repeated that Clare is trusting and loyal, almost to a fault, that her deep capacity to believe in others has led unscrupulous individuals to take advantage of her. And that once her relationships turn into friendships, she is steadfast and generous — again, at times, to her

own detriment. That Clare is, above all else, motivated by a burning desire to do good and help others, but that she has not always been able to live up to her principles, struggling with insecurities, and at times making mistakes as she tried to find acceptance. However, when she falls short of her standards, Clare holds herself accountable and feels a deep obligation to make it right.

While Clare is financially capable of living an extravagant lifestyle, she chooses an existence of humility, simplicity and modesty, indulging in few of the luxuries her wealth affords, void of personal extravagance. (Her sister Sara has described her life as "rather ascetic … she would probably be well-suited to being a nun.") In fact, Clare has an almost unyielding desire to continue improving her character as she sees it engaging with the world — both mentally (working on various projects, looking to create human connections and assisting others, or studying) and physically (she sticks to a rigorous early morning exercise program daily, she does not drink alcohol, adheres to a vegan diet and a strict eating schedule). A relentlessly hard worker, Clare seeks to overcome the stigma attached to her privileged position through constant and intensive work.

In noting her lifestyle as "frugal and conscientious" and remarking that there are "no ostentatious or vulgar displays of wealth or power in her home," Paul Kempisty, an acupuncturist who has been treating Clare twice a week for the last year, provided the insight that though "these may seem like insignificant observations, I feel they represent the root of genuine goodness and decency in her core."

Mr. Kempisty is not alone in his assessment. While it is not uncommon for friends and family members to submit letters of support on behalf of a defendant, the outpouring of love and support for Clare has been staggering, particularly given the high profile nature of this case and

the potential backlash her supporters may face. Family, friends, colleagues, employees, spanning childhood, adolescence, pre- and post-NXIVM — all have submitted letters to the Court describing Clare's good moral character, her charitable nature, and the countless good deeds she has done throughout her life. They describe someone who stands in sharp contrast to her portrayal in this case — a kind, humble, generous, and hard-working woman with an enormous heart who has always strived to do good in the world and to use the wealth she inherited for altruistic and humanitarian purposes.

While the files hold many such endorsements further detailing the general sketch of who Clare is, two aspects pertinent to her actions in this case stand out. The first is Clare's loyalty to those she regards as friends and in need. The second is Clare's willingness to spend time and money supporting people and causes she wholeheartedly believe to be laudable and noble. This has been the case with Clare from an early age. Her childhood friend, Emma Young, said she has always been "naturally driven to helping others" and "a very generous individual." Georgiana Havers, Clare's mother says: "She was a loving and caring child, kind to everyone and everything. She loved making people happy and could always bring out a smile in young and old alike. My father lived to 97 years and all through his later years she still could make him howl with laughter. I still have visions of them holding hands, feeding the ducks, and breaking out into laughter."

Judith Moore has also known Clare since she was a child — Judith was hired in 1985 to oversee the care of the Bronfman family's horses on their Virginia farm, where later Clare spent formative years. Judith writes that, "When I became ill with cancer in 2010, Clare was there for me, and made sure I was able to receive the alternative treatment I sought. When I hit a rough spot she flew overseas to the clinic and literally held my hand, fed me, made sure I had my meds. She

also changed her flight reservation so she could fly part way home with me because she was so concerned for my welfare."

██ writes: "There were doctors, hospitals, clinics, treatments, etc, that sounded like wonderful possibilities to make Pam's days better but her health was already very compromised and we didn't want her to travel unless we knew it was the best option we could find for her. Therefore, meeting these possibilities first hand was a must and it was going to required [sic] somebody traveling to ensure it was indeed the best option. I saw Clare make the impossible choice to leave Pam's side and travel so she could attest to the reliability of these possibilities. Tears in her eyes and the heavy heart that feels like you won't effectively be able to pull up your soul from the floor—and with the full understanding of the sad choice she was making—she spent many weeks away from her best friend's last months of life in order to open the possibility to "bring back" hope to her. This is Clare, she will give up what is dearest to her heart for somebody else to have a chance at a better life."

Partly this was because it was in Clare's character to shield her social standing from the glare of the spotlight. More often than not, she did so quite successfully. Her friend Baron Stewart explains that when he first met Clare in 1994, "[n]ever once in our lengthy conversation did I realize that this humble girl, dressed in modest clothing, was an heir to the Seagrams fortune. Instead, I saw her desire to raise her self esteem, discover her core values, strive to live an ethical life and share her beautiful essence with the world."

There were, of course, times when it has been impossible for Clare's financial privilege to be hidden from the people who depended on her, and its beneficiaries. And there's no better example of her large-scale generosity than her interactions with the residents of Fijian island of Wakaya, where she owns a sizable family property. When in February of 2016, the category 5

tropical cyclone Winston devastated the entire Pacific islands nation, killing 17 people, destroying homes, and causing widespread damage, Clare's principles kicked in. Seremaia Senilagakali writes: "Clare took that "uncertain of the future" feeling away from all of us and gave us hope as she took over ownership if [sic] the island. She also helped staffs whose homes were destroyed or partly damaged by the cyclone by donating materials for them to rebuild their homes. She continues to impact our lives through the management team here on the island in the promotion of healthy living, continuous growth, and communityship."

John Farrand, from whom she had purchased her personal home and who later became the property manager of Clare's later-formed Wakaya holdings, explained how she rallied everyone on the island together for a meeting and made a commitment to them that she would rebuild everything including the homes in the village of all who lived and worked on the Island. Toward that end, in August of 2016, Clare purchased Wakaya (she owns 80 percent, and there are other pre-existing, unrelated landowners who own the other 20 percent) and undertook not only significant improvements to the resort and infrastructure, but also the village homes, school and community buildings. Farrand noted that "Clare took a keen interest in every family and was extremely protective and nurturing toward her staff making sure to instill a culture of kindness and respect toward all the island employees." Even now, as Covid-19 has put halt to global travel, Clare continues to keep the islanders on her payroll, and her projects on Wakaya moving forward.

Mark Miness, who became friends with Clare when they met on a horse show circuit as teenagers, commends "her innate commitment to use her financial means to make a positive impact in this world."

In fact, during her allocution, while acknowledging the wrongfulness of her conduct in the case, Clare admitted as much by stating, "I was afforded a great gift by my grandfather and my

father. With the gift comes immense privilege, and more importantly, tremendous responsibility. It does not come with the ability to break the law, it comes with a great responsibility to uphold the law. I failed to uphold the following laws set forth by this country, and for that I'm truly remorseful." (Tr. at 33-34). After detailing her wrongful conduct, Clare added: "I endeavored to do good in the world and to help people, however, I have made mistakes. This experience has taught me the gravity of my responsibility, and I will take these lessons forward in every future decision." (Tr. at 35).

## BACKGROUND

### On Clare Bronfman's Life And Its Effects

As her allocution alluded, understanding how Clare developed her principled outlook on life, it is first important to understand a little bit about her upbringing, how the combination of privileges, challenges and unique formative experiences created the woman who stands before the Court.

A primary insight is provided by her older sister Sara when she says, "Despite the fact that our father was an incredibly wealthy and powerful man, we grew up in another world, far from any knowledge or understanding of this or what it meant. This was our mother's intent. She wanted us to be raised as she had been: in the countryside, connected to the cycle of life, resilient, adaptive, responsible, sensible, independent, courageous and hard working."

The tumultuous relationship between Clare's parents (twice marrying and divorcing each other), and their divergent views of the world; Clare's clear physical and emotional distance from her parents, in her youth; the relationship between Clare and her extended family, and their differing opinions on social status; Clare's experience in equine athletics and her care for horses — all played a crucial role in the formation of her own ideas of the world and people.

Emma Young, one of Clare's childhood friends since they were seven, explains that Clare "clearly enjoyed being in our busy household. Even at that age I was able to distinguish on reflection how much Clare needed and craved the security and safety of family life. She and her sister, Sara, were looked after by a nanny for the majority of the time as her mother was often away for long periods. Her father was in the USA which [meant] she saw little of him and only when she did it was for short bursts when visiting him in the States. I never saw Clare being hugged and cuddled by her parents and their relationship came across as formal and cold." Nevertheless, Clare's parents had a very strong effect on the direction her life took.

Though her relationship with her father, Edgar, was contentious at times, Clare held him in the highest regard. It was because of Edgar's guidance and trust in her decision-making that she would have the chance to develop her love of horses, which would in turn set Clare on her way towards a career as an equestrian. It was also Edgar's (and Sara's) initial positive experience with NXIVM that would introduce Clare to the organization — before also becoming the source of their animosity towards each other. Ultimately, however, all of their arguments resolved on the basis of their love for one another.

By 2012, prior to her sister Sara's wedding, Clare and her father started the reconciliation process. Shortly thereafter, Edgar's health started deteriorating, and as his condition worsened over the next two years, Clare devoted herself to caring for him. Again demonstrating his trust in his daughter, Edgar specifically requested that she and his wife serve as his health proxies, empowered to make medical decisions on his behalf during times of incapacitation. Although some witnesses insinuated that Clare was only interested in her father's wealth, her dedication to Edgar in his dying years was driven by her love for him, her deep regret in their prior estrangement, and a commitment to heal their rift and to enjoy every moment she had left with him.

After Georgiana Bronfman's initial divorce from Clare's father in 1983, she and her children moved to England, with an intense desire to bring up Sara and Clare as she had been brought up; respectful, polite, hard-working and cognizant of others. But Georgiana was not always present in the children's lives. During a good portion of their childhood, their mother was spending much of her time in Kenya and the sisters were cared for by nannies and subsequently placed in boarding school. The inadequacy of Clare's caretakers was recognized by Judith Moore, who worked on the family farm in Charlottesville, Virginia, noting that "[t]here was a revolving door of nannies who were often grossly under qualified, too young, intoxicated, or otherwise unsuited."

Yet in some ways, young Clare was already taking stock of herself. Sara recounts that, "At around 9 years old when Clare realized that the meat we ate was dead animals, she chose to be vegetarian. At around 16, she chose to omit all animal products from her diet and wardrobe where possible – long before such a choice was popular. Our mother who, having grown up hunting and shooting with her father, couldn't understand Clare's choice. She feared she might not be providing the correct nutrition for her growing child and thus gave Clare a hard time and refused to cater to her chosen diet. However, Clare loved animals and would not participate in something that was harming them, so she stuck to it regardless."

Nevertheless, Georgiana's insistence that her girls grow up aware and observant of the world around them, and not sheltered by their family wealth, was instrumental in forming aspects of Clare's character. About their youth, Sara recalls that, "We did not go on holidays to the Hamptons, nor the many European equivalents. We went on working holidays and educational adventures, we did volunteer work, helped people in need, and spent time with our mother's friends and people she thought we could learn from." Dr. Leakey, a close friend of Georgiana's, recalls

that on one such trip was arranged as a "ten-day visit with a traditional Maasai family. This included going to school as a pupil with her friends and [Clare] had totally[sic] immersion in the world of the Maasai in Kenya. I felt that being aware of her family's wealth needed to be put into a perspective of reality." Committed to stopping poaching and the trade of ivory, their mother would take Clare and Sara to various protests where the sisters would carry hand-made posters.

A key turn in Clare's life occurred when she was 16, having just left the Taft boarding school in Connecticut, and relocated to her father's farm in Charlottesville, Virginia. Once there, Clare reconnected with the one part of her life where she found acceptance and a relief from her social insecurities -- riding and taking care of horses. Her love of show-jumping blossomed. Despite attending high school full time and having no real guardian oversight, she would rise early in the morning to care for her horses, and rush back to the farm after school to ride. Edgar introduced her to famed show-jumper Peter Leone, and following the meeting, Clare made the decision to pursue a career as a professional equestrian. Though still a teenager, she discussed the decision with her father, promised to obtain a general education degree, dropped out of school and commenced her new career. Over the next eight years, Clare rose through the ranks to reach the elite levels of competition.

Leigh Robertson, who met Clare when they were in their late teens at a horse show, and who was also a young rider training to be a professional, writes: "As far as the horse world went, Clare always proved herself through a strong work ethic and determined spirit — she never took for granted that her wealth would open doors for her. Clare was always the last one in the barn at night. She insisted on staying late and doing all of the most mundane caretaking tasks herself, cleaning tack, mucking stalls, making sure the grooms weren't overworked and that they were well taken care of. This was certainly not the norm. She was an elite rider, but to her that meant actually

having holistic knowledge of everything related to horse care, not simply mastering riding technique and mechanics. She always referred to her horses as her "children."

In an effort to advance her show jumping career, in 2000, at the age of 21, Clare moved to Holland to train with Henk Nooren, who was (and still is) one of the best equestrian coaches in the world. She lived alone in a small apartment in a remote town in a foreign country. Although it was initially supposed to be a three-month stay, Clare ultimately lived in Holland and trained with Henk Nooren for the next three and a half years. She never hired a manager or anyone else to take care of the logistics, staff, or horse oversight; she did it all herself. According to Mr. Nooren, "[Clare] was not particularly talented but through her dedication and hard-working mentality she managed [to] make it to the highest level of the sport." Though she barely missed out on a spot in the 2004 U.S. Olympic team, Clare won three international "Grand Prix" competitions and achieved a ranking of twelfth in the United States (and approximately 80th in the world).

Yet throughout Clare's career in the sport, internal doubts always plagued her, for example why did her overwhelmingly successful results not amount to self-confidence? And, how could she reconcile her love of her horses, with what she often considered a violent sport, further confounded by the abusive tactics she became aware of at the elite levels of competition. Clare refused to participate in these behaviors, and after becoming immersed in NXIVM, she began to further question and understand her conflict in these areas, ultimately resulting in her early retirement. It was as Clare was grappling with these struggles that Sara and Edgar introduced Clare to NXIVM.

Sara had been struggling with issues in her personal life when a friend (a former psychologist) persuaded her to attend Executive Success Program's (ESP)16-Day Intensive. Sara emerged a different person. Sara had made a deal with Edgar that if the course had a positive

impact on her, he would attend his own intensive. Several months later, he attended his first course and came away similarly impressed. The two passed on word of their experience to Clare, although the positive effects were evident through her interactions with them.

Introduced to the community, by taking her first NXIVM course in 2003, Clare finally discovered that she was not alone with her insecurities, she began to understand herself and others and subsequently started to shed her self-hate. She could be herself in the company of NXIVM members without the fear of rejection. Her self-confidence grew and she began to enjoy spending time with others. Like many others, she found a community in NXIVM that she had always craved. Henk Nooren writes: "Clare was introduced to NXIVM during the fall of 2003. She opened her heart to this group straight away and I believe that in a way she finally found that sense of community that [she] had been looking for all of her life…. [S]he was convinced that she had found her place amongst a group of people who shared her desire and wishes to have a beneficial impact on the world."

Prior to NXIVM, Clare believed that horses were her best option for companionship. NXIVM taught her the value of human interactions and reduced the fear and insecurities that plagued her prior relationships with people. Clare quickly began to work closely with NXIVM's founders, Keith Raniere and Nancy Salzman, and, in 2005, purchased a farm in Albany where she could be part of the NXIVM community while continuing her equestrian training. Ultimately, Clare's newfound ability to spend time with people had opened up a new world to her, and combined with her feelings around what she considered violent tendencies of the sport, she no longer had the desire to ride at an elite level.  After a long and difficult period of questioning her choice, Clare decided to retire most of her horses and move on from the sport.

## On Clare Bronfman and Her Belief in NXIVM

Upon retiring from show jumping, Clare focused her attention on volunteering with NXIVM and dedicated herself to helping others. At first, Clare concentrated on studying the NXIVM curriculum, and seeking to learn new skills to build herself, provide focus and to support the company's mission to help people. <u>Clare's sole motivation was *her belief* that the organization was helping others, as it had helped her</u>.

NXIVM opened new doors for Clare. She discovered her strengths and weaknesses, as well as building a relationship with herself, discovering what was important to her. It helped her to be more comfortable in  relationships,  in building new ones, and in understanding how important it was for her to heal old wounds, including in her relationships with her father, mother and sister. The community and education of NXIVM helped transform a young girl gripped by self-loathing and fear of the world into a woman who felt comfortable in her own skin, purposeful, and fulfilled. The fundamental changes that NXIVM brought in her own life left no room for doubt and inspired her to do what she could to help others enjoy the same benefits of NXIVM's curriculum. As one of Clare's oldest friends, Justin Kreizel, recognizes: "NXIVM gave her a cause to fight for. She believed strongly in the organization and its potential to create positive change for the world."

A major part of Clare's transformation came from Keith Raniere, a mentor who helped her to learn about life beyond the world of horses, as well as come to terms with her financial position, and the responsibilities and pressures that came with it. Sara recognizes that, "Clare has always sought out a teacher or mentor — and has been a dedicated and loyal student. She has always sought out a group or community to be a part of, and for beings (people or animals) to care for and protect. She has always spent time in quiet reflection thinking about her choices, especially those that affect others." Clare had spent most of her life ashamed and afraid of her wealth and public

nature of her family. Keith, having mentored others who had similar backgrounds to Clare, helped her to learn about business and finance. He supported and encouraged her to have businesses outside of NXIVM, and to seek good outside experts to also guide her. Keith became one of the few people Clare felt she could truly confide in, a friendship and mentoring she deeply valued.

Clare's work inside NXIVM progressed naturally yet expediently. In 2009, at approximately the same time as having organized several events, including an event in Albany that featured a discussion with the Dalai Lama, she was invited to join the organization's Executive Board. As a Board member, Clare spent the majority of her time improving the organization's administrative and operative departments. She sought to address the issues that hindered the company's success through the implementation of corporate policies and procedures, and the establishment of clear levels of oversight. For example, she hired third-party accountants to audit the company's bookkeeping procedures and hired lawyers with substantial expertise to advise and direct her with different protocols. Clare never was a corporate officer, yet she worked hard to improve the company.

Clare never doubted NXIVM's legitimacy and was motivated by the knowledge that its aims were altruistic in nature. In this she was joined by thousands of other adherents who dedicated their lives and resources to NXIVM with the firm conviction that the organization was a vehicle for this positive change. Many of these NXIVM students came from the professional ranks, including many physicians, lawyers, judges, and professors. (Notable ESP alumni include a high-profile entrepreneur, a co-founder of the Black Entertainment Network, a Justice of the Arkansas Supreme Court, and an ex-U.S. Surgeon General.) Dozens of other NXIVM students held advanced degrees from prestigious universities and many of these professionals were counted among NXIVM's most ardent supporters.

Perhaps one of the most impactful moments of Clare's NXIVM tenure came when she witnessed the remarkably positive results in people who suffered from Tourette's Syndrome. Marc Elliott, who lived with a severe case of Tourette's Syndrome for 20 years and met Clare when he began taking ESP classes in 2010, writes that, "Using the tools of ESP and in combination with lots of hard work, I ended up completely beating my Tourettes mind over body…. In awe and shock from this unprecedented transformation, [Clare Bronfman] ended up funding a project to see if we could replicate the results." He explains that as part of the Tourettes Project, Clare paid the expenses for each person with Tourettes that they worked with. Marc recognizes that "without Clare's generosity most of these individuals might be living with the difficult symptoms Tourrette's Syndrome presents to this day."[2]

Much of the criticism of Clare's role within NXIVM centers on her financial support of the organization and of various individuals within the NXIVM community. But the suggestion that she knowingly funded criminal activity is just false. It is important to understand *what* Clare financed (patents, commodities, and a few loans, but <u>not</u> DOS or sexual or human trafficking); and *why* she financed what she did (to improve people's lives).

Clare's financial support of NXIVM was fueled by several motives: 1) her sincere and wholehearted belief in the power of NXIVM's methods to improve people's lives, proof of which she saw in her own life and the lives of people she met regularly, 2) her desire to use her inheritance wisely and selflessly for a noble cause, and 3) her awareness of her father's involvement in funding those involved in litigation against NXIVM and his participation in salacious media against

---

[2] We respectfully invite the Court and government to view a documentary, which Clare funded the production of, regarding NXIVM's work in the space of Tourette's Syndrome, entitled "My Tourette's." The Court may access this documentary at ████████████████████████████

NXIVM. She saw the pain this caused, not only for herself and the company, but also many of NXIVM's clients.

Clare wanted to help protect the company that had improved her life, as well as the lives of so many others. Her finances only supported legitimate business activities, such as loaning the company money for civil litigation to protect NXIVM's intellectual property under the guidance of experienced and well-respected lawyers, for filing and maintaining patents, and ensuring payment to contractors on the few occasions the company's cashflow was depleted. Her financial expenditures did not advance any criminal activity. Although Clare's financial support of NXIVM was extensive and she did invest in a number of Keith Raniere's business ideas, it would be inaccurate to suggest that her support was necessary to ensure NXIVM's survival or that she provided financial support for, or otherwise subsidized, Mr. Raniere's personal life. It is also absolutely false that her financial support funded any human trafficking, sexual or any other abuse.

**On Clare Bronfman Finding out about DOS and Her Actions Thereafter.**

Clare grew up with circumstances which placed a very high value on privacy. Until this case, Clare has always tried to live a very private life. On occasion she has posted a few blog articles, however, she was never comfortable doing so and discontinued. Clare does not make it a practice to share her personal life, even with most of her closest friends and family members. Reciprocally, Clare respects others' right to privacy. As Eduardo tells the Court: "She is also very sensitive and respectful. There's been many times when I've been very stressed and not wanting to talk about why I'm stressed, or even share that I am stressed. She always kindly asks how I'm doing, and I know she knows, she feels me, but if I say OK, she respects my space. It's very safe to have a friend who knows how you're doing inside, but it's even safer to know that if you don't want to talk about it, this friend absolutely respects it. Clare has always had that great balance. She

knows me and wants me to talk about my struggles so that I can feel better, but she understands I'm sometimes a private person. Somehow I always know I can go and talk to her, and I can also go and not talk to her. She's the person that if I want to cry in front of and have no questions asked, I can do it." Clare never asked questions about her friends' private lives. Clare never had any knowledge of Keith's private life. She knew he had fathered a child with Kristin Keeffe, and later with ███ however beyond that, she never asked and no one ever shared.

Clare first became aware of a small group of women who she was told had come together to help an individual overcome some serious personal issues at the end of May and beginning of June 2017. Over the following weeks, Clare was made aware of articles Frank Parlato was posting on his blog, the *Frank Report*. In July, Clare received approximately five emails from individuals resigning and requesting their collateral be returned amongst other things. Clare was, like most people, shocked and concerned by the allegations and the individuals who were making them and leaving NXIVM. That said, for many years, the Frank Report had written salacious articles about Clare and NXIVM in an effort to discredit Clare, who at the time was one of the main Government witnesses in a criminal case against him. During this time, Clare also discovered several individuals hacking into NXIVM's computer servers, downloading and deleting client information, and cancelling ongoing monthly payments. Clare immediately contacted NXIVM's counsel and asked for assistance in how to proceed. NXIVM hired an investigator to review the computer break-in allegations as well as to interview several individuals who were members of DOS to determine if there was any improper, or illegal behavior. At the conclusion of the interviews, and on recommendation by counsel, Clare proceeded to pursue criminal sanctions on the computer break in and was assured that there was no need for concern regarding DOS.  Why

would someone who was aware of ongoing, serious illegal activity seek to bring law enforcement into that organization?

Clare came to learn that some of the individuals in DOS were her close friends. But at no point did anyone ever tell her, including these close friends, that anything illegal was going on, let alone anything of a sexual nature at all.  She was kept entirely in the dark. Clare never funded DOS. DOS was formed by a group of people as a **secret society.** DOS existed years before Clare had any knowledge of it and its members took great pains to keep it secret. DOS did not have regular expenditures, and as the record shows, the only money spent on DOS, such as the purchase of a house (which Clare knew nothing about) was funded by DOS members themselves.

In the fall and winter of 2017, Clare was informed that individuals associated with a NXIVM Mexico company were being called, scared and persuaded to leave NXIVM. As a result, many people who relied on income through NXIVM to support themselves and their families were having their business destroyed and reached out to Clare for help. Clare, together with other leaders of the NXIVM Company in Mexico sought legal counsel to help stop what they were told was criminal behavior based on Mexican law. Admittingly, together with NXIVM Mexico lawyers, they aggressively tried to stop the damage. However, at no time was Clare attempting to dissuade anyone from bringing any claim to the authorities.

### THE COURT SHOULD EXERCISE ITS DISCRETION AND IMPOSE A BELOW GUIDELINES SENTENCE IN THIS CASE.

Clare Bronfman accepts full responsibility for her own criminal misconduct.  However, the crimes Clare committed were unrelated and distinct from the core of the racketeering offenses that formed the basis of Keith Raniere's trial or that other defendants in the case were convicted of.

**A.    The Court Has the Discretion to Impose a Non-Guidelines Sentence.**

In *United States v. Booker*, the United States Supreme Court held the United States Sentencing Guidelines to be advisory rather than mandatory.  543 U.S. 220, 245 (2005).  Therefore, the Court has the discretion to impose a Guidelines or a non-Guidelines sentence.  Under 18 U.S.C. Section 3553(a), the Sentencing Guidelines serve as one factor among several that courts must consider in determining an appropriate sentence.  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007); *see* 18 U.S.C. § 3553(a).

 First, as set forth below, we believe Clare's offense level to be a 16, not 17 as set forth by Probation.  Given Clare's criminal history category of I, the Guidelines recommend a sentence of 21 to 27 months. (Probation puts forth that Clare's total offense level is 17; the Guidelines recommend a sentence of 24 to 30 months, given their calculation.)  However, a sentence within or above this range is excessive in light of section 3553(a)'s objectives.  Rather, <u>having already served more than two years in home confinement</u> with significant restrictions on her activities, travel, and association with others, we respectfully submit that the appropriate sentence for Clare is <u>three years of probation</u>.

**B.    Guidelines Analysis**

As noted above, the Court must first calculate the advisory Guidelines range.  Here, in the plea agreement, Clare Bronfman stipulated to the Guidelines analysis below, which the government estimated was the appropriate calculation:

<u>Count One: Conspiracy to Conceal and Harbor Illegal Aliens</u>

| | |
|---|---|
| Base Offense Level (§ 2L1.1(a)(3)) | 12 |
| Total: | 12 |

<u>Count Two: Fraudulent Use of Identification</u>

| | |
|---|---|
| Base Offense Level (§ 2B1.1(a)(2)) | 6 |
| Plus: Loss Amount Exceeds $95,000 (§ 2B1.1(b)(1)(E)) | +8 |
| Plus: Substantial part of fraudulent scheme committed from outside the United States (§ 2B1.1(b)(10)(B)) | +2 |
| Total: | 16 |

| <u>Multiple Counts Analysis</u> (§ 3D1.4): | <u>Level</u> | <u>Units</u> |
|---|---|---|
| Conspiracy to Harbor Aliens | 12 | 1 |
| Fraudulent Use of Identification | 16 | 1 |
| Total Units | | 2 |

<u>Offense Level Calculation</u>

| | |
|---|---|
| Highest Offense Level (§ 3D1.4) | 16 |
| Increase in Offense Level (§ 3D1.4) | +2 |
| <u>Total Offense Level</u> | 18 |
| Acceptance of Responsibility (§ 3E1.1(a)) | -2 |
| **<u>Adjusted Offense Level</u>** | **<u>16</u>** |

Since Clare has no prior criminal history (placing her in criminal history category I), an adjusted offense level of 16 yields a sentencing range of 21 to 27 months.  In addition to the calculation above, for Count One (conspiracy to conceal and harbor illegal aliens), the Probation Officer adds a three-level enhancement for the Specific Offense Characteristics (PSR ¶ 123) and a two-level enhancement as an Adjustment for Role in the Offense (PSR ¶ 125), increasing the adjusted offense level to 17, which yields a sentencing range of 24 to 30 months.  However, as

explained below, neither enhancement is warranted here. Therefore, the adjusted offense level of 16, as estimated by the government in Clare's plea agreement, should be the Court's starting point in determining the appropriate sentence for Clare.

> **1. Clare Bronfman did not smuggle, transport or harbor at least 6 unlawful aliens.**

Clare Bronfman objects to the PSR's recommendation that a three-level increase is warranted pursuant to U.S.S.G. § 2L1.1(b)(2)(A) because "the offense involved the smuggling, transporting or harboring of at least 6 unlawful aliens." (PSR ¶ 123).

In the PSR, the Probation Officer asserts that with regard to Count One, between October 2015 and January 2018, Clare conspired to conceal and harbor three illegal aliens (Jane Does 3 and 12, and ██████ for financial gain. (PSR ¶ 110). The Probation Officer further asserts that between 2003 and September 2015, Clare conspired to conceal and harbor an additional three victims for financial gain (Sylvie and two non-citizens related to Rainbow Culture Gardens). *See id*. She contends that per U.S.S.G. §1B1.3 (Relevant Conduct Rules), these additional three victims are factored into the Guideline calculation, as they were part of the same course of conduct or scheme or plan as the offense of conviction. *See id*.

To be clear, Clare's plea and the resulting offense of conviction was related to only one alien, not three. Both the transcript of her plea hearing as well as her allocution specifically identify Jane Doe 12 as the victim of Count One. However, Probation asserts that Jane Doe 3 and ██████ were also victims of the offense of conviction. The government bears the burden of proving by a preponderance of the evidence that the enhancement is warranted. *See United States v. Archer*, 671 F.3d 149, 161 (2d Cir. 2011). As explained below, the record does not support the enhancement.

To sustain quantity-based enhancements for relevant conduct, the court must base its findings on "specific evidence" that the offense involved the requisite quantity of items. *See United States v. Shonubi,* 103 F.3d 1085, 1090 (2d Cir.1997). This requirement has two parts: (a) there must be evidence regarding the quantity of illicit or fraudulent goods, and (b) it has to be specific to the defendant. *See id.* As the Second Circuit has aptly noted:

> [A] court may not assume that because the defendant was convicted of dealing drugs, all the money that he has is drug money, *see U.S. v. Jones,* 531 F.3d 163, 177 (2d Cir. 2008) (finding the money to be drug money only, in part, because the defendant had "no other means of employment that could be a legitimate source of the money"), and we have held that simply because a defendant was convicted of cashing forged checks, it was error to conclude that every check he cashed was fraudulent, *United States v. Spitsyn,* 403 Fed. App'x 572 (2d Cir. 2010) (summary order) (remanding for resentencing because no evidence existed that 545 of the 578 checks defendant cashed were forged).

*Archer, supra,* 671 F.3d at 164.

Here, just because Clare pled guilty to conspiring to harbor Jane Doe 12 for financial gain does not mean she is guilty of conspiring to harbor other aliens, namely anyone else she helped with the immigration process. As explained below, the evidence does not support that Clare conspired to harbor five additional aliens.

██ [referred to as Jane Doe 3 in the PSR]

The evidence shows that ██ came to the United States with her immediate family members in 2003, having nothing to do with Clare. In fact, at the time they came to the U.S., Clare had not yet moved to Albany and was still pursuing her riding career, living in Europe or Florida to train. It is therefore untrue to state that "Ms. Bronfman made efforts to assist Jane Doe 3 . . . in entering" the United States, implying that Clare was instrumental in her initial entry to the United States. (PSR ¶ 28). The only evidence regarding the family's initial entry into the United States comes from Daniela testimony, in which she never mentions Clare when discussing the circumstances

surrounding ████ entering into the United States.

Clare had no involvement in ████ immigration status in the United States (and no reason to know anything about ████ legal status in the United States) until after Pam Cafritz was diagnosed with metastatic renal cancer in 2014. After the diagnosis, ████ served as Cafritz's primary companion and caretaker, accompanying her to medical procedures and appointments, and caring for her as she recovered from chemotherapy sessions and surgeries. At the time of the diagnosis, ████ was in the U.S. on a valid B1/B2 visitor's visa that allowed her to make multiple entries into the U.S. but limited the duration of her stay to no more than 180 consecutive days. Although ████ was careful to leave the U.S. without staying past the 180 days, U.S. Customs and Border Protection (CBP) officers began to caution ████ to secure a different type of visa as the cumulative amount of time she was spending in the U.S. appeared inconsistent with the purposes of a B1/B2 visa. Only after Pam's diagnosis did ████ and Clare discuss ways that ████ could legally secure a different visa that would allow her to remain in the U.S. to help take care of Pam.

On January 5, 2016, ████ was denied entry to the United States as she was traveling back to Albany with Clare and a group of NXIVM community members who were returning from a trip to Fiji. (*See* PSR ¶ 29). The purpose of the trip had been to spend time with Pam, whose condition had worsened considerably. At this point, Clare engaged immigration counsel for assistance in pursuing lawful immigration strategies for ████ to re-enter the United States. Notably, from the time that Clare became involved in ████ immigration status in January 2016, ████ never once overstayed a visa.

Beginning in January 2016, the lawyers undertook efforts to obtain ████ legal re-entry to the country. Legal efforts were focused on obtaining either a new visa from the US Embassy or a

"humanitarian parole"[3] from DHS based on ███ close relationship with Pam Cafritz as her friend and caregiver.

The evidence, including the emails cited by the PSR, demonstrates that Clare, as well as the attorneys and their independent contractors, were focused on seeking a parole based solely on ███ role as a caregiver to her dying friend. There is absolutely no evidence that Clare – or anyone working on her behalf – provided the false information to the United States Department of Homeland Security or any agency of the U.S. government that ███ was a cooperating witness providing information about "human smuggling organizations . . . and possible financial schemes." (PSR ¶¶ 31 & 208). To the contrary, all information provided to the government was related to ███ application for admission on humanitarian grounds as Pam Cafritz's caregiver due to her medical situation. The parole request was ultimately approved by special agents with Homeland Security Investigations and ███ re-entered the U.S. in February 2016. Clare had no reason to believe the grant of parole was based on anything other than the humanitarian grounds that counsel had advanced on ███ behalf. If a DHS employee falsified or exaggerated internal paperwork in order to justify the issuance of a parole to ███ to his superiors as a significant public benefit parole based on cooperation with law enforcement – as appears to be the case – that was done without Clare's knowledge or participation and without the participation of any attorney working on the matter, none of whom were present for the interview. It is important to note that there was an

---

[3] Parole allows an individual, who may be inadmissible or otherwise ineligible for admission into the United States, to be paroled into the United States for a temporary period. The Immigration and Nationality Act (INA) allows the secretary of Homeland Security to use their discretion to parole any alien applying for admission into the United States temporarily for *urgent humanitarian reasons or significant public benefit*. (See INA section 212(d)(5))." https://www.uscis.gov/humanitarian/humanitarian-or-significant-public-benefit-parole-individuals-outside-united-states ("What is Parole?") (emphasis added).

additional six-month humanitarian parole granted by CBP, which did an independent hour-long interview with ███ prior to authorizing the visa. CBP felt that a humanitarian parole was appropriate and therefore issued it.

Furthermore, Clare's efforts to have ███ qualify as an EB-5 investor is not evidence of a conspiracy to harbor illegal aliens. On the contrary, Clare's gift of $500,000 to ███ was properly documented, fully disclosed to USCIS in the visa application, and a gift tax return was prepared and filed. The rules and regulations governing the EB-5 program explicitly allow that an EB-5 visa application can be based upon the use of gifted funds as an investment in the United States. Thus, Clare's entirely lawful and disclosed gift to ███ cannot be the basis for the inclusion of ███ in the count of conviction.

███████

Like with Jane Doe 3, Clare had nothing to do with ███████ initial entry into the United States in 2003 with his family, including Jane Doe 3. ███████ was approximately 15 years old when he moved with his family to Albany, NY. Initially, his interactions with Clare were minimal as she was focused on her riding career and rarely in Albany. Later, once Clare was living in Albany, ███████ helped her with her horses one Christmas, and thereafter Clare considered ███████ as family, akin to a younger brother.

Clare was not involved in attaining his work visa, which he acquired through his father's company and with the help of one of the most well-known immigration law firms, Foster LLP (formerly Foster Quan LLP). ███████ did ask for Clare's advice when he was trying to get an extension on his visa; it was also Foster LLP that assisted him. His extension was denied, however, he had married his current wife and sought his visa through his marriage thereafter.

*Sylvie*

The evidence shows that Sylvie, who was from England, met Clare when she was searching for someone to take care of her horses. Sylvie came to the U.S. initially on a tourist visa for three months as a trial period, during which time Clare assisted in financial support; Sylvie later got a trainee visa to work on Clare's horse farm and the two became close friends. While in the U.S., Sylvie took some NXIVM classes, and she was inspired to apply its teachings to help others.

In 2009, after Sylvie's visa had expired and she was back in England, Sylvie and Clare spoke about another option for Sylvie to return to the U.S. -- starting a business to help elite athletes improve their performance by using NXIVM strategies (a melding of both of their primary interests which were a pursuit of athletic excellence and using athletics to build community using the tools of NXIVM with which they had both experienced positive effects). The business they started was called Ethletics; the plan was for Sylvie to come to the U.S. and run the business.

They pursued an E-2 visa for Sylvie which required an investment in the business by a foreigner seeking a visa. Sylvie did not have much capital to invest in the business, but she did own a horse, which she had been boarding at Clare's horse farm in Albany. To help fund Sylvie's investment in Ethletics, Clare purchased the horse from Sylvie for $30,000; Clare also loaned her an additional $10,000. On Sylvie's visa application, it was fully disclosed that both the money for the horse and the loan came from Clare. A few years later, the horse was sold. Although the contract for the sale was in Sylvie's name as if she still owned the horse,[4] the evidence shows that

---

[4] The reason Sylvie was listed as the owner of the horse on the contract was because she and Clare never submitted official paperwork for the transfer of ownership from Sylvie to Clare. Since this was a transaction between close friends who trusted each other, they had a contract memorializing the sale, and Clare was no longer competing professionally, neither of them felt it was necessary to document the transfer with the authorities.

the proceeds of the sale went to Clare, not Sylvie.  Clare was never able to cross-examine Sylvie

at Keith Raniere's trial on these issues, and the truth is that the proceeds of the sale of the horse

did go to Clare, not Sylvie. This was not an attempt to commit immigration fraud.  Sylvie

eventually abandoned her efforts to obtain the visa and return to the United States.  Clare

considered Sylvie as a little sister, loved her and tried her best to help her. While Sylvie now paints

a very different picture of their friendship, it is important to understand how much Sylvie expressed

her love and care for Clare, even writing her an email expressing her love the day after Clare was

arrested.

███████

The evidence demonstrates that ███████ was legally present in the U.S. on a H1B visa that

was obtained through ESF.  The petition for this visa disclosed that as an ESF employee, she would

be working as an MDS – Research Analyst.  To Clare's knowledge, ███████ was always paid the

full amount of the salary that had been disclosed in her visa application.[5]  Indeed, the evidence

reflects that Clare instructed those responsible for ESF payroll to ensure that it was consistent with

her visa.  The evidence also shows that ███████ did do work for ESF.  As she informed the

government: "████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████" ███████ also explained that she did other

types of work for ESF, and she provided evidence to the government of the data collection she was

required to do in her role at ESF.

---

[5] Despite any discussions about ███████ owing ESF for hours that she did not work, Clare never collected
or attempted to collect on those amounts.

There is no allegation that ▮▮▮ was not properly here on a student visa, as she was a bona fide student. The fact that she also worked for RCG and/or Clare "under the table" does not mean that she was harbored as an illegal alien, because there has been no showing that she was not lawfully present in the United States.

▮▮▮ came to the United States on a J1 visa as an au pair, unrelated to NXIVM or Clare. ▮▮▮ later enrolled in a local college and secured a student visa through her college. Clare paid for her schooling as well as expenses for her and her daughter, such as her bringing her daughter to America so she could grow up with her mother, her daughter's summer camp in Vermont, gymnastics, and travel home to South Africa with her daughter, when her daughter's father died because Clare considered them to be like family. Clare admits that she was aware ▮▮▮ was paid off the books in cash for her work for RCG. However, it is important to note that Clare had no authority or role within RCG and at no time did Clare believe that ▮▮▮ was unlawfully present in the United States. Clare also cared for ▮▮▮ and her daughter. ▮▮▮ felt close to Clare as evidenced by ▮▮▮ asking Clare to help her, and be there, to tell her daughter that her father had died. Additionally, on Clare's birthday, April 8, 2019, ▮▮▮ had a card and picture of herself, her daughter and Clare sent to Clare as a gift.

Because the evidence is insufficient that Clare smuggled, transported or harbored at least 6 unlawful aliens, a three-level increase pursuant to Section 2L1.1(b)(2)(A) is not warranted.

**Clare Bronfman did not recruit these individuals or any others for the purpose of sex trafficking, sexual relationships with Mr. Raniere or forced labor.**

Clare never pursued any individual to live in the United States unless they showed interest in coming, and if there was good and lawful reason for them to come. Clare always worked under

the advice of counsel and pursued legitimate visas for those who she helped. ▮ and ▮ entered the country with their parents and met Clare in Albany, NY. ▮ did not have a sexual relationship with Mr. Raniere (to Clare's knowledge), and once he and Clare became good friends, she supported his career and personal life. ▮ and Mr. Raniere have a child together and a loving relationship.

Clare is not aware of any sexual relationship that either ▮ or ▮ had with Mr. Raniere, nor is there any evidence that they did. ▮ was paid for her work with ESF, as supported by the Foundation's employment records. Clare supported ▮ extensively and Clare did pay ▮ for errands she did for Clare, albeit in cash. ▮ wanted the extra work so she could provide for her daughter.

Clare was not aware of the sexual encounter between Sylvie and Keith Raniere until trial. There is no evidence on the contrary. Clare did advise Sylvie to wait before having sex with her husband, due to Clare's knowledge of Sylvie's struggles in prior relationships. Clare was never able to cross-examine Sylvie regarding this topic. Clare financially supported Sylvie for many years.

Clare is not aware of any sexual relationship between Jane Doe 12 and Mr. Raniere, nor is there any evidence that there was one.

> 3. **Clare Bronfman was not an organizer, leader, manager, or supervisor in criminal activity.**

We also object to the PSR's recommendation that a two-level increase for her role in Count One (conspiracy to harbor an alien for financial gain) is warranted pursuant to U.S.S.G. § 3B1.1(c) because she was "an organizer, leader, manager, or supervisor in criminal activity." (PSR ¶ 125).

In the PSR, the Probation Officer asserts that the aggravating role enhancement is warranted because "Bronfman used her money, her businesses and her personal connections in order to facilitate the immigration-related crimes and secure visas. . . [and because] she recruited the aliens, who were NXIVM workers, and who followed her instructions." (PSR ¶ 110). The government bears the burden of proving by a preponderance of the evidence that the defendant should receive an aggravating role adjustment. *See Archer,* 671 F.3d at 161; *see also United States v. Lora-Andres*, 844 F.3d 781, 785 (8th Cir. 2016) ("The government bears the burden of proving by a preponderance of the evidence that the aggravating role enhancement is warranted"); *United States v. Al-Rikabi*, 606 F.3d 11, 14 (1st Cir. 2010) (same). Here, the facts here do not support such an enhancement.

To apply a 2-level aggravating role adjustment pursuant to Section 3B1.1(c), the court must find that the defendant was the organizer, leader, manager, or supervisor of at least one other participant. *See* U.S.S.G. § 3B1.1, comment. (n.2). Application Note 1 to Section 3B1.1 defines a *participant* as "a person who is criminally responsible for the commission of the offense . . ." U.S.S.G. § 3B1.1, comment. (n.1); *see, e.g., United States v. Tai*, 750 F.3d 309, 318-20 (3d Cir. 2014) (remanding the case for resentencing where the court applied §3B1.1(c) without making the required factual findings concerning whether the defendant supervised a "criminally responsible" participant). Section 3B1.1 does not require, however, that a criminally responsible person actually be convicted to qualify as a participant. *See* U.S.S.G. § 3B1.1, comment. (n.1); *see also United States v. Brockman*, 183 F.3d 891, 899 (8th Cir. 1999) ("Persons who are not indicted or tried, but who are nonetheless criminally responsible for defendant's crime, are 'participants' under § 3B1.1.") (citations omitted).

In Count One, Clare was convicted of conspiring with others to harbor an illegal alien for financial gain, namely Jane Doe 12. It has never been contended that Clare exercised any control over her co-defendants. Rather, the Probation Officer advances two separate bases on which the Court should find that Clare exercised control over others to support an aggravating role enhancement. As explained below, neither is sufficient to warrant the enhancement on Count One.

Probation's assertion that "Bronfman used her money, her businesses and her personal connections in order to facilitate the immigration-related crimes," (PSR ¶ 110), is insufficient on its face to justify an enhancement under Section 3B1.1(c), as it wholly fails to identify any supervisory role by Clare over other individuals. *See, e.g., United States v. Whitney*, 673 F.3d 965, 975-76 (9th Cir. 2012) (holding that the district court committed clear error when it imposed a two-level role enhancement pursuant to U.S.S.G. § 3B1.1(c) despite finding "that he was 'the guy that facilitated the crime' . . . because it fails to identify any supervisory role over other individuals").

Probation's assertion that Clare "recruited the aliens, who were Nxivm workers, and who followed her instructions" is also insufficient to support a role enhancement. (PSR ¶ 110). As noted above, "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other *participants*." U.S.S.G. § 3B1.1, comment. (n.2) (emphasis added).

In *United States v. Parmelee*, 42 F.3d 387, 389 (7th Cir. 1994), the defendant piloted a plane that smuggled illegal Polish aliens into the U.S. He then drove the aliens to a pre-arranged rendezvous site where he delivered them to a co-conspirator. *Id*. The Seventh Circuit reversed a supervisory or managerial role enhancement because although the defendant played an important role in the smuggling ring, there was no evidence that he controlled or coordinated any of his co-

defendants' activities. *Id*. at 395. The court held that the defendant's "management" of the illegal aliens did not warrant an enhancement because they were not participants in the offense. *Id*. *See also U.S. v. Mejia-Orosco*, 867 F.2d 216, 220 (5th Cir.) ("[F]or the purpose of § 3B1.1, the aliens smuggled, transported, or harbored are not considered participants unless they actively assisted in the smuggling, transporting or harboring of others.") (citing Commentary to U.S.S.G. § 2L1.1, which concerns the smuggling, transporting, or harboring of illegal aliens), *cert. denied*, 492 U.S. 924, 109 S.Ct. 3257, 106 L.Ed.2d 602 (1989); *U.S. v. Barrie*, 267 F.3d 220 (3d Cir. 2001) (holding that the district court erred in finding that the recipients of unlawfully produced Social Security cards were participants in the conspiracy, despite providing money and knowing they were obtaining something unlawfully); *U.S. v. Lewis*, 68 F.3d 987 (6th Cir. 1995) (reversing a § 3B1.1(c) leadership enhancement because the women the defendant used to cash stolen certificates for the defendant were not participants in the scheme); *U.S. v. Ramos-Paulino*, 488 F.3d 459 (1st Cir. 2007) (holding there was insufficient evidence to support a § 3B1.1(c) managerial role enhancement where the individual the defendant oversaw was acting undercover as part of a government sting and thus did not count as a participant under § 3B1.1); *U.S. v. Tank*, 200 F.3d 627 (9th Cir. 2000) (holding that the record was insufficient to support a determination that defendant was an organizer or leader of a child pornography internet "chat room" because the defendant's control over the victims was insufficient); *U.S. v. Paul*, 634 F.3d 668, 677 (2d Cir. 2011) (explaining the well-established rule that co-conspirators, who, by definition, know of the scheme, are not victims); *U.S. v. Jarrett*, 956 F.2d 864 (8th Cir. 1992) (noting that being deemed a "victim" is inconsistent with being a participant); *compare United States v. Caraballo*, 595 F.3d 1214, 1232 (11th Cir. 2010) (affirming enhancement where defendant recruited a co-defendant to participate in the smuggling operation, specifically instructed co-defendants on how to commit the

crime, required co-defendants to sign a contract agreeing to tell a fabricated story to the authorities if they were caught, and agreed to pay a co-defendant for his role in the venture).

Here, because Jane Doe 12 is the victim of the offense of conviction (*see* PSR ¶¶ 5, 114, 205), she cannot be a participant over whom Clare exercised control.  Neither can the other aliens identified by Probation as victims of Clare's immigration offenses (Jane Doe 3, ████ Sylvie, ████ and ████ (*See* PSR ¶¶ 114-115).  Because there is no evidence that Clare was the organizer, leader, manager, or supervisor of at least one other criminally responsible participant, a 2-level aggravating role adjustment pursuant to Section 3B1.1(c) cannot be applied.

**C.**   **The Court Should Sentence Clare Bronfman to a Below Guidelines Sentence Because a Guidelines or Above Guidelines Sentence Would Be "Greater than Necessary" to Achieve Section 3553(a) Objectives.**

**1.**   **Offense and offender characteristics**

Section 3553(a)(1) provides that in determining an appropriate sentence, the Court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant."  18 U.S.S.G. § 3553(a)(1).  As explained below, this factor supports a below Guidelines sentence, as there are no aggravating factors in either the offense conduct or Clare's history and characteristics.

**a.**   **Offense conduct**

Clare pled guilty and was convicted of one count of conspiracy to conceal and harbor an alien for financial gain in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and one count of fraudulent use of identification in violation of 18 U.S.C. §§ 1028(a)(7), 1028(b)(1)(D) and 1028(c)(3)(A). She allocuted as follows:

> Between approximately October 2015 and January 2018, along with others, I did harbor an individual who I knew had remained in the United States in violation of the law. I substantially facilitated her to live and work in our country in a way that

would be undetected, and I was wrong. She did work for me and businesses I was affiliated with, so her work was a financial benefit to me.

Additionally, I was wrong to facilitate the use of someone's credit card who had passed away. Between approximately November 2016 and March 2018, I knowingly facilitated the use by another person of a deceased person's credit card, and the use of that person's bank account to pay the bills for the credit card which were more than a thousand dollars. My office and I handled the logistics of payment of the credit card bill from the bank account, and the person using the credit card did not intend to pay taxes on the income received in the form of payment for goods purchased on the credit card. I meant no harm in either case, however, that does not justify my actions nor their affects, and for this I am truly sorry.

(Tr. at 34-35).

The facts surrounding each offense of conviction are discussed, in turn, below.

### Count One: Conspiracy to Conceal and Harbor an Alien for Financial Gain

Clare met Jane Doe 12 (████████) in or around December 2014 while Jane Doe 12 was in the United States on a tourist visa. Jane Doe 12 initially came to the United States to attend an Exoeso training with the intention of bringing the company back to Mexico as a teacher and running a studio. Exoeso had developed a set of classes, similar to exercise classes, to help people build more strength and stabilization and to explore how physical movement, thoughts and emotions all inter-relate.

While Jane Doe 12's victim statement suggests Jane Doe 12 was not happy and felt as though she was being overworked, and wanted to leave, Clare's experience of her and the emails between them painted a very different picture. Clare believed Jane Doe 12 truly wanted to live in Clifton Park, and although there were a few disagreements, Clare perceived a caring work-relationship and friendship between them and that Jane Doe 12 wanted to be in Clifton Park both to grow the business as well as to be with her then-boyfriend, now husband. Although Clare perceived Jane Doe 12 as genuinely wanting to work with and grow the company and enjoying the

Albany community, Jane Doe 12's work with Exoeso and the community was not without difficulties. Jane Doe 12 struggled to sustain herself, and Clare struggled with what she perceived as Jane Doe 12 not fulfilling her job requirements. While Clare believed they both earnestly tried to create and maintain a fruitful employment and friendship, Clare recognizes she neither put in the time to ensure the business relationship worked or work with Jane Doe 12 to end her employment. Upon reading the letter and knowing how Jane Doe 12 now feels, Clare is truly sorry for how Jane Doe 12 experienced things, which was certainly never what Clare had hoped for in their relationship.

### Count Two: Fraudulent Use of Identification

In 2016, Jane Doe 7 (Pam Cafritz) died after a long and painful fight with cancer. In her will, she left the entirety of her estate to Keith Raniere, who was also the executor of her estate.

As Clare explained in her plea allocution, her office and bookkeeper were handling some of the finances for Pam's estate after she passed away (as they had done for her before she passed away).[6] Pam, ▆▆ and Keith Raniere all lived together, and Pam paid for all of the expenses for the household. Some of the bills for the household were paid automatically out of Pam's bank account and ▆▆ had access to, and use of, Pam's Amazon account and her credit card. Upon Pam's death, ▆▆ and Keith continued to live together, expenses continued to be automatically paid, and ▆▆ continued to use Pam's Amazon account as well as her credit card.

When a question arose in Clare's office about what to do now that Pam had died, Clare asked a long-time attorney what should happen, and he advised that they should no longer use

---

[6] At some point during Pam's illness, Clare's office, which offered primarily bookkeeping services to individuals and companies, had taken over the bookkeeping for some of Pam's accounts. This was just a bookkeeping function that Clare's employees were performing; it did not give Clare any access or control over how the money was spent.

Cafritz's signature stamp, and instead Raniere should sign the checks as executor of the estate. This change was implemented immediately. There was nothing hidden about what they were doing. The banker at the bank that held Pam's accounts knew that she had died. And Keith signed the checks as suggested by the attorney as soon as the question of using Pam's actual signature stamp was brought up, and until someone else took over as the Estate's executor and began signing checks herself.

Clare knew that Keith had inherited all of Pam's money so she did not think there was anything wrong with this arrangement at the time. However, she now recognizes that it was wrong of her to facilitate the continued use of the deceased Cafritz's credit card to purchase items to support the lifestyle of Jane Doe 3 (███ and Raniere, who did not pay taxes on the spending from this credit card account of which they were the beneficiaries. Instead she should have worked to get the Estate accounts set up immediately. The loss amount in the plea agreement, and to which Clare stipulated, is based on the amount charged to Cafritz's credit card between November 7, 2016 (the date of her death) and February 8, 2018, which Probation agrees was $135,000.

Although Clare technically violated 18 U.S.C. §§ 1028(a)(7), 1028(b)(1)(D) and 1028(c)(3)(A), it should be noted this is not a **typical identity theft case and there was no direct loss to Cafritz or her estate, since she left the entirety of her estate to Raniere anyway**. There were also none of the emotional, financial and/or opportunity costs that typically accompany identity theft. *See* U.S.S.G. § 2B1.1, app. note 2 (1999) ("'Loss' means the value of the property taken, damaged, or destroyed."); *cf*. S. REP. 105-274 (1998) (reporting that "[o]n an individual level, the 'human' cost of identity theft can be quite substantial. These costs include emotional costs, as well as various financial and/or opportunity costs," and that the Identity Theft and Assumption Deterrence Act of 1998 (ITADA) therefore directed "the [Sentencing] Commission

[to] consider the extent that 'harm to reputation, inconvenience, and other difficulties resulting from the offense'" should be accounted for in sentencing).

The atypical circumstances of the identity theft crime should be considered as a mitigating factor. As the Sentencing Commission explains in its introduction to the Guidelines, it "intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." U.S.S.G. Ch. 1, pt. A, subpt. 4(b).

In committing both of the crimes described above, Clare was not motivated by greed or an intent to harm. On the contrary, although she broke the law, she did so believing, at the time (1) as to Count One (conspiracy to conceal and harbor an alien for financial gain), that she was helping Jane Doe 12, who expressed that she really wanted to come to the United States to build Exoeso, and work with Raniere,[7] and (2) as to Count Two (fraudulent use of identification), that she was helping carry out the wishes of the deceased Pam Cafritz, who had left the entirety of her estate to Keith Raniere in her will and designated him as the executor of her estate. <u>In short, although Clare's actions violated the law, they were never ill-intentioned</u>. A defendant's motive is highly relevant at sentencing. *See Wisconsin v. Mitchell,* 508 U.S. 476, 485 (1993).

Furthermore, neither crime was committed by sophisticated means nor are there any

---

[7] *See* Statement of Jane Doe 12: "I took the offer, it sounded so tempting for me, I wanted to increase my abilities as a business woman in an area that I love which is wellness and health, I said yes and started my process for my work Visa with exo|eso as a Management Consultant. . . . I was excited to start working with Keith Raniere and I felt special because from all my coworkers and friends I was chosen."

aggravating circumstances related to the offenses of conviction. Only one alien was involved,[8] Clare has no prior record of any immigration crimes, she did not transport an unaccompanied minor, no firearms or other dangerous weapons were used, there was no risk of death or serious bodily injury, there was no involuntary detention of an alien through coercion or threats, Clare did not harbor an alien for the purpose of prostitution, and she did not engage in the commercial transportation of large groups in a life-threatening manner. *See* U.S.S.G. § 2L1.1(b). Similarly, the fraudulent use of identification offense did not involve ten or more victims, was not committed through mass-marketing, did not result in substantial financial hardship to one or more victims, did not involve a theft from the person of another, did not involve receiving stolen property, did not involve misrepresentations by the defendant, did not involve misappropriation of a trade secret, did not involve a violation of securities or commodities law, did not involve the conscious or reckless risk of death or serious bodily injury, and did not involve the possession of a dangerous weapon (including a firearm) in connection with the offense. *See* U.S.S.G. § 2B1.1(b)(2). In short, the offense conduct was unremarkable under the law.

### b. Offender characteristics

Clare's background and characteristics are discussed in detail above. At the time of sentencing, Clare will be 41 years old. Since joining NXIVM when she was 23 years old, Clare has not consumed <u>any</u> alcohol or taken any illicit drugs. Rather, she follows a vegan diet and has a regimented exercise routine. Furthermore, as noted in the PSR, Clare has no prior criminal history, (*see* PSR ¶¶ 142-47), which should be taken into account as a substantially mitigating factor. *See, e.g., United States v. Baird*, 580 F.Supp.2d 889, 893 (D.Neb. 2008) (noting that a

---

[8] Although Probation asserts that Ms. Bronfman harbored six illegal aliens, the offense of conviction involves only one alien, namely Jane Doe 12, as explained above.

sentence below the advisory Guideline range was appropriate, in part, because the defendant had no criminal history points and no previous contacts with the criminal justice system).

### 2. The need for the sentence imposed

Section 3553(a)(2) provides that in determining the appropriate sentence, the Court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense"; "to afford adequate deterrence to criminal conduct"; and "to protect the public from further crimes of the defendant." 18 U.S.S.G. § 3553(a)(2). This subsection encompasses both "specific deterrence" of the particular defendant as well as "general deterrence" of other offenders who might pay attention to the sentence imposed for this offense. As explained below, given the particular circumstances of this case, a probationary sentence for Clare is sufficient to provide just punishment for the offense and satisfy the dual goals of deterrence.

### a. Specific Deterrence

A period of incarceration is not necessary "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). Prior to her arrest in this matter, Clare, who will be 41 years old at the time of sentencing, had no prior criminal history. Statistical data from a study commissioned by the United States Sentencing Commission shows that "[r]ecidivism rates decline relatively consistently as age increases." U.S.S.C., *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 12 (May 2004), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf. That study indicates that a 41-year-old defendant in criminal history category I only has a 6.9 percent likelihood of recidivating. *Id*. at 28. Thus, based on her age and lack of criminal history alone, there is a very low chance of

recidivism by Clare. (*See, e.g.*, *United States v. Ruiz*, 04 Cr. 1146 (RWS), 2006 WL 1311982, at *4 (S.D.N.Y. May 10, 2006) ("This Court and others have previously declined to impose Guidelines sentences on defendants who, like Ruiz, were over the age of forty at the time of sentencing on the grounds that such defendants exhibit markedly lower rates of recidivism in comparison to younger defendants.").

Moreover, as a result of this high-profile prosecution, Clare has been publicly disgraced and humiliated, as the most personal and intimate details of her life have been revealed. She has spent the last 26 months on electronic monitoring in home confinement with significant restrictions on her activities, travel, and association with others. She will be a convicted felon for the rest of her life with all the attendant consequences. She has paid a criminal forfeiture in the amount of $6 million. She expects to pay full restitution in the amount of $96,605.25 to Jane Doe 12. And she has been sued in a civil lawsuit, along with NXIVM, Raniere, her co-defendants, and 12 others. Indeed, given the devastating and life-changing effects of this prosecution and the harsh lesson she has already learned, there is no risk of recidivism by Clare. Compounding these consequences with a period of incarceration would go beyond what is necessary to punish her for her role in the offense.

Since her arrest on July 24, 2018, Clare has fully complied with all of her bail conditions. As her friend, Baron Stewart, explains:

> I was fortunate to be one of the people who was permitted to visit Clare while she was under house arrest, and I was able to observe her under these restrictive conditions. Clare was very mindful of the rules of her confinement. If she had a fixed time limit for grocery shopping or a run, she would always make sure she was back on time. If she were not allowed to leave an area, Clare would not leave it. She would exercise by walking around her apartment or in her building but never exceed the permitted rules. During this long period of mostly solitary exclusion from many of her friends, Clare has been sad, thoughtful, regretful, hopeful, and looking for ways to make herself a constructive member of society.

There is simply no reason to believe that Clare would engage in any criminal activity in the future.  Rather, three years of probation, in addition to the 26 months she has already spent in home confinement, the criminal forfeiture she has paid, the restitution she will pay, and all the collateral consequences of this prosecution and her felony convictions, is more than sufficient to deter Clare from any future misconduct.

### b.    General Deterrence

A period of incarceration is also not necessary "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B).  As with many white-collar offenders, the specter of deterrence arises primarily from the prospect of being caught, not from the harshness of the resultant sentence.  *See, e.g.*, David Weisburd, *et al.*, *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 CRIMINOLOGY 587 (1995) (finding no difference in deterrence for white-collar offenders between probation and imprisonment); Francis T. Cullen *et al.*, *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 PRISON J. 48S, 50S-51S (2011) (according to "the best available evidence, . . . prisons do not reduce recidivism more than noncustodial sanctions").

As noted above, this case has been widely covered by the media and the whole world has watched Clare Bronfman's reputational destruction.  (*See, e.g.*, Will Yakowicz, *From Heiress To Felon: How Clare Bronfman Wound Up In 'Cult-Like' Group Nxivm,* FORBES (May 31, 2019), *available at* https://www.forbes.com/sites/willyakowicz/2019/05/31/from-heiress-to-felon-how-clare-bronfman-wound-up-in-cult-like-group-nxivm/#5311f83a3ecf; Barry Meier, *The Journey of the 'Sex Cult' Heiress: From Reluctant Recruit to Criminal Defendant*, THE N.Y. TIMES (Aug. 11, 2018), *available at* https://www.nytimes.com/2018/08/11/business/clare-bronfman-nxivm.html). Every step of her downfall has been covered by the press: from her arrest, to her release on "$100

million bail," to her guilty plea including the enormous forfeiture in the amount of $6 million. *See, e.g.,* Molly Crane-Newman and Larry McShane, *Seagram's liquor heiress Clare Bronfman pleads guilty in NXIVM cult prosecution, to pay $6 million forfeiture*, N.Y. DAILY NEWS (Apr. 19, 2019), *available at* https://www.nydailynews.com/news/crime/ny-nxivm-guilty-pleas-20190419-bx5shvbnvvcuxoge67g45wtbd4-story.html; Reuven Fenton and Emily Saul, *Seagram's Heiress Clare Bronfman pays feds $6M over role in Nxivm,* Molly Crane-Newman, N.Y. POST (Aug. 14, 2019), available at https://nypost.com/2019/08/14/seagrams-heiress-clare-bronfman-pays-feds-6m-over-role-in-nxivm/.

Like any publicized penalty which is grossly disproportionate to the offense, the criminal forfeiture in this case will surely have a strong general deterrent effect that would eclipse the effect of any reasonable prison term that might be imposed. Indeed, the Second Circuit has recognized that criminal forfeiture may, in fact, be "a more potent weapon than . . . prison terms." *United States v. Walsh*, 700 F.2d 846, 857 (2d Cir. 1983), *cert. denied*, 464 U.S. 825 (1983).

Because this highly publicized prosecution has already demonstrated to the public that the crimes Clare committed will result in severe penalties, a period of incarceration is not necessary to generally deter criminal conduct.

### 3. The kinds of sentences available

Section 3553(a)(3) requires the Court to consider, in determining a sentence, "the kinds of sentences available." 18 U.S.C. § 3553(a)(3). Congress has directed the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources

are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." *See* Pub. L. No. 98-473, § 239, 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note).

Because there are no mandatory minimums for the offenses of conviction, the Court has the authority and discretion to impose a wide range of alternatives to the term of incarceration contemplated by the Guidelines. *See* 18 U.S.C. § 3561(a). Based on the section 3553(a) factors discussed herein, the Court should apply a downward variance and impose a probationary sentence for Clare.

### 4. The Sentencing Guidelines

Section 3553(a)(4) requires the Court to consider the appropriate Guidelines range, which is discussed in detail above. *See* 18 U.S.C. § 3553(a)(4). As explained herein, we submit that a non-Guidelines sentence is the only appropriate sentence in this case, in light of the other Section 3553(a) factors.

### 5. Policy statements

Section 3553(a)(5) requires the Court to consider any pertinent policy statements issued by the Sentencing Commission. *See* 18 U.S.C. § 3553(a)(5). Section 5H1.4 provides that "[p]hysical condition or appearance, including physique, may be relevant in determining whether a departure is warranted, if the condition or appearance, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines. An extraordinary physical impairment may be a reason to depart

downward; *e.g.*, in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." U.S.S.G. § 5H1.4.

In *United States v. Lara*, 905 F.2d 599 (2d Cir. 1990), the district court acted within its discretion in departing downward from the Sentencing Guidelines in sentencing the defendant based on the defendant's personal characteristics that made him particularly vulnerable to in-prison victimization. The district court found that defendant appeared to be 16 years old, although he was 22, that his appearance and demeanor indicated vulnerability, and that the defendant was bisexual. *Id.* at 603. The district court considered these factors believing them to present an extraordinary situation "because of the defendant's particular vulnerability due to his immature appearance, sexual orientation and fragility." *Id.* The Second Circuit held that to the extent that factors of physical, mental, and emotional condition were relied upon in imposing a sentence departing downward from the Sentencing Guidelines, such reliance was justified by the extraordinary situation faced by defendant, even though those factors are not ordinarily relevant in determining whether sentence should be outside Guidelines. *See id.*

### 6. Avoiding unwarranted sentencing disparities

Pursuant to Section 3553(a)(6), courts need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(6). As explained below, statistical data shows that (1) the majority of all sentences imposed in the Eastern District are non-Guidelines sentences, (2) the majority of the sentences imposed nationally pursuant to § 2L1.1 for alien smuggling, and pursuant to § 2B1.1 for fraud-related crimes are non-Guidelines sentences, and (3) the average sentences nationally imposed for defendants in criminal history category I convicted of immigration crimes and fraud-related crimes is far below the Guidelines range in this case. Furthermore, as demonstrated by the

cases cited below, district courts across New York routinely grant downward departures or variances to impose non-custodial or other sentences for the offenses Clare was convicted of. Therefore, sentencing Clare to a term above or even within the Sentencing Guidelines range would result in unwarranted sentencing disparities with defendants who are convicted of comparable crimes. *See, e.g., U.S. v. Toohey*, 132 F. App'x 883, 886 (2d Cir. 2005) (vacating sentence where district court "did not properly satisfy its statutory obligations under Section 3553(a)(6) to consider sentencing disparity by reference to similarly situated defendants nationwide").

Furthermore, there is the issue of internal sentencing disparities in the instant case. Since Clare is being sentenced prior to any of her co-defendants, her potential sentence cannot be compared to theirs; however, she certainly should not be sentenced harsher than co-defendants Nancy Salzman, Lauren Salzman, or Allison Mack, since, unlike them, she was not convicted of participating in the racketeering enterprise alleged in the Indictment. Of course, Keith Raniere has been convicted after a jury trial on all counts and is facing two mandatory minimum sentences of fifteen years. Allison Mack and Lauren Salzman pleaded guilty to RICO charges. Clare did not plead to any RICO charges, and was uninvolved in the core criminal case against her co-defendants, including human and sex trafficking and branding women. Her conduct was far less serious than her co-defendants.

> a. **The Sentencing Commission's most recently published sentencing statistics demonstrate that a Guidelines or above Guidelines sentence for Clare Bronfman would create an unwarranted disparity.**

The United States Sentencing Commission publishes a sourcebook each year of federal sentencing data statistics. The most recent annual figures are contained in the Commission's *Annual Report and Sourcebook of Federal Sentencing Statistics* for fiscal year 2018, which covers sentences imposed between October 1, 2017 and September 30, 2018 (hereafter "*2018*

*Sourcebook*"). The *2018 Sourcebook* reveals that in the Eastern District of New York, non-Guidelines sentences are the overriding norm, not the exception. For instance, the *2018 Sourcebook* demonstrates that in the Eastern District of New York, only 25.4% of all sentences were within the Guidelines range; a downward departure applied in 32.9% of cases,[9] and a variance applied in 41.7% of cases; an upward departure was not applied <u>in any cases</u>. (*See 2018 Sourcebook* at 87).

Even on a national basis the majority of sentences imposed for comparable crimes were non-Guidelines sentences. Specifically, only 39.2% of all sentences imposed pursuant to § 2L1.1 (alien smuggling) were within the Guidelines range, with an upward departure applied in 0.6% of cases, a downward departure applied in 43.6% of cases,[10] and a variance applied in 16.7% of cases. (*See 2018 Sourcebook* at 135). For sentences imposed pursuant to § 2B1.1 (fraudulent use of identification), 42.9% were within the Guidelines range, with an upward departure applied in only 0.5% of cases, a downward departure applied in 19% of cases,[11] and a variance applied in 37.6% of cases. (*See 2018 Sourcebook* at 159).

As for the length of the sentences imposed, Table 27 of the *2018 Sourcebook*, entitled "Sentence Length in Each Criminal History Category by Type of Crime," provides the mean and median sentence nationally in each offense category for fiscal year 2018 based on the offender's criminal history category. For crimes involving immigration for offenders in criminal history

---

[9] A § 5K1.1 departure applied in 21.9% of cases, a § 5K1.3 departure applied in 0.3% of cases, and a downward departure applied in 10.7% of cases. (*See 2018 Sourcebook* at 87).

[10] A § 5K1.1 departure applied in 3.8% of cases, a § 5K1.3 departure applied in 37.2% of cases, and a downward departure applied in 2.6% of cases. (*See 2018 Sourcebook* at 135).

[11] A § 5K1.1 departure applied in 14.9% of cases, a § 5K1.3 departure applied in 0.1% of cases, and a downward departure applied in 4% of cases. (*See 2018 Sourcebook* at 159).

category I, the national mean sentence was 4 months and the median sentence was 2 months (based on 10,266 offenders); for crimes involving fraud/theft/embezzlement for offenders in criminal history category I, the national mean sentence was 19 months and the median sentence was 8 months (based on 4,512 offenders).  *See 2018 Sourcebook* at 81.

In addition to the annual sourcebook, the Commission provides preliminary data on a quarterly basis concerning the sentences imposed in the federal courts.  According to the *4th Quarter Release of Preliminary Fiscal Year 2019 Data* (hereafter "*2019 Preliminary Data*"), which covers sentences imposed between October 1, 2018, and September 30, 2019, in the Eastern District of New York, only 26.3% of all sentences were within the Guidelines range; an upward departure applied in 0.3% of cases a downward departure applied in 28.1% of cases,[12] and a variance applied in 45.3% of cases.  *See 2019 Preliminary Data* at 14.

Furthermore, according to the *2019 Preliminary Data*, only 40.6% of all sentences imposed pursuant to § 2L1.1 (alien smuggling) were within the Guidelines range, with an upward departure applied in less than 1% of cases, a downward departure applied in 41.5% of cases,[13] and a variance applied in 17.8% of cases.  (*See 2019 Preliminary Data* at 19).  For sentences imposed pursuant to § 2B1.1 (fraudulent use of identification), 44.1% were within the Guidelines range, with an upward departure applied in only 0.3% of cases, a downward departure applied in 18% of cases,[14] and a variance applied in 37.6% of cases.  *See 2019 Preliminary Data* at 18.

---

[12] A § 5K1.1 departure applied in 18.6% of cases and a downward departure applied in 9.5% of cases.  *See 2019 Preliminary Data* at 14.

[13] A § 5K1.1 departure applied in 4.3% of cases, a § 5K1.3 departure applied in 34.6% of cases, and a downward departure applied in 2.6% of cases.  *See 2019 Preliminary Data* at 19.

[14] A § 5K1.1 departure applied in 14.3% of cases, a § 5K1.3 departure applied in 0.2% of cases, and a downward departure applied in 3.5% of cases. *See 2019 Preliminary Data* at 18.

As for the length of the sentences imposed, Table 6 of the *2019 Preliminary Data* demonstrates that for crimes involving immigration, the national mean sentence was 9 months and the median sentence was 6 months (based on 29,015 offenders); for crimes involving fraud/theft/embezzlement, the national mean sentence was 21 months and the median sentence was 12 months (based on 6,178 offenders). *See 2019 Preliminary Data* at 9). It should be noted that the average sentences reported in *the 2019 Preliminary Data* are higher because unlike the annual report, the national averages are not separately reported based on the offender's criminal history category and include sentences imposed on offenders in higher criminal categories than Clare. However, even these inflated averages are lower than the advisory Guidelines range for Clare in this case.

As the Commission's statistics demonstrate, across the country and particularly in the Eastern District of New York, imposing a sentence within the Guidelines is no longer the norm. And it is only in a very small fraction of cases -- inevitably where the offense conduct or offender characteristics are particularly egregious -- in which courts impose an *above* Guidelines sentence. Therefore, imposing a Guidelines or above Guidelines sentence in this case would create an unwarranted sentencing disparity with defendants who are convicted of comparable crimes both nationally and in this district.

**b.**     **Individual sentences imposed by federals courts in New York demonstrate that a Guidelines or above Guidelines sentence for Clare Bronfman would create an unwarranted disparity.**

As demonstrated by the examples below, federal courts throughout New York routinely sentence defendants convicted of similar immigration and identity theft offenses to non-custodial or otherwise lenient sentences. *See also generally United States v. Ruff*, 535 F.3d 999, 1006-1007 (9th Cir. 2008) (Gould, J., dissenting) (discussing how frequently lenient or non-custodial

sentences are imposed by district courts for while-collar or economic crimes).

### *Immigration Crimes*

In 2013, as "one of the largest criminal immigrant employment investigations ever conducted by the Department of Justice and the Department of Homeland Security," Kathryn G. Menu, *Sweeping Immigration & Wire Fraud Investigation Results in Arrest of Sag Harbor 7-Eleven Owners*, SAG HARBOR EXPRESS (June 19, 2013), *available at* https://sagharborexpress. com/23954/, a group of individuals were indicted on charges of conspiring to commit wire fraud, identity theft, and concealing and harboring illegal immigrants employed at 7-Eleven franchise stores located throughout Long Island and in Virginia. *See United States v. Baig*, No. 13-cr-0351 (SFJ), 2020 U.S. Dist. LEXIS 143887 (E.D.N.Y. Aug. 11, 2020). From 2000 until their arrest in 2013, the defendants collectively and systematically employed more than 115 illegal aliens at 13 franchise stores on Long Island and in Virginia, housed them at residences they owned, and stole substantial portions of their wages. As part of the complex multi-state scheme, the defendants stole the identities of 25 actual United States citizens, submitting these stolen names and Social Security numbers to conceal the presence of illegal immigrants on the 7-Eleven franchise store payrolls, and then causing the 7-Eleven payroll service to transmit this false information, including the stolen identity information, to United States regulatory agencies including the Internal Revenue Service and the Social Security Administration. During the scheme, the defendants generated over $182 million in proceeds from the 7-Eleven franchise stores and stole $2.6 million in wages from employees.

With the exception of the two most culpable parties, the District Court for the Eastern District of New York (Feuerstein, J.) sentenced the defendants to sentences far shorter than the

Guidelines range in this case.[15]  For instance, Bushra Baig, who was one of the top three managers and controllers of the scheme and married to Farrukh Baig, pled guilty to one count of conspiracy to conceal and harbor illegal aliens for financial gain in violation of 8 U.S.C. § 1324.  Although the PSR calculated her total offense level as 18 and recommended an advisory 27 to 33 month sentence, Judge Feuerstein sentenced her to time served of **less than four months** to be followed by five years of supervised release.[16]

The court sentenced the other "managers" to sentences between 15 and 18 months.  For instance, Zahid Baig, who pled guilty to one count of conspiracy to conceal and harbor illegal aliens for financial gain in violation of 8 U.S.C. § 1324, was sentenced to **time served of approximately 15 months** to be followed by three years of supervised release and $2,621,114.97 in restitution.  Shannawaz Baig, who pled guilty to one count of conspiracy to conceal and harbor illegal aliens for financial gain in violation of 8 U.S.C. § 1324, was sentenced to **time served of approximately 16 months** to be followed by three years of supervised release and $1,253,343.48 in restitution.  Ramon Nanas, who pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343, was sentenced to serve **16 months in prison** to be followed by three years of supervised release and $1,501,626.80 in restitution.  And Tariq Rana, who pled guilty to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1343, was sentenced to

---

[15] Farrukh Baig, who was the mastermind of the operation and who pled guilty to both conspiracy to commit wire fraud and to harbor illegal aliens for financial gain, was sentenced to 87 months in prison to be followed by three years of supervised release and restitution in the amount of $2,621,114.97.  Malik Yousaf, who was the "chief operations officer" for various stores and who had the most "hands on" responsibility of any of the conspirators, also pled guilty to both conspiracy to commit wire fraud and to harbor illegal aliens for financial gain; he was sentenced to 48 months in prison to be followed by three years of supervised release and $1,253,343.48 in restitution.

[16] The term of supervised release was later reduced to three years pursuant to an Order granting defendant's 28 U.S.C. § 2255 motion to vacate.

**time served of approximately 18 months** to be followed by three years of supervised release and $1,253,343.48 in restitution.

Defendants in New York have received non-custodial sentences even when they have put the government to its burden of proof at trial. *See United States v. Ebbers*, 458 F.3d 110, 116-17 (2d Cir. 2006) (explaining that it is not an "unwarranted sentencing disparity" to impose a harsher sentence on a defendant who does not cooperate with the government by pleading guilty, compared to defendants with similar records who plead guilty to similar conduct).

For instance, in *United States v. George*, 13-2762-cr (2d Cir. 2015), after a five-day jury trial, the defendant was found guilty of one count of harboring an illegal alien in violation of 8 U.S.C. § 1324(a)(1)(A)(iii). The evidence at trial established that the defendant had recruited and employed an illegal alien for 66 months, during which time the alien cared for five minor children and performed various domestic tasks starting at 5:30 a.m. and ending around 11:00 or 11:30 p.m., seven days a week, with no time off, vacation, or sick days. Defendant did not pay the alien the promised $1,000 per-month wage (instead paying her a total of approximately $25,000 to $26,000 which averages less than $400 per month over 66 months). Even with an obstruction of justice enhancement (based on the defendant instructing the alien to lie to enforcement officials about her status and for lying herself at trial), the District Court for the Northern District of New York (Sharpe, J.) sentenced the defendant to **five years of probation** with eight months of home confinement, and forfeiture of her residence.

In *United States v. Mehta*, 16-2585 (2d Cir. March 21, 2019), following a jury trial, three defendants were convicted of marriage fraud and immigration fraud in violation of 8 U.S.C. § 1325(c) and 18 U.S.C. §§ 2, 1546(a). Two of the defendants had entered the United States from India on tourist visas which permitted them to remain in the U.S. for six months. While in the

U.S., they entered into sham marriages with two U.S. citizens, one of whom was charged as the third defendant, and then applied to adjust their statuses to lawful permanent residents. After the jury convicted them of all counts, the District Court for the Northern District of New York (McAvoy, J.) sentenced each of the three defendants to **three years of probation**.[17]

In *United States v. Kim*, 193 F.3d 567, 570 (2d Cir. 1999), the defendant, who owned a New York City garment-manufacturing business, was charged with three counts of concealing, harboring, or shielding from detection three illegal aliens who were employed by him from January 1996 through April 1997. Following trial, the jury found the defendant guilty of harboring one alien and not guilty on the other two counts. *Id.* at 571-72. Although the District Court for the Southern District of New York (Rakoff, J.) found that the defendant had harbored more than six illegal aliens and that the prescribed imprisonment range under the Guidelines was 8-14 months, the court departed downward and sentenced the defendant to **three months of imprisonment**, to be followed by a two years of supervised release. *Id.* at 572.

The cases in which courts in New York have sentenced the defendant to a term that is equivalent to a Guidelines or above Guidelines sentence have been reserved for defendants who have engaged in far more egregious conduct, often involving many more aliens and a much more complex scheme than Clare's offense. *See, e.g., United States v. Uppal*, No. 18-3483, 2019 U.S. App. LEXIS 36856, at *2 (2d Cir. Dec. 13, 2019) (unpublished summary order) (the District Court for the Eastern District of New York (Feuerstein, J.) sentenced the defendant to time served of 21 months to be followed by three years of supervised release where defendant, who pled guilty to

---

[17] On appeal, the judgments were vacated and the cases remanded for further proceedings due to certain *ex parte* communications between the judge and the jurors.

one count of conspiracy to conceal and harbor aliens for financial gain in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(i) and 1324(a)(1)(B)(i), owned and operated <u>for 13 years</u> two 7-Eleven stores on Long Island, <u>employing 15 to 25 illegal alien workers</u>, utilizing misappropriated identities to conceal their presence, and illegally retaining part of their wages);[18] *United States v. Patel* (2:16-cr-00584-DRH-AYS) (the District Court for the Eastern District of New York (Hurley, J.) sentenced the defendant to the mandatory minimum of 36 months in prison to be followed by three years of supervised release where defendant, who pled guilty to one count of alien smuggling for financial gain in violation of 8 U.S.C. § 1324(a)(2)(b)(ii), owned and operated a company that engaged in the bonding of aliens and ran a scheme that <u>enabled hundreds of Indian nationals</u> to illegally enter and remain in the U.S.).

Here, <u>Clare's conduct was substantially less harmful than that of the defendants in the cited cases</u>. Therefore, a sentence within or above the Guidelines range would treat Clare more harshly than defendants convicted of comparable crimes, despite the fact that her conduct was less culpable. Rather, to avoid an unwarranted sentencing disparity, Clare should be sentenced, consistent with the sentences imposed in *George* and *Mehta*, *supra*, to a below Guidelines probationary sentence.

### Identity Theft Crimes

As noted above, this is not a typical identity theft case and the offense conduct significantly differs from the norm of other identity theft cases. However, even the sentences imposed in typical identity theft cases have still been substantially shorter than the advisory Guidelines range in this case, even where the defendant was not a first-time offender. For instance, in *United States v.*

---

[18] Defendant's appeal related solely to the restitution portion of the sentence.

*Giardina*, 2011 WL 5082177 (E.D.N.Y. Oct. 4, 2011), at *1, the defendant pled guilty to one count of fraudulent use of identification in violation of 18 U.S.C. § 1028(a)(7), 1028(b)(1)(D) and 1028(c)(3)(A).  The District Court for the Eastern District of New York (Weinstein, J.) sentenced the defendant to **one month of incarceration** to be followed by three years of supervised release, the first seven months of which were ordered to be served in home confinement.  *Id*. at *2.  Despite the fact that the defendant had "a long history of involvement in crimes petty and serious," the district court for the Eastern District found that "[a] sentence of 1 month of imprisonment, in conjunction with the home detention and restitution described above, reflects the seriousness of the offense and will promote respect for the law and provide just punishment."  *Id*.  The court explained that this sentence was sufficient to satisfy the dual goals of general deterrence and specific deterrence:

> General deterrence is effectuated by the sentence imposed and the restitution required. The sentence will send a clear message that the use of fraudulent documents in the furtherance of a violation of federal law will result in punishment. Specific deterrence is achieved through the order of restitution, the incarceration ordered, and the home confinement required.

*Id*.

Similarly, in *United States v. Porbeni*, 08-cr-00477-GBD (S.D.N.Y.), one of the two defendants pled guilty to one count of conspiring to make false statements in loan applications and to commit identity theft in violation of 18 U.S.C. §§ 371 and 1028(a)(7), three counts of making false statements in a loan application in violation of 18 U.S.C. § 1014, and three counts of transferring, possessing, and using a means of identification of another person with the intent to commit unlawful activity in violation of 18 U.S.C. § 1028(a)(7) and (c)(3).  The second defendant pled guilty to one count of conspiring to make false statements in loan applications and to commit identity theft in violation of 18 U.S.C. §§ 371 and 1028(a)(7), one count of making false statements

in a loan application in violation of 18 U.S.C. § 1014, and one count of using a means of identification of another person with the intent to commit unlawful activity in violation of 18 U.S.C. § 1028(a)(7) and (c)(3). The District Court for the Southern District of New York (Daniels, J.) sentenced both defendants to **five months of imprisonment**, followed by three years of supervised release, five months of which were to be served on home confinement.

Furthermore, like in the case of similar immigration crimes, defendants who have put the government to its burden of proof at trial in similar identity theft cases have likewise received non-custodial or lenient sentences. For instance, in *United States v. Zhyltsou*, 13-803-cr (2d Cir. Oct. 3, 2014), the defendant was convicted after trial of one count of the unlawful transfer of a false identification document in violation of 18 U.S.C. § 1028(a)(2) and (b)(1)(A)(ii). The evidence at trial established that the defendant had created a forged birth certificate to reflect that his friend was the father of an invented infant daughter so that his friend could avoid compulsory military service in the Ukraine. Following the guilty verdict, the District Court for the Eastern District of New York (Glasser, J.) sentenced the defendant to **time served (of approximately one year in detention pending trial)** and one year of post-release supervision.[19]

It is typically in cases of aggravated identity theft or other egregious conduct that courts have imposed sentences within or above the Guidelines range in this case. *See, e.g., United States v. Chandler*, 220 F. Supp. 2d 165 (E.D.N.Y 2002) (where the defendant was found guilty after a jury trial of possessing and using five or more false identification documents in violation of 18 U.S.C. § 1028(a)(3), making a false statement in the application and use of a passport in

---

[19] On appeal, the judgment was reversed and the case was remanded for a new trial because the district court erroneously admitted evidence going to the heart of the case against the defendant.

violation of 18 U.S.C. § 1542, and bank fraud in violation of 18 U.S.C. § 1344, the District Court for the Eastern District of New York (Spatt, J.) sentenced the defendant to 21 months' imprisonment to be followed by five years of supervised release); *United States v. Sash*, 396 F.3d 515, 516 (2d Cir. 2005) (where the defendant pled guilty to possession of fifteen or more counterfeit UPC bar codes for the purpose of fraud in violation of 18 U.S.C. § 1029(a)(3), (b)(1), (c)(1)(A)(i) and unlawful production of identification documents "of a type intended and commonly accepted for the purpose of identifying an individual as an officer of the New York City Police Department" in violation of 18 U.S.C. § 1028(a)(1), (b)(1)(B), the District Court for the Southern District of New York (Casey, J.) sentenced the defendant to 27 months' imprisonment to be followed by an eight-year term of supervised release)[20]; *United States v. Lewis*, 09-3002 (2d Cir. 2010) (unpublished summary order) (where defendant was convicted, following a jury trial, of one count of conspiracy to transfer false documents and means of identification in violation of 18 U.S.C. § 1028(f), two counts of aggravated identity theft in violation of 18 U.S.C. § 1028A, and two counts of making a false statement in a passport application in violation of 18 U.S.C. § 1542, the District Court for the Eastern District of New York (Cogan, J.) sentenced the defendant to three years' imprisonment).

In short, a Guidelines or above Guidelines sentences would necessarily create an unwarranted sentencing disparity between Clare and other defendants convicted of similar crimes. Rather, in order to avoid unwarranted sentencing disparities and in light of the other Section

---

[20] On appeal, the Second Circuit vacated the sentence imposed by the district court insofar as it ordered an eight-year term of supervised release. *Sash*, 396 F.3d at 525.

3553(a) factors, the only appropriate sentence is a below Guidelines sentence for Clare.

### 7.      The need for restitution

Section 3553(a)(7) requires the Court to consider the need for the defendant to provide restitution to any victims of the offense.  The Mandatory Victim Restitution Act (MVRA), 18 U.S.C. § 3663A requires restitution where (a) the offense was "committed by fraud or deceit" and (b) "an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii), (c)(1)(B).  Critically, "the district court's statutory authority to award restitution under the MVRA is limited to awards to victims of the offense of conviction."  *In re Local # 46 Metallic Lathers Union,* 568 F.3d 81, 85 (2d Cir.2009) (per curiam) (citing *Hughey v. United States*, 495 U.S. 411, 416-19, 110 S. Ct. 1979, 109 L. Ed. 2d 408 (1990)); *see id.* (holding that a victim of a fraud count in the indictment to which the defendant did not plead guilty was properly denied restitution).  The government bears the burden of demonstrating by a preponderance of the evidence that each individual it claims is entitled to restitution was actually a "victim."  18 U.S.C. § 3664(e); *see also Archer*, *supra*, 671 F. 3d at 173.

Pursuant to the plea agreement, Clare agreed that restitution in the amount of $96,605.25, payable to Jane Doe 12, should be ordered by the Court on Count One.  (PSR ¶ 205).  Clare will promptly pay this amount upon entry of the restitution order.

The PSR includes "Victim Impact Statements" from "additional Jane and John Does who were impacted by the defendant's criminal conduct," and purports to tie these victim statements to "additional crimes that are not part of the count of conviction." (PSR ¶ 116; Statements at pp. 39-50).  However, as noted in her Objections to the PSR, Clare objects to the Court's reliance on victim statements by individuals who are not appropriately considered victims of her offense of conviction under the MVRA and which do not relate to specific crimes Clare has been proven to

have committed.

Furthermore, notwithstanding much of the behavior complained of in the victim statements, these statements help demonstrate that at the time of the incidents described, these individuals appeared eager to have Clare's help and to live within the NXIVM community, and they espoused the same values as Clare. The statements describe their enthusiasm at the time and demonstrate why Clare would have believed that she was helping these individuals to achieve their own goals within the NXIVM framework, and according to principles that she believed they shared.

The Court should resist the temptation to evaluate these statements – and Clare's conduct – with the benefit of hindsight and the knowledge of all the conduct that was revealed in the criminal case since the investigation began. There is no doubt that these individuals who have written to the Court no longer believe in NXIVM and now bitterly regret the money, effort, and years of their lives they expended in service of it and its principles. However, it is also relevant to a fair evaluation of these individuals' statements to consider that many of these same individuals have filed a civil lawsuit against NXIVM, Raniere, Clare, her co-defendants, and 12 others, and that Clare Bronfman is the "deep pocket" from whom civil plaintiffs undoubtedly hope to recover for their harms. Much of these statements are untested hearsay which may be motivated in part by a desire to obtain an advantage or greater recovery in the civil case pending against Clare.

The Court is not in a position to evaluate the merits of these claims on an individual basis in the context of Clare's sentencing proceeding. The pending civil suit is a more appropriate forum in which any harm done to these individuals by Clare's alleged civil wrongs should be addressed and compensated, if appropriate.

**D.       An Upward Departure or Variance Is Not Warranted.**

Probation suggests that an upward departure may be appropriate based on the following additional crimes Clare allegedly committed: "conspiracy to commit identity theft of Edgar Bronfman Sr.; violation of campaign contribution laws; money laundering in March 2009 (wire transfers to Sylvie to obtain an investor's visa); visa fraud related to a visa application for Jane Doe 12; and immigration or visa fraud offenses in May 2017 (application for permanent residency based on marriage)." (PSR ¶¶ 112, 207).  However, much of what Probation points to as additional criminal conduct is already covered by the Count One offense conduct or as relevant conduct and is therefore already reflected in the Guidelines recommended sentence.[21]  A departure or variance on the basis of the same conduct would amount to double counting and would not be justified. The "additional crimes" not covered, as well as the allegations of Clare altering videotapes, obstructing justice, and funding litigation, are addressed in turn below, and do not justify an upward departure or variance.

### *Conspiracy to Commit Identity Theft of Edgar Bronfman Sr.*

The government has alleged that between August 2005 and November 2008 (beginning when Clare was 26 years old), Clare conspired with Raniere and others to commit identity theft by hacking into her father's home computer and installing keylogging software which enabled Jane

---

[21] Specifically, the "visa fraud" with respect to Jane Doe 12's visa is the offense that was charged as harboring an illegal alien in the Superseding Information and that Ms. Bronfman allocuted to. It is not an additional crime that would justify an upward variance. Similarly, the money laundering refers to the transfers of money into and out of Sylvie's account (as referenced in PSR ¶ 24) in service of a visa application. This conduct has already been counted as relevant conduct in the PSR. *See* PSR ¶ 110. Thus, these should not be listed as additional crimes and Ms. Bronfman objects to restating the same offenses which are already subsumed within the count of conviction or as relevant conduct as "additional crimes" or as the basis for an upward variance.

Doe 4 to access Edgar Bronfman Sr.'s email account and report the results to Raniere. *See* PSR ¶¶ 49-51. This is essentially a family dispute that Clare and her father later resolved and furthermore remains unproven.

### *Violation of Campaign Contribution Laws*

The PSR asserts that in 2007, Clare and Nancy Salzman asked a significant number of NXIVM members "to make the maximum individual political contribution to Hillary Clinton's campaign ($2,300 each), for which they would be reimbursed by Bronfman, Nancy Salzman, and/or Nxivm." (PSR ¶ 58). The PSR notes that several NXIVM members including Bronfman, Nancy Salzman, and Jane Doe 7[22] made such contributions; however, there is no proof of any reimbursements to NXIVM members.

### *Computer Hacking and Surveillance*

The PSR asserts that Clare, on behalf of NXIVM, "hired and paid several private investigation firms, including Canaprobe and Interfor, in order to investigate perceived enemies of Nxivm and Raniere." (PSR ¶ 54). However, the evidence at trial established that this was an effort led and directed by Kristin Keeffe, a former NXIVM-affiliated person who at the time was heading up NXIVM's legal affairs. Clare and Keeffe hired Canaprobe at the recommendation of an attorney at Harris Beach named Paul Yesawich. Notably, at the time, Clare was led to believe that Canaprobe's work was legal, and she was provided with proof of its supposed legality. As Keeffe told the government in an interview, Clare and Keeffe were told "that Canaprobe's actions were lawful because Canada had different laws than the United States."[23] They were even shown

---

[22] The PSR incorrectly asserts that Jane Doe 7 was deceased at the time. However, as noted elsewhere in the PSR, Jane Doe 7 did not pass away until November 2016.

[23] 3500-KK-14 at 3: "Keeffe was told that Canaprobe's actions were lawful because Canada had different

purported documentary proof. Paul Yesawich provided them with a declaration signed by Canaprobe President Richard Marier and filed in a federal case in the Northern District of New York that purported to show that Canaprobe's investigatory work was legal and proper.[24] It stated in part:

> I am the President and co-founder of the Canaprobe Group, a licensed international investigative firm based in Quebec, Canada, founded in 2004. Our firm holds an Investigation Agency Permit and a Security Agency Permit issued by the Ministry of Public Security of the Province of Quebec. Under Quebec law, licensed agencies are permitted to investigate potential criminal activity and to obtain private and confidential information for the prevention or detection of such activity. The Canaprobe Group specializes in tracking global asset movement and concealment.

3500-KK-14 at 4. Marier also asserted in the declaration that he and Canaprobe had "collaborated with various law enforcement agencies throughout North America, including the United States Federal Bureau of Investigation" and several Canadian law enforcement agencies. Id. at 4-5.

The financial information provided by Canaprobe turned out to be false, and a scam that preyed upon Clare's wealth and Keeffe's proclivity towards conspiracy theories, which she fed to Clare. Although the false information provided by Canaprobe was later found in a file in Nancy Salzman's house, there is no evidence that Clare was part of any effort to use the information. In 2014, Clare sued Marier in Canada based on her having been defrauded into paying for false information. That lawsuit is currently pending.

---

laws than the United States."

[24] *See also* p1, an email from Keeffe to Clare discussing the declaration by Marier that "Yesawich provided to authenticate Marier's services and prove the legality of his methods." In this email Keeffe also notes that "Yesawich never came back and told us Marier's information eventually proved false."

### Obstruction of Justice

Clare was not involved in "help[ing] Vicente with altering the videotapes to remove content" that were then produced in discovery by NXIVM's attorneys. PSR ¶ 61. As the evidence clearly shows, Kristin Keeffe was the head of legal affairs of NXIVM at the time, not Clare. The only emails Clare was copied on related to the purchase of equipment. However, she was never told that the purchase of such equipment was made in order to alter videotapes for purposes of production in discovery.

Clare also never attempted to silence and intimidate DOS slaves nor did she intentionally issue public statements falsely denying Raniere's involvement in DOS. When Clare first learned about DOS, she had hired a former LAPD investigator to look into a seeming computer hack into the NXIVM server. The investigator also interviewed witnesses and reviewed materials provided to them. In addition, Clare, in anticipation of a civil action, hired a well-known and reputable forensic psychologist to interview various members of DOS and NXIVM. Neither drew any conclusion suggesting any wrongdoing by anyone, other than the purported computer hack, which Sarah Edmondson subsequently admitted. Clare had no idea of any allegations relating to this case. Furthermore, when an article in the New York Times stated there was a criminal investigation underway, Keith Raniere's then-attorney contacted the U.S. Attorney's Office for the Northern District of New York and was told there was no investigation. Clare's actions and statement were her honest understanding of the facts at the time.

### Litigation Funding

The vast majority of funds that Clare spent on NXIVM or NXIVM- or Raniere-associated endeavors went to fund the following: (1) money that she invested in the commodities market, which was approximately $67 million, (2) loans to cover some of NXIVM's legal fees including

patents and patent retention for First Principles, and litigation to protect NXIVM's intellectual property amounting to no less than $32 million, and (3) investment in Plugged In Technologies which was no less than $7.1 million, a company owned by Pam Cafritz, which was developing a product related to cell phone and internet connection improvements as well as online community and business connectivity. The combination of these three projects represent more than 90% of the money Clare loaned or invested into all NXIVM or NXIVM related entities during her more than fifteen-year involvement with the company. The remaining 10% were the occasional loans so that NXIVM could pay its contractors on time when the company was struggling with its cash flow.

It is also important to note that when Clare was managing the litigation, she hired and worked with reputable and cost-effective attorneys. As one of her attorneys, Bill Savino, writes: "Even though I was engaged by her at the outset as her civil litigator, she was always insistent that our position be ethical, that we were entitled to the relief being sought, and that the remedy is not being pursued via improper means."

**E.    The Totality of the Factors Support a Below Guidelines Sentence.**

The Court has great latitude to grant a non-Guidelines sentence based on the totality of the factors. Here, the totality of the sentencing factors discussed above, as well as the severe collateral consequences Clare has suffered and the fact that her conduct constitutes aberrant behavior, justify a below Guidelines probationary sentence.

**1.    The collateral consequences are severe.**

In addition to the statutory factors discussed above, the Court can and should consider the collateral consequences of conviction which, as one court noted, "can be devastating." *United States v. Nesbeth*, 188 F.Supp.3d 179, 180 (E.D.N.Y. 2016). In *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009), the district court imposed a 20-month sentence despite a Guidelines range

of 78 to 97 months, in part because the "conviction made it doubtful that the defendant could pursue his career as an academic or translator, and therefore . . . the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant." The Second Circuit affirmed, reasoning that the district court's analysis was "required by section 3553(a)," and noting that "[i]t is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence." *Id*. at 141-42; s*ee also United States v*. *Thavaraja*, 740 F.3d 253, 262-63 (2d Cir. 2014) (recognizing that deportation is a permissible § 3553(a) factor and affirming the district court's imposition of a below-Guidelines sentence in light of several factors, including that the defendant faced likely deportation upon the completion of his sentence); *Nesbeth*, *supra*, 188 F.Supp.3d at 194-95 (holding that consideration of collateral consequences of conviction and sentence is an appropriate section 3553(a) factor and sentencing defendant to a one-year probationary sentence); *United States v*. *Anderson*, 533 F.3d 623, 633-34 (8th Cir. 2008) (affirming downward variance based on "other ways in which the defendant had suffered atypical punishment such as the loss of his reputation and company, the ongoing case against him from the Securities and Exchange Commission and the harm visited upon him as a result of the fact that his actions brought his wife and friend into the criminal justice system"; *United States v*. *Vigil*, 476 F.Supp. 2d 1231, 1235 (D.N.M. 2007) (finding variance appropriate where defendant was collaterally punished by loss of his position and reputation, widespread media coverage, and emotional toll of two lengthy public trials).

As noted above, Clare has suffered severely from the collateral consequences of this high-profile prosecution and her felony convictions including irreversible reputational harm to her and her family; professional harm to her business relationships and business prospects; loss of privacy;

lost business opportunities for herself as well as for her immediate family; loss of friends and family; and lost time with her young nieces. The life she thought she had in a community of people she loved is destroyed. What she believed she was part of for 17 years, building something good, is destroyed and is now forever associated with criminal activity. Many people now no longer speak to her. She is lonely. She has to rebuild a life. Being 41, if she is incarcerated, the likelihood of her ever be able to have children is virtually none. The foregoing repercussions have been devastating to Clare and will outlive any sentence this Court imposes on her. Clare must also now defend herself in a civil lawsuit relating to this case. Indeed, Clare will forever suffer the consequences of her actions in this case, as they will necessarily impact the rest her life and all future personal and business relationships.

During the most challenging period in her life, Clare has been isolated and cut off from most of her closest friends. For someone who longed so much for family and community, being suddenly banished from her home and entire community in Albany, and isolated from most of her closest friends for the last 26 months, has been the worst type of punishment for Clare. A friend, Mark Miness, notes: "Clare has paid a steep price for her mistakes, including the loss of friends and family, which, above all else, has been devastating to her."

Both the severe collateral consequences of her convictions, as well as the solitary conditions of her home confinement, warrant a downward variance in this case. *See United States v. Carty*, 264 F.3d 191, 196 (2d Cir. 2001) (holding that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures"); *United States v. K,* 160 F.Supp.2d 421, 442 (E.D.N.Y.2001) (Weinstein, J.) ("[The Second Circuit has recognized repeatedly that in deciding whether to depart downward a sentencing court may consider any pre-sentence rehabilitation that a defendant has demonstrated as well as the likelihood that probation

rather than prison will facilitate a defendant's future rehabilitation." (citing *United States v. Maier*, 975 F.2d 944, 948 (2d Cir.1992))); *United States v. Munoz-Nava*, 524 F.3d 1137, 1149 (10th Cir.2008) (affirming a significant downward variance because the district court considered, among other things, the defendant's "behavior while on a year-and-a-half pretrial release," which was "found to be exemplary.").

### 2. Clare Bronfman's conduct was aberrant.

Clare lived a law-abiding life until the instant offenses and her offenses are completely uncharacteristic when viewed in the context of her life. Section 5K2.20 of the Sentencing Guidelines provides that the Court may depart downward in certain exceptional cases for aberrant behavior if the defendant committed a single criminal transaction or occurrence without significant planning, of a limited duration, and if such conduct represents a marked deviation from an otherwise law-abiding life. *See* U.S.S.G. §§ 5K2.20(a), (b). The offenses here are not prohibited under subsection (c) of Section 5K2.20, as they do not involve serious bodily injury or death, do not involve a firearm or other dangerous weapon, do not involve a serious drug trafficking offense, and because Clare has neither more than one criminal history point or other significant prior criminal behavior. *See id*. § 5K2.20(c). In considering whether to depart under Section 5K2.20, the Court may consider the defendant's mental and emotional conditions, employment record, record of prior good works, motivation for committing the offense, and efforts to mitigate the effects of the offense. *See* § 5K2.20, Application Note 3.

Here, the offenses committed by Clare, although they took place over a period of time, still meet the definition and spirit of aberrant behavior under Section 5K2.20. The offenses were a relatively brief transaction which Clare committed without any significant planning. Furthermore, Clare's conduct was a serious departure from her otherwise law-abiding life, as evidenced by her

lack of any prior criminal history. And since her arrest in this matter over two years ago, Clare has not had so much as a single violation of her bail conditions, let alone any further contact with law enforcement. Since being on home detention, Clare has studied for and passed her GED, taken five college courses and studied for the bar exam, through what has proven to be an immensely challenging time for the world. She attempted to work for two charities but was rejected due to the media surrounding this case.

Accordingly, Clare's conduct prior to and after the offenses she committed demonstrate that the behavior in this case amounted to an unfortunate lapse in judgment.

Based on the totality of the circumstances and the aberrant nature of her conduct, the Court should grant a downward variance and sentence Clare to a below Guidelines sentence. *See, e.g.*, *United States v. Howe*, 543 F.3d 128 (3rd Cir. 2008) (after a jury found the defendant guilty of two counts of wire fraud at trial, the court granted a downward variance and sentenced the defendant to **two years of probation** with three months of home confinement based on an "isolated mistake" in an otherwise long and entirely upstanding life); *United States v. Hadash*, 408 F.3d 1080, 1084 (8th Cir. 2005) (after the defendant pleaded guilty to unlawful possession of six firearms, the court departed downward and sentenced the defendant to **four years of probation** based in part on the fact that defendant was a "law abiding citizen, who [did] an incredibly dumb thing"); *United States v. Vieke*, 348 F.3d 811 (9th Cir. 2003) (defendant convicted of identity theft sentenced to **5 years of probation** based on a 4-level downward departure for aberrant behavior); *United States v. Patterson* , 281 F.Supp.2d 626 (E.D.N.Y. 2003) (defendant convicted of conspiracy to import narcotics sentenced to **5 years of probation** based on a 13-level downward departure for aberrant behavior).

**F.    A Non-Custodial Sentence Is Particularly Appropriate in the Face of a Global Health Crisis in Which the Government Is Seeking to Reduce the Number of Prisoners in Government Custody.**

In December 2019, a novel infectious disease known as COVID-19 or "coronavirus" was identified in Wuhan, China and has rapidly spread worldwide, including to the United States.  On January 30, 2020, the World Health Organization ("WHO") declared the coronavirus outbreak a Public Health Emergency of International Concern ("PHEIC") and on March 11, 2020, WHO declared COVID-19 a pandemic.  On March 13, 2020, the President of the United States declared the coronavirus outbreak a national emergency and estimated the pandemic to last at least 18 months.  *See* Soo Kim, *U.S. Coronavirus Update as Death Toll Surpasses 150 Trump Admin Prepares for Pandemic to Last 18 Months or Longer*, NEWSWEEK (March 19, 2020), *available at* https://www.newsweek.com/us-coronavirus-update-death-toll-surpasses-150-trump-admin-prepares-pandemic-last-18-months-1493249.  To date, there have been 21,989,366 confirmed cases of COVID-19, 180 countries or territories affected, and 775,893 confirmed deaths.  With the easing of lockdown restrictions, there has been a resurgence of the virus in many places, and the numbers continue to rise dramatically.  *See* World Health Organization, COVID-19 Updates (updated August 19, 2020), *available at* https://www. who.int.

In response to the growing public health threat posed by this new coronavirus, both the federal government as well as state and local governments across the country, have taken unprecedented steps to help control the community spread of COVID-19.[25]  Like many countries

---

[25] The federal government has also taken steps to offer relief to the public.  For instance, the IRS has extended the filing deadline and federal tax payments until July 15, 2020.  And the federal government is implementing coronavirus-related paid leave for workers and tax credits for small and midsize businesses to swiftly recover the cost of providing coronavirus-related leave.  *See Coronavirus Tax Relief,* IRS.gov (updated April 3, 2020), *available at* https://www.irs.gov/coronavirus.

which have closed their borders and suspended travel in and out of their borders, the United States has banned global travel to certain countries and closed its borders to Canada and Mexico for nonessential travel. Many states, including New York,[26] have ordered schools and all nonessential businesses to close, and all residents to "stay home" or "shelter in place." *See* Grace Hauck, *These states are ordering residents to stay home or shelter in place. What does that mean?,* USA TODAY (March 21, 2020) *available at* https://www.usatoday.com /story/news/nation/2020/03/21/ coronavirus-lockdown-orders-shelter-place-stay-home-state-list/ 2891193001/. The federal government has also recommended that people should practice "social distancing" and should not congregate in groups of over ten people. *See, e.g.,* Knvul Sheikh, *No More Than 10 People in One Place, Trump Said. But Why?,* N.Y. TIMES (Mar. 16, 2020), *available at* https://www.nytimes.com/2020/03/16/health/coronavirus-social-distancing-crowd-size.html.

This unprecedented global pandemic has affected every facet of American life, including our criminal justice system. Since early March 2020, federal and state courts across the nation have imposed courthouse restrictions, and in some cases, entire closures to help curb the spread of the virus.[27]

The coronavirus pandemic poses a heightened problem at correctional facilities, where cramped cell blocks and required gatherings among inmate populations make the recommended social distancing policies a challenge. *See, e.g., Letters to the Editor: A prison doctor's stark*

---

[26] New York has become the epicenter of the COVID-19 crisis, with approximately one-third of all coronavirus cases in the U.S. *See* Christina Maxouris, *In a week, New York City became the epicenter of the US coronavirus outbreak,* CNN (March 21, 2020), *available at* https://www.cnn.com/2020/03/21/health/new-york-coronavirus-cases-epicenter/index.html.

[27] An updated list of court restrictions and closures as of August 14, 2020 can be found here. See Sarah Jarvis, Coronavirus: The Latest Court Closures And Restrictions, LAW 360 (updated August 14, 2020), available at https://www.law360.com/articles/1252836/coronavirus-the-latest-court-closures-and-restrictions?nl_pk=33156e8a-4880-48b4-ac3fc0946694fc14&utm_%20source=%20newsletter&utm_medium=email%20&utm_campaign=%20special.

*warning on coronavirus, jails and prisons*, LOS ANGELES TIMES (March 20, 2020), *available at* https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-corona virus-and-incarceration ("Prisons are petri dishes for contagious respiratory illnesses."). Beginning on March 14, 2020, the federal Bureau of Prisons (BOP) moved to an advanced defensive posture, temporarily blocking social visitors as well as lawyers in most circumstances from visiting inmates at the system's 122 facilities across the country, joining most states and some counties taking the same measure in their own prisons or jails. *See* Jason Hanna, *Federal and most state prisons are banning visits to protect inmates from coronavirus*, CNN (March 14, 2020), *available at* https://www.cnn.com/2020/03/14/health/prisons-coronavirus-visitations-banned/index.html. The BOP also suspended internal inmate transfers between facilities to try to narrow the possibility of the virus making it inside and minimize the spread of possible infections.

Inmates at both the state and federal level in New York have been impacted. *See, e.g.,* Robin McDowell, *38 positive for coronavirus in NYC jails, including Rikers,* ABC NEWS (March 21, 2020), *available at* https://abcnews.go.com/US/wireStory/38-positive-coronavirus-nyc-jails-including-rikers-69731911; *Coronavirus Update: Inmate At Metropolitan Detention Center Tests Positive For COVID-19,* CBS NEWS (March 21, 2020), *available at* https://newyork.cbslocal. com/2020/03/21/coronavirus-inmate-tests-positive-metropolitan-detention-center-brooklyn/; *see also* David Shortell and Kara Scannell, *New coronavirus cases in US jails heighten concerns about an unprepared system*, CNN.COM (March 20, 2020), *available at* https://www.cnn.com/ 2020/03/18/politics/coronavirus-in-us-jails-heighten-concerns/index.html (reporting the death of a New York City's Department of Correction investigator following a positive test for coronavirus). As New York residents were encouraged by Governor Cuomo to get tested for COVID-19, state prisons acted with less urgency. As of June 13, 2020, a total of 1,300 prisoners

were tested for the virus — about 3% of the 38,000 state prison population. *See e.g.* Rosa Goldensohn, *Coronavirus Testing Ramps Up in New York — But Not in State Prisons*, THE CITY (June 15, 2020), *available at* https://www.thecity.nyc/justice/2020/6/15/21292352/coronavirus-testing-ramps-up-in-new-york-but-not-in-state-prisons. Although the number of positive cases has dropped within New York State, four prisons continue to have a higher than average infection rate for the virus. Collectively, Shawangunk Correctional Facility, Wallkill Correctional Facility, Fishkill Correctional Facility and Green Haven Correctional Facility have a coronavirus infection rate of 4.6% — over twice the statewide infection rate of 1.9%, state Correction Department data shows. It is also approximately six times higher than the statewide infection rate of .78% reported on August 9th, the lowest single-day percentage of positive tests since March 16. *See, e.g.*, Chelsia Rose Marcius, *Four New York prisons still see high numbers of coronavirus*, NEW YORK DAILY NEWS (August 10, 2020), *available at https://www.nydailynews.com/new-york/ny-coronavirus-new-york-prisons-still-see-high-numbers-of-covid-19-20200810-dwovpwlumvhjlnwpbjcob42ohu-story.html*. In New York City jails, the infection rate is 7.10%. *See e.g.*, *COVID-19 Infection Tracking in NYC Jails*, THE LEGAL AID SOCIETY (July 31, 2020), *available at* https://www.legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/#:~:text=%E2%80%9CCOVID%2D19%20is%20spreading%20rapidly,the%20epicenter%20of%20COVID%2D19.

On March 12, 2020, Jerrold Nadler, Chairman of the U.S. House Committee on the Judiciary, sent a letter to Attorney General William P. Barr in which it states that in light of the global pandemic, it is important "for DOJ to consider measures that can be taken to reduce the number of prisoners in government custody." Toward that end, Mr. Nadler suggested that the DOJ "direct[] U.S. Attorney's Offices, wherever possible, to not seek the detention of individuals at

their initial appearance in court, declining prosecuting minor, non-violent offenses, and decline pursuing supervised release and probation revocations that involve technical and minor violations." *Id*.

Less than a week later, on March 18, 2020, the Director of the American Civil Liberties Union, Udi Ofer, sent a similar letter to Attorney General Barr and Michael Carvajal, the Director of the Federal Bureau of Prisons, in which he "call[ed] upon DOJ to ensure that more people are not admitted to BOP and USMS facilities by . . . [d]eclining to seek incarceration in cases prosecuted [and o]ffering diversion in appropriate cases prosecuted." Mr. Ofer also notes that "[j]udges, probation officers, and federal law enforcement should use their discretion to ensure against an increase in incarceration, especially among those most vulnerable to coronavirus." *Id*. As noted in the letter, "[p]ublic health officials agree that decreasing the number of people in custody is one of the best ways to deal with the inevitable spread of coronavirus in the carceral system." *Id*. (citing USMS, *Facts and Figures*, Feb. 25, 2020, *available at* https://www.usmarshals.gov/duties/factsheets/facts.pdf).

A week after that, on March 25, 2020, Manhattan District Attorney Cyrus R. Vance, Jr. and Brooklyn District Attorney Eric Gonzalez signed onto a national joint statement urging local officials across the country to stop admitting people to jail when there was no serious risk to the physical safety of the community. As stated in the joint statement, "Our country's jail and prison populations have exploded over the last few decades, a result of people being prosecuted more often for less serious behavior [and] an increase in the severity of sentences imposed … The result of these practices is overcrowded jail, prison and immigration detention facilities that force people together in close quarters without access to proper hygiene or medical care, sometimes living barracks-style in gyms or other open spaces, breathing the same recycled air for up to 23 hours per

day. These conditions are fertile ground for the spread of a virus like COVID-19." *See e.g.*, JOINT STATEMENT FROM ELECTED PROSECUTORS ON COVID-19 AND ADDRESSING THE RIGHTS AND NEEDS OF THOSE IN CUSTODY (March 25, 2020), available at https://fairandjustprosecution.org/wp-content/uploads/2020/03/Coronavirus-Sign-On-Letter.pdf. Having recognized the catastrophic consequences COVID outbreaks would have on communities due to the cycling of individuals in and out of correctional facilities, they urged government officials to "dramatically reduce the number of incarcerated individuals and the threat of disastrous outbreaks" by implementing and advocating for several reforms, including a policy to release individuals who have been convicted for "offenses which pose no immediate physical threat to the community." *Id*.

In response to the rapidly-evolving crisis and the specific threats posed to the inmate population due to the coronavirus, as of March 22, 2020, jails across the country including in New York began releasing low-level offenders to halt the spread of COVID-19 amongst the prison population. *See, e.g.*, Zusha Elinson and Deanna Paul, *Jails Release Prisoners, Fearing Coronavirus Outbreak*, WALL STREET JOURNAL (March 22, 2020), *available at* https://www.wsj.com/articles/jails-release-prisoners-fearing-coronavirus-outbreak-11584885600. Since the pandemic began, New York state has released 1,404 people, all non-violent offenders. *See, e.g.* Natasha Haverty, *Why New York is releasing so few inmates during the pandemic*, Northcountrypublicradio.org (July 24, 2020) *available at* https://www.northcountrypublicradio.org/news/story/41971/20200724/why-new-york-is-releasing-so-few-inmates-during-the-pandemic/. Within New York City, approximately 2,500 inmates have been released from Rikers Island. While those released included detainees who were convicted of felonies, the bulk of those released were jailed for misdemeanors and non-violent

offenses. *See e.g.,* Eddy Rodriguez, *NYC Prisoners Released Early Due to COVID-19 Concerns Were Re-Arrested, Police Say*, NEWSWEEK (June 13, 2020), *available at* https://www.newsweek.com/nyc-prisoners-released-early-due-covid-19-concerns-have-been-re-arrested-police-say-1510697; *see also* Rebecca Rosenberg, *More than 1,500 NYC inmates have been released during coronavirus crisis*, NEW YORK POST (April 10, 2020), *available at* https://nypost.com/2020/04/10/more-than-1500-nyc-inmates-have-been-released-amid-coronavirus-crisis/.

In light of the unusual risks posed by this unprecedented global pandemic and given the legislative directive to reduce the prison population, a probationary sentence for Clare is particularly appropriate in this case. As demonstrated above, Clare is a first-time offender and her offenses of conviction (including the relevant conduct) do not involve any violence or threats of violence. For the last two years, while in home confinement with onerous conditions, Clare has dutifully obeyed every order of the Court and remained in full compliance with the conditions of her release. Since she has adequately been punished for her crimes and is not a danger to the community, a term of incarceration would not serve any rehabilitative, retributive, or deterrent purpose; rather, it would only create an unreasonable safety risk for Clare as well as the public, which should be avoided during these extenuating circumstances.

## **CONCLUSION**

The circumstances presented in Clare's case justify a non-custodial sentence. Indeed, the nonviolent crimes that Clare was convicted of routinely yield sentences of probation, and in the more serious cases, minimal periods of incarceration. At the time of sentencing, Clare will have already served 26 months in home confinement on electronic monitoring with significant

restrictions on her activities and travel and no contact with a long list of individuals, including most of her closest friends.

For the reasons explained above, a Guidelines or above Guidelines sentence in this case will not serve any deterrent effect and will certainly be a sentence "greater than necessary" to achieve 18 U.S.C. Section 3553(a)'s objectives. Rather, in light of the federal sentencing factors as well as safety concerns in the face of the rapidly-evolving global pandemic, the appropriate sentence for Clare Bronfman is three years of probation, which is sufficient but not greater than necessary to satisfy the goals of sentencing.


Dated: August 28, 2020                       Respectfully submitted,
      New York, New York

                                            Ronald S. Sullivan, Jr., Esq.
                                            Ronald Sullivan Law, PLLC
  1300 I Street, N.W.
  Suite 400 E
  Washington, D.C. 20005
  (202) 935-4347

  Duncan Levin, Esq.
  Tucker Levin, PLLC
  230 Park Avenue, Suite 440
  New York, New York 10169
  (212) 330-7626

  *Attorneys for Defendant Clare Bronfman*