NS:TH
F. #2017R01840

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

        - against -                   Docket No. <u>18-CR-204 (S-3) (NGG)</u>

CLARE BRONFMAN,

           Defendant.

- - - - - - - - - - - - - - - - - - - - - - - -X


THE GOVERNMENT'S SENTENCING MEMORANDUM
<u>AS TO DEFENDANT CLARE BRONFMAN</u>


SETH D. DuCHARME
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Tanya Hajjar
Mark J. Lesko
Assistant U.S. Attorneys
    (Of Counsel)

PRELIMINARY STATEMENT

For over a decade, the defendant Clare Bronfman used her extraordinary wealth and social status to fund and promote a criminal enterprise led by her co-defendant Keith Raniere.  She recruited individuals into Nxivm-affiliated organizations and brought them within Raniere's orbit.  There can be little doubt that Raniere would not have been able to commit the crimes with which he was convicted were it not for powerful allies like Bronfman.  Bronfman spent millions of dollars of her inherited fortune on Raniere's endeavors.  She pursued Raniere's accusers and critics by dispatching powerful teams of lawyers, private investigators and public relations firms to attempt to discredit them and dredge up information that could be used to undermine their claims.  Even now—after Raniere's convictions for sex trafficking, forced labor, alien smuggling and child exploitation offenses—Bronfman continues to support Raniere.

Bronfman's request for a non-custodial sentence of three years of probation ignores the seriousness of her crimes and the significant need for deterrence in the unique circumstances of this case.  The Court should reject Bronfman's request for special treatment and instead impose a sentence that will demand respect for the law.  For the reasons set forth below, the government respectfully submits that a substantial variance is appropriate in this case, and that the Court should sentence the defendant to a non-Guidelines sentence of 60 months' imprisonment.  The Court should also order payment of forfeiture, restitution, and a $500,000 fine.

BACKGROUND[1]

Clare Bronfman pleaded guilty to both counts of a two-count Superseding Information.  Count One charged that between October 2015 and January 2018, Bronfman, together with others, conspired to conceal, harbor and shield from detection one or more aliens for financial gain, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i).  Presentence Investigation Report dated January 8, 2020 ("PSR") ¶¶ 1-2.  Count Two charged that between November 2016 and March 2018, Bronfman, together with others, unlawfully transferred and used a means of identification of another person with the intent to commit and in connection with attempted tax evasion, in violation of 18 U.S.C. §§ 1028(a)(7), 1028(b)(1)(D), and 1028(c)(3)(A).  Id.

I.      Alien Smuggling

Bronfman conspired to recruit and secure immigration status for numerous individuals so that they could work in one or more Nxivm-affiliated organizations.[2]  PSR ¶¶ 21-38.  Bronfman used a variety of Nxivm-affiliated organizations to sponsor, or enter into purported employment contracts with, these individuals, with the expectation that these

---

[1]     The Court is familiar with the factual background and offense conduct in this case, having presided over the six-week trial of Bronfman's co-defendant Keith Raniere.  In addition, the PSR provides a detailed summary of the relevant offense conduct based on evidence presented at trial.  The following factual summary is intended to provide an overview sufficient to situate the government's arguments with respect to Bronfman's sentencing.

[2]     Certain communications and documents relating to alien smuggling offenses are appended to this memorandum as Exhibit A.  The volume of names, addresses and other personal identifying information referred to in these communications makes individual redaction of such information impracticable.  To avoid confusion, the government respectfully seeks leave to file Exhibit A separately and under seal.

individuals would "earn" the cost of their visa.  Bronfman paid these individuals very little, if at all, and required them to submit a "payment plan" to "pay back" the cost of their visa.

For instance, Bronfman recruited young women, including Jane Doe 12, to work for Exo/Eso, a fitness-related Nxivm-affiliated company, and submitted documents purporting to hire them as "management consultants" with salaries in the amount of $3,600 per month in order to secure NAFTA professional (TN) visas. A TN visa is a visa category enabling citizens of Canada and Mexico to enter the United States to engage in professional business activities on a temporary basis.[3]  In order to obtain a TN visa, a prospective employer must provide a letter of employment detailing the professional capacity in which the individual will work in the United States and their anticipated compensation.  Lawyers, accountants, engineers, scientists and management consultants, among others, are the types of professionals eligible to seek admission into the United States as TN nonimmigrants. See 8 C.F.R. § 214.6.  The employment letters Bronfman presented in connection with the application for TN visas for these individuals were false because, among other things, Bronfman never intended to pay and did not pay the salary listed in the letters.

In addition, as set forth below, Bronfman participated in efforts to maintain siblings Marianna and Adrian in the United States.  Although Bronfman was aware that Marianna and Adrian had long overstayed their tourist visas and were not lawfully in the United States, Bronfman sought to obtain visas or other immigration status for them based on

---

[3]     A citizen of a NAFTA country may qualify for a TN visa and be employed as a professional in the United States if (1) the profession is recognized under NAFTA; (2) the alien possesses the specific criteria for that profession; (3) the prospective position requires someone in that professional capacity; and (4) the alien is going to work for a United States employer.  See 8 C.F.R. § 214.6.

3

false or fraudulent representations, including that they were employees of their father's rock-drilling company in Mexico, or Sagitta LLC, a purported U.S.-affiliate of the same company. In fact, "Sagitta LLC" served solely as a vehicle to attempt to gain lawful status in the United States.

        a.      <u>Exo/Eso and Jane Doe 12</u>

In January 2015, Jane Doe 12, a citizen of Mexico, entered the United States on a tourist visa.  PSR ¶ 34.  At this time, Bronfman invited Jane Doe 12 to remain in the United States and work for Exo/Eso.  <u>Id.</u>  Bronfman prepared an employment letter in connection with Jane Doe 12's application for a TN visa that contained materially false statements.  <u>See</u> Exhibit A1-001-005.  The letter stated that Exo/Eso would "engage [Jane Doe 12's] services as a management consultant to provide advice to Exo/Eso's management . . . on the development of strategic marketing and business development plans to expand our business[.]"  The letter also stated that Jane Doe 12 would be "compensated as an independent contractor at the rate of $3,600.00 monthly."  Exhibit A1-001.  The letter also included a detailed description of Jane Doe 12's "duties," which included, among other things, to:

- Analyze and resolve the strategic and operational challenges associated with marketing and selling the services and products of Exo/Eso to professional dancers and other high-performing arts individuals in other fields of endeavor

- Observe, research and analyze the company's existing marketing and sales activities

- Assess existing and potential market opportunities and interpret strategic research and competitive intelligence

Id.  All of these statements were false when submitted.  Even prior to the beginning of Jane Doe 12's employment with Exo/Eso under the terms of the October 1, 2015 letter, Jane Doe 12 expressed concerns to Bronfman about her experience being paid by Exo/Eso:

> . . . Exo Eso took around 8 months to pay me what I did last year.  One day I received a piece of paper with the quantity of 1,170 written on it, that they say I will be able to change that piece of paper to real money and that took months, I finally got the refund when one of the members of the Development Team found out that I had not eaten in 2 days and lent me 30 usd.  I don't want to tell you how many times I asked for the refund I just didn't get an answer at all.  Also the amount of money made it was really low, compare with the time, knowledge and effort.

Exhibit A1-007.  Jane Doe 12 asked Bronfman, in a November 7, 2015 email, if the "salary that is written in the contract" was "real" or if it was "only for purposes of processing the visa."  Exhibit A1-011.  Bronfman responded that the "contract" would "formally start when" Jane Doe 12  came to the United States, and "when we have a chance to sit down and define exactly what it is you will be doing[.]"  Exhibit A1-009.

Although Jane Doe 12's letter of employment stated that she would earn $3,600 per month, records from the Exo/Eso bank account at Key Bank reflect only three payments made to Jane Doe 12, totaling $4,194.75 between December 4, 2014 and July 31, 2017.  Jane Doe 12 emailed Bronfman on November 9, 2015, expressing concern about her salary: "With no money involved [it] is very difficult to support [sic] my self [sic], now that I am at home it has been hard to keep up the pace with no income and with the uncertainty of not knowing how I will live each day, either here or there."  Exhibit A1-009.

Once in the United States, Jane Doe 12 was forced to find other ways to earn money to live.  On December 3, 2015, Jane Doe 12 asked Bronfman about the possibility of seeking other means of earning an income because Exo/Eso was not paying her.  She wrote,

"I know that [Exo/Eso] is not making enough profit to pay me the [wage] that was mention [sic] in the contract and I am not vested on ask you [sic] for that.  I mention this because I have been looking for jobs to be able to support myself here and I want to check with you if my visa have some limititations [sic] about It or if is something that I can do."  Exhibit A1-012.  Bronfman responded that seeking any additional employment would cause "work issues due to" the TN visa but that she would talk to Raniere "as that would impact the work agreement."  Id.

In 2016, Bronfman offered Jane Doe 12 administrative work at $15 an hour. When Jane Doe 12 protested, Bronfman told Danielle Roberts to "[t]ell [Jane Doe 12] if Bill Gates cleaned a tiolet [sic] would it be right for him to charge millions of dollars? (Money module) it has nothing to do with her skills it is the job."  Exhibit A1-015.  On June 23, 2016, Jane Doe 12 submitted a proposed payment plan to Bronfman.  The following day, Bronfman responded, "There is one fundamental question yet to be answered; what are you going to do to earn having your visa? This needs to be figured out or technically you can not stay here."  Exhibit A1-020.

Bronfman recruited other individuals to work as "management consultants" at Exo/Eso, whom she purported to compensate at $3,600 per month.  On January 29, 2015, Bronfman prepared an identical letter for a TN visa submitted on behalf of ████ ████, a citizen of Canada.  See Exhibit A2-002-003.  Three months later, ████ wrote Bronfman an email stating that she was not "prepared for no income" and that she legally had "no other means of income other than exo/eso as per [my] visa."  Exhibit A2-007.

b.     Rainbow Cultural Garden, LLC

Bronfman used a nonprofit foundation she owned called Ethical Science Foundation ("ESF") to sponsor visas for certain non-citizens who were recruited into the Nxivm community.  PSR ¶¶ 25-27.  ESF was a favorable vehicle for sponsoring H1-B visa applications because ESF, as a nonprofit, was not subject to the annual H1-B visa caps applicable to for-profit organizations.  H-1B regulations require the sponsored worker to demonstrate, among other things, that the nature of the specific duties to be performed is "so specialized and complex that the knowledge required to perform the duties is usually associated with the attainment of a bachelor's or higher degree" and that the United States employer will offer a wage at or higher than the prevailing wage.  8 C.F.R. § 214.2(h)(4)(iii)(A) (detailing requirements for "specialty occupation"); 20 C.F.R. § 655.731(a) (prevailing wage requirements).

The individuals sponsored by ESF did no actual nonprofit work—or any work that qualified as a "specialty occupation" associated with a bachelor's or higher degree—but in fact worked as childcare workers for a separate for-profit Nxivm entity, Rainbow Cultural Garden, LLC ("RCG").  RCG employed caretakers of children that were fluent in other languages.  Although RCG used the title "Multi-cultural Development Specialist" or "MDS" to describe its employees, MDSs were not certified or qualified to teach children and there was little, if any, screening process to select them.[4]  See, e.g., Trial Transcript ("Tr.") at 646

---

[4]     In fact, a document titled "MDS Approval Guidelines 1.2," sent by Nicki Clyne to Loreta Garza and Clare Bronfman, stated that prospective RCG employees who had previously worked as "baby-sitters, teachers, tutors, psychologists, children's book writers, child development experts, etc." posed a potential "conflict of interest" to the company. EXHIBIT A3-018.

(testimony of Vicente that an "MDS" was a "fancy word for nanny" and that the "idea [of RCG] was . . . to have people of multiple nationalities that speak multiple languages spend time with the kids"); Exhibit A3-001; Exhibit A3-011 (duties of an MDS include "plan adventure with child" and "speak their native language ONLY at all times when they are present with each child they work with"); Exhibit A3-003 (email from Loreta Garza to Raniere regarding potential MDS candidates).

█████████████, a citizen of India, began working for RCG after she entered the United States on a visitor's visa.  ████ was paid $10 an hour in cash as an MDS.  Eventually, Bronfman sponsored ████ for an H-1B visa through ESF, although, as Bronfman knew, ████ continued to work as an MDS for RCG.[5]  For instance, a spreadsheet emailed by Loreta Garza to, among others, Clare Bronfman in 2009 listed eight MDSs in Albany, including ████ and Camila.  ████ was listed as a "Type A" MDS, which meant, as Garza put it, that when they arrived in the United States "I normally give them between 300 to 500 for their expenses before they begin making money."  Exhibit A3-001.  Garza also noted that "[n]ow that ████ has a visa I don't pay her anything but her salary."  Id.

█████████████████, a citizen of South Africa, began working for RCG after she entered the United States as an au pair on a J1 work visa.  In order to facilitate ████ staying in the United States and continuing to work for RCG, Bronfman purported to have ████ receive a "scholarship" from ESF.  Exhibit A4-002-003 ("The Ethical

---

[5]     ████ received a salary from ESF, but since ████ generally only worked for 20 hours a week at RCG, Bronfman required that ████ find additional work to "make up" an additional 20 hours or to pay Bronfman back.

Science Foundation has established its scholarship fund to recognize promising young people, who have distinguished themselves in business and personal excellence as well as language and multi-culture proficiency.  We congratulate you on being chosen to receive this scholarship award.  As a Ethical Science Scholar, you will receive financing to cover tuition, books and lodging of up to $9,000 per semester . . . .").  Bronfman was aware, however, that ███ would continue to work as a caretaker of children at RCG.  Bronfman's assistant emailed her about ESF scholarship documents and Bronfman responded: "Ok – she is single, a citizen of South Africa and she is an awarded scholar (relationship to me).  All else looks good.  Yes, the letter – not supposed to have RCG on there[.]"  Exhibit A4-004.

Email correspondence demonstrates that ESF was little more than a vehicle to employ MDSs.  Exhibit A3-003 ("Company to employ them under a work visa, right now ESF employs MDS's w Visa as RCG is not ready."); Exhibit A3-004 ("OK, [two MDS employees] will have their agreements with ESF – and will be different from the below because of the visa specifications.")  In 2013, an MDS who was fluent in Korean sought an employment letter from Loreta Garza that states that she would be hired "for an average of 15 hours per week."  Loreta forwarded the email to Bronfman's assistant and asked her: "Could ESF write the employment Letter for [MDS]?  She does Korean w/ [Raniere's son]."  Bronfman's assistant forwarded the email to Bronfman for Bronfman's approval and noted that "I believe we had a similar letter written for Sahajo by Jonathon [Ware, Esq.].  Can I ask him to create one?"  Exhibit A3-021.

     c.    <u>Sylvie</u>

In 2005, Sylvie, a citizen of the United Kingdom, entered the United States on a tourist visa in order to work for and train with Clare Bronfman in order to become an

equestrian showjumper.  PSR ¶ 24; Tr. at 85, 89-91 (Sylvie's testimony).  Although Sylvie

was prohibited from working in the United States, Bronfman paid Sylvie for her work.  Tr. at

91.  Bronfman also paid for Sylvie to take Nxivm classes.  Sylvie eventually returned to the

United Kingdom.  Bronfman encouraged Sylvie to apply for an investor's visa.  Tr. at 150.

Because Sylvie was only twenty and not in a financial position to invest in any commercial

enterprise as required by the investor's visa program, Bronfman came up with a scheme to

"pretend to buy" Sylvie's horse by wiring funds into Sylvie's bank account, which Sylvie

would then "invest" into Ethletics LLC, a defunct Nxivm-affiliated company, in an effort to

make it seem as though Sylvie were in fact a foreign investor eligible for a visa.  Id.

Bronfman also authorized payments from Ethletics LLC to Grow Sport to "pay" Sylvie

during this time.  Initial paperwork was submitted in support of the investor visa, but the plan

was eventually abandoned when the government requested additional documentation.  Tr. at

151.  Subsequent email communications make clear that Sylvie understood that she "owed

money" to Bronfman for "income unearned" from Grow Sport and for her visa.  See, e.g.,

Exhibit A5-006 ("Please can we determine what you would like paying back for (visa etc)?  I

would like to agree on a figure (of at least $15,000 which would cover the [horse] costs listed

below and propose a monthly repayment system.").

       Sylvie was eventually recruited into DOS and served as Raniere's DOS

"slave," as described further below.

        d.    <u>Adrian and Marianna</u>

Bronfman participated in a scheme to obtain an L1 visa[6] for Adrian on the false claim that he was employed by Sagitta LLC.  PSR ¶ 33.  Sagitta LLC, a company based in Clifton Park, New York, purported to be an affiliate of Adrian's father's rock-drilling company in Mexico, but in fact existed solely as a vehicle for obtaining Adrian's visa.  <u>Id.</u> Adrian in fact worked in film production for Moving Pixels, Inc., a company owned by Bronfman, and paid rent to Nancy Salzman.  PSR ¶ 33.  As part of the scheme, Bronfman, Nancy Salzman and Russell arranged for Adrian to be compensated through Sagitta LLC for work that he actually performed for Moving Pixels, Inc.  <u>Id.</u>; <u>see, e.g.</u>, Exhibit A6-004-005 (detailing expenses and describing paychecks as a "pass through").  Adrian was provided with false Sagitta LLC invoices and paystubs as part of the scheme.  <u>Id.</u>  Adrian was granted an L-1 visa in 2012, 2013, and 2015.

Bronfman also made significant efforts to assist Marianna, a Mexican national and Raniere's sexual partner, in entering and remaining in the United States.  PSR ¶¶ 28-32.  Marianna arrived in the United States in or about 2003, shortly after completing high school, in order to study the Nxivm curriculum with Raniere.  In 2004, Marianna began a sexual relationship with Raniere and Pamela Cafritz.  Some time thereafter, Marianna's status in the United States on a visitor's visa expired.  <u>See, e.g.</u>, Tr. at 2491 (testimony of Daniela).  On January 5, 2016, Marianna was denied entry into the United States.  PSR ¶ 30.  Shortly thereafter, Bronfman engaged a private consulting company (the "Consulting Company")

---

[6]     The L-1 visa facilitates the temporary transfer of a foreign worker in the managerial, executive, or specialized knowledge category to the United States to continue employment with an office of the sample employer, its parent, branch, subsidiary, or affiliate.

comprised of former officials of the United States Department of Homeland Security, for

assistance in pursuing a number of different ways for Marianna to re-enter the United States.

      In early 2016, Marianna sought to obtain admission into the United States

through a humanitarian parole for the purposes of taking care of Pamela Cafritz, who was

ill.[7]  The parole request was denied.  Several days later, Marianna was granted Significant

Public Benefit Parole (SPBP) from a United States Department of Homeland Security office

in San Antonio, Texas in support of "intelligence gathering for an ongoing investigation."

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

---

[7]    "Parole" allows an individual who is otherwise ineligible for admission to enter the United States for a temporary period for "urgent humanitarian reasons or significant public benefit."  8 U.S.C. § 1182(d)(5)(A). For humanitarian parole, the United States Citizenship and Immigration Services has discretion to authorize entry to the United States due to a compelling emergency, such as critical medical treatment or the need to assist a family member who is at an end of life stage of an illness.  Significant public benefit parole, or "SPBP" is a mechanism by which individuals may enter the United States for a "significant public benefit," which can include assistance in law enforcement investigations, prosecutions, or for testimony as a witness in a legal proceeding.  See, e.g., Milardo v. Kerilikowske, 2016 WL 1305120, at *2 (D. Conn. Apr. 1, 2016) (describing parole eligibility).

███████████████████████████████████████████

██████████████████████

        In mid-2016, Bronfman again sought admission to the United States based on a humanitarian parole.  Notwithstanding that Marianna had been living with Raniere without legal status in the Nxivm community for nearly a decade, Clare Bronfman falsely claimed that Marianna had always been compliant with United States immigration laws and that Marianna had been consistently employed by her father's rock-drilling company in Mexico. PSR ¶ 30; see, e.g., Exhibit A6-006.    Similarly, in an August 5, 2016 letter addressed to the United States Embassy in Mexico, a "former Acting General Counsel for DHS and Acting Director of U.S. Immigration and Customs Enforcement" and stated that Marianna had "never violated any immigration laws" and that she "poses no threat to immigrate to the United States."  This letter also claimed that Marianna "has no intent to remain unlawfully in the United States and holds close ties to her large Mexican family and friends, including her father who lives with her, and her mother and sister who live close to her home.  Marianna also enjoys gainful employment as a sales and marketing executive for her father's company[.]"  Exhibit A6-006-024.  Bronfman knew these statements were false. Specifically, Bronfman knew that (1) Marianna did not live in Mexico with her father; (2)

_____

8  ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████

Marianna did not work as a "sales and marketing executive" for a rock-drilling company; (3) Marianna did not have "close ties" with her mother and sister who live close to her home; and (4) Marianna had, for a significant period of time, been noncompliant with United States immigration laws.[9]

By December 2016, Bronfman and Raniere engaged in efforts to have Marianna qualify as an EB-5 investor. As Marianna was not in a financial position to invest in a commercial enterprise, Bronfman and Raniere discussed giving the funds to Marianna to "invest." Ultimately, in May 2017, Bronfman gave Marianna a gift in the amount of $500,000. On May 17, 2017, a Consulting Company attorney submitted a petition for entry into the United States on behalf of Marianna under the EB-5 Immigrant Investor Program on the basis of a $500,000 investment in the Steiner Brooklyn Navy Yard Redevelopment Project.

II.   Identity Theft and Unlawful Surveillance

Bronfman and Raniere engaged in unlawful surveillance and investigation of those perceived to be enemies of Raniere and Nxivm. PSR ¶¶ 49-54. The targets of these efforts included federal judges overseeing litigation in which Nxivm was a party, high-ranking politicians, reporters who had published articles critical of Raniere or Nxivm, Nxivm's own lawyers, legal adversaries and their families, an accountant (James Loperfido)

---

[9]      Bronfman claims that she had "no reason to know anything about [Marianna's] legal status in the United States" until after 2014. Def. Mem. at 28. Should the Court find it necessary, the government is prepared to prove by a preponderance of the evidence at a sentencing hearing that Bronfman was aware that (1) Marianna and her siblings had overstayed their visas and were not lawfully in the United States for a decade prior to 2016; and (2) neither Marianna nor Adrian were in fact employed by Sagitta Rock Tools, their father's Mexican rock-drilling company, or any affiliate thereof.

who worked for an attorney who had previously done work for Nxivm, and Edgar Bronfman

Sr., the father of Clare Bronfman.  Id.; Tr. at 3357 (testimony of Loperfido).  On multiple

occasions, Bronfman approached Stephen Herbits, a colleague of her father, whom she

believed to have political influence, in an attempt to persuade him to help her intimidate

individuals perceived to be hostile to Nxivm or Raniere.  PSR ¶ 49; Tr. at 1322-24

(testimony of Herbits), 1330-33.

       Between August 2005 and October 2008, Raniere directed Daniela to obtain

the usernames and passwords for email accounts belonging to individuals perceived to be

Nxivm enemies, in order to gain access to those individual's email accounts and monitor

their communications.  PSR ¶¶ 50-54; see GX 1518; Tr. at 2535-40 (Daniela's testimony).

After the publication of an October 2003 Forbes article in which Edgar Bronfman was

quoted as calling Nxivm a "cult," Raniere considered Edgar Bronfman an enemy of his and

of Nxivm.  See GX 1456.  As a result, Raniere tasked Daniela with creating keylogging

software in order to access and monitor Edgar Bronfman's email account.  Tr. at 2552-54

(Daniela's testimony).  Bronfman installed the keylogging software on her father's computer,

and Daniela was thereafter able to access Edgar Bronfman's email account.  Tr. at 2554-55.

For years, Daniela reported the results to Raniere.  PSR ¶ 52; Tr. at 2556-57.  At Raniere's

direction, Daniela also created and installed keylogging software on the computer of James

Loperfido, an accountant who had worked for Joseph O'Hara, an attorney who had

previously done work for Nxivm.  Tr. at 2553 (Daniela's testimony), 3370 (Loperfido's

testimony).  Daniela thereafter regularly emailed the results of the keylogging software,

which reflected Loperfido's computer activity, to Raniere.  PSR ¶ 52; Tr. at 2560.

On behalf of Nxivm, Bronfman hired several private firms, including Canaprobe and Interfor, in order to investigate perceived enemies of Nxivm and Raniere. PSR ¶ 54; Tr. at 5010.  Between approximately 2007 and 2009, Canaprobe sent the results of purported "bank sweeps" for bank account and balance information belonging to Nxivm's adversaries.  Id.  On March 27, 2018, a search warrant was executed on the residence of Nancy Salzman.  Among the items recovered was a large box containing what appears to be private banking information of many individuals perceived to be Nxivm enemies, including Edgar Bronfman, Joseph O'Hara, Rick Ross, and others.  Id.; Tr. at 4997-99 (describing purported banking information for, among other individuals, the author of the October 2003 Forbes article and prominent New York politicians and lobbyists).

III.   <u>Obstruction of Justice</u>

Raniere obstructed justice by altering videotapes that were to be produced in discovery in a federal lawsuit in New Jersey.  PSR ¶¶ 59-62.   In 2003, Nxivm and affiliated entities filed suit against Stephanie Franco, a former Nxivm student, her parents, and Rick Ross.  Tr. at 4683-84 (Ross's testimony).  The lawsuit alleged copyright infringement and centered on a claim that Franco had violated a non-disclosure agreement by providing Nxivm course materials to Rick Ross, a cult deprogrammer, who published the course materials on his website.  Tr. at 910, 1299 (Vicente's testimony); Tr. at 1988-89 (Lauren Salzman's testimony); Tr. at 4700-4703 (Ross's testimony).  In around 2008, Franco's attorneys requested the production of certain videotapes in support of their claim that the Nxivm curriculum contained false statements and violated certain state consumer protection laws. Id.  In June 2008, Raniere tasked Mark Vicente, among others, to alter videotapes and to remove certain segments from them without having the videotapes appear altered.  Tr. at 745

(Vicente's testimony).  Kristin Keefe and Bronfman provided Vicente with instructions for altering the videotapes to remove content, including segments in which Nancy Salzman made unsubstantiated health claims about Nxivm's curriculum.  Tr. at 1256. These altered videotapes were then produced in discovery by Nxivm's attorneys with the false claim that they were provided in "unedited fashion."

    IV.    <u>Financial Crimes</u>

Between approximately November 2016 and March 2018, Bronfman and Raniere conspired to commit identity theft in connection with Raniere's continued use of a credit card account number and bank account number of Pamela Cafritz, knowing she was deceased.  PSR ¶ 57.  This scheme was part of a long-standing practice of deliberately keeping money and assets out of Raniere's name.  Bronfman facilitated the scheme by arranging for regular payment of Pamela Cafritz's credit card after she died on November 7, 2016.  <u>Id.</u>; Tr. at 4540.  Among the charges on Pamela Cafritz's credit card were charges to Amazon Marketplace, Restoration Hardware, a pet shop, Domino's Pizza, a sock store in Brooklyn, Neiman Marcus, Bergdorf Goodman, Saks Direct, Netflix, and various baby companies.  Tr. at 4556-4629.  In total, approximately $135,000 was charged to Pamela Cafritz's credit card from November 7, 2016, the date of her death, to February 8, 2018.  Tr. at 4620.  In addition, disbursements were made from Pamela Cafritz's Key Bank account after she died.  Tr. at 4556-64.  Approximately $320,305 in checks and $736,856 total disbursements were drawn from Cafritz's account, which included payments to Russell.  Tr. at 4582.

17

V.      DOS

In late 2015, Raniere created DOS, a secret organization led by Raniere and comprised of "masters" who recruited and commanded groups of "slaves."  PSR ¶¶ 63-77; Tr. at 1506 (testimony of Lauren Salzman).  Aside from Raniere, all members of DOS were female.  Raniere gave himself the title "Grandmaster."  Id.  Raniere's direct slaves (the "First Line") were Camila, Daniella Padilla, Nicki Clyne, Loreta Garza, Rosa Laura Junco, Monica Duran, Allison Mack, and Lauren Salzman.  Tr. at 1509.  Each of these "first-line slaves" recruited their own "slaves" by approaching young women and falsely describing DOS as a secret women's empowerment group or sorority.  Id.  Raniere instructed the First Line never to disclose his participation in and leadership of DOS.  Prospective "slaves" were required to provide "collateral"—including damaging confessions about themselves and loved ones (truthful or not), rights to financial assets, and sexually explicit photographs and videos—to prevent them from leaving the group or disclosing its existence to others.  Tr. at 1508-09, 1602-05.  Through DOS, Raniere used the First Line to recruit other women to make a "collateralized vow of obedience" to their masters (and, by extension, to Raniere) and then required these "slaves" to perform labor, take nude photographs, and, in some cases, to engage in sex acts with Raniere.  Tr. at 1707, 1750, 2183.

Raniere and other DOS "masters" recruited women as "slaves" into DOS by deliberately concealing Raniere's role in DOS.  PSR ¶¶ 63-64; Tr. at 1509.  Women were recruited into DOS from California, Mexico, Canada and elsewhere, and DOS "masters" used encrypted messaging applications located overseas, including Telegram and Signal, to communicate with their "slaves" and to collect collateral.  Tr. at 1604-05.  After women were recruited into DOS and their collateral was collected, the DOS "slaves" were told that they

18

needed to provide additional collateral each month.  DOS "slaves," including Sylvie, Nicole, and Jay, among others, believed that if they did not obey their "masters," their collateral would be released.  PSR ¶¶ 76-77; see, e.g., Tr. at 213-14.

Raniere and DOS "masters" used a variety of means to coerce their "slaves" into submission.  In accordance with Raniere's instructions, DOS "slaves" were required to be branded with a symbol that, unknown to the "slaves," represented Raniere's own initials.  Tr. at 1621.  DOS "slaves" were also controlled in a number of other ways, including physical isolation (by being required to stay in Clifton Park); forced participation in "readiness" drills; requirements to seek permission from Raniere or their "master" for nearly everything they did; sleep-deprivation and extremely restrictive diets.  PSR ¶¶ 63-75.

At Raniere's instruction, the DOS victim being branded was held down by other DOS "slaves" and was required to state, among other things, "Master, please brand me, it would be an honor."  PSR ¶ 75.  The branding itself was performed without anesthesia and using a cauterizing pen, which burned the skin and left a permanent mark.  Id.  Most of the brandings were performed by Danielle, a DOS "slave" who was also a licensed medical professional.

DOS "masters" also benefitted financially from recruiting and maintaining DOS "slaves."  DOS "slaves" were coerced into providing labor and services for their "masters" under the threat of the release of their collateral, including editing and transcription work, taking naked photographs, and other tasks.  DOS "masters" were expected to receive approximately 40 hours of labor each week from their "slaves."  PSR ¶¶ 63-77; Tr. at 1618-1619 (testimony of Lauren Salzman that Raniere decided that "if we each had six slaves who each had six slaves under them . . . you would have 40 hours,

approximately 36, but approximately 40 hours of work per week for life from these individuals").

> a.   <u>Sylvie</u>

Sylvie had worked for Bronfman for nearly ten years when Monica Duran, a "first-line" master in DOS, approached Sylvie about joining DOS.  PSR ¶¶ 78-81; Tr. at 85 (Sylvie's testimony).  At that time, Sylvie had recently been married to another member of the Nxivm community.  PSR ¶ 78; Tr. at 261.  Both Bronfman and Raniere, at various points, instructed Sylvie not to have sex with her husband for the first two years of their marriage. <u>Id.</u>; Tr. at 447.

Duran approached Sylvie and invited Sylvie to a secret project that Duran said had nothing to do with Nxivm.  PSR ¶ 79; Tr. at 207.  Sylvie was told that, in order to learn more, she had to provide "collateral," which was something capable of destroying her relationships with her family. Tr. at 211, 264.  Sylvie provided a stamped letter addressed to her parents falsely confessing to being a prostitute.  Tr. at 277.  Sylvie also provided a naked photograph of herself as collateral.  <u>Id.</u>  Soon thereafter, Duran gave Sylvie an assignment to "seduce" Raniere.  PSR ¶ 80; Tr. at 219.  Sylvie was assigned to send Raniere naked photographs every day.  Sylvie was not attracted to Raniere and found him "creepy."  Tr. at 118.  Duran later arranged for Sylvie to meet Raniere at a house, where Raniere took Sylvie upstairs, instructed her to undress and lie down on the bed.  Tr. at 250-54.  Raniere then performed unwanted oral sex on Sylvie and took close-up photographs of Sylvie's vagina with Sylvie's phone.  Tr. at 257.  Sylvie felt disgusted by this encounter and acquiesced to it only because she believed her collateral would be released if she did not obey Raniere.  Tr. at 220.

b.   <u>Nicole</u>

Nicole, an actress in her early 30s, was recruited into DOS by Allison Mack in 2016.  PSR ¶¶ 82-84; Tr. at 3845-47 (Nicole's testimony).  At the time, Nicole was living in Brooklyn, New York.  Nicole was told, and believed, that the organization was women-only and had no connection to Nxivm.  After Mack made some suggestions of sufficient collateral, Nicole wrote a series of letters falsely alleging sexual abuse by a family member and other damaging allegations.  Tr. at 3850.  After Mack assured Nicole that the letters would be "locked in a box" where nobody could see them, Nicole provided the letters and a sexually explicit video of herself to Mack.  Tr. at 3853.  Nicole was later required to provide, and did provide, additional collateral on a monthly basis, including credit card authorizations and the right to her grandmother's wedding ring.  Tr. at 4021-22.

Nicole met the other DOS "slaves" under Allison Mack, including India, Michelle, and Danielle.  Tr. at 4011-12.  Throughout Nicole's time in DOS, Mack regularly required her "slaves" to pose for nude photographs, including close-up photographs of their vaginas, either as assignments or collateral.  Tr. at 4016, 4024.  These photographs were sent to Raniere.  Mack also assigned her other slaves—India, Michelle and Danielle—with the task of "seducing" Raniere, all of whom had sexual interactions with Raniere or attempted to do so.

c.   <u>Jay</u>

Jay is an actress and model who began taking Nxivm classes in or about 2016, during which time she became friendly with India, one of Mack's slaves.  PSR ¶¶ 92-96; Tr. at 4318 (Jay's testimony).  In approximately November 2016, India recruited Jay into DOS.  Tr. at 4324.  Jay was told that DOS was a women's-only organization.  <u>Id.</u>

After several months, Mack and India gave Jay a "special assignment" to "seduce" Raniere and have Raniere take a photograph of Jay to prove that she had done it. Tr. at 4416-17.  Mack told Jay, "I give you permission to enjoy it," and Jay understood the assignment as a direction to have sex with Raniere.  Tr. at 4418-20.  Jay asked Mack directly if Raniere was part of DOS, which Mack denied.  Id.  Jay refused to engage in a sex act with Raniere.  Tr. at 4419.  Before leaving DOS in approximately May 2017, Jay captured images of collateral belonging to other DOS "slaves," believing that she could protect the release of her own collateral by having other DOS members' collateral as leverage.  Tr. at 4423-25.

> d.   DOS Aftermath

The existence of DOS became known within the Nxivm community in early June 2017, when the husband of Sarah Edmondson, a DOS "slave," publicly confronted Lauren Salzman about DOS.  Tr. at 1796 (testimony of Lauren Salzman that she told Raniere that Sarah's husband was "really upset").  Immediately after the existence of DOS was publicly disclosed, Raniere directed the First Line of DOS to lie about his involvement in DOS, as well as to compile materials related to DOS and secure them.  PSR ¶ 99; Tr. at 1798-1800 (Salzman testimony).  Raniere also instructed the First Line to collect "positive" testimonials about DOS and to create a DOS website.  Tr. at 1815.

In July and September 2017, Raniere and Bronfman received letters from separate DOS victims requesting the return or destruction of collateral, which included descriptions of their collateral, including nude photographs and videos.  PSR ¶¶ 98-99; Tr. at 1805-14.  The following are excerpts from emails Bronfman received:

> I am requesting the immediate return and/or destruction of the "collateral" I provided to you, as well as the nude photographs and videos of me that were produced within DOS under your

> direction. . . . [M]y participation in DOS, and all material
> provided or created during that time, was based on false
> information you gave me.
>
> If the collateral were to get out it would cause irreparable
> damage to many innocent people.  Additionally, the collateral
> was procured by dishonest means.  As part of the Dos
> enrollment process, I was lied to multiple times including about
> the brand and the member of Dos . . . I would like the return of
> and/or proof of destruction of the following . . .
>
> I don't want to worry about my collateral being exposed and I
> absolutely have that right.  I would like you to destroy and
> delete any and all photos and dropbox collateral you received
> over that year.[10]

Bronfman made no attempt to contact the authors of these letters directly.  Bronfman

retained a private investigator and a public relations firm to rehabilitate DOS's public image

and distance it from Nxivm.

At the same time, Bronfman attempted to have criminal charges instituted

against Sarah Edmondson in Vancouver.  In September 2017, Raniere and Bronfman were

alerted to the fact that The New York Times would shortly be publishing an article about

DOS.  Bronfman and Raniere also drafted intimidating cease-and-desist letters to DOS

"slaves" that Bronfman and Raniere feared would publicly disclose the existence of DOS.

These letters were later sent to several DOS "slaves" by attorneys in Mexico.  PSR ¶ 100.

For instance, on September 13, 2017, Raniere sent Bronfman the following email with the

subject line, "What are your thoughts?":

> Ms. [DOS victim],
>
> I am the chief attorney of a criminal investigation in Mexico of more than 20
> individuals tied together in a cooperative destructive network. These individuals,

---

[10]     These letters were marked (but not admitted) as GX418R and GX428R.

including yourself, have been acting against individuals who participate in the NXIVM corporation community.

You are currently connected to several criminal investigations involving fraud, coercion, extortion, harassment, stalking, theft, larceny, hate crime, criminal conspiracy, breaking and entering, computer crimes, wire fraud, criminal enterprise, and corporate espionage.

I strongly suggest that you cease and desist, undo, reverse, cancel, and retract, participation in all past, present, and future, conversations, conference calls, meetings, news media, social media, blogs, or websites, relating to this subject matter until the criminal matters are resolved. You should do everything in your power to affect this.

Your best course of action to minimize your exposure, in addition to the above, is to repair all damages to parties you have acted against, reconciling with them, and fully cooperating with the criminal investigations. In this regard, I can help you for I represent some of your victims and have access to others.

I know that people in the media (and also bloggers and the like) can be coercive, abusive in their power, and force unwitting, uninformed, participants to complicate situations and potentially even waive rights. You still have the ability to pull away from all participation with these people.

Please contact me as soon as possible,

Exhibit B-001.  Less than thirty minutes later, Bronfman emailed the text of the email to a co-conspirator in Mexico.  Exhibit B-002.  The following day, September 14, 2017, the referenced DOS victim received an email from a Mexican attorney, Ricardo Olmedo of Olmedo Gaxiola & Abogados, with the subject line "CAUSA PENAL EN MEXICO." Attached to the email was a Microsoft Word document containing, nearly word-for-word, the text of the email sent by Raniere to Bronfman.  See Exhibit B-003.  The metadata of the Word document received by the DOS victim reflects that the creator of the document was Bronfman.

On September 18, 2017, Raniere sent Bronfman the following email with the subject line "Draft":

Ms. [DOS victim],

You are the only person receiving this letter. This overture is against my better judgement as I feel there is little probability of success yet more expense, but I am writing you on my clients' behalf.  If you do not respond affirmatively to this letter by 1:00pm September 19th I will need to proceed as previously required.  I will then not contact you informally again.

My clients want to give you this opportunity to cooperate and minimize the impact on your life. The criminal investigations will increase in number, and thoroughness, and will not stop until justice is served. This will not go away.

The group with which you are involved contains individuals who have already served prison time, others who are currently indicted, and some that face extradition proceedings.  The others are under investigation for quite serious crimes.  The form of justice to which they subscribe is trial and conviction by media, personal opinion, and abuse of power.  They appear to have no issue with committing a crime when it suites [sic] them. They use the actions of others to justify this.  Whether the person they target is right or wrong, this method of persecution is very wrongful.  You must separate from them completely to mitigate the effects on yourself.

Please divest yourself from this wrongfulness and this group. Please write to me affirmatively by the above deadline indicating you will cooperate fully. I can also help you with any criminal investigations within the United States.

Sincerely,

Exhibit B-004.  That same day, the DOS victim received an email from Mr. Olmedo Gaxiola attaching a second letter as a document in Microsoft Word, which contained nearly exactly the same text as that sent to Bronfman by Raniere and the metadata of the Word document reflects that the creator of the document was Bronfman.  Exhibit B-005.

Other DOS victims, including Jay, received similar intimidating letters from another attorney, Diego Ruiz Durán of Bufete Ruiz Durán S.C.  On October 11, 2017—six days before The New York Times published its reporting on DOS[11]—Jay received an email

---

[11]    See Barry Meier, Inside a Secretive Group Where Women Are Branded, N.Y. Times (Oct. 17, 2017).

from Mr. Durán.  In the email, Mr. Durán stated that he was taking "the liberty to writing to

you to let you know that the State's Attorney's Office in Mexico, has issued some directives

against you and other individuals."  Exhibit B-006.  Mr. Durán enclosed a letter in Spanish

and a document containing an English translation directing Jay to "[s]top, abstain and refrain

from incurring in any type of intimidation, acts of nuisance or disturbances[.]"  Exhibit B-

009.

       Months later, in December 2017, Bronfman released a public statement

characterizing DOS as a "sorority," stating that it had "truly benefited the lives of its

members, and does so freely.  I find no fault in a group of women (or men for that matter)

freely taking a vow of loyalty and friendship with one another to feel safe while pushing

back against the fears that have stifled their personal and professional growth."  GX 1393R,

Exhibit B-011.  Raniere also issued a public statement denying his association with DOS and

claiming that "experts" had concluded that "members of the sorority . . . haven't been

coerced."  GX 1009.

       After multiple DOS victims spoke publicly about their experiences, Raniere

and Nicki Clyne, a member of the First Line, considered releasing an edited video of Sarah

Edmondson's branding ceremony.  Tr. at 1836.  The branding video depicted Sarah naked

and being branded and stating, as she had been instructed, "Master, please brand me, it

would be an honor."  In May 2019, during the trial against Raniere, this edited video of

Sarah's branding was publicly disseminated and broadcast in Mexican media.  Tr. at 5149.

       Shortly after the media reports were published regarding DOS, Raniere and

Bronfman traveled to Mexico.  As media outlets begun reporting that the United States

Attorney's Office had launched a criminal investigation, Raniere stopped using the phone

number he had previously used for over fifteen years and he and Bronfman began using encrypted email accounts.  Tr. at 1855-56.

In March 2018, Raniere, who was living in Mexico with Bronfman and Marianna, invited members of the First Line to Chacala, Mexico, in order to participate in a "recommitment ceremony."  PSR ¶¶ 102-103.  A sealed arrest warrant was issued for Raniere in February 2018.   Mexican law enforcement apprehended Raniere a month and a half later, at a luxury resort where he was living with a number of first-line DOS "slaves," including Mack and Lauren Salzman.  When Mexican law enforcement arrived at the villa, Raniere hid in a closet.  Id.

After Raniere's arrest, Bronfman funded a legal defense fund to pay for his legal fees, as well as those of witnesses who had received subpoenas.  Bronfman made an initial deposit of approximately $5,000,000 to the fund from which her co-defendants' legal fees were paid.

## APPLICABLE LAW

"[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted); see also United States v. Booker, 125 S. Ct. 738, 743 (2005) (although the Guidelines are advisory, district courts are still "require[d] . . . to consider Guidelines ranges" in determining a sentence).

Significantly, however, the Court "may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented."

Gall, 552 U.S. at 50.  Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

Title 18, United States Code, Section 3661 directs the Court to consider all relevant conduct and information about the defendant when sentencing him or her:  "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."  As a result, "the court is virtually unfettered with respect to the information it may consider."  United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988).

## THE GUIDELINES

The Probation Department calculated Bronfman's Guidelines range to be 24 to 30 months—based on a total offense level of 17 and a criminal history category of I.  PSR ¶ 193.

### Count One: Conspiracy to Conceal and Harbor Illegal Aliens

| | |
|---|---|
| Base Offense Level (§ 2L1.1(a)(3)) | 12 |
| Plus: Offense involves smuggling of at least six unlawful aliens (§ 2L1.1(b)(2)(A)) | +3 |
| Plus: Defendant was organizer, leader, manager or supervisor (§ 3B1.1(c)) | +2 |

|  | Total: | <u>17</u> |
|---|---|---|

Count Two: Fraudulent Use of Identification

|  |  |  |
|---|---|---|
| Base Offense Level (§ 2B1.1(a)(2)) | | 6 |
| Plus: Loss amount exceeds $95,000 (§ 2B1.1(b)(1)(E)) | | +8 |
| Plus: Substantial part of fraudulent scheme committed from outside the United States (§ 2B1.1(b)(10)(B)) | | <u>+2</u> |
| Total: | | <u>16</u> |

Multiple Count Analysis

|  |  |  |
|---|---|---|
| Highest Offense Level | | 17 |
| Plus: Grouping units (§ 3D1.4) | | <u>+2</u> |
| Total: | | 19 |
| Less: Acceptance of Responsibility (§ 3E1.1(a)) | | <u>-2</u> |
| Total: | | <u>17</u> |

The Guidelines calculation in the PSR differs from that in the plea agreement in two respects. First, the Probation Department applied an enhancement for six or more aliens (U.S.S.G. § 2L1.1(b)(2)(A)), which the government did not include in the government's estimate of the applicable Guidelines. Second, the Probation Department applied a two-level enhancement for being an organizer, leader, manager or supervisor in criminal activity. Both of these enhancements are specific to Count One and are addressed below, starting with the applicability of the role enhancement.

I.   Applicability of Guidelines § 3B1.1(c)

Guidelines § 3B1.1(c) provides for a two-level enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than

described in (a) or (b) [of this Section]."  U.S.S.G. § 3B1.1(c).  To qualify for an adjustment

under this section, the defendant "must have been the organizer, leader, manager, or

supervisor of one or more other participants."  U.S.S.G. § 3B1.1(c), Application Note 2; see

also id. (noting that an "upward departure may be warranted, however, in the case of a

defendant who did not organize, lead, manage, or supervise another participant, but who

nevertheless exercised management responsibility over the property, assets, or activities of a

criminal organization").  "Whether a defendant is considered a leader depends upon the

degree of discretion exercised by [her], the nature and degree of [her] participation in

planning or organizing the offense, and the degree of control and authority exercised over the

other members of the conspiracy."  United States v. Brinkworth, 68 F.3d 633, 642 (2d Cir.

1995) (citation omitted).

       The Probation Department found Guidelines § 3B1.1(c) applicable because

Bronfman "used her money, her businesses and her personal connections in order to facilitate

the immigration-related crimes and secure visas" and because she "recruited the aliens, who

were Nxivm workers, and who followed her instructions."  PSR ¶ 110.  The government

agrees with the Probation Department that Bronfman leveraged her wealth and connections

to secure visas, but it does not appear that Bronfman's use of wealth or connections, on their

own, satisfies the requirements set forth in § 3B1.1(c).[12]  In addition, the commentary to

Guidelines § 2L1.2 notes that "the aliens smuggled, transported, or harbored are not

considered participants" within the meaning of § 3B1.1 "unless they actively assisted in the

smuggling, transporting, or harboring of others."  U.S.S.G. § 2L1.2, cmt. n.6.  The

---

[12]     However, as set forth below, the government respectfully submits that this
factor, along with others, warrants a substantial variance.

government agrees with Bronfman's contention that Jane Doe 12 is a victim, not a

participant, in the offense of conviction, and her participation does not support a two-level

role enhancement under § 3B1.1(c).  Def. Mem. at 38.

  II.  <u>Applicability of Guidelines § 2L1.1(b)(2)(A)</u>

    Section 2L1.1(b)(2)(A) provides for a three-level adjustment if the offense

involved the smuggling, transporting, or harboring of six or more aliens.   Title 8, United

States Code, Section 1324 extends to all conduct "tending substantially to facilitate [the]

alien's remaining in the United States illegally," as long as the defendant knows or recklessly

disregards the alien's unlawful status.  <u>United States v. Kim</u>, 193 F.3d 567, 572 (2d Cir.

1999) (quoting <u>United States v. Lopez</u>, 521 F.2d 437, 441 (2d Cir. 1975)).  For instance,

providing unlawful aliens with housing, transportation, and assisting them in obtaining

employment are actions which are meant to "facilitate the continued unlawful presence of the

aliens in the United States, which amounts to harboring."  <u>Id.</u>

    The government did not include this enhancement in the Guidelines estimate

in the plea agreement because it did not, at that time, anticipate being able to establish the

defendant's participation in the smuggling of six or more aliens at a sentencing hearing by a

preponderance of the evidence.  As reflected in the email communications in Exhibit A,

however, the Probation Department is correct and a three-level enhancement for six or more

aliens under this section of the Guidelines is likely appropriate.

            *   *   *

    The government notes, however, that if the Court declines to apply the two-

level role enhancement under § 3B1.1(c) described above, whether or not the three-level

enhancement for six or more aliens is applied will have no impact on the overall Guidelines

calculation because, in either event, the resulting Guidelines range would be 21 to 27 months' imprisonment.  In any event, the government's request for a non-Guidelines sentence is not based on the specific number of aliens involved in the offense.  Rather, as described below, the government seeks an upward variance to address the nature and circumstances of Bronfman's crimes, as well as the extraordinary harm caused to the victims by her conduct, and the unique need for deterrence presented in this case.

FINANCIAL PENALTIES AND RESTITUTION

I.   Forfeiture and Restitution

Pursuant to her plea agreement, Bronfman has agreed to the entry of a forfeiture money judgment in the amount of $6,000,000, which she has paid.  PSR ¶ 204. The parties have also agreed that restitution in the amount of $96,605.25 is owed to Jane Doe 12, representing unpaid income that Jane Doe 12 was promised but did not receive.

Under Section 3663A, a victim is a person "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered, including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  18 U.S.C. § 3663A(a)(2).  The government has received several declarations of loss from individuals who may be seeking restitution in connection with the defendant's conduct.  In order for the parties and the Court to assess these restitution requests, the government respectfully requests that the Court set a date no

later than 90 days after sentencing for a final determination of victim losses for the purposes of restitution.[13]  See 18 U.S.C. § 3664(d)(5).

    II.     Fines

        Title 18, United States Code, Section 3572(a) sets forth the factors to be considered by the Court before imposing a fine, in addition to the factors set forth in Section 3553(a).  Such factors include: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose upon the defendant and any of his or her dependents; (3) any pecuniary loss inflicted upon others as a result of the offenses; (4) whether restitution is ordered; (5) the need to deprive the defendant of illegally obtained gains from the offenses; and (6) the expected costs to the government of any imprisonment. 18 U.S.C. § 3572(a).  The Guidelines provide, in turn, that a district court "shall impose a fine in all cases, except where the defendant establishes that [s]he is unable to pay and is not likely to become able to pay any fine," and employs a similar eight-factor test to determine the amount of any such fine.  U.S.S.G. §§ 5E1.2(a), 5E1.2(d).  The Guidelines further provide that "[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive."  Id.  The defendant bears the burden of demonstrating an inability to pay a fine.  See United States v. Camargo, 393 F. App'x 796, 798 (2d Cir. 2010) (summary order); United States v. Salameh, 261 F.3d 271, 276 (2d Cir. 2001).

---

[13]    However, as restitution may only be ordered for "losses that [were] … directly caused by the conduct composing the offense of conviction," United States v. Silkowski, 32 F.3d 682, 689 (2d Cir. 1994), and then, only for the victim's "actual loss," United States v. Germosen, 139 F.3d 120, 130 (2d Cir. 1998), and in accordance with the terms of the plea agreement, it is not likely that the government will seek additional orders of restitution as to Bronfman.

The PSR states that the statutory maximum fine for Counts One and Two is $250,000 on each count.  See PSR ¶¶ 200-202.  The Guidelines fine range for the offenses of conviction is $10,000 to $95,000.  Id.  It is not in dispute that Bronfman, with a net worth of over $210 million, has the ability to pay a fine.  The government respectfully requests that Bronfman be ordered to pay a fine in the amount of $500,000, the statutory maximum.  For the reasons detailed herein, there is a strong need for a substantial financial penalty in light of the seriousness of Bronfman's crimes and the need for deterrence.

## ARGUMENT

The conduct underlying Bronfman's convictions warrants a significant upward variance.  For years, Bronfman leveraged her colossal wealth to recruit individuals, often women with no legal status in the United States, into Nxivm-affiliated organizations.  Although she claimed to award "scholarships" or present employment letters with the prevailing wage of a professional position, Bronfman had no intention of providing her victims with a living wage.  Instead, she secured a work-force of individuals desperate to earn a living and dependent on her and on Nxivm and Raniere for their continued legal status in the United States.

Through her unwavering support of Raniere, financial and otherwise, Bronfman enabled him to perpetrate his crimes.  She paid for scores of lawyers and private investigators to pursue individuals she perceived to be critics of Raniere and to attempt to intimidate Raniere's victims into silence.  After Raniere was arrested on sex trafficking charges, Bronfman funded a criminal defense fund that paid for his legal fees and the fees of individuals subpoenaed by the government to appear before the grand jury.  Bronfman remains loyal to and supports Raniere to this day.

Unlike most plea agreements into which the government enters, the agreement the government negotiated with Bronfman in this case expressly allows it to recommend any sentence to the Court.  See Plea Agreement at ¶ 2 ("The parties agree that either party may seek a sentence outside of the Guidelines range, suggest that the Probation Office consider a sentence outside of the Guidelines range, and suggest that the Court consider a sentence outside of the Guidelines range, based upon the factors to be considered in imposing a sentence pursuant to 18 U.S.C. § 3553(a).").  The plea agreement reflects the government's belief that the Guidelines dramatically understate the seriousness of Bronfman's criminal conduct and the unique need for deterrence presented in this case.

The government respectfully submits that the nature and circumstances of the offense, the history and characteristics of the defendant, as well as the need for deterrence, all weigh in favor of a significant variance and a term of incarceration of 60 months.

I.    The Court Should Reject Any Suggestion that Bronfman Relied on the Advice of Counsel, or, In the Alternative, Require Bronfman to Disclose the Contents of Those Communications

Bronfman's sentencing memorandum is replete with suggestions that Bronfman relied on the advice of counsel or other retained professionals in taking certain actions.  See, e.g., Def. Mem at 22 ("Clare immediately contacted NXIVM's counsel and asked for assistance in how to proceed . . . . on recommendation by counsel, Clare proceeded to pursue criminal sanctions on the computer break in and was assured that there was no need for concern regarding DOS"); Def. Mem. at 23 ("Clare, together with other leaders of the NXIVM Company in Mexico sought legal counsel to help stop what they were told was criminal behavior based on Mexican law."); Def. Mem. at 33 ("Clare always worked under the advice of counsel and pursued legitimate visas for those who she helped."); Def. Mem at

35

40 ("Clare asked a long-term attorney what should happen, and he advised that they should

no longer use Cafritz's signature stamp . . ."); Def. Mem at 68 ("It is important to note that

when Clare was managing the litigation [on behalf of Nxivm], she hired and worked with

reputable and cost-effective attorneys."); see also Def. Mem. at 19 ("For example, she hired

third-party accountants to audit the company's bookkeeping procedures and hired lawyers

with substantial expertise to advise and direct her with different protocols."); Def. Mem. at

21 ("Her finances only supported legitimate business activities, such as loaning the company

money for civil litigation to protect NXIVM's intellectual property under the guidance of

experienced and well-respected lawyers, for filing and maintaining patents, and ensuring

payment to contractors on the few occasions the company's cashflow was depleted.")

      The Court should reject outright any suggestion whatsoever that Bronfman

reasonably relied on the advice of counsel, or, in the alternative, should require Bronfman to

disclose the substance of those communications to the government.  As the Court is aware,

the government has repeatedly sought to gain access to communications between Bronfman

and certain attorneys which, in the government's view, were not protected by any valid

attorney-client privilege—efforts which were opposed and litigated by Bronfman.  See, e.g.,

ECF Docket Entry No. 256 (relating to, among other things, communications between

Bronfman and employees of the Consulting Company, as well as Bronfman and Jonathan

Ware, Esq.), 291, 361, 552.

      Bronfman cannot now attempt to defend her actions based on her reliance on

the advice of counsel.  It is well-settled that when a defendant asserts a defense based on her

reliance on the advice of counsel, she waives any attorney-client privilege over her

communications with the counsel in question.  See, e.g., United States v. Bilzerian, 926 F.2d

1285, 1292 (2d Cir. 1991) ("[T]he attorney-client privilege cannot at once be used as a shield and a sword. A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes." (citations omitted)); United States v. White, 887 F.2d 267, 270 (D.C. Cir. 1989) ("[r]eliance on advice-of-counsel is an affirmative defense that "waive[s] the [attorney- client] privilege"). Accordingly, when a defendant decides to raise a defense based on advice of counsel, "any communications or evidence [she] intend[s] to use to establish the defense are subject to disclosure" and "even otherwise-privileged communications that [he] do[es] not intend to use at trial, but that are relevant to proving or undermining the advice-of-counsel defense, are subject to disclosure." United States v. Crowder, 325 F. Supp. 3d 131, 138 (D.D.C. 2018) (emphasis in original) (collecting cases).

        To the extent that Clare Bronfman is seeking to assert a good-faith reliance on the advice of counsel or other professionals hired by counsel, as is suggested throughout her sentencing memorandum, the government respectfully submits that she has waived any attorney-client privilege with respect to those communications. The government fully expects that Bronfman will object to disclosure of her communications with the attorneys in question—to include, among others, Jonathan Ware, Esq., attorneys with O'Connell and Aronowitz, Reevin Pearl, Esq., John Sandweg, Esq., Ricardo Olmedo of Olmedo Gaxiola &

Abogados, and Diego Ruiz Durán of Bufete Ruiz Durán S.C.[14]  Therefore, the government respectfully requests that the Court wholly disregard any and all suggestion in Bronfman's sentencing memorandum, or any argument made on her behalf at sentencing, that Bronfman relied in good faith on the advice of counsel or any other professional hired by counsel.

II.     The History and Characteristics of the Defendant, the Nature and Circumstances of the Offenses, and the Need to Provide Just Punishment All Support a Lengthy Sentence

Bronfman asks this Court to "deeply examine" why she did what she did and "what motivated her actions, and perhaps even more importantly, what she actually did[.]" Def Mem. at 7.  The government agrees that the history and characteristics of the defendant and the nature and circumstances of the offenses are significant considerations in determining an appropriate sentence that will provide just punishment for Bronfman's crimes.  18 U.S.C. § 3553(a)(1), (a)(2)(A).  The government respectfully submits that an examination of these factors weigh in favor of a significant incarceratory sentence.

a.     Alien Smuggling

By promising to pay a salary in order to secure a visa and then refusing to pay it, Bronfman did more than defraud the United States.  Bronfman put her victims, including Jane Doe 12, in the impossible and desperate position of having to "pay back" a visa by

---

[14]     An advice-of-counsel defense requires that the defendant prove that she (1) made disclosure to counsel, (2) sought advice as to the legality of the specific conduct, (3) received advice the conduct was legal, and (4) relied on that advice.  See SEC v. Tourre, 950 F. Supp. 2d 666, 683 (S.D.N.Y. 2013) (citing Markowski v. SEC, 34 F.3d 99, 104-05 (2d. Cir. 1994)); see also SEC v. Wyly, 950 F. Supp. 2d 547, 565-66 (S.D.N.Y. 2013).  Thus, a defendant must show that she "(1) honestly and in good faith sought the advice of counsel; (2) fully and honestly laid all the facts before his counsel; and (3) in good faith and honestly followed counsel's advice, believing it to be correct and intending that h[er] acts be lawful." United States v. Colasuomo, 697 F.3d 164, 181 (2d Cir. 2012) (quotation marks omitted).

attempting to take on additional work, often menial and uncompensated.  Bronfman's

sentencing memorandum attempts to minimize and reframe this conduct: "While Jane Doe

12's victim statement suggests that Jane Doe 12 was not happy and felt as though she was

being overworked and wanted to leave, [Bronfman's] experience of her and the emails

between them painted a different picture."  Def. Mem. at 39.

 But in fact, the emails exchanged between Jane Doe 12 and Bronfman only

reflect Jane Doe 12's increasing desperation at her financial situation.  In one email sent to

another Exo/Eso development team member, Bronfman wrote, "We have not actually come

to an agreement for [Jane Doe 12's] visa, she was supposed to send me a proposal of how

she would grow through certain issues and her commitment to it – I have yet to see it…..she

has sent me the business proposal, but I can not accept without the other part…I will address

with her, but I think she should write a request to have this scholarship, and what she is

committed to in return for the investment."  Exhibit A1-014.  On June 13, 2016, Bronfman

denied the issuance of a commission check for Jane Doe 12.  Jane Doe 12 then sent an email

to Bronfman, which included the following:

> Paying you back is my priority and always has been, I have been struggling to
> make my living here, now I work for 2 people in the community and that is
> giving me a little more freedom to start supporting myself, but definitely I
> wouldn´t be able to find the way without your support.
>
> I am a hard worker and I come from a family where we work hard to be better
> every day, I understand the value of effort and my dad showed me loyalty,
> loyalty to myself and others. So I will work very hard to pay you back every
> single penny and also more with my loyalty to you.

Exhibit A1-018.  The following day, Jane Doe 12 emailed a "payment plan" to Bronfman.

Bronfman responded:  "There is one fundamental question yet to be answered; what are you

going to do to earn having your visa? This needs to be figured out or technically you can not

stay here."  Exhibit A1-020.  In February 2018, Jane Doe 12 asked Bronfman to approve a

commission check for $185.83 from Exo/Eso.  Bronfman responded that Jane Doe 12 needed

to submit a payment "proposal" to Danielle Roberts in order for Exo/Eso to pay her.  See

Exhibit A1-026.  For several days, Jane Doe 12 sent emails to Bronfman pleading that Jane

Doe 12 desperately needed the payment of commissions she had earned through Exo/Eso and

that it was an "emergency."   Bronfman did not respond to these emails.  Later that month,

Jane Doe 12 sent another email to Bronfman, noting that she had "submitted her proposal

and did everything that is on my side."  She told Bronfman that her "health [was] not well

and I need to see a doctor, so this money is very urgent for me."  Exhibit A1-029.

Bronfman responded, "Hola [Jane Doe 12,] Until you have a visa you can not work. I am

happy to loan you $200 . . .!"  Exhibit A1-029.

       Other emails exchanged between Bronfman and individuals she sponsored for

visas reflect an astonishing lack of empathy for the financial struggles of others.  Bronfman

required ███, the individual from South Africa whom Bronfman purported to award a

"scholarship award" from ESF that recognized "promising young people, who have

distinguished themselves in business and personal excellence," to work as a personal

assistant for Bronfman, caring for Bronfman's dogs and cleaning her house.  For instance,

Bronfman sent ███ emails instructing ███ to purchase oatmeal for her dogs; to follow up

on the purchase of a bed Bronfman had ordered; and to shred documents for one of her

companies.  See, e.g., Exhibit A4-006 (detailing oatmeal dog food recipe); Exhibit A4-007

("please can you call the following people to determine when my bed will arrive?"); Exhibit

A4-013 ("I would prefer to hire ███ 2 or 3 times per week to take [documents for

shredding] somewhere and shred it.")  When ███ asked another individual for help,

Bronfman told the individual that "███ is going to need you and I to be firm on her – she overwhelms herself every time she starts school…she just needs a little data again and a little tender loving firmness!!!"  Exhibit A4-010.

On October 21, 2016, Bronfman sent an email to ███ asking whether the condition of [a residence] was "nice enough to rent" and asking for a response regarding "the current state of it regarding functioning, mold and cleanliness."  Exhibit A4-012.  ███ responded:

> Clare, can I please clean at ushers and get it ready for guests like I've done before?  I can do it tomorrow and Sunday. . . . I'd like to be responsible for it please, I am still struggling a lot but I'm also really trying hard to do good work and I really need extra cash.  I will help [] create cleaning service website and get business cards . . . and hand them out.

Bronfman responded: "I don't think we should be doing business cards[.]"  Id.

Similarly, ███, the Canadian citizen Bronfman had sponsored for a TN visa at Exo/Eso at a salary of $3,600 per month, wrote emails to Bronfman explaining her financial predicament.  ███ wrote that she "had no other means of income other than exoeso" and did not have a "safety net since her family" thought she was in the United States "on a working visa with guaranteed income."  Exhibit A2-007.  After ███ ultimately made the decision to leave the United States and return to Canada, Bronfman disparaged her decision and told her she needed to "tie up all loose ends," including "the impact of the cost of your visa on the company[.]"  Exhibit A2-011.  ███ responded, "Visa – how do I find the cost of this?"  In a July 4, 2015 email, Bronfman responded:

> The commitment to the track was for the whole track, we would all do it together, your mentors with you and you with your mentors and we as a group in solidarity. It seems as though commitments are light for you - it may be good to contemplate the meaning of a commitment.

41

What does it mean to commit to fellow humans?

For the Ethicist - the total cost is $10K - but there will be interest on a payment plan - you will need to go above and beyond as the offer for the payment plan, has been in place and off the table for a while!

Exhibit A2-015.

The impact statements submitted for the Court's consideration at Bronfman's sentencing make clear that Bronfman's conduct had severe and devastating effects on her victims.  Jane Doe 12 describes her extreme stress about her financial situation and her frustration with not being paid the income that she had been promised.  The statement ██ submitted explains that ██ had to "beg" Bronfman to pay her tuition every semester and that Bronfman used ██'s financial dependency to "coerce [her] to become an active ESP Nxivm member and recruit my friends and professors from college." ██ writes that when she complained that her "unpaid tasks" were time-consuming, Bronfman told ██ that her tuition was an "unearned resource" for her.

Other victim impact statements from individuals who worked for Bronfman, which will be provided in full to the Court, reflect similar levels of financial coercion:

> "Another element that was very stressful for me during this time was my financial situation.  I came to Albany with very little money and limited credit. When this ran out, I was dependent on exchange work from Clare, personal loans from Clare, and personal loans from Keith. . . . On the rare occasion that I was paid, it was minimal, especially in comparison to the number of hours we worked, and that money went to pay my debts."

> "They paid me just enough to have food.  I had to work any side job I could find within the community just to survive.  I was also told that as long as I was working with Keith I needed to take the highest levels of NXIVM curriculum. Programs that costs tens of thousands of dollars that I couldn't afford.  So, I was given administration jobs to do for the companies, in exchange for which they would permit me to take this

> curriculum. . . . Because of the power and control of the higher
> ranks, when I fled I was terrified they would come after me.
> And in fact they tried. . . . . Early on, [Bronfman] was pushing
> me to return, claiming I owed her money (which was not true),
> and telling me I could not get any work . . . as a yoga or fitness
> instructor because I was obligated to Keith, NXIVM and
> exoeso. She even tried calling my family, more than once, just
> to try to track me down."

In keeping these individuals dependent on her and on Raniere for income and legal status in the United States, Bronfman provided Raniere and Nxivm with a labor force to be exploited. In November 2015, for instance, Bronfman wrote an email to Jane Doe 12 stating that she knew "Keith wanted to speak to [Jane Doe 12] and I was hoping that would happen sooner rather than later as that would impact the work agreement," adding, "Let me talk with him a little." Exhibit A1-010. Many of the individuals Bronfman attempted to assist in obtaining legal status were subsequently recruited into DOS. Although Bronfman may have been unaware that they were recruited into DOS at that time, she was of course aware of their significant financial dependency on her, as well as their isolation from family, friends and native country—all factors which made these individuals particularly vulnerable to Raniere's predation.[15]

### b. Use of Pam Cafritz's Credit Card

In her sentencing memorandum, Bronfman attempts to downplay virtually every aspect of her fraudulent use of Pamela Cafritz's identity in connection with attempted tax evasion. Bronfman claims that she "knew that Keith had inherited all of Pam's money so

---

[15]   Bronfman's July 4, 2015 email to ███████ echoes Raniere's statements about DOS. Compare Exhibit A2-015 ("It seems as though commitments are light for you - it may be good to contemplate the meaning of a commitment. What does it mean to commit to fellow humans?") with DOS book, GX1404 ("Lesson 16 – Nature of commitment, nature of the vow).

she did not think there was anything wrong with this arrangement at the time" and "there was

no direct loss to Cafritz or her estate, since she left the entirety of her estate to Raniere

anyway."[16]  Def Mem. at 41.  Bronfman ignores that the fraudulent use of Pamela Cafritz's

identity was part of a long-running scheme to intentionally keep money out of Raniere's

name, thereby evading income tax requirements and making it difficult or impossible for

creditors or the government to levy on those funds.  See, e.g., Tr. at 608 (testimony of Mark

Vicente about Raniere's preference that his companies be "bankruptcy remote"); Tr. at 1449-

54 (testimony of Investigator Fontanelli regarding cash seized from Nancy Salzman's

residence); see also Vanessa Grigoriadis, The "Sex Cult" That Preached Empowerment, New

York Times Magazine, May 30, 2018 (statements by Raniere that he "live[s] under the

poverty level," that his clothes "usually appeared" without his paying for them).

By participating in a scheme to keep wealth out of Raniere's name—even

though he had access to and control of the funds—Bronfman enabled Raniere to evade

income tax requirements but also any responsibility for judgments or to creditors.  These

actions had real consequences.  For instance, on December 13, 2016, after Raniere sued

Microsoft Corporation and AT&T for patent infringement, the United States District Court

for the Northern District of Texas ordered Raniere to pay defendants' attorneys' fees and

costs in an amount over $400,000.  See Raniere v. Microsoft et al., 15-CV-0540(M)

---

[16]      Significantly, Cafritz did not leave the entirety of her estate to Raniere
unencumbered.  If she had, the government would have sought to restrain his assets in
anticipation of restitution orders at sentencing in this case.  Rather, Raniere was
previously the executor of Cafritz's estate but renounced his appointment on
December 20, 2017, and it appears that no distributions to him have been made by the
estate.  If Raniere were to disclaim interest in the estate, the funds in the estate would
revert to Marianna, thereby frustrating the government's ability to secure millions of
dollars in funds for restitution for Raniere's victims.

(N.D.T.X. 2016), ECF Docket No. 181.  The district court found that Raniere had "acted in bad faith and vexatiously multiplied the proceeding and that his conduct was sufficiently egregious to justify the imposition of sanctions under the Court's inherent powers."[17]  One week later, Raniere signed and filed a declaration under penalty of perjury in the Northern District of Texas district court that he did "not have access to monies of over $400,000" and was therefore "unable to comply with the Court's order."  GX762.  At the same time that Raniere filed this declaration, however, Raniere was charging thousands of dollars to Cafritz's credit card with Bronfman's assistance.  GX727.  Bronfman's facilitation of this scheme demonstrates disrespect for the law and an extraordinary willingness to shield Raniere from the consequences of his behavior.

c.    <u>Harassment and Intimidation of Raniere's Critics and Victims</u>

For years, Bronfman used attorneys, public relations firms, and consultants to shield Raniere's crimes and to pursue individuals perceived to be Raniere's critics or detractors.  The targets of these efforts included reporters; vocal critics of Nxivm or Raniere, including Rick Ross and Raniere's ex-girlfriends; former Nxivm members; former Nxivm

---

[17]    The Federal Circuit affirmed the district court's decision in 2018.  <u>See</u> <u>Raniere v. Microsoft Corp.</u>, 887 F.3d 1298, 1301 (Fed. Cir. 2018).  In an opinion, the Federal Circuit found that the district court had acted within its discretion after finding that Raniere's testimony at a hearing had been "wholly incredible and untruthful," that the case was exceptional because of the "unreasonable manner in which it had been litigated," that Raniere had submitted a document containing knowingly false representations constituting an "abuse of the judicial process" warranting sanctions."  <u>Id.</u>

The government notes that this lawsuit, which spanned three years even though it was ultimately dismissed for lack of standing, appears to be an example of the "civil litigation" funded by Bronfman, described in Bronfman's sentencing memorandum as justified "to protect NXIVM's intellectual property under the guidance of experienced and well-respected lawyers[.]"  Def Mem. at 22.

45

attorneys; and even federal judges overseeing litigation involving Raniere and Nxivm. See, e.g., Tr. at 4728-29 (testimony of Rick Ross); id. at 4999 (testimony of Special Agent Weniger).  After the existence of DOS became known within the Nxivm community, Bronfman quickly and aggressively took action to attempt to dredge up damaging information about Raniere's accusers and discredit them.  Bronfman sent these sex trafficking victims threatening letters and attempted to have criminal charges filed against them—a pattern of behavior she had previously engaged in.  The government agrees with the Probation Department that Bronfman's obstructive conduct is an aggravating factor that the Court should consider seriously and, in the government's view, warrants a significant upward variance.

In her sentencing memorandum, Bronfman claims that she did not know the "details relating to DOS" until after Raniere's arrest and trial and characterizes her participation in protecting DOS as "unproven and untrue innuendo."  Def. Mem. at 3-4.  But these are the facts:

- In June 2017, Anthony ("Nippy") Ames, the husband of DOS victim Sarah Edmondson, publicly confronted Lauren Salzman and other Nxivm members about the existence of DOS.  Immediately, many Nxivm members began to express concerns and leave the community.  See, e.g., Tr. at 1796 (testimony of Lauren Salzman).

- In July and September 2017, Bronfman received approximately five emails from DOS victims requesting the return or destruction of their collateral.  The letters specifically identified the collateral, some of which was sexually explicit in nature (e.g. sexually explicit photographs, videos of women undergoing branding, videos of being paddled).  The DOS victims who wrote the letters were unequivocal that they had been lied to and manipulated into providing the collateral and participating in DOS.  Many of the authors of the emails were longtime Nxivm members known to Bronfman.  Bronfman did not respond to these emails or take any steps to identify, return or destroy collateral.

- In July 2017, Bronfman contacted the New York City Police Department ("NYPD") and the Vancouver Police Department in an effort to have criminal charges instituted against Sarah Edmondson.

- In September 2017, after Bronfman and Raniere learned that the New York Times would be publishing an article about DOS, they drafted threatening letters which were then sent, verbatim, to DOS victims by attorneys in Mexico that Bronfman had retained.  The letters warned the DOS victims, among other things, that they were "connected" to "criminal investigations involving fraud, coercion, extortion, harassment, stalking theft of trade secrets . . . criminal conspiracy, computer crimes and corporate espionage" and that their "best course of action" was to "repair all damages to parties you have acted against, reconciling with them."

- Bronfman hired a psychologist, private investigators, and a public relations firm in an effort to rehabilitate the public image of DOS.  Bronfman made no attempt to contact or interview any of the DOS victims who had spoken about their abuse, nor did she ask Lauren Salzman anything about DOS, despite knowing her to be involved.[18]

- In December 2017, Bronfman released a public statement characterizing DOS as a sorority that had "truly benefited the lives of its members."

- By December 2017, Bronfman stopped using Gmail and began using an end-to-end encrypted email account under an anonymous username ("thevalley") and Telegram to communicate about DOS.

---

[18]     Bronfman claims she "hired a well-known and reputable forensic psychologist [Park Dietz] to interview various members of DOS and Nxivm" who did not find "any conclusion suggesting any wrongdoing by anyone."  Def. Mem. at 67.  The Court should reject any attempt by Bronfman to claim that she reasonably relied on the findings by Park Dietz, whose communications with Bronfman have been withheld from the government on grounds of privilege.  Members of DOS who were interviewed by Dietz have acknowledged they were wholly untruthful and gave at times contradictory accounts of DOS.  See, e.g., Tr. at 1850 (testimony of Lauren Salzman describing that Allison Mack, while speaking to a reporter in a moment of impulse, "took credit for coming up with the idea of the brand and then was like, I don't know why I did that").  Although Dietz initially told one interviewed DOS victim (India) that the information shared during their session was confidential, India was directed to sign a form releasing her complete health record to Nxivm and Crockett & Associates for their exclusive use.  The government respectfully submits that the Court should reject any suggestion that Bronfman at any time engaged in a legitimate attempt to investigate DOS or to determine whether there was merit to the claims of Raniere's abusers. The evidence suggests that Bronfman had no interest in actually determining the truth about DOS, but was simply attempting to quell media and public scrutiny of Raniere and DOS.

At no time—not once in the two years after the "details about DOS" were made public in the press, during the course of a well-publicized criminal trial, after the guilty pleas of her co-defendants who were First Line members of DOS and after conviction at trial of Keith Raniere—has Bronfman wavered in her support and loyalty to Raniere.[19]

Bronfman claims that to hold her responsible for these actions would be asking her to "take the fall for facts beyond her involvement."  Def. Mem. at 5.  Not so.  Bronfman's actions in threatening witnesses and shielding the activities of a repeat abuser are, in the government's view, highly relevant conduct for this Court to take into consideration at sentencing.

The Court should reject the feeble excuses offered for this conduct in Bronfman's sentencing memorandum.  Bronfman claims, for example, that she penned threatening letters to DOS victims because she "sought legal counsel to help stop what [she was] told was criminal behavior based in Mexican law" and "aggressively tried to stop the damage."  Def. Mem. at 23.  This explanation is nonsensical and belied by the actual email communications.  It was Bronfman and Raniere, not their attorneys, who drafted these letters in their entirety.  The recipients of these letters had no involvement whatsoever in Nxivm Mexico or any purported "criminal behavior based on Mexican law."  Bronfman used Mexico-based attorneys to send these letters not because there was any legitimate nexus to Nxivm Mexico, but because, presumably, few United States-based attorneys would have agreed to sign or send such letters.

---

[19]     As Lauren Salzman testified at trial, Clare Bronfman was "incredibly loyal, incredibly dedicated" to Raniere and told Raniere that "she didn't want to know anything [about DOS] that she didn't need to know."  Tr. at 1863-64.

The only reason for Bronfman and Raniere to send these letters to sex trafficking victims was to attempt to threaten and intimidate them, efforts which succeeded. As recounted in her victim impact statement, the DOS victim who received the letters contained in Exhibit B-003 and B-005 had left "DOS and Nxivm quietly, wanting very much to just be alone.  I was frightened, I was confused, and I was in shock from my experiences." She writes:

> In September 2017, I received two letters from a law firm in Mexico.  These letters were ominous and intimidating, and threatened me with serious legal consequences, including criminal prosecution, if I did not remain silent and if I did not break off contact with others who had left DOS and NXIVM, several of whom were speaking out publicly and attempting to complain to various authorities about DOS and NXIVM.
>
> Receiving these letters shook me to my core. . . . . It had been more than a year since I left DOS and NXIVM, and I felt violated once again, wondering if they would ever just let me go and allow me to move on with my life.  If Clare never had anything to do with DOS, and if DOS had nothing to do with NXIVM, why did she deploy such an underhanded intimidation tactic to scare me into remaining silent?  When I was at my most vulnerable, Clare Bronfman traumatized me.  I would like her to accept responsibility and show some kind of remorse for her actions.  If she is capable of doing so.

Jay, who also received such a letter, writes that "[w]ords cannot describe" the traumatizing experience of receiving a "threatening letter from a lawyer in Mexico that basically warned me that I better keep my mouth shut about DOS or I would suffer consequences." These impact statements, along with many others which will be provided to the Court, are alike in their expression of hurt and frustration as to Bronfman's lack of acceptance of responsibility and remorse.

Bronfman's explanation of her attempts to bring criminal charges against Sarah Edmondson also has no basis in fact.  Only a month after Sarah Edmondson spoke up about DOS, Clare Bronfman contacted the NYPD and the Vancouver Police Department in an effort to initiate a criminal investigation into Edmondson.  Bronfman told investigators with the Vancouver Police Department that Edmondson had "hacked" Nxivm's servers and deleted client files.[20]  Bronfman provided the Vancouver Police Department with a list of individuals who she claimed had been victimized by the "hacking" of Nxivm's server by Edmondson.  Investigators with the Vancouver Police Department contacted a number of the individuals on the list, who told investigators that they had voluntarily left Nxivm.  The contacted individuals expressed concern over Nxivm's methods of operation and expressed relief they were no longer associated with the company.  The Vancouver Police Department declined to investigate further and closed the file.

Both Sarah Edmondson and Anthony Ames have submitted victim impact statements addressing Bronfman's actions.  Edmondson writes that Bronfman's willingness to travel to Vancouver in an attempt to "get [her] arrested" was "beyond terrifying" and that Edmondson will "always look over [her] shoulder—even if [Bronfman] is behind bars—her money can buy anything and I believe she is vengeful enough to hurt anyone who stands in her way."

In her sentencing memorandum, Bronfman suggests that her actions in attempting to bring criminal charges against Sarah Edmondson only reflected her ignorance about DOS.  See Def. Mem. at 22-23 ("Why would someone who was aware of ongoing,

---

[20]    Bronfman's sentencing memorandum states that Edmondson "admitted" that she had "hack[ed] a computer," Def. Mem. at 67, which has no basis in fact.

serious illegal activity seek to bring law enforcement into that organization?").  But, as described further below, Bronfman has long sought to use the threat of criminal charges to instill fear in those she perceived to be hostile to Raniere.  Bronfman approached law enforcement in an effort to get criminal charges instituted against a DOS victim because she believed it would help Raniere and because she believed she could.

As reflected in trial testimony and in the email communications appended to this memorandum as Exhibit C, for decades, Bronfman sought to leverage her wealth and connections in an attempt to intimidate individuals perceived to be hostile to Nxivm or Raniere.  As Stephen Herbits described, Bronfman attempted to have him contact the Attorneys General for New York and New Jersey to convey what he called an "inappropriate and frankly preposterous request."  He testified that Bronfman was "upset that [two prosecutors in Albany] would not prosecute the people who they were targeting."  Tr. at 1332.

In 2008, Bronfman emailed Herbits about attempting to bring criminal indictments against Rick Ross, a cult deprogrammer and longtime critic of Raniere's.  She wrote:

> Steve,
> If you really want to help us; we need the following;
> Regarding the Ross case – The "Ross camp" needs to be fearful, back down and look to fix the[] damage they have done; the thought of criminal charges may help inspire this.  Ross's attorneys are well funded.  Where ever that is coming from – be it Mars – it needs to stop. I know you are incredibly resourceful and have the intelligence to figure this out.  I don't need to know who is funding them, how you stop that from continuing, in fact I don't want to know – it just needs to be done, and quickly.

GX1494R, Exhibit C-004.  Herbits responded that he had nothing to add on a memo he had written on "trying to intimidate Ross through indictments."  Id.  Bronfman responded that she had mentioned "the indictment thing because I have been told by numerous officials Ross is very indictable, but white[] collar crimes often need political clout."  Exhibit C-005; see also Exhibit C-001 (Bronfman to Herbits: "I also believe you can rapidly facilitate the proper indictment and conviction of Rick Ross and Joseph O'Hara.").

Bronfman's attempts to investigate and intimidate perceived critics of Nxivm were obsessive.  In 2007, she sent an email to Raniere with the subject line "For Reevin," that is, Reevin Pearl, the attorney intermediary between Nxivm and Canaprobe, the firm hired to investigate perceived enemies of Nxivm and Raniere.  Exhibit C-009.   The attached list contained the names of members of the press that had published unfavorable articles regarding Nxivm (e.g., Michael Freedman of Forbes, Chet Hardin of Metroland, Dennis Yusko and Rex Smith of the Albany Times Union); the Albany District Attorney and lobbyists (e.g., Davis Soares and Roger Stone); and individuals who had been linked to criticism of Raniere and Nxivm, (e.g., Rick Ross, Kristin Snyder, Carlos Rueda).[21]  Exhibit C-010.

In 2015, Bronfman sent an email to another individual based in Mexico with URL website links to the Wikipedia pages for the United States Attorney General, the United States Attorney for the Southern and Northern Districts of New York, with the text, "I believe with the right connections we can create jurisdiction and make things happen – our

---

[21]     Negative press articles in 2003 and 2004 had referenced Carlos Rueda, a psychiatrist, and the death of Kristin Snyder, a young woman who had died after taking Executive Success Programs classes.

case [a]ffects so many people from all over the world, it is not hard to find jurisdiction IF they are not trying to use it as an excuse to not prosecute."  Exhibit C-011.  Bronfman added:

> Also, there are politicians who put them into power, who if they tell them jump, they say "how high" so there are options…like Senators…

> Also good to know our opposition is Steve Herbits who is VERY close to Clinton, D'Amato and the Jewish mafia – his power (which predominantly was acquired from my father) is not to be taken for granted…this is why we are w[h]ere we are – he and his connections are Goliath.

Exhibit C-011.[22]  Two years later, in 2017, Bronfman sent emails to Ricardo Olmedo of Olmedo Gaxiola & Abogados (the same lawyer who later sent threatening letters to DOS victims) with photographs of Barbara Bouchey, Kristin Keeffe, and Toni Natalie—all former partners of Raniere who became vocal critics.  The emails contained text such as, "This is what she looked like about 8 months ago" and "This is from a few years ago – her hair is naturally very dark."

In light of this behavior, Bronfman's claim to this Court that she "wrote checks to Nxivm" but that those "checks were never written with the knowing intent of harming another living soul," Def. Mem. at 3, strains credulity.  Dozens of individuals who were forced to litigate frivolous lawsuits, criminal charges or threatened criminal charges have written impact statements expressing the serious harm that Bronfman's actions caused. A few of these statements are excerpted here:

---

[22]    Although Bronfman's relationship with her father is not, in itself, a relevant consideration for the Court at sentencing, the government notes that this email—written years after Clare Bronfman's father died—stands in contrast to the claim in Bronfman's sentencing memorandum that Bronfman had reconciled with her father prior to his death and had "deep regret" for their "prior estrangement."  Def. Mem. at 13.

| James Loperfido: | I will never forget the feeling of being defenseless against these people with deep pockets and a relentless, paranoid desire to destroy perceived enemies. . . . . I was sure NXIVM/Bronfman [s]isters were out to get me and possibly a matter of time before trumped up charges would be filed against me soon. |
|---|---|
| India: | Keith and Clare put a lot of pressure on me to sue my mother because she was publicly speaking out about NXIVM and they wanted to silence her. . . . [T]hey put a lot of pressure on me to try and silence and discredit her. |
| Sutton family[23]: | A couple things should be emphasized. First, none of this was possible for Keith, Nancy and NXIVM without the support and money of Clare Bronfman  It is not possible to overstate her responsibility for the affronts committed against us. Ms. Bronfman was devious and diabolical. She was the very fuel that powered the NXIVM engine of vengeance and cruelty. |
| | Second, yes, we and our family were indeed victimized by these dastardly people; but, we fought them at every turn. Our father Morris was a man of some means and imbued with deep principles and courage. He never buckled under to Keith, Nancy and Clare; hence, the long-running battle.  Indeed, we admire the strength shown by my parents in refusing to cave in to NXIVM. And we love them both for their sense of purpose and deep convictions. That said, we buried both of them during the litigation with NXIVM and deeply regret that their last years were tainted with the fight with NXIVM and the attendant damage the litigation did to our family. They were loving and compassionate people and did not deserve to spend so much of their final years embroiled in this nightmare. |
| Toni Natalie: | I lost my home, and my mother lost her home, because of how Keith Raniere, Nancy Salzman, Clare Bronfman and others persecuted me. . . . They hired expensive private investigation firms, like Interfor, to dig into my life and the lives of those around me. They compiled a list of |

---

[23]     The Suttons are the parents of Stephanie Franco, the student sued by Nxivm for alleged copyright infringement based on the publication of Nxivm course materials on Rick Ross's website.  See PSR ¶¶ 59-62.

around 260 crimes they were trying to persuade authorities that I had committed. They had people in Mexico send me email "invitations" that literally caused me to fear for my life. I've had to change my name, move, have my mail sent to a P.O. box to protect my address, for 20 years this has been my life. They tortured me and they tortured everyone I loved. To this day, this has caused me to isolate myself in fear of reprisal for anyone that comes in contact with me.

\*         \*         \*

Bronfman did not commit these crimes out of need.  She is likely one of the most privileged and wealthy defendants to ever appear before this Court for sentencing. Bronfman committed these crimes to promote and support her co-defendant Keith Raniere and in doing so, she caused significant harm to others.  Prior to sentencing, the government intends to submit written statements from individuals who identify themselves as victims of the defendant's criminal conduct, including statements from many of the individuals referred to above.[24]  The government expects that these statements will further support the imposition of a significantly above-Guidelines sentence.

Pursuant to Federal Rule of Criminal Procedure 32, a district court must give any crime victim who is present the opportunity to be heard before sentencing. Fed. R. Crim. P. 32(i)(4)(B).  The term "victim" is broadly defined as "a person directly and proximately harmed as a result of the commission of a Federal offense."  18 U.S.C. § 3771(e)  Even if the Court does not find that the government has proven Bronfman's responsibility for a

---

[24]     These letters stand in marked contrast to the letters of support submitted with Bronfman's sentencing memorandum, many of which are from individuals Bronfman currently employs (e.g., Bronfman's acupuncturist, the manager of Bronfman's Fijian property, and former attorneys).  The government notes that at least one of the attorney letters of support is from an attorney, Robert D. Crockett, Esq., who was involved in efforts to "rehabilitate" DOS.

particular offense by a preponderance of the evidence, the government respectfully submits that the Court should still consider these impact statements under Sections 3553(a) and 3661. Pursuant to 18 U.S.C. § 3661, there is "[n]o limitation . . . concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." See, e.g., Pepper v. United States, 562 U.S. 476, 488 (2011) (courts are permitted under Section 3661 to "consider the widest possible breadth of information about a defendant."); United States v. Wernick, 691 F.3d 108, 118 (2d Cir. 2012) (recognizing district court discretion to consider a "broad range of information" in evaluating sentencing factors).  Consistent with these principles, courts have considered statements from victims of uncharged conduct, see, e.g., United States v. Quincoces, 503 F. App'x 800, 802 (11th Cir. 2013) (affirming sentencing court's consideration of victim impact statements where the district court acknowledged the impact statements did not constitute relevant conduct of the charged offenses but were nevertheless helpful to application of § 3553(a) sentencing factors), and individuals who did not meet the statutory definition of a victim, see, e.g., United States v. Shine, No. 17-CR-28-FPG-JJM, 2020 WL 32937, at *1 (W.D.N.Y. Jan. 2, 2020) (declining to strike a victim impact statement and noting that it was "vested with broad discretion to consider information pertinent to Defendant, even if it is collateral to his offense of conviction.").

        Bronfman's actions had serious consequences on others, and the government respectfully submits that those consequences should be considered in determining her sentence.  See, e.g., United States v. Kaye 23 F.3d 50, 53 (2d Cir. 1994) (affirming upward departure where Guidelines did not capture the proper degree of harm or consequences of criminal conduct); United States v. Brass, 527 F. App'x 70, 72-73 (2d Cir. 2013) (affirming

district court's non-Guidelines sentence where the court found that the victims of the defendant's fraud had suffered an "extraordinary degree of harm" and where the defendant "continued to hold herself out as a legitimate investment professional and posed a high likelihood for re-offense"). The nature and circumstances of Bronfman's crimes, as well as the degree to which they caused harm to others, warrants a sentence of no less than 60 months' imprisonment.

III.   A Significant Prison Sentence Would Serve the Goals of Specific and General Deterrence

The need for specific and general deterrence is of particular concern to the government in this case. Bronfman's own letter to the Court in connection with her sentencing acknowledges that she still supports Raniere. Even after Raniere's conviction, Bronfman has continued to wire funds to the "KAR 2018 Trust," the trust she created for the benefit of Raniere and Marianna's son. See PSR ¶ 187.

Raniere and his supporters are aware of Bronfman's continued loyalty and support. In a post-conviction prison call on November 8, 2019, Raniere and Marianna had the following exchange:

| | |
|---|---|
| Marianna: | Yesterday I talked to Clare and Kathryn for a very long time. |
| Raniere: | Uh-huh. |
| Marianna: | Um, because we always need to have a chaperone. |

                    *        *        *

| | |
|---|---|
| Raniere: | How is Clare [Bronfman]? She's good? |
| Marianna: | It was way more emotional than the year before. Caught off guard. She's very good, she's very good with you. |

| Raniere: | <u>I don't think her view of me has changed at all.  If anything it's gotten stronger.</u> |
| Marianna: | I don't.  I don't.  Yeah.  We're on the same page.  She just wants to go to jail if she's going to go to jail and get it over with. |
| Raniere: | Uh huh. |

Later in the conversation, Raniere refers to the "op-ed" he sent Marianna about DOS.[25]

Marianna asked if she could share the "op-ed" by "print[ing] it and shar[ing] it" with a "few of our close friends."  Raniere responded:

| Raniere: | All right, but they can't share with anyone else and you have to keep track of— |
| Marianna: | No, they won't. |
| Raniere: | —who you share it with. |
| Marianna: | Okay. . . . It would be three people, four people. |
| Raniere: | Who is that?  Dani, Edgar [Boone] . . . |
| Marianna: | Yeah, yeah, yeah. |
| Raniere: | . . . those people.  Can you send a copy of that to Nicki Clyne? |
| Marianna: | Yes, uh, yes. |
| Raniere: | All right. |
| Marianna: | And, and, and, and can I share it with, with Clare or no? |
| Raniere: | Yeah, oh, absolutely.  Yeah.  <u>Anything with Clare.</u> |

---

[25]    This "op-ed," attached to the government's sentencing memorandum as to Keith Raniere, described DOS as "good—not just good and even noble, but great" and "stymied by a few envious men abusing position of power in government, media, and film; some women who didn't live up to their sacred honor and vows."  <u>See</u> ECF Docket Entry No. 914, Exhibit D-001.

Bronfman's continued and unequivocal support of Raniere, combined with her unwillingness to accept responsibility for her conduct or to acknowledge or appreciate his, warrants significant consideration by this Court.  See United States v. Broxmeyer, 699 F.3d 265, 295 (2d Cir. 2012) (stating that defendant's "lack of remorse for, or even appreciation of, the seriousness of the totality of his conduct . . . further expand[s] the range of substantively reasonable sentences to allow the district court to afford adequate specific deterrence and protection of the public"); accord United States v. Kaziu, 559 F. App'x 32, 39 (2d Cir. 2014) (summary order).  The content of Raniere's continued communications with those few former members of DOS who continue to support him, such as Nicki Clyne and Danielle Roberts, demonstrates that he continues to pose a threat to the community.  That Nicki Clyne and Danielle Roberts have written letters of support in connection with Bronfman's sentencing should, in the government's view, give the Court serious pause and should not be grounds for leniency.[26]

By all accounts, Bronfman has spent a fortune supporting Raniere and Nxivm. See, e.g., Def. Mem. at 67-68 (acknowledging that Bronfman gave Raniere a $67 million "loan" to invest in the commodities market, "loans" to cover legal fees for patents and patent retention and litigation to protect Nxivm's "intellectual property" for $32 million, investment in Plugged in Technologies for $7.1 million, plus a remaining "10%," or 10 million dollars, for "occasional loans so Nxivm could pay its contractors on time when the company was

---

[26]     Nicki Clyne fails to mention that, at her request, Bronfman submitted a letter of support in connection with Clyne's application for a permanent residence in the United States based on her marriage to Allison Mack.  Although both Clyne and Mack were in relationships with Raniere, Bronfman wrote that they were "very close friends" of hers, one of the "few couples" she has travelled with, and "could not be more thrilled that they finally decided to marry."

struggling with its cash flow."  In her sentencing memorandum, Bronfman takes pains to

attempt to characterize these extraordinary expenditures as simply "support[ing] legitimate

business activities."  Def. Mem. at 21.  But these patents, and resulting litigation defending

such "intellectual property," clearly benefited Raniere, who has attempted to assert a ten

percent ownership in First Principles, Inc., the entity which held the patents in question.  See,

e.g. Exhibit D (patents for "rational inquiry sash," "sash with edge," "determination of

whether a Luciferian can be rehabilitated").

        What is especially significant about Bronfman's financial support of Raniere is

that it was without any apparent limitation.  When Raniere wished to invest in the

commodities market, Bronfman simply gave him $67 million to do so—with no expectation

that he would ever be in a position to pay her back (he didn't).  For this reason, Bronfman's

claim that she did not provide financial support for DOS or otherwise for Raniere's "personal

life," Def Mem. at 21, makes little sense.  Bronfman funded Raniere in all of his endeavors,

without question or limitation.  The government respectfully submits that Bronfman's

continued loyalty to Raniere and her substantial financial resources suggest that specific

deterrence is of unique concern in this case and counsels in favor of a substantial sentence.

        The need to promote respect for the law and to deter others also warrants a

significant sentence.  Indeed, general deterrence is often seen as a particularly important

factor in fraud and white-collar cases.  See, e.g., United States v. Martin, 455 F.3d 1227,

1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool,

and calculated than sudden crimes of passion or opportunity, these crimes are prime

candidates for general deterrence." (internal quotation marks and alterations omitted)).

There is reason to believe that individuals, who, like Bronfman, engage in crimes of fraud, can be deterred by the threat of substantial penalties.

Bronfman's efforts in shielding Raniere's activities and targeting those perceived to be detractors or critics also has the effect of undermining public confidence in the system of law.  A significant sentence imposed for her conduct will deliver a much needed message that similar conduct will have serious consequences.  Only a significant term of incarceration, no shorter than the term requested here, will ensure that Bronfman will be deterred from continuing to engage in criminal conduct.

IV.     The Court Should Reject Bronfman's Request for a Non-Custodial Sentence

Bronfman asks this Court to impose a non-Guidelines sentence of three years' probation.  Bronfman presses four arguments in support of her request, and none warrant a sentence below the term of incarceration sought by the government.

a.   "Collateral Consequences" Do Not Warrant Leniency

Bronfman first argues that "collateral consequences," such as "reputational harm to her and her family; professional harm to her business relationships and business prospects; loss of privacy; lost business opportunities . . . loss of friends and family" warrant a probationary sentence.  Def. Mem. at 68-71.  They do not.  Congress, through the Guidelines, has addressed and rejected arguments from privileged defendants who lament the collateral consequences of conviction as applied to them.  See 28 U.S.C. § 994(d) ("The Commission shall assure that the guidelines and policy statements are entirely neutral as to … socioeconomic status of offenders."); U.S.S.G. § 5H1.10 (socioeconomic status not relevant); see also U.S.S.G. § 5H1.2 (vocational skills and education not ordinarily relevant); U.S.S.G. § 5H1.5 (employment record not ordinarily relevant); U.S.S.G. § 5H1.6

(family ties and responsibilities not ordinarily relevant).  Courts have agreed.  See,

e.g., United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012) ("[I]t is impermissible for a

court to impose a lighter sentence on white-collar defendants than on blue-collar defendants

because it reasons that white-collar offenders suffer greater reputational harm or have more

to lose by conviction."); United States v. Musgrave, 761 F.3d 602, 608–09 (6th Cir. 2014)

(impermissible for the district court to rely heavily on the fact that the defendant had already

"been punished extraordinarily" through years of legal process, the loss of his CPA license,

and his felony conviction).  As the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized.
> Business criminals are not to be treated more leniently than
> members of the "criminal class" just by virtue of being regularly
> employed or otherwise productively engaged in lawful
> economic activity.  It is natural for judges, drawn as they (as
> we) are from the middle or upper-middle class, to sympathize
> with criminals drawn from the same class. But in this instance
> we must fight our nature. Criminals who have the education and
> training that enables people to make a decent living without
> resorting to crime are more rather than less culpable than their
> desperately poor and deprived brethren in crime.

United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999).  The suggestion that

Bronfman or any person from a privileged background should receive a lesser sentence than

others due to "reputational harm," "professional harm," or "lost business opportunities" is

simply wrong and this Court should reject it.

Many of the other "collateral consequences" identified by Bronfman are not

ones that would be appropriately considered in fashioning an appropriate sentence.  For

instance, the Court should reject Bronfman's claim that her time on pretrial release, under

conditions she describes as "banishment from her home and entire community in Albany,"

merit leniency at sentencing.  Def. Mem. at 70 (describing the "solitary conditions of her

home confinement" as warranting a "downward variance").  Many defendants are not able to

post security sufficient to warrant pretrial release at all, and few are able to live in luxurious

accommodations like Bronfman's.  See PSR ¶ 160 (describing Bronfman's residence in a

two-bedroom apartment in a full-service luxury building with concierge, fitness center and

rooftop).[27]

   b.  Bronfman's Conduct Was Not Aberrant

   The Court should also reject Bronfman's claim that her conduct was

"aberrant" or "uncharacteristic," Def. Mem. at 71-72, which is entirely belied by the

significant duration and scope of her criminal activity.  Bronfman's conduct was not the

byproduct of an "unfortunate lapse in judgment," Def. Mem. at 72.  As described above,

Bronfman engaged in deceptive conduct and participated in criminal schemes for years.  By

attempting to minimize her conduct as an "unfortunate lapse," Bronfman vastly understates

"the gravity of the underlying offenses by compressing the [her] entire record of misconduct

as if it were a single, isolated episode of crime, a one-time or sometime thing that occurred

over a lifetime of otherwise immaculate behavior.  There is a fallacy in this argument.  It

distorts the record . . . ."  United States v. Regensberg, 635 F. Supp. 2d 306, 309 (S.D.N.Y.

2009), aff'd, 381 F. App'x 60 (2d Cir. 2010).  It is also significant that Bronfman engaged in

schemes that were particularly complex, involving other participants, including attorneys,

and were directed at people who were particularly vulnerable—individuals who had no legal

---

[27]   Bronfman's claim that she has suffered enough because "[w]hat she believed she was part of for 17 years, building something good, is destroyed and is now forever associated with criminal activity," Def. Mem. at 70, is similarly meritless.  Her association with Raniere and the other members of the RICO enterprise proved at trial is not "associated with criminal activity"—it was criminal, as a jury has already found.

status in the United States and little to no income.  As the victim impact statements make

clear, Bronfman's conduct had serious and longstanding effects on her victims.[28]

Bronfman's claims make clear the need for an incarceratory sentence to

demonstrate what Bronfman still plainly does not perceive:  her actions were not just

"technically" criminal, but serious offenses against the government and the public.

---

[28]     Bronfman's sentencing memorandum also refers to her participation in "the space of Tourette's Syndrome," Def. Mem. at 20, but ignores that the participants in this "study" have expressed significant distress at their involvement.  In a victim impact statement, one participant in the study stated:

> When I was told that I was a candidate for participation in NXIVM's Tourette's study I believed that it was a legitimate medical study and I was hopeful that this study would help with my Tourette's.  In fact, there was no medical screening in advance of participation, and I was given no information about the study or its risks. . . . No one informed me that the study in fact required me to take ESP intensives. I had no clue that I was going to be required to take expensive intensives that went from 8:00 am to 7:00 pm-9:00 pm, or that as a result I would be obligated to Clare Bronfman.

> I felt like the weight of the world was on my shoulders because I needed to overcome my Tourette's in order to prove that this treatment worked.  I had to resist the urge to tic at all costs because I was so afraid to tic and mess up the study, which they told me would also mess up a cure for Tourette's and potentially other medical conditions that NXIVM wanted to cure . . . On two occasions while I was in Albany, Nancy and Marc threatened to send me home. They each mentioned that if I don't start acting better and trying harder, I will have wasted thousands of dollars of Clare's money that she had spent on me and their "medical experiment." It was scary—but I couldn't show that because showing fear means something is wrong and I need to be fixed.

> The "study" these people did, did nothing for me except ruin my self-esteem, ruin my mental health, and made me hate myself. It did not cure my Tourette's in any way.

c.  Need to Avoid Unwarranted Sentence Disparities

In support of her request for a sentence of probation, Bronfman cites to various cases in support of her argument that imposition of a Guidelines or above-Guidelines sentence would create an unwarranted sentencing disparity.  See Def. Mem. at 49-62.  The cases selected by Bronfman do not bear any factual similarity to this case.  In none of the cases cited by Bronfman did the defendant commit alien smuggling or identity theft offenses under remotely similar circumstances—nor did they result in similar harms to the victims of those offenses.  None of these cases involve, for example, the use of attorneys or other sophisticated parties to lend a patina of legitimacy to the defendant's repeated fraudulent efforts to secure visas.  Cf. Exhibit A1-003 (transmittal letter, by attorney with the Consulting Company, of Bronfman's false letter of employment for Jane Doe 12, which stated that Jane Doe 12 was "successful businesswoman with over a decade of experience promoting the arts" and with "no intent to immigrate" to the United States).  In addition, as set forth below, there are numerous examples of alien smuggling and identity theft cases in which more substantial sentences were imposed.  The cases cited by Bronfman do not provide a template for sentencing in this matter, and the government respectfully submits that the Court must decide it based on the particular facts and circumstances of this case.

For instance, Bronfman highlights United States v. George, in which Judge Sharpe of the United States District Court for the Northern District of New York sentenced the defendant, who had been found guilty of one count of harboring an illegal alien, to five years' probation.  See Def. Mem. at 56.  Bronfman fails to acknowledge, however, that the advisory Guidelines range in that case was only 8 to 14 months' imprisonment, and the government sought a sentence of eight months of home detention.  See United States v.

Annie George, 12-CR-382 (GLS) (CFH) (N.D.N.Y. 2013), Gov't Sentencing Mem., ECF

Docket Entry No. 60.

Bronfman also highlights the sentence imposed in United States v. Zhyltsou,

in which Judge Glasser sentenced a defendant who had been convicted of transfer of a false

identification document to a term of imprisonment of one year.  Zhyltsou's conviction was

premised on his creation of a false New York City birth certificate as a favor to his friend,

and the Guidelines applicable to his offense were 0 to 6 months' imprisonment.  See United

States v. Zhyltsou, 12-CR-327 (ILG) (E.D.N.Y. 2013), Def. Sentencing Mem., ECF Docket

Entry No. 94.  The facts of these cases bear no resemblance whatsoever to the nature and

circumstances of the crimes in this case.

Bronfman also overlooks many alien smuggling and identity theft cases in

which courts have imposed significant custodial terms.  See, e.g., United States v. Lopez-

Cabrera, 617 F. App'x 332, 338 (5th Cir. 2015) (affirming 45-month Guidelines sentence for

conviction to transport illegal alien within the United States); United States v. Abiodun, 378

F. App'x 12, 14-15 (2d Cir. 2010) (district court imposed above-Guidelines sentence of 96

months' imprisonment on defendant convicted of, among other crimes, fraud in connection

with identification documents, in part due to the "pain and suffering and frustration" of

defendant's victims even if they did not ultimately suffer monetary loss); United States v.

Hilel, 352 F. App'x 378, 380-81 (11th Cir. 2009) (sentencing court's imposition of a 60-

month sentence reasonable, including decision to upwardly vary because the defendant had

been involved in alien smuggling for a long time); United States v. Pina-Suarez, 280 F.

App'x 813, 815-16 (11th Cir. 2008) (affirming 96-month sentence for convictions for

bringing in aliens by boat at a place other than a designated port of entry); United States v.

Amati, 273 F. App'x 790 (11th Cir. 2008) (affirming 80-month sentence for five counts of alien smuggling); United States v. Ramirez-De Rosas, 873 F.2d 1177, 1179 (9th Cir. 1989) (affirming 30-month sentence for single instance of alien smuggling where advisory Guidelines range was 0 to 4 months' imprisonment).  As these cases demonstrate, custodial sentences for serious violations of the laws governing immigration and identity theft offenses are a regular occurrence, and the Court should impose such a sentence here for the reasons stated above.

      d.  The COVID-19 Pandemic

Lastly, Bronfman's arguments related to COVID-19 also fall well short of supplying a basis for leniency, much less a non-incarceratory sentence.  Bronfman does not appear to have any underlying medical conditions that would increase her vulnerability to COVID-19, and the Bureau of Prisons ("BOP") generally has demonstrated that they are prepared to handle, and are effectively handling, the risks presented by COVID-19.

Since March 2020, the BOP has instituted a series of "Action Plans" in order to minimize the risk of COVID-19 transmission into and inside its facilities.  At this time, in BOP facilities, legal, social and volunteer visits have been suspended; contractor visits are limited to essential services; all staff members are regularly screened; and inmate movements between facilities are extremely limited.  All incoming inmates are screened.  Moreover, asymptomatic inmates with exposure risk factors are quarantined, and symptomatic inmates with exposure risk factors are isolated and tested for COVID-19 based on local health authority protocols.  Within facilities, BOP has implemented "modified operations to maximize social distancing," including efforts to minimize inmate gathering, while still

allowing for mental health treatment, medical care, commissary visits, telephone and legal call usage, and other functions.[29]

The measures taken by the BOP, as detailed above, belie Bronfman's suggestion that the COVID-19 pandemic represents a "rapidly-evolving crisis" within the BOP, see Def. Mem. at 78.  To the contrary, they show that the BOP has taken the threat seriously, has mitigated it, and continues to update policies and procedures in accord with the facts and recommendations.  United States v. Gumora, No. 20-CR-144 (VSB), 2020 WL 1862361, at *1 (S.D.N.Y. Apr. 14, 2020) (noting that BOP has "developed and has implemented a plan to mitigate the impact of COVID-19 on the federal prison population" and "the implementation of [those] actions . . . appears to have limited the spread of the virus within the institution."); United States v. Haney, No. 19-CR-541 (JSR), 2020 WL 1821988, at *6 (S.D.N.Y. Apr. 13, 2020) ("Still, despite rumors, there is no meaningful counter-evidence suggesting that the COVID-19 virus is rapidly spreading in the MDC, or anything of the kind.").

Indeed, as the Honorable Rachel P. Kovner recently found after conducting a two-day evidentiary hearing:

> Rather than being indifferent to the virus, MDC officials have recognized COVID-19 as a serious threat and responded aggressively. . . .  With [such aggressive] measures in place, just one MDC inmate has been hospitalized in connection with COVID-19, and none have died from the disease, even though the surrounding community has been at the epicenter of the pandemic.

---

[29]     See https://www.bop.gov/coronavirus/covid19_status.jsp (last visited September 14, 2020).

Chunn v. Edge, No. 20-CV-1590 (RPK), 2020 WL 3055669, at *1 (E.D.N.Y. June 9, 2020).

Although it is not clear where the BOP will designate Bronfman to serve any sentence of incarceration the Court should impose or what the risk will be when the defendant begins any such term, the facilities in New York currently show a low rate of infection. As of September 10, 2020, MDC Brooklyn has tested 1,480 inmates for COVID-19 since March 13, 2020, and only 16 of those tests were positive.[30] MDC Brooklyn has only had one additional inmate test positive for COVID-19 between August 20, 2020 and September 10, 2020, despite doubling the COVID-19 tests during that time frame.[31] As of September 13, 2020, there are currently no active cases of COVID-19 among inmates or staff at MDC.[32]

These facts show that Bronfman's claim that the BOP is in the midst of a "rapidly-evolving crisis" is not supported by the reality on the ground. Moreover, the statistics and articles cited in Bronfman's memorandum do not accurately reflect any potential risk to her because, among other flaws, they focus on state prisons and reflect a time frame of March through April 2020 rather than looking at current numbers as of September 2020. Accordingly, her arguments relating to the dangers associated with

---

[30]     See Letter to Chief Judge Mauskopf dated September 10, 2020, from MCC Warden M. Licon-Vitale and MDC Warden Heriberto Tellez, at p. 2-3, available at https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200910_023131.pdf.

[31]     See Letter to Chief Judge Mauskopf dated August 20, 2020, from MCC Warden M. Licon-Vitale and MDC Warden Heriberto Tellez, at p. 2-3, available at https://www.nyed.uscourts.gov/pub/bop/MDC_MCC_20200820_031258.pdf.

[32]     See https://www.bop.gov/coronavirus/ (last visited September 13, 2020) (providing COVID-19 data for each BOP institution).

contracting COVID-19, <u>see</u> Def. Mem. at 73-79, do not warrant a sentence below the term of incarceration sought by the government.

<u>CONCLUSION</u>

For the reasons above, the government respectfully submits that a sentence of 60 months is sufficient but no greater than necessary to achieve the goals of sentencing in this case.

Dated:     Brooklyn, New York
             September 14, 2020

Respectfully submitted,

SETH D. DuCHARME
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:     /s/ Tanya Hajjar
         Tanya Hajjar
         Mark J. Lesko
         Assistant United States Attorneys
         (718) 254-7000