# Exhibit D

Case 1:18-cr-00204-NGG-VMS   Document 928-8   Filed 12/20/21   Page 1 of 29 PageID #: 16086

US00D469594S

(12) **United States Design Patent**

Raniere

(10) Patent No.: **US D469,594 S**

(45) **Date of Patent:** ✳✳ **Feb. 4, 2003**

(54) **RATIONAL INQUIRY SASH**

(75) Inventor: **Keith A. Raniere**, Clifton Park, NY (US)

(73) Assignee: **First Principles, Inc.**, Albany, NY (US)

(✳✳) Term: **14 Years**

(21) Appl. No.: **29/149,362**

(22) Filed: **Oct. 9, 2001**

(51) **LOC (7) Cl.** ..................................................... **02-05**

(52) **U.S. Cl.** ......................................... **D2/502**; D2/627

(58) **Field of Search** ......................... D2/500, 501, 502, D2/600, 624, 605, 627; 2/171, 202, 203, 207, 91, 144, 279

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| D120,854 | S | * | 6/1940 | Brody | D2/605 X |
| D121,458 | S | * | 7/1940 | Opper | D2/606 |
| D127,094 | S | * | 5/1941 | Katzman | D2/500 |
| 2,308,449 | A | * | 1/1943 | Katzman et al. | 2/91 |
| 2,402,996 | A | * | 7/1946 | Geissmann | 2/91 |
| 2,452,972 | A | * | 11/1948 | Rodenstein | 2/91 |
| 4,870,707 | A | * | 10/1989 | Hayes | 2/207 |
| D413,007 | S | * | 8/1999 | Vaughn | D2/600 |
| D445,993 | S | * | 8/2001 | Raol | D2/500 |

* cited by examiner

*Primary Examiner*—Paula A. Mortimer

(74) *Attorney, Agent, or Firm*—Schmeiser, Olsen & Watts

(57) **CLAIM**

The ornamental design for a rational inquiry sash, as shown and described.

**DESCRIPTION**

FIG. **1** is a front view of a rational inquiry sash showing our new design;

FIG. **2** is a top plan view thereof;

FIG. **3** is a front view thereof;

FIG. **4** is a bottom plan view thereof; and,

FIG. **5** is a front view of a second embodiment of a rational inquiry sash showing my new design, the only difference being the length.

The broken line showing of the human form in FIGS. **1** and **5** is for illustrative purposes only and forms no part of the claimed design.

**1 Claim, 3 Drawing Sheets**



Case 1:18-cr-00204-NGG-VMS   Document 922-3   Filed 08/14/19   Page 3 of 29 PageID #: 16087

US00D472033S

(12) **United States Design Patent**

Raniere

(10) Patent No.: **US D472,033 S**

(45) Date of Patent: ✱✱ *Mar. 25, 2003

(54) **CHECKERED SASH WITH EDGE**

(75) Inventor: **Keith A. Raniere**, Clifton Park, NY (US)

(73) Assignee: **First Principles, Inc.**, Albany, NY (US)

( * ) Notice: This patent is subject to a terminal disclaimer.

(**) Term: **14 Years**

(21) Appl. No.: **29/151,681**

(22) Filed: **Oct. 30, 2001**

(51) **LOC (7) Cl.** ...................................... **02-05**
(52) **U.S. Cl.** ...................................... **D2/502**
(58) **Field of Search** ......................... D2/500, 501, 502, D2/600, 605, 606; 2/171, 202, 203, 207, 91

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| D120,854 S | * 6/1940 | Brody | D2/605 X |
| D121,458 S | * 7/1940 | Opper | D2/606 |
| D127,094 S | * 5/1941 | Katzman et al. | D2/500 |
| 2,308,449 A | * 1/1943 | Katzman et al. | 2/91 |
| 2,402,996 A | * 7/1946 | Geissmann | 2/91 |
| 2,452,972 A | * 11/1948 | Rodenstein | 2/91 |
| 4,870,707 A | * 10/1989 | Hayes | 2/207 |
| D413,007 S | * 8/1999 | Vaughn | D2/600 |
| D459,935 S | * 8/2001 | Raol | D2/500 |

* cited by examiner

*Primary Examiner*—Paula A. Mortimer
(74) *Attorney, Agent, or Firm*—Schmeiser, Olsen & Watts

(57) **CLAIM**

The ornamental design for a checkered sash with edge, as shown and described.

**DESCRIPTION**

FIG. **1** is a front view of a checkered sash with edge showing our new design;
FIG. **2** is a top plan view thereof;
FIG. **3** is a front view thereof; and,
FIG. **4** is a bottom plan view thereof.
The broken line showing of the human form in FIG. **1** is for illustrative purposes only and forms no part of the claimed design.

**1 Claim, 2 Drawing Sheets**



(12) **United States Design Patent**      (10) **Patent No.:**        **US D472,034 S**
Raniere                                    (45) **Date of Patent:**  ✱✱  *Mar. 25, 2003

(54) **SASH WITH EDGE**

(75) Inventor:  **Keith A. Raniere**, Clifton Park, NY (US)

(73) Assignee:  **First Principles, Inc.**, Albany, NY (US)

( * ) Notice:  This patent is subject to a terminal disclaimer.

(**) Term:  **14 Years**

(21) Appl. No.: **29/151,777**

(22) Filed:  **Oct. 30, 2001**

(51) **LOC (7) Cl.** .................................................. **02–05**
(52) **U.S. Cl.** ..................................................... **D2/502**
(58) **Field of Search** ......................... D2/500, 501, 502, D2/600, 605, 606; 2/171, 202, 203, 207, 91

(56)                    **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| D120,854 S | * | 6/1940 | Brody | D2/605 X |
| D121,458 S | * | 7/1940 | Opper | D2/606 |
| D127,094 S | * | 5/1941 | Katzman | D2/500 |
| 2,308,449 A | * | 1/1943 | Katzman et al. | 2/91 |
| 2,402,996 A | * | 7/1946 | Geissmann | 2/91 |
| 2,452,972 A | * | 11/1948 | Rodenstein | 2/91 |
| 4,870,707 A | * | 10/1989 | Hayes | 2/207 |
| D413,007 S | * | 8/1999 | Vaughn | D2/600 |
| D445,993 S | * | 8/2001 | Raol | D2/500 |

* cited by examiner

*Primary Examiner*—Paula A. Mortimer
(74) *Attorney, Agent, or Firm*—Schmeiser, Olsen & Watts

(57)                    **CLAIM**

The ornamental design for a sash with edge, as shown and described.

**DESCRIPTION**

FIG. **1** is a front view of a sash with edge showing our new design;
FIG. **2** is a top plan view thereof;
FIG. **3** is a front view thereof;
FIG. **4** is a bottom plan view thereof; and,
FIG. **5** is a front view illustrating an embodiment showing an alternate sash of the present invention, the undisclosed top, bottom, and rear view are not part of the claimed design. The broken line showing of the human form in FIGS. **1** and **5** is for illustrative purposes only and forms no part of the claimed design.

**1 Claim, 3 Drawing Sheets**



Case 1:18-cr-00204-NGG-VMS Document 902-8 Filed 09/14/20 Page 5 of 29 PageID #: 16033

US009180339B2

US 9,180,339 B2

(12) **United States Patent**
Raniere

(10) Patent No.: **US 9,180,339 B2**
(45) Date of Patent: **Nov. 10, 2015**

(54) **METHOD OF PROVIDING RESISTANCE FOR USE WITH A RESISTANCE TRAINING DEVICE**

(71) Applicant: **FIRST PRINCIPLES, INC.**, Albany, NY (US)

(72) Inventor: **Keith A. Raniere**, Clifton Park, NY (US)

(73) Assignee: **FIRST PRINCIPLES, INC.**, Albany, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/612,852**

(22) Filed: **Feb. 3, 2015**

(65) **Prior Publication Data**

US 2015/0148198 A1     May 28, 2015

**Related U.S. Application Data**

(62) Division of application No. 13/841,627, filed on Mar. 15, 2013.

(51) **Int. Cl.**
| | |
|---|---|
| *A63B 23/14* | (2006.01) |
| *A63B 21/22* | (2006.01) |
| *A63B 21/02* | (2006.01) |
| *A63B 21/05* | (2006.01) |
| *A63B 21/00* | (2006.01) |
| *A63B 23/035* | (2006.01) |
| *A63B 23/16* | (2006.01) |
| *A63F 7/06* | (2006.01) |

(52) **U.S. Cl.**
CPC .............. *A63B 23/14* (2013.01); *A63B 21/023* (2013.01); *A63B 21/05* (2013.01); *A63B 21/1446* (2013.01); *A63B 21/1469* (2013.01);

*A63B 23/03541* (2013.01); *A63B 23/16* (2013.01); *A63F 7/0672* (2013.01); *A63B 21/1496* (2013.01); *A63B 2210/50* (2013.01)

(58) **Field of Classification Search**
CPC ........ A63B 23/14; A63B 23/12; A63B 23/02; A63B 23/00; A63B 21/12; A63B 21/015; A63F 7/0672
USPC ................. 482/110, 44–50, 142; 273/108.52
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 1,788,210 | A | | 1/1931 | Staar |
| 2,832,596 | A | * | 4/1958 | Brown .................... 273/108.52 |
| 3,574,350 | A | * | 4/1971 | May ....................... 273/108.52 |
| 4,127,269 | A | * | 11/1978 | Rest ....................... 273/108.52 |
| 4,382,598 | A | * | 5/1983 | McCloud ............... 273/108.52 |

(Continued)

OTHER PUBLICATIONS

Restriction Requirement for U.S. Appl. No. 13/841,627, mailed on Oct. 23, 2014.

(Continued)

*Primary Examiner* — Stephen Crow
*Assistant Examiner* — Garrett Atkinson
(74) *Attorney, Agent, or Firm* — Schmeiser, Olsen & Watts, LLP

(57) **ABSTRACT**

A method of using a resistance training device including mounting a mounting device onto a game table, wherein a placement of the mounting device onto the game table corresponds to an opening on a sidewall of the game table, and utilizing a resistance article with a game table rod that extends into a game space of the game table, the resistance article coacting with the game table rod to gradually increase a resistance during rotation of game table rod is provided.

**20 Claims, 10 Drawing Sheets**



Case 1:18-cr-00204-NGG-VMS   Document 308-3   Filed 09/11/20   Page 6 of 29   PageID #: 5480

US 20130281879A1

(19) **United States**

(12) **Patent Application Publication**   (10) Pub. No.: **US 2013/0281879 A1**
  Raniere   (43) **Pub. Date:** **Oct. 24, 2013**

(54) **DETERMINATION OF WHETHER A LUCIFERIAN CAN BE REHABILITATED**

(71) Applicant: **FIRST PRINCIPLES, INC.**, ALBANY, NY (US)

(72) Inventor: **Keith A. Raniere**, Clifton Park, NY (US)

(21) Appl. No.: **13/839,361**

(22) Filed: **Mar. 15, 2013**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 12/272,941, filed on Nov. 18, 2008, Continuation of application No. 11/931,524, filed on Oct. 31, 2007, now abandoned.

**Publication Classification**

(51) **Int. Cl.**
  *A61B 5/16* (2006.01)

(52) **U.S. Cl.**
  CPC ....................................... *A61B 5/165* (2013.01)
  USPC ............................ **600/558**; 600/300; 600/559

(57) **ABSTRACT**

An aspect of the present invention is a method for determining whether a Luciferian can be rehabilitated. The method includes stimulating the Luciferian with a first stimulus and recording a first physiological response by the Luciferian to said first stimulus. The method includes determining, from the first physiological response, a first polarity of the Luciferian's response to the first stimulus. The method includes stimulating the Luciferian with a second stimulus and recording a second physiological response by the Luciferian to said second stimulus. Further, the method includes determining, from the second physiological response, a second polarity of the Luciferian's response to the second stimulus. The method includes comparing the first polarity to the second polarity to determine whether the second polarity has a greater value than the first polarity; and determining, from said comparing of first polarity and second polarity, whether the Luciferian can be rehabilitated.



Case 1:18-cr-00204-NGG-VMS   Document 922-3   Filed 09/14/20   Page 7 of 29 PageID #: 16091



**Fig. 1**



**Fig. 2**

Case 1:18-cr-00204-NGG-VMS   Document 922-3   Filed 09/14/20   Page 8 of 29 PageID #: 16092



**Fig. 3**

Case 1:18-cr-00204-NGG-VMS   Document 922-3   Filed 09/14/20   Page 9 of 29 PageID #: 16093



*Fig. 4*



*Fig. 5*



**Fig. 6**



**Fig. 7**



*Fig. 8*



*Fig. 9*

Case 1:18-cr-00204-NGG-VMS   Document 922-3   Filed 09/14/20   Page 13 of 29 PageID #: 16097



**Fig. 10**



*Fig. 11*



*60*

*Flow Chart*

*Presenting Questionnaire to Person* — *61*

*Requesting Person Respond to Items in Questionnaire* — *62*

*Recording Responses to Items on Questionnaire* — *63*

*Providing a Space of Potential Emotional Polarities* — *64*

*Providing Subspace of the Space* — *65*

*Determining Whether the Person is a Luciferian* — *66*

**Fig. 12**



*Fig. 13*

Flow Chart          **Fig. 14**

```
┌─────────────────────────────────────────────┐
│     Stipulating a Luciferian with First Stimulus     │
└─────────────────────────────────────────────┘

┌─────────────────────────────────────────────┐
│  Recording Physiological Response to First Stimulus  │
└─────────────────────────────────────────────┘

┌─────────────────────────────────────────────┐
│        Determining First Emotional Polarity         │
└─────────────────────────────────────────────┘

┌─────────────────────────────────────────────┐
│     Stimulating Luciferian with Second Stimulus      │
└─────────────────────────────────────────────┘

┌─────────────────────────────────────────────┐
│ Recording Physiological Response to Second Stimulus  │
└─────────────────────────────────────────────┘

┌─────────────────────────────────────────────┐
│ Recording Physiological Response to Second Stimulus  │
└─────────────────────────────────────────────┘

┌─────────────────────────────────────────────┐
│   Comparing First Emotional Polarity and Second     │
│  Emotional Polarity to Determine Greater Value      │
└─────────────────────────────────────────────┘

┌─────────────────────────────────────────────┐
│ Recording Physiological Response to Second Stimulus  │
└─────────────────────────────────────────────┘

┌─────────────────────────────────────────────┐
│ Recording Physiological Response to Second Stimulus  │
└─────────────────────────────────────────────┘
```

**Fig.15**



90

<u>Flow Chart</u>

| Stimulating Luciferian with Plurality of Constructive Stimulus |
|---|

91

| Recording Physiological Response to Each Constructive Stimulus |
|---|

92

| Determining Corresponding Emotional Polarity for Each Constructive Stimulus |
|---|

93

| Comparing Corresponding Polarity for Each Constructive Stimulus to Determine Greatest Value |
|---|

94

| Determining Humanity of Luciferian |
|---|

95

**Fig.16**



100

Flow Chart

| Stimulating Luciferian with Plurality of Constructive Stimuli and Plurality of Destructive Stimuli | 101 |

| Recording Physiological Response to Each Constructive Stimulus and Each Destructive Stimulus | 102 |

| Determining Corresponding Polarity for Each Constructive Stimulus and Each Destructive Stimulus | 103 |

| Comparing Corresponding Polarity for Each Constructive Stimulus to Determine Greatest Value of Polarity for Constructive Stimulus | 104 |

| Comparing Corresponding Polarity for Each Destructive Stimulus to Determine Greatest Value of Polarity for Constructive Stimulus | 105 |

| Comparing Greatest Value of Polarity for Constructive Stimulus to Greatest Value of Polarity for Destructive Stimulus to Determine which Is Higher | 106 |

| If Greatest Value of Polarity for Constructive Stimulus Is Higher than Greatest Value of Polarity for Destructive Stimulus, Determine Humanity Based on Greatest Value of Polarity for Constructive Stimulus; If Lower, Determine That Luciferian Lacks Humanity | 107 |



FIG. 17

US 2013/0281879 A1

Oct. 24, 2013

1

## DETERMINATION OF WHETHER A LUCIFERIAN CAN BE REHABILITATED

### RELATED APPLICATIONS

[0001]   This application is a continuation in part of Ser. No. 12/272,941, filed on Nov. 18, 2008, which is a continuation of Ser. No. 11/931,524, filed on Oct. 31, 2007.

### BACKGROUND

[0002]   1. Technical Field

[0003]   The present invention relates to a method for determining whether a person, who has destructive tendencies, may be rehabilitated.

[0004]   2. Related Art

[0005]   Organizations such as businesses, religions, governments, law enforcement agencies, schools, etc. have had difficulties when individuals disrupt the organization's well-being by committing destructive acts. If organizations can identify such individuals they may better interact with them. Since these destructive individuals do not overtly disclose their nature, it is not easy to detect their presence. Failure to discover these individuals could be costly due to their destructive inclinations. There is a need to determine whether a given person, who has destructive tendencies, may be rehabilitated.

### SUMMARY

[0006]   The present invention provides an objective and accurate capability for determining whether a Luciferian may be rehabilitated. A Luciferian is a person, who commits destructive acts. A Luciferian is a type of sociopath. He has severe behavioral problems that are masked by good psychological adjustment. He appears on the outside to be sane but he is not. A Luciferian is fundamentally unhappy and feels enmity toward others but has learned that, for him, pleasure can be had from achieving his selfish desires such as destroying material objects or relationships, and causing others pain, distress, or unhappiness. A Luciferian realizes his desires by any means—without consideration for others and without remorse. A Luciferian is a person lacking in conscience and loyalty to others. He commonly employs manipulation and deceit to achieve his desired end and is therefore capable of acts that could be highly destructive to those that interact with him. A Luciferian, therefore, typically experiences pleasure or gratification in situations where "normal" people would be repulsed or disturbed.

[0007]   A first general aspect of the present invention is a method for determining whether a Luciferian can be rehabilitated, comprising: stimulating said Luciferian with a first stimulus; recording a first physiological response by said Luciferian to said first stimulus; determining, from said first physiological response, a first polarity of said Luciferian's physiological response to said first stimulus; stimulating the Luciferian with a second stimulus; recording a second physiological response by the Luciferian to said second stimulus; determining, from said second physiological response, a second polarity of the Luciferian's physiological response to said second stimulus; comparing said first polarity to said second polarity to determine whether said second polarity has a greater value than said first polarity; and determining, from said comparing of said first polarity and said second polarity, whether said Luciferian can be rehabilitated.

[0008]   A second general aspect of the present invention is a method for determining a humanity of a Luciferian, comprising: stimulating said Luciferian with a plurality of constructive stimuli; recording a physiological response by said Luciferian corresponding to each constructive stimulus of said plurality of constructive stimuli; determining, for said each constructive stimulus, a corresponding polarity of said physiological response; comparing said corresponding polarity of said physiological response for said each constructive stimulus to determine a greatest value; and determining, from said greatest value, said humanity of said Luciferian.

[0009]   A third general aspect of the present invention is a method for determining a humanity of a Luciferian, comprising: stimulating said Luciferian with a plurality of destructive stimuli; recording a physiological response by said Luciferian corresponding to each destructive stimulus of said plurality of destructive stimuli; determining, for said each destructive stimulus, a corresponding polarity of said physiological response; comparing said corresponding polarity of said physiological response for each destructive stimulus to determine a least value; and determining, from said least value, said humanity of said Luciferian.

### BRIEF DESCRIPTION OF THE DRAWINGS

[0010]   FIG. 1 depicts a representation of a human brain identifying the locations of the ventral tegmental area, the nucleus accumbens, and the prefrontal cortex.

[0011]   FIG. 2 depicts a person's relative change in dopamine levels as represented by positron emission tomography (PET) scans.

[0012]   FIG. 3 depicts a person's physiological responses to a stimulus, said physiological responses being recorded by instrumentation, said physiological responses being processed according to an algorithm to determine whether the person is a Luciferian.

[0013]   FIG. 4 depicts a space of potential polarities in relation to the stimulus of FIG. 3 and a subspace of the space, wherein the subspace defines a Luciferian.

[0014]   FIG. 5 depicts an event stream comprised by the stimulus of FIG. 3.

[0015]   FIG. 6 represents the stimulus of FIG. 3 as having N stimulus components with an associated N polarity components, wherein N∃2.

[0016]   FIG. 7 represents the N stimulus components and N polarity components of FIG. 6 as an N-component stimulus vector S and an associated N-component polarity vector P.

[0017]   FIG. 8 depicts a flow chart for determining whether the person in FIG. 3 is a Luciferian.

[0018]   FIG. 9 depicts the flow chart of FIG. 8 with added steps relating to the space of FIG. 4.

[0019]   FIG. 10 depicts a person's response to items on a questionnaire, said responses being recorded by instrumentation, said responses being processed according to an algorithm to determine whether the person is a Luciferian.

[0020]   FIG. 11 depicts a flow chart for determining whether the person in FIG. 10 is a Luciferian.

[0021]   FIG. 12 depicts the flow chart of FIG. 11 with added steps relating to the space of FIG. 4.

[0022]   FIG. 13 depicts a flow chart for generating a polarity profile of a questionnaire.

[0023]   FIG. 14 depicts a flow chart for determining whether the Luciferian may be rehabilitated.

[0024]   FIG. 15 depicts a flow chart for determining a humanity of a Luciferian.

[0025] FIG. 16 depicts a flow chart for an alternative method of determining a humanity of a Luciferian.

[0026] FIG. 17 depicts the recording and processing a response to a stimulus.

DETAILED DESCRIPTION

[0027] Strong feelings of satisfaction are associated with behaviors that meet various human needs. For example, specific areas in the human brain provide pleasurable sensations as a "reward" for these behaviors. These areas are interconnected with one another to form what is known as the "reward circuit". The reward circuit in the brain provides feelings of satisfaction to encourage us to repeat pleasurable experiences that we learn in the course of our lives. The reward circuit is at the heart of our mental activity and guides all our behaviors. This circuit is complex, but it contains a central link that plays a fundamental role. This link is comprised of the nerve connections between two particular small groups of neurons. FIG. 1 contains a depiction of the human brain and the location of these groups of neurons. One of these groups is located in the ventral tegmental area (VTA) 1, and the other in the nucleus accumbens 2. The chemical messenger that makes the connections between these two groups of neurons is dopamine. Dopamine is a chemical messenger (neurotransmitter) in the brain. Thus, there is an association between feelings of pleasure and dopamine. For example, when the cortex has received and processed a sensory stimulus indicating a reward, it sends a signal announcing this reward to the VTA 1 whose activity then increases. The VTA 1 then releases dopamine, not only into the nucleus accumbens 2 but also into the septum, the amygdala, and the prefrontal cortex 3. The nucleus accumbens 2 then activates the individual's motor functions, while the prefrontal cortex 3 focuses his or her attention. These regions are part of the reward circuit. The reward circuit is part of the medial forebrain bundle (MFB), whose activation leads to the repetition of the gratifying action to strengthen the associated pathways in the brain.

[0028] The MFB is a bundle of axons that originates in the reticular formation, crosses the VTA, passes through the lateral hypothalamus, and continues into the nucleus accumbens as well as the amygdala, the septum, and the prefrontal cortex. The MFB is composed of ascending and descending pathways, including most of the pathways that use monoamines as a neurotransmitter. The mesocorticolimbic dopaminergic system is one of its main components. This system comes into play when a person experiences pleasure.

[0029] Another distinct pleasure circuit, driven by opioids, overlaps considerably with the dopamine system, to the point where some cells take part in both circuits. A key part of this system is the ventral pallidum which takes in signals from the nucleus accumbens and passes them on to the cortex. Additionally, cells nearer the surface of the brain, in a region of the forebrain called the orbitofrontal cortex (OFC), may have a vital role as well.

[0030] Pleasure is a direct response to a sensory stimulus. One of the first brain regions to process sensory information is the OFC. Signals such as taste, touch, smells, and sounds travel first to the sensory cortex, and from there go straight to the OFC. Visual information enters by a slightly less direct route. From here the signal passes into the opioid and dopamine circuits. A pleasant or unpleasant smell, taste, or touch is represented in the sensory cortex simply as a magnitude—strong brain activity for a strong smell and weak brain activity for a faint one, for example. But by the time it has passed on to the OFC it now correlates with how pleasant or unpleasant the stimulus may be rated. As each sensory signal passes through the OFC, it may receive a level of liking or disliking Activity in the OFC may increase or decrease in line with the level of pleasure people may feel for a given stimulus.

[0031] The ventral pallidum and OFC may be associated with pleasure, but other parts of the brain's cortex may also become especially active during pleasure such as the cingulate cortex and somatosensory cortex. The emotion of pleasure may include the dopamine and opiate circuits and OFC, but actually feeling pleasure may require a level of reflection that can only be provided by other brain regions that carry sensory maps or representations of our bodies—the cingulate cortex, somatosensory cortex and certain parts of the brainstem.

[0032] Testing for physiological evidence of elevated activity in the reward or pleasure center of the brain has not been used to determine whether a Luciferian may be rehabilitated or to determine a Luciferian's humanity. The present invention seeks to determine whether a Luciferian takes more pleasure in some aspect of human welfare, animal welfare, human value or human dignity than the pleasure that the Luciferian takes in destruction.

[0033] Ser. No. 12/272,941 provides testing for physiological evidence of elevated activity in the reward or pleasure center of the brain used as a way to ascertain whether a person is a Luciferian. Physiological characteristics which can be independent, dependent, or interdependent with the pleasure center can be used as indicators of whether a person is a Luciferian such as changes in heart rate, blood pressure, respiration depth, electrodermal response, skin temperature, sweating, muscle electrical activity, and cerebral blood flow.

[0034] Testing to determine whether a person is a Luciferian may include subjecting a person to a stimulus. A response to a stimulus may be an emotional, chemical, or physiological response which may be expressed as a polarity (P). The polarity of the response of a person to a stimulus is indicative of an extent to which the emotional, chemical, or physiological response is positive or negative. For example, a scale of polarity may be defined such that: P=0 is a neutral point at which the response is neither positive nor negative; P>0 may denote a positive response such that P increases as the magnitude of the positive response increases; and P<0 may denote a negative response such that P algebraically decreases as the magnitude of the negative response increases.

[0035] In FIG. 4, the space 30 is the locus of all potential emotional, chemical, and physiological polarities of the polarity of the response of the person 10 to the stimulus S. In other words, the space 30 includes all possible polarities that could manifest by any arbitrary person subjected to the stimulus S. FIG. 4 also shows the space 30 as consisting of a subspace 32 and a subspace 34. If the algorithm 22 determines that the polarity of the person 10 falls within the subspace 32 then the person 10 is determined to be a Luciferian. Conversely, if the algorithm 22 determines that the polarity of the person 10 falls within the subspace 34 or on the interfacial boundary 35 between subspaces 32 and 34, then the person 10 is determined not to be a Luciferian. Such determination of which subspace (32 or 34) the polarity of the person 10 falls within could also be made by a human being instead of by the algorithm 22 within the computer 24, wherein the human being would utilize the same methodology as is utilized by the algorithm 22.

[0036]  The space 30, as well as the subspaces 32 and 34 individually, could be represented in any electronic dataset format as may exist in, inter alia, a database, table, file, spreadsheet, etc. FIG. 4 shows such a dataset 36 for representing the space 30, wherein a portion 37 of the dataset 36 represents the subspace 32, and wherein a portion 38 of the dataset 36 represents the subspace 34. Alternatively, the portion 38 may not be present if the portion 37 is present, since the algorithm 22 need only test for whether the polarity of the person 10 falls within the subspace 32; thus the algorithm 22 needs to know the scope of the subspace 32 and does not need to know the scope of the subspace 34. Similarly, the portion 37 may not be present if the portion 38 is present, since the algorithm 22 need only test for whether the polarity of the person 10 does not fall within the subspace 34; thus the algorithm 22 needs to know the scope of the subspace 34 and does not need to know the scope of the subspace 32.

[0037]  FIG. 3 depicts a recording and processing of responses 12 of a person 10 to a stimulus (S). The depiction in FIG. 3 may be referred to as a test to determine whether a person is a Luciferian. A test to determine whether a person is a Luciferian comprises a person subjected to a stimulus and a recording of a response to the stimulus. The stimulus S is a factor capable of eliciting a response from a person. The stimulus S may be a visual stimulus 14, an audio stimulus 16, a tactile stimulus 18, a multimedia stimulus 19, or any other stimulus. A combination stimulus 21 may be any combination of a visual stimulus 14, an audio stimulus 16, a tactile stimulus 18, a multimedia stimulus 19, or any other stimulus. The stimulus S may be obvious or unobvious as a test element to the person 10 subjected to a test. The person 10 may be in a variably controllable environment 23 while subjected to the stimulus S. Controllable environmental conditions may include temperature, humidity, air movement, lighting, room size, room shape, location, setting, odor, noise, or any other external physical condition surrounding the person 10. A response to a stimulus may include physiological, emotional, cognitive, oral, written, or other like responses by a person to a stimulus. Physiological responses 12 may be recorded by instrumentation 20 and subsequently processed according to an algorithm 22 stored in a data processing device 24 to determine, and to display as output 26, whether the person 10 is a Luciferian.

[0038]  The stimulus S may be of a type that evokes a response from the person 10. The stimulus S may include one of, or a combination of, the visual stimulus 14, the audio stimulus 16, the tactile stimulus 18, the multimedia stimulus 19, or any other factor or combination of factors capable of eliciting a response from the person 10. Examples of the visual stimulus 14 include, inter alia, a movie; a series of pictures; a sports telecast, a sequence of colors; etc. Examples of the audio stimulus 16 include, inter alia, a recital of a book, emotionally provocative sounds; expressions of anger, fear, pain, laughter; white noise, subliminal signals; etc. White noise is a random signal with a flat power spectral density. In other words, the signal's power spectral density has equal power in any band, at any center frequency, having a given bandwidth. Examples of the tactile stimulus 18 include, inter alia, touching a dead person or dead animal. As a response to tactile stimulus of touching the dead person or dead animal, if the individual is Luciferian, one response in the subset would be a positive polarity based on the increase of chemical and electrical activity in the "reward circuit".

[0039]  The multimedia stimulus 19 may include combinations of the visual and audio stimuli such as combinations of text, sound, graphics, animation, photo images, and full-motion video. A combination stimulus 21 may include any combination of visual, audio, tactile, multimedia, or any other stimulus. An example of an audiovisual stimulus that would increases the response of the of the reward circuit for a Luciferian would be a video depicting the failure of an athlete by falling just before the finish line and losing or a skier crashing during a great athletic event. This would result in a positive polarity for the Luciferian. A negative polarity would be if the Luciferian were to see the athlete or skier be successful.

[0040]  The instrumentation 20 serves to record the physiological responses 12, which may include involuntary or unintentional responses, under the assumption that the physiological responses 12 could be used to infer the responses of the person 10 to the stimulus S. Medical instrumentation 20 may be devices which are used to measure attributes of human physiology. The variable measured may include any measurable variable related to human physiology. Examples of instrumentation 20 may include, inter alia, medical instrumentation such as an electroencephalogram (EEG) instrument, a computed axial tomography (CAT) instrument, a positron emission tomography (PET) instrument, a magnetic resonance imaging (MRI) instrument, an electromyogram (EMG) instrument, a polygraph instrument, or combinations thereof.

[0041]  For example, FIG. 2 contains PET scan images evidencing increased levels of dopamine in the brain—particularly in the nucleus accumbens 2. PET scanners may be used to view brain activity in test subjects who have been injected with a chemical that binds to dopamine receptors in the brain, but is less able to bind when the brain is releasing dopamine. A decrease in binding to the receptors is associated with an increase in dopamine release, while an increase in binding indicates reduced release of dopamine. This technique provides a visualization of the strength and location of dopamine release. The PET scan images in FIG. 2 illustrate an increase of dopamine 4 relative to a baseline level 5. Scans show the concentration of available dopamine receptors on a scale that goes from blue (low) to red (high). More dopamine receptors available means less dopamine is in the brain. PET scans may be used in this way to indicate when a test subject experiences an increase of dopamine in response to a stimulus.

[0042]  Examples of a polarity of P=0 would be for a person's normal chemical balance of dopamine or normal neural activity, based on statistical sampling and given that the individual does not have drugs in his system, drug addiction, mental or physical illness, obesity, or other factors that may skew normal dopamine or neural activity levels.

[0043]  The responses 12 may include voluntary or intentional responses such as responding to items on a questionnaire as will be discussed infra in conjunction with FIGS. 9 and 10 or the responses 12 may include involuntary or unintentional physiological responses such as, inter alia, changes in heart rate, blood pressure, respiration depth, electrodermal response, skin temperature, muscle electrical activity, cerebral blood flow, and neural activity in pleasure centers of the brain. If the responses 12 include such voluntary or intentional physiological responses, then the instrumentation 20, such as a polygraph instrument, may be used to ascertain whether the person 10 has been truthful in his or her voluntary or intentional responses.

4

[0044] Polarity may be inferred from data collected by medical instrumentation **20** such as EEG, CAT, PET, MRI, EMG, and polygraph. For example, EEG may be used to assess brain electrical activity. While connected to EEG instrumentation, a test subject may be subjected to a stimulus S. Electrical signals produced by the brain neurons in response to the stimulus S are picked up by electrodes and may be transmitted to a polygraph for analysis. Similarly, PET and CAT scans may be used to obtain information about brain function and to study brain activity in response to a stimulus S. EEG, PET, and CAT recordings may be analyzed for abnormalities to reveal a polarity to a given stimulus S. The recorded physiological responses **12** of the person **10** may be processed by an algorithm **22** executed by a computer **24**. Generally, any data processing hardware (e.g., a microprocessor) capable of executing compiled code, interpreted code, or hard-wired code could be used instead of the computer **24**. Alternatively, the recorded physiological responses **12** could be processed by a human being instead of by data processing hardware. The output **26** expresses the result of the processing of the recorded physiological responses **12**, and said output **26** may include an expression of whether or not the person **10** is a Luciferian.

[0045] The algorithm **22** determines the polarity of the response of the person **10** to the stimulus S, and further determines whether the person is a Luciferian. After the algorithm **22** determines said polarity, the algorithm **22** may utilize a space **30**, as exemplified in FIG. **4** to determine whether the person is a Luciferian.

[0046] The algorithm **22** may be executed in real time in direct response to the recording of the physiological responses **12** by the instrumentation **20**. For said real-time execution of the algorithm **22**, the algorithm **22** should be electronically coupled to the physiological data recorded by the instrumentation **20**. Alternatively, the algorithm **22** may be executed off-line after the recording of the physiological responses **12** by the instrumentation **20**. For said off-line execution of the algorithm **22**, the algorithm **22** may or may not be electronically coupled to the physiological data recorded by the instrumentation **20**.

[0047] Using well-known concepts of physiology and medical instrumentation, the subspace **32** within the space **30** may be generated. A test to determine whether a person is a Luciferian comprises a person subjected to a stimulus S and recording of a response to the stimulus S, such as that depicted in FIG. **3**. A test to determine whether a person is a Luciferian may be designed to identify the types of stimuli that elicit pleasure responses in a test subject. For example, a person may be subjected to a neuropsychological test comprising a stimulus S. Neuroimaging, using medical instrumentation **20** may be used to identify and/or quantify neurophysiological processes **12** in the pleasure systems of the brain in response to the neuropsychological test stimulus S. Based on the stimulus S, and the corresponding response **12**, a polarity may be determined. A space **30** may be created for each stimulus S. Luciferian-type polarities are a sub space **32** of the space **30**. The sub space **32** may be identified directly by defining the range of polarities a Luciferian would produce or the sub space **32** may be identified indirectly by defining what range of polarities a non-Luciferian would produce within the space **30**, and selecting all others as the sub space **32**.

[0048] One example of a test to determine whether a person is a Luciferian comprises a video clip of an ice skater performing in a competition. Everything goes flawlessly until, at the very end, a mistake is made during a jump and the skater falls to the ice—all hope of winning the event is gone. A Luciferian will experience pleasure and satisfaction from this. Accordingly, the Luciferian's neurophysiological processes **12** will register pleasure over the skater's misfortune which may be identified and quantified using the medical instrumentation **20**. On the other hand, a non-Luciferian will feel sympathetic and empathize with the unfortunate skater. Unlike the Luciferian, a non-Luciferian's neurophysiological processes **12** will not register as pleasure for this stimulus.

[0049] Another example of a test to determine whether a person is a Luciferian that may be given is to have the subject view a film of human torture. Instrumentation **20** will reveal that a Luciferian subject viewing a torture movie is experiencing a pleasure response. Further, external stimuli (i.e. not included in the torture movie) such as a door slamming will not elicit much response, if any, from a Luciferian subject. A Luciferian may be enjoying the scene too much to divert attention to other things. This may also be due to a low startle response typical of sociopaths. In contrast, when a non-Luciferian views a torture movie, pleasure centers in the brain are not responsive and may even diminish from a previous level. A non-Luciferian will exhibit a greater response to external stimuli such as a door slamming. This may be due to a desire to direct attention elsewhere rather than on the uncomfortable scene in the movie. The preceding examples are merely illustrative and any other criteria for defining the scope of a Luciferian.

[0050] A test to determine whether a person is a Luciferian may comprise elements designed to identify a person's true physiological response to stimuli. A Luciferian may fear discovery and may attempt to outwit a test that would reveal his true character. A Luciferian may try to control his responses, possibly by disinterest or unresponsiveness to certain types of stimuli or possibly by mimicking responses he feels would be appropriate from "normal" people. Accordingly, a test may have obvious stimulus S test elements (e.g. questionnaire, movie clips, pictures, etc.), but a test may also incorporate stimulus S test elements which are unobvious. A test may contain stimuli that a subject does not realize are part of the test. There may be unobvious test stimuli that are being administered before, during, or after, the obvious test elements. Unobvious test stimuli may be of any type including visual **14**, audio **16**, tactile **18**, multimedia **19**, and combination **21**. For example, unobvious test stimuli may be subliminal audio or video signals, a slamming door, a person tripping on a sidewalk while visible to a subject through an outside window, or any other stimuli that may be administered to a subject without the subject's recognition that the stimuli is part of a test. Unobvious stimuli may be the primary test or a part of the primary test. On the other hand, responses to unobvious test stimuli may confirm or bring into question the responses to the obvious test stimuli. In this way, true responses may be captured from a Luciferian attempting to "beat" a test.

[0051] The stimulus S of FIG. **3** may be an event stream such as the event stream **40** shown in FIG. **5**, in accordance with embodiments of the present invention. In FIG. **5**, the event stream **40** includes events **41**, **42**, and **43**. Although FIG. **5** shows 3 events, the number of such events may be any positive integer of at least 1. An example of the event stream **40** is a sequence of events occurring in an activity such as, inter alia, a movie in which the events **41**, **42**, and **43** each represent a scene or scenery occurring in a time interval

5

within the movie. The event stream **40** may include the entire activity (e.g., the movie), or the event stream **40** may include a continuous or discontinuous subset of the activity, wherein the subset is not the entire activity. Other examples of event streams include a movie, a play, a television performance, a sports event, and a military event. The event stream **40** may be presented in a real-time mode; e.g., if the event is a sports event such as a football game then the football game would presented as the stimulus S to the person **10** in real time while the football game is being actually played. The event stream **40** may alternatively be presented in a playback mode; e.g., if the event is a sports event such as a football game then the football game would first be recorded (such as on video tape) and subsequently presented (by being played back) as the stimulus S to the person **10**.

[0052]    If the stimulus S of FIG. **3** comprises N events (N≡1) of an event stream, then the stimulus S may comprise N components $S_1, S_2, \ldots, S_N$ respectively corresponding to the N events of the event stream. For each such stimulus component $S_i$ (i=1, 2, . . . , N), there is an associated polarity $P_i$ of the response of the person **10** to the stimulus component $S_i$. Thus, the N polarities $P_1, P_2, \ldots, P_N$ are respectively associated with the N stimulus components $S_1, S_2, \ldots, S_N$ as depicted in FIG. **6**, in accordance with embodiments of the present invention.

[0053]    S is defined herein as an N-component stimulus vector having components $S_1, S_2, \ldots, S_N$ as depicted in FIG. **7**, in accordance with embodiments of the present invention. FIG. **7** also shows that the stimulus vector S results, via the configuration of FIG. **3**, in an N-component polarity vector P having components $P_1, P_2, \ldots, P_N$. In FIG. **7**, an M-dimensional space **46** embodies the space **30** of FIG. **4**, and the subset **48** of the space **46** embodies the subset **32** of the space **30** of FIG. **4**. If $P_1, P_2, \ldots, P_N$ are mutually independent, then M=N. If one of $P_1, P_2, \ldots, P_N$ is dependent upon another of $P_1, P_2, \ldots, P_N$, then M<N, wherein N−M is the number of such mutual dependencies. FIG. **7** shows a projection **45** of the polarity vector P into the space **46** to determine if the polarity vector P is within the subspace **48**. If the polarity vector P is determined, such as by the algorithm **22** of FIG. **3**, to be within the subspace **48**, then the person **10** of FIG. **3** has is determined to be a Luciferian.

[0054]    A special case of FIG. **7** arises for N=1 in which the stimulus S has exactly one stimulus component. In this special case N=M=1 and there is one response and one associated polarity. For this special case, the space **30** of FIG. **4**, or the space **46** of FIG. **7**, thus comprises a one-dimensional range of polarities.

[0055]    FIG. **8** depicts a flow chart **50** that describes steps in a method for determining whether the person **10** in FIG. **3** is a Luciferian. The flow chart **50** presents an alternative view in conjunction with FIGS. **3-7**. The flow chart **50** comprises steps **51**, **52**, **53**, and **56**. Referring to both FIG. **8** and FIG. **3**, the step **51** stimulates the person **10** with the stimulus S. The step **52** records the response **12** by the person **10** to stimulus S. The step **53** determines, from the response **12**, a polarity of the response of the person **10** to the stimulus S. The step **56** determines, from said polarity of the response of the person **10** to the stimulus S, whether the person **10** is a Luciferian.

[0056]    FIG. **9** depicts the flow chart of FIG. **8** with added steps **54** and **55** relating to a space such as the space **30** of FIG. **4** or the space **46** of FIG. **7**. The step **54** provides the space. The step **55** provides a subspace of the space associated with step **54** such that if the polarity of the response of the person

**10** to the stimulus S is within said subspace, then the person is determined to be a Luciferian.

[0057]    FIG. **3** may be modified to reflect an alternative mechanism for determining whether the person **10** is a Luciferian, using a "questionnaire" as the stimulus S instead of or in addition to, for example, the visual stimulus **14**, the audio stimulus **16**, the tactile stimulus **18**, the multimedia stimulus **19**, and the combination stimulus **21**. A questionnaire may be combined with other stimuli by containing items or questions related to the other stimuli. For example, a person may be shown a video followed by a questionnaire asking specific questions about the video. A questionnaire may be used in variably controllable environmental conditions **23**. For example, a person may complete the same questionnaire two times—first at 70° F. and then at 85° F. Following this, the two sets of answers provided in response to the questionnaire may be compared for inconsistencies that may reveal a polarity of the person. Accordingly, FIG. **10** depicts a recording and processing of responses **12** of a person **10** to a stimulus S in the form of a questionnaire **13**, in accordance with embodiments of the present invention. The questionnaire **13** may be administered to a person **10** in writing or orally. The responses **12** may represent voluntary or intentional responses by the person **10** to items on the questionnaire **13** and/or they may represent involuntary or unintentional responses. As in FIG. **3**, the responses **12** may be recorded by instrumentation **20** and subsequently processed according to an algorithm **22** stored in a data processing device **24** to determine, and to display as output **26**, whether the person **10** is a Luciferian. The instrumentation **20** may include any device (e.g., a sheet of paper, a computer diskette, etc.) that records physiological responses **12**. The instrumentation **20** may include a polygraph instrument which may be used to ascertain whether the person **10** has been truthful in his or her voluntary or intentional responses, by correlating the voluntary response with the polygraph data.

[0058]    Some or all of the responses by the person **10** may reflect a polarity of the person **10**. Alternatively, at least one of the responses by the person **10** may reflect a polarity of the person **10**, in order to make it difficult for the person **10** to guess, or otherwise try to determine, the purpose of each item on the questionnaire **13**.

[0059]    FIG. **11** depicts a flow chart **60** that describes steps in a method for determining whether the person **10** in FIG. **3** is a Luciferian. The flow chart **60** presents the embodiments associated with use of the questionnaire **13** of FIG. **10**. The flow chart **60** comprises steps **61**, **62**, **63**, and **66**. Referring to both FIG. **11** and FIG. **3**, the step **61** presenting the questionnaire **13** to the person **10**, wherein the questionnaire **13** comprises a plurality of items. The step **62** requests the person **10** to communicate a voluntary response to each item of the plurality of items. The step **63** records the voluntary response of the person **10** to each item of the plurality of items. The step **66** determines, from said voluntary response of the person **10** to the items on the questionnaire **13**, whether the person **10** is a Luciferian, based on a predetermined prescription. The algorithm **22** of FIG. **10** may include said predetermined prescription. Use of predetermined prescription is analogous to the space **30** and subspace **32** of FIG. **4** (or the space **46** and subspace **48** of FIG. **7**), described supra.

[0060]    FIG. **10**, depicts the flow chart of FIG. **11** with added steps **64** and **65**. The step **64** determining a polarity of the voluntary or intentional responses of the person **10** to each item of the plurality of items. The step **65** determines, from

6

the polarity of the voluntary or intentional responses of the person **10** to each item of the plurality of items, whether the person is a Luciferian.

[0061]   In FIGS. **11** and **12**, the requesting step **62** may comprise requesting the person **10** to communicate a structured voluntary response to at least one item of the plurality of items. Said structured voluntary response may be selected by the person **10** from a predetermined set of responses for each item on the questionnaire **13**.

[0062]   Alternatively, the requesting step **62** may comprise requesting the person **10** to communicate an unstructured voluntary response to at least one item of the plurality of items. The predetermined prescription may include a comparison of the unstructured voluntary response with a predetermined set of responses.

[0063]   In addition to recording the voluntary or intentional responses of the person **10**, the instrumentation **20** may include instrument(s) that record involuntary or unintentional physiological responses by the person **10** while the person **10** is communicating voluntary or intentional responses of the person **10** to the items on the questionnaire **13**.

[0064]   All aspects of FIGS. **3-7**, discussed supra, apply to use of the questionnaire **13** in FIG. **10** in conjunction with the flow chart **60** of FIGS. **11** and **12**. Such aspects of FIGS. **3-9** include, inter alia, use of: the instrumentation **20**, algorithm **22**, computer **24**, and output **26** of FIG. **3**; the space **30** and dataset **36** of FIG. **4**; the event stream **40** of FIG. **5**; the stimulus components and associated vector S, the polarity components and associated vector P, and space **46** of FIGS. **6** and **7**.

[0065]   A method for generating a polarity profile of the questionnaire **13**, comprises correlating recorded polarities with recorded voluntary responses in relation to the questionnaire **13**. The recorded voluntary responses and the recorded polarities are derived from the following procedure, depicted in the flow chart **70** in FIG. **13**, as applied to a symbolic person representing each individual of N individuals such that N is large enough for said correlating to be statistically significant. In FIG. **13**, step **71** presents to the person the questionnaire **13** comprising a plurality of items. The step **72** requests the person to communicate a voluntary response to each item of the plurality of items. The step **73** records the voluntary responses of the person. The step **74** records physiological responses of the person while the person is communicating the voluntary responses. The step **75** determines, from the physiological responses, polarities of the voluntary responses. The step **76** records the polarities. The recorded voluntary responses of the person and recorded polarities are then utilized for performing said correlating.

[0066]   A subjective evaluation may be used to supplement an objective evaluation of a person in the determination of whether the person is a Luciferian. For example, a person may observe a test subject during an objective test that includes stimuli and recording instrumentation, for signs that the test subject's responses were not genuine. Similarly, a person may look for signs of disingenuous responses during an interview with a test subject conducted independently or in conjunction with an orally administered questionnaire. Incorporating a subjective evaluation of a test subject may aid in the determination of whether the subject is a Luciferian.

[0067]   In accordance with FIG. **4**, a person **10** is determined to be a Luciferian if the polarity of the person **10** falls within subspace **32**. After determining that a person **10** is a Luciferian, it is helpful to determine whether the person **10** may be rehabilitated. FIG. **14** depicts a flow chart **80** for determining whether the person **10**, pre-determined to be a Luciferian, may be rehabilitated, in accordance with the present invention. The flow chart **80** of FIG. **14** comprises the steps **81**, **82**, **83**, **84**, **85**, **86**, **87**, and **88**. Referring to FIG. **14**, the step **81** stimulates the person **10** with a first stimulus. The step **82** records the response **12***a* by the person **10** to first stimulus. The step **83** determines, from response **12***a*, a first polarity of the response **12***a* of the person **10** to the first stimulus. The step **84** stimulates the person **10** with a second stimulus. The step **85** records the response **12***b* by the person **10** to second stimulus. The step **86** determines, from response **12***b*, a polarity of the response **12***b* of the person **10** to the second stimulus. The step **87** compares the two polarities to determine whether the first polarity or second polarity has a greater value. The step **88** determines whether person **10** can be rehabilitated.

[0068]   In accordance with FIG. **14**, a first stimulus and a second stimulus are factors capable of eliciting responses from a person **10**, pre-determined to be a Luciferian. The first stimulus may be a visual stimulus **14**, an audio stimulus **16**, a tactile stimulus **18**, a multimedia stimulus **19**, any other factor or combination of factors capable of eliciting a response from the person **10**. The first stimulus may be obvious or unobvious as a test element to determine whether person **10** may be rehabilitated. The second stimulus may be a visual stimulus **14**, an audio stimulus **16**, a tactile stimulus **18**, a multimedia stimulus **19**, any other factor or combination of factors capable of eliciting a response from the person **10**. The second stimulus may be obvious or unobvious as a test element to determine whether person **10** may be rehabilitated. The person **10**, pre-determined to be a Luciferian, may be in a variably controllable environment **23** while subjected to the first stimulus. The person **10**, pre-determined to be a Luciferian, may be in a variably controllable environment **23** while subjected to the second stimulus.

[0069]   FIG. **14** depicts a recording and processing of responses of a person **10** to a first stimulus and second stimulus to determine whether person **10** (pre-determined to be a Luciferian) may be rehabilitated. A test of FIG. **14** comprises subjecting the person **10**, pre-determined to be a Luciferian, to a first stimulus and recording of a first response **12***a* to the stimulus by a medical instrumentation **20**. In accordance with FIG. **17**, an algorithm **27** is stored in data processing device **24**. The test of FIG. **17** comprises processing response **12***a*. An algorithm **27** processes the response **12***a* by determining the first polarity of the response **12***a* of the person **10** to the first stimulus. The test of FIG. **14** comprises subjecting the person **10**, determined to be a Luciferian, to the second stimulus. A response **12***b* to the second stimulus may be recorded by instrumentation **20**. Algorithm **27** processes the response **12***b* by determining the polarity of the response **12***b* of the person **10** to the second stimulus. Then, the first polarity and second polarity are compared to determine whether the first polarity or the second polarity has a greater value using algorithm **27**. The test of FIG. **17** comprises displaying as output **26** whether a person **10**, determined to be a Luciferian, may be rehabilitated. The output **26** may include an expression of whether or not the person **10** may be rehabilitated.

[0070]   A determination of whether a person **10** (pre-determined to be a Luciferian) may be rehabilitated may be made by a human being rather than by the algorithm **23** within the computer **24**, wherein the human being would utilize the same methodology as utilized by algorithm **23**.

7

[0071] The first stimulus may be a constructive stimulus or a destructive stimulus. The second stimulus may be a constructive stimulus or a destructive stimulus. An example of constructive stimulus may include a movie clip of a person rescuing animal from a fire. An example may be a picture of a person feeding the poor. Another example of a constructive stimulus may be a movie clip of a person assisting a falling person. An example could be a movie clip showing a criminal's confession to a crime for which another has wrongfully been convicted. A constructive stimulus could be a movie clip of community clean-up efforts. A constructive stimulus may be a movie clip of a person, performing a musical composition. A constructive stimulus may be a movie clip of a person showing respect for a clergy member. A constructive stimulus may be a movie clip of a person working in a flower garden. A constructive stimulus may be a tactile stimulus such as the smell of fresh flowers. A constructive stimulus may be an open page of a magazine showing a successful charity auction. A constructive stimulus may be a newspaper clipping hanging on a wall that praises an employee's successful performance.

[0072] An example of a destructive stimulus may include a movie clip or a picture that shows a person hiding in a house and waiting for a victim to arrive. Another example of a destructive stimulus may be a movie clip or picture that shows a person hiding under another's bed. An example of a destructive stimulus may be a movie clip or a picture that shows a person, breaking a bathroom door with an occupied victim inside the bathroom. An example of destructive stimuli may include a movie clip or a picture of a person breaking into a home, entering into the home and murdering a victim. An example of a destructive stimulus may be a movie clip showing a person buried alive. Other examples of destructive stimuli may be a picture of dead animal, a picture of mutilated body of a female, a picture of human torso, a picture of a slit throat, a picture of a dissected body, a movie clip of a person setting a fire, a picture of dungeon or basement, a movie clip of a body in a duffle bag, a picture of a chemical used to degrade a body, a picture of a poisonous substance, a movie clip of a person using a substance to render another unconscious, a movie clip of a child being brutally beaten, a movie clip of cooked human flesh, a movie clip of a person consuming another's blood or body parts, a movie clip of blood under a floor board, and a movie clip of blood seeping through carpet.

[0073] A destructive stimulus may be an audio stimulus such as the sound of gun fire. A destructive stimulus may be a person destroying another's sand castle. A destructive stimulus may be a rotten smell. A destructive stimulus may be a movie clip of a person bragging about the murder of a person. A destructive stimulus may be a movie clip showing a person, who appears outwardly positive toward a victim but inwardly is negative towards such individual and the person is open to using any means to destroy the individual, including physically injuring the individual or damaging the individual's property. A destructive stimulus may be a movie clip, showing a person who lies and deceives an individual merely because the person hates the individual. A destructive stimulus may be a scene through a window of a person intentionally stepping on papers dropped by another. A destructive stimulus may be a scene in a doorway where a person smiles at an individual and then frowns at the individual as the individual departs from the presence of the person. A destructive stimu-

lus may be a movie clip of a murderer returning to the scene of a murder to relive the murder experience.

[0074] An example of an unobvious stimulus may be an open page of a magazine showing a successful charity auction or a newspaper clipping hanging on a wall that praises an employee's successful performance. An example of an unobvious stimulus may be a scene in a doorway where a person smiles at an individual and then frowns at the individual as the individual departs from the presence of the person. An example of an unobvious stimulus may be a scene through a window of a person intentionally stepping on papers dropped by another.

[0075] FIG. 17 shows algorithm 27, instrumentation 20, computer 24 and output 26. Algorithm 27 may record physiological responses 12a and 12b. Physiological response 12a may be an involuntary response or an unintentional response, under the assumption that physiological response 12a could be used to infer the response of the person 10 to the first stimulus. Similarly, physiological response 12b may be an involuntary response or an unintentional response, under the assumption that physiological response 12b could be used to infer the response of the person 10 to the second stimulus.

[0076] Algorithm 27 may determine the polarities of the person 10 to the first stimulus and the first stimulus of the responses 12a and 12b. The polarity of the response 12a and the polarity of response 12b indicate whether the response 12a and response 12b are positive or negative. For example, where the first polarity P>0, then the response 12a is positive. If the first polarity P<0, then the response 12a is negative. If the first stimulus S is a destructive stimulus and the first polarity P of response 12a is positive, the Luficerian gains pleasure from the destructive stimulus. If the first stimulus S is a destructive stimulus and the first polarity P of response 12a is negative, the Luficerian does not gain pleasure from the destructive stimulus. If the first stimulus S is a constructive stimulus and the first polarity P of response 12a is positive, the Luficerian gains pleasure from the constructive stimulus. If the first stimulus S is a constructive stimulus and the first polarity P of response 12a is negative, the Luficerian does not gain pleasure from the constructive stimulus.

[0077] Algorithm 27 determines whether a Luciferian may be rehabilitated. The output 26 indicates whether a Luciferian may be rehabilitated. If the Luciferian is stimulated with a plurality of constructive stimuli, and then a plurality of destructive stimuli, and the polarity for the plurality of constructive stimuli is greater than the polarity for the plurality of destructive stimuli, then algorithm 27 will express the result that the Luciferian may be rehabilitated. If the Luciferian is stimulated with a plurality of constructive stimuli, and then a plurality of destructive stimuli, and the polarity for the plurality of constructive stimuli is less than the polarity for the plurality of destructive stimuli, the algorithm 27 will express the result that it is unlikely the Luciferian may be rehabilitated.

[0078] FIG. 15 depicts a flow chart 90 for determining a humanity of a Luciferian. In step 91, a person 10 is stimulated with a plurality of constructive stimuli $(S_1, S_2, \ldots, S_N)$. In step 92, a physiological response to each constructive stimulus is recorded by the instrumentation 20. In step 93, the algorithm 27 determines a corresponding polarity $(P_1, P_2, \ldots, P_N)$ for each constructive stimulus. Then, the algorithm 27 compares the polarity of each constructive stimulus to determine the greatest value of polarity. The algorithm 27 determines a

US 2013/0281879 A1

Oct. 24, 2013

8

humanity of the person **10** based on the constructive stimulus that yields the greatest value of polarity P.

[0079] In another aspect, FIG. **16** depicts a flow chart **100** for an alternative method of determining a humanity of a Luciferian. In step **101**, a person **10** is stimulated with a plurality of constructive stimuli and a plurality of destructive stimuli. In step **102**, a physiological response to each stimulus is recorded by the instrumentation **20**. In step **103**, the algorithm **27** determines a corresponding polarity for each constructive stimulus and each destructive stimulus. In step **104**, the algorithm **27** compares the polarity of each constructive stimulus to determine the greatest value of polarity for constructive stimuli. In step **105**, the algorithm **27** compares the polarity of each destructive stimulus to determine the greatest value of polarity for a destructive stimulus. In step **106**, the algorithm **27** compares the greatest value of polarity for the constructive stimulus to the greatest value of polarity for the destructive stimulus. In step **106**, the algorithm **27** determines whether the greatest value of polarity for the constructive stimulus is higher than the greatest value of polarity for the destructive stimulus. According to step **107**, if the greatest value of polarity for the constructive stimulus is higher the greatest value of polarity for the destructive stimulus, the algorithm **27** determines the humanity of the person **10** based on the constructive stimulus that yields the greatest value of constructive stimulus. The algorithm **27** determines at least one humanity and the output **26** expresses the humanity. Thus, the algorithm **27** determines what gives the person **10** more pleasure than destruction. After the humanity of the person **10** is determined, the humanity may be used to counsel the person **10**.

[0080] Alternatively, the algorithm **27** may determine whether any values of polarities for constructive stimulus are higher than the greatest value of polarity for the destructive stimulus. The algorithm **27** may determine humanities of the person **10** based on the constructive stimuli that yield polarity values higher than the greatest value of polarity for the destructive stimulus.

[0081] While particular embodiments of the present invention have been described herein for purposes of illustration, many modifications and changes will become apparent to those skilled in the art. Accordingly, the appended claims are intended to encompass all such modifications and changes as fall within the true spirit and scope of this invention. All embodiments heretofore described are predicted test results and prophetic examples and have not actually been conducted.

What is claimed is:

**1**. A method for determining whether a Luciferian can be rehabilitated, said method comprising:

stimulating said Luciferian with a first stimulus;

recording a first physiological response by said Luciferian to said first stimulus;

determining, from said first physiological response, a first polarity of said Luciferian's physiological response to said first stimulus;

stimulating said Luciferian with a second stimulus;

recording a second physiological response by said Luciferian to said second stimulus;

determining, from said second physiological response, a second polarity of said Luciferian's physiological response to said second stimulus;

comparing said first polarity to said second polarity to determine whether said second polarity has a greater value than said first polarity; and

determining, from said comparing of said first polarity and said second polarity, whether said Luciferian can be rehabilitated.

**2**. The method of claim **1**, wherein at least one stimulus consists of one stimulus component, wherein the Luciferian's corresponding physiological response consists of one response component.

**3**. The method of claim **1**, wherein said at least one stimulus comprises an N-component stimulus vector $\{S_1, S_2, \ldots, S_N\}$ such that N is at least 2, wherein the polarity of the Luciferian's corresponding physiological response to said at least one stimulus is an N-component polarity vector $\{P_1, P_2, \ldots, P_N\}$ such that $P_1, P_2, \ldots, P_N$ respectively corresponds to $S_1, S_2, \ldots, S_N$.

**4**. The method of claim **3**, wherein $P_1, P_2, \ldots, P_N$ are mutually independent.

**5**. The method of claim **3**, wherein one of $P_1, P_2, \ldots, P_N$ has a dependence on another of $P_1, P_2, \ldots, P_N$.

**6**. The method of claim **1**, further comprising: representing a space in a first electronic dataset format;

**7**. The method of claim **1**, further comprising: representing a subspace in a second electronic dataset format.

**8**. The method of claim **1** wherein said first stimulus is obvious or unobvious.

**9**. The method of claim **1** wherein said second stimulus is obvious or unobvious.

**10**. The method of claim **1** wherein at least one physiological response to takes place in a variably controllable environment.

**11**. The method of claim **1**, wherein at least one stimulus comprises an event stream.

**12**. The method of claim **11**, wherein the event stream is in a real-time mode.

**13**. The method of claim **11**, wherein the event stream is in a playback mode.

**14**. The method of claim **11**, wherein the event stream is selected from the group consisting of a movie, a play, a television performance, a sports event, a military event, and combinations thereof.

**15**. The method of claim **1**, wherein at least one stimulus comprises a visual stimulus.

**16**. The method of claim **1**, wherein at least one stimulus comprises an audio stimulus.

**17**. The process of claim **1**, wherein at least one stimulus comprises a tactile stimulus.

**18**. The method of claim **1**, wherein at least one stimulus comprises a multimedia stimulus.

**19**. The method of claim **1**, wherein at least one stimulus comprises a combination stimulus.

**20**. A method for determining a humanity of a Luciferian, comprising:

stimulating said Luciferian with a plurality of constructive stimuli;

recording a physiological response by said Luciferian corresponding to each constructive stimulus of said plurality of constructive stimuli;

determining, from each constructive stimulus, a corresponding polarity of the Luciferian's response for each constructive stimulus to determine a greatest value; and

determining, from said greatest value, a humanity of said Luciferian.

9

**21**. A method for determining a humanity of a Luciferian, comprising:

stimulating said Luciferian with a plurality of destructive stimuli;

recording a physiological response by said Luciferian corresponding to each destructive stimulus of said plurality of destructive stimuli;

determining, from each destructive stimulus, a corresponding polarity of the Luciferian's response for each destructive stimulus to determine a least value; and

determining, from said least value, a humanity of said Luciferian.

\* \* \* \* \*