UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

  -  v.  -

CLARE BRONFMAN,

                Defendant.

No. 18-cr-204 (NGG) (VMS)

**CLARE BRONFMAN'S RESPONSE TO
THE GOVERNMENT'S SENTENCING MEMORANDUM**

Ronald S. Sullivan, Jr., Esq.
Ronald Sullivan Law, PLLC
1300 I Street, N.W.
Suite 400 E
Washington, D.C. 20005
(202) 935-4347

Duncan Levin, Esq.
Tucker Levin, PLLC
230 Park Avenue, Suite 440
New York, New York 10169
(212) 330-7626

*Attorneys for Defendant Clare Bronfman*

# TABLE OF CONTENTS

INTRODUCTION................................................................................................1

CLARE IS CONTRITE, REMORSEFUL, AND DEEPLY SORRY FOR HER OFFENSE
CONDUCT ......................................................................................................3

CLARE DID NOT FUND OR PROMOTE ANY CRIMINAL ACTIVITY BY KEITH
RANIERE OR ANYONE ELSE: CLARE DID NOT FUND A SEX CULT ..........................4

OFFENSE CONDUCT .......................................................................................16

    A.  The government is attempting to enlarge the criminal activity by alleging more than
        one victim and more than six aliens............................................................16

    B.  The government misstates a key fact related to the ████████ parole and omitted key
        facts ......................................................................................................17

    C.  The government incorrectly asserts that Clare attempted to keep money out of Keith
        Raniere's name.........................................................................................18

CLARE COMMITTED TWO OFFENSES TO WHICH SHE PLEADED GUILTY AND
THERE IS ONE VICTIM....................................................................................19

    A. There is no basis to order restitution for or hear from multiple purported victims.......19

    B. The fine should be on the basis of the nature of the acts pertaining to the particular
    crime, not just Clare's net worth .......................................................................21

COVID-19.....................................................................................................22

    A. The government is seeking to put a non-violent, first-time offender in prison during a
    public health emergency and claims that the "September 2020" numbers are under
    control (even though the federal courthouse just down down)...........................22

CONCLUSION ................................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*Austin v. United States*

    509 U.S. 602, 609-10 (1993) ........................................................................18

*Graziano v. United States*

    83 F.3d 587 (2d Cir. 1996)..........................................................................18

*Mitchell v. United States*

    526 U.S. 314, 316-17 (1999) ......................................................................1, 2

*Torres v. United States*

    140 F.3d 392, 404 (2d Cir. 1998)...................................................................4

*Townsend v. Burke*

    334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948)................................4

*United States v. Campagna*

    No. 16 CR. 78-01 (LGS), 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) ........21

*United States v. Cassidy*

    17-CR-116S (W.D.N.Y. May 13, 2020 .........................................................21

*United States v. George*

    779 F. 3d (2d Cir. 2014) .............................................................................13

*United States v. Hansen*

    No. 1:07-cr-00520 (KAM), ECF No. 213, (E.D.N.Y. Apr. 8, 2020)................23

*United States v. Hickman*

    330 F. Supp. 3d 921 (W.D.N.Y. 2018) .........................................................18

*United States v. Knox*

    No. 15 CR. 44 (PAE), 2020 WL 1487272, (S.D.N.Y. Mar. 27, 2020).............22

*United States v. Lemon*

    723 F.2d 922 (D.C. Cir.1983) ...........................................................................6

*United States v. Malcolm*

    432 F.2d 809, 816 (2d Cir. 1970) ....................................................................4

*United States v. McCall*

    No. 2:18cr95-MHT (WO) (M.D. Ala. June 4, 2020) ........................................21

*United States v. McKenzie*

    No. 18 CR. 834 (PAE), 2020 WL 1503669, (S.D.N.Y. Mar. 30, 2020)....................21, 22

*United States v. Nkanga Nkganga*

    No. 18-CR-713 (JMF), 2020 WL 1529535, (S.D.N.Y. Mar. 31, 2020) ..........................22

*United States v. Roeder*

    No. 20-1682, 2020 WL 1545872, at *3 (3d Cir. Apr. 1, 2020) ........................................22

*United States v. Witter*

    No. 19-cr-0568 (ECF 40) (S.D.N.Y. Mar. 26, 2020)....................................................22

*United States v. Vargas-Cordon*

    733 F.3d 366, 381 (2d Cir. 2013) ...................................................................13

*United States v. Zukerman*

    No. 1:16-cr-194 (AT), ECF No. 116 (Apr. 3, 2020)........................................22

*United States v. Marquez*

    941 F.2d 60 (2d Cir. 1991).............................................................................18

*United States v. Rivera*

    971 F.2d 876 (2d Cir. 1992)...........................................................................18

*United States v. Stewart*

    686 F.3d 156, 169 (2nd Cir.).............................................................................6

## Federal Statutes

8 U.S.C. § 1324(a)(1)(A)(iii) .................................................................................3, 12, 13

18 U.S.C. § 1028(a)(7) .................................................................................................3

18 U.S.C. § 1028(b)(1)(D) ...........................................................................................3

18 U.S.C. § 1028(c)(3)(A) ...........................................................................................3

18 U.S.C. § 1546(a) ...........................................................................................12, 13

18 U.S.C. § 3553(a) ...........................................................................................18, 23

18 U.S.C. § 3572 .......................................................................................................18

18 U.S.C. § 3572(a) ..................................................................................................18

18 U.S.C. § 3572(a)(1) ..............................................................................................18

18 U.S.C. § 3771(e)(2) ..............................................................................................16

U.S. CONST. amend. VI. ..............................................................................................5

## United States Sentencing Guidelines

U.S.S.G. § 2L1.1(b)(2)(A) .........................................................................................17

U.S.S.G. § 3B1.1(c) ...................................................................................................17

## Other Materials

Clare Bronfman Memo .............................................................................................3, 9

Gov't. Memo .............................................1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 17, 19

Frank G. Runyeon, *Brooklyn Court Closed After Positive COVID-19 Tests (September 4, 2020),*
*available at https://www.law360.com/articles/1307530?scroll=1&related=1; see also*
*https://www.nyed.uscourts.gov* .................................................................20

Sentencing Resource Counsel for the Federal Public Community Defenders, The COVID-19
Crisis in Federal Detention, September 9, 2020, available at
https://www.fd.org/sites/default/files/covid19/sentencing_advocacy/9.9.2020_sentencing_resour
ce_counsel_fact_sheet-
distribution_copy_0.pdf?utm_source=The+Marshall+Project+Newsletter&utm_campaign=baf49
234da-
EMAIL_CAMPAIGN_2020_09_11_11_13&utm_medium=email&utm_term=0_5e02cdad9d-
baf49234da-174521881 .............................................................................21

# INTRODUCTION

The Department of Justice's sentencing submission in this case is shocking in its recklessness with the facts. The government seeks to imprison Clare Bronfman for five years based on a number of assertions that are unproven and false and that Clare has never had the meaningful opportunity to contest. And they are seeking to do so in the midst of a global health pandemic that recently shut down the Eastern District of New York. Clare Bronfman pleaded guilty pursuant to a plea agreement and took full responsibility for what she did. Now, more than two years after she was charged, the government is attempting to convict her through a sentencing memorandum of a wide swath of criminal activity based on assertions that are simply wrong and that Clare has never had the opportunity to address in any meaningful way. This approach is without precedent and a violation of Clare's right to fundamental due process. We could not object more strenuously and now respectfully renew our request that Clare either be sentenced based on the conduct to which she pleaded guilty or be able to show at a Fatico[1] hearing the wrongfulness of the government's sweeping allegations against her.[2] An unfortunate number of the

---

[1] Since the government's submission specifically attempts to rely on the PSR, which we believe is fundamentally flawed and incorrect, we renew our request for a Fatico hearing so that the record can be corrected to show Clare's lack of involvement in any of the core criminal conduct involving Keith Raniere and the other co-defendants. To be clear, Clare is not seeking to delay sentencing; on the contrary, she is ready to be sentenced for the crimes to which she pleaded guilty to as expeditiously as possible, since she has been under home confinement for the past 26 months, which has taken a heavy toll on her. (The government does not seem to believe that 26 months in "luxurious accommodations" is any reason for leniency, *see* Gov't. Memo at 62-63. The truth is that Clare lives in a relatively modest apartment in downtown Manhattan. The government ignores the toll of being confined to an apartment but for a few hours a week, for 26 months, seven of which have been in the midst of a global pandemic. The last two years have been the hardest in her life, and she has not been able to speak to or be with most of her closest friends and support network the entire time. Additionally, her family lives in Europe and given the current state of the world, she has not seen them for nine months.)

[2] Although she reserves her rights to testify, we also respectfully object to the Court's admonition at the most recent conference that Clare must testify at a Fatico hearing. *See Mitchell v. United States*, 526 U.S.

government's allegations are flatly and demonstrably wrong as a matter of fact. To rely on them violates Clare's due process rights.

What Clare did, we respectfully submit, should be punished with three years of probation. This is not an unreasonable request. The core of her conduct was violations of harboring an illegal alien and facilitating the use of someone's credit card. What she did not do is anything at all related to the core of the conduct alleged against her co-defendants. Nothing she was ever accused of, or convicted of, relates to the so-called "NXIVM case."

To be very clear, what the government is attempting to do, through its sentencing memorandum and its PSR, is to convict Clare of "fund[ing] and promot[ing] a criminal enterprise led by her co-defendant Keith Raniere." Gov't. Memo at 1. That is not what the plea agreement provided; that is not what in fact happened; and it is unfair and a violation of Clare's fundamental rights under the Due Process clause to level such untested and factually incorrect accusations in a sentencing memorandum and Probation report.

---

314, 316-17 (1999) ("Two questions relating to a criminal defendant's Fifth Amendment privilege against self-incrimination are presented to us. The first is whether, in the federal criminal system, a guilty plea waives the privilege in the sentencing phase of the case, either as a result of the colloquy preceding the plea or by operation of law when the plea is entered. We hold the plea is not a waiver of the privilege at sentencing. The second question is whether, in determining facts about the crime which bear upon the severity of the sentence, a trial court may draw an adverse inference from the defendant's silence. We hold a sentencing court may not draw the adverse inference."). Along similar lines, we also wish to briefly address a point brought up by the Court at a recent conference that Clare's former counsel hired Michael Avenatti to represent her at a meeting with the U.S. Attorney. Clare relied upon former counsel's advice, and that counsel has now been replaced by Clare's current counsel. That said, we do respectfully ask the Court to disregard any of her testimony at the <u>Curcio</u> hearing as she was required to testify without the benefit of being able to confer with counsel, to which we also object.

**CLARE IS CONTRITE, REMORSEFUL, AND DEEPLY SORRY
FOR HER OFFENSE CONDUCT**

Before turning to the government's many contortions of fact and innuendo in this case, it is essential to Clare that the Court understands that she is truly contrite and remorseful in her expressions of remorse for what she pleaded guilty to: namely, one count of conspiracy to conceal and harbor an alien for financial gain in violation of 18 U.S.C. § 1324(a)(1)(A)(iii) and one count of fraudulent use of identification in violation of 18 U.S.C. §§ 1028(a)(7), 1028(b)(1)(D) and 1028(c)(3)(A). The government is seeking to further punish Clare for not being contrite about crimes she has never been charged with or been offered the due process to contest. We trust that the Court will reject the government's clear attempt to falsely state that she has not acknowledged guilt. *See* Gov't. Memo at 58 (arguing that "her unwillingness to accept responsibility for her conduct . . . warrants significant consideration by this Court). She pleaded guilty and took full responsibility for what she did. She still does. She fully accepts this Court's judgment of punishment, as she made plainly clear in her letter to Your Honor. In her sentencing memorandum, Clare specifically noted that "[a]t the outset, with regard to the charges that Clare actually pleaded guilty to, she has been contrite in her guilt, recognizing the mistakes of her actions. That is true to this day." *See* Clare Bronfman Memo at 2. We hope to be clear in this assertion: Clare stands ready to be sentenced by this Court and is deeply sorry for her violations of law.

That being said, Clare's fervent hope is that the Court will see through the government's blatant efforts to use <u>unproven</u> and <u>incorrect</u> assertions of fact – mostly elicited as uncontested "facts" in the trial of Keith Raniere (to which Clare was not a party) -- as a basis for an upward enhancement. She cannot comment upon or apologize for the actions of her co-defendants of which she had no knowledge, and in which she did not participate.

**CLARE BRONFMAN DID NOT FUND OR PROMOTE ANY
CRIMINAL ACTIVITY BY KEITH RANIERE OR ANYONE ELSE**:

## CLARE DID NOT FUND A SEX CULT

What the government is trying to do in its sentencing submission is to pervert the process of ascertaining a fair and just punishment by casting a pall of innuendo over these proceedings in violation of Clare's constitutional rights.[3]   The government far oversteps by making claims like: "Through her unwavering support of Raniere, financial and otherwise, Bronfman enabled him to perpetrate his crimes."  Gov't. Memo at 34.   The government's filing seeks an upward variance to address "the extraordinary harm caused to the victims by her conduct," see id. at 32, or because of her "obstructive conduct," *see id*. at 46.   Let it be very clear:  *Clare Bronfman did not know about DOS, had nothing to do with DOS, and did not fund DOS*.   And when the government references "victims," we fully acknowledge that the government will seek to bring crime victims to address the court in Mr. Raniere's case; however, as to Clare Bronfman, there is only one victim of the conduct to which she pleaded guilty:  ██████████   Clare's conduct simply did not involve any additional victims, and we object to the government's characterization otherwise.   Clare Bronfman renounces sex trafficking and human trafficking in their entirety: full stop.

---

[3] *See Townsend v*. *Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948) (It "is inconsistent with due process of law" for a defendant to be "sentenced on the basis of assumptions . . . which [a]re materially untrue."); *Torres v*. *United States*, 140 F.3d 392, 404 (2d Cir. 1998) (due process "requires . . . that a defendant not be sentenced based on materially false information); *id*. (*citing Townsend v*. *Burke*, 334 U.S. at 740-41 (1948) (a defendant must "be given notice and an opportunity to contest the facts upon which the sentencing authority relies in imposing the sentence," and that a defendant "not be sentenced based on a material misapprehension of fact.").  In fact, it is well established that "material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process." *United States v*. *Malcolm*, 432 F.2d 809, 816 (2d Cir. 1970).

We are troubled by and condemn the government's approach in this case particularly because there is no evidence in the record *anywhere* to support many of the gross exaggerations, inuendo, and untruths in the government's sentencing submission. Even more, in many instances, clear facts contradict the government's assertions. The United States is seeking to lay the blame for DOS at Clare Bronfman's feet because she has a large checkbook. That is inappropriate. In full recognition of her role in NXIVM, the government never charged Clare with anything related to human or sex trafficking and permitted her (and only one other defendant) to plead guilty to non-RICO charges.[4]

The United States maintains that the "Court is familiar with the factual background and offense conduct in this case, having presided over the six-week trial of Bronfman's co-defendant Keith Raniere." *See* Gov't. Memo. at 2. The fallacy of the government's logic is evident by the words themselves: the trial of *Keith Raniere*. Clare was not on trial and did not have the benefit of competent counsel utilizing what is "beyond any doubt the greatest legal engine ever invented for the discovery of truth": cross examination to challenge both falsehoods and mischaracterizations. 3 Wigmore, Evidence §1367, p. 27 (2d ed. 1923). Thus, the government's sentencing submission relies on alleged conduct that: (1) is not what Clare was charged with; (2) is not what Clare pleaded guilty to; and (3) is factually incorrect with respect to her role at NXIVM. It is a violation of due process to ask the Court to rely upon facts that we have never had a meaningful opportunity to explore and contest.[5] Clare should be sentenced based on the conduct she pleaded guilty to or

---

[4] The government now inexplicably and incoherently argues that "[t]he plea agreement reflects the government's belief that the Guidelines dramatically understate the seriousness" of the criminal conduct. Gov't. Memo at 35.

[5] *See* U.S. CONST. amend. VI.

facts that have been established through due process of law.   The government should not be permitted to, in effect, bring new charges against Clare Bronfman in its sentencing memorandum.

It is particularly troubling that the government, in seeking to advance incorrect and unproven allegations does so in such an inflammatory and imprecise way.  It makes the deprivation of Clare's constitutional rights more significant and the prejudice more difficult to overcome. It adds insult to injury for the government to seek to introduce these so-called facts via a sentencing memorandum and not in a contested courtroom proceeding designed to separate fact from mere allegation.   The government and Probation largely rely on demonstrably false assertions of "fact" from Keith Raniere's trial.

By way of example, to easily highlight for the Court, the below grid analyzes the government statements on page 1 – the very first page, only – of the government's sprawling 71-page submission. It compares the governments suggestions, overtones, illusions, innuendo, and invitations to infer the truth:

| Government Inuendo and Falsehood | The Truth |
|---|---|
| "There can be little doubt that Raniere would not have been able to commit the crimes with which he was convicted were it not for powerful allies like Bronfman." (Gov't. Memo at 1.) | When the government refers to "the crimes," they are referring to human and sex trafficking and forced labor, among other things.  These crimes hardly required millions of dollars, and NXIVM was profitable every year, having nothing to do with Clare Bronfman.  These sweeping statements have no basis in reality and are simply untrue.  Furthermore, Clare's monetary support was not for any criminal activity, and the government has never charged Clare with doing that.  The funds she gave and loaned were predominantly for an unrelated commodities deal, and what she did loan to NXIVM was all done without any knowledge of any illegality or wrongdoing and was done |

| | to support an endeavor in which she deeply believed. |
|---|---|
| "Bronfman spent millions of dollars of her inherited fortune on Raniere's endeavors." (Gov't. Memo at 1.) | Clare's support was entirely for NXIVM, or viable business investments. The word "endeavors" is innuendo, and Clare never funded criminal activities. |
| "She pursued Raniere's accusers and critics by dispatching powerful teams of lawyers, private investigators and public relations firms to attempt to discredit them and dredge up information that could be used to undermine their claims." (Gov't. Memo at 1.) | At bottom, Clare's legal efforts were entirely non-frivolous and well supported. All of these efforts were intended to support an organization in which she deeply believed.[6] |
| "Even now—after Raniere's convictions for sex trafficking, forced labor, alien smuggling and child exploitation offenses—Bronfman continues to support Raniere." (Gov't. Memo at 1.) | The government makes sweeping statements throughout without any basis of fact whatsoever. NXIVM and Mr. Raniere changed Clare's life and she stands by both the organization and Mr. Raniere for the tremendous good they did for thousands of people. Clare stands by her friends, but she does not stand by sex trafficking, forced labor, or any other criminal conduct, period. That allegation is exactly the type of innuendo that is so reckless.[7] |

---

[6] There is no doubt that Clare assisted with and oversaw certain litigation related to NXIVM. The government mocks this litigation and argues that "[s]he pursued Raniere's accusers and critics by dispatching powerful teams of lawyers, private investigators and public relations firms to attempt to discredit them and dredge up information that could be used to undermine their claims." (Gov't. Memo at 1.). What is remarkable about this, however, is that their sentencing memorandum then does not actually inform the Court about what any of this litigation in fact was. The litigation in which Clare was involved was not at all malicious or frivolous. We would very happily provide the Court with further information about these lawsuits, but the government is simply incorrect that any of this litigation was used to threaten or subdue crime victims. It is, quite simply, an outrageous suggestion. Nothing could be further from the truth, and it is deeply troubling that the government has not taken the time to explain what this litigation was about. This is yet another item that calls for a <u>Fatico</u> hearing.

[7] A court may not punish an individual by imposing a heavier sentence for the exercise of first amendment rights. . . . A sentence based to any degree on activity or beliefs protected by the first amendment is constitutionally invalid." *United States v. Stewart*, 686 F.3d 156, 169 (2nd Cir. 2012) (*quoting United States v. Lemon*, 723 F.2d 922, 937-38 (D.C. Cir.1983). While "the defendant's support for illegal activity" may be appropriately considered, "it is impermissible to sentence a defendant more harshly based on associations that do not relate to specific criminal wrongdoing, for example, or for beliefs that some might find morally reprehensible, or for critical statements made in public because they were made in public." *Id.* at 169.

And that is just the first page. The entire filing is replete with issues and errors like this.

For example, the government writes that "[e]ven after Raniere's conviction, Bronfman has continued to wire funds to the 'KAR 2018 Trust,' the trust she created for the benefit of Raniere and ████████ son. *See* PSR ¶ 187. <u>That is not true. The government is presenting false information to the Court</u>. The truth is that Clare made two payments, both of $250,000, on June 4, 2018 and June 13, 2018, both prior to Clare's arrest. Keith Raniere was convicted on June 19, 2019. Furthermore, what is wrong with funding this trust anyway? The trust is for the sole benefit of a young child, whose father is in jail. Clare cares about the child and his mother and has known them for years. Nothing inures to Mr. Raniere's benefit. Clare selflessly set up a trust to ensure that an innocent to all of this - a young child – would continue to have a roof over his head, food, education and medical care. *He is three years old*.

"For many years," the government writes, "Clare Bronfman used her extraordinary wealth and social status to fund and promote a criminal enterprise led by her co-defendant Keith Raniere." Gov't. Memo at 1. That is wrong: <u>Clare Bronfman never knowingly funded a criminal enterprise.</u> Why is the government saying this now? It did not charge her with this behavior, and she did not plead to it. The government also says that that "[f]or years, Bronfman leveraged her colossal wealth to recruit individuals, often women with no legal status in the United States, into Nxivm-affiliated organizations." Gov't. Memo at 34. Here, the government makes sweeping and unprovable claims with no support or facts that would support such a conclusion. As to how Clare allegedly used her wealth to further the aims the government alleges, its papers are silent on details. Such a conspicuous silence is necessary because the stubborn facts revealed by an accounting of Clare's financial relationship with NVIVM would compel a different conclusion. This is yet

another reason a <u>Fatico</u> hearing is urgently required to separate fact from unproven innuendo. Furthermore, the truth is that Clare enrolled very few people whatsoever – and Sylvie was the only person Clare enrolled that she helped with a visa and was the only person related to the government's case against Mr. Raniere – though not through Clare – in any way. None of the people she enrolled are famous or wealthy, so it is unclear what the government is trying to accomplish with its innuendo, loose language, and untethered accusations. The government is trying, once again, to inflate Clare's role so that the Court will see her as responsible.

The government seems somewhat unable to separate Clare's support for NXIVM, an institution that she loved and continues to believe in, from her lack of knowledge of DOS. NXIVM is not DOS. <u>DOS was a secret society that she knew nothing about</u>. As she made clear in her sentencing submission, Clare would never knowingly fund a sex cult, and she renounces human trafficking and sex trafficking unequivocally. There is no evidence to the contrary. That Clare has to even give voice to this fact in a sentencing memorandum further shows the prejudicial state of the record.

The court noted, *sua sponte*, at a recent hearing that Clare Bronfman "wrote a lot of checks." Clare does not deny this. But that does not mean that she had any idea of the activity that was revealed at Keith Raniere's trial. The care and detail that comes with developing reliable assertions of fact would show that Clare's money went to specific activities at an independently financially executive coaching business that she thought would improve the world. While the government's papers spill a lot of ink on rebutting a straw-man argument that Clare is asking for a special privilege at sentencing, the truth is that, because of Clare's money, the Department of

Justice is treating Clare differently from the other members of NXIVM's leadership.[8] **The government conflates, at every turn, Clare's generosity toward an organization whose mission was to help people better their lives, and that changed her life with wealth that knew no limits between what was right and wrong**. The United States writes that:

> "[w]hat is especially significant about Bronfman's financial support of Raniere is that it was without any apparent limitation. When Raniere wished to invest in the commodities market, Bronfman simply gave him $67 million to do so—with no expectation that he would ever be in a position to pay her back (he didn't). For this reason, Bronfman's claim that she did not provide financial support for DOS or otherwise for Raniere's "personal life," Def Mem. at 21, underline makes little sense. Bronfman funded Raniere in all of his endeavors, without question or limitation. The government respectfully submits that Bronfman's continued loyalty to Raniere and her

---

[8] The government's memo is dripping with innuendo that Clare is somehow asking for "special treatment," Gov't. Memo at 1, because of her wealth, which she assuredly is not. In fact, quite to the contrary, she is being treated differently by the government than some of the less wealthy board members of NXIVM, since there is truly no difference between her involvement and theirs. If anyone is getting "special treatment," it raises the question of why Clare Bronfman is singled out at every turn. As the government writes, "there can be little doubt that Raniere would not have been able to commit the crimes with which he was convicted were it not for *powerful allies* like Bronfman," Gov't. Memo at 1 (emphasis added). Along those lines, the government does seem quite interested in bringing up Clare's wealth in irrelevant ways that appear to be done for the sole benefit of harming the Court's opinion of her. For example, the government mentions that she showed "an astonishing lack of empathy for the financial struggles of others," Gov't Memo at 40, and that "[s]he is likely one of the most privileged and wealthy defendants to ever appear before this Court for sentencing." Gov't. Memo at 55; *see also id*. at 34 ("Bronfman leveraged her colossal wealth . . . "). As Clare's letters attest, she is an incredibly generous person and giving person, and she loaned millions of dollars to an organization she deeply believed in. The number of letters from her employees and colleagues in Fiji, for example, attest to the way in which she changed their lives and saved them from financial ruin after the last major hurricane. *See* Exhibits to Clare Bronfman Memo. It is further disappointing that the government implies that these letters were somehow written under duress, since Clare owns the property, but the authors of these letters – like all of the rest – know that they likely will suffer negative consequences for speaking up on Clare's behalf. It is further quite remarkable that the government seeks to undermine NXIVM's legitimate work, and Clare's charitable contributions, on behalf of individuals with Tourette's Syndrome, *see* Gov't. Memo at 64 n. 28. Remarkably, it seems quite clear that the government has not even taken the time to watch the documentary entitled "My Tourette's," which very clearly lays out the very legitimate and real work done by NXIVM to help patients suffering from Tourette's. Instead the government mocks the work by referring to it as a "study" in quotation marks. We once again respectfully invite the Court and government to view this work Tourette's Syndrome, entitled "My Tourette's." The Court may access this documentary at ███████████████████████ ████████ ███████████████████████.

10

> substantial financial resources suggest that specific deterrence is of unique
> concern in this case and counsels in favor of a substantial sentence."

Gov't. Memo at 60 (emphasis added).[9]  The government continues purposefully to conflate NXIVM with DOS, and Clare's support for the former as tacit approval and participation in the latter. Where Clare contends that NXIVM "is now forever associated with criminal activity," Clare Bronfman Memo at 70, the government retorts that NXIVM "*was* criminal, as a jury has already found."  Gov't. Memo at 63 n. 27 (emphasis added).

This is simply not true.   NXIVM is not a criminal organization.   NXIVM has (appropriately) never faced criminal charges, and if NXIVM were truly a criminal organization, far more people associated with its leadership would have been prosecuted.  That is false, and underscores once again the government's complete misrepresentation of the difference between NXIVM and DOS.

There are very many good and decent people who loved NXIVM and who benefitted immensely from its teachings.   A high-profile entrepreneur, a co-founder of the Black Entertainment Network, a Justice of the Arkansas Supreme Court, and an ex-U.S. Surgeon General:  they and so many others might be surprised to learn that they were all part of a criminal enterprise. Many alumni of ESP, including Clare Bronfman, never intended to hurt anyone, never intended to traffic people for sex or to break the law in any way.  **That the government would**

_____

[9]  Once again, a major factual error in the government's brief.  Clare did not "simply g[i]ve" $67 million to Keith Raniere to invest in the commodities market.  Gov't. Memo at 60.  It is astounding that the government just says things like this with no factual support.  In fact, this investment was made to cover calls in the commodities market that were going to financially harm a number of people that Clare cared about, so she made the investment to help them, and it certainly was not an easy or flippant decision.  In the end, she lost money, but there was a good and caring reason that she made this investment. Not just "simply giving" Keith Raniere money. Furthermore, Mr. Raniere was very helpful to her in discussing investments, some of which she made money on, such as purchasing certain stocks.

**enter into a plea with Clare Bronfman for two violations of unrelated law and then seek to bootstrap those charges into something significantly larger and more nefarious (*i.e.*, that she funded a sex cult) is unfair and unjust**.

It is remarkably telling that the government attempts to lay out facts about DOS, which the government itself concedes was a "secret organization," Gov't. Memo at 18, and then literally has nothing to say about Clare Bronfman's involvement in DOS itself. Instead, the government relies on elliptical sentences that invite the reader to speculate -- Sylvie worked for Clare, Monica recruited Sylvie for DOS, bad things happened at DOS. This is how the government attempts to connect Clare to DOS: by and through a contract employee who was, according to the government's own theory, sworn to secrecy about DOS. (Never mind that the government is incorrect and misrepresents that Syvlie worked for Clare for ten years, and never mind that Monica recruited Syvlie for DOS *ten* years after Syvie first came to the United States to work for Clare.) The government has not produced – and cannot produce – one check or wire transfer that links Clare to DOS. The government has not produced – and cannot produce – one witness who says Clare recruited her to DOS. The government has not produced – and cannot produce – one witness who says that they told Clare about DOS in defiance of their "master's" strict orders of secrecy. Indeed, the government cannot, in good faith, aver contradictory theories. On the one hand, the government contends that DOS was a secret organization that forbad its initiates from disclosing information about DOS to anyone. The government further contends that Mr. Raniere's hold over the first-line masters was such that obedience was strict. At Mr. Raniere's trial, which the government relies on so heavily, its own witness testified that Mr. Raniere ordered that no one tell Clare about DOS. There is no evidence – anywhere – that anyone invited Clare to join DOS.

Despite this, the government, in full sophistic prose, invites the reader of its submission to believe that the DOS "slaves" defied their "masters" in just this one instance to secretly tell Clare of its existence and solicit her financial support. It strains credulity to accept such a premise. Accordingly, it is appropriate to pull every DOS reference from the PSR and cull it from the government's sentencing submissions. The Court should not rely on any DOS reference. The only meaningful fact about DOS relevant to Clare is that it was purposefully kept secret from her.

To the extent the Court is considering relying on DOS in sentencing, a <u>Fatico</u> is required to avoid the prejudice that touches and concerns Clare's due process rights, among other constitutional protections *See* Gov't Memo at 20. The discussion of Nicole similarly is entirely silent on anything to do with Clare. *See id*. at 21. Their discussion of Jay is also silent on anything to do with Clare. *See id*. at 20-21. <u>Why would the government engage in a long discussion about DOS and then fail to lay out any evidence whatsoever tying Clare Bronfman to any actual involvement in it? Because the government has none, and if it believes any evidence exists, then Clare should be granted a Fatico hearing.</u>

Yet, even though the government cannot point to any involvement whatsoever Clare had with DOS, the government nevertheless asks the Court to disregard her well-intentioned efforts to get to the bottom of allegations that something might be wrong, after the DOS story became public. Even though Clare helped hire a well-known and reputable forensic psychologist to interview various members of DOS and NXIVM, the government tells the Court to ignore that fact because the evidence "<u>suggests</u>" that Clare had "no interest in actually determining the truth about DOS, but was simply attempting to quell media and public scrutiny of Raniere and DOS." Gov't Memo at 47 n. 18 (emphasis added). The government ignores its own witness at Mr. Raniere's trial who

stated that DOS initiates were instructed to "lie" to the investigators Clare hired. According, the government asked the jury in Mr. Raniere's trial to credit testimony that it now, by implication, invites the Court to ignore and impute knowledge to Clare when she sought to investigate. It is precisely this type of tunnel vision and cherry picking of facts that has painted such a wrong impression of Clare's actions and motivations.

To further try to bolster a case that Clare "promoted a criminal enterprise led by Keith Raniere," the government then highlights letters that it represents were sent to "Raniere and Bronfman" – again attempting to convey that it is fair to infer Clare had knowledge of collateral and DOS. The truth of which the government is well aware is that such letters went out to the entire board of NXIVM, as well as other leaders and members of NXIVM (Clare was just one of a number of board members and other leaders and members in NXIVM receiving these materials). The government leaves out this important contextual detail to invite a conclusion not supported by any record of fact. On the government theory, these letters must impute foreknowledge to the entire NXVIM board or anyone who received such a letter. Of course, such an imputation of foreknowledge is not warranted, but by leaving out crucial facts, the government invites this very specious conclusion. Significantly, almost none of the many individuals who received these letters have **ever** been charged with a crime by the U.S. government. Presumably, then, the fact of receiving one of these letters, on the government's theory, appears only probative of guilt with respect to Clare, but no other. Inasmuch as this form of argument is blatantly inconsistent, the government opts simply to omit inconvenient facts in its submission.

The government also spends much time addressing Clare's communications with attorneys in Mexico, *see* Gov't. Memo at 23-26, and implies that she was attempting to silence sex crime

victims from coming forward to the authorities. That is not what happened as the clear facts and record show, and she would never try to silence crime victims. In fact, Clare was in possession of evidence that NXIVM's computers had been hacked into and that the NXIVM client roster was being contacted in Mexico. Misusing NXIVM's client list to cause harm to the company was properly against the law in Mexico, and the attorneys in Mexico took action based on that. There was never an intent on Clare's part to engage Mexican lawyers for the purpose of stifling crime victims' rights to go to law enforcement.

To further bolster their "promotion of a criminal enterprise" case, the government points to an online statement Clare authored in December 2017 – with the benefit of virtually no information – in which she supported DOS. *Id*. at 26. As our initial sentencing submission made very clear, she was acting at that time with limited information and did not understand the full scope of DOS until Keith Raniere's trial (and she may never understand the full scope). The government attempts to pile up other tidbits of inuendo. For example, the government writes, "As media outlets begun [sic] reporting that the United States Attorney's Office had launched a criminal investigation, Raniere stopped using the phone he had previously used for over fifteen years and he and Bronfman began using encrypted email accounts." Gov't. Memo at 26-27. This is yet another blatant misstatement of fact as regards Clare. Clare had maintained the email the government references well before the U.S. Attorney's Office initiated an investigation. But, through semantic slight-of-hand, the government implies that *both* Mr. Raniere and Clare *stopped* using emails in favor of encrypted emails only after the initiation of an investigation. Nearly every fact averred by the government is in dispute; the email half-truth is but another example. To deny Clare a <u>Fatico</u> hearing on this record prejudices Clare and is fundamentally unfair in violation of

her constitutional rights. The government continues to take issue with the fact that Clare set up a legal defense fund, *see* Gov't. Memo at 27, even though these were some of her best friends in the world and she could afford it, and went to great lengths to ensure it was properly administered and that she had absolutely no control of it, as was established at the numerous Curcio hearings addressing the trust. The government also notes that Clare sought criminal charges against Sarah Edmondson, even though these were charges made in good faith.[10]

## OFFENSE CONDUCT

With regard to the charges that Clare actually did plead guilty to, the government is again incorrect on certain factual points. However, we raise these errors not in any way to undermine Clare's acceptance of responsibility but in order to ensure that the factual basis for her sentencing is corrected and that the guidelines are calculated accurately. Clare has pleaded guilty and she fully accepts responsibility for her violations of two criminal statutes.

### A. The government is attempting to enlarge the criminal activity by alleging more than one victim and more than six aliens

The government is attempting to bootstrap far more serious charges against Clare with a disingenuous argument that her conduct involved six or more illegal aliens. Clare was never, in fact, charged with any offense that would involve more than one alien. Originally, as the Court is aware, she was charged with visa fraud in violation of 18 U.S.C. § 1546(a), for a false representation about payment to ▮▮▮▮▮, which was the basis for the visa. **Clare is sincerely sorry to ▮▮▮▮▮ for this**. The government asked Clare to plead guilty instead to harboring

---

[10]   Another factual error in the government submission states that Clare contacted the NYPD regarding Sarah Edmondson, Gov't. Memo at 50, but in fact Clare contacted HSI. But again, the general point is true, since Clare had a good-faith basis to believe that Ms. Edmonson committed a crime. There are errors large and small in the government's brief; this is what happens when one party just unilaterally states "facts" that have not been properly challenged in a court of law.

an illegal alien in violation of 8 U.S.C. § 1324(a)(1)(A)(iii), which she did in order to satisfy the government's request that she forfeit $6 million. Now, they seek to enhance that criminal charge by arguing that Clare harbored six or more aliens, which is absolutely not the case.

B. **The government misstates a key fact related to the ██████ parole and omitted key facts**

The Government brief suggests that ██████ requested a humanitarian parole and was denied before the ICE agent approved a parole on questionable grounds. *See* Gov't. Memo at 12. They make this assertion because it casts more doubt on the validity of the ICE parole. However, this statement is factually inaccurate as ██████ **was never denied** a humanitarian parole. This is an additional factual dispute that requires resolution through a <u>Fatico</u> hearing.

After her visa was canceled by CBP officers in Los Angeles, ██████ applied for a new B1/B2 (visitor) visa from the U.S. Embassy in Mexico City. This visa application was denied. Only after the denial of the visitor visa application did ██████ request a humanitarian parole through counsel. This request was first made to ICE HSI special agents and was approved -- ██████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████

Not only did the Government inaccurately suggest that there was a humanitarian parole application that was denied before the ICE approval, they fail to mention a few key facts, including that U.S. Customs and Border Protection approved a second humanitarian parole for ██████ after the expiration of the ICE parole. Because there are no allegations that anything inappropriate occurred in the approval of this parole, this second parole demonstrates that the parole was based on valid grounds and that the decision by ICE to parole ██████ into the U.S. was not so unusual as to suggest something inappropriate occurred. As to this point, we invite the Court to read the

letter from ███████████████████████ ███████████████████████. *See*

Gov't. Memo at Exhibit A6 ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

### C. The government incorrectly asserts that Clare attempted to keep money out of Keith Raniere's name

As to the identity theft charges, the government wrongfully and recklessly asserts that "Bronfman ignores that the fraudulent use of Pamela Cafritz's identity was part of a long-running scheme to intentionally keep money out of Raniere's name, thereby evading income tax requirements and making it difficult or impossible for creditors or the government to levy on those funds." Gov't. Memo at 44. That is not what Clare allocuted to, and that is not what happened. To the contrary, at the time of the payments, Clare believed the money to belong to Mr. Raniere and never intended to keep it out of his name. That is simply untrue and unproven, and more evidence of the need for a <u>Fatico</u> hearing.[11] In support of its proposition, the government cites to trial testimony of Mark Vicente; however, Mr. Vicente would have no basis to testify as a tax expert or even as a first-hand fact witness on this issue, and his testimony was not subject to any cross examination by Clare's legal counsel (like so much of what the government relies on).

---

[11] ████████ is Mexican and would not pay U.S. taxes.

Furthermore, there is a great deal of evidence demonstrating Clare's history of tax compliance, as well as attempts to ensure that taxes were filed for the various NXIVM companies, and Clare even went so far as to hire an outside accountant to assist.

### CLARE COMMITTED TWO OFFENSES TO WHICH SHE PLEADED GUILTY AND THERE IS ONE VICTIM

**A.  There is no basis to order restitution for or hear from multiple purported victims**

The government is seeking to bring multiple crime victims in front of this Court and is asking the Court to order Clare to pay restitution to them.  There is absolutely no basis for this.

Of course, crime victims should be heard, and we respectfully submit that the appropriate time for these individuals to address the Court will be at Keith Raniere's sentencing and/or the civil case (for which most of them are plaintiffs) -- not Clare's sentencing.  Here there is only one victim of the crimes to which Clare pleaded guilty or otherwise had any dealings at all:  ███████.  We object to the government's request to have these individuals at Clare's sentencing or to ask her to pay them any restitution for crimes that she did not commit.

As we believe is quite clear, Clare's plea and the resulting offense of conviction was related to only one alien.  Both the transcript of her plea hearing as well as her allocution specifically identify Jane Doe 12 as the victim of Count One.  Under 18 U.S.C. § 3771(e)(2), a "crime victim" is defined as "a person directly and proximately harmed as a result of the commission of a Federal offense." Furthermore, these alleged victims were not named in the original indictment nor were they mentioned in Clare's plea agreement in which she pled guilty to a criminal violation concerning the sole victim.  The government's attempt to introduce previously unmentioned individuals and their statements in the sentencing hearing is inadmissible as it would violate Ms. Bronfman's Fifth Amendment Due Process right.  Furthermore, many of the purported victims of

Clare's criminal activity are plaintiffs in ongoing civil litigation against her, and we believe that there are factual inaccuracies, as they relate to Clare's conduct, in the letters that were submitted with the government's memorandum. Thus, we believe the Court should not hear from these purported victims in Clare's sentencing and should not order restitution for any victims other than ███████[12]

The government has made many misleading claims about these purported victims, including that Clare "had no intention of providing her victims with a living wage." Gov't. Memo at 34. First, there is only one victim of Clare's offense conduct. Second, the government's haphazard allegations are factually incorrect. As to ██████ Clare paid for her education, parental support, books, medical expenses, a car, and a two-bedroom apartment. (██████ victim statement stands in stark contrast with the card and gift that she sent to Clare almost a year after Clare was indicted.) As to Sylvie, while she was employed by Clare, she was paid a living wage, and even when she was employed by other people, Clare continued to support Sylvie with a place to live, classes at NXIVM, medical care, and other support. ████████ never worked for Clare, and the government's own submission acknowledges that Clare paid ██████ Thus, there is zero evidence for this outlandish claim by the government, and it does not relate to the offense conduct at all.

---

[12] On a related point, the government agrees with our analysis that Jane Doe 12 is not a participant in the offense of conviction and that there should not be a two-level role enhancement under § 3B1.1(c). *See* Gov't. Memo at 31 (*citing* Clare Bronfman Memo at 38.). Nevertheless, given the history of the plea in this case, it is disturbing that the government is using this opportunity to argue that the three-level adjustment under Section 2L1.1(b)(2)(A) for the smuggling, transporting, or harboring of six or more aliens applies. The government amazingly argues that this enhancement is "*likely appropriate*," *see id*. (emphasis added), even though they posit they point this as an academic point if the Court declines to give the two-level role enhancement under § 3B1.1(c) because it will not impact the guidelines range. This is far more than a moot point because it shows the lengths the government is going to in order to bootstrap much larger criminal charges onto Clare's plea.

Furthermore, we invite a close look at the exhibits attached to the government's sentencing submission. While the government cherry picks certain sentences from the letters attached thereto as exhibits, none of these passages implicate Clare in any way.

**B. The fine should be on the basis of the nature of the acts pertaining to the particular crime, not just Clare's net worth**

The government is seeking, based on Clare's plea to two criminal offenses, a statutory maximum fine of $500,000. While there is no doubt that Clare can afford it, that does not make it right. The fine should be lower and not just based on Clare's wealth. It should reflect the crimes to which she pleaded guilty.

In general, fines imposed in criminal cases are determined by 18 U.S.C. § 3572 and the U.S. Sentencing Guidelines. When determining whether to impose a fine, a court should consider several factors set forth in 18 U.S.C. § 3572(a), in addition to those set forth in 18 U.S.C. § 3553(a). *See id*. § 3572(a). The § 3572(a) factors include, inter alia, "the defendant's income, earning capacity, and financial resources" and "the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose." *Id*. § 3572(a)(1), (2). *See also United States v*. *Hickman*, 330 F. Supp. 3d 921, 922-23 (W.D.N.Y. 2018). However, courts are only "require[d] . . . to 'consider' [the factors outlined under § 3572]." *United States v*. *Marquez*, 941 F.2d 60 (2d Cir. 1991). When an individual's financial circumstances do factor in, it is to lower or eliminate a fine because a person lacks financial means rather than increase a fine in proportion to his or her income. United States Sentencing Guidelines § 5E1.2(a). *See also Graziano v*. *United States*, 83 F.3d 587, 589 (2d Cir. 1996); *United States v*. *Rivera*, 971 F.2d 876

(2d Cir. 1992). Within the Eighth Amendment, the Excessive Fines Clause provides that "excessive fines [shall not be] imposed." U.S. CONST. amend VIII. "The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as *punishment* for some offense." *Austin v. United States*, 509 U.S. 602, 609-10 (1993) (internal quotation marks omitted).

## COVID-19

**A. The government is seeking to put a non-violent, first-time offender in prison during a public health emergency and claims that the "September 2020" numbers are under control (even though the federal courthouse just shut down).**

It is important to address the quite callous arguments by the United States with respect to COVID-19, in which they argue that the pandemic does not "supply[] a basis for leniency." Gov't Memo at 67. We disagree strongly that prison is appropriate in this case, not only because Clare is a first time, non-violent offender but also because sending her to prison right now is manifestly unjust. Furthermore, even if Clare is not in an at-risk health population, others in the prisons are, and given the prisons' efforts to socially distance at-risk populations, there is no reason to add more bodies to the population now unless it is absolutely necessary.

We simply disagree with the Department of Justice that "the Bureau of Prisons ('BOP') generally has demonstrated that they are prepared to handle, and are effectively handling, the risks presented by COVID-19." Gov't. Memo at 67. It is further quite shocking that the government would assert that "Bronfman's claim that the BOP is in the midst of a 'rapidly-evolving crisis' is not supported by the reality on the ground." The government urges, in the sentencing memorandum, for us to "look[] at current numbers as of September 2020." *Id*. at 69. We agree that the Court should. We need not inform this Court that the Chief Judge for the Eastern District

of New York shut down the main Brooklyn courthouse from September 3, 2020 until September 14, 2020 to facilitate cleaning and conduct contract tracing pursuant to CDC protocols after court officers tested positive for COVID-19.[13]

On September 9, 2020, the Defender Services Office, an organization dedicated to upholding individuals' right to counsel guaranteed by the Sixth Amendment, issued a fact sheet regarding the transmission of COVID-19 in federal detention centers. The publication stated that the infection rate amongst the incarcerated is four times higher compared to the general population and the death rate is twice that of the national rate. According to Joe Rojas, the regional vice president of the American Federation of Government Employees Council of Prison Locals, the Federal Bureau of Prisons ("BOP") is making the situation worse, claiming "[BOP is] making the virus explode." Currently, the number of reported deaths of incarcerated individuals is 126 and BOP, having knowledge that the majority—93—were at higher risk of complications from COVID-19, did not take necessary measures to prevent their avoidable deaths. The publication further cited the federal government's response to COVID-19 at Federal Medical Center ("FMC") Carswell as an example of "a culture of cruelty and disregard for the well-being of incarcerated people," particularly because several inmates who were denied compassionate release on the reasoning that they were receiving adequate care at the prison ultimately contracted COVID-19 and died.[14] These occurrences are not unique to FMC. Reports confirmed by The Office of

---

[13] *See* Frank G. Runyeon, *Brooklyn Court Closed After Positive COVID-19 Tests*, LAW.COM (September 4, 2020), https://www.law360.com/articles/1307530?scroll=1&related=1; *see also* UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF NEW YORK https://www.nyed.uscourts.gov (last visited Sept. 20, 2020).

[14] *See Sentencing Resource Counsel for the Federal Public Community Defenders*, The Covid-19 Crisis in Federal Detention (Sept. 9, 2020), http://www.fd.org/sites/default/files/covid19/sentencing_advocacy /9.9.2020_sentencing_resource_counsel_fact_sheet-distribution_copy_0.pdf; *see also Coronavirus cases*

Inspector General ("OIG") of the DOJ, along with court-appointed experts, like Dr. Michael Rowe and Dr. Homer Venters, demonstrate that the conditions in federal prisons promote the inevitable spread of COVID-19 among prisoners as " facilities lack proper cleaning equipment, room to social distance, personal protection equipment, or hygiene products."[15]

Courts across the U.S. have "recognized that BOP undertreats or ignores COVID-related symptoms, despite CDC findings that COVID-19 can 'result in prolonged illness even among persons with milder . . . illness.'" *Id.*; *see also United States v. McCall*, No. 18-cr-95-MHT (WO) (M.D. Ala. June 4, 2020) (finding compassionate release is necessary where defendant's sickle cell anemia posed a heightened vulnerability to COVID-19 that the BOP was unable to address at the facility housing the defendant); *United States v. Cassidy*, 17-CR-116S (W.D.N.Y. May 13, 2020) (finding defendant's pulmonary and cardiac conditions put him at heightened risk of contracting COVID-19 during an outbreak at his facility and thus necessitated defendant's release to home confinement). Cognizant of this fact, courts have seen an influx of petitions for compassionate release and have been considerably more likely to grant a modification when COVID-19 concerns were paired with additional justifications for release. In a recent decision by the Southern District of New York, Judge Lorna G. Schofield granted a defendant's application under 18 U.S.C. Section 3582 to modify his sentence after he had exhausted his administrative rights through BOP first, and where he had a compromised immune system. The government did not oppose his application. *See United States v. Campagna*, No. 16 CR. 78-01 (LGS), 2020 WL

---

*in prison are exploding. More people need to be let out*, WASH. POST (Aug. 21, 2020), https://www.washingtonpost.com/opinions/coronavirus-cases-in-prisons-are-exploding-more-people-need-to-be-let-out/2020/08/21/711b7b9a-e306-11ea-8dd2-d07812bf00f7_story.html.
[15] See *Sentencing Resource Counsel for the Federal Public Community Defenders*, The Covid-19 Crisis in Federal Detention (Sept. 9, 2020), http://www.fd.org/sites/default/files/covid19/sentencing_advocacy /9.9.2020_sentencing_resource_counsel_fact_sheet-distribution_copy_0.pdf

1489829, at *3 (S.D.N.Y. Mar. 27, 2020). In another recent decision from S.D.N.Y, while an inmate's request for modification to time served was denied without prejudice, his alternative request for a recommendation that the BOP allow him to serve the rest of his sentence in a halfway house and home confinement instead of New York's Metropolitan Correctional Center was granted. Judge Engelmayer cited the "heightened health risk" and explained that "at the time of sentencing, the Court did not know, and could not have known, that at least a substantial portion of [defendant's] final seven months of imprisonment would be served at a time of worldwide pandemic, which is directly impacting the facility at which [defendant] is incarcerated." *See United States v. Knox*, No. 15 CR. 44 (PAE), 2020 WL 1487272, at *2 (S.D.N.Y. Mar. 27, 2020*); see also United States v. Zukerman*, No. 1:16-cr-194 (AT), ECF No. 116 (S.D.N.Y. Apr. 3, 2020) (ordering modification of term of imprisonment to home confinement rather than making a recommendation to the BOP). Lastly, in a decision from the Eastern District of New York, Judge Kiyo Matsumoto granted defendant's Section 3582 motion, stating "[t]he court cannot glean what ends of justice may be served by keeping Mr. Hansen incarcerated," and acknowledging, in addition to Mr. Hansen's medical issues, "the unique risks posed by the COVID-19 pandemic to prisoners like Mr. Hansen, who is elderly and infirm." *See United States v. Hansen*, No. 1:07-cr-00520 (KAM), ECF No. 213, (E.D.N.Y. Apr. 8, 2020), at 23.

In reducing the spread of COVID-19 infections within the criminal justice system, courts have also been forced to re-think the circumstances under which an individual should be detained. Successful requests for bail pending sentencing that rely on COVID-19 have largely emphasized health concerns. But these decisions have varied widely. In one case, a diabetic paraplegic with a catheter was denied bail. *See United States v. Witter*, No. 19-cr-0568 (ECF 40) (S.D.N.Y. Mar. 26,

2020). In other cases, asthma was sufficient. *See United States v. McKenzie*, No. 18 CR. 834 (PAE), 2020 WL 1503669, at *1 (S.D.N.Y. Mar. 30, 2020); *United States v. Nkanga Nkganga*, No. 18-CR-713 (JMF), 2020 WL 1529535, at *3 (S.D.N.Y. Mar. 31, 2020) (noting in dicta that exceptional reasons existed). Overall, the question requires a case-by-case inquiry. *See United States v. Roeder*, 807 F.App'x 157, 160–61 (3d Cir. 2020) ("[T]he existence of a widespread health risk is not, without more, a sufficient reason for every individual subject to a properly imposed federal sentence of imprisonment to avoid or substantially delay reporting for that sentence.").

## CONCLUSION

For the reasons explained above and in Clare Bronfman's sentencing submission dated August 28, 2020, a Guidelines or above Guidelines sentence in this case will not serve any deterrent effect and will certainly be a sentence "greater than necessary" to achieve 18 U.S.C. Section 3553(a)'s objectives.  Clare Bronfman should be held responsible for the conduct she actually committed, not incorrect and unproven allegations for which she was never charged or convicted.  In light of the federal sentencing factors, as well as legitimate safety concerns surrounding COVID-19, the appropriate sentence for Clare Bronfman is three years of probation.


Dated: September 22, 2020  
     New York, New York

Respectfully submitted,

Ronald S. Sullivan, Jr., Esq.  
Ronald Sullivan Law, PLLC  
1300 I Street, N.W.  
Suite 400 E  
Washington, D.C. 20005  
(202) 935-4347

Duncan Levin, Esq.  
Tucker Levin, PLLC  
230 Park Avenue, Suite 440  
New York, New York 10169  
(212) 330-7626

*Attorneys for Defendant Clare Bronfman*