UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES,

               -against-

CLARE BRONFMAN,

                         Defendant.

**SENTENCING
MEMORANDUM
18-CR-204 (S-3) (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

This sentencing statement concerns Defendant Clare Bronfman, who entered a plea of guilty to a superseding information, pursuant to a plea agreement, on April 19, 2019 to one count of Conspiracy to Conceal and Harbor Aliens for Financial Gain, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I) and 1324(a)(1)(B)(i) and one count of Fraudulent Use of Identification, in violation of 18 U.S.C. §§ 1028(a)(7), 1028(b)(1)(D), and 1028(c)(3)(A).

## I.    CALCULATION OF OFFENSE LEVEL & GUIDELINES RANGE

The Probation Department recommends that I calculate the Total Offense Level for Ms. Bronfman's sentence as 17. (Presentence Investigation Report ("PSR") ¶ 141.) Ms. Bronfman challenges two aspects of the Probation Department's suggested calculation. First, she argues that a three-level increase pursuant to U.S.S.G. § 2L1.1(b)(2)(A) is not warranted because the offense of conviction on Count One did not "involve[] the smuggling, transporting or harboring of six or more unlawful aliens." (*See* Def. Sentencing Mem. ("Def. Mem.") (Dkt. 915) at 26-33.) Second, she argues that a two-level increase pursuant to U.S.S.G. § 3B1.1(c) is not warranted because her role in the offense of conviction on Count One was not as "an organizer, leader, manager, or supervisor in criminal activity." (*See id*. at 36-38.) Ms. Bronfman suggests that the correct Total Offense Level is 16. (*Id*. at 24-25.) The Government agrees with Ms. Bronfman that the two-level enhancement for holding a leadership role is not warranted, but it agrees with

1

the Probation Department that the three-level enhancement for participation in the smuggling of six or more aliens is appropriate. (Gov't Sentencing Mem. ("Gov't Mem.") (Dkt. 922) at 29-31.)

I agree with Ms. Bronfman that the Total Offense Level is 16, for the following reasons.

### A.   Offense Level on Count One

Under Count One, Ms. Bronfman pleaded guilty to Conspiracy to Conceal and Harbor Illegal Aliens for Financial Gain. U.S.S.G. § 2L1.1(a)(3) provides that the Base Offense Level for this offense of conviction is 12. At issue is whether I should apply either or both of two possible enhancements to the base offense level: a three-level enhancement under U.S.S.G. § 2L1.1(b)(2)(A) or a two-level enhancement under U.S.S.G. § 3B1.1(c).

I decline to apply the three-level enhancement for smuggling or harboring six or more aliens. Ms. Bronfman pleaded guilty to the offense of conviction in Count One based on charged conduct concerning Jane Doe 12. As the Probation Department described in the PSR, evidence presented at the trial of Ms. Bronfman's co-defendant, Keith Raniere, suggested that Ms. Bronfman also participated in conspiracies to conceal and harbor five additional non-citizens. (*See* PSR ¶¶ 21-38.) While the law is clear that the court may consider this evidence in determining a defendant's sentence, s*ee, e.g., United States v. Cacace*, 796 F.3d 176, 191 (2d Cir. 2015)[1], I decline to consider it for the narrow issue of determining whether to apply this particular Offense Level enhancement under the Guidelines. Because the charged conduct to which Ms. Bronfman pleaded encompassed only one victim, Jane Doe 12, I will not apply the enhancement set forth in U.S.S.G. § 2L1.1(b)(2)(A).

I also decline to apply a two-level enhancement under § 3B1.1(c) on the theory that Ms. Bronfman acted in a leadership, management, or

---

[1] When quoting case law, except as otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

supervisory role. Section 3B1.1(c) of the Guidelines indicates that this enhancement applies when the defendant was "the organizer, leader, manager, or supervisor of one or more other participants" in the offense of conviction. U.S.S.G. § 3B1.1(c), cmt. n.2. The commentary to the Guidelines specifies that non-citizens who are smuggled, transported, or harbored by the defendant are "not considered participants" for purposes of this enhancement unless they play an active role in the smuggling, transporting, or harboring of additional non-citizens. *See* U.S.S.G § 2L1.2, cmt. n.6. I agree with the Government's characterization of Jane Doe 12 as a victim of the offense of conviction, rather than a co-participant in the offense. (*See* Gov't Mem. at 30-31.) Accordingly, I find that Ms. Bronfman did not have a supervisory role in the commission of this offense, insofar as she did not manage or direct the conduct of other participants in the conspiracy to conceal and harbor Jane Doe 12.

I therefore find that the Adjusted Offense Level on Count One is 12.

### B.   Offense Level on Count Two

Under Count Two, Ms. Bronfman pleaded guilty to Fraudulent Use of Identification. Ms. Bronfman, the Government, and the Probation Department are all in agreement regarding the calculation of the Offense Level on Count Two, and I agree with their reading of the Guidelines. Subject to U.S.S.G. § 2B1.1(a)(2), the Base Offense Level for this count is 6. An eight-level enhancement applies because the loss amount exceeds $95,000. *See id*. § 2B1.1(b)(1)(E). An additional two-level enhancement applies because a substantial part of the fraudulent scheme was committed from outside the United States. *See id*. § 2B1.1(b)(10)(B).

I therefore find the Adjusted Offense Level for Count Two is 16.

### C.   Calculation of Total Offense Level

We have two counts of conviction, one with an Adjusted Offense Level of 12 and the other with an Adjusted Offense Level of 16. According to

§ 3D1.4 of the Guidelines, which addresses multiple counts of conviction, I must take the highest Offense Level and increase it by two levels based on the unit calculations under that provision. The highest Adjusted Offense Level is 16, and a two-level increase yields a subtotal of 18. Because Ms. Bronfman pleaded guilty, she is entitled to a two-level reduction for acceptance of responsibility. (*See* § 3E1.1(a).) A two-level reduction from 18 leaves her with a Total Offense Level of 16.

### D.   Calculation of Guidelines Range

Having determined the Total Offense Level, I will now calculate the Guidelines range. Ms. Bronfman's Criminal History category is I, and her Total Offense Level is 16. Using the Guidelines table, I calculate the applicable Guidelines range as 21 to 27 months in the custody of the Attorney General.

## II.   SENTENCE

Having calculated the Guidelines range, I now turn to the sentence I will impose. It is well-established law that the Sentencing Guidelines are merely advisory, rather than binding on a district court. *Gall v. United States*, 552 U.S. 38, 46 (2007). Accordingly, Supreme Court and Second Circuit precedent require that I determine an independently "reasonable" sentence based on an "individualized application of the statutory sentencing factors" in 18 U.S.C. § 3553(a). *United States v. Dorvee*, 616 F.3d 174, 184 (2d Cir. 2010) (citing *Gall*, 552 U.S. at 47). And while, as the Second Circuit has noted, "in the overwhelming majority of cases, a Guidelines sentence will fall comfortably within the broad range of sentences that would be reasonable in the particular circumstances," *United States v. Betts*, 886 F.3d 198, 201 (2d Cir. 2018), that is not always the case. *See United States v. Wernick*, 691 F.3d 108, 118 (2d Cir. 2012) ("[T]he guideline recommendation is but one factor to be considered in selecting an appropriate sentence . . . and we have frequently emphasized that a sentencing court has discretion to consider a broad range of information bearing on the history and characteristics of the defendant.").

That is particularly true in a case such as this one, where the crimes of conviction, standing alone, do not fully encompass the larger pattern of misdeeds perpetrated by Ms. Bronfman. This case is not about an isolated incident of credit card fraud or a run-of-the mill case of harboring of illegal aliens for financial gain. To the contrary, the crimes to which Ms. Bronfman has pleaded guilty exist in the larger context of the crimes committed by her co-defendants, including Keith Raniere. A brief description of that context is therefore necessary before turning to an analysis of the § 3553(a) factors.

Raniere is the founder of an organization called Nxivm, a self-styled executive coaching and self-help organization that functioned as a pyramid scheme in which members paid thousands of dollars for various "workshops" and new members were recruited via the promise of payments or services for enrolling others into the scheme. (PSR ¶¶ 8-13.) Raniere made members of Nxivm call him "the Vanguard," and he maintained a rotating group of fifteen to twenty female Nxivm members with whom he had sexual relationships. (*Id.*) These women were not permitted to have sexual relationships with anyone but Raniere or to discuss with others their relationship with Raniere. (*Id.*) From at least 2009 to 2018, Ms. Bronfman served on Nxivm's Executive Board. (*Id.* ¶ 16.)

In 2015, Raniere created a secret society called "DOS" or "the Vow." (*Id.* ¶ 14.) As the PSR explains:

> DOS was comprised of all female masters (who were Nxivm members) who recruited and commanded groups of all female slaves. When identifying prospective slaves, masters often targeted women who were experiencing difficulties in their lives, including dissatisfaction with the pace of their advancement in Nxivm. Each DOS slave was expected to recruit slaves of her own, who in turn owed service not only to their masters but also to masters above them in the DOS pyramid. Raniere alone formed the top of the pyramid as the highest master. Other than Raniere, all participants in DOS were women. Raniere's status as head of the

pyramid was concealed from all newly recruited slaves, other than those directly under Raniere. DOS masters persuaded slaves to join DOS by falsely describing it as a secret women's empowerment group and that the goal of DOS was to eradicate weaknesses in its members. Prospective slaves were required to provide collateral to prevent them from leaving the group or disclosing its existence to others. Collateral included sexually explicit photographs and videos of themselves, rights to financial assets, and videos or letters of (true or untrue) confessions that would be damaging to the prospective slave's family members and friends. After joining DOS, slaves were required to provide additional collateral, including sexually explicit photographs, and to pay tribute to their masters, including by performing tasks that would otherwise be compensable. In addition, several DOS slaves were directed to have sex with Raniere to maintain membership.

(*Id.* ¶ 14.)[2]

DOS operated to abuse and exploit young women for sex, labor, and financial gain. There are too many examples to name; to pick one, when a DOS "slave" developed feelings for another man, Raniere told her parents that she had committed an "ethical breach" and ordered that she be confined to a room in her parents' home without human contact. (PSR ¶ 46.) Many DOS slaves were to be branded with a symbol, which, unbeknownst to the "slaves," represented Raniere's initials; at Raniere's instruction, the DOS victim being branded was held down by other DOS "slaves" and required to state "Master, please brand me, it would be an honor." (PSR ¶¶ 63-75.) Following a six-week jury trial over which I presided, Raniere was convicted of racketeering,

---

[2] As the PSR Addendum notes, Ms. Bronfman objects to paragraph 14 of the PSR because, *inter alia*, the discussion of DOS "creates a false impression that the defendant was aware of or even a participant of DOS." While I will discuss the extent of the Ms. Bronfman's knowledge of DOS in the context of the § 3553(a) factors, I note that Paragraph 14 does not state that Ms. Bronfman was aware of or involved with DOS, or that she directly funded it.

racketeering conspiracy, wire fraud conspiracy, forced labor conspiracy, sex trafficking conspiracy, and two counts of sex trafficking.

To be crystal clear, Ms. Bronfman was not convicted of any of those crimes. Ms. Bronfman was not convicted of participating in any racketeering activity. And there are many aspects of Raniere's crimes with which Ms. Bronfman very well may not have been familiar. Ms. Bronfman vigorously disputes the proposition that she was aware of either DOS or any sex trafficking that Raniere engaged in, and she vigorously disputes the proposition that she knowingly funded DOS or sex trafficking activity. I agree with Ms. Bronfman that the available evidence does not establish that she was aware of DOS prior to June 2017 or that she directly or knowingly funded DOS or other sex trafficking activities.

However, I believe that this background about not only Raniere and Nxivm—in which she held a leadership role—but also DOS—in which there is no evidence that she directly participated—is relevant context for my analysis of the appropriate sentence for Ms. Bronfman. Ms. Bronfman's crimes were not committed in a vacuum. They were committed in connection with her role in Nxivm and her close relationship with Raniere, and I believe that it would be inappropriate for me to consider them divorced from that context.

### A.  Materials Considered

Before turning to an analysis of the § 3553(a) factors, it is important to say a word about what I will be considering in that analysis. First, I have reviewed the parties' sentencing submissions. (*See* Def. Mem.; Gov't Mem.; Def. Reply (Dkt. 927).) I have read the 67 letters submitted in support of Ms. Bronfman, as well as the many victim letters that have been submitted. I have listened carefully to the victim statements made here today in court. And I have heard and considered counsel's arguments.

I have also considered testimony adduced at Raniere's trial, to the extent it is relevant and has been proven, in my view, by a

preponderance of the evidence. It is well-settled that the scope of a sentencing judge's inquiry when analyzing the § 3553(a) factors is "largely unlimited as to the kind of information [the district court] may consider, and it is free to consider evidence of uncharged crimes, dropped counts of an indictment, and criminal activity resulting in an acquittal in determining sentence." *United States v. Bennet*, 839 F.3d 153, 161 n.5 (2d Cir. 2016). I am not bound by the rules of evidence that would pertain at a trial, and I am not limited to considering admissible evidence in determining an appropriate sentence. *See United States v. Chang*, 59 F. App'x 361, 363 (2d Cir. 2003). Particularly relevant here, the Second Circuit has repeatedly held that a sentencing court is entitled to rely on information "gleaned from a trial in which the person to be sentenced was neither a defendant nor represented by counsel." *Cacace*, 796 F.3d at 191; *see also United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993).

### B.   § 3553(a) factors

I now turn to the § 3553(a) factors. Under § 3553(a), I must consider several factors in imposing a sentence, including the nature and circumstances of the offense; the defendant's history and characteristics; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; the need for the sentence to afford adequate deterrence; and the need to protect the public.

#### 1.   Nature and Circumstances of the Offense

Ms. Bronfman argues that a below-Guidelines, non-custodial sentence is appropriate because there are no aggravating factors, and because her actions were "never ill-intentioned." (*See* Def. Mem. at 38, 42.) The evidence suggests, however, that Ms. Bronfman's conduct underlying her conviction on Count One was particularly egregious because it was not only dishonest with respect to the United States government, but it was also dishonest and damaging with respect to the individuals whom she harbored.

8

Ms. Bronfman helped Jane Doe 12 to obtain a visa by representing that she would make $3,600 per month as a "management consultant" for the Nxivm-affiliated fitness company Exo/Eso. (Gov't Ex. A1-001.) Instead, Jane Doe 12 was barely compensated for her work. Her email correspondence with Ms. Bronfman shows that she repeatedly made Ms. Bronfman aware that Ms. Bronfman's failure to deliver on the terms of the employment agreement had left her in dire financial straits. In November 2015, for example, Jane Doe 12 emailed Ms. Bronfman that "[w]ith no money involved" it was "very difficult [for her] to support" herself and to "keep up the pace with no income and with the uncertainty of not knowing how I will live each day." (Gov't Ex. A1-009.) The following month, in December 2015, Jane Doe 12 emailed Ms. Bronfman that because Exo/Eso was not paying her the contractually specified wage she was owed, she needed to find another source of income "to support myself here." (Gov't Ex. A1-012.) Jane Doe 12's victim impact statement makes clear that she felt tremendous pressure from Ms. Bronfman, who led her to believe that she did not deserve the salary provided for in her employment letter because any business difficulties that Exo/Eso endured were attributable to Jane Doe 12's "personal issues." (PSR ¶ 114.) According to Jane Doe 12's statement, Ms. Bronfman, despite her financial means and earlier commitments to the contrary, explained that she "couldn't pay [her]" because she had failed to enroll enough participants in Exo/Eso to generate sufficient revenue. (*Id*.)

Ms. Bronfman also used Jane Doe 12's immigration status as a means of pressuring her to continue working without compensation. When Jane Doe 12 emailed Ms. Bronfman to ask if she could look for another job, Ms. Bronfman replied that it "would impact the work agreement" and cause possible visa issues. (Gov't Ex. A1-012.) Several months later, Ms. Bronfman emailed Jane Doe 12 that in order to "stay here" she needed to address "one fundamental question yet to be answered; what are you going to do to earn your visa?" (Gov't Ex. A1-020.)

Importantly, none of these facts are disputed. Ms. Bronfman does not contend that she provided Jane Doe 12 with adequate or consistent compensation or honored the terms of the employment agreement. Rather, she merely suggests that she was surprised to learn that Jane Doe 12 was unhappy with the circumstances of her employment, and that she thought their relationship was "caring" and a "friendship." (Def. Mem. at 39; *see also* Clare Bronfman Letter to Judge Garaufis ("Bronfman Letter to Court") (Dkt. 915-1) at ECF p. 1 (suggesting that she "never meant [to] hurt" Jane Doe 12 and "wanted to make her life better".) But her characterization is belied by Jane Doe 12's victim impact statement and by the email correspondence between Ms. Bronfman and Jane Doe 12. In short, I find by a preponderance of the evidence that Ms. Bronfman refused to honor the terms of Jane Doe 12's employment agreement, demanded work from Jane Doe 12 without compensation, and emotionally manipulated Jane Doe 12 into believing that her own personal failures and job performance—not Ms. Bronfman's refusal to pay her—were the cause of her precarious financial situation.

And all of this emotional and financial pressure came at a severe cost to the victim—a cost greater than the sum of its parts. Jane Doe 12 was eventually recruited into DOS, Raniere's secret society, in which she was pressured into giving up "collateral" and becoming a "slave." (PSR ¶ 114.) I am not suggesting that Ms. Bronfman had a direct role in Jane Doe 12's recruitment into DOS, or even that she was aware of it. The evidence before me does not support such a proposition. But I do find that the kind of pressure and mistreatment that Jane Doe 12 was subjected to by Ms. Bronfman put her in a very vulnerable state, the kind of state that could make a person more susceptible to being recruited into an organization like DOS.

Moreover, the evidence suggests that this kind of conduct was part of a pattern. Ms. Bronfman obtained a visa for another non-citizen so that she could supposedly earn $3,600 per month as a management consultant at Exo/Eso. (Gov't Exs. A2-002, 003.) Three months later,

that woman emailed Ms. Bronfman to say that she had not been "pre-pared for no income." (Gov't Ex. A2-007.) Despite this individual's financial predicament, emails between her and Ms. Bronfman demon-strate that Ms. Bronfman's main concern was that the individual "go above and beyond" to pay her back—plus interest. (Gov't Ex. A2-009.) Ms. Bronfman helped obtain a visa for another non-citizen, a woman from India, and actually paid her a salary—but then required that the woman pay her back when the work responsibilities she was given were less than fulltime. (Gov't Mem. at 8 n.5.) Adrian, the brother of Jane Does 2, 3, and 4, submitted a victim impact statement in which he states that Ms. Bronfman "told me she was going to help me with my immigration problem . . . but she never did," and that she repeat-edly talked him out of returning to Mexico but "made sure I never got my visa so that she would always have something to hold over my head." (PSR ¶ 114.)[3] And at least one other woman who worked for Ms. Bronfman, and who was in the United States pursuant to a visa that Ms. Bronfman helped to obtain, was recruited into DOS. (Raniere Trial Tr. ("Tr.") at 150, 207, 211-12.) As a DOS "slave," she was coerced into an unwanted and nonconsensual sexual relationship with Rani-ere. (*Id*. at 219-20, 250-57.)

What is clear to me, from all of this, is that Ms. Bronfman made prom-ises to immigrants that she did not keep, exacted labor that she did not pay for, and took advantage of these individuals' financial straits and immigration statuses, in a manner that exacerbated both their fi-nancial and emotional vulnerabilities and made them more reliant on her and the Nxivm community, sometimes with very harmful conse-quences.

Ms. Bronfman's conviction on Count Two, for fraudulent use of identi-fication, must also be considered in the context of her relationship to Raniere and his history and conduct. The charged conduct concerns

---

[3] Ms. Bronfman's sentencing submission suggests that she considered Adrian "akin to a younger brother." (Def. Mem. at 30.) Apparently, the feeling is not mutual.

Ms. Bronfman's use of credit card and bank account information belonging to a deceased individual who had been a close associate of hers and Raniere's. Over the fifteen months that followed this woman's death, Ms. Bronfman paid approximately $135,000 in bills charged to the deceased's credit card. (PSR ¶ 57; *see also* Tr. at 4540, 4556-64.) Additionally, approximately $320,205 in checks and $736,856 total disbursements were withdrawn from the deceased's account. (*Id.*; *see also* Tr. at 4582.) The Government suggests that this conduct was consistent with Raniere's habit of keeping expenses out of his name in an effort to avoid tax liability (*see* Gov't Mem. at 17, 44; PSR ¶ 57), while Ms. Bronfman characterizes her actions as a mere misunderstanding and a victimless crime, since the deceased had left the entirety of her estate to Raniere (*see* Def. Mem. at 40-41). She also suggests that her only involvement in the scheme was that her office handled bookkeeping for the deceased's accounts, and that her role was therefore minimal and indirect. (*Id*. at 40, 40 n.6.)

Ms. Bronfman denies that she engaged in any effort to intentionally help Raniere keep money out of his name. (Def. Reply at 18.) I agree with her that the preponderance of the evidence available to me does not suggest what her specific intentions were in authorizing expenditures of a deceased woman's money. But I do find, by a preponderance of the evidence, that the facts underlying this offense are consistent with a pattern of facts suggesting that Raniere attempted to minimize money that was in his name. (*See, e.g.,* Gov't Mem. at 44; Tr. at 608, 1449-54.) And I find, by a preponderance of the evidence, that Ms. Bronfman's *conduct* in committing this offense helped to facilitate those efforts on Raniere's part, regardless of whether or not that is what Ms. Bronfman understood herself to be doing. This crime, like the crime in Count One, was committed within a larger context of more serious crimes and alarming behavior by Ms. Bronfman's co-defendants and was consistent with the hallmarks and aims of that behavior. That does not necessarily mean that Ms. Bronfman shared in those aims, but it is still relevant context, and I can and do take it into consideration.

2.    History and Characteristics

Ms. Bronfman is a person of considerable privilege and wealth; so much so, in fact, that she was able to give Nxivm and other Raniere-associated endeavors more than $100,000,000. (*See* Def. Mem at 67-68.) There is nothing wrong with being wealthy, of course. But I am troubled by evidence suggesting that Ms. Bronfman repeatedly and consistently leveraged her wealth and social status as a means of intimidating, controlling, and punishing individuals whom Raniere perceived as his adversaries, particularly Nxivm's detractors and critics. For example, in a 2008 email to Stephen Herbits, a friend of Ms. Bronfman's father whom she believed to have political connections, Ms. Bronfman inquired whether criminal indictments could be brought against Nxivm critic Rick Ross. She wrote that the "'Ross camp' needs to be fearful, back down and look to fix the[] damage they have done" and that "the thought of criminal charges may help inspire this." (Dec. 4, 2008 Bronfman Email (Dkt. 922-2) at ECF p. 5.) In a separate email, she indicated that she hoped Mr. Herbits would "rapidly facilitate" Mr. Ross's indictment and conviction. (Nov. 11, 2008 Bronfman Email (Dkt. 922-2) at ECF p. 2.) Mr. Herbits testified at Raniere's trial that Ms. Bronfman also asked him to contact the Attorneys General of New York and New Jersey to request that they prosecute Mr. Ross. (Tr. at 1330-32.)

Furthermore, Ms. Bronfman's efforts to intimidate and silence Nxivm's critics were not limited to its prominent and powerful detractors. In 2017, for example, she emailed a Mexican lawyer photographs of three of Raniere's former partners along with descriptors that seem to be aimed at facilitating the former partners' contemporaneous identification. (May 9, 2017 Bronfman Emails (Dkt. 922-2) at ECF pp. 13-15.) According to the Government, all three of these women had become vocal critics of Raniere. (Gov't Mem. at 53.) It is not clear from the record why Ms. Bronfman wanted this lawyer to be able to visually identify these women, but it is hard to imagine an innocuous explanation. Numerous victim impact statements from other individuals

corroborate the fact that Ms. Bronfman was forceful and aggressive in her efforts to use the legal system to silence Nxivm's critics. One woman wrote that Ms. Bronfman and Raniere "put a lot of pressure on [her] to sue [her] mother because she was publicly speaking out about [Nxivm] and they wanted to silence her." (*Id*. at 54.) The parents of a young woman whom Nxivm sued for publishing its course materials online wrote that it is "not possible to overstate" the significance of Ms. Bronfman's financial support for the litigation against their daughter, calling her "the very fuel that powered the [Nxivm] engine of vengeance and cruelty." (*Id*.)

It was one thing to believe in Nxivm's mission and methods, and to adhere to its teachings. As Ms. Bronfman points out, she was far from alone in that respect. (Def. Mem. at 19.) But the record is clear that she used her incredible wealth and attempted to use her social status and connections not only to support Nxivm's work, but also as a means of intimidating, threatening, and exacting revenge upon individuals who dared to challenge its dogma. This culture of stifling and threatening dissenters, a culture that Ms. Bronfman clearly participated in and perpetuated, is the same culture that gave rise to the darkest and most horrific crimes that Raniere and others committed. This was one of the mechanisms by which Raniere exerted and retained power over his victims, and even if Ms. Bronfman did not knowingly facilitate Raniere's worst crimes, as a general matter she was his accomplice in the effort to intimidate and silence detractors, using her wealth and privilege as a sword on Raniere and Nxivm's behalf.

Ms. Bronfman's comfort with using her wealth and status to attack perceived enemies is evidenced in further ways. The first involves her role in hacking into the computer of her father, Edgar Bronfman. In October 2003, Forbes Magazine published an article in which Mr. Bronfman was quoted as calling Nxivm a "cult." From that point on, Raniere reportedly considered Mr. Bronfman to be on "the enemy side." (Tr. at 2549-50.) As a result, Raniere told Jane Doe 4 that it would

14

be good to gain access to Mr. Bronfman's email. (*Id.* at 2550.) Initially, the plan to access Mr. Bronfman's emails was that Ms. Bronfman, given her relationship with her father, would send him email messages containing a link to software that, when opened, would infect his computer and provide Jane Doe 4 access to his emails. (*Id.* at 2552-53.) Jane Doe 4 testified that she handed Ms. Bronfman a USB with a file on it that she would then send to her father as an attachment. (*Id.* at 2553.) Ms. Bronfman sent multiple emails with the attachment to her father; but the plan was stymied because, for whatever reason, Mr. Bronfman did not open the emails. (*Id.* at 2554.) To overcome this obstacle, Ms. Bronfman ended up physically plugging a USB drive given to her by Jane Doe 4 into her father's computer, clicking on the necessary software, and infecting the computer locally. (*Id.*) Ms. Bronfman was successful, and Jane Doe 4 was able to monitor Mr. Bronfman's email, which she did "regularly, mostly at the request" of Raniere. (*Id.* at 2556.) Ms. Bronfman's attempts to downplay this incident as an "unproven" and a mere "family dispute" notwithstanding (*see* Def. Mem. at 65), I find that Jane Doe 4's testimony credibly establishes Ms. Bronfman's role in this scheme by a preponderance of the evidence. And I am troubled by Ms. Bronfman's dismissive characterization of this incident as a "family dispute." This is serious conduct, and it became more than a "family dispute" the moment that Ms. Bronfman gave access to her father's email account to individuals who were outside of the family, and who in fact considered her father to be an "enemy."

Ms. Bronfman was not finished helping Raniere spy on his perceived enemies. According to the testimony of FBI Special Agent Michael Weniger, Ms. Bronfman paid "upwards of $400,000" to a Canadian company called Canaprobe to spy on Raniere's enemies, including Rick Ross. (Tr. at 5013; *see also id.* at 5014 (evidence of Mar. 3, 2009 Canaprobe invoice with subject listed as "Rick Ross" and customer listed as "Clare Bronfman").) In the face of this testimony, Ms. Bronfman now argues that she was "led to believe that Canaprobe's work was legal," because, *inter alia*, "Canada had different laws than the United

States." (*See* Def. Mem. at 65.) While I find it difficult to imagine that Ms. Bronfman thought that this kind of surveillance would be legal in Canada but not the United States, that debate is purely academic. Ms. Bronfman concedes that she was aware that Canaprobe specialized in "tracking global asset movement and concealment" (Def. Mem. at 66), and the testimony of Special Agent Weniger, supported by substantial documentary proof, establishes by a preponderance that Ms. Bronfman spent hundreds of thousands of dollars on Canaprobe's services in an attempt to gain information about Raniere's so-called enemies. I find this behavior to be yet another example of a consistent theme for Ms. Bronfman: at every turn, she was a willing partner to Raniere in his efforts to intimidate and silence perceived enemies or threats.

Perhaps the most troubling example of this theme concerns Ms. Bronfman's actions once she was confronted with information about DOS. Ms. Bronfman is adamant that DOS was a secret society that she "neither participated in nor knew anything about." (*See* Def. Mem. at 2; *see also id.* at 20 (distinguishing things Ms. Bronfman financed such as "patents, commodities, and a few loans," from DOS, which she did not finance); Def. Reply at 4 ("Clare Bronfman did not know about DOS, had nothing to do with DOS, and did not fund DOS.").) To be clear, the fact that some "commodities," a "few loans" and "patents" translated to Ms. Bronfman giving Raniere and Raniere-associated endeavors more than $100,000,000 suggests, yet again, an almost unshakeable commitment to Raniere on the part of Ms. Bronfman. Yet, I discuss DOS not because the evidence establishes, for example, that Ms. Bronfman funded specific DOS activities or even knew about specific DOS rituals in real time. I do not find that the Government has proven by a preponderance of the evidence that Ms. Bronfman knowingly funded particular criminal activities. I do not find that Ms. Bronfman knowingly funded a sex cult.

There is ample evidence, however, that as Ms. Bronfman was confronted with information about DOS, and therefore necessarily

became aware of it, she doubled down on her support of Raniere and pursued her now-familiar practice of attacking his critics.

In June 2017, the existence of DOS started to become known within the larger Nxivm community when the husband of Sarah Edmondson, a DOS "slave," publicly confronted a DOS First Line member, Lauren Salzman, about the cult. Subsequently, Ms. Salzman began to receive requests from DOS slaves—many of whom were longtime Nxivm members whom Ms. Bronfman knew—that their collateral be returned to them. (Tr. at 1805). When asked what she did when she received those requests, Ms. Salzman testified that "I forwarded them to Clare" because "Clare was heading up our legal initiatives." (*Id.*) One such email from a DOS victim that Salzman forwarded to Ms. Bronfman began as follows: "I am requesting the immediate return and/or destruction of the 'collateral' I provided to you, as well as the nude photographs and videos of me that were produced within DOS under your direction." It continued: "[M]y participation in DOS, and all material provided or created during that time, was based on false information you gave me." It concluded, "I don't want to worry about my collateral being exposed and I absolutely have that right." (*See* Gov't Mem. at 22-23.)

Ms. Bronfman protests what she considers to be the Government's assertion that her receipt of these emails imputes to her fore-knowledge of DOS's activities.[4] That is not what I find to be true, and I do not base Ms. Bronfman's sentence on the assumption that she knew about DOS prior to receiving these emails. What it does impute,

---

[4] Ms. Bronfman also argues that these letters were also sent to the rest of the Nxivm board, as well as other members of Nxivm. (Def. Reply at 14.) For one thing, Ms. Salzman testified that she specifically forwarded the email she received from a DOS victim asking for her collateral back to Ms. Bronfman. For another, the fact that the emails were sent to other people has no bearing on the fact that Ms. Bronfman was in receipt of an email from a woman referencing collateral of nude photographs and videos that had been extracted from her, expressing fear that this collateral would be exposed.

however, and what I do consider relevant, is Ms. Bronfman's aware-
ness, in that moment, of DOS victims urgently reaching out to recover
their "collateral"—including, as Ms. Bronfman now knew, nude pho-
tographs and videos—and expressing obvious fear that this collateral
would be exposed. With this knowledge, Ms. Bronfman could have
begun to distance herself from Raniere and attempt to help those who
were clearly in need. Instead, she chose to double-down on her sup-
port for Raniere, even helping to facilitate further intimidation of DOS
victims. For example, shortly after learning that the New York Times
would be publishing an article about DOS in September 2017, Raniere
sent an email to Ms. Bronfman with the subject line "What are your
thoughts" containing a draft of a threatening letter to be sent to DOS
victims. (Sept. 13, 2017 Raniere Email (Dkt. 922-1) at ECF p. 2) The let-
ter that Raniere wanted Ms. Bronfman's thoughts on is worth reading
in full:

> Ms. [DOS victim],
>
> I am the chief attorney of a criminal investigation in Mexico of
> more than 20 individuals tied together in a cooperative destruc-
> tive network. These individuals, including yourself, have been
> acting against individuals who participate in the NXIVM corpora-
> tion community.
>
> You are currently connected to several criminal investigations in-
> volving fraud, coercion, extortion, harassment, stalking, theft,
> larceny, hate crime, criminal conspiracy, breaking and entering,
> computer crimes, wire fraud, criminal enterprise, and corporate
> espionage.
>
> I strongly suggest that you cease and desist, undo, reverse, cancel,
> and retract, participation in all past, present, and future, conver-
> sations, conference calls, meetings, news media, social media,
> blogs, or websites, relating to this subject matter until the crimi-
> nal matters are resolved. You should do everything in your power
> to affect this.

18

> Your best course of action to minimize your exposure, in addition to the above, is to repair all damages to parties you have acted against, reconciling with them, and fully cooperating with the criminal investigations. In this regard, I can help you for I represent some of your victims and have access to others.
>
> I know that people in the media (and also bloggers and the like) can be coercive, abusive in their power, and force unwitting, un-informed, participants to complicate situations and potentially even waive rights. You still have the ability to pull away from all participation with these people.
>
> Please contact me as soon as possible,

(*Id.*) Less than thirty minutes later, Ms. Bronfman emailed the text of the email to an associate in Mexico. (Sept. 13, 2017 Bronfman Email (Dkt. 922-1) at ECF p. 3.) The next day, the DOS victim referenced in the draft email received an email from a Mexican attorney, Ricardo Olmedo, with an attachment of a Microsoft Word document contain-ing, nearly word-for-word, the text of the email sent by Raniere to Ms. Bronfman. (Sept. 14, 2017 Olmedo Letter (Dkt. 922-1) at ECF p. 4.) Metadata of the Word document received by the DOS victim reflects that the creator of the document was Ms. Bronfman. (Gov't Mem. at 24.) Raniere sent further drafts of threatening emails to Bronfman, who passed them along to Mr. Olmedo, who sent them to DOS victims. (*See* Sept. 18, 2017 Raniere Email (Dkt. 922-1) at ECF p. 5 (draft of email to a DOS victim sent from Raniere to Bronfman threatening that "[t]he criminal investigations will increase in number, and thorough-ness, and will not stop until justice is served. This will not go away").)

In other words, here we have Ms. Bronfman, in September 2017, working hand-in-hand with Raniere to intimidate and silence victims of Raniere's brutal campaign of sexual abuse and exploitation. I frankly find Ms. Bronfman's explanation of this behavior deeply disingenuous. Ms. Bronfman argues that she was "informed individuals associated

with a [Nxivm] Mexico company were being called, scared and per-
suaded to leave [Nxivm]." (Def. Mem. at 23.) As a result, and
supposedly out of a magnanimous sense of duty to people who were
reliant on Nxivm for their income, and whose livelihoods might be put
at risk if Nxivm members were talked into leaving, Ms. Bronfman ex-
plains that she "sought legal counsel to help stop what [she was] told
was criminal behavior based in Mexican law," and "together with
[Nxivm] Mexico lawyers. . . aggressively tried to stop the damage." (*Id.*)
Such an argument flies in the face of the facts: Raniere specifically
sought out Ms. Bronfman to review and forward his threatening let-
ters, which she then ensured were sent to Raniere's victims—she
cannot now seek to pawn off the entire chain of events on counsel.
Ms. Bronfman further avers that she merely engaged counsel in Mex-
ico out of a concern that Nxivm's client list was being misused. (Def.
Reply at 14-15.) That suggestion is belied by the language of the letter,
which is plainly written in a manner designed to threaten its recipient.
In lieu of any mention of the Nxivm client list, the letter accuses its
recipient of being "connected to several criminal investigations involv-
ing fraud, coercion, extortion, harassment, stalking, theft, larceny,
hate crime, criminal conspiracy, breaking and entering, computer
crimes, wire fraud, criminal enterprise, and corporate espio-
nage."(Sept. 13, 2017 Raniere Email at ECF p. 2.) That is a threat.

And, not surprisingly, recipients of these emails felt threatened. One
DOS victim who received a threatening letter writes the court that
"[w]ords cannot describe" the experience of receiving a "threatening
letter from a lawyer in Mexico that basically warned me that I better
keep my mouth shut about DOS or I would suffer the consequences."
(Gov't Mem. at 49.) Another DOS victim who received such a letter
writes that the letter represented an "underhanded intimidation tac-
tic to scare me into remaining silent." (*Id.*) The victim's statement
continues, "[w]hen I was at my most vulnerable, Clare Bronfman trau-
matized me." (*Id.*)

The trend continued for Ms. Bronfman. In December 2017, Ms. Bronfman issued a public statement in which she falsely characterized DOS as a "sorority" that "truly benefited the lives of its members, and does so freely." (Bronfman Stmt. (Dkt 922-1) at ECF p 12.) Ms. Bronfman is adamant that at the time she made this statement, "she was acting with limited information," and that she "did not understand the full scope of DOS until Keith Raniere's trial." (Def. Reply at 15.) What Ms. Bronfman did know at the time, however, was that DOS victims were reaching out to Lauren Salzman asking for their "collateral" of nude photographs and videos to be returned. She knew that Raniere had sent threatening letters to DOS victims—letters she helped draft and send. She knew that in October of 2017, the New York Times published an expose on DOS, in which, for example, former DOS "slave" Sarah Edmondson describes getting branded and saying, as instructed, "Master, please brand me, it would be an honor."[5] Yet, Ms. Bronfman was too concerned with, as she put it in her December 2017 statement, the potential "tragedy" of losing the "innovative and transformational ideas and tools" of Nxivm to acknowledge the horrors that had occurred within the community to which she both belonged and helped lead, or to take action on behalf of those who had been badly hurt. (Bronfman Stmt.) To the contrary, she acted against their interests and in defense of Raniere—yet again—by seeking to have criminal charges brought against Ms. Edmondson in Vancouver. (Gov't Mem. at 23.) She subsequently travelled to Mexico to live with Raniere, during which time Raniere invited First Line DOS members to participate in a "recommitment ceremony." (PSR ¶¶ 102-103.) And, after Raniere's arrest, Bronfman funded his legal defense—including an initial deposit of approximately $5,000,000 to the fund from which her co-defendants' legal fees were paid. (Gov't Mem. at 27.) To date, Ms.

---

[5] Barry Meier, *Inside a Secretive Group Where Women Are Branded*, N.Y. TIMES (Oct. 17, 2017), https://www.nytimes.com/2017/10/17/nyregion/nxivm-women-branded-albany.html?searchResultPosition=3

Bronfman has contributed $13,800,000 to an irrevocable trust created to pay the legal fees of Raniere and other co-defendants. (PSR. ¶ 190.)

I find this behavior indicative of Ms. Bronfman's allegiance to Raniere—whatever the cost, whomever it hurt—and highly relevant to the application of the § 3553(a) factors to Ms. Bronfman's sentence. Ms. Bronfman came to learn details about DOS and faced a choice as to whose interests she would protect: Raniere's or his victims'. She chose Raniere unequivocally, and to this day she has not clearly apologized for that choice, admitted that her actions were harmful, or conceded that her loyalty was misplaced.

Ms. Bronfman repeatedly argues that she knew nothing about, and never funded, DOS. As I said earlier, I do not base my sentence on a finding that contradicts either of those claims. However, I do find it relevant that Ms. Bronfman seems to have a pattern of willful blindness when it comes to Raniere and his activities. As Lauren Salzman testified, Ms. Bronfman "didn't want to know anything [about DOS] that she didn't need to know." (Tr. at 1863-64.) I find that testimony particularly credible because it would not be the first time that Ms. Bronfman exuded the sense that she wanted to participate in Raniere's world while remaining unaware of its uglier aspects. For example, when she tried to get Stephen Herbits to convince authorities to bring criminal charges against Raniere-enemy Rick Ross, Bronfman told Herbits, "I don't need to know who is funding [the efforts], how you stop that from continuing, *in fact I don't want to know*—it just needs to be done, and quickly." (Dec. 4, 2008 Bronfman Email) (emphasis added).

I also find it relevant that Ms. Bronfman's allegiance to Raniere shines through again and again. She has paid his legal fees and, to this day, maintains that he "greatly changed [her] life for the better." (Bronfman Letter to Court at ECF p. 2.) That is consistent with both her actions, as described above, and what others have said about her. (*See, e.g.,* Tr. at 1863 (testimony of Lauren Salzman that Ms. Bronfman was "incredibly

loyal" and "incredibly dedicated" to Raniere).) Raniere and his adher-
ents appear to understand Ms. Bronfman's continued loyalty—even
after his trial and conviction, during which all the details of his sexual
abuse and exploitation became known to the world. For example, in a
post-conviction call between Raniere and Jane Doe 3, Jane Doe 3 re-
ported that Ms. Bronfman is "very good with you," to which Raniere
responded, "I don't think her view of me has changed at all. If anything
it's gotten stronger." (Gov't Mem. at 57-58.) Later in the conversation,
when discussing whether Jane Doe 3 could share with Ms. Bronfman
an op-ed about DOS authored by Raniere, Raniere explained, "Yeah,
oh, absolutely. Yeah. Anything with Clare." (*Id*. at 58.) Raniere's view
that Ms. Bronfman remains loyal to him to this day only buttresses my
conclusion that Ms. Bronfman was concerned, first and foremost, with
protecting Raniere and attacking his enemies. That she personally
feels like Raniere changed her life for the better is beside the point.
And while she might not have known about DOS before receiving the
collateral emails in September 2017, I find it clear that, in her own
words, she did not want to know, either.

   3.   Additional Factors

In determining an appropriate sentence**,** I also consider the need for
the sentence that I impose to reflect the seriousness of the offense,
promote respect for the law, and provide just punishment. As I have
mentioned, the offenses of conviction, particularly on Count One,
were more serious here than those crimes might ordinarily be under
other circumstances. The immigration-related offense is serious be-
cause Ms. Bronfman's dishonesty and misrepresentations were
harmful not only to the federal government, but to the immigrants like
Jane Doe 12 who were taken advantage of and put in a position of
having to work for little or no pay. Likewise, Ms. Bronfman's conduct
with respect to Count Two had the effect of facilitating Raniere's ef-
forts to keep money out of his name.  In terms of promoting respect
for the law, I am mindful of Ms. Bronfman's history of seeking to ma-
nipulate the legal system to her advantage, both in her execution of

the offenses of conviction and, for example, by seeking to leverage her social connections to have criminal charges brought against Raniere's critics. This is not a defendant who has shown great respect for the law, and a just punishment must take that into account.

I also need to consider the extent to which the sentence will operate as a deterrent. Ms. Bronfman's circumstances are rather unique: I don't know how many other multimillionaires are out there, ready to devote the limitless resources at their disposal to supporting pyramid schemes run by dangerous criminals and stifling the voices of their critics and victims. But in another sense, her circumstances are not so unique. She maintains that she was an innocent bystander to Raniere's abhorrent conduct, completely blind to Raniere's crimes and the sex trafficking that occurred within the Nxvim community. As I have said, I find that any such blindness was willful and cultivated, and Ms. Bronfman's sentence can and should serve to deter other people who find themselves in situations in which they can choose to either confront or avert their gaze from the harm wrought by their actions and the actions of those to whom they are close.

I also need to consider whether the sentence will protect the public from further crimes committed by Ms. Bronfman. I believe that Ms. Bronfman has been chastened by this experience, and she has expressed remorse for the crimes to which she has pleaded guilty. I don't doubt her sincerity. It does, however, concern me that she continues to stand by Raniere and believe in his work, even as he stands convicted of truly heinous conduct. Nonetheless, I don't expect her to commit further crimes of this nature, regardless of the sentence I impose.

I have considered the range of sentences that are available and the range suggested by the Sentencing Guidelines. There is no mandatory minimum sentence for the offenses of conviction, and Ms. Bronfman requests a non-custodial sentence. I have considered that possibility, but given the nature and circumstances of the offenses and the context in which they were committed, my view is that a non-custodial

sentence would be insufficient. I have considered sentences that are below the Guidelines range and sentences that are within that range. And I have considered sentences that are above that range, up to and including the statutory maximums of 10 years on Count One and 15 years on Count Two. *See* 8 U.S.C. § 1324(a)(1)(B)(i); 18 U.S.C. § 1028(b)(1)(D). Because these sentences may be imposed either concurrently or consecutively, the combined statutory maximum I can sentence Ms. Bronfman to is 25 years. *See* 18 U.S.C. § 3584(a).

I have considered the need to avoid unwarranted sentence disparities between Ms. Bronfman and other defendants who have been convicted of similar conduct. But I find, for the reasons I have explained, that the context of Ms. Bronfman's criminal conduct places her in an altogether different category from other defendants who are convicted of the same offenses, and therefore her circumstances defy easy comparison. I have also considered the threat that COVID-19 poses to incarcerated persons and the humanitarian need to minimize our prison populations in light of the pandemic. Neither Ms. Bronfman's age nor health condition, however, place her in the category of high-risk individuals, and I find that her conduct warrants a custodial sentence even during the pandemic.

Finally, I have also considered the appropriateness of imposing a fine, as I am obligated to do subject to 18 U.S.C. § 3571, unless I find that Ms. Bronfman is unable to pay. Section 3571(b) permits me to impose a fine on each count of up to $250,000, for a total of $500,000. In addition to the factors I have noted already, § 3572(a) sets out additional factors that I must consider in determining whether to impose a fine and, if I do, what the amount should be. These factors include Ms. Bronfman's ability to pay and the financial burden that a fine will impose on her or anyone else. They also include the expected cost to the Government of her sentence. The Guidelines fine range for Ms. Bronfman's offenses is between $10,000 and $95,000. (*See* U.S.S.G. § 5E1.2(c)(3); *see also* PSR ¶ 202.) Ms. Bronfman points out that I may

not impose an excessive fine as punishment, and that I should not in-crease her fine above the suggested range simply on the basis of her ability to pay. (*See* Def. Reply at 21-22.)

In light of Ms. Bronfman's wealth, there is no question that she can afford to pay any fine that I might impose, up to and including the stat-utory maximum. As I have already explained, I find that the seriousness of her offenses, viewed in the context of her other con-duct and the conduct of her co-defendants to whom she remains loyal, justifies a serious sentence. As one aspect of that sentence, I am imposing the statutory maximum fine of $500,000. I select this fine amount not because Ms. Bronfman is wealthy, but because I believe that the nature and seriousness of her conduct warrants such a sub-stantial fine, and because I find that her personal financial circumstances do not preclude me from imposing it.

### C.   Conclusion

In determining an appropriate sentence, I am guided by the Second Circuit's instruction that I use the Guidelines "as an initial benchmark, and then make an informed and individualized sentencing determina-tion, taking into account all the statutory factors." *United States v. Glass*, 770 F. App'x 584, 587 (citing *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc)). Applying the statutory factors to this case, I find that a substantial upward variance is appropriate. As the foregoing has made clear, I find that the nature and circumstances of Ms. Bronfman's offenses exacted a harm not reflected in the Guide-lines and placed her conduct outside the ordinary realm for these offenses. I also find that a fair appreciation of her history and charac-teristics—including her repeated attempts to leverage her wealth and status as a sword against Raniere's enemies and her decision, as she became aware of DOS, to remain steadfast in her support of Raniere—lead to the conclusion that a sentence greater than the upper limit of the Guidelines is warranted. The remaining statutory factors likewise reflect the need for an above-Guidelines sentence in this case.

I therefore sentence Ms. Bronfman as follows: a prison sentence of 81 months, which is three times the high end of the Guidelines range and which takes into account the severity of Ms. Bronfman's illegal behavior; a fine in the amount of $500,000, the statutory maximum, payable immediately; a $200 Special Assessment, also due immediately; three years of post-incarceration supervised release on each count, to be served concurrently; and restitution of $96,605.25 to Jane Doe 12 on Count One. Finally, I also enter a forfeiture money judgment of $6,000,000—which Ms. Bronfman consented to in her plea agreement—payable within 30 days.

SO ORDERED.

Dated:      Brooklyn, New York
            September 30, 2020

                                          /s/ Nicholas G. Garaufis
                                         NICHOLAS G. GARAUFIS
                                         United States District Judge